Ronaldo A. Coulter (ISB No. 3850)
IDAHO EMPLOYMENT LAW SOLUTIONS
776 E. Riverside Dr., Suite 240
Eagle, Idaho 83616
Telephone: (208) 672 6112
Facsimile: (208) 672-6114
ron@idahoels.com

*Attorney for Plaintiff*

## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **JUN YU,** ) | |
| ) | **Case No. _____** |
| **Plaintiff,** ) | |
| **v.** ) | **COMPLAINT AND DEMAND FOR** |
| ) | **JURY TRIAL** |
| **IDAHO STATE UNIVERSITY,** ) | |
| ) | |
| and ) | |
| ) | |
| **JOHN/JANE DOES I through X, whose** ) | |
| **true identities are presently unknown,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

## COMPLAINT

Comes now Plaintiff, Jun Yu, ("Plaintiff" or "Mr. Yu") by and through his counsel of record,

Ronaldo A. Coulter of the law firm of Idaho Employment Law Solutions, PLLC, and for causes of

action against the above named Defendants complains and alleges as follows:

## I. INTRODUCTION

This is a case of discrimination in violation of Title VI of the 1964 Civil Rights Act, 42

U.S.C. §§ 2000d et. seq. Mr. Yu was a graduate student at ISU. Mr. Yu had only one practicum to

complete before receiving his Ph.D., returning to his native China and starting his professional

career. Because of unlawful discrimination and lack of due process that was not voluntarily waived

by Mr. Yu, Mr. Yu was denied an opportunity to complete his lone remaining practicum in his native homeland, The Peoples Republic of China.

## II. PARTIES

1.      Mr. Yu is a citizen of The People's Republic of China. His address at the time of his dismissal through the final denial of his appeal from ISU was 5144 Beckett Ridge, Stow, Ohio, 44224. From August of 2008 through late June of 2012, Mr. Yu resided in Pocatello, Idaho at the following locations: (a) McIntosh Manor D8, Idaho State University, Pocatello, ID 83209; and (b) McIntosh Manor F7, Idaho State University, Pocatello, ID 83209.  Mr. Yu presently resides in the Peoples Republic of China.

2.      Defendant Idaho State University (hereinafter "ISU"), is now, and at all relevant times herein was, a "body politic and corporate, with its own seal and having power to sue and be sued in its own name" (*See* Idaho Code § 33-3003) and is now and at all relevant times herein "was established in the city of Pocatello, Idaho, an institution of higher education to be designated and known as the Idaho State University, consisting of such colleges, schools or departments as may from time to time be authorized by the Idaho State Board of Education." *See* Idaho Code § 33-3001.

3.      Defendant ISU's official address is 921 S. 8th Ave., Pocatello, Idaho 83209; and upon information and belief, Defendant receives financial assistance from both the U.S. Department of Health and Human Services and the U.S. Department of Education.

## III.      JURISDICTION, VENUE, AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1343, and 1367. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and grant all further relief deemed necessary and proper as Plaintiff

brings this private right of action for intentional discrimination pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et.seq.*[1]

     5.      Pursuant to 28 U.S.C. §§ 1391(b)(1) and 1331(b)(2) Plaintiff brings this action in, and jurisdiction is proper in, the United States District Court for the District of Idaho.

     6.      On May 3, 2013, the Director of Clinical Training, Dr. Mark W. Roberts constructed a letter notifying Plaintiff that he had been dismissed from the doctoral program in Clinical Psychology. Plaintiff appealed this decision.

     7.      On May 17, 2013, the Graduate Faculty of the Department of Psychology denied Plaintiff's appeal.

     8.      On June 26, 2013, Mr. Yu submitted his appeal to the Dean of Idaho State University College of Arts and Letters.

     9.      On July 30, 2013, the Dean issued her decision on Plaintiff's appeal denying Plaintiff the relief he sought. On August 29, 2013, Plaintiff requested a hearing before the Graduate Council.

     10.      On October 2, 2013, Plaintiff presented his case before the Graduate Council. Additionally, on October 2, 2013, Mr. Yu was informally advised that his appeal had been denied.

     11.      On October 3, Plaintiff received the final and formal decision of the Graduate Council denying his appeal.

     12.      Mr. Yu filed a Notice of Tort Claim against the Defendants on March 14, 2014. Defendants claim was denied on June 12, 2014, after the 90-day statutory period to respond

---

[1] *See Alexander v. Sandoval*, 532 U.S. 275, 280-81, 121 S. Ct. 1511, 1516, 149 L. Ed. 2d 517 (2001).

ended. Plaintiff has satisfied the notice requirements under the Idaho Tort Claims Act, I.C. §§ 6-901, et seq., to file a civil action against the State of Idaho.

13.     The filing of the complaint is timely, as it has been filed within the two-year statute of limitations.[2]

## IV. STATEMENT OF FACTS

14.     That Mr. Yu is a citizen of the People's Republic of China and grew up in a Chinese cultural and language context.

15.     In 2008, Mr. Yu was accepted into ISU's Graduate program seeking to obtain a PhD in Clinical Psychology.

16.     Mr. Yu is/was an international student and is Chinese.

17.     Mr. Yu's identity includes Chinese language and culture, and speaking English as a foreign language.

18.     Mr. Yu attended ISU from 2008 through May of 2013. His final GPA was 3.69.

19.     Mr. Yu successfully defended his dissertation titled "A Clinical Trial of Behavioral Family Therapy in China".

---

[2] The last and final act of discrimination occurred when as required, Mr. Yu exhausted the administrative  remedies provided by ISU and the Graduate Council denied Plaintiff's appeal; *see Sirpal v.Univ of Miami,* 684 F.Supp. 2d. 1349, 1360 (S.D. Fla. 2010). Plaintiff was informally advised of the denial on October 2, 2013. Two years from October 2, 2013 is Friday October 2, 2015 which is within the statute of limitations:

> The length of the statute of limitations for a civil rights action is governed by state law. Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (overruled only as to claims brought under the Securities Exchange Act of 1934, which is not applicable here). Idaho Code § 5-219 provides for a two-year statute of limitations for professional malpractice, personal injury, and wrongful death actions. ***Federal civil rights actions arising in Idaho are governed by this two-year statute of limitations***…Notwithstanding the use of the state statute of limitations in civil rights cases, the Court uses federal law to determine when a claim accrues under a statute. Elliott v. Union City, 25 F.3d 800, 801-02 (9th Cir.1994). ***The Ninth Circuit has determined that a claim accrues when the plaintiff knows, or should know, of the injury which is the basis of the cause of action***. See Kimes v. Stone, 84 F.3d 1121, 1128 (9th Cir.1996).

*Osborn v. Butler*, 712 F. Supp. 2d 1134, 1149 (D. Idaho 2010)(Emphasis added)

On October 2, 2013, Defendant denied Plaintiff's appeal and it was then that Plaintiff was fully aware of the basis for the cause of the present action.

20.     Mr. Yu's career goal was to return to China to work at a university or research center.

21.     The ISU Clinical Psychology PhD program Mr. Yu attended was accredited by the American Psychological Association (APA).

22.     Per IDAPA Rule 24.12.01.004, the Idaho State Board of Psychologists Examiners has incorporated into its administrative rules the APA Ethical Principles of Psychologists and Code of Conduct.

23.     Per Idaho Code § 54-2309(5), any Psychologists who has been unethical as detailed by the current, and future amended, ethical standards of the American Psychological Association is subject to discipline up to and including the revocation of the psychologist's license.

24.     ISU's Clinical Psychology PhD program is obliged to follow APA standards including the APA Ethical Principles of Psychologists and Code of Conduct (Ethics Code) and relevant APA policies.

25.     That ISU policy, APA accreditation standards, and the APA Ethics Code embrace "cultural and individual diversity" and prohibit discrimination and harassment based on the diversity dimensions.

26.     That per APA, cultural and individual diversity dimensions "include, but are not limited to, age, disability, **ethnicity**, gender, gender identity, **language**, **national origin, race**, religion, **culture**, sexual orientation, and social economic status" (emphasis added).

27.     When Mr. Yu entered the program, he was the only non-white student for whom English was not their first language.

COMPLAINT AND DEMAND FOR JURY TRIAL                        Page 5 of 23

28. All of the clinical faculty and clinical supervisors that Mr. Yu worked with during his time as an ISU student were White, European American, from the US, and native English speakers who did not speak Chinese.

29. Mr. Yu's English proficiency met ISU's admission requirements for international students.

30. Mr. Yu, a person who spoke English as a foreign language, was keenly aware that he needed to immerse himself in English so that he would be successful in the doctorate program.

31. Mr Yu did immerse himself in learning English.

32. Mr. Yu, because of his efforts to become fluent in English, was able to provide professional services in a manner consistent with an international student seeking a PhD.

33. Mr. Yu completed all of his course work in English.

34. Mr. Yu taught courses at ISU in English and received satisfactory evaluations from his students.

35. Mr. Yu successfully presented and defended his dissertation in English.

36. Prior to embarking on an internship, Mr. Yu had successfully completed all other degree requirements and defended his dissertation.

37. Prior to embarking on his internship, Mr. Yu was still in good standing and not on any form of academic probation.

38. Prior to embarking on his internship, Mr. Yu had satisfactory grades in all of his required courses.

39. During Mr. Yu's first three years in the program, the Clinical Training Committee (CTC) evaluations written and signed by Dr. Roberts stated that "The committee finds Jun's academic and professional progress to be satisfactory."

COMPLAINT AND DEMAND FOR JURY TRIAL                    Page 6 of 23

40.     Mr. Yu received As and Bs in all of his classes, including his practica, and published a paper in an international peer-reviewed journal.

41.     Consistent with APA Ethics Code requirements ISU Psychology Department's Clinical Student Handbooks for 2011-2012 and 2012-2013 states:

> "If a student is at risk of earning a U-grade, the Clinical Training Committee (CTC) will be informed by the advisor prior to the end of the semester, and a formal letter will be issued that describes the nature of the unsatisfactory progress, the steps needed to remedy the deficiency, and a deadline for re-evaluation. Failure to meet the specified remediation plan will result in a U-grade and subsequent academic probation. Probation will be lifted upon semester-long performance yielding an S-grade."

42.     Mr. Yu was dismissed from an externship and internship -- both classes where students could earn a U-grade or an S-grade -- without remediation[3].

43.     During Mr. Yu's fourth year in the program, Dr. John Landers was Mr. Yu's supervisor for Fall 2011 PSYC 7748 Clinical Externship class at Eastern Idaho Regional Medical Center (EIRMC).

44.     This externship was not a required course, but Mr. Yu was recommended by the CTC to the externship, opining that the experience "is critical for students to compete for national internships". According to the contract, the externship was planned to last for one year.

45.     That Dr. Landers and Mr. Yu were in a cross-cultural supervision relationship.

46.     On November 4, 2011, after just over two months into the Externship, Dr. Landers abruptly dismissed Mr. Yu from PSYC 7748 Clinical Externship, alleging Mr. Yu was "unable to grasp the communication nuances".

---

[3] APA provides a model for trainee remediation on their website. Their model for remediation includes the following components: 1) Competency Domain/Essential Components; 2) Problem Behaviors; 3) Expectations for Acceptable Performance; 4) Trainee's Responsibilities/Actions; 5) Supervisors'/Faculty Responsibilities/Actions; 6) Time frame for Acceptable Performance; 7) Assessment Methods; 8) Dates of Evaluation; 9) Consequences for Unsuccessful Remediation.*Competency Remediation Plan*, American Psychological Association, https://www.apa.org/ed/graduate/competency-remediation-template.doc

COMPLAINT AND DEMAND FOR JURY TRIAL                    Page 7 of 23

47.     Dr. Landers did not provide Mr. Yu any prior specific feedback regarding his alleged areas of concern and omitted remediation.

48.     That Dr. Landers denied Mr. Yu due process in supervision.

49.     That Dr. Landers wrote "… that this site could not afford to engage in remediation efforts…" and acknowledged that "Daily feedback may have been too indirect".

50.     That "Dr. Landers states that when he interviewed Complainant [Mr. Yu], he had concerns that Mr. Yu would not be able to do the externship …" but Dr. Landers did not share his alleged concerns with Mr. Yu.

51.     That "Dr. Landers admitted that he may not have specifically told Mr. Yu that he was concerned about Plaintiff's performance."

52.     That Dr. Mark Roberts, who was the Director of Clinical Training at ISU, reported "And for all we knew things were going along swimmingly… So we were surprised when I got a phone call, and then a subsequent documentation [the dismissal letter] from Dr. Landers that Dr. Landers was going to dismiss him, and that that was not a choice."

53.     In his one page letter sent to Dr. Roberts dismissing Mr. Yu from the PSYC 7748 externship, Dr. Landers shared that "concerns do not revolve around effort" but that:

> "I have consistently observed that Jun Yu is unable to grasp the communication nuances that are required to build rapport with difficult patients, administer standardized tests with difficult patients… Given his desire to return to China and specialize in parent/child training, he is probably right where he needs to be in this regard.  However, his deficits have made this practicum one that was not a good fit and placed him, patients, and psychology services at the hospital in a difficult position".

54.     Dr. Landers provided no documentation to support his allegations.

55.     When Mr. Yu mentioned that the sudden dismissal violated the externship contract which required "documented reasons that the Party must document" for withdrawal of a student, Dr. Roberts opened Mr. Yu's student file and looked for information to support Dr. Landers' dismissal.

COMPLAINT AND DEMAND FOR JURY TRIAL                            Page 8 of 23

56.    Dr. Roberts pointed out comments from past practica regarding Mr. Yu's command of English.

57.    Mr. Yu respectively received Bs and As from these practica.

58.    That Dr. Roberts showed Mr. Yu he already documented reasons for Dr. Landers to dismiss Mr. Yu before Mr. Yu had even started the externship. That Dr. Roberts demonstrated prejudice against Mr. Yu.

59.    Mr. Yu complained to ISU Student Affairs Officer Shane Ostermeier about Dr. Landers' and the Psychology Department's actions/omissions.

60.    Mr. Yu also expressed to Dr. Roberts that Dr. Landers' actions were potentially in violation of the APA Ethics Code.

61.    Dr. Roberts immediately denied any ethical violations had taken place.

62.    Dr. Roberts requested that Dr. Landers do an evaluation of Mr. Yu.

63.    Dr. Lander's evaluation was dated November 14, 2011, 10 days after the dismissal occurred.

64.    Despite Mr. Yu's academic success in his four plus years in the doctoral program, Mr. Yu continued to receive negative comments regarding his supposed language skills inadequacy.

65.    That as an example of how Mr. Yu was denied participation in a practicum because of his national origin even though he was proficient in communication in English, Mr. Yu was denied a practicum because of "perceived" deficits in language fluency needed to evaluate English-speaking patients who were being tested with English language instruments.

66.    That Dr. Cheri Atkins served as an Adjunct Faculty member in the Department of Psychology, ISU.

67.     That Dr. Atkins allowed Mr. Yu to enroll in her Fall 2011 PSYC 7724 Community Practicum class at ISU held at her own private practice site, but only allowed Mr. Yu to observe during his practicum at her private practice.

68.     That notwithstanding Dr. Akins' concerns about Mr. Yu's English language proficiency, Mr. Yu obtained a "B" in his Spring 2010 PSYC 7725 Psychology Clinic practicum and an "A" in Summer 2010 PSYC 7725 Psychology Clinic practicum; in these two PSYC 7725 practicum classes, Dr. Atkins allowed Mr. Yu to provide direct clinical services to clients.

69.     That upon information and belief, Dr. Shannon Lynch is the present Chair of the Department of Psychology.

70.     That Dr. Lynch wrote in her 12/15/2011 practicum evaluation of Mr. Yu "I am assigning an "I" [Incomplete] at this time" and "his current efforts reflect performance + skills equivalent to a "B"".

71.     After Mr. Yu finished the Incomplete in Spring 2012, Dr. Lynch gave him an "A-" grade for her practicum but did not do a final evaluation of Mr. Yu's work.

72.     Dr. Roberts later used Dr. Lynch's 12/15/2011 incomplete practicum evaluation to justify dismissing Mr. Yu from the doctoral program.

73.     That Dr. Shannon Lynch signed the May 17, 2013 document that denied Mr. Yu's appeal of Mr. Yu's dismissal.

74.     That Dr. Shannon Lynch complained to Mr. Yu's wife that Mr. Yu's English was "terrible".

75.     At the time Mr. Yu was unlawfully dismissed from the Graduate program, Mr. Yu was a student in good standing with only one practicum to complete prior to receiving his Doctorate in Clinical Psychology.

COMPLAINT AND DEMAND FOR JURY TRIAL                                    Page 10 of 23

76.     Completing an internship involved two steps. The first step was simply obtaining an internship, which is a stressful and challenging process. The second step was for Mr. Yu to complete successfully the internship.

77.     In gaining an internship, Mr. Yu could have re-applied for an internship through the Association of Psychology Postdoctoral and Internship Centers (APPIC), but was discouraged by the CTC.

78.     Had Mr. Yu chosen this path, it would have delayed the start of his internship by an entire year.

79.     Due to the then shortfall in internship positions available through APPIC, there was no guarantee that Mr. Yu would actually be matched to an internship.

80.     Mr. Yu also had the option of proposing an internship that he was to construct/find for himself.

81.     Mr. Yu also had the option of constructing an internship in his native China.

82.     That at the time, and for both personal and professional reasons, Mr. Yu chose not to construct an internship in China, where he did the work that was the basis for his dissertation.

83.     Dr. Roberts gave Mr. Yu the Association of Psychology Postdoctoral and Internship Centers (APPIC) standards, which he directed Mr. Yu to follow in constructing his internship.

84.     Mr. Yu initially found Dr. Cheryl Chase, a psychologist in private practice who was interested in working with him on the internship.

85.      APPIC standards required at least two supervisors for an internship, compelling Mr. Yu to look for other supervisors.

86.     In searching for the additionally needed supervisor, Mr. Yu found Dr. Leslie Speer and Dr. Thomas Frazier at Cleveland Clinic Center for Autism (CCCA), who agreed to work with him.

87.     Mr. Yu constructed an internship with Dr. Chase and the Cleveland Clinic Center for Autism (CCCA) Cleveland, Ohio, as it seemed to be the best option to complete the internship within the time and the manner that suited Mr. Yu's goals.

88.     Mr. Yu worked with Dr. Roberts/the Clinical Training Committee (CTC) to develop an internship proposal.

89.     The internship was set to follow the APPIC standards.

90.     The APPIC standards include the requirement of due process and grievance procedures for interns.

91.     In drafting the proposal, Plaintiff included the grievance and due process procedures that ISU afforded its graduate students.

92.     ISU's established grievance and due process procedure for the Department of Psychology is contained in the Department's Clinical Student Handbook.

93.     ISU's established grievance and due process procedure for the Department of Psychology contains the two elements of procedural due process: (1) notice and (2) an opportunity to be heard.

94.     On or about October 29, 2012, Dr. Jill Hedt was serving as the Training Director of the Boise Veterans Administration Clinical Internships.

95.     On or about October 29, 2012, acting upon a request by the CTC Dr. Jill Hedt delivered a review of "Mr. Yu's Proposal for Non-APPIC Internship Placement".

96.     Dr. Jill Hedt stated that there were two areas of concern with the proposal that did not meet the APPIC criterion one of which was the Due Process and Grievance Procedure Policy.

97.     That in reviewing the proposal internship at the CCCA it was noted by Dr. Jill Hedt that the procedural due process safeguards were absent from the proposed agreement.

98.     A specific concern of Dr. Jill Hedt was the lack of due process that would be afforded Mr. Yu in the proposed agreement was problematic as it was devoid of protection for Mr. Yu.

99.     Dr. Jill Hedt wrote the following:

The Due Process and Grievance Procedure do not appear sufficient:

1.  There is not a defined procedure (systematic steps) for managing intern problematic conduct or performance. Will the trainee be notified in writing or person of issues? *Will the intern have the right to appeal the decision*? Is there a remedial procedure for problematic performance?

2.  There is not a trainee grievance procedure. What is the process if the intern has a grievance against a supervisor? *What if the grievance is against the identified training director*?

*In my opinion, the lack of a Due Process and Grievance Procedure places the intern in a vulnerable position. He could be dismissed any time during the year and would have no ability/right to appeal this decision. Similarly, if the intern is experiencing undue treatment he has no venue to grieve this treatment.*

I would recommend the intern and proposed program draft a Due Process and Grievance Procedure. (Emphasis added)

100.    Dr. Mark Roberts, working within the CTC unilaterally without the consent of Plaintiff, removed the grievance and due process procedures from the proposal and subsequently approved the proposal.

101.    Mr. Yu understood that the proposal was neither an agreement nor acquiescence by him in a proposal that did not contain the grievance and due process procedures available to all students enrolled in degree programs sponsored by ISU's Department of Psychology.

102.    On or about October 31, 2012 a Clinical Education Agreement entered into by the Cleveland Clinic and ISU governing Mr. Yu's internship with CCCA was established.

103.    The agreement was signed by the Executive Director of the Center for Health Sciences Education on October 16, 2012 and by the Provost of Idaho State University on or about October 31, 2012.

104.    Mr. Yu was neither a party to nor signatory of the agreement.

105.    The CCCA agreement to which Mr. Yu was not a party was devoid of the grievance and due process procedure for the Department of Psychology.

106.    Plaintiff had no say in the bargaining process that lead to the CCCA agreement.

107.    On January 2, 2013, Plaintiff started his internship.

108.    The internship was designed to last for at least one year.

109.    While in the internship, Plaintiff was considered a full-time student at ISU and enrolled in PSYC7749 Clinical Internship.

110.    That Dr. Leslie Speer of the CCCA was one of three of Mr. Yu's supervisors during Mr. Yu's internship.

111.    That Dr. Cheryl Chase, a Psychologist with a private practice in Independence Ohio, was also a supervisor in Mr Yu's internship.

112.    That Dr. Mark Roberts served as the Director of Clinical Training at ISU Department of Psychology while Mr. Yu was a student at ISU.

113.    That Dr. Thomas Frazier of the CCCA was one of three of Mr. Yu's supervisors during Mr. Yu's internship.

114.    Dr. Thomas Frazier, however, ceased his role as a supervisor of Mr. Yu in the first week of Mr. Yu's internship. This was against the internship proposal.

115.    That on January 11, 2013, in a phone conversation Dr. Leslie Speer expressed concerns to Dr. Roberts alleging Mr. Yu manifested a "...slow learning curve."

116.     That Dr. Leslie Speer also reported that Dr. Thomas Frazier, who was named in the approved internship as a second supervisor at the Cleveland Clinic, indicated Jun "...was not ready for patient care."

117.     Dr. Mark Roberts recommended that Dr. Leslie Speer use the agreed upon "Psychology Trainee Competency Assessment Form" as soon as possible (i.e. January).

118.     Dr. Mark Roberts recommended that Dr. Leslie Speer use the agreed upon "Psychology Trainee Competency Assessment Form "to "establish a baseline and to gauge progress at the agreed upon evaluation points for the internship".

119.     That the agreed upon evaluation points were April, July and December.

120.     That Dr. Mark Roberts never addressed any of the concerns raised by Dr. Leslie Speer with Mr. Yu.

121.     Mr. Yu was not made aware of Dr. Leslie Speer's concerns.

122.     Dr. Roberts did not immediately share the content of the January 11, 2013 conversation with Mr. Yu.

123.     The first time Mr. Yu learned of the concerns Dr. Speer expressed to Dr. Roberts in the January 11, 2013 phone conversation was when he received his May 3, 2013 dismissal letter.

124.     That early in Mr. Yu's internship at CCCA, Dr. Speer reduced Mr. Yu's weekly individual supervision time with her from one hour to half an hour.

125.     This reduction in individual supervised time was contrary to the signed proposal, which had promised Mr. Yu a full hour of supervised time with Dr. Speer each week.

126.     Mr. Yu was never provided remediation per current American Psychological Association standards as stipulated in the internship proposal.

127.    Additionally, as Mr. Yu's due process rights were unilaterally rescinded without his consent by agreement, Mr. Yu had no due process rights to challenge Dr. Leslie Speer's assessment of his performance.

128.    That it was clear, based on the comments of Dr. Leslie Speer, that establishing rapport with clients as well as other areas that require communicating in English was a concern of Dr. Leslie Speer in her assessment of Mr. Yu.

129.    That there exists no evidence that any action was taken by Dr. Leslie Speer to recognize the language or cultural challenges encountered by Mr. Yu and devise a strategy to effectively address the issue during his brief internship with CCCA.

130.    On April 3, 2013, Dr. Leslie Speer abruptly dismissed Plaintiff from CCCA alleging, "Jun has not made progress" and the "level of remedial work required is beyond the scope of this placement."

131.    Prior to his dismissal, Dr. Leslie Speer omitted remediation with Plaintiff; Mr. Yu had never had clear counseling or warning from Dr. Speer that dismissal loomed within the realm of possibility.

132.    Dr. Roberts told Dr. Chase to stop working with Mr. Yu.

133.    Mr. Yu informed Dr. Roberts that he had located an internship site in China willing to take him.

134.    On April 29, 2013, Dr. Cheryl Chase evaluated Mr. Yu's performance and found it to be satisfactory.

135.    That Dr. Cheryl Chase provided a positive evaluation of Mr. Yu's internship performance that was discounted by ISU during the appeals process.

136.    That on May 3, 2013, Dr. Roberts informed Mr. Yu in writing (the dismissal letter) that he was dismissed from the doctoral program in Clinical Psychology based on Mr. Yu's alleged unsatisfactory progress towards degree completion.

137.    The dismissal letter omitted any reference to Dr. Cheryl Chase's positive evaluation of Plaintiff's performance.

138.     The dismissal relied on the evaluations of Dr. Landers, Dr. Lynch, Dr. Roberts, and Dr. Speer to justify Mr. Yu's dismissal.

139.    That prior to the May 3, 2013 dismissal letter from Dr. Roberts, Mr. Yu had never been placed on probation.

140.    That prior to the May 3, 2013 dismissal letter from Dr. Roberts, Mr. Yu had never been informed that he was at risk of being dismissed from the doctoral program.

141.    That Dr. Lynch admitted, "It is true that you [Mr. Yu] were in good standing. You were not on academic probation at the point of dismissal from the Cleveland Clinic."

142.    The dismissal letter contained alleged deficiencies of which Mr. Yu had received no prior or adequate notice.

143.    The dismissal letter also contained multiple omissions, misrepresentations, and unsubstantiated claims.

144.    That in the May 3, 2013 dismissal letter, it was stated that "We recommend that Idaho State University award you the Master of Science degree in Psychology, to be conferred in August, 2013".

145.    The recommendation was made despite the fact that Mr. Yu had successfully defended his dissertation and only needed to complete on practicum to be awarded his PhD.

146.    Upon information and belief, it is the practice in ISU's doctoral programs in Psychology, to award students in the Clinical Psychology Doctoral Program a PhD in General

Psychology based upon their completion of required course work at the time of their dismissal from the Clinical Psychology Doctoral Program.

147.     At the time of his dismissal, Mr. Yu had successfully completed the course requirements to be awarded a PhD in General Psychology.

148.     Notwithstanding his academic eligibility, ISU did not award Mr. Yu a PhD in General Psychology.

149.     That as of this filing, ISU has not even conferred upon Mr. Yu the Master of Science degree in Psychology mentioned in the dismissal letter.

150.     That due to this May 3, 2013 dismissal from the doctoral program in Clinical Psychology, Mr. Yu had to cancel a job interview with a university in China for an assistant professor position in their Psychology Department.

151.     That Dr. Speer rated Mr. Yu low on items under "competence in individual and cultural diversity" and that Dr. Landers alleged, "He is significantly lagging in all the 'B' rated areas of functions primarily as it relates to cultural awareness and competency" yet neither of them clearly communicated these alleged issues to Mr. Yu prior to dismissing him, nor did they offer remediation to Mr. Yu.

152.     That neither Dr. Speer nor Dr. Landers acknowledged the inherent challenges Mr. Yu faced in a foreign social-cultural context while speaking a foreign language.

153.     That while Mr. Yu had a record of having delivered psychological services to clients in their native language of English while a student at ISU, Mr. Yu was also a client of Dr. Speer and Dr. Landers as a supervisee and neither supervisor could deliver supervision services to Mr. Yu in his native language of Chinese, yet they both alleged he had cultural competency issues.

154.    That there is no evidence that Dr. Speer and Dr. Landers were culturally competent and specifically competent to supervise an international student whose cultural-linguistic background was different from theirs.

155.    In his presentation to ISU, Dr. Michael Dwyer, a psychology professor at Baldwin-Wallace University, stated that Mr. Yu "was harmed by the ISU psychology department's cultural incompetence."

156.    Dr. Dwyer reminded ISU that the program violated the APA Ethics Code, APA Accreditation standards, and APPIC policies.

157.    That, consistent with aversive racism, ISU had not articulated minimal levels of achievement required to maintain satisfactory professional progress in the program nor in practicum settings (including the externship and internship) as per APA Accreditation standards, yet ISU determined Mr. Yu had allegedly failed to meet standards in an externship, an internship and the program itself.

158.    ISU took pride and ownership of the fact that they approached Mr. Yu's case using the same "model for applying for internships, the same external review, and the same process for notification of the limitations".

159.    Nothing was done that was specific to Plaintiff. Therefore, Mr. Yu's treatment was the same as the other students who had proposed the alternative internship. That Dr. Lynch stated, "... Nothing was done that was specific to him [Mr. Yu]. So in each of those cases his treatment was the same as the other students who had proposed the alternative internship."

160.    The sample internship proposal that ISU had previously approved for another student, who was a White European American, had due process and grievance procedures, while Mr. Yu's internship proposal had none.

COMPLAINT AND DEMAND FOR JURY TRIAL                    Page 19 of 23

161.    That ISU has denied Mr. Yu the opportunity to complete his degree requirements in China where his cultural competence and communications skills are beyond question and appreciated.

162.    Dr. Lynch wrote, "The Graduate Faculty is convinced that a fourth "chance" (i.e., an Internship in China) is unwarranted and might put Chinese patients at risk of harm," Dr. Lynch's opinion is contradicted by the fact that Mr. Yu's dissertation, A clinical trial of Behavioral Family Therapy in China, is evidence that he benefited Chinese patients.

163.    That Mr. Yu's unfortunate experience at the hands of ISU and ISU's denial of Mr. Yu's appeal establishes a prima facie case of discrimination in that Mr. Yu is a member of a protected class, he is qualified to continue to participate in the ISU Psychology Doctorate Program, and that he has been denied that opportunity by a federally funded institution where other similarly situated non-Asian students were not.

## V. DAMAGES[4]

164.    As a direct and proximate consequence of Defendant's unlawful practices, Mr. Yu has suffered the loss of an opportunity to gain an education in the field of his choice in a publicly funded university, which receives funding from both the state of Idaho and the federal government to include the U.S. Department of Health and Human Services and U.S. Department of Education.

---

[4] To state a claim for damages under 42 U.S.C. § 2000d, *et seq.,* a plaintiff must allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance. Although the plaintiff must prove intent at trial, it need not be pled in the complaint.  *Rodriguez v. California Highway Patrol*, 89 F. Supp. 2d 1131, 1139 (N.D. Cal. 2000) and *Joseph v. Boise State Univ.*, 998 F. Supp. 2d 928, 944 (D. Idaho 2014)

165.     Because of the foregoing, Mr. Yu suffered the loss of a PhD degree despite successfully defending his dissertation.

166.     Because of the foregoing, Mr. Yu suffered the loss of job opportunities and career in his field of choice.

167.     Because of the foregoing, Mr. Yu has lost time that could have been spent towards his career and professional development.

168.     Because of the foregoing, Mr. Yu has suffered fear, anger, frustration, irritability, depression, anxiety, emotional duress, pain, humiliation and has experienced a profound sense of betrayal.

169.     Because of the foregoing, Mr. Yu has lost a part of his self-respect and his feeling of self-worth.

## VI. STATEMENT OF CLAIM

### COUNT ONE
### (Violation of Title VI ) [5]

**A Violation of Title VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d et. seq. and  34 C.F.R. §§ 100.1 and 100.3 Which Prohibits the Exclusion on the Basis of Race, Color, or National Origin Programs or Activities Receiving Federal Financial Assistance from the U.S. Department of Education and a Violation of I.C. § 67-5909 (1) against Defendant, ISU.**

170.     Mr. Yu restates, incorporates and re-alleges paragraphs 1-169 as this paragraph 170 of this Count One.

171.     ISU's cultural incompetence and aversive racism/prejudice resulted in the unlawful disparate treatment of Mr. Yu which treatment manifested a deliberate and indifference to ISU's obligation to Mr. Yu under Title VI.

---

[5] To establish a *prima facie* case that Defendants violated Title VI regulations, Plaintiffs must demonstrate that Defendants have a program, policy or practice that has a "discriminatory impact."*Rodriguez v. California Highway Patrol,* 89 F. Supp. 2d 1131, 1139 (N.D. Cal. 2000)

172.    By virtue of the foregoing, the Defendant caused Mr. Yu to suffer as a victim of deliberate and unlawful discrimination due to his national origin in violation of Title VI of The 1964 Civil Rights Act, 42 U.S.C.§§ 2000d *et. seq.*

## COUNT TWO

**Deprivation of Constitutional Rights Under Color of State Law**
**Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983**
**(Denial of 14th Amendment Procedural Due Process Rights)**

173.    Plaintiff restates, incorporates and re-alleges paragraphs 1 through 172 herein as paragraph 173 of this Count Two.

174.    Plaintiff was dismissed from ISU's Psychology Graduate program without being informed of the clinical evaluators' dissatisfaction with his progress.

175.    Plaintiff was not accorded established grievance and due process procedures for the Department of Psychology that contains the two elements of procedural due process (1) notice and (2) an opportunity to be heard prior to being involuntarily released for alleged academic deficiencies.

176.    Plaintiff's dismissal deprived him of a liberty interest by substantially impairing his opportunity to continue his education.

177.    Plaintiff's dismissal deprived him of the opportunity to complete the only remaining practicum he needed to obtain his Ph.D. in Clinical Psychology.

178.    At all times material hereto, the Conduct of the Defendants was subject to 42 U.S.C. § 1983 and the Defendants were acting under color of law.

## COUNT THREE

**(Negligent Infliction of Emotional Distress)**

179.    Plaintiff restates, incorporates, and re-alleges paragraphs 1 through 178 herein as paragraph 179 of this Count Three.

180.   Defendant's actions caused Plaintiff to suffer severe emotional and physical distress. Additionally, and as a result of Defendant's conduct, Plaintiff has suffered from fear, anger, frustration, and a profound sense of betrayal.

181.   As a result of Defendant's actions, Plaintiff has lost a part of his self-respect, his feeling of self-worth, and his self-identity.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Mr. Yu, respectfully prays for the following relief against Defendant:

a. Readmission of Mr. Yu to Defendant's Graduate Clinical Psychology Program; or in the alternative award Mr. Yu a PhD in either General Psychology or Clinical Psychology.

b. That Defendant allow Mr. Yu to complete his remaining practicum in the Peoples Republic of China where the opportunity presents itself that will allow Mr. Yu to successfully receive his Doctorate in Clinical Psychology; and

c. Attorney fees and costs related to the filing and pursing the present administrative claim.

d. Compensatory damages as determined at trial should Plaintiff establish that the violation of Title VI was intentional.

## VIII. DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

PLAINTIFF
By Plaintiff's Attorney

Idaho Employment Law Solutions, PLLC

R.A. (RON) COULTER

COMPLAINT AND DEMAND FOR JURY TRIAL                    Page 23 of 23