Vol. 1 - 1

1                     IN THE UNITED STATES DISTRICT COURT

2                         FOR THE DISTRICT OF IDAHO

3    JUN YU,                        )
                                    )   Case No. 4:15-cv-430-REB
4              Plaintiff,           )
                                    )
5                                   )   Pocatello, Idaho
          vs.                       )   February 26, 2019
6                                   )   12:59 p.m.
     IDAHO STATE UNIVERSITY,        )
7                                   )   Bench Trial, Day 1
               Defendant.           )
8    _____)

9                         TRANSCRIPT OF PROCEEDINGS
                     BEFORE THE HONORABLE RONALD E. BUSH
10            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiff:

13             RONALDO A. COULTER, ESQ.
               HOLLY A. SUTHERLAND, ESQ.
14             Idaho Employment Law Solutions
               776 E. Riverside Drive, Suite 206
15             P.O. Box 1833
               Eagle, Idaho 83616
16             208-672-6112

17   For the Defendant:

18             MICHAEL E. KELLY, ESQ.
               Kelly Law, PLLC
19             137 E. 50th Street
               Garden City, Idaho 83714
20             208-342-4300

21   Also present:  Jun Yu, Mark Roberts, Crystal Anderson

22

23   Court Reporter:  Katherine Eismann, CRR, RDR
                       katherine_eismann@id.uscourts.gov
24

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

 1              (Tuesday, February 26, 2019, 12:59 p.m.)

 2                           --oOo--

 3              P R O C E E D I N G S

 4         THE COURT:  Thank you.  Please be seated.

 5         COURTROOM DEPUTY:  The Court will hear, at this time,

 6    the Bench Trial in Civil Case Number 15-430, Jun Yu versus ISU.

 7         Beginning with plaintiff's counsel, if you could

 8    please state your appearance for our record.

 9         MR. COULTER:  Ron Coulter, lead counsel.

10         MS. SUTHERLAND:  Holly Sutherland, cocounsel.

11         THE COURT:  And this is your client with you, I

12    assume?

13         MR. COULTER:  Yes, Your Honor.  This is Mr. Jun Yu.

14         THE COURT:  All right.  Thank you.

15         Mr. Kelly.

16         MR. KELLY:  Michael Kelly for Idaho State University,

17    and I have Dr. Mark Roberts, program representative for ISU.

18         THE COURT:  All right.  Well, I am understanding that

19    you have had a chance to visit with Miss Case and make certain

20    that our understanding of the stipulated exhibits are the same

21    as you have, so we have settled that water.

22         The Court will, of course, hear the opening

23    statements at this time.  I did want to check with each of you

24    as to whether there was anything else that you want to raise

25    with the Court before we begin.

1              Mr. Coulter?

2              MR. COULTER:  Yes, Your Honor.  We still have those

3    objections in regards to what we -- what we did in Docket 106

4    in regards to what would be mentioned from the Idaho Human

5    Rights Commission and that type of thing.  They have not been

6    resolved.  So, I guess what's going to happen is that when they

7    are offered, we have to object.

8              THE COURT:  You can go to the podium, because I'm

9    having trouble hearing you, and if I'm having trouble hearing

10   you, then I am sure that --

11             MR. COULTER:  Can you hear me now, Your Honor?

12             THE COURT:  Yes.  Thank you.

13             MR. COULTER:  The only issue we had was for Docket

14   106.  It's probably not even going to come up until trial

15   counsel -- excuse me -- not trial counsel, but defense counsel

16   enters any exhibits.  But we still wanted to make sure that the

17   Court understood that that motion was -- the objection was

18   still there, and we had written a brief on it, et cetera.

19   Because we don't want anything from the -- that mentioned from

20   the Idaho Human Rights Commission in regards to this case

21   coming into the case because of the things that we said in our

22   brief.

23             THE COURT:  All right.  Well, that's apparently one

24   that I've missed.  I remember it being raised now, but it isn't

25   one that I have decided on.  We will have to look at it after

1    the end of today.  There are lots of motions coming my way, and

2    I wasn't aware that we'd overlooked one.  So, I can't give you

3    an answer to that right now.

4            MR. COULTER:  Yes, Your Honor.  It wasn't a motion.

5    It was an objection to.  As we got the exhibits, we --

6            THE COURT:  Oh, objection to.  Okay.  Well, that

7    explains why I am not remembering it in that fashion.  I can't

8    give you an answer to that right now.

9            MR. COULTER:  Yes, Your Honor.

10           THE COURT:  We may have to take it up at the time.

11           Mr. Kelly, anything further from you?

12           MR. KELLY:  Nothing, Your Honor.

13           THE COURT:  All right.  Mr. Coulter, are you ready to

14   proceed?

15           MR. COULTER:  Yes, Your Honor.

16           THE COURT:  All right.  I will hear your opening

17   statement.

18           Oh, one other thing.  I'm sorry.  I forgot to tell

19   you.  It looks like we are going to be giving -- Mr. Coulter,

20   you will have 21 hours for your proof, and Mr. Kelly 17 hours

21   for your case.  All right?  Go ahead, please.

22           MR. COULTER:  I just want to make sure.  It was

23   working this morning, so you'll be able to see it.  It took a

24   while for this -- there it is right there.

25

1            PLAINTIFF'S OPENING STATEMENT

2          MR. COULTER:  Your Honor, first I will start with the

3   factual background of this particular case, and we are going to

4   be as brief as possible.  I just want to make sure I make a

5   record, because I'm certainly sure that the Court is pretty

6   much familiar with everything.

7          So, to be brief, Mr. Yu is a citizen of the People's

8   Republic of China, and he grew up in a Chinese cultural

9   language context.

10         Am I speaking too fast for you, ma'am, or are we good

11  to go?  You can hear me fine?  Okay.  Good.  Because I have a

12  tendency to speak fast, so I always check with the court

13  reporter first.

14         Now, after nearly three year of extensive

15  preparation, Mr. Yu applied and was accepted in to Idaho State

16  University in the university's doctoral program in clinical

17  psychology.

18         Now, Mr. Yu had an outstanding English score of 94,

19  which exceeded ISU's admission requirement of 80.  Mr. Yu was

20  admitted into Idaho State University in 2008.  And while a

21  student at Idaho State University, Mr. Yu successfully served

22  as a teaching assistant.  He taught class in English.  He met

23  with students.  He recruited participants for Idaho State

24  University laboratories.  He graded papers and examinations,

25  and he assisted with research, all while he -- all -- and

1    speaking in English.

2           Mr. Yu's ISU record reflects that he was proficient

3    both academically and professionally.  Nevertheless, throughout

4    his tenure at Idaho State University, Mr. Yu was criticized for

5    his proficiency in English and his alleged failure to build

6    alliances with native-speaking clients he encountered during

7    his externship and practicums.

8           In the fall of 2011, Dr. Roberts, the Director of

9    Clinical Training for the Psychology Department at Idaho State

10   University verified the clinical hours and approved the

11   Association of Psychology Postdoctoral Internship Centers.  And

12   we'll refer to that as APPIC from here on out, Your Honor.  And

13   he approved that application of Mr. Yu.  And by approving

14   Mr. Yu's application, Dr. Roberts certified that Mr. Yu was

15   qualified both academically and professionally to enter an

16   internship in psychology.  At any time, Dr. Roberts could have

17   rescinded his approval; however, he did not do so.

18          On June 22nd, 2012, Mr. Yu completed his

19   dissertation, which was called a Clinical Trial of Behavioral

20   Family Therapy in China, which involved 251 successful clinical

21   hours, which represented 49 percent of the total direct

22   clinical hours that Mr. Yu had at Idaho State University.

23          By July 13, 2012, with the exception of completing

24   his final internship, Mr. Yu had successfully completed all the

25   requirements to be awarded his Ph.D. or Doctorate in Clinical

1    Psychology.

2         On October 31, 2012, a contract was entered into

3    between the Cleveland Clinic Children's Center for Autism --

4    which we will refer to as CCCA -- Foundation and Idaho State

5    University to enable Mr. Yu to participate in what we call a

6    non-APPIC internship.  The internship was to commence on

7    January 2, 2013.

8         Now, on November 12, 2012, Mr. Yu was reminded, by

9    Dr. Roberts, through a letter, that he had three choices in

10   meeting the internship requirement.  He could:  One, apply

11   again for an APPIC internship; two, construct a non-APPI [sic]

12   internship; or three, construct an internship in China.

13        Now, importantly, here, Your Honor, is that at no

14   time was Mr. Yu ever informed that he did not -- if he did not

15   complete his choice of meeting the internship requirement, that

16   he would be foreclosed from choosing the other two remaining

17   options to be -- to be precluded from constructing another

18   APPIC internship.

19        On January 15th, 2013, Mr. Yu was given an evaluation

20   of his performance to that date and was told that his

21   competency would -- would be reevaluated in two months.  So,

22   what we're really saying, Your Honor, is in 13 days, he's

23   getting an evaluation from the time he started.

24        On April 4th, 2013, Dr. Mark Roberts, ISU's Director

25   of Clinical Training, was informed that Mr. Jun Yu had been

1   dismissed, without notice, from the non-APPIC internship at

2   CCCA.  On May 3, 2013, Mr. Yu was informed that the graduate

3   faculty of the Psychology Department of ISU had voted to

4   dismiss him entirely from his doctoral program in clinical

5   psychology.

6          Mr. Yu, meantime, sought to construct the non-APPIC

7   internship in his native China.  On April 14th -- on April 14,

8   2013, Mr. Yu informed Dr. Roberts that a professor at Shanghai

9   Mental Health Center had expressed an interest in taking Mr. Yu

10  on as an intern.

11         On May 16, 2013, Mr. Yu submitted his appeal to the

12  Idaho State University graduate faculty and requested that he

13  be given an opportunity to complete his internship in his

14  native China.  However, notwithstanding Mr. Yu's extraordinary

15  clinical success in China, Dr. Shannon Lynch wrote the

16  following:  "The graduate faculty is convinced that a fourth

17  chance, i.e., an internship in China, is unwarranted and might

18  put Chinese patients at risk."

19         So, after going through ISU's administrative

20  appellate process, Mr. Yu was effectively dismissed from Idaho

21  State University on October 2, 2013.

22         On January 15th, 2013, Mr. Yu was given an evaluation

23  of his performance to date and was told that his competency

24  would be reevaluated in two months.  On April 4, 2013,

25  Dr. Roberts, ISU Director of Clinical Training, was informed

1    that Mr. Yu had been dismissed without notice and -- must have

2    had two in there.  I guess I had it in there twice.

3         So, what we have to do is show what is our

4    litigation -- you know, what is the Title VI litigation and

5    burden of proof.  Because on -- in 2016 or 2015, Mr. Yu

6    actually submitted his -- he submitted his complaint to begin

7    the present litigation.

8         So -- and those -- and in that complaint, he asked

9    for -- he alleged a violation of procedural due process,

10   negligent infliction of emotional distress.  And not to go into

11   all the procedure, after an extensive pretrial litigation, only

12   Title VI claim that was alleged in -- alleged discrimination

13   remains to be resolved in the present litigation.

14        Now, Title VI provides a private right of action, but

15   the key point in that is for intentional discrimination,

16   without going into whether it's disparate treatment or that

17   type of thing, but disparate treatment can be a form of

18   intentional discrimination.

19        The principal question, in this case, is will Mr. Yu

20   be able to meet his burden of showing that he was a victim of

21   intentional discrimination as required by Title VI.

22        Now, to establish a prima facie case of racial and

23   national origin discrimination by an educational institution,

24   Mr. Yu must establish the following:  Mr. Yu must establish

25   that during the relevant time period, Idaho State University

1  was a recipient of federal funds; Mr. Yu must established that

2  he was a member of a protected class; Mr. Yu must establish

3  that he suffered an adverse action at the hands of ISU in

4  pursuit of his education; Mr. Yu must establish that he was

5  qualified to continue in pursuit of his education; and Mr. Yu

6  must establish that he was treated differently from similarly

7  situated students who were not members of his protected class.

8  And additionally, beyond establishing a prima facie case,

9  Mr. Yu must also establish that the discrimination was

10  intentional.

11       Now, the Court has already ruled that it will take

12  judicial notice of the fact that Idaho State University was a

13  recipient of federal funds during the relevant period.

14       Mr. Yu, by his presence, has established that he's a

15  member of a protected class.  It is an undisputed fact that

16  Mr. Yu was dismissed from Idaho State University's doctoral

17  program; therefore, he has established that he suffered an

18  adverse action at the hands of Idaho State University in

19  pursuit of his education.

20       So, what elements remain to be proven by the evidence

21  that we need to present in this particular case?  That Mr. Yu

22  was qualified to continue his pursuit of his education.  That

23  Mr. Yu was treated differently from similarly situated students

24  who were not --

25       THE COURT:  Actually, you could slow down just a bit

1    at this point.

2           MR. COULTER:  All right, Your Honor.  Okay.  Did you

3    miss anything, ma'am?

4           THE REPORTER:  No, but you're making it tough.

5           MR. COULTER:  All right.  I always tell people, tell

6    me to slow down.

7           THE COURT:  Yeah, we're all that way, and so I

8    will --

9           MR. COULTER:  All right.  So, I will slow it down.

10          THE COURT:  All right.

11          MR. COULTER:  So, Mr. Yu was treated differently.  So

12   this needs to be -- remain to be proven by the evidence:  One,

13   that Mr. Yu was qualified to continue the pursuit of his

14   education; two, that Mr. Yu was treated differently from

15   similarly situated students, who were not members of his

16   protected class, thus establishing the unlawful discrimination;

17   and, three, that the discrimination was intentional.

18          All right.  So, Mr. Yu was qualified to continue in

19   pursuit of his education.  The evidence that we will present

20   will establish the following:  That at the time of his

21   dismissal from Idaho State University, Mr. Yu was a student in

22   good standing; that at the time of his dismissal from Idaho

23   State University, Mr. Yu was not on any probation or

24   disciplinary status when he was dismissed; and that at the time

25   of his dismissal from Idaho State University, Mr. Yu had not

1   received any previous warning that should he not complete the

2   internship at the Cleveland Clinic, he would be terminated from

3   Idaho State University's doctorate in clinical psychology

4   program.

5          Mr. Yu was treated differently from similarly

6   situated students who were not members of his protected class,

7   thus establishing an unlawful discrimination, and that the

8   discrimination was intentional.  These are the things that are

9   left.  Both of these elements will be established through the

10  testimony of plaintiff's fact witnesses, plaintiff's expert

11  witnesses, even the defendant's fact witnesses, and plaintiff's

12  rebuttal witnesses.

13         The testimony will reveal that there is both

14  sufficient direct and circumstantial evidence to establish that

15  Mr. Yu was treated differently from similarly situated students

16  who were not members of his protected class and that the

17  discrimination was intentional.

18         With the Court's permission, Mr. Yu is anxious to

19  present his case.  Mr. Yu is confident that at the conclusion

20  of both parties' presentation of the evidence, the Court will

21  rule in his favor and grant the relief sought and deserved.

22         Thank you, Your Honor.

23         THE COURT:  Thank you, Mr. Coulter.

24         Mr. Kelly, I will hear your opening statement.

25         MR. KELLY:  Thank you, Your Honor.

1              THE COURT:  I neglected to inquire, at the beginning,

2    I guess I assumed that you would ask me if there -- either of

3    you would ask me if there were witnesses you intended to ask be

4    excluded.  Are there -- either of you wishing to make that

5    motion?

6              Mr. Coulter?

7              MR. COULTER:  No, Your Honor.

8              THE COURT:  All right.  Mr. Kelly?

9              MR. KELLY:  I don't think so, Your Honor.

10             THE COURT:  All right.

11             MR. KELLY:  I think we are good.

12             THE COURT:  Go ahead.

13                  DEFENDANT'S OPENING STATEMENT

14             MR. KELLY:  Thank you.  Thank you for the

15    opportunity, Your Honor.

16             While the plaintiff claims this lawsuit is based on a

17    Title VI discrimination action, this case is really about

18    competency.  It's about my client's duty.  It's about my

19    client's duty to produce clinicians who can adequately and

20    professionally treat their patients.

21             While ISU is an educational institution of about

22    13,000 students, roughly, the program at ISU in this lawsuit,

23    the one being tested, so to speak, is a clinical psychology

24    Ph.D. program at the school.

25             It's important to note, Your Honor, that this program

1    is very small.  Each class has no more than five to seven Ph.D.

2    candidates in each class in comparison to the 13,000 total

3    students at the school.

4           This program began in 1980 and was first accredited

5    by the American Psychology Association in 2001, and it just

6    received its current accreditation renewal in the spring of

7    2017.

8           Regardless of its size, part of the obligation of

9    this program is to be a gatekeeper; to make sure that the

10   program is producing students who have the qualifications, the

11   expertise, and perhaps, most importantly, the empathy to treat

12   complex human problems and help patients cope with their mental

13   issues.

14          It's the objective and obligation of my client to

15   produce competent practicing clinicians, not just push students

16   through the program or not graduate or just graduate students

17   who have good GPAs.

18          You will hear a lot, in the next couple days, about

19   the plaintiff's academic success.  My client is not challenging

20   the plaintiff's academic ability.  ISU believes he was a

21   satisfactory student academically during his tenure in the

22   program.  In fact, he did some good things academically after

23   he matriculated in the fall of 2008.

24          He successfully completed his dissertation, with the

25   assistance of ISU professors Dr. Roberts and Professor Maria

1    Wong -- Dr. Wong -- acting as his advisers.  In fact, while

2    working on his dissertation in China over the summer of 2011,

3    Dr. Roberts worked with him every week over Skype.

4           I think it was alluded to earlier that Mr. Yu worked

5    as a teaching assistant during his time at ISU.  In fact, ISU

6    had him teach two undergraduate classes also during his time.

7    There was never any attempt to coddle Mr. Yu nor were there any

8    attempts to set him up for failure.

9           Unfortunately, once Mr. Yu started performing

10   clinical work, that's where the problems started.  Once he got

11   outside the classroom setting, cracks developed, and it

12   eventually became clear he lacked the skills and the conceptual

13   abilities to be a good practicing clinical psychologist.

14          It appears that his clinical skills and professional

15   developmental problems started in the spring of 2010.  There

16   were concerns expressed by several professors and supervisors,

17   both inside and outside the program, starting in that time

18   frame and continuing -- and excuse me -- continuing to the time

19   of his dismissal in the spring of 2013.

20          Your Honor, the evidence will show early on there

21   were concerns.  Those concerns were attributed to language

22   difficulties.  You will hear Dr. Sherry Atkins, who said she

23   was concerned about his ability to form an alliance with

24   English-speaking clients.  She needed to give him feedback on

25   the impact of his language skills on his clinical work.

1           Also, Dr. Atkins had problems with him in the spring

2    of 2011 or the fall of 2011.  In the summer, she still

3    expressed concern that fluent English was a -- was a problem

4    especially when treating younger children.  So, early on,

5    again, it seemed to be focused on language skills.  But it

6    became more apparent, as Mr. Yu did more clinical work, that

7    those concerns went beyond language difficulties.

8           You'll hear how in the spring of 2011, there was

9    concern about Mr. Yu's ability to form alliances with -- with

10   his patients and the dropout rate of some of those student

11   clients he was seeing.  A bellwether event was in the fall of

12   2011, when he was doing his internship at the -- at EIRMC, the

13   Eastern Idaho Regional Medical Center with Dr. John Landers.

14          You'll hear Dr. Landers testify that Mr. Yu was

15   significantly lagging in all the B-rated areas of functioning

16   primarily as it relates to cultural awareness and competency.

17   And Dr. Landers was probably the first to kind of scratch the

18   surface on his inability and his competency to deal with

19   patients and how it would affect the patients themselves.

20          He actually said that his deficits made this

21   practicum that he was involved in not a good fit and placed

22   him, the patients, and the psychology services at the hospital

23   in a difficult position.

24          In the spring of 2012, one of his professors,

25   Dr. Haight, during a family therapy session or a practicum --

1    excuse me -- indicated he struggled again with alliance

2    formations and was not sensitive to client signals during the

3    sessions, which again are all part and parcel of being a good

4    clinician.

5            And then probably the straw that broke the camel's

6    back was when he took the option of creating his own internship

7    at the Cleveland Clinic.  His supervisor, Dr. Leslie Speer,

8    said that he was not ready to perform activities as a clinical

9    psychologist.  And she said, in addition to that, she believed

10   it put him at significant risk to do harm to families and

11   patients he may work with in the future.

12           Those are pretty -- pretty bold statements, but yet

13   you hear it a couple of times from a couple of practicing

14   clinicians and practicing clinicians who are outside the realm

15   of the university.

16           Now, part of the argument is that ISU did nothing at

17   all to help Mr. Yu.  There were plenty of opportunities he had

18   for remediation, and he got feedback on a regular basis.  When

19   he first had language problems, Dr. Atkins, in the spring of

20   2010, you will hear gave him feedback on how to -- how to do

21   better and how to work on his language skills.

22           Jumping back to the fall of 2009, there was a real

23   minor, minor issue with plagiarism on a brief.  That was

24   addressed through a remediation of citation rules.  But again,

25   a problem popped up.  It was addressed by the university.

1          After he was dismissed from the internship with

2    Dr. Landers, a course of action was created by Dr. Roberts to

3    help him prepare for his APPIC applications.  And then there

4    was constant oversight and recommendations, again from

5    Dr. Roberts and Dr. Wong, regarding his dissertation.  You will

6    hear that and see that in these evaluations as they are

7    presented.

8          Eventually, after he did apply for an APPIC match and

9    he failed to match, Dr. Roberts suggested three options for his

10   internship path.  As you heard earlier, he took the option to

11   do a non-APPIC internship at Cleveland Clinic that he created.

12   The university had suggested and had hoped he would take the

13   China option, but he decided that the US option was better for

14   him at the time.  Nevertheless, he was counseled on that, and

15   he was given feedback on a regular basis.

16         When he had problems with the internship at the

17   Cleveland Clinic, Dr. Roberts communicated with Dr. Speer, at

18   the Cleveland Clinic, to find out what the problems were.  And

19   he, in fact, asked Dr. Speer to do an assessment of him and

20   work with him, which she did.  Unfortunately, after two

21   different assessments, she came to the conclusion I discussed

22   earlier, that he was not ready, and he was not capable of being

23   a clinical psychologist.

24         Once that dismissal from the Cleveland Clinic came

25   about, the graduate faculty in the psychology department at ISU

looked at that and looked at other professional development

issues, that were cited earlier, and in reviewing his progress

as a Ph.D. candidate, they came to the conclusion that he would

not be able to attain the skills necessary to be a good

practicing clinical psychologist.  Based on that determination,

they unanimously determined that he should be dismissed from

the program.

They advised him in writing about the dismissal.

They advised him, due to his academic abilities and success,

that they would award him a master's degree.  And they advised

him of what his due process rights were.  That he had the right

to appeal their decision.  And he took them up on that.  He

appealed to the College of Arts and Letters, which denied his

appeal.  And then after a hearing, the school's Graduate

Council likewise upheld the dismissal.

Your Honor -- clearly, Your Honor, if this was a case

of deliberate discrimination against Mr. Yu due to his national

origin, Dr. Roberts, Dr. Lynch, Dr. Wong, Dr. Seikel, and all

the other members of the ISU Psychology Department would not

have put the effort in to helping Mr. Yu succeed.  This was

almost a five-year process.  They put five years of work in to

try to get Mr. Yu to succeed.

And while they have a duty to their students to help

them succeed, they have a greater duty to the public at large

to make sure these graduates are competent, trained

1  professionals.  Unfortunately, they didn't succeed in this

2  incident, but it wasn't because they were prejudiced.  It

3  wasn't because they were deliberately discriminating against

4  Mr. Yu.  It was because, in their professional judgment, Mr. Yu

5  lacked the competency to become a successful licensed clinical

6  psychologist.

7          And the evidence you will see in the next couple

8  days, Your Honor, will clearly show that's the case.  Thank

9  you.

10          THE COURT:  Thank you, Mr. Kelly.

11          Mr. Coulter, you may call your first witness.

12          MR. COULTER:  Thank you, Your Honor.  Your Honor, at

13  this time, we call Dr. Nicole Prause to the stand.

14          COURTROOM DEPUTY:  Would you raise your right hand,

15  please?

16          You do solemnly swear that the testimony you are

17  about to give in the matter now before this Court will be the

18  truth, the whole truth, and nothing but the truth, so help you

19  God?

20          THE WITNESS:  I do.

21          COURTROOM DEPUTY:  Thank you.  And for our record, if

22  you could state your full name spelling your last.

23          THE WITNESS:  Nicole Prause, last is P-R-A-U-S-E.

24          THE COURT:  You may inquire.

25          MR. COULTER:  Thank you, Your Honor.

1                          NICOLE PRAUSE,

2    having been duly sworn, was examined and testified as follows:

3                         DIRECT EXAMINATION

4    BY MR. COULTER:

5    Q.   Dr. Prause, what is your formal education?

6    A.   I am a clinical scientist.

7    Q.   And which undergraduate school did you attend?

8    A.   Indiana University of Bloomington.

9    Q.   And what degree did you obtain while you were there?

10   A.   I have a BA in psychological science.

11   Q.   And what was your major field of study?

12   A.   Psychological science.

13   Q.   All righty.  Do you have any advanced degrees?

14   A.   I do.

15   Q.   And could you tell the Court what they are?

16   A.   I have a Ph.D. in clinical science also from Indiana

17   University.

18   Q.   Now, do you belong to any professional organizations?

19   A.   I do.

20   Q.   And can you tell us what they are?

21   A.   Sure.  The Association of Psychological Science, the

22   Society for Psychophysiological Research, the Society for

23   Effects of Science, and I am an elected member of the

24   International Academy of Sex Research.

25   Q.   Thank you, Doctor.  Have you served in any capacity in

Nicole Prause - Direct

1    teaching in higher education?

2    A.    I have.

3    Q.    And could you please inform the Court of what that is?

4    A.    I was a member of various faculties for about 10 years as

5    a professor, so starting as an assistant professor and

6    progressing up to associate scientist.

7    Q.    Okay.  And where are you currently employed?

8    A.    I am currently employed at my own company, Liberos.

9    Q.    What does your company do?

10   A.    We primarily conduct research for nonprofits, so including

11   National Institute of Mental Health, National Organization of

12   Rare Diseases --

13             THE REPORTER:  Please slow down.

14             THE WITNESS:  Sure.  Including nonprofits like the

15   National Institute of Mental Health and the National

16   Organization of Rare Diseases.  And we also have a couple of

17   contracts for research as well.

18             THE COURT:  Dr. Prause, I think it will help if you

19   don't get right on top of the microphone.  Get a little bit

20   back from it.  All right.

21             THE WITNESS:  I usually speak too quiet.

22   BY MR. COULTER:

23   Q.    All right.  Now, would you please detail your experience

24   at the university level to include teaching assignments,

25   faculty positions in the field of psychology?

Nicole Prause - Direct

1    A.   Sure.  So, I started as an assistant professor at Idaho

2    State University in 2007 and taught a course load that included

3    a variety of clinical practica, including couples in sex

4    therapy, behavioral medicine, also taught statistics at the

5    undergraduate and graduate level in time series, research

6    methods, psychology of women's course, at that university, and

7    then continued on at the Mind Research Network, where I was

8    also a professor at University of New Mexico and taught

9    laboratory courses there.  And eventually went to the

10   Department of Psychiatry at UCLA where I taught laboratory

11   courses as well.

12   Q.   Now, have you written or published in the field of

13   psychology?

14   A.   Yes.

15   Q.   And could you please give us a little example of that?

16   A.   I estimate I have published about 60 peer-reviewed papers,

17   and I -- maybe a dozen chapters.

18   Q.   Have any journals, professional journals published your

19   articles?

20   A.   All the peer-reviewed papers are in journals including

21   some of the top neuroscience journals in our field.

22   Q.   Dr. Prause, I believe you stated already that you were an

23   assistant professor at the Department of Psychology at Idaho

24   State University from 2007 to 2010; is that correct?

25   A.   Yes, sir.

1   Q.   Now, while serving as a faculty member of the Psychology

2   Department of Idaho State University, was Dr. Mark Roberts on

3   the faculty of Idaho State University?

4   A.   Yes.

5   Q.   Now, while you were on the faculty of the Psychology

6   Department of Idaho State University, did you have an

7   opportunity to serve on any committees with Dr. Roberts?

8   A.   I did.

9   Q.   And what was the committee that you participated in with

10  Dr. Roberts?

11  A.   The graduate student recruitment committee.

12  Q.   And could you tell the Court what the purpose of the

13  graduate student recruitment committee was?

14  A.   Selecting amongst applicants for the doctoral program at

15  Idaho State in the Department of Psychology.

16  Q.   Now, do you know the plaintiff in this case, Mr. Jun Yu?

17  A.   I do.

18  Q.   If you see him in the courtroom today, would you please

19  point him out?

20  A.   Right there.

21          MR. COULTER:  Your Honor, do I need to say that she

22  has recognized or does the record reflect that she recognized

23  Mr. Plaintiff -- the plaintiff?

24          THE COURT:  She pointed to the plaintiff.  The record

25  will reflect that.

1          MR. COULTER:  Thank you, Your Honor.

2    Q.   Now, for admission into the doctoral program in clinical

3    psychology at Idaho State University, while you were there, can

4    you tell the Court what the procedure was?

5    A.   We received the folders from the applicants containing

6    information about their application, such as GRE scores, essay

7    work, and then we also had them come on-site for interviews.

8    Q.   Okay.  Now, in reviewing Mr. Yu's folder, what immediately

9    came to your attention?

10   A.   He stood out primarily for having a very high quantitative

11   GRE score, and I wanted him because I was teaching statistics

12   and needed a TA that was good.

13          THE COURT:  GRE, graduate exam --

14          THE WITNESS:  Yeah, graduate record examination.

15          THE COURT:  Yeah.  Okay.  Thank you.

16   BY MR. COULTER:

17   Q.   Now, did you have an opportunity to personally interview

18   Mr. Jun Yu?

19   A.   I did.

20   Q.   At some time later, did you and Dr. Roberts have an

21   occasion to speak about Mr. Yu during evaluation of Mr. Yu for

22   admission to Idaho State University's doctorate in clinical

23   psychology program?

24   A.   We did in a committee meeting.

25   Q.   Could you please tell the Court about this discussion?

1  A.   I was strongly recommending to admit Jun Yu, and

2  Dr. Roberts's reply was "But I can't understand him," to which

3  I immediately shot back "I understood him just fine," as did

4  Dr. Vik sitting beside me.

5  Q.   Now, did you have an opportunity to observe Mr. Yu

6  interacting with students in English in an academic setting as

7  an instructor?

8  A.   Yes.

9  Q.   And can you tell us how this observation came about?

10  A.   I did get him as my teaching assistant for the stats

11  class, so he was teaching independently the laboratory section

12  while I taught the lecture portion of that course.  So, I was

13  helping supervise the content he was covering and visiting his

14  class sometimes as well, and then also, of course, talking to

15  the students that were jointly sharing our courses.

16  Q.   And from your observation of Mr. Yu, how do you believe

17  Mr. Yu fared in interacting with students as a teaching

18  assistant?

19  A.   As strong as I thought he would, and I think they also

20  found him to be warm and easy to approach.  I often saw

21  students going up to him after class to ask him questions, as

22  is common in statistics labs, and, you know, in my meetings

23  with them individually, you know, they would say they found him

24  sweet and helpful.

25  Q.   Okay.  Now, to your knowledge and personal observation,

Nicole Prause - Direct

1    how would you classify the students' evaluation of Mr. Yu?

2    A.    Generally good.

3    Q.    Okay.  And so we have kind of a complete record, about how

4    many times approximately did you actually observe Mr. Yu

5    teaching?

6    A.    I think it was four or five times.

7    Q.    Was there ever a time, in your recollection, that a

8    student complained about Mr. Yu's ability to effectively

9    communicate in English?

10   A.    No.

11   Q.    Now, Dr. Prause, if a supervising clinician was concerned

12   about the ability of a therapist to create an alliance or

13   effectively communicate with a client, what is a good way to

14   dispel or confirm that -- this concern?

15           MR. KELLY:  Objection, Your Honor.  Calls for

16   speculation.

17           MR. COULTER:  Not if she knows.

18           THE COURT:  Just a moment.  Your response again?

19           MR. COULTER:  Your Honor, she's been -- we went

20   through the whole deal to qualify her to -- so she could

21   actually speak to what a therapist could do, et cetera.  She

22   has an extensive background in psychology.  She's taught it.

23   She does research.  She's very competent to testify to that.

24   She's not speculating.  She's giving testimony from personal

25   experience and from her expertise in the field.

 1            THE COURT:  Mr. Kelly.

 2            MR. KELLY:  Well, if she's talking in general terms,

 3    yes.  But I think he's leaning towards getting an opinion on

 4    Mr. Yu.

 5            THE COURT:  Overruled.  Go ahead.

 6    BY MR. COULTER:

 7    Q.    Okay.  Dr. Prause, I will repeat the question.

 8    A.    Please.

 9    Q.    Dr. Prause, if a supervising clinician was concerned about

10    the ability of a therapist to create an alliance or effectively

11    communicate with a client, what is a good way to dispel or

12    confirm this concern?

13    A.    There are many quantitative assessments available to

14    assess that concern.

15    Q.    And -- and what are those tests and could you explain to

16    the Court?

17    A.    There are about 11 that are commonly used to assess

18    therapeutic alliance with a client.  Some of them primarily are

19    rated by the patient.  Some can be rated by the supervisor or

20    the therapist.  And they've shown strong psychometric

21    properties such as predicting dropout over time.

22    Q.    And Dr. Prause, how long have these -- to your knowledge,

23    how long have these tests been available for use?

24    A.    Decades.

25    Q.    Now, to your knowledge, are these tests used to assess the

1  effectiveness of a student -- students in forming alliance with

2  clients and testing the effectiveness of a student's

3  communication with the client while the student is engaged and

4  participating in either clinical externships, practicums, or

5  internships?

6  A.    Good schools.

7  Q.    Okay.  And could you name a couple of schools that you are

8  absolutely familiar with that use these tests?

9  A.    Vanderbilt helped develop one.  UCLA helped develop one, a

10  couple.

11  Q.    Now, Dr. Prause, if -- what, if any, studies have been

12  conducted, to your knowledge, to assess a clinician's ability

13  to judge another clinician's interaction with clients?

14  A.    There are hundreds like that.

15  Q.    And Dr. Prause, what, if any, studies have been conducted

16  to assess a clinician's ability to judge another clinician's

17  interaction with their clients as the clinician is making the

18  judgment gains as the -- as he gains more in the years?

19  A.    One thing that is remarkable is as you gain more years of

20  practice, your judgments about your own efficacy increase while

21  the actual outcomes with patients become poorer over time, so

22  they become poorer judgments of patient outcome without good

23  quantitative assessment.

24        MR. COULTER:  Okay.  I have no further questions.

25  Your witness.

Nicole Prause - Cross

1          THE COURT:  Mr. Kelly, cross-examination.

2          MR. KELLY:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MR. KELLY:

5   Q.   Dr. Prause, you indicated you were at ISU from 2007 to

6   2010; correct?

7   A.   Yes, sir.

8   Q.   Okay.  And Mr. Yu matriculated in the fall of 2008; is

9   that correct?

10  A.   Yes.

11  Q.   Okay.  And other than having him as your teaching

12  assistant, any other interaction with Mr. Yu?

13  A.   Primarily teaching assistant.

14  Q.   So, you never actually saw him or supervised him in a

15  clinical setting; is that correct?

16  A.   Not in clinical work.

17  Q.   And just to be sure, Dr. Prause, as far as your testimony

18  here, do you have any ill will towards Idaho State University?

19  A.   No.

20  Q.   Okay.  You threatened to sue them at one point in time;

21  didn't you?

22  A.   They were trying to withhold clinical hours, but that's

23  resolved five years ago.

24  Q.   But nevertheless, you had some animosity towards the

25  university at the time; correct?

Nicole Prause - Cross

1    A.   It's resolved five years ago.

2    Q.   But at the time, you had animosity; correct?

3    A.   It was resolved very quickly.

4    Q.   You threatened to hire a lawyer?

5    A.   I -- it's been resolved.

6    Q.   That's not my question.  You threatened to hire a lawyer

7    against Idaho State; correct?

8    A.   I think that's just a factual basis, not an emotion, so --

9            MR. KELLY:  Your Honor, I'm going to ask the witness

10   to answer the question, please.

11           THE COURT:  That's an appropriate question.  I'll

12   need you to answer it, please.

13           THE WITNESS:  I -- I would characterize it as

14   frustrated.

15   BY MR. KELLY:

16   Q.   Did you hire a lawyer to sue Idaho State University?

17   A.   I did not.

18   Q.   Did you retain a lawyer with the idea that you would have

19   to sue Idaho State University?

20   A.   I did not.

21   Q.   And again, did you consult a lawyer in regard to suing

22   Idaho State University?

23   A.   Ultimately, I did not, actually.

24   Q.   But you indicated to Idaho State that you had; correct?

25   A.   As I stated, it was resolved quickly.

Nicole Prause - Cross

1  Q.   But you did tell Idaho State that you were going to hire a

2  lawyer; correct?

3  A.   If -- if it came to that, I was willing to.

4  Q.   Okay.  And again, just to be clear, that you never ever

5  witnessed or supervised Mr. Yu in a clinical setting; correct?

6  A.   Still correct.

7            MR. KELLY:  Okay.  Thank you.  That's all I have.

8            THE COURT:  Mr. Coulter, redirect?

9            MR. COULTER:  No redirect, Your Honor.

10           THE COURT:  All right.  Miss, you may step down.

11  Thank you.

12           Your next witness.

13           MR. COULTER:  At this time plaintiff, would like to

14  call Miss Jocelyn Eikenburg to the stand.

15           COURTROOM DEPUTY:  Raise your right hand.

16           You do solemnly swear that the testimony you are

17  about to give in the matter now before this Court will be the

18  truth, the whole truth, and nothing but the truth, so help you

19  God?

20           THE WITNESS:  I do.

21           COURTROOM DEPUTY:  Thank you.  Please be seated.  For

22  our record, if you can state your full name spelling your last.

23           THE WITNESS:  Jocelyn Eikenburg, E-I-K-E-N-B-U-R-G.

24           THE COURT:  You may inquire.

25           MR. COULTER:  Thank you, Your Honor.

1          JOCELYN EIKENBURG,

2    having been duly sworn, was examined and testified as follows:

3

4              DIRECT EXAMINATION

5    BY MR. COULTER:

6    Q.   Miss Eikenburg, do you know the plaintiff, Mr. Jun Yu?

7    A.   Yes, he's my husband.

8    Q.   Now, were you with Mr. Yu during the time he was a student

9    at Idaho State University?

10   A.   Yes.

11   Q.   Now, when Mr. Yu was a student at Idaho State University,

12   were you also -- were you also aware of -- of some of the

13   issues that came up in regards to his being present at Idaho

14   State University?

15   A.   Could you repeat the question?  I couldn't hear the --

16   Q.   Okay.  You can't -- can you hear me now better?

17   A.   Yeah, I can hear you.

18   Q.   Okay.  Well, let me just go -- I'll do something different

19   here.  I'll change that question.

20          When Mr. Yu was a student at Idaho State University,

21   did you know a Miss or Dr. Shannon Lynch?

22   A.   Yes.

23   Q.   And how did you know her?

24   A.   She was one of the clinical faculty members in the

25   program, and, you know, later on, in 2010, to my recollection,

1    she became the department chair, you know, and, you know, as a

2    spouse of a student, you know, they would have events, you

3    know.  So, like, you know, end of year, beginning of year

4    activities, and so I would attend those along with my husband,

5    and I got to know some of the faculty members.

6    Q.   All right.  Now, during your time at Pocatello, Idaho, did

7    you have an opportunity to have a conversation with Dr. Shannon

8    Lynch about Mr. Yu, that stands out in your mind?

9    A.   Yes, I did.

10   Q.   Can you tell the Court about that, please?

11   A.   Yes.  It was in May 2010.  And, you know, that day

12   Dr. Lynch and I happened to be at the same yoga class at Idaho

13   State University.  They had these classes, and so we were in

14   the same class.

15            And, you know, I happened to see her.  You know, we

16   are -- you know, we know each other, and so I thought, you

17   know, I'd say hello.  So, I said "hello" to her.  And, you

18   know, we had a little, you know, small talk, chitchat.  You

19   know, then she walked away to, you know, organize her stuff,

20   and I was organizing my stuff and getting ready to leave, and

21   then she comes back to me.

22   Q.   And what happened then?

23   A.   And then she asked me -- she asked me the question, "Do

24   you speak English at home with Jun?"  And I said, "Yes, I do."

25   And then she said, "Well, you should know, Jun's English is

Jocelyn Eikenburg - Direct

1   terrible."  And later in the conversation, she even went on to

2   say, you know, "Unless his English improves, we will not be

3   able to find a clinical position for him in this town."

4   Q.   And what was your reaction after you heard this statement?

5   A.   I thought it was kind of -- I thought it was outrageous.

6   You know, I've -- I've spent much of my adult life living in a

7   foreign country, living abroad.  And I have also personally

8   taught English as a second language.  And, you know, so I have

9   a good, you know, understanding of, you know, different

10  English-speaking levels of people who are not native English

11  speakers.  And I have a good sense of what's considered very

12  good and what would conversely be considered, you know, not

13  very good, or, you know, really bad.

14          And, you know, Jun's English is very good.  It's very

15  good.  And it just did not merit to be labeled as terrible.

16  You know, he is not a native speaker, so, of course, he's not

17  going to speak like native speakers, like you or I, you know,

18  or certainly the -- the faculty in the clinical department.

19  But that does not mean that, you know, his English is a

20  problem.

21          MR. COULTER:  Thank you, Miss Eikenburg.  Your

22  witness.

23          MR. KELLY:  Your Honor, I have no questions.

24          THE COURT:  All right.  Miss Eikenburg, you may step

25  down.  Thank you.

Vol. 1 - 36

Jocelyn Eikenburg - Direct

1              MR. COULTER:  Your Honor, I also want to say that

2    she's not subject to recall.  I don't want to bring her back,

3    so I would like to have her remain in the courtroom.  She's not

4    going to be a witness.

5              THE COURT:  That would be fine.

6              MR. COULTER:  Thank you, Your Honor.

7              THE COURT:  I think we established that anybody that

8    was a witness could remain.

9              Your next witness.

10             MR. COULTER:  Could we take a slight recess, Your

11   Honor?  I need to use the facility.

12             THE COURT:  All right.  We will take a five-minute

13   recess.

14        (Recess 1:53 p.m.  Resumed 1:53 p.m.)

15             THE COURT:  Thank you.  Please be seated.

16             Mr. Coulter.

17             MR. COULTER:  Thank you, Your Honor.  At this time, I

18   would like to call plaintiff, Mr. Jun Yu, to the witness stand.

19             THE COURT:  All right.  Mr. Yu, if you will go to the

20   witness box, please.

21             COURTROOM DEPUTY:  Raise your right hand.

22             You do solemnly swear that the testimony you are

23   about to give in the matter now before this Court will be the

24   truth, the whole truth, and nothing but the truth, so help you

25   God?

Jun Yu - Direct

1          THE WITNESS:  Yes, I do.

2          COURTROOM DEPUTY:  Thank you.  Please be seated.

3          THE COURT:  Mr. Coulter, before you begin with your

4   examination, I just want to make a record that all of the

5   exhibits that the parties have stipulated for admission are

6   deemed admitted.  Go ahead.

7          MR. COULTER:  Thank you, Your Honor.

8                          JUN YU,

9   having been duly sworn, was examined and testified as follows:

10                     DIRECT EXAMINATION

11  BY MR. COULTER:

12  Q.    Mr. Yu, are you the -- are you the plaintiff in this case?

13  A.    Yes.

14  Q.    Now, where do you currently reside?

15  A.    Beijing, China.

16  Q.    And how long have you lived there?

17  A.    A little over a year.

18  Q.    Okay.  And have you been living there since you left Idaho

19  State University?

20  A.    No.

21  Q.    Okay.  So, where did you live after, right after you went

22  from Idaho State University till you got moved to Beijing?

23  A.    Zhejiang, China.

24  Q.    Could you please spell that for the record?

25  A.    Z-H-E-J-I-A-N-G.

Jun Yu - Direct

1    Q.    Okay.  Now, are you currently employed?

2    A.    Yes.

3    Q.    And who do you work for?

4    A.    Hangzhou Dizigui Jiaoyu.

5    Q.    You need to spell that for the record.

6    A.    Okay.  It's H-A-N-G-Z-H-O-U, as one word, then

7    D-I-Z-I-G-U-I, as one word.  J-I-A-O-Y-U as one word, and

8    Consulting Company.

9    Q.    Good to go, ma'am?

10             Okay.  What is it that you do?

11   A.    I am an educational consultant.

12   Q.    And can you tell the Court what your current salary is?

13   A.    38,000 RMB around.

14   Q.    And in US dollars as of, let's say, yesterday, can you

15   give an estimate of what that is?

16   A.    That's about $5,600.

17   Q.    Annually, is that correct?

18   A.    Yes.

19   Q.    And let me see.  What is your current level of education?

20   A.    Master of Education in Developmental and Educational

21   Psychology.

22   Q.    And where did you get that?

23   A.    From Shanghai University.

24   Q.    Thank you.  Now, in what year did you receive that degree?

25   A.    2005.

Jun Yu - Direct

1   Q.   Now, when were you admitted to Idaho State University?

2   A.   2008.

3   Q.   Would that be in spring, fall, or winter of 2008?

4   A.   Fall 2008.

5   Q.   Now, between 2005 and your admittance to Idaho State

6   University in 2008, what were you doing?

7   A.   My wife and I came to the US.  The goal for me is to earn

8   a doctoral degree in psychology, because the psychology field

9   in the US is most developed around the world.  And the plan is

10  after that, we return to China and for me to start a career

11  there.  So, then I took classes at Cleveland State University.

12  I worked for Dr. Dwyer at Baldwin Wallace College for his

13  research.

14  Q.   Could you spell Dr. Dwyer's name for the record?

15  A.   D-W-Y-E-R.  I also worked for preparation for TOEFL and

16  GRE exams.  I also worked as a bicultural educator in

17  Cleveland.  That's basically what I did during these years.

18  Q.   Okay.  Could you explain to the Court what a TOEFL

19  examination is?

20  A.   Test of English as a Foreign Language.  It measures

21  nonnative English speaker's English proficiency.

22  Q.   You mentioned you took the GRE?

23  A.   Yes.

24  Q.   And is that the same graduate record examination that was

25  referred to earlier by someone else?

Jun Yu - Direct

1    A.    Yes, the same as the one Dr. Prause referred to.

2    Q.    Thank you.  So, why did you take the TOEFL exams?

3    A.    It was required for graduate school in the US to admit

4    students who speak English as a foreign language.  Nonnative

5    English speakers, it was required, yes.

6    Q.    Okay.  Now, can you tell the Court what classes you took

7    at Cleveland State University?

8    A.    Experimental psychology, physiology of behavior.

9    Q.    Okay.  So, in taking the TOEFL, the GRE, and the classes

10   at Cleveland State University, what, if anything, were you

11   preparing for?

12   A.    I need to identify the programs, and write essays, and

13   prepare application materials.

14   Q.    For what?

15   A.    For admission into graduate school in the US.

16   Q.    All right.  Now, when did you apply to Idaho State

17   University?

18   A.    Fall of 2007.

19   Q.    And why did you apply to Idaho State University as opposed

20   to some other schools?

21   A.    I found Dr. Roberts's research interest match with mine.

22   Q.    And what was that interest?

23   A.    Which was treatment for childhood disruptive behavior

24   problems.

25   Q.    Did you apply to other colleges and universities?

Jun Yu - Direct

1    A.    Yes.

2    Q.    Can you tell the Court which ones?

3    A.    It's a long time ago, but I remember I applied to

4    Cleveland State University, Iowa State University, Southern

5    Illinois University.  I don't remember others.

6    Q.    Now, did you eventually have an interview with Idaho State

7    University?

8    A.    Yes.

9    Q.    And can you tell us, the Court, where the interview took

10   place?

11   A.    At ISU.

12   Q.    And do you know who was at the interview?

13   A.    Dr. Roberts, Dr. Prause, Dr. Wong, all the faculty

14   members.

15   Q.    And were you eventually accepted into Idaho State

16   University?

17   A.    Yes.

18   Q.    And in what semester did you start school at Idaho State

19   University?

20   A.    Fall 2008 semester.

21   Q.    During your first semester at ISU, okay?  Can you tell the

22   Court what courses you took?

23   A.    Clinical psychology, advanced social psychology, psych

24   diagnostics.

25   Q.    And can you tell the Court who your instructors were?

Jun Yu - Direct

1   A.   Dr. Roberts, Dr. Seikel, Dr. Atkins.

2   Q.   Now, Mr. Yu, were you engaged in any clinical work during

3   the -- during this first semester?

4   A.   No, I did observations of the clinical teams.

5   Q.   Now, Mr. Yu, during the first semester, were you involved

6   in any assistantships with the department?

7   A.   Yes.

8   Q.   And could you explain to the Court would those were?

9   A.   I was assigned to Dr. Roberts and Dr. Wong as a graduate

10  teaching assistant.  I also was assigned to manage the

11  Psychology Department's SONA system, which matches the research

12  participates with the research projects.

13           MR. COULTER:  Can we connect our table?  This table

14  here to the system?  There -- there you go.

15           Your Honor, Plaintiff's Exhibit-- is it admitted?

16           MS. SUTHERLAND:  No, you are good.

17           MR. COULTER:  Plaintiff's Exhibit Number 24 has been

18  stipulated to, so I am assuming it's been admitted based on

19  your instructions.

20           THE COURT:  Yes.

21  BY MR. COULTER:

22  Q.   Now, can you tell the Court what Plaintiff's Exhibit 24

23  is?

24  A.   It's a semi-annual student evaluation for fall 2008.

25  Q.   Okay.  And did Dr. Wong or Dr. Roberts rate your

Jun Yu - Direct

1    performance as a teaching assistant?

2    A.   Yes, Dr. Wong rated me 3.9 out of 4, with 4 mean -- means

3    exceptionally good in professional skills and instruction

4    process.  Dr. Roberts was pleased with my performance.

5    Q.   Okay.  We can go ahead and take that document from Mr. Yu.

6    Thank you, Mr. Shumard.

7            Now, Mr. Yu, were you enrolled at Idaho State

8    University during the spring semester of 2009?

9    A.   Yes.

10   Q.   Did you take any classes involving clinical work?

11   A.   No.

12   Q.   Were you assigned any duties as a teaching assistant?

13   A.   Yes.

14   Q.   And who were you assistant to?

15   A.   I was assisting Dr. Wong and Dr. Roberts.

16   Q.   And can you tell the Court what were some of your duties?

17   A.   Grading papers, helping with researches.

18   Q.   Okay.  26.  Now, Mr. Yu, you have just been handed what

19   has been marked as Plaintiff's Exhibit Number 26, which has

20   been stipulated to, and I want you to take a look at that, and

21   when you have had time to look at it and look at the contents,

22   just please look up and I will ask you some questions on that.

23        (Pause in the proceedings.)

24            Are you ready to answer questions, Mr. Yu?

25   A.   Yes.

Jun Yu - Direct

1    Q.    Now, did Dr. Wong give you a formal rating?

2    A.    Yes.

3    Q.    And what was it?

4    A.    It was 4, out of 4.  4 means exceptionally good.

5    Q.    Okay.

6    A.    She also was very pleased with my research assistance.

7    Q.    All right.  We can have that document admitted.  I mean,

8    it is admitted, so we can retrieve the document, please, from

9    Mr. Yu.  Thank you.

10            Now, Mr. Yu, were you enrolled in Idaho State

11   University in the fall semester of 2009?

12   A.    Yes.

13   Q.    Did you take any classes that involved clinical or

14   practicum work?

15   A.    Yes.

16   Q.    Who was your supervisor?

17   A.    Dr. Roberts.

18   Q.    Now, did Dr. Roberts submit an evaluation of your

19   performance?

20   A.    Yes.

21   Q.    I would like to show the witness, please, 27.  27 and 39.

22            THE COURT:  Is there any reason we couldn't just have

23   all of these given to Mr. Shumard right now, and then he can

24   just -- we can save some time and steps perhaps.  And then --

25   and then Mr. Yu can just set them aside in the witness box when

Jun Yu - Direct

1    he's done.  All right?

2            MR. COULTER:  Do you want mine?  You got them.

3            MS. SUTHERLAND:  No.

4            MR. COULTER:  Okay.

5    BY MR. COULTER:

6    Q.   All right.  Go ahead and take a look at that.  When you

7    have time, look up.

8            Do you also have 39 with you?  27 and 39?

9            THE LAW CLERK:  39 is not admitted.

10           MR. COULTER:  All right.

11           THE LAW CLERK:  And it appears like it may be

12   misnumbered.

13       (Pause in the proceedings.)

14           MR. COULTER:  Your Honor, at this time, I would like

15   to introduce Exhibit Number 39 and pass it over to ISU counsel

16   for his objection and possible argument, inspection and

17   possible --

18           THE COURT:  Yeah, I understand.  You are wanting to

19   offer it into evidence.  Is there an objection?

20           MR. KELLY:  I am just trying to figure out what 39

21   is.  I'm sorry, Your Honor.

22           THE COURT:  Okay.

23           MR. COULTER:  Part of that 634 document.

24           MR. KELLY:  Sorry.  So, that's the complaint

25   against --

Jun Yu - Direct

1            THE COURT:  Mr. Coulter, why don't you just hand

2   what's been marked as 39 to Mr. Kelly, please.

3            MR. KELLY:  It's mislabeled on your list; correct?

4            Your Honor, I am confused, because 39 on the

5   plaintiff's list is Mr. Yu's complaint filed to the APA.  And

6   this is an externship semester evaluation.

7            MR. COULTER:  That was part of that 634-page document

8   and we -- when we sat down and talked about stipulations, we

9   said we're not going to enter that whole document.  That didn't

10  mean that we weren't going to enter parts of that document.

11           THE COURT:  Well, let's figure out a solution to the

12  problem.  Will there be an exhibit that is Mr. Yu's complaint

13  filed to the APA re Dr. Roberts?

14           MR. COULTER:  No, Your Honor.

15           THE COURT:  Okay.  Then why don't we strike that

16  and -- in the exhibit list, and I am fine with you making this

17  39, but then, of course, Mr. Kelly, if you have objections, I

18  will hear your objections before we go any further.

19           MR. KELLY:  No, that works for me, Judge.

20           THE COURT:  Okay.

21           MR. KELLY:  It was just super-confusing.

22           THE COURT:  All right.  So, Exhibit 39 is admitted by

23  stipulation.

24       (Exhibit 39 admitted.)

25           THE COURT:  Let's give it a name then, Mr. Coulter.

Jun Yu - Direct

1    What was it?  Externship evaluation?

2              MR. COULTER:  I have to take a look at it.

3              MS. SUTHERLAND:  You have one.

4              MR. COULTER:  I know.

5              THE COURT:  Is this fall 2009 externship?

6              MR. COULTER:  Yeah, it's the student evaluation by

7    Dr. Roberts for the fall of 2009.

8              THE COURT:  Student evaluation --

9              MR. COULTER:  By --

10             THE COURT:  -- of Mr. Yu?

11             MR. COULTER:  Yes.

12             THE COURT:  Okay.  All right.  That will be the

13   title.  It will go into the exhibit list.  39 -- oops -- I

14   wrote it down wrong on my list -- will be admitted.  Go ahead.

15   BY MR. COULTER:

16   Q.   Okay.  Mr. Yu, you have got Exhibit 27 and 39 in front of

17   you?

18   A.   Yes.

19   Q.   All right.  Have you had an opportunity to take a look at

20   the documents and are you ready to answer questions?

21   A.   Yes.

22             THE COURT:  Can we stop for a moment?  Is this 39

23   that's in front of us on the screen then?

24             MR. COULTER:  Yes, Your Honor.

25             THE COURT:  All right.  Mr. Shumard, I will need you

Vol. 1 - 48

Jun Yu - Direct

1   to bring that over to Miss Case so she can put an exhibit label

2   on it, please.

3           THE LAW CLERK:  Judge, it's got an exhibit.

4           THE COURT:  I didn't see it.  Okay.

5           MR. COULTER:  Well, it's not on the screen, Your

6   Honor, because -- same thing though.

7           THE COURT:  All right.  I assumed it was the -- the

8   one on the screen doesn't show an exhibit label.  That's why I

9   asked.

10          All right.  Go ahead, Mr. Coulter.

11  BY MR. COULTER:

12  Q.   All right.  Mr. Yu, were you enrolled in ISU in the spring

13  semester of 2010?

14  A.   Yes.

15  Q.   And did you take any clinical or practicum in the spring

16  of 2010?

17  A.   Yes.

18  Q.   And can you tell the Court who your supervisor was?

19  A.   Dr. Atkins.

20  Q.   And how was your working relationship with Dr. Atkins?

21  How would you characterize your relationship with Dr. Atkins?

22  A.   We have a good working relationship.  She -- she was

23  supportive and -- of me.

24  Q.   Okay.

25          MS. SUTHERLAND:  53, we need to hand him 53.

Jun Yu - Direct

1    BY MR. COULTER:

2    Q.   Okay.  Mr. Yu, do you have Exhibit 53 in your hands?

3              All right.  Mr. Yu, I would like you to take a look

4    at Exhibit 53, and when you've had the opportunity to review

5    it, could you please just let us know.

6              THE COURT:  Are you waiting for a question?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  Go ahead, sir.

9    BY MR. COULTER:

10   Q.   Are you ready to go?  Okay.  Mr. Yu, can you tell us, the

11   Court, what Plaintiff's Exhibits 53 is?

12   A.   It's a student practicum semester evaluation from

13   Dr. Atkins for -- for spring 2010.  Dr. Atkins awarded me a B

14   grade, which indicates good performance.

15   Q.   All right.  Now, prior to this particular -- prior to

16   today's hearing, have you had an opportunity to see Plaintiff's

17   Exhibit Number 53?  Had you had an opportunity to see this

18   before today?

19   A.   Yes.

20   Q.   Okay.  Now, can you tell the Court what categories that

21   you -- that you were rated below expectations?

22   A.   Item 18.

23   Q.   Okay.  And can you tell -- tell the Court any concerns

24   Dr. Atkins had with your performance?

25   A.   Actually, during the discussion, we had a good discussion.

Jun Yu - Direct

1   It was very positive.  She noted, "I would be doing a -- doing

2   Jun a disservice if I did not give him feedback regarding the

3   impacts of his language skills on clinical work."  She

4   witnessed dramatic improvement over the year, but she noted my

5   conversational English still subpar for doctor-level training.

6   Q.   How did you respond to Dr. Atkins's assessment?

7   A.   I actually appreciated her feedback.  I accepted, and I

8   tried to work hard on improving my English.  She also noted I

9   will make a good clinician.

10  Q.   Now, Mr. Yu, how would you, in your own words,

11  characterize your performance in the practicum?

12  A.   Overall, I did well.  We worked on two cases, and I felt I

13  learned a lot from her.

14  Q.   All right.  You can go ahead and put that document down

15  for now.

16          Now, did you teach any classes in the spring of 2010?

17  A.   Yes.

18  Q.   And what subjects did you teach?

19  A.   I was assisting Dr. Prause on statistics.  I taught the

20  lab part of the class.

21  Q.   Was Dr. Prause your supervisor for that class?

22  A.   Yes.

23  Q.   All right.  All right.  Could you please hand him 28,

24  please, Mr. Shumard.  I believe that 28 has been stipulated to

25  for admission.

Jun Yu - Direct

1          THE COURT:  Yes.

2    BY MR. COULTER:

3    Q.   Now, Mr. Yu, would you please take a look at exhibit --

4    Plaintiff's Exhibit Number 28, and when you have had time to

5    review it, just look up and we will continue.

6          Now, Mr. Yu, did Dr. Prause evaluate your performance

7    as a graduate teaching assistant in statistics?

8    A.   Yes.

9    Q.   And --

10   A.   Dr. Prause was very pleased with my performance.  She

11   recommended I be allowed to teach in the future.

12   Q.   Okay.  Now, I am going to direct your attention to page 2

13   of that particular document.

14         All right.  Now, was it suggested or recommended to

15   you that you immerse yourself in English by Dr. -- by anyone?

16   A.   Yes.

17   Q.   Okay.  What -- what steps did you take to immerse yourself

18   in English?

19   A.   I took the committee's advice.  I immersed myself in

20   English-speaking contacts.  I took -- took all the classes in

21   English.  I did a -- all the clinical work in English.  I

22   interacted with professors and peers and others in English.  I

23   also listened to radio programs and songs in English.  I also

24   watched English movies and TV programs.

25   Q.   So, would you consider that you immersed yourself in

Jun Yu - Direct

1   English and took their advice?

2   A.   Yes.

3   Q.   Okay.  Were you enrolled -- Mr. Shumard, you can have that

4   one back.

5          Now, were you enrolled in Idaho State University in

6   the summer of 2010?

7   A.   Yes.

8   Q.   And did you take any classes that involved clinical or

9   practicum work then?

10  A.   Yes.

11  Q.   And who was your supervisor?

12  A.   Dr. Atkins.

13  Q.   Okay.  Could you hand him 55?

14         Mr. Shumard, could you please hand the witness -- you

15  have got it already.  Thank you.

16         Now, I want you to take a look at Exhibit 55.  When

17  you have had an opportunity to review it, please look up, and

18  we will ask you some questions.

19         Now, Mr. Yu, can you -- can you tell me what

20  Exhibit 6 is?  I mean, excuse me.  What Exhibit 55 is?

21  A.   It's a student practicum semester evaluation from

22  Dr. Atkins for summer 2010.  She awarded an A grade, which

23  indicates excellent performance.

24  Q.   All right.  Can you tell me how many below expectation

25  ratings you received in this evaluation?

Jun Yu - Direct

1   A.   Zero.

2   Q.   And can you tell me how many -- or, excuse me -- tell

3   me -- could you tell the Court how many exceeds expectations

4   ratings that you received?

5   A.   15.

6   Q.   Now, do you see Dr. Atkins's handwritten comments?

7   A.   Yes.

8   Q.   Okay.  And how would you characterize your performance in

9   this practicum?

10  A.   I did very well.  We -- we saw two clients.  We were

11  successful with the clients.  She comment I will do extremely

12  well in my native language, but she also commented fluent

13  English is still a concern.

14  Q.   All right.  Were you enrolled in Idaho State University in

15  the fall of -- fall semester 2010?

16  A.   Yes.

17  Q.   Did you take any classes involving clinical work in the

18  fall of 2010?

19  A.   Yes.

20  Q.   And who was your supervisor?

21  A.   Dr. Cellucci.

22  Q.   And what was your professional relationship with

23  Dr. Cellucci?

24  A.   We have a very good professional relationship.  We trusted

25  and supported each other.  We also respected each other.  He

Jun Yu - Direct

 1  was very understanding and supportive of me.  We worked

 2  together on several case.  We were successful with the clients.

 3  One client even continued in multiple sessions into the next

 4  semester until satisfactory completion.

 5          Later, Dr. Cellucci recommended me for internship.

 6  He wrote a letter of recommendation for my internship

 7  application.

 8  Q.   Okay.  Mr. Shumard, could you please hand the witness what

 9  has been marked as Exhibits 29 and 56?  Got them already.

10  Thank you.

11          All right.  I want you to take a look at

12  Exhibits 50 -- 56 and 29.  And when you have an opportunity to

13  do so, please look up, and I will ask you some questions.

14          All right.  Mr. Yu, by looking up, I am assuming that

15  you have had time to look at it and review these documents?

16  A.   Yes.

17  Q.   All right.  Now, can you tell the Court, what are those

18  documents?

19  A.   It's a student practicum semester evaluation from

20  Dr. Cellucci for fall 2010.

21  Q.   Okay.  Now, can you tell the Court how many below

22  expectation ratings did you receive in this practicum?

23  A.   Zero.

24  Q.   And how would you characterize your performance in the

25  practicum?

Jun Yu - Direct

1    A.    I did a very well.  Dr. Cellucci awarded an A grade.  I

2    learn a lot from Dr. Cellucci.

3    Q.    Now, could you tell the Court about -- about the class you

4    taught in the fall of 2010?

5    A.    Fall 2010, I intermittently taught a class, undergraduate

6    class, child development.

7    Q.    And can you tell the Court how many students were in your

8    class?

9    A.    There were about 30 students.

10   Q.    Did you receive any negative evaluations from your

11   students?

12   A.    No.

13   Q.    Did you attend Idaho State University in the spring

14   semester of 2011?

15   A.    Yes.

16   Q.    Did you take any course involving clinical or practicum

17   work?

18   A.    Yes.

19   Q.    And can you tell the Court who was your supervisor?

20   A.    My supervisor was Dr. Seikel.

21   Q.    Do you have Exhibit 51 in front of you?

22   A.    Yes.

23   Q.    All right.  What I would like you to do is take a look at

24   Exhibit 51, and when you have had time to thoroughly review it,

25   look up, and I will ask you some questions.

Jun Yu - Direct

1          Okay.  Mr. Yu, have you had time to review

2    Exhibit 51?

3    A.   Yes.

4    Q.   Can you tell the Court what is Exhibit 51?

5    A.   It's a student practicum semester evaluation from

6    Dr. Seikel for spring 2011.

7    Q.   Now --

8    A.   She --

9    Q.   Excuse me.  Go ahead.

10   A.   She awarded me an A grade.

11          THE COURT:  Mr. Coulter, I want to interrupt just to

12   make the record clear.  I think I am understanding here in this

13   context, Mr. Yu, when you reference grades, you referring to

14   letter grades for the course that appear on your transcript.

15          THE WITNESS:  Correct.

16          THE COURT:  All right.  So, they aren't -- that isn't

17   tied, for instance, to this Exhibit 51 to the three-level

18   scale.  That's separate and distinct; correct?  In other words,

19   the three-level scale is below expectation, meets expectations,

20   exceeds expectations.

21          THE WITNESS:  Actually, it's different system.  Like,

22   on my transcript, the letter levels, there are many levels like

23   A, B, C, D.

24          THE COURT:  Yes.

25          THE WITNESS:  F.

Jun Yu - Direct

1            THE COURT:  I understand.  I just want the record to

2    be clear, because it isn't yet, that when you talk about a

3    grade, you are talking about a letter grade.

4            THE WITNESS:  Yes.

5            THE COURT:  All right.

6            THE WITNESS:  On transcript which is different from

7    here.

8            THE COURT:  Go ahead, Mr. Coulter.

9    BY MR. COULTER:

10   Q.   Okay.  All right.  Mr. Yu, how many areas did you receive

11   below expectation ratings?

12   A.   Two.

13   Q.   All right.  Can you tell the Court what those are?

14   A.   Item 18, ability to form working alliance with patients,

15   and item 37, ability to adjust treatment plans and

16   interventions as a function of ongoing assessment data,

17   therapeutic processes, and/or changes in circumstances.

18   Q.   Now, Mr. Yu, did you discuss these -- these issues and

19   markings with Dr. Seikel?

20   A.   Yes.  Actually, she was very pleased with my overall

21   performance, and then she just suggested I can be more of

22   myself, relaxed.  And she commented I was diligent, committed,

23   and just always seek appropriate assessment in the treatment

24   materials.

25            She comment I was totally non-defensive in accepting

Jun Yu - Direct

1  supervisory feedback.  My conceptualizations are accurate and

2  sophisticated.

3  Q.  Did she give you any areas that you needed to grow?

4  A.  Yes.

5  Q.  Can you tell the Court what those were?

6  A.  She suggest I -- I be more relaxed and myself in session,

7  and fluency in English, also.

8  Q.  Did you take the doctor's advice?

9  A.  Yes.

10  Q.  Could you tell the Court how you did that?

11  A.  I -- I tried to immerse myself in English-speaking

12  contexts.  Also, in session, I tried to be more relaxed.

13  Q.  When you say in session, for the Court, what do you mean

14  by in session?

15  A.  When I see clients.

16          THE COURT:  I understand.

17  BY MR. COULTER:

18  Q.  Okay.  Now, do you have Exhibit 30 in front of you?

19  A.  Yes.

20          MR. COULTER:  All right.  And Exhibit 30 has been

21  stipulated to for admission, Your Honor?

22          COURTROOM DEPUTY:  Yes.

23  BY MR. COULTER:

24  Q.  Okay.  All right.  Now, I would like you to take a look at

25  Exhibit 30.  And when you are done looking at Exhibit 30, could

Jun Yu - Direct

1    you please look up.

2              Okay.  Mr. Yu, by your looking up, I assume that you

3    have had an opportunity to read this document and understand

4    it?

5    A.    Yes.

6    Q.    Now, can you tell the Court what is Exhibit 30,

7    Plaintiff's Exhibit 30?

8    A.    It's a semi-annual student evaluation for spring 2011.

9    Q.    Now, can you tell us -- could you tell the Court about the

10   course you taught in spring 2011?

11   A.    I taught an undergraduate course called Test Construction

12   and Measurement.

13   Q.    How many students did it have about approximately?

14   A.    About 20 students.

15   Q.    Did you get student evaluations?

16   A.    Yes.

17   Q.    Can you tell the Court about those student evaluations?

18   A.    The evaluation overall is good.

19   Q.    What about the comment about a significant subgroup that

20   had problems with your teaching?

21   A.    I cannot comment, since -- because I don't understand --

22   don't get what the exact meaning of a significant subgroup.

23   Q.    Did you review this -- who gave you this evaluation?

24   A.    Dr. Roberts.

25   Q.    Did you review this evaluation with Dr. Roberts?

Jun Yu - Direct

1    A.    No.

2    Q.    Why didn't you?

3    A.    That summer I was doing clinical work for my dissertation.

4    This evaluation was possibly put into my mail back in May, and

5    at the end of August, I came back from China.

6    Q.    Now, I believe you said that the exhibit was placed -- you

7    believe it was placed in your mailbox?

8    A.    Yes.

9    Q.    Do you have any direct evidence that it was placed in your

10   mailbox, Mr. Yu?

11   A.    I got this from my mailbox.

12   Q.    Okay.  All right.  Now, did you follow the Clinical

13   Training Committee's recommendation as to identifying sites

14   that serve Chinese immigrant populations?

15   A.    Yes.  I identified three such sites, and I also reach out

16   to Asian American Psychological Association asking if they have

17   more sites, such sites.  But I was unable to -- I didn't find

18   more, but three sites just not enough to get a spot.  So, I

19   applied at two more other sites.

20   Q.    Now, there, right there in this paragraph that's

21   highlighted, it says "Jun's expressive speech and English

22   remain halting at times."

23         Can you explain why someone would say that your

24   speech was halting at times?  And what does that mean to you?

25   Could you explain it to the Court?

Jun Yu - Direct

1  A.   To me, since I speak English as a foreign language, I try

2  to be careful in my choice of words.  In communicating with my

3  listeners, I try to make sure my listeners can understand me.

4  So, I was just careful in communicating.

5  Q.   Much as you are doing today?

6  A.   Yes.

7  Q.   Now, how do you respond to the characterization that your

8  English is a real problem with alliance formation?

9  A.   I always try to improve my English and also work on

10  improving working alliance.

11  Q.   Okay.  Now, were you enrolled in Idaho State University in

12  the fall of -- excuse me -- in the fall semester of 2011?

13  A.   Yes.

14  Q.   And were you involved in any practicums or externships in

15  the fall of 2011?

16  A.   Yes.

17  Q.   Can you tell the Court who your supervisors were?

18  A.   Dr. Landers and Dr. Lynch.

19  Q.   And Dr. Landers was your supervisor in what?

20  A.   Dr. Landers was the supervisor for my externship and

21  Dr. Lynch was a supervisor for my practicum.

22  Q.   Now, how would you characterize your externship with

23  Dr. Landers?

24  A.   My externship was with Dr. Landers at Eastern Idaho

25  Regional Medical Center.  I was scheduled to work Tuesdays and

Jun Yu - Direct

1    Thursdays afternoons.  I was told by Dr. Landers, Tuesdays

2    after 2:00 p.m. and Thursdays after 5:00 p.m. I was on my own.

3            So, usually, when I go in, Dr. Landers will show me a

4    list of tests he want -- wanted me to do.  And then he will

5    discuss the client and the tests with me.  Then he will leave

6    the room.  Then I will bring patients to the testing room and

7    do the testing.  After that, I will bring back the patient to

8    his or her area.  Then I would leave.

9            So, my major responsibility was to administer tests

10   there.

11   Q.   Were you dismissed from the externship?

12   A.   Yes.

13   Q.   Can you tell the Court when you were dismissed from the

14   externship?

15   A.   November 4th, 2011.

16   Q.   Do you have what has been marked as Plaintiff's Exhibit 38

17   in front of you?

18   A.   Yes.

19           MR. COULTER:  And that has been stipulated to, Your

20   Honor, by the parties.

21   Q.   Now, I want you to take a look at exhibit -- Plaintiff's

22   Exhibit 38, and when you have time to review it, please look

23   up, as you have been, and I'll ask you some questions.

24           All right.  By your looking up, I assume you have had

25   the opportunity to effectively read this document?

Jun Yu - Direct

1    A.    Yes.

2    Q.    Now, Mr. Yu, how would you characterize your professional

3    relationship with Dr. Landers?

4    A.    Generally, good.  He -- he has good knowledge and skills.

5    Q.    Did you learn anything from him?

6    A.    Yes.

7    Q.    Can you tell the Court what you learned?

8    A.    I learned about new tests, like I didn't learn at the

9    Psychology Department, like continuous performance test, this

10   kind of tests.

11   Q.    Okay.  Did you appreciate learning that?

12   A.    I appreciate.

13   Q.    Now, do you agree with Dr. Landers's assessment of you in

14   this particular document?  Excuse me.  In Plaintiff's Exhibit

15   Number 38?

16   A.    I agree with his comments that I was diligent and

17   obviously mastered the behavioral science components essential

18   to my career goal of returning to China to provide parent/child

19   skills training.  I was amiable and willing to learn and a

20   desire to do well.

21          But I respectfully disagree with his conclusion that

22   I was unable to grasp communication nuances.  Because before

23   this letter, he never provided feedback about what are the

24   communication nuance he was referring to and didn't provide

25   remediation.  So, I was surprised.

Jun Yu - Direct

1   Q.   Now, did Dr. Landers ever give you a formal test to see if

2   you were grasping the communication nuances?

3   A.   No.

4   Q.   Were you ever presented with any empirical evidence to

5   show that you were not communicating well with clients, picking

6   up on verbal cues, or forming work alliances with patients?

7   A.   No.

8   Q.   All right.  Do you have Exhibit Number 46 in front of you?

9   Mr. Yu, do you have Exhibit Number 46 in front of you?

10  A.   Yes.

11          MR. COULTER:  And that would be Plaintiff's Exhibit

12  Number 46, Your Honor.

13  Q.   Now, I want you to take a look at exhibit number --

14  Plaintiff's Exhibit 46, and when you are finished looking at

15  it, please look up at me.  We will proceed.

16          Okay.  You are looking up.  By that, Mr. Yu, I

17  believe that you are indicating that you have had ample time to

18  review Plaintiff's Exhibit 46; is that correct?

19  A.   Yes.

20  Q.   Now, can you tell the Court how many below expectation

21  ratings did you receive in this evaluation?

22  A.   16.

23  Q.   Did you agree with Dr. Landers's assessment of your

24  performance?

25  A.   I agree with his comment that given my desire to return to

Jun Yu - Direct

1    China and specialize in parent/child training, I was probably

2    right where I needed to be.

3            But I respectfully disagree with his B ratings,

4    because this evaluation was done on November 14th, 2011, like

5    10 days after he dismissed me from the externship.  If we -- I

6    would appreciate it more if he provide this feedback while I

7    was still in the externship.  So, it's untimely.

8    Q.  Okay.  Mr. Yu, I am going to call your attention to -- you

9    have the monitor in front of you; don't you?

10   A.  Yes.

11   Q.  I am going to call your attention to the language that's

12   been called out.  Do you see that language, Mr. Yu?

13   A.  Yes.

14   Q.  Now, do you agree with Dr. Landers's assessment that

15   you -- you were significantly lagging in areas due to your

16   cultural awareness and competency?

17   A.  No.

18   Q.  Can you tell the Court why?

19   A.  Because he didn't explain to me what this were, and while

20   I was there, he didn't tell me what I did that was wrong and

21   also didn't provide a remediation.  I cannot improve on things

22   I was not made aware of.

23   Q.  Now, did you take a practicum course from Dr. Lynch in the

24   fall of 2011?

25   A.  Yes.

Jun Yu - Direct

1    Q.   And how would you characterize your practicum with

2    Dr. Lynch?

3    A.   Generally, it's good.

4    Q.   Did you learn anything?

5    A.   Yes.  Well, this practicum exposed me to new type of

6    clients, like couples, and new type of treatment approaches.

7    So, we saw two clients together.

8    Q.   Let me make sure.  You saw two types of clients together

9    with Dr. Lynch?

10   A.   I remember one was Dr. Lynch and the other was another

11   student.  We saw -- the other student and I saw the couple

12   together.  And for Dr. Lynch, she and me saw a woman in crisis

13   together.

14   Q.   Okay.  Now, I'm going to -- do you have Plaintiff's

15   Exhibit Number 34 in front of you?

16   A.   Yes.

17   Q.   All right.  I'd like you to take a moment and look at

18   exhibit -- Plaintiff's Exhibit Number 34.  And when you've had

19   an opportunity as in the past, look up, and I will ask you some

20   questions about it.

21          Actually, you finished before I did.  Okay.  All

22   right.  Mr. Yu, could you tell the Court what is Exhibit

23   Number 34?

24   A.   This is a letter from Dr. Roberts to me.  The Clinical

25   Training Committee recommended a course of action in responding

Jun Yu - Direct

1   to Dr. Landers's concern.

2   Q.   All right.  Did ISU provide with you an action plan to

3   address the issues with Dr. Landers?

4   A.   Yes.

5   Q.   And looking at your monitor, do you see these actions?

6   A.   Yes.

7   Q.   Okay.  Could you tell the Court what those actions were

8   and what you did about them?

9   A.   The actions were continue to work with Dr. Lynch and

10  register for one credit of PSYC 7725.

11  Q.   Hold on for a second.  I want to take them one at a time.

12  The first one, did you do that?

13  A.   Yes, I did that.

14  Q.   Okay.  Could you tell the Court how you did it?

15  A.   I continued to work with Dr. Lynch in the following

16  semester actually, spring 2012.

17  Q.   Now, on the second action item, where it says register for

18  one credit of PSYC 7725 in Dr. Haight's clinic team.  Did you

19  do that?

20  A.   Yes.

21  Q.   Okay.  How did that turn out?

22  A.   Well, I did well.  Dr. Haight -- actually, Dr. Roberts

23  together, they awarded a B grade, which indicates good

24  performance overall.

25  Q.   Now, what about number three, where it says "Register one

Jun Yu - Direct

1    credit of PSYC 5517 on Dr. Roberts's interdisciplinary

2    evaluation team"?

3    A.    I did that.

4    Q.    Okay.  What about number four?

5    A.    I did that.

6    Q.    So, you assumed primary therapist role for one behavioral

7    family therapy case under Dr. Roberts's supervision?

8    A.    Yes.

9    Q.    Okay.  Can you tell us about that?

10   A.    Well, oh, okay.  I think the committee revised -- the

11   committee revised this -- this recommendation later.

12   Q.    I don't know.  I want you to answer questions.

13   A.    I think the committee revised the recommendations in that

14   fall of 2011 Clinical Training Committee evaluation.

15   Q.    Okay.  What about number five?

16   A.    Also revised.

17   Q.    Okay.  So, you didn't do number four, and you didn't do

18   number five, because they were revised by the Clinical Training

19   Committee; is that your answer?

20   A.    Yes.

21   Q.    Okay.  Do you have Plaintiff's Exhibit Number 48 in front

22   of you?

23   A.    Yes.

24   Q.    Okay.  All right.  The same process.  I would like you to

25   take a look at Plaintiff's Exhibit Number 48, and when you have

Jun Yu - Direct

1    had an opportunity to review it and are ready to answer

2    questions, just look up.

3            THE COURT:  Okay.  Mr. Coulter, we are ready to go

4    again.

5    BY MR. COULTER:

6    Q.   Okay.  Mr. Yu, can you tell us what Exhibit 13 is?  Excuse

7    me.  Exhibit 48 is?

8    A.   It's student practicum semester evaluation from Dr. Lynch

9    for fall 2011.

10   Q.   Now, did you review this evaluation?

11   A.   Yes.

12   Q.   Did you sign this evaluation?

13   A.   Yes.

14   Q.   Do you agree with Dr. Lynch's assessment?

15   A.   She actually awarded me an A minus, which indicates

16   excellent overall performance.  This evaluation was not the

17   final assessment of my performance for this practicum.  I agree

18   she -- when she said I was motivated and committed to seeking

19   out appropriate assessment and treatment materials and I

20   progressed over the semester.  However, I respectfully disagree

21   with her negative ratings of me.  For example --

22   Q.   Which negative rating in particular?

23   A.   She rated me below expectations on five items.

24   Q.   As far as engagement in classes, did she rate you on that;

25   or did she tell you anything about that?

Jun Yu - Direct

1    A.    She -- she said I appeared unengaged during group

2    discussion.  I respectfully disagree with that.  I was engaged.

3    I was listening, and I provided comments when I can.  And I was

4    listening to others.  If I was briefly reading material, it is

5    because the materials are relevant to the discussion and can be

6    helpful for discussion.  In my culture, it is not unusual for

7    one to read while still engaged.

8    Q.    Were you paying attention?

9    A.    Yes.

10   Q.    Did you actually ask questions?

11   A.    Yes.

12   Q.    Did Dr. Lynch recognize you and answer the questions?

13   A.    Yes.

14   Q.    Okay.  49 and 33.  Just make sure you have those.

15           MR. COULTER:  Both stipulated to.  Okay.

16   BY MR. COULTER:

17   Q.    Now, do you have Exhibits 49 and 33 in front of you?

18   A.    Yes.

19   Q.    All right.  I will ask you to do the same thing.  I'd like

20   you to review Exhibit 49 and 33, and when you have had ample

21   opportunity to do so, please look up, and I will ask you some

22   further questions.

23           Okay.  Are you ready to answer questions, Mr. Yu?

24   A.    Yes.

25   Q.    Okay.  Can you tell the Court what is Exhibit 49?

Jun Yu - Direct

1   A.   It's a course completion contract.

2   Q.   All right.  And can you tell the Court what is Exhibit 33?

3   A.   Exhibit 33 is an unofficial transcript from Idaho State

4   University.

5   Q.   And how did you receive it?  How did you get this?

6   A.   I print out through ISU's website.  I have -- you know,

7   there's a portal for students.

8   Q.   Okay.  Thank you.  Now, did you complete the class -- the

9   practicum class with Dr. Lynch?

10  A.   Can you speak slower and repeat it?

11  Q.   Yes.  Okay.  I am going to refer you to Plaintiff

12  Exhibit 49.  Okay.  And at the -- where the highlighted

13  portion, where it says method -- excuse me -- method for final

14  grade, okay?  You see where it says, "This currently reflects

15  the performance and skills equivalent to a B."  Do you see

16  that?

17  A.   Yes.

18  Q.   Okay.  Why is that important to you?  Was the B your final

19  grade?

20  A.   No.

21  Q.   All right.  Can you tell the Court about the B and your

22  final grade and how it is reflected here on your transcript?

23  A.   Well, my final grade is A minus.  And based on this

24  contract, if I do not do additional work, during -- for

25  Dr. Lynch's practicum, I will get a B.

Jun Yu - Direct

1   Q.   All right.  But you got an A?

2   A.   Yes.

3   Q.   Is that correct?  All right.  Could you explain to the

4   Court how you go from a B to an A in this particular practicum?

5   A.   Well, I did additional clinical work, and obviously

6   Dr. Lynch was happy with my performance, and she saw I made

7   progress.

8   Q.   Did you get an evaluation from the time when you finished

9   and got the A minus?

10  A.   No.

11  Q.   Okay.  Okay.  Can you tell the Court why did you get the

12  incomplete?

13  A.   Here it's written there, because of low clinical

14  referrals.  It's not to relate to me.

15  Q.   Okay.  I know this is going to be hard for you, but can

16  you explain what does it mean by low clinical referrals and how

17  does that relate for you carrying over to the next core to

18  finish the class?

19  A.   Low clinical referrals mean not so many patients come in.

20  So, if we have three students in a team, and we only get one

21  client, then two -- maybe two other students won't get a

22  client.  So, that -- that will affect student's practice.

23  Q.   All right.  So, what did you do to, in fact, get the

24  number of referrals to get the A?  Did you have to complete

25  another course?  Did you have to carry over to another course?

1  A.   Yes.  So, basically, the time frame of that practicum is

2  expanded, you know.  Because like here, she -- she wrote,

3  during that fall semester, I just began to take on a client in

4  November.  So -- so, I needed more time to do more clinical

5  work.

6  Q.   Okay.  Were you enrolled in ISU during the semester of

7  2012?

8  A.   Yes.

9  Q.   Did you take any practicums during the spring semester of

10  2012?

11  A.   Yes.

12  Q.   And can you tell the Court who your supervisor was?

13  A.   My supervisors were Dr. Roberts and Dr. Haight.

14  Q.   Okay.  Do you have Defendant Exhibit 538 in front of you?

15  A.   Yes.

16  Q.   Take your time and take a look at it.  Notice it says

17  Defendant's Exhibit 538 at the top.  Do you see that, Mr. Yu?

18  Do you see where it says Defendant's Exhibit 538 at the top?

19  A.   Yes.

20  Q.   Okay.  Now, go ahead, take your time and look at it, and

21  when you are done, look up.

22           MR. COULTER:  Okay.  Your Honor, at this particular

23  point in time, we probably -- it hasn't been objected to, but

24  this is one of the ones where we wanted to redact it.  We

25  actually redacted it.  It's defendant's exhibit.  Defendant's

Jun Yu - Direct

1   exhibit is probably not going to be redacted there, but ours is

2   that we are offering on Defendant's Exhibit 538.

3          It has the issues that we were dealing with in docket

4   106, where there was language --

5          THE COURT:  Let me see the original.  Mr. Shumard,

6   will you bring it up to me, please?

7          Mr. Kelly, this is your Exhibit 538, and I am

8   understanding Mr. Coulter wants to make an exhibit of his own

9   but in a redacted form.

10          MR. COULTER:  The last sentence.

11          MR. KELLY:  It's already been stipulated to; correct?

12          MR. COULTER:  It has been stipulated to, Your Honor,

13   but I didn't know whether or not he saw our redaction, and I

14   wanted to make sure we were clear.

15          THE COURT:  All right.  Let me -- let me try to

16   repeat what I am understanding what we have here then.

17          We have Defendant's Exhibit 538.  Did you stipulate

18   to its admission in the form proposed by the defendant?

19          MR. KELLY:  We went through this before we started

20   today, Judge, and that was one of the stipulated exhibits.

21          THE COURT:  Well, bear with me, Mr. Kelly.

22          Miss Case, what do you show in that regard?

23          COURTROOM DEPUTY:  Yes.

24          THE COURT:  All right.  It's been admitted by

25   stipulation.  Therefore, it's in the form that it's in in its

Jun Yu - Direct

1    original form.  So, I don't know that there's any point, sir,

2    by -- if you want to, but I don't see there is any reason to.

3                 MR. COULTER:  There is no reason to, Your Honor.  I

4    just wanted to be clear.  I didn't want to try to sneak

5    something in.

6                 THE COURT:  I understand that.  So, just use it then

7    as a Defendant's Exhibit 538.

8                 MR. COULTER:  538, Your Honor.

9                 THE COURT:  538.  All right.

10                MR. COULTER:  Thank you, Your Honor.

11   Q.   Now, Mr. Yu, can you tell us what Exhibit 538 is?

12   A.   It's a student practicum semester evaluation from

13   Drs. Roberts and Haight for spring 2012.

14   Q.   All right.  Mr. Yu, having seen the evaluation and read

15   your response, do you stand by your response that is written

16   today in Exhibit 538, Defendant's Exhibit 538?

17   A.   Yes.

18   Q.   Now, what is your response to Dr. Haight and Dr. Roberts's

19   evaluation summarized?

20   A.   Okay.  I appreciate they said I was diligent.

21                THE COURT:  I am going to stop, because apparently

22   what you have in front of the witness is a form that is not the

23   form that's admitted into evidence, because you just showed a

24   page that had some redaction from it.

25                So, if it's going to be in front of the witness, it

Jun Yu - Direct

1   needs to be in the form that it's been admitted.  Do you have

2   it in that form?

3            MR. COULTER:  I'd have to look, Your Honor.

4            THE COURT:  Okay.  Well, maybe it would be easier

5   just to hand him the exhibit as it appears.  Is there any other

6   hard copy other than the one I have, Mr. Shumard?

7            All right.

8            MR. KELLY:  Judge, if we want to take the time, I can

9   project mine up.

10           THE COURT:  Well, it's going to come right out of my

11  book, and it's going to go right to the witness.  538.

12           THE WITNESS:  Thank you.

13           THE COURT:  Mr. Coulter, I have handed him

14  Exhibit 538 from my hard copy notebook.  So, he has the

15  complete exhibit now, so you can inquire of him on that.

16           MR. COULTER:  Your Honor, can I take a look at that

17  exhibit?

18           THE COURT:  Well, of course you can.  Mr. Shumard,

19  why don't you bring it down for him.

20           MR. COULTER:  Okay.  Your Honor, could we have a

21  sidebar?

22           THE COURT:  About what, the exhibit?

23           MR. COULTER:  Yes, Your Honor.

24           THE COURT:  All right.

25        (Sidebar.)

Jun Yu - Direct

1          THE COURT:  You will need to come over here close

2     enough so that you can be picked up on the microphone.   Go

3     ahead.

4          MR. COULTER:  Your Honor, in this particular exhibit,

5     it has a response, and it says that I looked at this and there

6     will be retaliation against the Idaho Human Rights Commission

7     complaint that we filed.

8          Okay.  What I am trying to avoid is trying not to

9     open doors having the Human Rights Commission being placed in

10    there, because that's being read into the record.

11         Now, I don't know why we didn't see this before, but

12    we have tried to redact anything that had anything to do with

13    the Idaho Human Rights Commission, so --

14         THE COURT:  I understand.

15         Mr. Kelly, do you have some response?  You have got

16    to get up here so you can be picked up by the court reporter.

17         MR. KELLY:  They had the opportunity to look these

18    exhibits over and over again.  In fact, it was proven yesterday

19    when they tried to change all these exhibits.  This has been a

20    four-month process.  So, why now?

21         THE COURT:  All right.  I am not -- in any case,

22    there's always a mountain of documents, and it's always

23    possible that something might get slipped by, particularly when

24    the Court is pressuring lawyers, as I always do, to try to

25    reach stipulation wherever you can.  If you inquire into that

Jun Yu - Direct

1    particular detail, then the door is open.

2              MR. COULTER:  Yes, Your Honor.

3              THE COURT:  But it's also in the record, and we will

4    take up the issue about whether it needs to be precluded

5    somehow otherwise.  And in terms of your inquiry about it, we

6    will just wait, and I will deal with that.  I will look at it

7    at the end of the day, and you can cross-examination him when

8    it's your turn on this document with the exception of that

9    piece.

10             All right?  And we will decide where we are going to

11   go from there.  Okay?

12        (End of sidebar.)

13             MR. COULTER:  Your Honor, I just need a little bit

14   more sidebar, because there's a different piece of information

15   that we know about this.

16        (Sidebar.)

17             THE COURT:  Mr. Coulter, you need to get a little

18   closer.

19             MR. COULTER:  Yes, Your Honor.  My cocounsel jogged

20   my memory about this.  This is one of the documents where it

21   wasn't complete.  Okay?  And so we asked him to complete the

22   document.  We had already looked at our documents for our

23   objection under 106, but when we got this back, we put it in,

24   and this is why it was redacted out.

25             THE COURT:  Back up.  You are telling me that the

Jun Yu - Direct

1    exhibit that was originally proposed by the defendant --

2                 MR. COULTER:  Yes.

3                 THE COURT:  -- is not --

4                 MR. COULTER:  Was not complete.

5                 THE COURT:  Okay.  Mr. Kelly, is that right?

6                 MR. KELLY:  And then we provided the complete

7    document.  I am not going to ask, Judge -- we can leave this

8    out.  I am not going to ask any questions about this anyway.

9                 MR. COULTER:  I just want to make sure it doesn't

10   open the door.

11                THE COURT:  I understand.  All right.  Here is what

12   we are going to do.  We are going to make this one -- we are

13   going to make this the one that you want to use that's

14   redacted --

15                MR. COULTER:  Yes.

16                THE COURT:  All right.  Will be -- what number is

17   this again?  358?

18                MR. COULTER:  538.

19                THE COURT:  It's going to be 538A.  All right?  And

20   then you can inquire on that.  And we will leave the other

21   piece of this out of this for the time being.  It would be a

22   bigger issue if it were a jury trial, but I am certain I can

23   sort through this thing.

24                MR. KELLY:  Okay.

25                MR. COULTER:  The same objection.

Jun Yu - Direct

1            THE COURT:  Give to Miss Case so she can mark it as

2    538.

3            MR. COULTER:  Miss Case, it's going to be 538 alpha.

4       (End of sidebar.)

5            THE COURT:  You can go ahead and give that to

6    Mr. Shumard, and he will give it to the witness.

7            All right.  The witness is being handed a document

8    that's been marked as 538A.  Any objection to its admission as

9    plaintiff's exhibit, Mr. Kelly?

10           MR. KELLY:  None, Your Honor.

11           THE COURT:  All right.  538A is admitted.  It will be

12   Plaintiff's Exhibit.  Go ahead.

13      (Exhibit 538A admitted.)

14   BY MR. COULTER:

15   Q.   Okay.  Mr. Yu, do you have 538 in front of you,

16   Plaintiff's Exhibit 538?

17           THE COURT:  538A or 538?

18           MR. COULTER:  538A, Your Honor.

19           THE COURT:  All right.

20           THE WITNESS:  Yes.

21   BY MR. COULTER:

22   Q.   Okay.  Can you tell the Court what is Exhibit 538A?

23   A.   It is a student practicum semester evaluation from

24   Dr. Roberts and Dr. Haight for spring 2012.

25           THE COURT:  Take this down, please.

Jun Yu - Direct

1          MR. COULTER:  Take this down.

2          THE COURT:  She's doing it.  Thank you.

3     BY MR. COULTER:

4     Q.   All right.  Mr. Yu, have you seen the evaluation and read

5     your response?  Do you stand by your response that was written

6     today?

7     A.   Yes.

8     Q.   Okay.  All right.  Do you disagree with this evaluation at

9     all?

10         THE COURT:  Mr. Coulter, because it's not on the

11    screen and I don't have the copy in front of me, you may want

12    to inquire of him as to what that response is.

13         MR. COULTER:  Okay.

14         THE COURT:  All right.  So that I have that in the

15    context.

16    BY MR. COULTER:

17    Q.   All right.

18    A.   I agree with that comments that I was passionate and

19    diligent for clinical work.  The part I disagree with are

20    the -- the below expectation ratings and the negative comments.

21    Q.   Are there any areas that you just don't understand the

22    evaluations?

23         MR. KELLY:  Objection, Your Honor, leading.

24         THE COURT:  Overruled.

25

Jun Yu - Direct

1  BY MR. COULTER:

2  Q.   Did you hear the question?

3  A.   Would you please repeat?

4       MR. COULTER:  Madam Court Reporter, could you read

5  that back?

6       THE REPORTER:  "Question:  Are there any areas that

7  you just don't understand the evaluations?"

8       THE WITNESS:  Yes, I don't understand what are the

9  facts to support this below ratings.  I was not made aware of

10 what I was doing wrong at the time, and I cannot improve or

11 change what I didn't know.

12 BY MR. COULTER:

13 Q.   Mr. Yu, were you given any empirical evidence to support

14 the negative findings that you see in the evaluation?

15 A.   No.

16 Q.   Now, Mr. Yu, can you tell the Court what is the -- what is

17 one of the major requirements for you to get your doctoral

18 degree in clinical psychology?

19 A.   To defend a dissertation.

20 Q.   And did you do that?

21 A.   Yes, I successfully defended my dissertation.

22 Q.   And can you tell what the -- can you tell the Court what

23 was the subject of your dissertation?

24 A.   A Clinical Trial of Behavioral Family Therapy in China.

25 Q.   Can you tell the Court what that involved?

Jun Yu - Direct

1   A.   It involved a lot of work, especially clinical work.

2   Because this therapy was developed in the US and was well

3   studied and accepted, but it was never tried in China.  So, I

4   adapted this therapy and tried to gain some empirical data on

5   how -- whether Chinese children and their caregivers respond to

6   this therapy, which treats children's disruptive behaviors

7   among two- to seven-year-olds.

8        So, I did this clinical trial of this behavioral

9   family therapy in Shanghai, China.  I totally accumulated 251

10  direct clinical hours from this dissertation work.  So, the

11  clinical work involves assessment and treatment.  So, the

12  dissertation committee required me to recruit 10 families, but

13  I recruited 19 families.  So, that's a lot of work.

14       Each -- all of the families complete all the

15  assessment and the treatment.  So, that's extraordinary.  You

16  don't get this kind of 100 percent completion rate usually.

17  So, the result was very good.  The children's behavior problems

18  reduced after the treatment, and the parents were very

19  satisfied with my services.

20       (Pause in the proceedings.)

21       MR. KELLY:  This is going to be what number?  What

22  number is this?

23       MR. COULTER:  It was part of Exhibit 39.  There were

24  600 and something pages, but we are not going to put everything

25  in.

1          MR. KELLY:  So, it's got to be a new exhibit then.

2          MR. COULTER:  Yes.

3          MR. KELLY:  Okay.  What's the exhibit next in order.

4   118?

5          MS. SUTHERLAND:  118.

6          MR. COULTER:  Let's mark it as 118.

7          Your Honor, at this time, I am going to have Mr. Ken

8   Shumard take what's going to be next in order on the docket,

9   Plaintiff's Exhibit 118.  It has not been admitted at this

10  particular point in time, but there is no objection from

11  Mr. Kelly.

12          THE COURT:  You stipulate to what you have seen

13  marked as Exhibit 118, Mr. Kelly?

14          MR. KELLY:  Yes, Your Honor.

15          THE COURT:  All right.  118 will be admitted.

16      (Exhibit 118 admitted.)

17          THE COURT:  Can you -- all right.

18  BY MR. COULTER:

19  Q.   Now, Mr. Yu, you have in front of you what has been marked

20  as exhibit -- Plaintiff's Exhibit 118.  And I want you to take

21  a look at that, and when you have time, when you have had an

22  opportunity to look at it, I want you to look up.

23          Okay.  What is Exhibit 1 -- Plaintiff's Exhibit 118,

24  Mr. Yu?

25  A.   It's professional hours summary table Dr. Roberts gave to

Jun Yu - Direct

1   me.

2   Q.   So, you didn't make this document?

3   A.   No.

4   Q.   Okay.  And Dr. Roberts was the one who created this

5   document; is that your testimony?

6   A.   I believe so.  He nodded his head.  Must be yes.

7   Q.   Okay.  Now, would you please tell the Court what, if

8   anything, does this document show regarding your clinical hours

9   at Idaho State University?

10  A.   It shows from summer 2011, from my dissertation work in

11  China, I earned 204.5 intervention hours, which is like

12  65 percent of the total intervention hours during my four years

13  at ISU.  I also earned 46.5 assessment hours, which is

14  23 percent of the total clinical hour -- assessment hours I

15  earned during the four years at ISU.

16  Q.   Okay.  Did you have a supervisor for your dissertation?

17  A.   Yes, Dr. Roberts.

18  Q.   Thank you.  Now, can I ask you another question?  Can you

19  tell the Court what this exhibit represents?  Wait a minute.

20  Hold on.

21       (Off-the-record discussion.)

22            MR. COULTER:  119.

23            THE COURT:  We have proposed Exhibit 119, Mr. Kelly.

24  Do you stipulate to its admission?

25            MR. KELLY:  I do, Your Honor.

Jun Yu - Direct

1          THE COURT:  Plaintiff's 119 is admitted.

2          (Exhibit 119 admitted.)

3   BY MR. COULTER:

4   Q.   Okay.  Now, Mr. Yu, do you have Plaintiff's -- no, you

5   don't.  You will have.

6          Mr. Yu, do you now have Plaintiff's Exhibit 119?

7   A.   Yes.

8   Q.   All right.  I want you to take a look at that, and when

9   you are ready, look up, and I will ask you some questions on

10  it.

11         All right.  Mr. Yu, can you tell the Court what is

12  Exhibit 119?  Plaintiff's Exhibit 119?

13  A.   It is a table from my dissertation.  It shows the results

14  of the parents' consumer satisfaction questionnaire,

15  satisfaction with therapist.  So, there were six items on the

16  questionnaire.  And M means the number of caregiver, primary

17  caregivers.  So there are total 19 primary caregivers.  M means

18  the average rating.  The rating range, the ratings range from

19  zero to six.  The zero means very dissatisfied.  Six means very

20  satisfied.  So, SD, that's standard deviation, which means the

21  scatteredness of the ratings from the average.

22         Well, let me tell you what this table means.  So,

23  this table showed, on average, the caregivers were very

24  satisfied with therapist teaching skills.  Therapist is me.

25  So, the caregivers also were very satisfied with my

Jun Yu - Direct

1   preparation.  They also very satisfied with my interest and

2   concern for caregiver and their child's problems.

3          Caregivers consider I was very helpful.  They also

4   have very positive feelings toward me.  That's basically what

5   this table shows.

6   Q.   Can you tell me what N stands for?  What's that column?

7   A.   N, number.  Number of primary caregivers who fill out this

8   questionnaire.

9   Q.   Okay.  And how many people were actually in your program

10  totally?  Did you lose some?

11  A.   No.  There's 19 families, actually, including children and

12  other caregivers.  But this number means the number of the

13  primary caregiver.

14  Q.   Okay.  And they all came back?

15  A.   Yes.

16  Q.   Is that unusual in -- in the psychological parlance?

17  A.   Yes.

18  Q.   Why?

19  A.   Because, actually, I read a study for students in

20  training.  The dropout rates can be as high as, like,

21  80 percent.  So, it's very unusual for me to have all the

22  participants to finish this program.

23  Q.   Mr. Yu, did you give any inducements to the parents who

24  were participating in this -- in this study to come back?

25  A.   No.

Jun Yu - Direct

1   Q.   Did you pay them?

2   A.   No.

3   Q.   Did you offer any incentive whatsoever?

4   A.   No.

5   Q.   Okay.  Now, Mr. Yu, is an internship required for you to

6   receive your doctoral degree in clinical psychology from Idaho

7   State University?

8   A.   Yes.

9   Q.   So, what steps did you take to attain an internship?

10  A.   Well, the Clinical Training Committee approved my

11  readiness to apply for internship.  Then I identify sites and

12  prepare the application materials including personal essays.

13  Then applied through that 09 system, APPIC system.  Then

14  Dr. Roberts approved and verified my application.  I got four

15  interviews but didn't get matched through that system.

16  Q.   So, is it your testimony you did not get matched in an

17  APPIC?  Is that what you are saying, APPIC --

18  A.   Yes.

19  Q.   -- internship?

20  A.   Yes.

21  Q.   And is that APPIC the acronym that I defined in my opening

22  argument?

23  A.   Yes.

24           MR. COULTER:  Okay.

25           THE COURT:  Mr. Coulter, we are going to take a

Jun Yu - Direct

1   15-minute recess.  This seems to be a good opportunity to do

2   that.

3             MR. COULTER:  Thank you, Your Honor.

4             THE COURT:  We will begin promptly at 4:00.

5         (Recess 3:44 p.m.  Resumed 3:59 p.m.)

6             THE COURT:  Thank you.  Please be seated.  You may

7   continue.

8             MR. COULTER:  Thank you, Your Honor.

9   Q.   Mr. Yu, did you get an APPIC internship?

10  A.   No.

11  Q.   Did you have any discussions with Dr. Roberts about the

12  next steps after you did not match with an APPIC internship?

13  A.   Yes.  Dr. Roberts provided me with three options for my

14  internship during early April 2012.  I mean, the time --

15  Q.   Excuse me.  Was this a conversation?  Was it a document?

16  What?

17  A.   Actually, he gave me a piece of paper, presented the three

18  options during a meeting.

19  Q.   Was that meeting in his office?

20  A.   Yes.

21  Q.   Okay.  Is this the only time you were presented with these

22  three options?

23  A.   No.

24  Q.   Do you have the Plaintiff's -- do you have Plaintiff's

25  Exhibit Number 32 in front of you?

Jun Yu - Direct

1   A.   Yes.

2   Q.   All right.  I'd like you to go ahead and look at

3   Plaintiff's Exhibit 32.  And when you are finished reviewing

4   it, please look up.

5        Have you had an opportunity to fully review

6   Plaintiff's Exhibit Number 32?

7   A.   Yes.

8   Q.   All right.  Does the Clinical Training Committee -- can

9   you tell me what is Exhibit Number 32?

10  A.   It's a semi-annual student evaluation for spring 2012.

11  Q.   All right.  Did the Clinical Training Committee provide

12  you with different options to complete your internship?

13  A.   Yes.

14  Q.   Okay.  And could you tell us what those were?

15  A.   First, reapply through the APPIC system.  Second, propose

16  an internship in the US.  Third, propose an internship in China

17  consistent with my career goals.  I will have to decide which

18  option to pursue.

19        The Clinical Training Committee will consider any of

20  these three options.  All three options require review and

21  approval by the Clinical Training Committee.

22  Q.   Now, Mr. Yu, for the record, what option did you choose?

23  A.   I choose option two.

24  Q.   Which is?

25  A.   Which is to propose an internship in the US and following

Jun Yu - Direct

1    the APPIC criteria.

2    Q.   Now, why did you choose that option?

3    A.   I think I mentioned this, did I?  Oh, okay.  Because --

4    because why we came to the US, the goal is to earn a doctoral

5    degree in psychology, and internship is part of that education.

6    And -- and the psychology field is most developed in the US.

7    You know, US higher education has a good reputation around the

8    world.

9    Q.   All right.  Can you tell the Court what steps you took to

10   secure a non-APPIC internship?

11   A.   Dr. Roberts first gave me APPIC criteria and examples of

12   the most recent student who also proposed a non-APPIC

13   internship.  Then I identified -- I worked on identifying the

14   psychologists or sites who were willing to work with me on

15   internship.  Then write proposal.  Then --

16   Q.   So, after you received the input from Dr. Roberts, what

17   steps -- what did you do next to secure a non-APPIC internship?

18   A.   The Clinical Training Committee will have to review and

19   approve.  Also, external reviewer will have to review it and

20   approve by a Clinical Training Committee.

21   Q.   Mr. Yu, do you know who Dr. Dwyer is?

22   A.   Yes.

23   Q.   Did Dr. Dwyer assist you in any way regarding putting your

24   APPIC internship together?

25   A.   He -- Dr. Dwyer helped me send out the inquiry emails or

Jun Yu - Direct

1   and contacts to identify psychologists who can work with me.

2   Q.   What was the result?

3   A.   The result is actually Dr. Cheryl Chase then expressed

4   interest in working with me.  So, through Dr. Dwyer, I was able

5   to find Dr. Cheryl Chase.  Then the APPIC criteria requires at

6   least two supervisors for internship.  So, I finally found

7   Dr. Speer and Dr. Frazier.

8   Q.   And then what did you do?

9   A.   Then we wrote the proposal, and also ISU worked with the

10  Cleveland Clinic to come up with a contract.

11         MR. COULTER:  Your Honor, we are having plaintiff

12  take a look at Exhibit 120.  Exhibit 120 will be the exhibit

13  next in order.  During the recess, I got together with counsel,

14  and he has no objection to the admission of Plaintiff's

15  Exhibit 120?

16         THE COURT:  Confirm that, Mr. Kelly?

17         MR. KELLY:  Yes, Your Honor.

18         THE COURT:  Plaintiff's 120 is in.

19     (Exhibit 120 admitted.)

20  BY MR. COULTER:

21  Q.   All right.  Now, I want you to take a look at 120, and

22  when you are done, as we have been doing all day, look up when

23  you have completed it, your review.

24         All right.  Mr. Yu, I see you looked up.  Have you

25  had an adequate opportunity to review this document?

Jun Yu - Direct

1    A.   Yes.

2    Q.   All right.  Can you tell the Court what is Exhibit 120?

3    A.   120 is a form for Idaho State University doing contract

4    review and also included a contract between Cleveland Clinic

5    and Idaho State University.

6    Q.   And do you see whose signatures are on it?

7    A.   Yes.

8    Q.   And do you -- what date was this contract signed according

9    to this document?

10   A.   October 31st, 2012, signed by interim provost and vice

11   president for academic affairs, Dr. Adamcik for Idaho State

12   University.

13            MR. COULTER:  Your Honor, I have just handed Mr. Yu a

14   document, Plaintiff's Exhibit 121.  I've gotten with counsel.

15   There is no objection to this.

16            THE COURT:  Mr. Kelly?

17            MR. KELLY:  Agreed, Your Honor.

18            THE COURT:  120 is in.

19            THE LAW CLERK:  Judge, it's 121.

20            THE COURT:  Excuse me.  I misspoke.  Exhibit 121 is

21   admitted.

22        (Exhibit 121 admitted.)

23   BY MR. COULTER:

24   Q.   Now, it's the same deal.  Take a look at it.  When you are

25   done, look up, and I will ask you some questions on it.

Jun Yu - Direct

1          Okay.  Mr. Yu, can you tell me what is docket --

2     excuse me, not docket -- but Plaintiff's Exhibit 121?

3     A.   It's a proposal for non-APPIC internship placement.

4     Q.   Okay.  And I want to take your attention to -- I think

5     it's page 11.  We should be bringing it up here pretty soon.

6     Mr. Yu, do you see your signature there?

7     A.   Yes.

8     Q.   And what date is that?

9     A.   September 13th, 2012.

10    Q.   And do you see Dr. Leslie Speer's name typed?

11    A.   Yes.

12    Q.   And do you see a signature above that?

13    A.   Yes.

14    Q.   And do you see it was on the same day?

15    A.   Yes.

16    Q.   What day was that?

17    A.   September 13th, 2012.

18    Q.   All right.  And then the bottom of it, you see there's a

19    signature for a typed name for Mr. Mark Roberts and a signature

20    above that.  Do you see that?

21    A.   Yes.

22    Q.   Okay.  And do you see the date?

23    A.   Yes.

24    Q.   Okay.  I want to call your attention to --

25          (Pause in the proceedings.)

Jun Yu - Direct

1    Q.   Okay.  Now, I would like to take your attention to page 9

2    where it says ISU Document 0393.  Do you see that?

3    A.   Yes.

4    Q.   Do you see the highlight there?

5    A.   Yes.

6    Q.   Okay.  Now, according to this document, when is this

7    internship supposed to start?

8    A.   It just has the contract will commence on January 2nd,

9    2013.

10   Q.   When you signed this document, was that your

11   understanding?

12   A.   Yes.

13   Q.   Now, Mr. Yu, do you have Defendant Exhibit Number 523 in

14   front of you?

15   A.   Yes.

16   Q.   Okay.  I'd like you to take a look at Defendant Exhibit

17   Number 523.  And when you are done with it, please look up.

18            All right.  Mr. Yu, can you tell the Court what is

19   exhibit -- Defendant's Exhibit 523?

20   A.   It's a letter Dr. Roberts sent to me on November 12th,

21   2012.

22   Q.   And from your perspective, can you tell the Court what is

23   the substance of this letter?

24   A.   This letter sets out the steps to finalize my internship.

25   Also, the letter said, "Please remember that the Clinical

Jun Yu - Direct

1    Training Committee provided you two other options to complete

2    the required internship:  Reply to APPIC member sites; propose

3    an accommodated internship in China."

4              Both of these options are still available to me.  So,

5    these options are not foreclosed.

6    Q.   Is that your interpretation, that the options are not

7    foreclosed?

8    A.   Yes.

9    Q.   Why did you have that interpretation?

10   A.   Because it didn't say so.  Didn't say the China internship

11   is foreclosed.

12   Q.   Did it foreclose the possibility of reapplying for an

13   APPIC internship site?

14   A.   No.

15   Q.   Now, when did you start your internship with the Cleveland

16   Clinic?

17   A.   January 2nd, 2013.

18   Q.   And who were your supervisors?

19   A.   Dr. Speer, Dr. Frazier, and Dr. Cheryl Chase.

20   Q.   And Mr. Yu, did you start your internship on January 2,

21   2013?

22   A.   Yes.

23   Q.   All right.  Now, Mr. Yu, do you have Defense -- Defendant

24   Exhibit 527 in front of you?

25   A.   Yes.

Jun Yu - Direct

1   Q.   Okay.  I want you to take a look at it, and when you have

2   time, when you have fully reviewed it, please look up, and I

3   will ask you some questions on it.

4          Okay.  Mr. Yu, have you had an opportunity to --

5   adequate time to take a look at Defendant's Exhibit 527?

6   A.   Yes.

7   Q.   Can you tell the Court what Defendant's Exhibit 527 is?

8   A.   It's a psychology trainee competency assessment form.

9   Q.   For whom?

10  A.   Filled out by Dr. Speer.

11  Q.   About who?

12  A.   About me.

13  Q.   Okay.  And what training year was it?  What training year

14  was it, left-hand corner bottom?

15  A.   Please speak a little slower and louder.

16  Q.   Sure.  What training year was it?  It's located on the far

17  left bottom of the top document.

18  A.   Can you --

19  Q.   Can you look at the monitor?

20  A.   Oh, oh.  It's 2013.

21  Q.   Thank you.  Now, Mr. Yu, is there a time between

22  January 15, 2013, and April -- excuse me.  I will slow down.

23          Mr. Yu, is there any time between January 15th, 2013,

24  and April 1st, 2013, that Dr. Speer ever told you orally that

25  you -- that if you did not improve by the time of your next

1   evaluation, that you would be subject to dismissal from the

2   internship?

3   A.    No.

4   Q.    Mr. Yu, is there a time -- is there any time between

5   January 15th, 2013, and April 1st, 2013, that Dr. Speer ever

6   told you or informed you in writing that if you did not

7   improve, by the time of your next evaluation, that you would be

8   subject to -- subject from -- subject dismissal from the

9   internship?

10  A.    No.

11  Q.    Mr. Yu, do you have Plaintiff's Exhibit Number 100 in

12  front of you?

13  A.    Yes.

14        MR. COULTER:   Okay.  This was stipulated to by the

15  parties, Your Honor.

16  Q.    Now, I'd like you to take a look at Plaintiff's

17  Exhibit 100.  And when you are done, could you please look up?

18        All right.  I am assuming that you have had ample

19  time to look at Plaintiff's Exhibit 100, Mr. Yu?

20  A.    Yes.

21  Q.    All right.  Now, can you tell the Court what is the

22  Plaintiff's Exhibit Number 23?

23  A.    It's a --

24  Q.    Excuse me.  Plaintiff's Exhibit 100.

25  A.    It's an email Dr. Speer sent to Dr. Roberts on March 21st,

Jun Yu - Direct

1   2013.

2   Q.   All right.  And what is the substance of this email?

3   A.   In this email, Dr. Speer told Dr. Roberts she is

4   terminating my placement there.

5   Q.   Okay.  Anything else?  You can also look at the monitor,

6   too, while you are reading.

7   A.   She also said she will be sitting down with me in the next

8   week to discuss this with me.  That's mainly, I think, the

9   message.

10  Q.   Okay.  All right.  Mr. Yu, do you have Defense Exhibit 529

11  in front of you?

12  A.   Yes.

13  Q.   All right.  Could you please take a look at Defense

14  Exhibit 529 and, again, when you have had an opportunity to

15  thoroughly review the same, please look up.

16           THE COURT:  What exhibit number is this again?

17           MR. COULTER:  Defense Exhibit 529, Your Honor.

18           THE COURT:  Okay.  How many pages is that exhibit?

19           MR. COULTER:  I think it's about 10 pages, Your

20  Honor, roughly.  Let me see.

21           MR. KELLY:  Seven.

22           MR. COULTER:  Seven.

23           THE COURT:  And this page says 18 at the bottom?

24           MR. COULTER:  Well, it was part of a -- it was part

25  of, I am sure, another document, but this is the total

Jun Yu - Direct

1   evaluation that we are looking at.

2           THE COURT:  All right.  Go ahead.

3   BY MR. COULTER:

4   Q.   Which we received from Idaho State University.

5           Have you had an opportunity to review?  Are you ready

6   to answer a question, Mr. Yu?

7   A.   Yes.

8   Q.   Okay.  What is Exhibit 529, Defense Exhibit 529?

9   A.   It's a psychology trainee competency assessment form

10  filled out by Dr. Speer on April 1st, 2013.

11  Q.   And did Dr. Speer provide an evaluation that you agree

12  with?

13  A.   I agree with her comments that I continue to be eager to

14  learn and accept feedback well.  I -- however, I respectfully

15  disagree with her comment that I was at risk for causing harm

16  to patients.

17  Q.   All right.  Now, during this time that you were with

18  Dr. Speer in this evaluation, did you ever get any type of

19  formal assessment in regards to the concerns that Dr. Speer

20  stated in her -- in her evaluation?

21  A.   No.

22  Q.   Okay.  What was -- what was the last day at Cleveland

23  Clinic Center for Autism?  What was your last day?

24  A.   April 3, 2013.

25  Q.   Now, can you tell the Court what you did after being

Jun Yu - Direct

1   dismissed from the CCCA?

2   A.   I began working on finding a professor or internship sites

3   willing to work with me in China.

4   Q.   Okay.  Mr. Yu, do you now have Exhibit -- Plaintiff's

5   Exhibit 122?

6           MR. COULTER:  Okay.  Your Honor, Plaintiff's

7   Exhibit 122 was again shown to defense counsel during the

8   break.  I believe there's no objection to the admission.

9           THE COURT:  Is that right?

10          MR. KELLY:  That's correct, Your Honor.

11          THE COURT:  122 is admitted.

12       (Exhibit 122 admitted.)

13  BY MR. COULTER:

14  Q.   All right.  Now, I want you to take a look at 122.  And

15  when you have an opportunity to read that, understand it,

16  please look up, and I will ask you some questions on it.

17          All right.  Mr. Yu, you looked up, so I assume you

18  have had adequate time to review this document.  Can you please

19  tell the Court what is Exhibit 122, Plaintiff's Exhibit 122?

20  A.   It's a document about the email exchanges between me and

21  Dr. Roberts during April 2013.

22  Q.   And I will call your attention to the email that you sent

23  to Dr. Roberts on April 14th, 2013.  Do you see that?

24  A.   Yes.

25  Q.   And can you tell the Court what is the substance of the

Jun Yu - Direct

1   April 14, 2013, email?

2   A.   In that email, I informed Dr. Roberts that a professor at

3   Shanghai Mental Health Center expressed interest in taking me

4   as an intern.  I also expressed wish to work on my proposal for

5   an internship in China, and also asked Dr. Roberts are there

6   any different criteria for proposing an internship in China.

7   Q.   Okay.  All right.  Do you have Plaintiff's Exhibit

8   Number 88 in front of you?

9   A.   Yes.

10  Q.   Okay.  I want you to go ahead and take a look at Plaintiff

11  Exhibit 88.  Look at it, and when you have had an opportunity

12  to read it, look up.

13          All right.  Mr. Yu, you have looked up.  I assume

14  that you have had an opportunity to read and become familiar

15  with Plaintiff's Exhibit Number 88; is that correct?

16  A.   Yes.

17  Q.   And can you tell the Court what is Plaintiff's Exhibit

18  Number 88?

19  A.   It's an email I sent to Dr. Roberts on April 30th, 2013.

20  Q.   And could you please tell the Court what the substance of

21  this email is?

22  A.   In that email, I request Dr. Roberts to consider granting

23  an incomplete for the current internship experience, and I

24  provided reasons.  I also -- I also asked Dr. Roberts's

25  assistance with proposing an internship in China which is

Jun Yu - Direct

1    consistent with my career goal.

2    Q.   And what happened next?

3    A.   I received a letter from Dr. Roberts informing me that the

4    Clinical Training Committee recommended me being dismissed from

5    the doctoral program in clinical psychology.

6    Q.   And what date was that?

7    A.   That letter was dated May 3rd of 2013.

8    Q.   Do you have Plaintiff's Exhibit Number 37 in front of you?

9    A.   Yes.

10   Q.   Okay.  I want you to take a look at it, and when you have

11   time, after you have reviewed it, look up, and I will ask you

12   questions on it.

13        All right.  Mr. Yu, by your looking up, I assume that

14   you have had an opportunity to become familiar with Plaintiff's

15   Exhibit 37; am I correct?

16   A.   Yes.

17   Q.   All right.  What is Exhibit 37?  Plaintiff's Exhibit 37?

18   A.   It's a letter signed by Dr. Lynch on May 17th, 2013, about

19   the graduate faculty of the psychology department's decision on

20   my appeal.

21   Q.   Did they grant your appeal or deny your appeal?  Did they

22   grant your appeal or deny your appeal?

23   A.   My appeal was denied.

24   Q.   And Mr. Yu, did you agree with this?

25   A.   No.

Jun Yu - Cross

1   Q.   And what, if anything, really stood out to you in regards

2   to this letter?

3   A.   The thing stood out to me is that --

4   Q.   You can look at the monitor.

5   A.   That sentence, "The graduate faculty's convinced that an

6   internship in China is unwarranted and might put Chinese

7   patients at risk of harm."

8   Q.   And Mr. Yu, why do you disagree with this?

9   A.   It's just ridiculous.  There's no evidence to show that I

10  harmed a single patient in the US or in China.  But I have

11  dissertation evidence to show that I actually benefited

12  patients in China.  Patients there were very satisfied with my

13  services.  I was very helpful to clients there.

14  Q.   All right.  Did you want to add anything else, Mr. Yu?

15  A.   No.

16           MR. COULTER:  Your witness.

17           Your Honor, I might suggest -- I don't know.  It's

18  4:30.  I think we are going to be out at 5:00.  Did you want to

19  start your cross now?

20           THE COURT:  That's what we will do.  Yeah, we are

21  going to go to 5:00.

22           MR. COULTER:  Thank you, Your Honor.

23                       CROSS-EXAMINATION

24  BY MR. KELLY:

25  Q.   Mr. Yu, do you still have 37 in front of you, Exhibit 37?

Jun Yu - Cross

1    That's the last one you looked at.

2    A.    Yes.

3    Q.    Okay.  You made a comment, as you were closing out your

4    testimony, that there was a concern -- I can't find it -- about

5    the fact that the Chinese -- the internship in China would be

6    unwarranted.  I will have to look at it.

7          "Due to the fact that you may cause harm to

8    patients."  Do you recall saying that?

9    A.    Yes.

10   Q.    Now, it did not say that you harmed patients; did it?  Let

11   me pull it up for you here.  So, if you look at the page, it

12   has the number 0614 at the bottom.

13         THE COURT:  41.

14         MR. KELLY:  I'm sorry.  41.  Thank you, Judge.

15   Q.    If you look at the monitor, that might help out.  So, the

16   paragraph under argument three, do you see that?

17   A.    Yes.

18   Q.    "Based on the available data, we believe you may actually

19   put patients at risk.  The graduate faculty is convinced a

20   fourth chance, i.e., internship in China, is unwarranted and

21   might put Chinese patients at risk of harm."

22         Do you see that?

23   A.    Yes.

24   Q.    So, it doesn't come out and say that you actually harmed

25   patients; does it?  It says that you might or you could

1    potentially put patients at harm.

2    A.   Yes.

3    Q.   And wasn't that the concern of Dr. Speer at the Cleveland

4    Clinic?  That from her perspective, due to your inability to

5    learn the procedures and policies in testing at the Cleveland

6    Clinic, that there was the potential for putting patients at

7    harm?  Do you recall her saying that?

8    A.   No.

9    Q.   Did you review any of the assessments that Dr. Speer did

10   of you while you were at the Cleveland Clinic?  It wouldn't be

11   on -- do you recall looking at either one of the assessments

12   that she did, which would have been either Defendant

13   Exhibit 529 or Defendant Exhibit 527, which you should have up

14   there?

15   A.   Yes.

16   Q.   Okay.  And at any point in time, did you speak to

17   Dr. Speer about any of the -- any of these, either one of these

18   assessments?

19   A.   No.

20   Q.   Did you speak to Dr. Roberts about either one of these

21   assessments?

22   A.   No.

23   Q.   You never spoke to Dr. Roberts at all about the

24   assessments from the Cleveland Clinic?

25   A.   No.

Jun Yu - Cross

1    Q.   Did you ever learn specifically why you were dismissed

2    from the internship at the Cleveland Clinic?

3    A.   No.

4    Q.   Why did you think you were dismissed from the Cleveland

5    Clinic?

6    A.   I was treated unfairly.

7    Q.   And that's the only reason you believe you were dismissed?

8    A.   Yes.

9    Q.   And did you approach Dr. Speer or anybody else at the

10   Cleveland Clinic as to why you were dismissed?

11   A.   Can you repeat the question?

12   Q.   Sure.  Did -- at any point in time, did you approach

13   Dr. Speer or anyone else at the Cleveland Clinic to inquire why

14   you were being dismissed?

15   A.   She just gave me this document.

16   Q.   Which document?  The assessment?

17   A.   Yes.

18   Q.   Which one?  The April one or the --

19   A.   The April 1st, 2013.

20   Q.   Okay.  So, that would have been Exhibit 529?

21   A.   Yes.

22   Q.   Okay.  And did you read through it when you got it?

23   A.   Yes.

24   Q.   And after you read through it, did you gain an

25   understanding of why you were being dismissed?

Jun Yu - Cross

1    A.   Yes.

2    Q.   Okay.  And what was your understanding?

3    A.   My understanding is she treated me unfairly.

4    Q.   Okay.  And does it say that in the assessment?

5    A.   It didn't.

6    Q.   It says things such as you have little insight into your

7    own cultural beliefs even after supervision.  Do you see that?

8    If you look at the monitor under R.

9    A.   She didn't circle that.

10   Q.   She underlined it.  Okay.  Let's go to the next page then,

11   one she did circle.  A significant deficit and understanding of

12   psychiatric classification system and/or ability to use the

13   DSS -- DSM4 criteria to develop a diagnostic conceptualization.

14   Do you see that?

15   A.   Yes.

16   Q.   Did you have an understanding what that means?

17   A.   She didn't explain that to me.

18   Q.   Do you have an understanding of what that means?

19   A.   That rating means -- R means needs remediation.

20   Q.   Okay.  And Dr. Speer didn't offer remediation to you; did

21   she?

22   A.   No, she didn't.

23   Q.   Did you ask her to?

24   A.   I asked her.  Yes, I asked.

25   Q.   And what did she say?

1   A.   She said it's -- it's beyond the scope of the placement.

2   Q.   Okay.  Dr. Speer is with Cleveland Clinic, not Idaho State

3   University; correct?

4   A.   Yes.

5   Q.   And let's just go down to the page I have up on the

6   monitor, where it says "Additional -- or areas of additional

7   development or remediation including recommendations."  It

8   says, "Jun has not made progress.  He is not learning" -- on --

9   I can't read that -- "something an assessment."  Shorthand for

10  some other things.  "Accommodations and support, Jun is unaware

11  of own limitations.  Combination of above factors put Jun at

12  risk for causing harm to patients."

13          Did you read that when you first saw the assessment?

14  A.   Yes.

15  Q.   And did you talk to Dr. Speer about that?

16  A.   Yes.

17  Q.   And what did she say?

18  A.   She just repeated her conclusion.

19  Q.   She didn't give you any examples of the potential harm to

20  patients?

21  A.   No.

22  Q.   But that was her conclusion, based on your conversation

23  with her, that you could potentially harm some patients;

24  correct?

25  A.   That's not --

Jun Yu - Cross

1    Q.    That's what she wrote; correct?

2    A.    That's what she wrote.

3    Q.    Let me jump back to the evaluation -- or, excuse me --

4    your externship with Dr. Landers in the fall of 2011.  You were

5    dismissed from that externship at Eastern Idaho Medical Center;

6    correct?

7    A.    Correct.

8    Q.    And Dr. Landers was the one who dismissed from you the

9    externship?

10   A.    Yes.

11   Q.    And do you have an understanding of why he dismissed you?

12   A.    Yes.

13   Q.    And what was your understanding?

14   A.    My understanding is he treated me unfairly.  He just made

15   a premature judgment.

16   Q.    Okay.  But what was the reason, from his perspective, that

17   he dismissed you; do you know?

18   A.    He claimed I was unable to grasp communication nuances.

19   Q.    Okay.  What type of patients were you working with at

20   Eastern Idaho Regional Medical Center?

21   A.    All kinds of.  Usually severely mentally ill.

22   Q.    Okay.  Individuals that could potentially harm themselves?

23   Any patients who were suicidal that you recall?

24   A.    No.

25   Q.    How about some that had potential to harm others?

Jun Yu - Cross

1   A.   The patients I worked with, I think one was dementia

2   concern.

3   Q.   Okay.  All right.  That was one patient.  How about some

4   others?

5   A.   Another one was schizophrenia concern.

6   Q.   And Dr. Landers was concerned about you working with some

7   of these patients?

8   A.   Can you repeat the question?

9   Q.   Is it your understanding that Dr. Landers was concerned

10  about you working with some of these patients?

11  A.   Dr. Landers didn't express this concern to me while I was

12  there.

13  Q.   And so you feel that there should have been some feedback

14  by Dr. Landers?

15  A.   I feel he would be more helpful if he give me feedback

16  while I was there and give me opportunity to improve and

17  teaching me how to improve and grasp what he wants me to grasp.

18  Q.   But he didn't do any of those things for you?

19  A.   No.

20  Q.   And so you felt that Dr. Landers was treating you

21  unfairly?

22  A.   Yes.

23  Q.   And again, did you ever ask Dr. Landers for any feedback

24  at any point in time?  Let me strike that.

25          Dr. Landers had you do testing; correct?

Jun Yu - Cross

1   A.   Yes.

2   Q.   Did he show you how to do the tests before you did them?

3   A.   He will -- provided general introduction about the tests.

4   Q.   Okay.  And did he go over those test results with you once

5   you completed them?

6   A.   Not all.

7   Q.   Okay.  At any point in time, did he ask you to stop

8   testing an individual patient?

9   A.   Would you please repeat your question?

10  Q.   Sure.  At any point in time, did Dr. Landers tell to you

11  stop in the middle of testing somebody?  Did he say, "I don't

12  want you to test this individual anymore?"

13          Are you contemplating the answer, or you still don't

14  understand what I am asking?

15  A.   I try to recall what happened.  So, you mean if he ever

16  stopped me?

17  Q.   Yeah.  Did he -- for instance, did he say "This individual

18  is getting agitated.  I want you to stop testing"?  At any

19  point did he say that to you?

20  A.   No.

21  Q.   Did he ever tell you, after you finished testing someone,

22  that you should have taken a different tack while testing them?

23  A.   Would you please --

24  Q.   Well, I will just strike that.  Nevertheless, you never

25  heard from Dr. Landers that you were actually dismissed from

Jun Yu - Cross

1    the externship; correct?  You learned that from Dr. Roberts?

2    A.   Yes.

3    Q.   And did you ever go back to Dr. Landers and ask him for

4    feedback?

5    A.   No.

6    Q.   But you believe Dr. Landers should have given you some

7    type of feedback or remediation; correct?

8    A.   Well, I would say yes.

9    Q.   And again, Dr. Landers was, at the time, with Eastern

10   Idaho Regional Medical Center; correct?

11   A.   Yes.

12   Q.   And not Idaho State University; is that correct?

13   A.   Yes.  He's an adjunct professor.

14   Q.   But at the time, he was running an externship?

15   A.   He actually was an adjunct professor for ISU.

16   Q.   But he was running an externship at Eastern Idaho Regional

17   Medical Center at the time; correct?

18   A.   Yes.

19   Q.   Let's go back to Exhibit -- do you still have 51,

20   Plaintiff's Exhibit 51?

21   A.   Plaintiff's Exhibit 51?

22   Q.   That would have been the spring 2011 practicum with

23   Dr. Seikel.

24   A.   Yes.

25   Q.   Okay.  And Dr. Seikel gave you two Bs; is that correct?

Jun Yu - Cross

1    Number 18 --

2    A.    Yes.

3    Q.    -- and number 37.  Do you know why she gave you a B for

4    number 18?

5    A.    Number 18?  Yes.

6    Q.    And why was that?

7    A.    She believed some sessions can last longer.

8    Q.    Meaning you should have stayed with the patients longer

9    or -- exactly what do you mean by that?

10   A.    I guess what she means is I could have worked longer with

11   the clients for more sessions.

12   Q.    Okay.  What does it mean to you to form a working

13   alliance?  What does that mean to you?

14   A.    It means work together on a shared goal.

15   Q.    Okay.  And Dr. Seikel believed that you should have been

16   working longer with these patients to establish the alliance?

17   A.    Dr. Seikel actually was pleased with my efforts.  We

18   reviewed -- like, she consider I did things right.  She

19   actually said it might be prejudice from client.

20   Q.    Because the client didn't show back up?

21   A.    Yes.

22   Q.    So, do you believe she was punishing you by giving you a B

23   in that instance?

24   A.    No, I appreciated her feedback actually.

25   Q.    Okay.  So, you believe that was an accurate assessment of

Jun Yu - Cross

1    you at the time?  By her giving you a B for that category, that

2    was -- that was appropriate from your perspective?

3    A.   No, it's -- it's not a fact.  I mean, it's her perception,

4    and --

5    Q.   And do you believe that she was inaccurate in her

6    perception?

7    A.   Yes.

8    Q.   But you appreciated the feedback she gave you

9    nevertheless?

10   A.   Yes.

11   Q.   How about number 37, the ability to adjust treatment plans

12   and interventions as a function of ongoing assessment data.  Do

13   you feel the same way about that, that you appreciated the

14   feedback but felt that it was an unwarranted assessment?

15   A.   It's -- yeah, basically the same.  She was very positive

16   about me.

17   Q.   Going back to your last day at the Cleveland Clinic, did

18   you leave the clinic of your own accord or did they have to

19   walk you out the door?

20   A.   You mean Cleveland Clinic?

21   Q.   When you finished the internship there, were you escorted

22   out the door?

23   A.   I walk out by myself.

24   Q.   You didn't walk out with security?

25   A.   There was a security.

Jun Yu - Cross

1    Q.   Okay.

2              THE COURT:  Mr. Kelly, how much more do you think you

3    have?

4              MR. KELLY:  At least half an hour.

5              THE COURT:  Well then, we will take a recess at this

6    point.  Sounds like you are about ready to change subjects, so

7    we will end the trial day today, and we will start again

8    promptly at 9:00 a.m. tomorrow morning.

9              Counsel, I will need you to stay for just a moment.

10   I want to visit about this Exhibit 106 issue.

11             Now, that's just cruel, Mr. Kelly.

12         (Referring to screen saver.)

13             MR. KELLY:  I am trying to get it off.

14             THE COURT:  All right.

15             MR. KELLY:  It's Costa Rica by the way.

16             THE COURT:  We will be in recess for today.

17             We will stay on the record for this discussion just a

18   moment.

19             So, Mr. Coulter, remind me again about this issue on

20   the Exhibit 106 and the issue about the Human Rights

21   Commission?

22             MR. COULTER:  Yes, Your Honor.  In our brief, to

23   summarize, basically -- basically, in the Ninth Circuit, it is

24   allowed to have the recommendation or I should say the decision

25   or opinion -- the probable cause finding or no probable cause

1    finding and bring it in to court.

2              However, that is related to, like, a decision.  So,

3    if Mr. Yu had an Idaho Human Rights Commission complaint for

4    this, and then that complaint went to this particular

5    proceeding, then, according to the law, that Human Rights

6    Commission's probable cause or no probable cause determination

7    could come in.

8              The problem that we are having here is that the

9    Idaho -- the Idaho Human Rights Commission determination that

10   was made has nothing to do with this particular trial.

11             THE COURT:  You mean by that, that the issue in this

12   trial is not --

13             MR. COULTER:  Yes, Your Honor.  The issue in this

14   trial, everything that was done, that was decided, Mr. Yu

15   didn't even file the complaint with the Idaho Human Rights

16   Commission in regards to this or the EEOC, because it's not

17   required when you have a private right of action.  So, anything

18   having to do with that was not -- had nothing to do with his

19   being terminated from --

20             THE COURT:  So, the heart of your point is that you

21   don't think it's relevant.

22             MR. COULTER:  Yes, Your Honor.

23             THE COURT:  Okay.

24             MR. COULTER:  And I think -- like I said, I think I

25   have stated the law pretty clearly in my objection.

1           THE COURT:  Yeah, and I haven't gone back to look at

2    it obviously yet.

3           I just thought I would have the conversation with

4    both of you now, and hopefully I can look at it overnight, and

5    then we won't need to take up any time with it tomorrow other

6    than to have me tell what you I am thinking.

7           So, Mr. Kelly, let me hear your response to that.  I

8    will need to you the podium, please.

9           MR. KELLY:  You know, Judge, I think we are in a

10   little bit of a situation than we were when the trial

11   preparation started.  And that -- you know, frankly, we wanted

12   to have a jury trial, and I am indifferent now.

13          THE COURT:  Well, I understand that.  And there is

14   some latitude in a court trial in that area in that the Court

15   understands where those fences are drawn and what to consider

16   and what not to consider.

17          But I do think it's also true that the Court always

18   needs to recognize that just as with a jury, if there's

19   something that comes in front of it that is different or is not

20   particularly relevant, then you need to be on guard that it

21   doesn't somehow color your thinking about other evidence.

22          Now, in this particular case, I'm aware that there

23   was a proceeding before the Human Rights Commission.  I'm aware

24   of who prevailed or not prevailed in it.  But otherwise, I

25   don't have any present recollection of any of the other details

1    about it.

2              So, if it isn't something that you can argue to me

3    that's relevant to what I have to consider today, or, I mean,

4    in this trial, then I am inclined to say let's just leave it

5    out.

6              MR. KELLY:  And I am fine with that, Judge.  I think

7    it really almost got addressed when we were discussing that

8    last exhibit about the redaction issue.

9              THE COURT:  Okay.

10             MR. KELLY:  So, I am fine with it being out.

11             THE COURT:  All right.  Then any reference to that,

12   any evidence that relates to it should be redacted, and any

13   inquiries should not be allowed or won't be allowed.

14             And if a door gets opened somehow, then I will take

15   that up if that's what develops.  All right?

16             MR. KELLY:  Thank you, Judge.

17             MR. COULTER:  Thank you, Your Honor.

18             THE COURT:  Thank you, counsel.  We will see you

19   at --

20             MR. KELLY:  Judge.

21             THE COURT:  Do you have another matter you want to

22   take up?

23             MR. KELLY:  Just to find out what the witness list is

24   for tomorrow.

25             THE COURT:  Oh, well, I am expecting both of you

1    to --

2              MR. COULTER:  I can pretty well tell you.

3              THE COURT:  -- make that known to each other.  So, I

4    shouldn't have to remind you.  So, you will get that done

5    between the two of you.

6              All right.  We will be in recess.

7         (Recess 5:03 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATIONS

For the Plaintiff:

| Witness Name | Direct | Cross | RD | RX | Voir Dire |
|---|---|---|---|---|---|
| Nicole Prause | 21 | 30 | | | |
| Jocelyn Eikenburg | 33 | | | | |
| Jun Yu | 37 | 104 | | | |

PLAINTIFF'S EXHIBIT INDEX

| Exhibit No. | Marked | Admitted |
|---|---|---|
| 39 | | 46 |
| 118 | | 84 |
| 119 | | 86 |
| 120 | | 92 |
| 121 | | 93 |
| 122 | | 101 |
| 538A | | 80 |

1

2                                    --oOo--

3                      COURT REPORTER'S CERTIFICATE

4

5       I, KATHERINE EISMANN, Official Court Reporter, certify

6    that the foregoing is a correct transcript from the record of

7    proceedings in the above-entitled matter.

8

9    Date:  March 11, 2019.

10                             /s/ *Katherine Eismann*

11                          Katherine Eismann, CRR, RDR

12

13

14

15

16

17

18

19

20

21

22

23

24

25