1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF IDAHO

3   JUN YU,                      )
                                 )   Case No. 4:15-cv-430-REB
4           Plaintiff,           )
                                 )
5                                )   Pocatello, Idaho
        vs.                      )   February 27, 2019
6                                )   9:00 a.m.
    IDAHO STATE UNIVERSITY,      )
7                                )   Bench Trial, Day 2
            Defendant.           )
8   _____)

9                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE RONALD E. BUSH
10        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

11  APPEARANCES:

12  For the Plaintiff:

13          RONALDO A. COULTER, ESQ.
            HOLLY A. SUTHERLAND, ESQ.
14          Idaho Employment Law Solutions
            776 E. Riverside Drive, Suite 206
15          P.O. Box 1833
            Eagle, Idaho 83616
16          208-672-6112

17  For the Defendant:

18          MICHAEL E. KELLY, ESQ.
            Kelly Law, PLLC
19          137 E. 50th Street
            Garden City, Idaho 83714
20          208-342-4300

21  Also present:  Jun Yu, Mark Roberts, Crystal Anderson

22

23  Court Reporter:  Katherine Eismann, CRR, RDR
                     katherine_eismann@id.uscourts.gov
24

    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

1          (Wednesday, February 27, 2019, 9:00 a.m.)

2                              --oOo--

3                    P R O C E E D I N G S

4          THE COURT:  Thank you.  Please be seated.

5          Counsel, good morning.  We will begin the second day

6  of trial in Jun Yu versus Idaho State University.  I know

7  Mr. Shumard was just inquiring whether there was anything we

8  need to take up at the beginning.

9          Anything from you, Mr. Coulter?

10         MR. COULTER:  No, Your Honor.

11         THE COURT:  Mr. Kelly?

12         MR. KELLY:  No, Your Honor.

13         THE COURT:  All right.  Are you ready to resume your

14  cross-examination?

15         MR. KELLY:  I am.

16         THE COURT:  All right.  Mr. Jun, you need to be back

17  in the witness box, please.  I said Jun.  I meant Mr. Yu.  I'm

18  sorry.

19         Mr. Yu, you are still under oath.  Do you understand

20  that?

21         THE WITNESS:  Yes.

22         THE COURT:  All right.  Thank you.  You may proceed.

23         MR. KELLY:  Thank you, Your Honor.

24                              JUN YU,

25  having been previously sworn, was examined and testified as

Jun Yu - Cross

1    follows:

2                      CROSS-EXAMINATION

3    BY MR. KELLY:

4    Q.   Mr. Yu, just to continue with some questioning from

5    yesterday, you testified yesterday you moved to Beijing about a

6    year ago; correct?

7    A.   Yes, a little over a year.

8    Q.   Do you recall when exactly you moved to Beijing?  Like the

9    month?

10   A.   That's about October of 2017.

11   Q.   And you are working as an educational consultant; is that

12   correct?

13   A.   Correct.

14   Q.   Are you working full-time or part-time?

15   A.   Part-time.

16   Q.   Okay.  Have you looked for full-time work?  Have you

17   looked for full-time employment?

18   A.   Would you please --

19   Q.   You say you are working part-time; is that correct?

20   A.   Yes.

21   Q.   And how many hours a week would that be?

22   A.   That's about 20 hours.

23   Q.   Okay.  Have you looked for full-time employment?

24   A.   Yes.

25   Q.   Okay.  And have you been successful in finding work at

Jun Yu - Cross

1    all?

2    A.    No.

3    Q.    Okay.  And now you have Master's in Development and

4    Educational Psychology; is that correct?

5    A.    Correct.

6    Q.    And have you tried to find employment using your master's

7    degree?

8    A.    Yes.

9    Q.    And you have been unsuccessful?

10   A.    Yes.

11   Q.    Now, when we last talked, spoke, you and I, you remember I

12   took your deposition back in July of 2016?  Do you recall that?

13   A.    Yes.

14   Q.    Okay.  At that time, you were living in -- if I am saying

15   this correct -- Hangzhou.  Is that the town you were living in,

16   city?

17   A.    Yes.

18   Q.    And you were working as an educational consultant then,

19   too; correct?

20   A.    Correct.

21   Q.    Are you working for the same company?

22   A.    Yes.

23   Q.    And at that point in time, your salary was 30,000 RMB, but

24   now it's 38,000; is that correct?

25   A.    Correct.

Jun Yu - Cross

1    Q.   Could you look at Exhibit 523?  Do you still have that in

2    front much you?  Or you can look on the monitor, either one.

3    A.   I adjust this.  It's glaring.  Excuse me.  It's glaring.

4    I cannot see clear.  I need to adjust.  Thank you.

5    Q.   Okay?  And if you recall, we looked at this exhibit

6    yesterday.  This is a letter of November 12, 2012, from

7    Dr. Roberts to you?

8    A.   Yes.

9    Q.   Okay.  If we scroll down to the bottom of page 1 and the

10   top of page 2, you were asked questions about this section in

11   which -- which reads, "Please remember the Clinical Training

12   Committee provided you with two other options to complete the

13   required internship."

14         And then it refers to the semester evaluation of

15   June 4, 2012.  And one of those options was to reapply to an

16   APPIC member site and the other one was to propose an

17   internship in China; correct?

18   A.   Yes.

19   Q.   That was in addition to the Cleveland Clinic internship

20   you were proposing; correct?

21   A.   Yes.

22   Q.   Now, this letter from Dr. Roberts, again, is dated

23   November 12, 2012; correct?

24   A.   Yes.

25   Q.   Okay.  And now this letter was provided to you before the

Jun Yu - Cross

1  Cleveland Clinic internship started; correct?

2  A.   Yes.

3  Q.   And the letter was provided to you well before Dr. Speer

4  performed her assessments of you in January and in April of

5  2013; correct?

6  A.   Yes.

7  Q.   Okay.  Do you have -- I don't have the exhibit.  It's

8  Exhibit 118, the summary of your intervention hours.  Do you

9  recall looking at that yesterday, the summary --

10 A.   Yes.

11 Q.   -- of your hours?  Okay.  And do you have that in front of

12 you?

13 A.   Let me find it.  Yes, yes.

14 Q.   I never got a hard copy of it.  I just wanted to ask a

15 quick question on that.  It looks like, from that summary

16 though, a majority of your intervention hours were hours you

17 obtained while working in China; correct?

18 A.   Correct.

19 Q.   Okay.  And then we went through or you went through

20 Exhibit 119, which was the parents' consumer satisfaction

21 rating of your work in China; correct?

22 A.   Correct.

23 Q.   And the work there was -- excuse me -- the ratings of your

24 work there was proven to be very satisfactory; correct?

25 A.   Correct.

Vol. 2 - 128

Jun Yu - Cross

1    Q.   Now, let's look at Exhibit 32.  I have it up on the

2    monitor, too.  Do you see it?

3    A.   Okay.

4    Q.   Do you want to look at it there or do you want to look for

5    the hard copy?

6    A.   Monitor is fine.

7    Q.   Okay.  So, this is the semi-annual student evaluation from

8    the spring of 2012; correct?

9    A.   Correct.

10   Q.   Okay.  So, if we scroll down to number six on the next

11   page.

12         THE COURT:  That's my problem.  I just accidentally

13   hit a spot on the screen.

14         Lynette, can you save me from myself here?

15         COURTROOM DEPUTY:  Oh, boy.

16         THE COURT:  We will charge this time to me.  I think

17   I hit video conference, so which one do we need to bring up?

18   Turn that one off?  Can we just turn it off and then pull the

19   others back up?

20       (Off-the-record discussion.)

21         THE COURT:  All right.  I'm sorry for that

22   inconvenience.  You may continue.

23         MR. KELLY:  Thank you.

24   Q.   So, Mr. Yu, if we look at Exhibit 32, down to the second

25   page on your number six, and then further down, we look at that

Jun Yu - Cross

1    next paragraph where it talks about first, second, and third

2    about your internship paths.  Do you see that?  Where it starts

3    "Jun must to complete an internship to meet requirements."

4    A.    Yes.

5    Q.    And then you will see the words "first, second, and third"

6    underlined.  Do you see that in that paragraph?

7    A.    Yes.

8    Q.    Okay.  If we look at third, it states, "Jun can propose an

9    internship experience in China consistent with his career

10   goals.  The Clinical Training Committee sees this third option

11   as possessing two specific merits.

12            "First, an internship experience in China would

13   preclude the communication difficulties that appear to be

14   restricting his professional development in the USA.

15   Performing psychotherapy in a foreign language and in a

16   different culture is understandably difficult given the subtle

17   nature of communication.

18            "Second, an internship experience in China would you

19   provide you with opportunities to form alliances with mental

20   health professionals in the region of China in which he hopes

21   to perform clinical research and practice."

22            Do you see that?

23   A.    Yes.

24   Q.    Did I read that properly?

25   A.    Yes.

Jun Yu - Cross

1   Q.   And at some point in time, you had discussions with

2   Dr. Roberts about your internship options; correct?

3   A.   Correct.

4   Q.   Now, let me ask you, you know, we just asked -- we just

5   discussed the summary of your intervention hours, and you got

6   most of those in China; correct?

7   A.   Correct.

8   Q.   The parent consumer satisfaction rating, which is

9   Exhibit 119 where the parents were very satisfied, do you

10  believe, if you followed the CTC's recommendations in regard to

11  the merits of the internship in China, you would have been

12  successful in completing an internship in China?

13  A.   Yes.

14  Q.   And if so, you would have gotten your degree; correct?

15  A.   Yes.

16  Q.   Okay.  Let me ask one more question about the options.  Do

17  you recall, prior to the discussions on getting placed for an

18  APPIC match, during the spring of 2012, you had a -- excuse

19  me -- after -- after the process where you didn't match, you

20  had a meeting with Dr. Roberts and Joyce Hammond-Perry at the

21  ISU Diversity Center.  Do you recall that?

22  A.   Yes.

23  Q.   And do you recall, at that meeting, a fourth option was

24  considered for you?

25  A.   No.

Jun Yu - Cross

1   Q.   Okay.  Do you recall being offered the opportunity to

2   remain at ISU, work with the program to improve your skills,

3   and reapply to APPIC.  Do you recall that?

4   A.   No.

5   Q.   Do you recall discussing anything like that with

6   Dr. Roberts and Miss Hammond-Perry; do you recall?

7   A.   No.

8   Q.   Do you recall, at any point in time, where you were

9   offered that option and you refused it?

10  A.   No.

11  Q.   Let's go to Exhibit 37.  We are all having problems today,

12  I guess.

13          Okay.  Mr. Yu, do you recall looking at Exhibit 37

14  yesterday?  That's the letter to you dated May 17th, 2013, and

15  it's from Dr. Lynch.  Do you recall that?

16  A.   Yes.

17  Q.   And in that letter, essentially, Dr. Lynch was upholding

18  the -- your dismissal from the program; correct?

19  A.   Correct.

20  Q.   And that letter again is dated May 17th, 2013.  Is it your

21  recollection that as of May 3rd or thereabout is when you were

22  actually dismissed from the program?

23  A.   Yes.

24          MR. KELLY:  Your Honor, I think that's all the

25  questions I have.

Jun Yu - Redirect

1          THE COURT:  All right.  Any redirect?

2          MR. COULTER:  Yes, Your Honor.

3          THE COURT:  All right.

4                     REDIRECT EXAMINATION

5     BY MR. COULTER:

6     Q.   Good morning, Mr. Yu.

7     A.   Good morning.

8     Q.   Counsel for Idaho State University asked you a question,

9     and I believe your response was you were dismissed from Idaho

10    State University on May 3; is that correct?

11    A.   No, I -- my dismissal was effective on October 2nd, 2013.

12    Q.   All right.  So, on May 3rd, 2013, did you feel that you

13    had been dismissed from the Idaho State University Doctorate in

14    Clinical Psychology Program?

15    A.   No.

16    Q.   Now, Doctor -- Or, excuse me -- counsel for the defendant

17    asked you about a fourth option in regards to Mr. -- I guess

18    Miss Perry and Dr. Roberts.  Do you remember that question?

19    A.   Yes.

20    Q.   All right.  Did you ever -- did you ever get any formal

21    writing from Dr. Perry -- from Dr. Roberts combined with

22    Dr. Perry in regards to any fourth option?

23    A.   No.

24    Q.   Are the only options that you ever got notice of were

25    the -- the three that were mentioned in the November 12th,

Jun Yu - Redirect

1    2012, letter?

2    A.    Yes.

3              MR. COULTER:  No further questions.

4              THE COURT:  Any further cross?

5              MR. KELLY:  No, Your Honor.

6              THE COURT:  All right, sir.  You may step down.

7    Thank you.

8              THE WITNESS:  Thank you.

9              MR. COULTER:  Your Honor, at this time, I'd like to

10   call Dr. Chase, but we have to set up the phone call.

11             THE COURT:  All right.

12             MR. COULTER:  So, I have got to work with Lynette and

13   call her.

14             THE COURT:  I am just going to stay put and go ahead.

15             MR. COULTER:  You don't mind if I go outside and make

16   that call?

17             THE COURT:  Sure.

18        (Pause in the proceedings.)

19             THE COURT:  All right.  Ladies and gentlemen, we are

20   going to take a recess while this is being set up.

21        (Recess 9:22 a.m.  Resumed 9:56 a.m.)

22             THE COURT:  Thank you.  Please be seated.  I am a

23   little concerned, as we begin this, of the volume as being

24   distracting.  Is there any way -- Jean, is there any way we can

25   ratchet down the volume?

Cheryl Ann Chase, Ph.D. - Direct

1      IT SPECIALIST:  Yes.  Oh, let's do this.

2         (Off-the-record discussion.)

3         THE COURT:  Thank you.  All right.

4         Court had issued an order earlier in this matter that

5   would allow testimony of Dr. Chase by video conference call.

6   We have all that set up now.

7         Miss Case, if you will please swear the witness in.

8   Dr. Chase, you will need to stand, please.

9         COURTROOM DEPUTY:  You do solemnly swear that the

10  testimony you are about to give in the matter now before this

11  Court will be the truth, the whole truth, and nothing but the

12  truth, so help you God?

13        THE WITNESS:  I do.

14        COURTROOM DEPUTY:  Thank you.  Please be seated.  And

15  for our record, if you will state your full name spelling your

16  last.

17        THE WITNESS:  Cheryl Ann Chase, C-H-A-S-E.

18        THE COURT:  You may inquire.

19        MR. COULTER:  Thank you, Your Honor.

20                  CHERYL ANN CHASE, PH.D.,

21  having been duly sworn, was examined and testified as follows:

22                  DIRECT EXAMINATION

23  BY MR. COULTER:

24  Q.  Dr. Chase, what is your formal education?

25  A.  I have a bachelor's degree, a master's degree, and a Ph.D.

Cheryl Ann Chase, Ph.D. - Direct

1   Q.   And Dr. Chase, which undergraduate school did you attend?

2   A.   Undergraduate was at Baldwin Wallace College which is now

3   called Baldwin Wallace University.

4   Q.   And what degree did you obtain there?

5   A.   I have a bachelor of arts with a major in psychology and

6   my minor is in biology and chemistry.

7   Q.   Now, do you have any advanced degrees, Doctor?

8   A.   I do.  I have a Master's Degree in Psychology from the

9   University of Cincinnati, and then I have a doctorate -- a

10  Ph.D. in Psychology, Clinical Psychology from the University of

11  Toledo.  And as part of my internship year, I had a joint

12  appointment at Wayne State University School of Medicine and

13  Children's Hospital in Michigan, so that was that last year of

14  internship.

15  Q.   Now, Dr. Chase, do you belong to any professional

16  organizations?

17  A.   I do.  I am a member of the American Psychology

18  Association, the International Dyslexia Association, and then

19  the Learning Disabilities Association of America.

20  Q.   And Dr. Chase, have you served in any capacity in teaching

21  in higher education?

22  A.   I have.  I have been an adjunct instructor at a handful of

23  institutions as I was training, and then once I came back to

24  Cleveland, I have been at Baldwin Wallace University, John

25  Carroll University, and then a branch of Kent State University.

Vol. 2 - 136

Cheryl Ann Chase, Ph.D. - Direct

1  Q.   And do you teach any courses currently?

2  A.   Right now I do not.  My speaking schedule is very heavy.

3  I most recently taught last spring, Child Development at John

4  Carroll University.

5  Q.   And Doctor, have you written or published any in the field

6  of clinical psychology?

7  A.   I have.  I have a handful of peer-reviewed articles that

8  were done, so journal articles, and then I also have a host of

9  articles that were written more for a parent audience on things

10 ranging from anxiety in the classroom, executive functioning,

11 validating different neuropsychological tests that have been

12 used with children, handedness, head injury, headache, a

13 variety, about 8 or 10 in all.

14 Q.   Thank you, Doctor.  Where are you employed, Dr. Chase?

15 A.   I am self-employed in private practice.  It's called

16 Chasing Your Potential and just outside of Cleveland, Ohio.

17 Q.   And do you know the plaintiff in this case, Mr. Jun Yu?

18 A.   I do.

19 Q.   And how do you know Mr. Yu?

20 A.   Mr. Yu contacted me back in about the end of 2012 and was

21 putting together an internship for his internship year in his

22 clinical program and had asked me about supervising his work,

23 and I was happy to do so, so we started a supervisory

24 relationship in 2013.

25 Q.   Okay.  So, I am not sure that I understand, but how did

Cheryl Ann Chase, Ph.D. - Direct

1   you become -- how did you become one of Mr. Yu's supervisors

2   during his internship?

3   A.   Sure.  Jun had a relationship with some of the professors

4   at Baldwin Wallace, which is where I had done my undergrad and

5   also served as an adjunct.  And it's my understanding that one

6   of the faculty had suggested maybe he contact me and see if

7   there was some availability for supervised work in my private

8   practice, and there was.

9   Q.   Now, do you know a Dr. Leslie A. Speer?

10  A.   I have never met her.  I am familiar with her, but I

11  wouldn't know her if I saw her.

12  Q.   Well, Dr. Chase, what was your understanding of

13  Dr. Speer's role in Mr. Yu's internship?

14  A.   My understanding was that Dr. Speer was the overarching

15  supervisor, kind of overseeing the whole internship year, and

16  that I would be supervising his work in my private practice and

17  then sending, you know, feedback to her as well as back to the

18  university.

19  Q.   All right.  Now, Dr. Chase, did you and Dr. Speer ever

20  discuss Mr. Yu's progress in his internship?

21  A.   I -- to the best of my recollection, I had two

22  conversations with her.  The first one she had contacted me

23  and -- over the phone, and wanted some feedback on how I

24  thought he was doing in my practice.

25           And she had expressed some concerns about his

Cheryl Ann Chase, Ph.D. - Direct

1  socialization, his interactions with the families that were

2  coming in.  I expressed to her, at that time, I did not have

3  the same concerns.  That everything I had seen was appropriate

4  to the setting that I had him in.

5           And then the second phone call I got was her letting

6  me know that he was being released from the training program or

7  at least from the internship program.

8  Q.   Now, did Mr. Yu do any testing for you?

9  A.   Jun worked with me.  We were at the point in the

10  internship year or in his internship placement with me where I

11  was still supervising him, watching him administer tests so I

12  could be sure that they were done properly.  I did not have him

13  directly testing clinical cases yet.

14  Q.   Okay.  Is there a reason for that?

15  A.   Sure.  So, in a training program -- so, psych testing is

16  very particular.  And, for example, when I was on internship,

17  it took us about four to six, maybe even eight weeks before we

18  were allowed to test clinical cases.

19           The way the testing works is every test is very

20  specifically standardized.  And so there are times you are

21  allowed to ask a follow-up question and times you are not.

22  There are some subtests that are very carefully timed.  Some

23  subtests you are not timing at all.

24           And so it takes a great deal -- and it's really easy

25  to learn bad habits.  So, even if someone has been testing for

Cheryl Ann Chase, Ph.D. - Direct

1   years, especially in a private practice setting like mine, I

2   was making sure that Jun was going to be using the testing

3   materials properly, that he knew when to query, he knew when to

4   time, he knew what subtests he didn't need to time.

5           So, at that point, what we're doing is focusing on

6   case studies.  We were focusing on articles and him reading

7   some things to give him a better base in learning disability

8   evaluations, which is what I do.  And I had him doing some

9   writing.  We would -- he sat in on some cases.

10          So, for example, he sat in on a case, and then took

11  the data, and drafted the report, and then gave me a first

12  draft of the report, which the level at which he was

13  interpreting and summarizing the data, making recommendations

14  and diagnostic impressions I was very impressed with.

15  Q.  Now, Dr. Chase, you have in your possession a document

16  that has been marked Exhibit 47.  Do you have that in front of

17  you?

18  A.  I do, yes.

19          MR. COULTER:  And Your Honor, this has been

20  stipulated to for admission by the parties.

21          THE COURT:  If it has, it has.  Go ahead.  Yeah, if

22  it's on that list, you don't need to make mention of that.

23          MR. COULTER:  Thank you, Your Honor.

24  Q.  Now, Dr. Chase, what is -- what is it that you have in

25  front of you?

Cheryl Ann Chase, Ph.D. - Direct

1    A.    I have the letter that I wrote dated April 8th, 2013, to

2    Dr. Roberts noting Jun's progress with me thus far.

3    Q.    And Dr. Chase, what was the purpose of this

4    correspondence?

5    A.    I was giving an update as to where his training stood with

6    me at that point.  So, we were about three months in.

7    Q.    Now, I want you to take a look at that second paragraph in

8    Exhibit 47, and you write following.  "And I have had some

9    concerns about Jun delivering test items.  Since English is a

10   second language for him, my plan is to have him begin by

11   administering tests that require little verbal instruction, and

12   then we will move on to tests that are CD-based.  Before I have

13   him" --

14   A.    Uh-huh.

15   Q.    -- "administering full-scaled tests for clinical purposes,

16   I plan to supervise him administering the tests to two of the

17   three pilot cases, i.e., volunteer children first.  I plan to

18   have this happen in June when school is out and these children

19   are available."  Do you see that Dr. Chase?

20   A.    Uh-huh.

21   Q.    Now, Dr. Chase --

22   A.    I do, yes.

23   Q.    Dr. Chase, what was your concern regarding Mr. Yu's

24   administering tests because English is a second language for

25   Mr. Yu?  And second question, part two question then, would you

Vol. 2 - 141
Cheryl Ann Chase, Ph.D. - Direct

1    have the same concern for any intern administering the tests

2    where English was that intern's second language?

3            MR. KELLY:  Your Honor, let me object as being

4    compound.

5            THE WITNESS:  Certainly.

6            MR. COULTER:  It is compound, Your Honor.

7            THE COURT:  Just a moment, Dr. Chase.

8            Objection, it's compound, is sustained.

9            MR. COULTER:  I will break it up.

10           THE COURT:  So, let's just answer the first question.

11   BY MR. COULTER:

12   Q.   Okay.  Dr. Chase, what was your concern regarding Mr. Yu's

13   administering tests because English is a second language for

14   Mr. Yu?

15   A.   My concern was primarily because in dyslexia evaluations,

16   without getting too detailed, dyslexia itself is a

17   language-based disorder, and it requires -- to understand

18   dyslexia, to evaluate dyslexia, one of the primary ways that we

19   do that is we will, for example, read off nonsense words.  So,

20   words that are still made up of the same basic building blocks

21   of English but they are put together in a way that is novel or

22   new.

23           So, for example, lis-sa-shal.  Lis-sa-shal would be a

24   word that the examiner would have to say, and then the subject

25   would have to -- the patient would have to repeat back.  And it

 1   is not unusual for students where English is a second language

 2   that they don't pronounce the full names the same way that the

 3   test is intended, and he may not have, or any student may not

 4   have the ability to hear the faux names once they are read

 5   back.

 6          And so me being a native English speaker, it took me

 7   probably a good year or a year and half of listening and

 8   hearing those nonsense words before I understood what I was

 9   supposed to be saying fluently and then could hear them back.

10          And so it was one of my concerns that with English as

11   a second language, he may not pronounce and then be able to

12   hear back the faux names the way the exam -- the way the

13   book -- the way the test intended.

14          These tests are also now available on CD.  And so

15   this is an issue that my field has been dealing with, speech

16   language has been dealing with, and I knew that these tests

17   were coming that had the availability to be given on CD.  So,

18   it was just a matter of training him on the tests that weren't

19   available on CD, and then being able to have him use the CD so

20   that I could ensure accuracy of administration and scoring.

21   Q.   Okay.  Now, Dr. Chase, one last question.  Would you have

22   the same concern for any intern administering these tests where

23   English was the intern's second language?

24   A.   Absolutely.  Absolutely.  We even have that concern with

25   students who have certain dialects or certain drawls and

Cheryl Ann Chase, Ph.D. - Direct

1    certain ways of pronouncing things, and it really is an issue

2    that my field is contending with, which is why they have gone

3    to CD administration.

4    Q.    Okay.  Now, Dr. Chase, on April 8, 2013, as one of

5    Mr. Yu's supervisors, how would you characterize Mr. Yu's

6    progress as related to administering psychological tests?  On

7    progress is where I am putting my emphasis.

8    A.    Uh-huh.  The progress that I had seen up to that point I

9    thought was solid progress.  What he came in with -- now,

10   again, administering the tests is just one part of what we do.

11   The real -- and that's something that we learn relatively early

12   in our training.

13        The real -- the real work comes in interpreting the

14   data and making meaningful recommendations that families can do

15   something valuable with.  Jun already had the interpretation,

16   the diagnostic impressions, and the recommendations at a level

17   I was very impressed with.

18        The administering of the tests was something that I

19   was still working through, for my own understanding, that what

20   he was doing was commensurate with what -- a level that I would

21   expect.  I have very high standards for students when they work

22   with me.  And at that point in time, Jun was making progress

23   along the lines of anything I would have expected from his

24   level of training.

25   Q.    Now, Dr. Chase, the first paragraph of Exhibit 47, reads

1   as follows.  And I just want to make sure we -- you are there

2   with me.  It reads, "I am a psychologist in private practice

3   and conduct primarily psychoeducational assessments of

4   school-aged children.  Thus far, Jun and I have discussed about

5   a dozen cases and provided direct clinical service to

6   approximately six cases."

7           Do you see that, Doctor?

8   A.    I do.

9   Q.    Now, Dr. Chase, could you please explain, in layman's

10  terms, if possible, what you mean in saying "Thus far, Jun and

11  I have discussed about a dozen cases and provided direct

12  clinical service to approximately six cases"?  And I am trying

13  to emphasize direct clinical services.

14  A.    Certainly.  So, case studies are the primary way that my

15  field trains.  And so when I first started with Jun, at the

16  very, very beginning of the internship year, we had sat down

17  and gone over some redacted cases.  So, cases where I removed

18  the patient names, and we talked about how would you interpret

19  this data?  What would you make of this?  What stands out?

20          The next phase was, as I said, he had sat in on a

21  couple of cases, and I had him draft the initial report on

22  those cases, take the data, do the background history, do the

23  interpretation, do the recommendations, all at a very high

24  level.  I was very happy.

25          The direct clinical service comes in, so we divide up

Cheryl Ann Chase, Ph.D. - Cross

1   the supervision.  There's direct and there's indirect.  Direct

2   meaning that he was actually interacting with referred patients

3   that were paying for services with me.  And he was doing

4   things -- so, for example, bringing patients back from the

5   waiting room, doing the background interview.  I would do the

6   testing.  He would be making observations.  We would do a

7   feedback session shared together.

8           He would be involved in asking many of the questions

9   for the background interview, trying to understand the history,

10  how the family got to where they are, and then he was also

11  involved in the feedback sessions.  What I hadn't formally

12  stepped into yet was having him administer the tests.  But

13  that's the difference between the direct service and then the

14  indirect.

15          MR. COULTER:  Thank you, Dr. Chase.  I have no

16  further questions.

17          THE COURT:  Mr. Kelly.

18          MR. KELLY:  Thank you, Your Honor.

19                   CROSS-EXAMINATION

20  BY MR. KELLY:

21  Q.  Dr. Chase, good morning.  My name is Mike Kelly.  I

22  represent Idaho State University.  Can you hear me okay?

23  A.  (Nods head).  I sure can.  Yes, sir.

24  Q.  Just a couple follow-up questions for you.

25          First of all, if you look at that letter again that

Cheryl Ann Chase, Ph.D. - Cross

1   you wrote to Dr. Roberts of April 8th --

2   A.    Yes.

3   Q.    -- 2013?  Mr. Coulter read you the first couple of

4   sentences of the second paragraph, which says "I am a

5   psychologist in private practice."  Do you see that?

6   A.    I do.

7   Q.    The last sentence he did not read to you.  It states, "In

8   my opinion, we are just finishing the get-to-know-one-another

9   phase of the internship."  Do you see that?

10  A.    Uh-huh.

11  Q.    Is that accurate?

12  A.    I do.

13  Q.    Is that accurate?

14  A.    Uh-huh.

15  Q.    Is that yes?

16  A.    Yes.

17  Q.    Thank you.

18  A.    Yes.

19  Q.    And you indicated that you were working with Dr. Speer

20  from the Cleveland Clinic in regard to Mr. Yu's internship;

21  correct?

22  A.    Working with her?  I -- I did not say that.

23  Q.    Okay.  Well, you were -- you were a supervisor as she was

24  of Mr. Yu's internship; correct?

25  A.    Correct.

Cheryl Ann Chase, Ph.D. - Cross

1   Q.   But you did indicate that her role in the internship is

2   that she had the overreaching supervision of the internship;

3   correct?

4   A.   Correct.

5   Q.   And it was --

6   A.   And she had started with him earlier than I did.

7   Q.   And I, in fact, was just going to ask you that.  She had

8   been --

9        THE COURT:  Mr. Kelly, let me interrupt.  You said

10  overreaching.  I think the testimony was overarching, and they

11  are two different things.

12       MR. KELLY:  All right.  Overarching.  Thank you.

13  Q.   So, she had been working with Mr. Yu for a longer period

14  of time; correct?

15  A.   Right.  I don't recall offhand how much longer.

16  Q.   Okay.  But she had expressed to you, in one of her phone

17  calls with you, that she believed Mr. Yu had some problems with

18  social interaction?

19  A.   That was -- she was asking if those were my observations,

20  because those were her observations.

21  Q.   And it would be fair to say that at the time you wrote

22  this letter to Dr. Roberts, that you -- Mr. Yu was working with

23  you mainly in an observational capacity?

24  A.   There -- there had been six different cases on which he

25  was directly interacting with the patients.

Cheryl Ann Chase, Ph.D. - Cross

1  Q.   Okay.  Do you recall -- and I don't know if you have a

2  copy of it, but do you recall having your deposition taken in

3  August of 2016?

4  A.   I do.

5  Q.   And do you actually recall that --

6  A.   I do.

7  Q.   -- one of questions to you was that up until that time, up

8  until the time of the letter being written, that Mr. Yu's

9  involvement had been purely observational?

10 A.   I don't recall saying that.

11 Q.   Do you recall agreeing with that observation?

12 A.   No, I don't recall.  2016.

13       MR. KELLY:  I know this is difficult, in this

14 situation, but since she doesn't have a copy in front of her, I

15 don't know how procedurally --

16       THE COURT:  Well, we are doing this as an

17 accommodation to the plaintiff.  It's reasonable to allow you

18 to use the deposition by describing the question and answer.

19       Mr. Coulter, if you want to make a record of any

20 objection to that, you are welcome to.  But in my view, that's

21 only fair in the context.

22       MR. COULTER:  Your Honor, I believe that's fair in

23 the context, Your Honor.

24       THE COURT:  All right.  Thank you.

25       MR. KELLY:  Do I need to have the deposition

1   published for the record?

2           THE COURT:  Yes, you will need to publish the

3   deposition.

4           MR. KELLY:  Okay.

5           THE COURT:  So, this is the deposition of Dr. Chase

6   taken on what date?

7           MR. KELLY:  This would have been August 31st of 2016.

8           THE COURT:  Okay.  Let's open that and give that copy

9   to Mr. Kelly.  You will use that one, please.

10          MR. KELLY:  May I approach?

11          THE COURT:  Yes.

12  BY MR. KELLY:

13  Q.   Dr. Chase, I am not trying to put you on the spot here.  I

14  just want to get accurate testimony.

15  A.   (Nods head.)

16  Q.   And this may be a little bit out of context, so I will

17  read as much as you want.  But let me start on, for the record,

18  what is page 22 of your deposition.

19          And it starts on line five:

20          "Question:  All right.  You had the opportunity to

21  review Exhibit 12," which I will represent to you is Exhibit 47

22  that you have in front of you today.

23  A.   Okay.

24  Q.   It was Exhibit 12 to your deposition.

25  A.   Uh-huh.

Cheryl Ann Chase, Ph.D. - Cross

1    Q.   And you say, "I have."

2            "And let's just identify it for the record.  It

3    appears to be the email from you to Mark Roberts at Idaho State

4    University dated April 8th, 2013; is that correct?"

5            Your answer:  "Yes.

6            "Do you remember the purpose in sending this email?

7            "Answer:  I believe it was to report to the director

8    of clinical training his progress up until that point.

9            "Question:  Have you previously spoken with

10   Dr. Roberts by telephone or otherwise?

11           "Answer:  I don't know.

12           "Question:  At the beginning, the second paragraph,

13   you state in your opinion, we are just finishing the

14   get-to-know-one-another phase of the internship.  Do you read

15   that?

16           "Answer:  I did.

17           "Question:  That's consistent with what you

18   previously testified about, that things were just getting

19   underway with Mr. Yu?

20           "Answer:  Right.

21           "If you jump down to the next paragraph, there's a

22   statement in there about a quarter of way down, 'I have not had

23   him,' meaning Mr. Yu, 'engage in testing of students directly

24   as yet.  Do you see that?

25           "Answer:  Yes.

Cheryl Ann Chase, Ph.D. - Cross

1          "What do you mean by testing students directly?

2     Prior to that time, had it just been observational?

3          And your answer, "Correct."

4          Do you recall that testimony?

5     A.   Sure, the testing element was observational.

6     Q.   Okay.  And -- and again -- and I think I should have been

7     clearer on that.  But as far as testing, any testing that you

8     would have had him done on his own, you had not gotten to that

9     stage yet?

10    A.   Correct.

11    Q.   Okay.  Would it be fair to say, as far as where you were

12    at that point in time, with -- with Mr. Yu and his internship,

13    that you were treating him as what you would treat a first- or

14    second-year grad student?

15    A.   No.

16    Q.   How would you categorize him, at that point in time, prior

17    to allowing him to do any testing for you?

18    A.   How would I categorize him did you say?

19    Q.   Did you think he was at the point of being qualified as

20    a -- for the internship you were supervising him in?

21    A.   I am not sure -- the criteria that I was looking for, at

22    that point, involved a knowledge of ethics, which he

23    demonstrated to me that he had, a knowledge of scoring and

24    interpreting the tests, which he demonstrated that he had.

25    Knowledge base of being able to interpret and summarize the

Cheryl Ann Chase, Ph.D. - Redirect

1   data, make educated estimates of the diagnoses, and then

2   appropriate recommendations, and I saw that.

3          In terms of the type of work that I do as a clinical

4   psychologist, I felt that he was at an appropriate level given

5   where he was at in his training.  My only concern was being

6   able to pronounce faux names and hear them.

7   Q.   Okay.  But nevertheless, you still weren't allowing him --

8   regardless of your concerns, allowing him to independently test

9   your patients; correct?

10  A.   Testing, no.  Right.  But that's -- that's a fraction of

11  what I do.

12         MR. KELLY:  All right.  Thank you.  That's all I have

13  for you.  Thank you?

14         THE COURT:  Mr. Coulter, do you have further

15  questions?

16         MR. COULTER:  Yes, Your Honor.

17         THE COURT:  All right.  Redirect.

18                    REDIRECT EXAMINATION

19  BY MR. COULTER:

20  Q.   Dr. Chase, during the cross-examination, Mr. Kelly was

21  talking to you about this, you know, observation -- observation

22  period where you are just getting to the honeymoon period.  You

23  were just trying to get through that.

24         But when did Dr. -- excuse me -- when did Mr. Yu

25  start actually his portion of the internship with you?  Do you

Cheryl Ann Chase, Ph.D. - Redirect

1   remember what month?

2   A.   Early January.

3   Q.   So, we are talking --

4   A.   Early January.

5   Q.   Right.  And by April 4th or by April 8th, when you wrote

6   this letter, you still felt you were in the

7   getting-to-know-each-other phase; is that correct?

8   A.   We were just finishing that phase.  That's what a --

9   that's what I had documented, yeah, so --

10  Q.   All right.

11  A.   I got a sense of what skill set he came in with.

12  Q.   All right.  So, you were still doing an assessment and --

13  and would it be -- would it be fair to say that now you had

14  planned more sophisticated things for Mr. Yu, simply because he

15  had progressed to a particular point?

16  A.   Yes.

17  Q.   Okay.  And the -- and the clinical aspect of it, Mr. Yu --

18  one thing you said, in your deposition -- sometimes things

19  aren't clear, because the lawyers want to keep them not clear.

20       But one of the things that we asked you specifically

21  was did he do clinical work?  Okay.  And do you remember that?

22       MR. KELLY:  Your Honor, I'm going to object.  This is

23  narrative from the -- from counsel.  If it's easier --

24       THE COURT:  Well, the question is, did he do clinical

25  work?

Cheryl Ann Chase, Ph.D. - Redirect

1        MR. KELLY:  Well, then, Judge, I would move to strike

2   the narrative of the first part of it.  The question is fine.

3   It's the narrative that's a problem.

4        THE COURT:  All right.  Which I assume is the

5   reference to Mr. Coulter said lawyers don't always want to keep

6   things clear.

7        MR. KELLY:  Exactly.

8        THE COURT:  That's a very subjective view with all

9   sorts of perspectives, and I think lawyers do a good job of

10  trying to keep things clear while they are still being

11  advocates.  So, it's noted.  The objection is sustained.

12        The question, please.

13  BY MR. COULTER:

14  Q.   All right.  Dr. Chase, to be clear for the record, is it

15  your opinion or is it your experience that Mr. Yu was engaged

16  in clinical work?

17  A.   Yes.

18        MR. COULTER:  No further questions.

19        THE COURT:  Any further cross?

20        MR. KELLY:  Nothing, Judge.

21        THE COURT:  All right.  Dr. Chase, thank you for your

22  testimony today.  Now we just need to get you unplugged and let

23  you get back to what you are doing.

24        THE WITNESS:  Thank you so much for allowing this.

25        THE COURT:  That's fine.

Cheryl Ann Chase, Ph.D. - Redirect

1          Jean, yeah, what do we need to do to get that
2   accomplished?  It's already done.  No, there she is again.
3          All right.  Now, are we still going to be able to use
4   the system for exhibits?
5          IT SPECIALIST:  Yes.
6          THE COURT:  Okay.  We are all good to go there.
7          Mr. Coulter, your next witness.
8          Jean, thank you so very much for your assistance
9   today.
10          IT SPECIALIST:  May I come forward?
11          THE COURT:  Yes, of course.
12          MR. COULTER:  Let her get hooked up first.
13          IT SPECIALIST:  Do you want me to stick around?
14          THE COURT:  That's a good idea.  Why don't you stick
15   around for a minute.
16          Mr. Coulter, your next witness.
17          MR. COULTER:  Your Honor, at this time, we call
18   Dr. Gerald Koocher.
19          COURTROOM DEPUTY:  Please raise your right hand.
20          You do solemnly swear that the testimony you are
21   about to give in the matter now before this Court will be the
22   truth, the whole truth, and nothing but the truth, so help you
23   God?
24          THE WITNESS:  Yes, I do.
25          COURTROOM DEPUTY:  Thank you.  Please be seated.

Gerald P. Koocher, Ph.D. - Direct

1           For our record, sir, if you could state your full

2    name spelling your last.

3           THE WITNESS:  My named is Gerald Paul Koocher,

4    K-O-O-C-H-E-R.

5           THE COURT:  You may inquire.

6                    GERALD P. KOOCHER, PH.D.,

7    having been duly sworn, was examined and testified as follows:

8                    DIRECT EXAMINATION

9    BY MR. COULTER:

10   Q.   Good morning, Dr. Koocher.

11   A.   Good morning.

12   Q.   Now, Dr. Koocher, what is your formal education?

13   A.   I received a Bachelor's Degree in Psychology from Boston

14   University, a Master's Degree in Clinical Psychology, and a

15   Ph.D. Degree in Clinical Psychology from the University of

16   Missouri.

17   Q.   And do you belong to any professional organizations,

18   Doctor?

19   A.   Yes, I am a fellow of the American Psychological

20   Association and a fellow of the American Association for the

21   Advancement of Science.

22   Q.   How do you become a fellow in these organizations?

23   A.   You get nominated by your peers and evaluated on the basis

24   of your scholarly or professional work.

25   Q.   Thank you, Doctor.  Now, Doctor, have you served in any

Gerald P. Koocher, Ph.D. - Direct

1  capacity in teaching in higher education?

2  A.   Yes.  I have been a full-time faculty member at Simmons

3  University, formerly Simmons College, a full-time faculty

4  member at Harvard Medical School, and a full-time faculty

5  member at DePaul University.

6            I also taught the Ethics and Professional Issues

7  class to the doctoral students at Boston College for a dozen

8  years, and I taught the same course at DePaul University.

9  Q.   And when you were at the DePaul University, what was your

10  position?

11  A.   I was the Dean of the College of Science and Health, and,

12  in that capacity, oversaw the doctoral programs in psychology.

13  Q.   Now, what courses do you currently teach if, in fact, you

14  are currently teaching any classes?

15  A.   I am not currently teaching.

16  Q.   Okay.  Did you teach any class in the summer of 2017?

17  A.   In the summer of 2017, I taught a Forensic Psychology

18  class to undergraduates at DePaul University.

19  Q.   Now, would you please detail your experience at the

20  university level to include teaching assignments, faculty

21  positions in the field of psychology?

22  A.   The primary ones were at Harvard Medical School and Boston

23  Children's Hospital, where I was at first Director of Training

24  and then Chief of Psychology, and supervised the psychology

25  internship and postdoctoral programs.  I also taught medical

Vol. 2 - 158

Gerald P. Koocher, Ph.D. - Direct

1   school students.

2         At DePaul University, I -- I'm sorry.  At Simmons

3   College, where I went next, I became Dean of the College of

4   Science and Health and oversaw the graduate and undergraduate

5   programs in Health Sciences.  I then served a few years as an

6   associate provost at Simmons before accepting the deanship at

7   DePaul University.

8   Q.   All right, sir.  And in those roles, did you have any

9   administrative responsibilities?

10  A.   Yes, I was administratively responsible at the hospital

11  for the selection of interns and oversight of interns.  And in

12  the doctoral programs where I served as dean, I was responsible

13  for overseeing the academic quality and administrative

14  operations of the graduate programs.

15  Q.   Doctor, have you written and published in the field of

16  ethics -- in the field of ethics as they are related to

17  teaching in the practice of psychology or related fields?

18  A.   Yes.

19  Q.   And could you -- could you please explain?

20  A.   Well, overall, I have published about 350 articles and

21  book chapters.  But specifically focused on teaching and

22  ethics, I have a couple of textbooks.  I have an ethics

23  textbook which is now in its fourth edition, and I have some

24  textbooks on evidence-based practice.

25  Q.   Is one of those textbooks "The Ethics and Psychology in

Gerald P. Koocher, Ph.D. - Direct

1   the Mental Health Profession"?

2   A.   Yes, that's the textbook.

3   Q.   Is this textbook being used a number of universities and

4   colleges?

5   A.   It was the first ethics textbook ever published on

6   psychology, and it's been the most popular one over the past

7   several years.

8   Q.   And about how many publications have you authored in the

9   field of ethics as ethics is related to teaching and practice

10  of psychology?

11  A.   I'm sorry.  I have never counted them.  Of my 350, I would

12  say about a third are related to ethics and the rest are

13  related to my clinical practice with children with chronic

14  illness.

15  Q.   Have any journals published your articles on ethics as

16  ethics are related to the teaching and practice of psychology

17  or related fields?

18  A.   I'm sorry.  I don't understand.

19  Q.   Okay.  Have any journals published, like, professional

20  journals published your articles on ethics?

21  A.   Yes, including Nature and the American Psychologist.

22  Q.   Now, Doctor, have you written and published on the topic

23  of accreditation as it relates to the teaching and practice of

24  psychology or related fields?

25  A.   I published on accreditation and supervision and

Gerald P. Koocher, Ph.D. - Direct

1   credentialing in psychology.

2   Q.   And if you know, how many publications have you authored

3   on the topic of accreditation as related to the teaching of

4   psychology or related fields?

5   A.   I would have to go through my resumé and count them.

6   Sorry.  I haven't counted those.

7   Q.   All right.  Now, Dr. Koocher, can you tell the Court what

8   is the American Psychology Association?

9   A.   The American Psychology Association is the largest

10  professional association, scholarly association of

11  psychologists in the world.  If you add in the foreign

12  affiliates and student members, they have about 150,000

13  members.

14  Q.   Have you ever held office within the America Psychological

15  Association?

16  A.   Yes, I have been an officer in several divisions.   I

17  served as treasurer of the association and on the board of

18  directors for 10 years, and I served as a president in 2006.

19  Q.   And can you tell the Court what your duties were in these

20  offices?

21  A.   I was -- the APA is the largest scholarly publisher in the

22  United States, and it has a substantial staff to do the

23  business operations.  So, as treasurer, I was a member

24  overseeing the business operations and voting on the board of

25  directors.  And then as president elect, president, and past

Gerald P. Koocher, Ph.D. - Direct

1   president, I served three years on the board, in one year

2   chairing the board of directors.

3   Q.   Now, Doctor, in your tenure as the president of the

4   American Psychology Association, what would you consider to be

5   the major accomplishment of your tenure?

6   A.   The major accomplishment, I believe, was focused on

7   immigration and care of military-dependent families.

8   Q.   Now, have you served on any commissions or committees

9   concerned with the -- responsible for the accreditation of

10  academic institutions offering undergraduate and graduate-level

11  courses and degrees in psychology?

12  A.   I have been a site visitor for the New England Commission

13  on Higher Education and for what's called the Higher Learning

14  Commission, which accredits higher educational institutions in

15  the Upper Midwest, covering Illinois, Minnesota, Michigan.

16          I have also -- I also serve as an accreditation site

17  visitor for the American Psychology Association Commission on

18  Accreditation and for the Commission on Accreditation Physical

19  Therapy Education.

20  Q.   Okay.  And what specific duties did you have on these

21  commissions or committees?  You may have already answered that,

22  but --

23  A.   In all of those cases, it was a role as a site visitor

24  where one has to read the self-study documents that the program

25  provides and then visit the site and interview faculty,

Gerald P. Koocher, Ph.D. - Direct

1  students, and view the site in order to determine the accuracy

2  of the material that is submitted.

3  Q.    Now, Doctor, where are you currently employed?

4  A.    I am currently employed as the Provost and Senior Vice

5  President for Academic Affairs at Quincy College, in Quincy,

6  Massachusetts.

7  Q.    And what do you do in that capacity?

8  A.    I am the Chief Academic Officer of the institution.

9  Q.    And by being the Chief Academic Officer of the

10  institution, what does that mean?

11  A.    I oversee the Dean's Program Development, academic and

12  teaching, instruction and accreditation across our two

13  campuses.

14  Q.    Now, Doctor, is the field of psychology governed by any

15  published ethical principles or code of conduct?

16  A.    Yes, there's a document called "The Ethical Principles of

17  Psychology and Code of Conduct."  The ethical principles are

18  identified by letters of the alphabet, and they're

19  aspirational.  The code of conduct is designated by numerical

20  units, and those are enforceable by the ethics committee.

21          THE COURT:  Mr. Coulter, I'm not sure if you are

22  shifting gears at this point.  Are you laying further

23  foundation at this point or are you seeking testimony?

24          MR. COULTER:  I am laying further foundation at this

25  point, Your Honor.

Vol. 2 - 163

Gerald P. Koocher, Ph.D. - Direct

1          THE COURT:  All right.  Go ahead.

2          MR. COULTER:  Just trying to go by the --

3          THE COURT:  All right.

4          MR. COULTER:  -- evidentiary handout that I have.

5          THE COURT:  Okay.

6    BY MR. COULTER:

7    Q.   All right.  Doctor, do you have Exhibit 116 and 117 in

8    front of you?

9    A.   No.  I do now.

10          THE COURT:  116 and 117 are not admitted.

11          MR. COULTER:  We have already spoken about it, and I

12   believe there is no objection, Your Honor.

13          THE COURT:  Is that right, Mr. Kelly?

14          MR. KELLY:  That's correct, Your Honor.

15          THE COURT:  All right.  Plaintiff's Exhibit 116 and

16   117 are admitted.

17       (Exhibits 116 and 117 admitted.)

18   BY MR. COULTER:

19   Q.   Now, Dr. Koocher, what is the Association of Psychology

20   and Postdoctoral Internship Center?  What is that?

21   A.   That's known by the acronym APPIC, and that is an

22   association of sites offering internship training that has an

23   effort to get all of the internship sites, who are its members,

24   to adhere to fundamental policies and principles with respect

25   to the selection and training of interns in psychology.

Vol. 2 - 164

Gerald P. Koocher, Ph.D. - Direct

1   Q.   Now, in regards to the conduct of internships, has the

2   APPIC published specific procedures for due process, appeals,

3   grievances, those types of things?

4   A.   Yes, they have procedures for membership and for due

5   process published on their website.

6   Q.   Okay.  Now, Doctor, have you previously served as an

7   expert for any regulatory or legislative committees?

8   A.   Yes.

9   Q.   And if you have, could you tell the Court your experience?

10  A.   I have testified before licensing boards in half a dozen

11  states.  I have testified before state and federal courts, and

12  I have testified before the United States Congress.

13  Q.   And have you previously served as an expert in any state

14  or federal legal proceeding; and, if you have, could you please

15  delineate, to the best of your knowledge, where and in what

16  capacity?

17  A.   Well, I did that on the case list that I provided, and I

18  am sorry.  I can't recite them from memory, but there probably

19  are at least 40 or 50 cases on the list.

20  Q.   Were you allowed to give testimony in the field of ethics

21  as related to this practice of psychology and other related

22  fields?

23  A.   Yes.

24  Q.   Were you allowed to give testimony regarding the topic of

25  accreditation as related to the teaching and practice of

Gerald P. Koocher, Ph.D. - Direct

1   psychology and the related fields?

2   A.   Yes.

3   Q.   Now, Dr. Koocher, what is your -- what is your specialty

4   or specialties in the field of psychology?

5   A.   My initial training was in clinical psychology and child

6   clinical and pediatric psychology.  I hold board certification

7   by examination in the fields of clinical, clinical health

8   psychology, clinical child and adolescent psychology, couple

9   and family psychology, and forensic psychology.

10  Q.   Doctor, are you familiar with the present case of Jun Yu

11  versus Idaho State University?

12  A.   Yes.

13  Q.   And how did you become familiar with this case?

14  A.   I believe that my first contact was I received an email

15  from Mr. Yu, explaining that he had used my ethics textbook in

16  his class.  And as a result of some of the material he read in

17  that textbook, he was seeking help with his legal case.

18  Q.   All right.  Did you read any documents or anything?

19  A.   Well, I told Mr. Jun before I could know whether I could

20  be of assistance to him or not, I would have to read material

21  about the case.

22         And he sent me electronically a large packet of

23  materials that he had prepared as part of a complaint to the

24  APA committee on accreditation.  I believe it was about 700

25  pages.  And I read those for him and then that was the first

Vol. 2 - 166

Gerald P. Koocher, Ph.D. - Direct

1  instance of what I read.

2  Q.   Was there a second instance?

3  A.   The second instance was after I told Mr. Yu that I thought

4  he had a strong issue to pursue --

5          THE COURT:  Let's -- we are qualifying here.  We are

6  not testimony on --

7          MR. COULTER:  Right.  I will move on, Your Honor.

8  Q.   But I wanted to ask a couple other things.  Have you --

9  have you and are you receiving any monetary compensation to

10  serve as a witness for Mr. Yu?

11  A.   Yes.

12  Q.   And has the fact that you are being paid to serve as an

13  expert for Mr. Yu impacted your professional assessment of this

14  case?

15  A.   No.

16  Q.   Okay.  And have you reviewed any documents in this matter

17  other than what Mr. Yu has provided to you?

18  A.   Yes.

19  Q.   And can you tell the Court what some of those documents

20  are?  Not all of them, just some of them.

21  A.   Well, they are all -- they are listed in a report that I

22  prepared.  But the fundamental documents that I read, in

23  addition to the complaint documents, the documents that Mr. Yu

24  provided, and the materials that were provided to counsel on

25  discovery, those would cover most of what I read.

Gerald P. Koocher, Ph.D. - Direct

1  Q.   Dr. Koocher, do you have an opinion whether Mr. Yu was a

2  victim of the defendant's failure to adhere to the ethical

3  principles, psychologists -- psychologists and the guidelines

4  and principles established for the accreditation programs, in

5  professional psychology, while he was a student in the doctoral

6  clinical psychology program at Idaho State University?

7  A.   Yes.

8         MR. KELLY:  Your Honor, I object.

9         THE COURT:  Just a moment.

10         Mr. Kelly.

11         MR. KELLY:  Well, I don't think he's finished

12  qualifying the witness, number one.  But number two, I object

13  to this question as to relevance for this particular case.

14         THE COURT:  Mr. Coulter, in the ordinary course, you

15  would offer this witness as an expert, and then there would be

16  an opportunity for opposing counsel to either stipulate or

17  object, and I would deal with that issue first.  So --

18         MR. COULTER:  Okay, Your Honor.

19         THE COURT:  -- are you intending to offer Dr. Koocher

20  as an expert witness --

21         MR. COULTER:  Yes, Your Honor.

22         THE COURT:  -- to testify in this matter?

23         MR. COULTER:  I did intend to offer him as a witness

24  in this matter from -- to answer the objection, we have

25  established the expert's qualifications.  In this particular

Vol. 2 - 168

Gerald P. Koocher, Ph.D. - Direct

1  case, we have --

2           THE COURT:  I don't know if there's an objection yet,

3  so I am just trying to --

4           MR. COULTER:  I am going to offer -- I am going to

5  offer, Your Honor.

6           THE COURT:  Okay.  Mr. Kelly, any objection to

7  Dr. Koocher?

8           MR. KELLY:  I have no objection to Dr. Koocher

9  operating as an expert in this matter.

10          THE COURT:  Okay.

11          MR. KELLY:  My objection is on that pending question.

12          THE COURT:  All right.  So, I am satisfied, based

13  upon the foundation that's been laid, that he's an expert in

14  the field.  The particular details of any opinions that he may

15  offer are, of course, always a separate matter.

16          So now you have the question that's been posed as to

17  whether he has an opinion as to the ethical and accreditation

18  issues, as I recall.  I don't have the question right in front

19  of me.

20          Let me look back at that just for a moment so I have

21  got it clear in my head.  So, the question was whether

22  Dr. Koocher has an opinion whether Mr. Yu was a victim of the

23  defendant's failure to adhere to the ethical principles -- and

24  Kathy, this is the first time I have not -- there is a word I

25  am not recognizing -- and the guidelines and principles

Gerald P. Koocher, Ph.D. - Direct

1  established for the accreditation programs in professional

2  psychology while he was a student in the doctoral clinical

3  psychology program at Idaho State University.

4          Was that your question, Mr. Coulter?

5          MR. COULTER:  Yes, Your Honor.

6          THE COURT:  Okay.  So, let me hear your objection

7  then, Mr. Kelly.

8          MR. KELLY:  My objection, Your Honor, is the fact

9  that that issue was not relevant to this lawsuit.

10         THE COURT:  Okay.  So, the objection is relevance.

11         Mr. Coulter, what is the relevance of that question?

12         MR. COULTER:  Well, the relevance, Your Honor, is

13  that when we said -- we stated in our opening -- opening

14  statement that we had a duty to, in fact, show through -- show

15  that there was an intentional discrimination.

16         Now, one of the factors that we have here is that --

17  that it is our contention that Idaho State University did not

18  adhere to those ethical concerns.  And that by doing so,

19  they -- they fell below an accepted standard.

20         In other words, what they did was arbitrary and

21  capricious.  If it was arbitrary and capricious, that means

22  there is no credibility to what they -- what they had.  If we

23  can show, through several examples, that there was no

24  credibility, that, in turn, strengthens our prima facie case,

25  according to law, and we can make the argument that -- that

Gerald P. Koocher, Ph.D. - Direct

1  there was intentional discrimination by Idaho State University.

2        THE COURT:  All right.  Mr. Kelly, let me hear your

3  response to that.

4        MR. KELLY:  Initially, my response is that's quite a

5  leap, Your Honor.  The standard again is intentional

6  discrimination.  Here we are talking about ethical violations

7  that Dr. Koocher apparently, from Mr. Coulter's response to

8  you, would be arbitrary and capricious as far as ethical

9  violations.  I am not sure where the connection is there.

10        THE COURT:  All right.  I am -- this is an area in

11  which the very nature of the claim -- and it's not unique to

12  Title VI claims, but exists in other discrimination settings --

13  in which there's -- allegations of discrimination is that the

14  direct proof is often very difficult to put forward.  The

15  indirect or inferential evidence is often one means of that.

16        It's further complicated in this setting where a part

17  of one of the elements is intention.  And, so, I'm going to

18  allow the question.  I will allow the answer.  As you go

19  forward, I will deal with any other objections as they may be

20  raised.

21        Mr. Kelly, you will have an opportunity to

22  cross-examine, of course, and then each of you will have an

23  opportunity to argue the credibility of or the relevance of the

24  opinions that are expressed vis-à-vis the plaintiff's burden of

25  proof.

Gerald P. Koocher, Ph.D. - Direct

1          So, I am going to allow it.  I guess that's all I

2    will say about it right now.  Okay.

3          MR. COULTER:  I just need to get a little water, Your

4    Honor.

5    Q.   Dr. Koocher, do I need to reread the question to you?

6          THE COURT:  Why don't you just do it again just so we

7    set the stage and because we've had this conversation.  Go

8    ahead.

9          MR. COULTER:  Yes, Your Honor.

10   Q.   Dr. Koocher, do you have an opinion as to whether Mr. Yu

11   was a victim of the defendant's failure to adhere to the

12   ethical principles of psychologists and the guidelines and

13   principles established for the accreditation of programs in

14   professional psychology while Mr. Yu was student in the

15   doctorate clinical program -- doctorate of clinical psychology

16   program at Idaho State University?

17   A.   Yes, I do.

18   Q.   And how positive are you of your opinion?

19   A.   I feel very strongly positive about my opinion.

20   Q.   Okay.  How certain would you be of your conclusion?

21   A.   How certain, I have -- in psychology, we have -- we use

22   percentiles.  I would say beyond the 99th percentile.

23   Q.   And what is that opinion?

24   A.   I feel -- I found, in reading the materials, at least 11

25   instances in which policies and procedures or ethical

Vol. 2 - 172

Gerald P. Koocher, Ph.D. - Direct

1  principles appear to have been violated in dealing with Mr. Yu

2  and his progress through the doctoral program at Idaho State

3  University.

4  Q.  Now, Dr. Koocher, can you explain to the jury -- to the

5  Court why you are of the opinion that Mr. Yu suffered in the

6  manner that you have spoken about?

7  A.  Well, there were a number of policies and ethical

8  principles that place obligations on the psychology faculty in

9  the administration of the psychology program where they either

10 did not appear to meet their obligation or where those

11 obligations were violated in some way.

12 Q.  Okay.  Okay.  Doctor --

13      MR. COULTER:  Could you turn on the -- so we can show

14 the documents?  It's not on.

15      THE COURT:  We may have to turn it on again because

16 we -- because of the phone call.

17      COURTROOM DEPUTY:  You are plugged into the lectern;

18 correct?

19      MR. COULTER:  Excuse me?

20      COURTROOM DEPUTY:  You are plugged into the lectern?

21      MR. COULTER:  No, she is.

22      THE COURT:  Mr. Coulter, who do you have assisting

23 you?  I don't think she's been introduced to the Court.

24      MR. COULTER:  That's Miss Crystal Anderson.

25      THE COURT:  All right.

Gerald P. Koocher, Ph.D. - Direct

1         MR. COULTER:  That's a paralegal in the case.

2         THE COURT:  All right.  Ms. Anderson, then I have a

3  name to attach to you.  So, all right.

4         MR. COULTER:  I can see it anyway.  I can see the

5  monitor, so I don't need to be plugged in.

6         COURTROOM DEPUTY:  Mr. Coulter, you just need to let

7  us know which computer you are going to use, the lectern or if

8  you are using hers.

9         MR. COULTER:  Hers.

10        THE COURT:  But now I don't have anything on my

11  screen, nor do you have anything there?

12        Jean, we need you back.  We don't have anything on

13  the other monitors.

14        IT SPECIALIST:  She doesn't have a document showing.

15        THE COURT:  Oh, all right.  Well, that's the problem

16  then.

17        Okay.  If the tree falls in the forest.

18        All right.  Go ahead, Mr. Coulter.

19  BY MR. COULTER:

20  Q.   All right.  Now -- we will let you get that adjusted.

21  A.   Thank you.

22  Q.   Now, what everyone is seeing on the screen is that we have

23  a number of things from Exhibit 116 and 117 that Dr. Koocher

24  will be referring to and sometimes -- and sometimes it will

25  change.

Vol. 2 - 174
Gerald P. Koocher, Ph.D. - Direct

1          Can you hear me better now?  All right.  I couldn't

2   hardly hear myself.

3          All right.  Dr. Koocher, what is the standard

4   practice if a student is an academic jeopardy or placed on

5   probation?

6   A.   The standard practice is that the student is notified of

7   their alleged deficit; that a remediation plan is proposed.

8          THE COURT:  Mr. Coulter, I'm sorry to interrupt.

9   Could you put this in some context for me?  Is this a student

10  anywhere?  Is this a student in some national sort of policy?

11  Is it in an ISU student handbook?

12         MR. COULTER:  No, Your Honor.  What we are looking at

13  is the Ethical Principles of Psychologists and Code of Conduct,

14  Exhibit 116, and the Guidelines and Principles for the

15  Accreditation of Programs.  And so what we are doing --

16         THE COURT:  All right.  In the inquiry of this

17  witness, if you will kind of be careful to define where in this

18  pantheon of information it sits, it will help me.  You're

19  intimately familiar with it.  I am not as much.

20         MR. COULTER:  All right.

21         THE COURT:  All right.  Thank you.

22         MR. COULTER:  Yes, Your Honor.  And then what we are

23  going to do after that, we are going to show from the general

24  to how it's specific.

25         THE COURT:  All right.

Gerald P. Koocher, Ph.D. - Direct

1       MR. COULTER:  How it applies to Idaho State
2  University.
3       THE COURT:  Understood.  Thank you.
4  BY MR. COULTER:
5  Q.   Okay.  Now, did you understand the question that I asked
6  you, Dr. Koocher?
7  A.   Yes.  As I understood it, you were asking in general are
8  there obligations that a program would have if it was -- if the
9  student was not progressing, or would you state the --
10 Q.   I can restate the question.  I can restate the question.
11       What is the standard practice, if a student is in
12 academic jeopardy or placed on probation, generally, in
13 accordance with the ethical principles or the guidelines?
14 A.   Both have the same thrust.  What you are showing on the
15 screen is the ethical principle.  The underlying principle is
16 that student is put on notice that they are having a problem,
17 that the notice is specific.
18       Ideally, it should be communicated to the student in
19 writing, a remedial plan should be put in place with a time
20 frame, and there should be documentation of the student's
21 progress through and completion of the remedial plan.
22 Q.   And how was -- how was Mr. Yu treated in -- from your
23 observation?
24 A.   There were a number of instances in which Mr. Yu was not
25 put on notice, where a written remedial plan was not provided,

1    or when there was no follow-up on any remedial plan.

2    Q.   Now, you have told us about students in academic jeopardy.

3    What happens when a student is performing poorly in a degree

4    program such as the clinical psychology program and doctorate

5    at Idaho State University?

6    A.   From the degree program perspective, the ultimate

7    sanction, of course, would be to dismiss the student from the

8    program.  And again, the policies that would follow are putting

9    the student on notice that they are in jeopardy, putting them

10   on notice as to what the jeopardy is, giving them the

11   opportunity to have a remedial plan, presenting that plan in a

12   formal way, and monitoring that plan through to a conclusion.

13          In addition, if one were going to impose the ultimate

14   sanction on the student, there should be some sort of

15   procedure, hearing, appearance before the faculty where the

16   student has the opportunity to present their view of the

17   situation, present a defense as it were.

18   Q.   Okay.  And, Doctor, based on your reading the -- all the

19   documents that you read in regards to Mr. Yu's case, can you

20   tell me how Mr. Yu was -- can you give an opinion how Mr. Yu

21   was treated in this particular case for that particular

22   question?

23   A.   These policies do not appear to have been followed in

24   Mr. Yu's case.  And, in fact, the most dramatic example is that

25   Mr. Yu was quite surprised to learn of his dismissal, which

1    occurred without his being invited to present his side or to

2    have a hearing before the department.

3    Q.   And we are talking about the dismissal from Idaho State

4    University?

5    A.   We are talking, in the first instance, about his

6    termination by the clinical faculty, the vote of the clinical

7    faculty.

8    Q.   Now, how would -- how should a university treat a student,

9    in general, when they are receiving unsatisfactory grades?

10   A.   In general, when a student is receiving unsatisfactory

11   grades, they are put on probation, and every university that

12   has regional accreditation has a policy for an unsatisfactory

13   performance and putting the student on notice and suggesting

14   either a remediation plan or some kind of assignments that they

15   have to engage in to resolve that problem.

16   Q.   Okay.  And did -- in your opinion, did Idaho State

17   University follow its policy?

18   A.   No.

19   Q.   Can you explain to the Court why?

20   A.   Well, in the first instance, Mr. Yu received a few grades

21   that were unsatisfactory where the university did not appear to

22   follow its own policy for assigning unsatisfactory grades.  In

23   addition, some of the unsatisfactory grades were in areas where

24   Mr. Yu was not put on any notice or given a chance to respond.

25   Q.   Okay.  Now, would a university ever use an

Gerald P. Koocher, Ph.D. - Direct

1   underperforming, poorly communicating student to teach?

2   A.   No.  In fact, that would be an ethical violation of the

3   standards on wanting to have a competent faculty.

4   Q.   And what did ISU do, in your opinion?

5   A.   ISU repeatedly hired Mr. Yu to teach undergraduates.  I

6   believe at least three different courses, including statistics,

7   child development, and another course.  And Mr. Yu received

8   laudable grades in -- I'm sorry -- laudable student ratings and

9   laudable reviews by the faculty overseeing his teaching.

10  Q.   Now, what are the -- in general, what are the expectations

11  of directors of clinical testing or programs with respect to

12  monitoring of students off-site?

13  A.   Do you mean directors of clinical training?

14  Q.   Yes, sir.  I do mean directors of clinical training.

15  A.   The so-called DCT, director of clinical training, is

16  expected to oversee student's placements by communicating with

17  the placement site back and forth on the student's progress,

18  and assuring that the facility, where the student is being

19  trained, is adequate and meets the requirements that are

20  necessary to recognize the experience.

21  Q.   And in your opinion, what did Idaho State University do or

22  fail to do in this respect?

23  A.   There were a number of problems that were irregularities.

24  In the first instance, it was highly unusual that Idaho State

25  University told Mr. Yu in writing that he should not apply to

Gerald P. Koocher, Ph.D. - Direct

1    sites that did not serve Chinese-speaking individuals.

2              When he did apply to sites and chose to follow

3    through, and he did not match -- which, by the way, was not

4    unusual in the time frame when Mr. Yu was applying, because

5    there was a shortage of clinical training sites during that

6    period, and up to a quarter of the students nationally did not

7    match -- the typical thing that a director of training would

8    have done would have been to aid their student in finding an

9    alternative placement.

10             And that could have taken a number of forms,

11   including the DCT outreaching to sites that might arrange

12   something.  Also, when Mr. Yu set up his ad hoc program in

13   Cleveland, there should have been close communication with the

14   director of clinical training to assure that all of Mr. Yu's

15   rights were being protected, because the site would not have

16   been APPIC affiliated and would not necessarily have to adhere

17   to those policies.

18             In addition, if there were difficulties at the site,

19   there should have been close communication on the part of the

20   director of clinical training with the site in order to assure

21   remediation and attention to those issues.

22   Q.   Now, Dr. Koocher, what would be the expectation for a

23   clinical training program in helping students secure

24   internships?

25   A.   In helping students what?

Gerald P. Koocher, Ph.D. - Direct

1  Q.   Secure.  Secure internships.

2  A.   There would be a number of issues that would be involved.

3  First, of course, is being sure that the student has proper

4  training.  And this is designated by the training director

5  signing off before the student can apply to internship, that

6  they are prepared and qualified to go an internship.

7           Another thing that would be important is for the

8  director of clinical training to assist the student should they

9  not match in finding another appropriate experience or

10 alternative.

11 Q.   In your opinion, did Idaho State University do this?

12 A.   No, they did not in my opinion.

13 Q.   Would you please explain to the Court?

14 A.   When Mr. Yu didn't match, the director of clinical

15 training, clinical faculty apparently offered him a three-part

16 choice of waiting another year, of trying to arrange something

17 in the United States, or of trying to arrange something in

18 China, but they did not appear to take an active role in

19 assisting him.

20          Instead, Mr. Yu was left on his own to make phone

21 calls, to outreach with whatever connections he had to try to

22 cobble something together in order to meet that middle offer in

23 his effort to secure a prompt, non-APPIC-approved site within

24 the United States.

25 Q.   All right.  Now, Doctor, are you familiar or -- are you

Gerald P. Koocher, Ph.D. - Direct

1    familiar with the fact that Mr. Yu was turned down for an

2    externship for his perceived lack of fluency in the fall of

3    2010 to the spring of 2011?

4    A.    Yes.

5    Q.    And how did ISU handle it?

6    A.    I was puzzled by the way that they handled it.  They

7    brought him back from the site and assigned him teaching and

8    research assistant duties.  What surprised me about that is

9    that what would normally happen, because the experience that he

10   was supposed to have would have been delivering clinical

11   services that would better prepare him for internship, would be

12   for the director of clinical training to try to arrange some

13   other opportunities for him to acquire this clinical

14   experience.

15          Instead, they brought him back into the comfort zone

16   that they had with him where they had him teaching and doing

17   research or being a research assistant, teaching assistant, but

18   did not find a substitute clinical experience for him.

19   Q.    So, in your opinion, what -- what would have been the

20   ideal way to handle the situation?

21   A.    The ideal way to handle it would have been to have the DCT

22   reach out to other potential training sites or even to

23   practitioners in the community where Mr. Yu might have obtained

24   some additional clinical experience.

25   Q.    Dr. Koocher, what typically happens, in a clinical

Gerald P. Koocher, Ph.D. - Direct

1  psychology program, when a student fails to complete an

2  internship?

3  A.   The answer to that question would be bifurcated, and it

4  would really depend to the reason why the student failed to

5  complete the internship.  If a student were dismissed from an

6  internship because of malfeasance, such as sexual intimacies

7  with a client or substance abuse problem, it would not be

8  unusual for the program to dismiss the student as personally

9  unsuited for the profession or as risky to the profession in

10  some way.

11          In any other circumstance, the usual remedy would be

12  to find an alternative model where the student could acquire

13  that experience, such as helping them to apply for an

14  internship in another year, find another appropriate activity

15  to substitute for that, especially if the reason for the

16  internship was not a character flaw or legal violation, but

17  rather it was perceived a need for remediation.

18  Q.   Now, in your review of the documents, what do you -- what

19  did you find ISU did in this particular case?

20  A.   The surprising thing to me, in seeing ISU's response, was

21  that they terminated him from the program rather than making

22  available some other remedial course of action for him to

23  complete his training.

24  Q.   Now, Dr. Koocher, is there anything in the ethical

25  policies that generally address how a student should be treated

Gerald P. Koocher, Ph.D. - Direct

1    in training programs?

2    A.    Yes.

3    Q.    Could you explain to the Court what that is?

4    A.    In training programs, it's very important that students be

5    treated equally and fairly compared with other students in the

6    same program.

7    Q.    And how would you characterize how ISU handled Mr. Yu in

8    this regard?

9    A.    Having looked at the materials in discovery showing the

10   way that Iowa State University handled --

11               THE COURT:  It's Idaho State University.

12               THE WITNESS:  I'm sorry.  I apologize.

13               THE COURT:  It's a sore spot in Idaho.  Just helping

14   you out there, Doctor.

15               Go ahead.

16               THE WITNESS:  Idaho State University treated other

17   students who had unsatisfactory grades or had problems in the

18   ways that I described earlier as ideal, in the sense that there

19   were written plans, there was follow-up on those plans, the

20   remediation linked to the nature of the alleged unsatisfactory

21   work that the student was facing, and it appeared that the

22   student had a chance to weigh in when criticized, as opposed to

23   Mr. Yu's case, where he was abruptly dismissed by a vote of the

24   clinical faculty, without any notice that he was even -- he was

25   never notified he was on probation.

Gerald P. Koocher, Ph.D. - Direct

1          He was never notified that he was at risk for

2    termination.  And then suddenly it happened, all the while he

3    was, on his own, attempting to set up a remedial program that

4    would have allowed him to complete his internship training in

5    China.

6    BY MR. COULTER:

7    Q.   Now, Dr. Koocher, could you please tell us what the

8    typical practice for a training program when the student might

9    be at risk for termination?

10   A.   When a student is at risk for termination from a whole

11   training program, there would, again, be notice to the student,

12   remediation, if that were a potential option, or some other due

13   process where the student could be heard and respond to

14   concerns of the program.

15   Q.   Now, Dr. Koocher, did ISU's treatment of Mr. Yu comport

16   with what you just explained?

17   A.   No, it did not.

18   Q.   Could you please explain to the Court?

19   A.   Once again, he was never put on probation.  He was never

20   notified he was at risk for termination from the program.  When

21   he received allegedly unsatisfactory performance grades, there

22   was no following of the university's usual process on those

23   grades.

24   Q.   Dr. Koocher, what role does a doctoral dissertation play

25   in completing a Ph.D. in clinical psychology?

Gerald P. Koocher, Ph.D. - Direct

1  A.   A Ph.D. in any field but especially in clinical psychology

2  revolves primarily around the dissertation.  The reason for

3  that being there are doctoral programs that offer Doctor of

4  Psychology Degrees, Psy.D. degrees, instead of Ph.D.s, that do

5  not require research.

6         The doctoral dissertation is an independent research

7  program where the student has to demonstrate their capacity to

8  conduct and interpret research.  There is also the clinical

9  component, which is very important, especially as a

10  qualification for licensing, but the cornerstone of the Ph.D.

11  program is the dissertation.

12  Q.   Now, how does Idaho State University's offer of a master's

13  degree comport with that standard?

14  A.   It was frankly insulting.

15  Q.   Why do you say that?

16  A.   Mr. Yu entered the program with a master's degree.  And as

17  part of the admissions process, he was recognized as having

18  some advanced standing because of that master's degree.  He

19  wasn't going to be required to get a master's degree at Idaho

20  State University.

21         In addition, Mr. Yu's doctoral dissertation was -- I

22  guess the best way to say it, involved far more work than many

23  Ph.D. dissertations in the United States.  The common practice,

24  in many clinical psychology programs in the United States, is

25  that when you entered as a graduate student, you are assigned

Gerald P. Koocher, Ph.D. - Direct

1    to a faculty member's research team and often your doctoral

2    research flows out of the work of the faculty member that you

3    are assigned to work with.

4            In Mr. Yu's case, he actually designed his own study.

5    He recruited his own subjects.  He delivered an intervention.

6    He collected the data and did the analysis and writeup and then

7    defended it.  So, he actually did considerably more work than

8    the students in many Ph.D. programs in the United States.

9            So, having accomplished that, even before he went out

10   on his internship, and then to be offered a master's degree as

11   he's being pushed out of the program is tantamount to being

12   offered some type of booby prize.

13   Q.   Okay.  Now, Dr. Koocher, based on your expertise, do you

14   have an opinion about whether Mr. Yu's dismissal from the Idaho

15   State University's clinical psychology doctoral program was

16   appropriate?

17   A.   Yes, I do.

18   Q.   Could you please explain to the Court what that is?

19   A.   His dismissal, in this context, was frankly over the top,

20   unreasonable, unwarranted, and extremely detrimental to him.

21   It far exceeds, as an action by the university, any valid data

22   that they had to dismiss him from the program.

23   Q.   Would you -- how would you characterize it?  Would you

24   characterize it -- let me put it this way.

25            Is it a departure from accepted academic norms that

1   you have experienced in this field?

2   A.   Yes.  It was excessive, unreasonable, and very far outside

3   the norm of any doctoral program that I am familiar with.

4           MR. COULTER:  Thank you, Dr. Koocher.  Your witness.

5           THE COURT:  Cross-examination.

6                        CROSS-EXAMINATION

7   BY MR. KELLY:

8   Q.   Good morning, Doctor.

9   A.   Good morning.

10  Q.   When did you start working at Quincy College?

11  A.   September 11th of this year.  I'm sorry.

12  September 11th of 2018.

13  Q.   Because the CV we have indicates that you are still at

14  DePaul University.

15  A.   You must have an old CV.

16  Q.   And when did you leave DePaul?

17  A.   I left DePaul at the -- technically, I was using up

18  vacation time, so I technically left DePaul at the end of

19  September, even though my last day on campus was at the end of

20  August.

21  Q.   Okay.  And why did you leave DePaul?

22  A.   It was actually family reasons.  My five-year contract at

23  DePaul was up, and I was in the middle of renewing it when I

24  was offered a position in Massachusetts that I hadn't applied

25  for.  And my spouse, who was unhappy with my commuting between

Gerald P. Koocher, Ph.D. - Cross

1   Boston and Chicago, applied pressure.

2   Q.   The report you did for Mr. Yu's counsel was done back in

3   January of 2016.  Do you recall that?

4   A.   Yes.

5   Q.   Okay.  Have you done any subsequent work, written reports

6   since that point in time?

7   A.   I compiled a table for counsel documenting my

8   understanding of the ethical and accreditation deviations from

9   the program.

10  Q.   And you turned that over to counsel?

11  A.   Yes.

12  Q.   And when was that?

13  A.   Within the past four to six weeks.

14  Q.   Okay.  Anything else that you turned over to counsel

15  that -- I will just represent we didn't get that, so I just

16  wanted to see if there was anything else you turned over to

17  counsel.

18  A.   No, there was nothing else.

19  Q.   When I look at your January 2016 report, it indicates that

20  you looked at the complaint, the original complaint filed.

21  There's been subsequently an amended complaint.  Have you seen

22  that?

23  A.   Yes.

24  Q.   Okay.  And when did you see that?

25  A.   Well, does my report say that I read the amended

Gerald P. Koocher, Ph.D. - Cross

1    complaint?

2    Q.    No.

3    A.    No, then I didn't.  Then I didn't -- I listed in my report

4    everything that I had in my possession at that time.

5    Q.    Okay.  Well, let me ask you, Doctor, did you ever see the

6    ISU clinical student handbook?

7    A.    I had looked at it online.

8    Q.    That's not listed in your report however.

9    A.    I looked at it after my report was finished.

10   Q.    And what time frame was that?

11   A.    It was probably in the area of last December.

12   Q.    Okay.  You testified earlier that the standard practice

13   for a student not progressing is to put them on academic

14   probation; correct?

15   A.    If I said that, I misspoke.  I was generally describing

16   how one would proceed, and it might involve putting them on

17   probation.  It might involve giving them some remedial

18   assignment without putting them on probation.  There's a range

19   of things.  But in a severe case, it would involve putting them

20   on probation.

21   Q.    Okay.  In Mr. Yu's case, he was never put on academic

22   probation; correct?

23   A.    Correct.

24   Q.    Do you recall Mr. Yu -- did you look at Mr. Yu's

25   transcript at all?

Gerald P. Koocher, Ph.D. - Cross

1   A.   Yes.

2   Q.   And when did you look at that?

3   A.   I believe I was shown that in December.

4   Q.   Okay.  Before or after you did your report?

5   A.   After I did my report.

6   Q.   So, there was a lot of work you did after you did your

7   report; isn't there?

8   A.   Yes.

9   Q.   You have a requirement to provide updated information

10  after you do an initial report.

11        MR. COULTER:  Objection, Your Honor.  Calls for a

12  legal conclusion.

13        MR. KELLY:  He's an expert witness.  He should know

14  this.

15        THE COURT:  Well, there's variations on that theme.

16  There's certainly an obligation, under the rules, to

17  supplement, if there's been a proper request and just generally

18  as to experts.

19        Mr. Coulter, was any disclosure made to the defendant

20  of the substance of any additional testimony and anything else

21  that had been reviewed by the witness?

22        MR. COULTER:  No, Your Honor.  We were going to do

23  that, but we had this -- we had the discussion in regards to

24  the table.  And since the table was not going to be allowed to

25  be admitted into evidence, we didn't -- we didn't turn it over

Gerald P. Koocher, Ph.D. - Cross

1   to the defense, because they -- they objected to the

2   demonstrative evidence anyway, so they didn't get it.

3           THE COURT:  Well --

4           MR. KELLY:  I am not sure that answers the question.

5           THE COURT:  Yeah, we will take that up.

6           MR. COULTER:  This is why we brought it up at the

7   hearing, Your Honor, because I wanted to say, "Can we do

8   demonstrative evidence" --

9           THE COURT:  But that's independent of the underlying

10  issues, and I don't know I have enough in front of me right now

11  to reach any kind of conclusion about whether there's been a

12  problem with what was disclosed or what wasn't.

13          So, Mr. Kelly, continue with your cross-examination.

14  When we are done with this, then we will have a further

15  conversation about it, and I will make a decision about whether

16  there's something amiss.  Go ahead.

17          MR. KELLY:  Okay.  Thank you.

18  Q.   So, to your knowledge, Mr. Yu was not on academic

19  probation; correct?

20  A.   To my knowledge, that's correct.

21  Q.   And you said you looked at his transcript; correct?

22  A.   Yes.

23  Q.   Did you ever see -- and we will get to the two U grades in

24  a second.  But other than those two U grades, did you ever see

25  any grade lower than a B on his transcript?

Gerald P. Koocher, Ph.D. - Cross

1  A.   No.

2  Q.   All right.  So, would there be any reason that he would be

3  on academic probation?

4  A.   I don't know.  I think not, is my best answer.

5  Q.   So, in regard to those two U grades, you believe -- remind

6  me again what your testimony was.  What should have ISU done in

7  regards to the two unsatisfactory grades?

8  A.   They should have followed the university policy as

9  specified in the handbook.

10 Q.   Okay.  Which you indicated you looked at; correct?

11 A.   Yes.

12 Q.   And in that handbook, do you recall seeing a section in

13 regard to thesis and dissertations, which those are the only

14 two sections in which a U grade can be appealed?  Did you see

15 that?

16 A.   I do not recall.

17 Q.   All right.  Well, let me represent to you, since you

18 looked at it, under ISU policies, those are the only two

19 classes, a thesis and dissertation, in which a U grade can be

20 appealed.  Would that sound accurate to you from an ISU

21 standpoint?

22 A.   Well, if you are representing that to me, I will take you

23 at your word.

24 Q.   And to take it further, it doesn't -- the appeal of a U

25 grade doesn't appeal to any professional courses.  I will

Vol. 2 - 193

Gerald P. Koocher, Ph.D. - Cross

1   represent that's represented in the handbook also.

2   A.   Again, if you are asking me, will I take your word that

3   that's in the handbook, certainly.

4   Q.   Okay.  All right.  You indicated earlier being paid as a

5   witness to testify; correct?

6   A.   Yes.

7   Q.   Are you being paid to testify -- are you being paid just

8   to testify or are you being paid to sit through the entire

9   trial?

10  A.   I don't understand the question.

11  Q.   All right.  Well, most experts are being paid -- usually

12  paid for their testimony time.  Are you being paid for your

13  testimony time, or are you also being paid for your time

14  sitting back here and observing?

15  A.   When I perform a forensic function, I bill for my time.

16  All of my time.

17  Q.   Okay.  So, as you sit here and observe, you are being paid

18  for your time here?

19  A.   Yes.

20  Q.   Okay.  Thank you.  Now, in looking at the documents we

21  looked at, whether you reference them in your report or not,

22  did you ever see a letter from Mr. Yu to Dr. Roberts in regard

23  to his non-APPIC internship in which he waived his due process

24  rights at the Cleveland Clinic?

25  A.   I don't specifically recall it, but I -- I would not be

Gerald P. Koocher, Ph.D. - Cross

1   surprised if it were there.

2   Q.   And he also waived the right for a salary.  Do you

3   understand?

4   A.   Yes.

5   Q.   Okay.  And from your perspective, is that acceptable?  If

6   the -- if the student goes ahead and waives his rights to due

7   process and salary and goes ahead with the internship that he

8   created, is that acceptable from your standpoint?

9   A.   It raises a number of informed consent issues.  Certainly

10  it would be very clear to a student that they were agreeing to

11  forego a salary in order to pursue their internship, although

12  APPIC frowns on that.

13          However, whether a student or anyone signing an

14  agreement fully understands what it means to waive their rights

15  to other things may be open to question.

16  Q.   Okay.

17  A.   Depends on what the explanation was.

18  Q.   So, that's subjective from your standpoint?

19  A.   Yes.

20  Q.   So again, with the understanding that the two U grades

21  could not be appealed from an academic standpoint, and Mr. Yu

22  was dismissed from the program, you were sitting back here when

23  we were going through the letter to Mr. Yu from the graduate

24  faculty indicating that his dismissal had been upheld.  Do you

25  recall seeing that letter?

Vol. 2 - 195

Gerald P. Koocher, Ph.D. - Cross

1   A.   I am sorry.  It sounded a little bit compound in there to

2   me.  Could you clarify?

3   Q.   Are you objecting to my question?

4   A.   I am not understanding what I am being asked to answer.

5   Q.   So, as you were sitting here observing the trial, when

6   both Mr. Coulter and I were questioning Mr. Yu, we showed him a

7   letter, from May 17th of 2013, which the graduate faculty of

8   ISU upheld his dismissal from the program.  Do you recall

9   seeing that letter?

10  A.   Yes.

11  Q.   And in that letter, it indicated that he had the right to

12  appeal that decision.  Do you recall seeing that?

13  A.   Yes.

14  Q.   Okay.  And would it be fair to say that that gave Mr. Yu

15  the due process rights he was entitled to?

16          MR. COULTER:  Objection, Your Honor.  That's beyond

17  the scope of direct.

18          THE COURT:  He's testified that he thought there was

19  violations.

20          MR. COULTER:  But not with the Idaho State University

21  in regards to the appellate process.

22          THE COURT:  Overruled.  Overruled.

23          MR. COULTER:  Thank you, Your Honor.

24          THE COURT:  Go ahead.

25

Gerald P. Koocher, Ph.D. - Cross

1    BY MR. KELLY:

2    Q.    You can go ahead and answer.

3    A.    Would you restate the question, please?

4    Q.    Sure.  In that letter, that May 17th, 2013, letter, Mr. Yu

5    was advised that the graduate faculty was upholding his

6    dismissal from the program.  Do you recall that?

7    A.    Yes.

8    Q.    Okay.  And the letter concluded that he had the right to

9    appeal that decision to the College of Arts and Letters.  Do

10   you recall that?

11   A.    Yes.

12   Q.    Okay.  And what I am asking you is, wouldn't that fulfill

13   the due process obligation of ISU to Mr. Yu?

14   A.    No.

15   Q.    Why not?

16   A.    Because the members of the psychology faculty owed him due

17   process and gave him none.  They neglected their ethical

18   obligation to observe that.  In addition, from a regional

19   accreditation point of view, it is very unusual for any

20   university to say that a grade cannot be appealed on a

21   procedural basis.  So, it may say that in the University of

22   Idaho handbook that you can't --

23              THE COURT:  Idaho State University.

24              THE WITNESS:  I'm sorry.  In the Idaho State

25   University handbook, but still, regional accreditors looking at

Gerald P. Koocher, Ph.D. - Cross

1   that would find that deeply flawed.

2   BY MR. KELLY:

3   Q.   Okay.  But nevertheless, the university gave him the right

4   to appeal; correct?

5   A.   At the university level.

6   Q.   Okay.  And again, though we have already discussed the

7   fact that, under the graduate clinical handbook, your grades

8   are not appealable, and I think you took me at my word for

9   that; correct?

10  A.   I took you at your word, yes.

11  Q.   So, let me ask you about the accreditation process.  You

12  indicated you served as an accreditation site supervisor for

13  the C of A; correct?

14  A.   No, I said I served as an accreditation site visitor.

15  Q.   Site visitor.  I'm sorry.  And how many times have you

16  done that?

17  A.   I have done it for approximately 50 internship programs

18  and for one Ph.D. program.

19  Q.   Okay.  Have you ever been a site visitor at the Idaho

20  State University?

21  A.   I never visited Idaho State University.

22  Q.   Just so we are clear, in all the documents that you have

23  reviewed, have you ever reviewed the site visit report of 2016

24  by site visitors on behalf of the C of A?

25  A.   No, and I wouldn't be able to.  That's a confidential

1    document.

2    Q.   Are you aware that ISU was accredited again in the spring

3    of 2017?

4    A.   I heard that statement made in court, yes.

5    Q.   And I will represent to you that there was a site visit in

6    December of 2016.  Would that sound fair if they got accredited

7    in 2017?

8    A.   The decisions made by the commission on accreditation

9    generally occur within six to eight months after a site visit,

10   so that sounds reasonable.

11   Q.   So, let me ask you, have you ever heard of Dr. Mitchell

12   Berman?

13   A.   No.

14   Q.   He's the head of psychology at the Mississippi State

15   University.  Ever heard of him?

16   A.   No.

17   Q.   How about Irwin Rosenfarb?  He was affiliated with Alliant

18   International University in San Diego.

19   A.   Do not know him.

20   Q.   How about Jonell Strough from West Virginia University?

21   A.   Do not know her.

22   Q.   I'll represent to you --

23        MR. COULTER:  I am going to object, Your Honor.  And

24   the reason I am going to object is because we didn't know

25   anything about this.  It was not provided to us so we could

Gerald P. Koocher, Ph.D. - Cross

1  even prepare to respond to anything that's he's going to say

2  that these people represent.  We have never seen it.  We have

3  never had an opportunity to look at it or to analyze it.

4          MR. KELLY:  Merely laying foundation for potential

5  questions.

6          THE COURT:  Yeah, I'm not understanding your

7  objection, Mr. Coulter.  Are you contending that there was

8  something that there was a duty to disclose?

9          MR. COULTER:  Yes, Your Honor.

10         THE COURT:  In the context of cross-examination?

11         MR. COULTER:  Yes, Your Honor.

12         THE COURT:  Okay.  And how so?  What's the duty?  Was

13  there discovery directed at --

14         MR. COULTER:  The discovery was directed -- was --

15  the discovery was general discovery.  Anybody who will testify,

16  anything that you -- anything that you would use, et cetera, so

17  we would be able to prepare for trial.

18         I have never heard of these people, and I have never

19  heard of what context they are going to be in.  At least in my

20  situation, I at least presented something and asked for

21  objection.

22         THE COURT:  Okay.  I'm understanding.  I'm having

23  trouble envisioning what the discovery request would have been

24  that would call -- would have called for information about the

25  questions that he's using to cross-examine on.

Gerald P. Koocher, Ph.D. - Cross

1      What was the discovery question that was asked?

2            MR. COULTER:  The discovery is who are you going to

3      call on, basically, to testify in this particular case.  If, in

4      fact, he's going to be quoting from sources that we have no

5      knowledge of, we would not be able to prepare for that.

6            So, if I knew he was going to be -- if I knew that he

7      was going to be quoting some people from the University of

8      Mississippi --

9            THE COURT:  I don't think he's got any obligation --

10     he has an obligation, as an officer of the court, to have a

11     basis for inquiry in terms of what the ultimate information is

12     and not misrepresent something the same way that you do.

13           But I don't think he has any obligation to disclose

14     what the nature and details are going to be for

15     cross-examination of a particular witness, unless there's been

16     some discovery that calls for some piece of that that hasn't

17     been disclosed.

18           And I am not understanding that that's the case here.

19     And the same would be true if the shoe were on the other foot.

20     So, the objection is overruled.  Please proceed.

21           MR. COULTER:  Thank you, Your Honor.

22           MR. KELLY:  Thank you.

23     Q.   So, let me just represent to you, Doctor, that those three

24     individuals were the site visit team at ISU in December of

25     2016.  But I just wanted to see if you knew any of them.

Gerald P. Koocher, Ph.D. - Cross

1    A.   I do not know any of them.

2    Q.   And from your experience as a -- as a site team member,

3    when you visited a school for accreditation purposes, was there

4    ever an instance where you were obligated to review student

5    complaints and reports?

6    A.   Yes.

7    Q.   And would it be --

8            THE COURT:  Mr. Kelly, I am going to stop you for a

9    moment.  Mr. Coulter, was there a request made by your side for

10   a copy of the accreditation report, this 19 -- or 2017

11   accreditation report?

12           MR. COULTER:  No, Your Honor.  What we did was

13   request everything that was related to Mr. Yu in regard to his

14   education there.  So, if that site visit happened at that

15   particular point in time --

16           THE COURT:  Yeah, that's too general, in my view, so

17   that's why I was asking if there was a specific request.

18           All right.  I'm sorry to interrupt you, Mr. Kelly.

19   Go ahead.

20   BY MR. KELLY:

21   Q.   So, would it surprise you that during the site visit of

22   2016, that the site team visit actually reviewed Mr. Yu's

23   complaints against ISU?

24   A.   That would not surprise me.

25   Q.   And I will represent to you, Doctor, that the site team,

Gerald P. Koocher, Ph.D. - Cross

1   in their report, indicated that the complaint -- and I say

2   complaint, because there was another complaint in addition to

3   Mr. Yu -- were thoroughly addressed, appropriately documented,

4   and professionally managed by the program and the department.

5   Would that surprise you that the team came to that conclusion?

6   A.   That would not surprise me.

7   Q.   Doctor, can you tell me what the Hoffman Report is?

8   A.   The Hoffman Report is a document that was contracted by

9   the American Psychological Association to an attorney from

10  Chicago to investigate the role of psychologists involved in

11  the interrogation and detention of detainees in the aftermath

12  of 9/11.

13  Q.   And you were implicated in that report; correct?

14  A.   Could you explain what you mean by implicated?  My name

15  was mentioned in the report.

16  Q.   Well, your name was mentioned because the APA -- it was

17  alleged that the APA collaborated with officials at the

18  Pentagon to weaken the association's ethical guidelines in

19  regard to interrogation programs after 9/11?

20  A.   What is the question?

21  Q.   So, is that accurate?  Is that how you were implicated?

22  A.   The statement that you made is inaccurate.  I was the

23  president of the American Psychology Association in 2006, and I

24  participated in forming a committee looking into whether or not

25  it was ethical for psychologists to function as military

1    interrogators in 2005.  And that became politically unpopular

2    over the past few years, and that material was covered in the

3    report.

4    Q.   And essentially, it felt that you implicated the APA by

5    saying that the interrogation procedures of the Department of

6    Defense and the CIA were appropriate?

7    A.   No, that's not true.

8    Q.   But that's what it said; wasn't it?

9    A.   No, that's not what it said.

10   Q.   Remind me again what it said.

11   A.   The report was several hundred pages long.

12   Q.   Okay.  In regard to you.

13   A.   It -- the report indicated that I supported a role for

14   military psychologists in the treatment and interrogation of

15   detainees.

16   Q.   And you wrote a rebuttal to that report; did you not?

17   A.   I made a number of public statements.  I have not written

18   a formal rebuttal.  I was not given the opportunity to write a

19   formal rebuttal.

20   Q.   And, in fact, there is a certain population of

21   individuals, including students at DePaul University, who

22   wanted you to resign over that report; correct?

23   A.   There was actually one student who did want me to resign,

24   who started a Facebook page and a petition before he was

25   psychiatrically hospitalized.

Gerald P. Koocher, Ph.D. - Cross

1   Q.   Okay.  But nevertheless, that process caught on and others

2   suggested that you resign from your position at DePaul;

3   correct?

4   A.   Very few people at DePaul suggested that, and the

5   president of DePaul did not accept any of those suggestions.

6   Q.   Not to be crass, Doctor, but that kind of sucks; doesn't

7   it, to be accused of something that you didn't do?

8            MR. COULTER:  Objection, Your Honor.  Unprofessional

9   language in the courtroom.

10           MR. KELLY:  I will rephrase.

11           THE WITNESS:  Well --

12           THE COURT:  No, sir.  You don't answer any question

13   until I have solved the objection.  All right?  I know you want

14   to.

15           What is the objection, Mr. Coulter?  To the use of

16   the word crass?

17           MR. COULTER:  No, "sucks."

18           THE COURT:  Okay.  All right.  Because I didn't catch

19   all the question.  So, let me look back at it.

20           Why don't you rephrase the question.

21           MR. KELLY:  I will, Your Honor.

22           THE COURT:  All right.

23   BY MR. KELLY:

24   Q.   Doctor, it's kind of terrible to be accused of something

25   you didn't do; correct?

Vol. 2 - 205

Gerald P. Koocher, Ph.D. - Cross

1   A.   I would imagine it is, yeah.

2          MR. KELLY:  Okay.  That's all I have.  Thank you.

3          THE COURT:  Mr. Coulter, redirect.

4          MR. COULTER:  No, Your Honor.

5          THE COURT:  All right.  Stay put for a minute,

6   Doctor.

7          Do you wish to -- to be further heard on this issue

8   about whether there's been failure to disclose under Rule 26, I

9   gather, is your complaint?

10         MR. KELLY:  Well, Your Honor, I think I covered the

11  documents.  You know, if there's not going to be redirect on

12  any additional information, I just think the fact that we are

13  caught off guard, in that there were other documents he

14  reviewed after he issued his report and it wasn't supplemented,

15  I think we covered those, to be honest with you.

16         So, I think I'll withdraw the objection at this point

17  in time as long as there's not going to be any redirect of this

18  witness.

19         THE COURT:  All right.

20         MR. KELLY:  Thank you.

21         THE COURT:  Dr. Koocher, you may step down.

22         THE WITNESS:  Thank you, Your Honor.

23         THE COURT:  All right, counsel.  Ordinarily, I take

24  these 20-minute breaks on this compressed trial days at

25  one-third intervals, but we had this extended break this

Gerald P. Koocher, Ph.D. - Cross

1  morning.  So, we are already a ways past when I would have

2  ordinarily done that, but I think we will go ahead and do it

3  now.  We will be back at exactly noon to resume.  All right?

4          MR. COULTER:  Yes, Your Honor.

5       (Recess 11:40 a.m.  Resumed 12:00 p.m.)

6          THE COURT:  Thank you.  Please be seated.

7          Mr. Coulter, you may call your next witness.

8          MR. COULTER:  Thank you, Your Honor.  Your Honor, at

9  this time -- at this time I would like to call Dr. Shannon

10 Chavez-Korell to the stand.

11         COURTROOM DEPUTY:  Raise your right hand.  Thank you.

12         You do solemnly swear that the testimony you are

13 about to give in the matter now before this Court will be the

14 truth, the whole truth, and nothing but the truth, so help you

15 God?

16         THE WITNESS:  Yes, I do.

17         COURTROOM DEPUTY:  Thank you.  Please be seated.

18         THE WITNESS:  Yes.

19         COURTROOM DEPUTY:  And for our record, if you could

20 state your full name spelling your last.

21         THE WITNESS:  My name is Shannon Chavez-Korell.

22 Chavez-Korell is spelled C-H-A-V-E-Z hyphen K-O-R-E-L-L.

23         THE COURT:  You may inquire.

24         MR. COULTER:  Yes.

25

Shannon Chavez-Korell, Ph.D. - Direct

1           SHANNON CHAVEZ-KORREL, PH.D.,

2   having been duly sworn, was examined and testified as follows:

3                   DIRECT EXAMINATION

4   BY MR. COULTER:

5   Q.   For the record, Doctor, when I address you, do you want to

6   be called Dr. Chavez-Korell or Dr. Korell?  Which would you

7   prefer?

8   A.   Dr. Chavez would be fine.

9   Q.   Okay.  Thank you.  Dr. Chavez, I will wait until you get

10  your water.

11  A.   Thank you.

12  Q.   Dr. Chavez, can you tell the Court what your formal

13  education is?

14  A.   I have a bachelor's degree, master's degree, and a

15  doctoral degree.

16  Q.   Now, which undergraduate school or university did you

17  attend?

18  A.   I attended Angelo State University in San Angelo, Texas.

19  Q.   And what degree did you obtain there, ma'am?

20  A.   A bachelor of science.

21  Q.   In what field of study?

22  A.   Psychology.

23  Q.   Do you have any advanced degrees?

24  A.   Yes, I do.

25  Q.   And can you tell the Court what they are?

Shannon Chavez-Korell, Ph.D. - Direct

1   A.   Yes, I have a Master's of Arts in Community Counseling

2   from St. Mary's University in San Antonio, Texas.  I also have

3   a Doctorate of Philosophy Degree from the Pennsylvania State

4   University with a major concentration in Counseling Psychology.

5   Q.   And do you have a license in psychology?

6   A.   Yes, I do.

7   Q.   Do you belong to any professional organizations?

8   A.   Yes, several.

9   Q.   And what professional organizations or associations or

10  affiliations do you belong to?

11  A.   I am a member of the American Psychology Association, and

12  within the American Psychology Association, I am a member of

13  five different divisions; Division 5, which is the Division of

14  Quantitative Qualitative Methods; Division 17, Counseling

15  Psychology.  I am a member of Division 27, which is Community

16  Psychology.  Member of Division 32, Humanistic Psychology, and

17  also a member of Division 45, which is the Society for the

18  Study of Cultural Ethnicity and Race.

19           In addition to my membership in APA in those five

20  divisions, I am also a member of National Latino Psychology

21  Association, a member of the American Society of Independent

22  Psychologists, and a member of the Michigan Psychology

23  Association.

24  Q.   Now, have you served in any capacity in teaching in higher

25  education?

Shannon Chavez-Korell, Ph.D. - Direct

1    A.    Yes, I have.

2    Q.    And could you please explain to the Court the number of

3    years and where you were teaching?

4    A.    Sure.  I have been teaching at the college level for 13

5    years.  For 10 years, I was at the University of

6    Wisconsin-Milwaukee from 2007 to 2017, where I was an associate

7    professor with a tenure.  Also, I was a -- that was -- I'm

8    sorry.  That was in the Department of Educational Psychology in

9    an APA accredited doctoral program.

10             For the past year and a half, I have been at the

11   Michigan School of Psychology where I serve as a faculty

12   member.  This is also an APA accredited clinical psychology

13   program.

14             In addition to that, during that doctoral training, I

15   was a teaching assistant at Penn State University for four

16   different semesters.  And prior to my doctoral training, I

17   taught at Palo Alto Community College in San Antonio, Texas.

18   Q.    Okay.  Do you teach any courses today?

19   A.    Yes.  In the -- yes, I do.

20   Q.    Okay.  Could you tell the Court what they are?

21   A.    Sure.  In the 2018-2019 academic year, I am teaching

22   Quantitative Research.

23   Q.    Doctor, would you please detail your experience at the

24   university level to include teaching assignments, faculty

25   positions in the field of psychology?

Vol. 2 - 210
Shannon Chavez-Korell, Ph.D. - Direct

1   A.    Sure.  For my 10 years at the University of

2   Wisconsin-Milwaukee, my teaching assignments -- you know, there

3   were two classes that I regularly taught, which was the

4   Multicultural Counseling Class, which was a graduate level

5   course, also Group Counseling, another a graduate level course.

6   And I taught those classes frequently, often several times a

7   year -- or often twice a year for 10 years.

8           In addition to those two classes, I regularly taught

9   courses in our Multicultural --

10          THE COURT:  Dr. Chavez, would you slow down just a

11  tad, please.

12          THE WITNESS:  I would love to slow down.  Thank you.

13          THE COURT:  Thank you.

14          THE WITNESS:  In addition to those two classes,

15  Multicultural Counseling and Group Counseling, I also

16  frequently taught courses in our graduate certificate in

17  Multicultural Knowledge in Mental Health Practices.  And the

18  classes I taught in that program were Multicultural Guidelines

19  in Ethics, Multicultural Guidelines in Working with Latinos,

20  Multicultural Guidelines in working with African-Americans, and

21  Multicultural Guidelines in working with LGBT Clients in

22  Affirmative Counseling.

23          In addition to those classes, some of the other

24  courses I taught were advanced Multicultural Psychology at the

25  doctoral level.  I taught Professional Ethics at the doctoral

Shannon Chavez-Korell, Ph.D. - Direct

1    level.  I taught Clinical Supervision and Consultation at the

2    doctoral level.  I also taught Practicum at the master's and

3    doctoral level.  So, that -- that's -- those are the courses I

4    taught at the University of Wisconsin-Milwaukee.

5             In my time at the Michigan School of Psychology, I

6    have taught Multicultural Psychology, Group Psychotherapy,

7    Quantitative Methods, and Research Foundations.

8             When I taught at the junior college, which was Palo

9    Alto College, I taught Social Psychology.  And during my time

10   at Penn State, I taught three semesters of Multicultural

11   Counseling at the graduate level.  And I taught one

12   undergraduate course titled Understanding Discrimination.

13   Q.   Now, in those roles, for all that teaching that you did,

14   did you have any administrative responsibilities?

15   A.   Yes, I did.

16   Q.   Would you please explain to the Court what those were?

17   A.   While at University of Wisconsin-Milwaukee, my

18   administrative responsibilities included serving as the

19   training director for our Master's Counseling Program.  I was

20   also the program coordinator for our -- for our graduate

21   certificate in Multicultural Knowledge and Mental Health

22   Practices.

23            And after earning tenure, I served on the scholastic

24   appeals committee for the graduate school at the university

25   level.  In my work at the Michigan School of Psychology, I

Shannon Chavez-Korell, Ph.D. - Direct

1    serve as -- I currently serve as the program director and chief

2    academic officer.

3    Q.   Now, Dr. Chavez-Korell, or Dr. Chavez, have you written

4    and/or published in the area of multicultural competence in the

5    field of psychology or related fields?

6    A.   Yes, I have.

7    Q.   And could you please explain to the Court what -- what it

8    is you wrote, et cetera?

9    A.   Sure.  Well, I have written peer-reviewed journal

10   publications and book chapters.  Large -- largely, that's where

11   my published work is.  Are you asking about where I am

12   publishing or --

13   Q.   Both.

14   A.   Okay.  Yeah, so, my publications have been almost

15   exclusively, with the exception of two publications in APA

16   journals.  These journals include Training and Education in

17   Professional Psychology, Professional Psychology Research and

18   Practice, Journal of Counseling Psychology, and the Counseling

19   Psychologist.  So, that's just some of my publications.

20   Q.   In regards to your research publications and grants, what

21   was the primary focus for the past years in regards to those

22   things?

23   A.   Yeah.  So, all of my work, since earning my doctoral

24   degree -- so for the past 12 years of work in the field -- has

25   focused specifically on multicultural psychology, like in the

Shannon Chavez-Korell, Ph.D. - Direct

1  broad contexts, and then more specifically on cultural

2  competence, particularly in the domains of culturally competent

3  clinical supervision, cultural adaptations to evidence-based

4  practices, cultural knowledge of specific cultural groups,

5  racial and ethnic identity development, campus and school

6  climate, access and barriers to education, to quality

7  education, access and barriers to quality mental health

8  services.

9  Q.   And about how many books -- how many publications or

10 presentations that you have given in regards to multicultural

11 psychology and competence?

12 A.   Yeah.  Specifically to multicultural psychology and

13 competence, I have 13 publications.  I have given 62, so I have

14 authored and co-authored 62 presentation at regional and

15 professional conferences.

16          You know, I have received nine grants that were -- to

17 conduct research within the field of multicultural psychology.

18 I have been invited to deliver workshops, trainings, keynotes,

19 professional consultation work, specifically in the domain of

20 cultural competency development.

21 Q.   And have you served on any editorial boards in regards to

22 your work?

23 A.   Yes, I have.  I have served on three editorial boards.  I

24 am currently serving on the editorial board for the Journal of

25 Latino Psychology.  I have served on the -- which is an APA

Shannon Chavez-Korell, Ph.D. - Direct

1    journal.  I have served on the editorial board for the Journal

2    of Counseling Psychology, which is also an APA journal, and the

3    journal entitled The Counseling Psychologist.

4    Q.   Now, Doctor --

5    A.   And I have also served as an ad hoc reviewer for about 12

6    individuals, including, you know, Journal of Black Psychology,

7    Journal of Migrant and Minority Health, Journal of Clinical

8    Psychology, and Sex Roles just to name a few.

9    Q.   Doctor, about how many publications have you authored in

10   the field of multicultural psychology?

11   A.   13.

12   Q.   Have any journals published your articles in multicultural

13   psychology?

14   A.   Yes.  Yes, they have.  APA journals and two other journals

15   that were not APA journals, but -- uh-huh.  Do you need an

16   example of those?

17   Q.   Well, I'm looking at something like training and

18   educational --

19   A.   Yes, Training and Education in Professional Psychology.  I

20   have published there.  The Counseling Psychologist, Journal of

21   Counseling Psychology, and Professional Psychology Research and

22   Practice are some of them.

23   Q.   I think you have already answered this question.  Are you

24   currently employed at the Michigan School of Psychology?

25   A.   Yes.

Shannon Chavez-Korell, Ph.D. - Voir Dire

1    Q.   And how would you describe your current duties and

2    responsibilities?

3    A.   I serve as the program director and chief academic officer

4    for the school.  My responsibilities in this role include

5    leading the faculty in oversight of all of the faculty.  It

6    also includes oversight of all of our academic programs,

7    including an APA accredited Clinical Psychology program, a

8    Master's Program in Clinical Psychology, as well as a Master's

9    Certificate in Applied Behavioral Analysis.

10              In addition to that work, I teach sometimes.  I teach

11   and I continue to chair doctoral dissertations.  And I have an

12   active research team where we are currently studying the

13   experiences of students of color at predominately white

14   campuses.

15              MR. COULTER:  Your Honor, at this time, I would like

16   to offer Dr. Chavez-Korell as an expert in multicultural

17   psychology and multicultural competence.

18              THE COURT:  Any objection?

19              MR. KELLY:  Yes, Your Honor.  May I inquire?

20              THE COURT:  Yes, you may.

21                        VOIR DIRE EXAMINATION

22   BY MR. KELLY:

23   Q.   Doctor, have you ever testified in court?

24   A.   No, I have not.

25   Q.   Okay.  Just to be sure, federal court, state court,

Shannon Chavez-Korell, Ph.D. - Voir Dire

1    anywhere?

2    A.    Never.

3    Q.    How about administrative proceedings on behalf of a

4    family, or a client, or a patient?

5    A.    No, I have not.

6               MR. KELLY:  Your Honor, I don't believe this witness

7    is qualified as an expert.

8               THE COURT:  All right.  Mr. Coulter, specifically the

9    discipline that you offer her as a witness in.

10              MR. COULTER:  Is multicultural -- excuse me, Your

11   Honor.  Multicultural competence, and I think every expert has

12   to have a first time.

13              THE COURT:  That's not what I am focused upon.  I am

14   focused upon more about whether this is a field -- this is a

15   discipline that is -- that meets *Daubert* standards, in terms of

16   an understanding and an acceptance in the field and the

17   scholastic rigor that goes along with it.

18              What you have elicited from her to this point is that

19   she teaches and writes about it, but I don't know what it

20   consists of beyond that.  Am I making sense?

21              In other words, she could be an island in the ocean

22   on this topic.  I will give you an opportunity to lay further

23   foundation about what -- what larger universe there is in the

24   field.

25              MR. COULTER:  Well, Your Honor, multicultural

Vol. 2 - 217
Shannon Chavez-Korell, Ph.D. - Direct

1   competence --

2           THE COURT:  I understand what the concept is.  What I

3   am looking for is further foundation about the nature of the

4   concept in the field of psychology.

5           I am not trying to be obtuse, but perhaps I am.  In

6   other words, is -- is it something that is generally accepted

7   as a subdiscipline in the field of psychology?

8           MR. COULTER:  Your Honor, I can lay more foundation

9   on that.

10          THE COURT:  That's why I am describing it, to give

11  you an opportunity to do so.

12                     DIRECT EXAMINATION RESUMED

13  BY MR. COULTER:

14  Q.   All right.  Dr. Korell, the question is how does the

15  multicultural competency field fit into the psychology field

16  and the discipline of psychology?

17  A.   Thank you.  Thanks for asking that question.  So, the

18  field of psychology today is staunchly positioned in

19  multicultural psychology.  And -- and this is evidenced by

20  APA's endorsement, the American Psychological Association's

21  endorsement of the multicultural competencies and guidelines in

22  2002 and again recently, they re-endorsed them again in 2017.

23  This multi- --

24          THE COURT:  Dr. Chavez, could I interrupt?

25          THE WITNESS:  Yeah.  Sure.

Shannon Chavez-Korell, Ph.D. - Direct

1          THE COURT:  Perhaps you could define what

2    multicultural competency is.

3          THE WITNESS:  Sure.

4          THE COURT:  And then work out from that.

5          THE WITNESS:  Okay.  Okay.

6          THE COURT:  All right.

7          THE WITNESS:  Okay.

8          THE COURT:  I have an idea --

9          THE WITNESS:  Right.  Right.

10          THE COURT:  -- but I don't want to presume.

11          THE WITNESS:  Sure.  Sure.  Uh-huh.  And so -- so,

12    multicultural competency is defined by the domains of

13    awareness, knowledge, and skills.  There is cultural awareness

14    of self, cultural knowledge of self and others, and then

15    skills, and these skills would in turn be the interventions we

16    do with clients.

17          There's been a multicultural competence movement in

18    the field of psychology, and this really comes because, in

19    multicultural psychology in this competence movement, there is

20    this recognition, multicultural psychology.  Multicultural

21    psychology recognizes that psychology and psychologists have

22    historically done great harm to clients and individuals in --

23    by not recognizing the role that culture plays in the lives of

24    individuals -- individuals in their day-to-day lives.

25          And so multicultural psychology then says, you know,

Shannon Chavez-Korell, Ph.D. - Direct

1    it recognizes the harm that's been done in the field.

2    Multicultural psychology also recognizes that -- that good

3    intentions are not enough.  And so a competence needs to be in

4    place in our clinical work.  And multicultural psychology says

5    that true clinical competence, multicultural competence

6    supersedes clinical competence.

7              And in order to be clinically competent, we have to

8    be guided by multicultural competence.  So, this commitment to

9    multicultural psychology again is evidenced in our code of

10   ethics, where there are teeth to, you know, saying that

11   psychologists or mandates around not discriminating, and in

12   terms of the mandates around competence, where we are operating

13   in our domains of competence in the field including cultural

14   competence.

15             We also see this commitment to multicultural

16   competence echoed in the commission on accreditations

17   expectation that all APA accredited programs provide training

18   in multicultural psychology.  It had to be in the curriculum.

19             THE COURT:  All right.  Doctor, I am satisfied with

20   that --

21             THE WITNESS:  Okay.  Great.

22             THE COURT:  -- further explanation along with what

23   you have described previously that --

24             THE WITNESS:  Thank you.

25             THE COURT:  -- that you are qualified to testify in

Shannon Chavez-Korell, Ph.D. - Direct

1    this area.  The *Daubert* analysis is, at its heart, anything

2    that materially advances a party's claim and case.  The

3    strength of what the testimony may be and the credibility of

4    the same is subject to the trial process.

5            So, you may proceed with inquiry.  She's qualified as

6    an expert.

7            MR. COULTER:  Thank you, Your Honor.

8    Q.   Now, Doctor -- Dr. Chavez.

9    A.   Yes.

10   Q.   Are you familiar with the present case of Jun Yu versus

11   Idaho State University?

12   A.   Yes, I am.

13   Q.   And how did you become familiar with this case?

14   A.   I become familiar with this case in January 2016 when I

15   received a phone call from you, and you gave me some

16   information about the case.  You then forwarded me some more

17   documents that I reviewed in deciding on whether or not to join

18   as an expert witness, and then after becoming an expert

19   witness, I have since read more documents.

20   Q.   Have you -- and have you received monetary compensation to

21   testify for Mr. Yu?

22   A.   Yes.  Yes, I am.

23   Q.   And I'm going ask the questions.  Are you being paid to be

24   in the courtroom at any time -- every time you are in the

25   courtroom, are you being paid?

1  A.   Yes, I am.

2  Q.   Has the fact that you are being paid to serve as a -- to

3  serve as an expert for Mr. Yu impacted your professional

4  assessment of this case?

5  A.   No, it has not.

6  Q.   Why not?

7  A.   I would not compromise my integrity for pay.

8  Q.   Now, have you reviewed any documents in this matter?

9  A.   Yes, I have reviewed several documents, and they are

10  listed in my expert report.

11  Q.   Okay.  And can you just cite just a couple?

12  A.   Sure.  So, I read the filing with the US Court.  I --

13  specific -- you know, specifically, I looked at a transcript.

14  I also looked at the other reports completed by expert

15  witnesses on both sides of this case.  I have also looked at

16  the practica evaluations across semesters.

17  Q.   Okay.  Now, in what context did you evaluate these

18  materials?

19  A.   I evaluated these materials in the context of the American

20  Psychological Association's Codes of Ethics, the American

21  Psychological Association's Multicultural Guidelines, the

22  American Psychological Association's -- I'm sorry -- the

23  Commission on Accreditation's Guidelines and Principles and

24  also APA's Multicultural -- I am sorry -- yeah, APA's

25  Competency Benchmarks as well for training.

Vol. 2 - 222
Shannon Chavez-Korell, Ph.D. - Direct

1   Q.   All right.  Dr. Chavez, do you have an opinion as to

2   whether Mr. Yu was a victim of the defendant's cultural

3   incompetence while he was a student in the doctoral -- the

4   doctorate of clinical psychology program at Idaho State

5   University?

6            MR. KELLY:  Your Honor, I'm going to object again for

7   the same reason as Dr. Koocher as far as relevance of this

8   witness's testimony.  But, also, to add that based on that

9   question, I believe this testimony is going to be cumulative,

10  and I am not so sure it's necessary.

11           THE COURT:  Well, as to the latter, I don't need to

12  hear argument on it.  I don't find it to be cumulative.  I will

13  hear on the relevance.

14           MR. COULTER:  The relevance, Your Honor is again we

15  have the obligation to -- to establish a prima facie case.  And

16  the way we show intentional discrimination is to show as many

17  ways that the legitimate business reasons or legitimate reasons

18  that are being offered, will be offered by the defense, have no

19  bearing or have no credibility and fall below an acceptable

20  academic standard.

21           Those things are all present in this particular case,

22  because one of the issues -- the key issues, in this case, is

23  did Idaho State University competently work with Mr. Yu based

24  on his international status and based on the fact that he has

25  English as a second language.

Shannon Chavez-Korell, Ph.D. - Direct

1          I believe that Dr. Chavez-Korell -- excuse me --
2    Dr. Chavez's testimony will inform very well about that and it
3    will establish another level of cred- -- lack of credibility.
4    The reason why is because the opening statement of the defense
5    counsel has basically said, "Well, we did everything possible.
6    There was no discrimination.  There was nothing," and that type
7    of thing.
8          What Dr. Chavez-Korell can testify to is that
9    certainly in the area of cultural competence, Idaho State
10   University failed to the extent where any legitimate reason
11   would lack any type of credibility.  Any legitimate reason
12   proffered by defense would lack any credibility.  And that's
13   another prong.  We have to strengthen our case, because this is
14   a circumstantial case basically.
15         THE COURT:  All right.  I'm satisfied that the nature
16   of the testimony that you describe and intend to elicit is part
17   of a frame around the ultimate issue.  What's going to be
18   inside that frame remains to be seen.  I will allow it.
19   Objection overruled.  Go ahead.
20   BY MR. COULTER:
21   Q.   All right.  Dr. Chavez-Korell, do you have an opinion
22   whether Mr. Yu was a victim of defendant's cultural
23   incompetence while he was student in the doctorate of clinical
24   psychology program at Idaho State University?
25   A.   Yes, I do.

Shannon Chavez-Korell, Ph.D. - Direct

1    Q.   How positive are you of your opinion?

2    A.   Very positive.

3    Q.   Now, how certain are you of your conclusion?

4    A.   I am -- I have a reasonable and professional degree of

5    certainty.

6    Q.   And, Doctor, what is that opinion?

7    A.   It is my opinion that Mr. Yu, a student who's assigned

8    grades and evaluations across semesters was consistent with

9    satisfactory progress, was a victim of the cultural

10   incompetence of the ISU faculty.  And as a result of that

11   incompetence suffered serious harm while he was a student in

12   the doctoral program at ISU.

13            As a result of this incompetence, the ISU faculty

14   failed to adequately and properly address the diversity and

15   cultural challenges faced by Mr. Yu.

16   Q.   Now, Doctor, before I get any more questions, what is

17   multicultural psychology and multicultural competence?

18   A.   Sure.  I began addressing --

19            THE COURT:  I thought she answered that question.

20            MR. COULTER:  I thought she did, too, Your Honor,

21   but --

22            THE COURT:  I don't need to hear any more on that.

23   Thank you.

24            MR. COULTER:  Thank you, Your Honor.

25   Q.   Okay.  Can you please explain to the Court why you are of

Vol. 2 - 225

Shannon Chavez-Korell, Ph.D. - Direct

1    the opinion that Mr. Yu was a victim of cultural

2    incompetence --

3    A.    Sure.

4    Q.    -- under the tutelage of Idaho State University?

5    A.    Sure.  So -- so, as I said, that the framework for

6    multicultural competence is awareness, knowledge, and skills;

7    awareness of self, cultural knowledge of self and others and

8    skills.  Right?  And this multicultural competence framework,

9    it actually serves as a proactive framework in -- as we enter

10   our professional work as psychologists.  Right?

11            So, when -- and when this cultural competence

12   framework is missing, this is when an individual is at risk

13   of -- this is when there's a risk of mislabeling a client, of

14   overpathologizing or of harming an individual.  And this could

15   be where psychologists are working with clients.  This could be

16   where psychologists are working as supervisors or when

17   psychologists are working with students.  And, so, when this

18   multicultural competence framework is missing, then the

19   individual is at risk of being harmed.

20            And it is my opinion that Mr. Yu was harmed because

21   of this lack of cultural competence by the ISU faculty.

22   Q.    Dr. Chavez, can you give the Court some specific examples

23   of where this multicultural incompetence played out in Mr. Yu's

24   case?

25   A.    Sure.  Sure.  So, as I was reviewing the documents, and,

Shannon Chavez-Korell, Ph.D. - Direct

1    specifically, I was -- the things that stood out to me was I

2    looked at the evaluations that came out of the -- the Clinical

3    Training Committee's evaluations, right?  Where there was

4    consideration for, you know, evaluating the -- Mr. Yu's

5    progress in the program.

6            And in that consideration -- in that evaluation,

7    there's consideration of the feedback coming from clinical

8    supervisors.  And, so, when I was reviewing those documents, I

9    started -- there were some missed opportunities that started

10   surfacing in those documents, and the first one being his first

11   practicum experience where he's being supervised by -- it was

12   in spring of 2010, and he was being supervised by Dr. Atkins.

13   And in that evaluation from the Clinical Training Committee,

14   they -- there was a -- a -- I'm sorry -- in the evaluation by

15   Dr. Atkins, she noted that it would be a disservice for me not

16   to give Mr. Yu -- to give Jun feedback on how his language

17   skills are influencing his clinical work.  And that was stated

18   in the evaluation.

19           So, that, to me, seems -- seemed important.  Seemed

20   significant.  And then when I looked at the Clinical Training

21   Committee's response in their semi-annual evaluation, it

22   indicated that Mr. Yu was in satisfactory progress, and there

23   was a suggestion that he immerse himself in English-speaking

24   contexts.  It was a suggestion.

25   Q.   Why is that important to you?

Shannon Chavez-Korell, Ph.D. - Direct

1  A.   That's important to me because it struck me as unusual in

2  that as an international student studying in the United States

3  in Idaho, he is constantly immersed in an English-speaking

4  context without actual -- I mean, that is the reality of his

5  experience.  So, it seemed like an empty suggestion to me.

6       And as I further evaluated what the concern was,

7  Dr. Atkins scored him a one, which represented below

8  expectations, for his ability to form working alliances.  And,

9  so, I was thinking -- so, the training committee said "immerse

10  yourself in English-speaking context," but that doesn't

11  directly take on working alliances.

12  Q.   Why not?

13  A.   Well, working alliances are a lot more nuanced, a lot

14  more -- that can be defined by culture.  So, that stood out to

15  me as a missed opportunity.  And, so, from a cultural

16  competence perspective, I think a remediation or a

17  recommendation, at that point, that could be more specific to

18  what his needs were, his cultural challenges that he was

19  experiencing would focus on what does it mean to build a

20  working alliance, and how do working alliances look differently

21  across cultural groups.

22       All of that is very important information in terms of

23  the perceptions of working alliance, even in educating Mr. Yu

24  about working alliances in the United States.  So -- so, that

25  was, you know, one of the first kind of opportunities that

1    jumped out at me as a missed opportunity, and I really saw that

2    as evidence of cultural incompetence.

3    Q.   Was there a second opportunity that you --

4    A.   Sure.  I mean, in the very -- the very next semester, so,

5    that would be fall 2010, Dr. Atkins again, in her evaluation,

6    indicated that there continued to be concerns about Mr. Yu's

7    English or language skills.  And there were no -- she didn't

8    give him any scores below expectations, but I noted that she

9    still wrote that -- felt the need to write that in her

10   evaluation.

11          And I am aware that the conclusion of the Clinical

12   Training Committee was that Mr. Yu was meeting expectations.

13   And if I recall correctly, that was the extent of that.  But in

14   a cultural competence lens, I recognize that there's a trend

15   across semesters.  And it's not actively -- it wasn't

16   documented that it was identified.

17          And so if we were to explore that further and say,

18   "Yes, this has happened across two semesters now early in his

19   clinical training," that's an opportunity to intervene and to

20   say, "You know, maybe what we suggested last semester -- or the

21   last time we did this" -- well, it was last semester -- "maybe

22   what we suggested last semester was not sufficient" --

23   right? -- "to immerse yourself in an English-speaking context."

24   And so maybe taking that further, you know.  So, I think had

25   there been an acknowledgment that this was repeated, but then

Shannon Chavez-Korell, Ph.D. - Direct

1    also that then our suggestion didn't work.  And then I think

2    that could have moved people to consider, again, like maybe

3    how -- how can we intentionally teach, in our clinical

4    supervision -- maybe it's the clinical supervisor and the

5    student -- the faculty who teaches practicum.

6           How can we intentionally model, in our relationship

7    with Mr. Yu, how to build alliance.  And then maybe that could

8    serve as a parallel process in how you take that into therapy.

9    I mean, that could have also been a teachable moment.

10          And I also think if the language piece continued,

11   this would be a great opportunity for consultation.  And I

12   didn't see that documented.  And, so, I would think, you know,

13   consulting, whether it's within the university or outside of

14   the university with someone who is a -- is involved in clinical

15   training for students in psychology programs, who has work --

16   worked with international students, particularly Chinese

17   international students and also second language speakers, those

18   could have been really valuable consultations in how can we

19   best support our student in really developing his clinical

20   competence.

21          And so I saw that as another missed opportunity in

22   just the second semester of his clinical work.

23   Q.   Dr. Chavez, did you notice any other missed opportunity in

24   regards to the cultural competency in this case?

25   A.   I mean, I -- I can offer another one.  So, in the

Shannon Chavez-Korell, Ph.D. - Direct

1   following semester -- so, these are three consecutive

2   semesters.  We have Dr. Seikel indicate in their evaluation,

3   that there was a note about clients -- an observation of

4   clients maybe not returning to -- to their therapy.  I am

5   paraphrasing here, but it was something about maybe clients not

6   returning.  And there was -- that was attributed to possibly

7   the prejudice on behalf of clients toward Mr. Yu.

8           So, that was -- I identified that as an opportunity

9   to intervene.  And the response was, for the Clinical Training

10  Committee, he was given satisfactory progress.  And there --

11  from what I read in the documents, there was not an intentional

12  focus on -- you know, I think about, you know, supporting

13  Mr. Yu, for one, in being potentially discriminated by his

14  clients in that experience.

15          But I also think about exploring then about the

16  dynamics of culture that might be present in the clinical space

17  with clients.  And how we form alliances by directly taking on,

18  you know, sometimes difficult conversations or really just

19  honoring the culture of everyone who is in the room.

20          And I think about how -- yeah, so that discriminatory

21  piece.  Oh, and I also think about how, because that was never

22  approached, then we could never even explore whether or not

23  this was even clinically relevant for clients to discuss this

24  action in therapy, which in some cases it can be clinically

25  relevant for the client.

Shannon Chavez-Korell, Ph.D. - Direct

1  Q.   Now, Dr. Chavez, did you read anything -- happen to read

2  anything in regards to the externship with Dr. Landers?

3  A.   Yes, I did.

4  Q.   All right.  And could you please explain how cultural

5  competency would be impacted in regards to this externship with

6  Dr. Landers?

7  A.   For the externship?  Well, so what's striking to me in

8  terms of externship is -- you know, is that it ended abruptly

9  without any remediation at all.  So, I couldn't see the end --

10 the entry point into even examining what the cultural

11 competence issues could be, because of the abrupt dismissal

12 without feedback and remediation for the student.

13         And that -- when I look across these missed

14 opportunities, that is one of the trends is that, you know, not

15 only the cultural incompetence but the lack of formal,

16 appropriate remediation, you know, to meet the student where

17 they are at in growing, ideally for growing their cultural

18 competence.

19 Q.   Now, Dr. Chavez, are you aware that Mr. Yu was dismissed

20 from an internship with the Cleveland Clinic Center for Autism?

21 A.   Yes, I am.

22 Q.   And is there any -- anything regarding cultural competency

23 in regards to that particular dismissal?

24 A.   Yeah.  I -- from the documents I reviewed, you know, again

25 what struck me was similar to the externship, was that he was

Shannon Chavez-Korell, Ph.D. - Direct

1    dismissed with very limited feedback and no formal remediation.

2    Q.   Now, the -- you are aware that Mr. Yu was dismissed from

3    the Idaho State University psychology -- clinical psychology

4    program to get his doctorate degree; is that correct?

5    A.   Yes, I am.

6    Q.   Can you tell how cultural incompetence played into that?

7    A.   In the dismissal.

8    Q.   Yes.

9    A.   Yeah.  So -- so, in the dismissal, well, I think about how

10   that decision to overlook the cultural issues related to

11   Mr. Yu's training, and to dismiss that, and to not take

12   responsibility for the role in actually mediating his training

13   needs, and to not have a process for him to appeal directly to

14   the faculty, I think that reflects the cultural incompetence as

15   well --

16   Q.   What about --

17   A.   -- to some degree.

18   Q.   How does the -- the doctoral dissertation fit into this

19   particular argument in regards to dismissal of Mr. Yu from the

20   program?

21   A.   You know, well, cultural incompetence in regards to his

22   dissertation is actually interesting to consider, because I've

23   also done cultural adaptations to evidence-based practices as

24   he did.

25             And what's interesting is that in order to

1    appropriately adapt a cultural treatment, you have to have a

2    pretty good understanding of the culture in which the treatment

3    originally orient- -- was based in to really understand the

4    therapeutic elements of that treatment.  And you have to have a

5    strong understanding of the culture that you are trying to

6    adapt it to.

7            So -- so, in terms of cultural competence, I think

8    his dissertation could actually be an exemplar of cultural

9    competence for him.

10   Q.   What about for Idaho State University?

11   A.   You know, the fact that he completed that dissertation

12   there is -- you know, I think speaks to support he received in

13   doing that work.

14   Q.   Now, based on your experience -- expertise in

15   multicultural competency, do you have an opinion about whether

16   Mr. Yu's dismissal from Idaho State University's clinical

17   psychology doctoral program was appropriate?

18   A.   Yes, I do.

19   Q.   What is that opinion?

20   A.   It's my opinion that Mr. Yu was inappropriately dismissed

21   from the school.  It seemed this decision seemed excessive and

22   unjustified and -- and objectively unreasonable.  And in my

23   opinion is further evidence of the harm he's experienced.

24           And, you know, I would also add that in my

25   experience, that this really -- it's my opinion that this is a

Vol. 2 - 234

Shannon Chavez-Korell, Ph.D. - Cross

1  substantial deviation from what would be considered.

2         THE COURT:  Let's ask another question.  She's moved

3  on to another subject.

4  BY MR. COULTER:

5  Q.   Yes.  In your -- is it your opinion that -- that the way

6  Mr. Yu was treated in regards to multicultural competency was a

7  substantial departure from any academic norms?

8  A.   I do.

9  Q.   Why?

10 A.   Yeah, it's a -- in my experience, in my opinion, it's a

11 substantial departure considering there was no formal

12 remediation and it seems unreasonable.

13        MR. COULTER:  Your witness.

14        THE COURT:  Mr. Kelly, your cross-examination,

15 please.

16        MR. KELLY:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18 BY MR. KELLY:

19 Q.   Doctor, again, just so I am clear that we have everything,

20 the last CV we have from you indicates that you are at

21 Wisconsin-Milwaukee?

22 A.   Right.  Right.  That was in 2016, yes.

23 Q.   And so we haven't had the update on that.  I just want to

24 be sure, in addition to the CV, there weren't any documents

25 that you looked at after your March 2016 report?

1  A.   You know, I have reviewed documents, but I am not aware

2  that I have reviewed any additional documents that I don't have

3  listed in my report.  And if I could add that I have reviewed

4  documents, because I have never done this before.  So, I was

5  really, you know, trying to ground myself in what I'm saying

6  based on the evidence.

7  Q.   Well, I just want to be sure that we know what you looked

8  at.

9  A.   Yes.

10 Q.   So, I read what you looked at in the report, but you

11 testified today that you looked at a transcript?

12 A.   Yeah, I think there was an unofficial transcript in the

13 original documents that I looked at.

14 Q.   Transcript of what?  Do you recall?

15 A.   It was Mr. Yu's transcript from ISU.

16 Q.   It was actually a scholastic transcript?

17 A.   Yes.  Yeah.

18 Q.   Not a transcript of testimony?

19 A.   Oh, no.  I'm sorry.  Yes, it was an academic transcript

20 from ISU for Mr. Yu.

21 Q.   Okay.  I know the term has been bantered about all

22 afternoon long, but cultural incompetency, as it applies to ISU

23 in this instance --

24 A.   Uh-huh.

25 Q.   -- could you again give me a CliffNote version of what

1  you're talking about?

2  A.    Sure.  Yeah.  So -- so, to understand cultural

3  incompetence, it's important to really mark that in what

4  cultural competence is.  So, cultural competence is an

5  awareness of how culture might be influencing the dynamics of

6  whatever the professional capacity of a psychologist is.

7        So, if I'm serving as a clinician, as a supervisor,

8  as a professor, as a researcher, whatever my domain of practice

9  is, cultural competence says that I am approaching that work

10  with strong understanding and awareness of how culture might be

11  coming into play in terms of the interactions between

12  individuals, people's attitudes, their behaviors, and really in

13  that acknowledgment then, when I'm striving to find appropriate

14  intervention, then I'm informed by culture.  And so that allows

15  me to create intervention that -- that meets a person where

16  they are at as opposed to a one size fits all.  And so that's

17  cultural competence.

18        So, cultural incompetence would be when this

19  proactive framework is missing, and we are then at increased

20  risk of mislabeling or base -- we are at increased risk of

21  mislabeling things because it's biased almost exclusively by

22  our own world view because we are lacking a cultural awareness

23  of others.

24        And -- and, so -- so, that would be the beginnings of

25  cultural incompetence and it would go as far as when we

1   actually commit harm because of the intervention, skills, or

2   strategies we are utilizing are harmful to the individual

3   because they are culturally incongruent.  So, that would be

4   cultural incompetence.

5   Q.   Okay.  Would cultural incompetence in the field of

6   psychology also apply to a Ph.D. student who is doing an

7   internship?

8   A.   Absolutely.

9   Q.   So, in the instance of Mr. Yu, if he's doing an externship

10  or an internship, and he's dealing with a patient, whether

11  testing or interviewing, would he be obliged to essentially

12  have an understanding of that person and as he's treating that

13  person, be aware of himself, and be aware of the cultural

14  incompetency?

15  A.   Yeah.  The, you know, APA has a competency framework.  And

16  in that framework, one of the domains of competence is

17  multicultural diversity issues.  So, yes, cultural competence

18  applies to all of our students.  And if they are not meeting --

19  because we are trying to develop competency, we would be

20  assessing that and trying to meet their needs in their growth

21  and development so that they can become competent upon their

22  entry into internship or their entry into the profession.

23          So, as a program director or a training director,

24  when a student goes off on internship, their program directors

25  are actually signing a letter saying "I'm confirming that my

1   student is ready for internship and that they are competent,"

2   and the ISU faculty signed that letter for readiness for

3   internship for Mr. Yu.  So, they were confirming that he's

4   ready for internship.

5   Q.   And in the instance as far as the externship, Dr. Landers

6   determined that he wasn't; correct?

7   A.   That he wasn't what?

8   Q.   He wasn't ready to --

9   A.   Oh, right.  So, Dr. Landers -- you are asking did

10  Dr. Landers confirm that he was not ready?

11  Q.   Right.

12  A.   I would conclude that, based on him dismissing him from

13  that externship.

14  Q.   And the same with Dr. Speer at the Cleveland Clinic; would

15  that be accurate?

16  A.   That they are concluding that he's not ready for

17  internship?

18  Q.   Yes.

19  A.   I would hope that that's -- that that would be why they

20  dismissed him if they felt that he wasn't ready.  Uh-huh.

21            MR. KELLY:  Okay.  Thank you.

22            THE COURT:  Mr. Coulter, anything further?

23                      REDIRECT EXAMINATION

24  BY MR. COULTER:

25  Q.   Okay.  Dr. Chavez-Korell, whose obligation is it to ensure

1    that the student is ready culturally and be culturally

2    competent to, in fact, work with the clients or patients either

3    in an externship or an internship?

4    A.   Well, for an externship, because -- well, actually, for

5    externship and internship, all of the practicum work that a

6    student is engaged, in that falls on the responsibility of the

7    faculty in really assessing where the student is at, assessing

8    their competency.

9          APA's competency benchmarks has a nice evaluation

10   form to see -- to really assess people -- student's skills

11   across their readiness for practicum, readiness for internship,

12   readiness for entry into practice.  And again, one of those

13   domains is cultural competence.  And that responsibility falls

14   on the faculty to confirm that they are ready for, whether it's

15   practicum, externship, or their formal internship experience.

16   Q.   And this -- and in reading the documents that you were

17   provided, did you see any evidence that the faculty met their

18   obligations under cultural competency?

19   A.   Did I see any -- could you repeat the question?

20   Q.   Yes.  In reviewing the documents that you were provided

21   and that you looked at, did you see any evidence that Idaho

22   State University had fulfilled their obligation to -- for

23   cultural competency for Mr. Yu?

24   A.   No, I -- I didn't.  I saw it glaringly missing as I have

25   testified.

 1          MR. COULTER:  Thank you.

 2          THE COURT:  Counsel, I am going to inquire of

 3     Dr. Chavez.

 4          Dr. Chavez, when you talk about competency for the

 5     externship or the internship, I'm trying to understand, from

 6     your testimony, whether there are differences in being

 7     competent to go into an externship, as distinct from being

 8     competent to go into an internship, as distinct from being

 9     competent to engage in clinical practice.  Does that make

10     sense?

11          THE WITNESS:  That makes perfect sense.

12          THE COURT:  So, what are the difference?

13          THE WITNESS:  So, yes.  There are differences, and

14     because the competency movement is about -- it's developmental.

15     So, in thinking in a developmental model, a student who is

16     beginning their training, our expectations are really focusing

17     on, you know, basic skills really.

18          And as they grow in that competence, then we set a

19     new domain of expectations of what do we expect from them.  You

20     know, maybe it's a higher level of independence in their

21     clinical work that they are doing at practicum.  And then that

22     would also be true for externship.

23          So, it's like a stepped increase in independence.

24     But also, the competencies are -- you know, so when a student

25     is on internship, they are really -- even though it's still

Vol. 2 - 241

Shannon Chavez-Korell, Ph.D. - Redirect

1    training, they are -- they are moving towards independent

2    practice.  It's the final training opportunity to meet any

3    deficits in one's skill set before entering practice.

4            So, yes, it's stepped, it's developmental, and there

5    are different expectations along the way.

6            THE COURT:  Am I correct in understanding that the

7    externship and the internship are markers of the path of the

8    study intended to demonstrate competence for completion of the

9    program?

10           THE WITNESS:  Yes.  That's the typical path, and one

11   should not be allowed to move forward if that competency is not

12   met.

13           THE COURT:  But it's not intended to be a guarantee

14   of success in -- in other words, if -- if a university places a

15   student in an externship, it's not intended to be a guarantee

16   that they will successfully complete the externship; is that

17   right?

18           THE WITNESS:  That could be the case in some

19   situations, uh-huh.

20           THE COURT:  Well, is it ever a situation where it's a

21   guarantee?

22           THE WITNESS:  Well, because it's evaluative, I would

23   think that it depends on, you know, for each respective

24   student, what kind of work are they delivering at the site.

25   So, it really is a evaluative in that moment.  Like what is

Shannon Chavez-Korell, Ph.D. - Redirect

1   their performance at this -- at this externship site.

2               THE COURT:  And that would be true for an internship

3   as well.

4               THE WITNESS:  Uh-huh.

5               THE COURT:  Is that yes?

6               THE WITNESS:  Yes.  Uh-huh.

7               THE COURT:  Okay.  And in a Court trial, such as I am

8   doing, it's appropriate for the Court to inquire, all intended

9   to try to allow me to fully understand the evidence and make a

10  decision.  And then I give the attorneys an opportunity to

11  follow up on these questions.

12              What I'm not certain I'm understanding here is where,

13  in any of this, you have an opinion that anything that the

14  faculty at Idaho State University did that was intended to

15  discriminate against Mr. Yu?

16              THE WITNESS:  Uh-huh.

17              THE COURT:  And how your -- your opinion that there

18  was multicultural incompetence --

19              THE WITNESS:  Uh-huh.

20              THE COURT:  -- translates into intentional act.

21              THE WITNESS:  Right.  Right.

22              THE COURT:  Can you help me with that?

23              THE WITNESS:  Sure.  Sure.  So, I think for me, the

24  intention would come from when a student is struggling, and we

25  decide not to get involved in remediating them.  There's a

Shannon Chavez-Korell, Ph.D. - RX

1    decision-making.  It doesn't -- it's not just happenstance.

2    There is an active decision on intervention.

3            And the faculty intentionally decided not to

4    intervene.  There were no formal remediations in the process of

5    training here, and so I consider that intentional.

6            THE COURT:  Okay.  Mr. Coulter, do you have any

7    follow-up?

8            MR. COULTER:  No, Your Honor.

9            THE COURT:  Mr. Kelly?

10           MR. KELLY:  Just one, Your Honor.

11                       RECROSS-EXAMINATION

12   BY MR. KELLY:

13   Q.   Doctor, in regard to the question the Judge just asked,

14   you said -- essentially responding to whether ISU intentionally

15   discriminated against --

16   A.   Uh-huh.

17   Q.   -- Mr. Yu, you said, "Well, when" -- and you said, in

18   general terms.  You didn't say about Mr. Yu.  You said in

19   general terms when a student is struggling, they didn't

20   intervene.

21   A.   Right.

22   Q.   You were talking in general terms.

23   A.   Sure.  Right.

24   Q.   And is that all you're doing is talking in general terms?

25   A.   No, no.  I'm saying that in this case for ISU, there was

Vol. 2 - 244

Shannon Chavez-Korell, Ph.D. - RX

1    an intentional decision not to intervene.  It's not documented.

2    There was never a formal intervention.  So, I consider that an

3    intentional decision to not support Mr. Yu while he was facing

4    what I thought was well-documented challenges in regards to

5    diversity in culture.

6    Q.   And do you believe that decision not to intervene was

7    specifically based on his national origin?

8    A.   I believe that it was intentional.  I don't -- can I give

9    my opinion further than that?  I -- you know, I think it's hard

10   to remediate something you don't have yourself.  So, it's hard

11   to remediate the cultural struggles he might be having when

12   that's lacking from the faculty themselves.  And I saw markers

13   of that.

14   Q.   All right.  But that would then be unintentional then;

15   right?

16   A.   It's intentional.  It's a competency domain.  We are

17   required -- many states require multicultural training to keep

18   our license up even.  It's intentional.

19   Q.   Well, I'm sorry to interrupt, but I don't think I got the

20   answer then.  Did they specifically intentionally discriminate

21   because he was Chinese?

22   A.   My opinion is yes.

23   Q.   And based on what?

24   A.   Based on the inaction and the decision not to support him.

25   Q.   And is that anywhere --

Vol. 2 - 245

Shannon Chavez-Korell, Ph.D. - RX

1   A.    And in cultural incompetence, uh-huh.

2   Q.    And cultural incompetence is an intentional act?

3   A.    Yes, it can be.

4   Q.    It can be?

5   A.    Absolutely.

6   Q.    It can be, but it isn't always; correct?

7   A.    Yeah, that's kind of a -- it can be, but it's not always.

8   Yes, that's true.

9   Q.    And again, do you have any -- did you see any documents

10  that specifically said that they were not intentionally or were

11  intentionally discriminating against Mr. Yu because of his

12  national origin?

13  A.    I didn't see that explicitly written anywhere, no.

14          MR. KELLY:  Thank you.

15          THE COURT:  All right.  Your next witness.

16          Miss, you may step down.  Thank you.

17          Your next witness, Mr. Coulter.

18          MR. COULTER:  Your Honor, at this time, I would like

19  to call Dr. Leslie W. Zorwick to the stand.

20          COURTROOM DEPUTY:  Do you solemnly swear that the

21  testimony you are about to give in the matter now before this

22  Court will be the truth, the whole truth, and nothing but the

23  truth, so help you God?

24          THE WITNESS:  I do.

25          COURTROOM DEPUTY:  Thank you.  Please be seated.  And

Leslie W. Zorwick, Ph.D. - Direct

1  for our record, would you please state your full name and spell

2  your last?

3         THE WITNESS:  Sure.  My name is Dr. Leslie Wade

4  Zorwick.  Last name Z-O-R-W-I-C-K.

5         THE COURT:  You may inquire.

6         MR. COULTER:  Thank you, Your Honor.

7                  LESLIE W. ZORWICK, PH.D.,

8  having been duly sworn, was examined and testified as follows:

9                      DIRECT EXAMINATION

10  BY MR. COULTER:

11  Q.   Good afternoon, Dr. Zorwick.

12  A.   Good afternoon.

13  Q.   Now, Dr. Zorwick, could you please tell the Court what is

14  your formal education?

15  A.   Sure.  I have a bachelor's degree, a master's degrees, and

16  a Ph.D.

17  Q.   And which undergraduate school did you attend, ma'am?

18  A.   I went to Emory University.

19  Q.   And what degree did you obtain there?

20  A.   I actually graduated with a BA with highest honors in both

21  psychology and philosophy.

22  Q.   Psychology and what?

23  A.   And philosophy.

24  Q.   Do you have any advanced degrees, ma'am?

25  A.   I do.  I have a master's degree from the Ohio State

Leslie W. Zorwick, Ph.D. - Direct

1    University and my doctorate is also from the Ohio State

2    University.

3            During my time in the Social Psychology Graduate

4    Program at Ohio State, we were ranked the number one social

5    psychology program in the country by social psychologists from

6    around the world.  And I trained under Marilynn B. Brewer,

7    whose theories about prejudice, identity, and intergroup

8    interactions were so influential, she's won every major award

9    in our field.  She actually is retired now and, upon moving to

10   Australia, was declared a National Treasure by the Australian

11   government.

12   Q.   Now, Dr. Zorwick, do you belong to any professional

13   organization?

14   A.   I do.  I'm a member of the America Psychology Society, the

15   Society for Personality in Social Psychology, which is the

16   American Psychological Association Division 8, and I'm a member

17   of the Southwestern Psychological Association.

18   Q.   Doctor, have you served in any capacity in teaching in

19   higher education?

20   A.   I have.  From 2003 to 2007, I was a graduate teaching

21   associate and lecturer at the Ohio State University.  Since

22   2007, I have been employed at Hendrix College, first as an

23   assistant professor and now as an associate professor with

24   tenure.

25   Q.   What courses do you currently teach, Dr. Zorwick?

1    A.    In the 2018-2019 academic year, I'm teaching five courses;

2    Stereotyping and Prejudice, Racial Justice and the Bible, which

3    is co-taught with a faculty member in Religious Studies, Social

4    Psychology, Psychology and Law, and Statistics.

5    Q.    Now, Doctor, would you please detail your experience at

6    the university level to include teaching assignments, faculty

7    positions in the field of social psychology?

8    A.    Sure.  So, during my time in graduate school from 2003 to

9    2007, I taught multiple sections of Introduction to Psychology

10   and multiple sections of Social Psychology.

11          During my time at Ohio State, I also won an award as

12   the most effective instructor in Introduction to Psychology out

13   of about 40 graduate students.  I won the first ever Psychology

14   Department Teaching Award, and I won a Graduate Associate

15   Teaching Award, which is a university level award at Ohio State

16   given to the top 10 graduate students instructors out of the

17   tens of thousands of graduate students.

18          During my time a Hendrix College, I have taught a

19   variety of classes.  So, I am just going to go in order from

20   the most introductory level to the most senior.

21          I have taught Introduction to Psychology.  I have

22   taught Social Psychology in Film.  I have taught Identity and

23   the Need to Belong.  I have taught Social Psychology.  I have

24   taught Stereotyping and Prejudice.  I have taught Racial

25   Justice and the Bible.  I have taught Statistics.  I have

1    taught Social Cognition.  I have taught Psychology and Law, and

2    I have taught Advanced Research in Identity and Stereotyping.

3           And during my time at Hendrix, I have been nominated

4    three times for the Faculty Appreciation Award given by our

5    students.  I am currently a nominee for our university -- The

6    United Methodist College University Exemplary Teaching Award,

7    and I have been nominated for the Undergraduate Mentoring and

8    Teaching Award given by the Society for Personality and Social

9    Psychology.

10   Q.   Now, in those roles, did you have any administrative

11   responsibilities?

12   A.   I have.  From 2005 to 2007, when I was in graduate school,

13   I was the course coordinator for our Social Psychology course.

14   This meant that I coordinated schedules, did troubleshooting,

15   and provided mentoring for the 25 students teaching their own

16   individual sections of the course as the only instructor of

17   record, and I prepared professional development activities for

18   those students.

19          During my time at Hendrix, I have had a variety of

20   administrative roles.  I served for five years as the chair of

21   our Human Subjects Review Board, which is the branch of our

22   Institutional Review Board that oversees all research conducted

23   with human participants.

24          I have served for three years as the chair of our

25   Diversity and Dialogue Committee.  I chaired the committee that

Leslie W. Zorwick, Ph.D. - Direct

1    wrote the part of our college's Strategic Plan dealing with

2    Diversity and Campus Climate.  I have twice been an elected

3    faculty representative with -- on our Academic Policy Committee

4    with the administration.  And I currently serve as chair of the

5    Department of Psychology.  This is my first year of a

6    three-year term.

7    Q.   Now, Doctor, have you written and/or published in the

8    field of Stereotyping and Prejudice?

9    A.   I have.  And a big focus of my professional work isn't

10   just my own writing but is facilitating the writing of others

11   and translating social psychological research for use out in

12   the world, not just in academic contexts.

13   Q.   Okay.  Have you published any papers?

14   A.   I have.  So, using my background, I have published seven

15   different papers, and they cover a range of topics from the

16   Structure of Gender Stereotypes to how Urban Education Programs

17   Can Facilitate the Reduction of Race-Based Prejudice, to the

18   Importance of Developing Perspective Taking and Empathy Skills

19   Through Certain Kinds of Educational Attainment.

20           But in addition to publishing in journals and book

21   chapters, I have edited a book.  I have written a nationally

22   distributed report for the YWCA, which is a nonprofit that does

23   work at the intersection of racial justice and women's

24   empowerment.

25           I have also served -- I'm currently serving as an

Leslie W. Zorwick, Ph.D. - Direct

1    area editor for a project of the Oxford University Press called

2    Oxford Annotated Bibliographies.  In this role, I identify

3    topic areas in criminal and forensic psychology and put the

4    Oxford University Press in touch with authors that could write

5    these annotated bibliographies.

6              I'm also currently working with this other faculty

7    member in Religious Studies on a project about Contextual Bible

8    Study.  And in that work, we are doing psychological assessment

9    of using Bible study to facilitate conversations about race,

10   but we are also writing up a manual of how you can teach

11   students and community members to engage in that work

12   effectively.

13   Q.   Now, about how many publications have you authored in the

14   field of stereotyping and prejudice?

15   A.   Seven.

16   Q.   Have any journals published your articles?

17   A.   Yes.  I have published in Sex Roles.  I have published in

18   the Journal of Communication Education, and I have published in

19   Argumentation and Advocacy.  I have also written for broader

20   audiences, and that's my two publications in the Rostrum as

21   well as the book chapters I wrote.

22   Q.   Now, it's my understanding that you are employed at

23   Hendrix College; is that correct?

24   A.   Correct.

25   Q.   This is your first year of being the head of the

Leslie W. Zorwick, Ph.D. - Direct

1    Psychology Department?

2    A.   It is.

3    Q.   Could you describe your current duties and

4    responsibilities for the Court?

5    A.   Sure.  So, I'm currently chair of the Psychology

6    Department.  I am also chair of our Campus Committee on

7    Diversity and Dialogue.  I also hold the three-year Margaret

8    Berry Hutton Odyssey Professorship to support my work in

9    contextual Bible study and racial justice.

10            I'm also part of a group of faculty who received a

11   grant from the National Science Foundation to put together

12   programming and do research about developing feelings of

13   inconclusion and belonging on the part of students from

14   historically underrepresented groups studying the natural

15   sciences.  And, so, we're assessing the psychology experience

16   of those students and crafting some interventions to make sure

17   they feel like they belong and are meaningfully included in our

18   community.  So, I think that about covers.

19   Q.   Thank you.

20   A.   Uh-huh.

21   Q.   Now, Doctor, have you previously served as an expert in

22   any state or federal legal proceedings?

23   A.   I have.  In 2010, I testified in *Spurlock v. Fox* in U.S.

24   District Court for the Middle District of Tennessee.  I was

25   retained and testified on behalf of the plaintiffs in an

Leslie W. Zorwick, Ph.D. - Direct

1  NAACP-backed lawsuit against a 2009 Metro Nashville Rezoning
2  Plan.
3          As part of my work, I testified about aversive
4  racism, about stereotyping, prejudice, and the benefits of
5  integrated educational settings.  And in this work, I wrote an
6  expert witness report, I was deposed, and I testified in court.
7  Q.   Okay.  And what did your testimony include?
8  A.   My testimony included a discussion of aversive racism,
9  discussions of modern manifestations of prejudice, race-based
10  prejudice specifically, and then a lot about the benefits of
11  integrated educational spaces and the value of intergroup
12  contact.
13          MR. COULTER:  And, Your Honor, at this particular
14  point in time, I'd like to ask that Dr. Zorwick be recognized
15  as an expert in aversive racism.
16          THE COURT:  Mr. Kelly.
17          MR. KELLY:  No objection, Your Honor.
18          MR. COULTER:  All right.
19          THE COURT:  Hold on.
20          MR. COULTER:  Yes, Your Honor.
21          THE COURT:  Yeah, I still have to make a decision
22  about whether she's qualified.  I -- I suspect you have the
23  question in your outline further on, but I'd like to have an
24  explanation of the subject much as I did with Dr. Chavez.
25          MR. COULTER:  As regards to aversive racism?

Leslie W. Zorwick, Ph.D. - Direct

1          THE COURT:  Yes.

2          MR. COULTER:  And the components and everything that

3   goes into that?

4          THE COURT:  Well, what it is and the nature of its

5   acceptance or lack thereof in the field of psychology.

6          MR. COULTER:  All right.  Which will not prevent me

7   from going into the details later on.  In other words, I don't

8   want to be -- I don't have an objection of cumulative from

9   establishing that.

10          THE COURT:  Well, only if I -- if I think that I have

11   heard it, and I don't need to hear it again.

12          MR. COULTER:  All right, Your Honor.

13          THE COURT:  Go ahead.

14   BY MR. COULTER:

15   Q.   So, could you please explain to the Court what is aversive

16   racism and how has it been accepted within the field of

17   psychology?

18   A.   Sure.  So, aversive racism is a theory that tries to

19   explain what does racism look like in modern contexts.  It's

20   probably the most dominant theory that people are studying and

21   publishing about when we think about the modern manifestations

22   of prejudice.  And so, really, aversive racism is how we think

23   racism looks in 2019.

24          It's such a broadly accepted theory.  It's been

25   something I have been teaching about for 16 years in most of my

1   classes, including all last week, in my Social -- in my

2   Stereotyping and Prejudice Course.

3           Aversive racism rests on the assumption that

4   prejudice today doesn't look the same as prejudice used to

5   look.  That social norms have changed tremendously about the

6   explicit and overt expression of prejudice.  And so, aversive

7   racism says that the way that racism tends to manifest now is

8   that folks can hold simultaneously a generalized belief in

9   egalitarianism, which is the idea that we should treat

10  everybody the same, but that they can also know negative

11  stereotypes and be profoundly influenced by those negative

12  stereotypes they've learned about race that they pick up on in

13  their socialization.

14          And there is a lot of evidence that suggests people

15  learn negative stereotypes early, they are profoundly

16  influenced by them, and that when we see evidence of those

17  negative race-base stereotypes impacting people, are in a very

18  specific set of circumstances, because most of the time people

19  will say, "No, no.  My motives are I care about

20  egalitarianism."

21          And aversive racism theory gives us a way to say, "We

22  need to look at not what people say about their intentions but

23  what they do."  And if what they do treats different groups of

24  people differently, that gives us a much better window into

25  what was influencing the judgment and decisions of people when

Leslie W. Zorwick, Ph.D. - Direct

1    race is a factor.

2          And like I said, it really is the dominant theory of

3    understanding race-based prejudice in social psychology and has

4    been for a while.

5          MR. COULTER:  Your Honor, would you like further

6    inquiry?

7          THE COURT:  No.  We will deem her qualified on this

8    particular topic.  Go ahead.

9          MR. COULTER:  Thank you, Your Honor.

10   Q.   Now, before I get into -- I just want to make sure I clear

11   something up.

12         Have you made any report to me in writing regarding

13   aversive racism other than the report that you provided in your

14   expert report?

15   A.   Nothing official, no.  I -- in our back and forths over

16   email just about the order of exhibits I wanted to show, I

17   emailed and said, "Hey, here's an order of things," so that you

18   all could put that together before trial, but that's it.

19   Nothing official.

20   Q.   And were you provided the student records that were

21   provided to us and have you been able to review the same?

22   A.   Yes.  So, I looked at all of the things that I outlined in

23   my expert witness report, in writing that expert report, which

24   I wrote in 2016.  And I'd be happy to identify some of those

25   things if that's helpful, but you have the list of things I

Leslie W. Zorwick, Ph.D. - Direct

1  looked at.

2        But since my expert report was written, there is more

3  information that's available.  So, I know that the plaintiff

4  filed a motion to compel the release of information about other

5  students in the program.  That happened after I wrote my

6  report.  The Court's decision about that happened after I wrote

7  my report.

8        And then the files about these similarly situated

9  students at risk of dismissal didn't become available until

10  after I wrote my initial report.  But I read all of those

11  things, because considering how Mr. Yu was treated relative to

12  other students in the program is important.

13        MR. KELLY:  Your Honor.

14        THE COURT:  Just a moment, Miss.

15        Yes, sir.

16        MR. KELLY:  I'm sorry.  I am going to move to strike

17  this part of the testimony.  Again, she is testifying as to

18  things that are not -- she specifically said these are things

19  not in her report.

20        THE COURT:  Yeah.

21        MR. KELLY:  And so I move to strike any testimony in

22  regard to any documents not provided in her report.

23        THE COURT:  Mr. Coulter.

24        MR. COULTER:  Your Honor, the documents were provided

25  as a result of a motion to compel after she -- after she wrote

Leslie W. Zorwick, Ph.D. - Direct

1  her report.  She's using these things now.

2           The case law I've read is that you can actually use

3  information, without writing an additional report, to inform

4  your decision, that was provided to you by the direction of the

5  Court.

6           So, I wanted to make sure we got that cleared up,

7  because she didn't produce any report that I needed to provide

8  to the defense, she only used the things provided to her after

9  her report, so she is a discrimination expert and so this helps

10  inform her --

11           THE COURT:  Am I understanding that she intends to

12  add additional opinion testimony to that which is set out in

13  her report based --

14           MR. COULTER:  No, Your Honor.

15           THE COURT:  -- based upon these additional documents

16  that were produced by the defendant?

17           MR. COULTER:  Well, Your Honor, to answer that

18  question, she will use the documents.  However, it does not

19  change her conclusion or -- and -- that was done in her report.

20           THE COURT:  Then where -- where is the

21  supplementation that Rule 26(e) would require in this setting?

22           MR. COULTER:  Your Honor, she didn't -- she didn't

23  produce a report.  She -- she did not change her report.

24           THE COURT:  Well, I have got a report in front of me.

25           MR. COULTER:  Yes, Your Honor.

Leslie W. Zorwick, Ph.D. - Direct

1          THE COURT:  You are saying she didn't produce a

2   supplemental report?

3          MR. COULTER:  She didn't.  She didn't produce --

4          THE COURT:  But that's the point.  Why is there not a

5   supplementation as to her prior report if she's looked at

6   additional documents and intends to testify in some way based

7   upon that -- those additional documents?

8          MR. COULTER:  Because, the -- the motion to compel

9   was provided so that we could, in fact, use the documents to

10  show that there was similarly situated people.

11         THE COURT:  I understand why.  The question is why

12  wasn't there then some supplementation?  There's nothing

13  inappropriate with providing the information to the expert.

14  The question is why wasn't there a supplementation as to her

15  report and what she had looked at under the rule?

16         Because that's -- that's the -- that's the -- what

17  gives notice to the opposing party as to what this expert

18  intends to testify upon.

19         MR. COULTER:  Well, because we already had given --

20  we already had given the required response by providing the --

21  by providing the report.  The report specifically states that

22  aversive racism was there.

23         Now, if -- if we had to -- if we had to have

24  Miss Zorwick testify in regards to aversive racism without

25  the -- the student compelling records, that would -- we could

Leslie W. Zorwick, Ph.D. - Direct

1   still do that.  But the fact of the matter is it didn't change

2   the report and didn't change the outcome.

3            And the -- there couldn't be any prejudice involved

4   in that, because they knew what they were giving up.  They knew

5   that they were giving the student records for a specific

6   purpose.

7            THE COURT:  How are they to know what this witness

8   would then say about such things or to know that she had been

9   provided the documents and she would use them in some way as

10  the basis for her opinion?  That's the whole point here.

11           So, what -- what I am going to do, so we aren't

12  furthered delayed, I am not going to allow you to inquire as to

13  anything related to those.  I will allow you, when we finish

14  with her testimony today, to make argument to me about why you

15  think the Rule 26(e) supplementation requirement has either

16  been met or -- or should be excused in the instance.

17           MR. COULTER:  Yes.

18           THE COURT:  That's the best I can do to try to give

19  you a fair opportunity but also a fair opportunity to the

20  defendant.

21           So, the motion to strike will be granted and any

22  testimony on this subset of what she was coming here to

23  prepared to testify about will be off limits until there's been

24  further ruling of the Court.  All right?

25           MR. COULTER:  Yes, Your Honor.  May I have about a

Leslie W. Zorwick, Ph.D. - Direct

1   five-minute recess?

2              THE COURT:  So you can sort out what you want to do

3   in that regard?

4              MR. COULTER:  Yes, Your Honor.

5              THE COURT:  Yeah.  Well, we will take the 20-minute

6   recess then now, and then when we come back, we will go till

7   3:00.

8              So, we will -- we will come back again at 22 minutes

9   to 2:00 p.m.  Or wait.  No.  We will take a five-minute because

10  we are going to go till 3:30.

11             All right.  We will take a five-minute recess.

12         (Recess 1:17 p.m.  Resumed 1:23 p.m.)

13             THE COURT:  Please be seated.

14             Would you please ask counsel -- all right.  Here he

15  comes.

16             All right.  Mr. Coulter, you may resume your

17  examination.

18  BY MR. COULTER:

19  Q.   Okay.  Dr. Zorwick, what is your specialty?

20  A.   So, my expertise is in social psychology, with a

21  particular focus on stereotyping, prejudice, discrimination,

22  and identity.  And aversive racism really overlaps with all of

23  those areas, which is why it's something I teach about in all

24  of my classes.

25  Q.   All right.  Dr. Zorwick, can you tell us what aversive

Leslie W. Zorwick, Ph.D. - Direct

1    racism is?

2    A.    Sure.  So, as I said before, it's this idea that modern

3    manifestations of racism look different than the racism of the

4    1950s.  I mean, I would say people in my field would start by

5    saying aversive racism is racism period.  It's just how it

6    looks now.

7             And what aversive racism offers us is the idea that

8    we need to be paying more attention to what people do than what

9    they say about why they did what they did.  That we need to

10   look for a pattern of behaviors and choices that treat groups

11   differently, not just someone's explicit motives, because

12   social norms have changed so much surrounding how people

13   express their motives.

14   Q.    Okay.  Now, can you explain how aversive racism can be

15   intentional racism if it operates unconsciously and in subtle,

16   indirect ways?

17   A.    Sure.  So, the language in the literature of aversive

18   racism sometimes uses the language of race-based attitudes as

19   being unconscious or implicit.  And that, I think, really

20   connote the wrong thing to people.

21             So, what we mean by that is that this is a way that

22   race-based stereotypes can influence us that we have to do a

23   little bit of extra work to notice.  So, it's not that we could

24   never be aware of these attitudes that we have about race.

25   Rather, we have to be paying attention and asking ourselves

Leslie W. Zorwick, Ph.D. - Direct

1  questions to understand why we are having the reactions we

2  have.

3         There are folks who study these unconscious or

4  implicit attitudes, and what they find is that people can

5  really accurately predict theirs.  We know the stereotypes that

6  we have about groups.  We just tend to call them our gut

7  feelings.

8         And so we have an opportunity, when we have a gut

9  feeling, to ask, "Why am I having a feel about this person?  Is

10  it about a group they belong to?  Is it about something other

11  than the immediate situation?"

12         So, an example might be if I am walking to my car at

13  night, and I pass by a black man, and I have a moment of

14  feeling nervous.  I have an opportunity then to think, "Why am

15  I reacting differently than I did to the white man I passed a

16  block back?"

17         I have the choice that I get to make then to think

18  about why I'm having the reaction I'm having.  I have the

19  choice to learn something about myself.  I have the choice to

20  notice an intentional, you know, behavior that I enacted that

21  came from this kind of gut feeling.

22         The second thing that I would say is that sometimes

23  in the literature, people talk about aversive racism as being

24  subtle or invisible, and I think that's also a little bit

25  misleading.  It connotes the wrong thing.  The idea is that

Leslie W. Zorwick, Ph.D. - Direct

1  aversive racism can be invisible to us if we choose not to see

2  it.

3          So, that is to say I can focus on my explicit motive

4  of I care about egalitarianism and not pay attention to the gut

5  feeling I'm having that is clearly related to racial identity.

6  So, like, if I decide I'm going to have pizza for night every

7  dinner for a month, I can tell myself that has nothing to do

8  with my health.  It's just because it's easy.

9          But the reality is, like, it does have something to

10  do with my health, too.  And so that's why the motives that we

11  ascribe to our actions are not enough alone.  We also have to

12  look at those actions themselves and the consequences of those

13  actions to fully understand what was influencing us.

14  Q.   Okay.  Now, sometimes aversive racism has been described

15  as invisible or subtle.  Can you comment on that?

16  A.   Yeah.  So, that's the two points that I really want to

17  communicate, is that just because we talk about the stuff as

18  invisible doesn't mean we can't see it.  It just means we have

19  to make a choice to see it.  And it means that we can lie to

20  ourselves about why we're doing what we're doing.

21          Because we tend to come up with an explanation for

22  our motives that makes us look good and feel good.  We don't

23  tend to lean into, I did something bad.  I did something

24  biased.  I did something embarrassing.  We come up with the

25  best positive spin on what we did.  And so that's a reason why

Leslie W. Zorwick, Ph.D. - Direct

1   the way that we articulate our motives, sometimes we really

2   need to pay attention to behaviors to decide if those motives

3   that are explicitly expressed are maybe a little bit suspect.

4   Q.   Okay.  Now, Dr. Zorwick, can you tell the Court what are

5   the characteristics of aversive racism?

6   A.   Sure.  Research finds that there are five characteristic

7   hallmarks that tend to be present if aversive racism is at

8   play.

9       The first is the presence of a lot of ambiguity

10  surrounding decision-making.  So, if someone's in a position

11  where making a choice will clearly make them look prejudiced,

12  they won't make that choice.  But if there's some ambiguity, it

13  tends to invite racial bias to influence decision-making a

14  little bit more.  And that ambiguity can come from not being

15  totally clear about what we are looking for, from really

16  subjective evaluation criteria.  But the more ambiguity there

17  is, the more likely we are to see evidence of aversive racism.

18      The second characteristic and hallmark is the use of

19  race neutral explanations after the fact.  So, for example, if

20  people shift from acknowledging racial identity and differences

21  as being meaningful and important, and then after a decision is

22  made, they lean hard on, like, color blindness; the idea, oh,

23  no.  We treat everyone the same.  Race has nothing to do with

24  it.  That shift, that focus, that really cling to race neutral

25  explanations tends to be something that we do again to make our

1    motives look good and to create some ambiguity about why we

2    did.

3          The third thing that tends to be happening in the

4    case of aversive racism are the expressions of microaggressions.

5    So, these are like small, everyday things that communicate who

6    is and isn't valued in different learning contexts, in

7    different employment contexts, and it starts with the word

8    micro which makes it sound small but it's not.

9          These things add up really powerfully to communicate

10   who is expected to succeed, who is valued, who will thrive, who

11   people have positive expectations about.  In research that

12   looks at the experience of microaggressions for Asian

13   international students, research finds three specific things

14   that tend to happen.

15         The first is sort of an idea that cultural

16   differences that people experience don't really matter.  We

17   should be able to treat everybody the same, because that can

18   really invalidate the experience of an Asian international

19   student who is having a different experience.

20         The second thing that we tend to see is ridicule

21   surrounding accent.  So, where Dr. Prause says, "Well, how can

22   we admit Mr. Yu to the program?  I can't understand him?"

23   Right?  She heard Dr. Roberts say that.  That is exactly the

24   kind of thing we would expect to pop up for Asian international

25   students.

Leslie W. Zorwick, Ph.D. - Direct

1          The third thing is a lack of awareness of how

2    structural barriers can profoundly impact the ability of Asian

3    international students to take advantage of the same

4    opportunities as white American students.

5          The fourth characteristic is really challenging

6    interracial interactions and relationships.  So, what tends to

7    happen on the part of the person holding aversive racism is

8    they focus a lot more on a general belief in egalitarianism and

9    they think that will be communicated and everything will go

10   well.

11         In contrast, the racial minority in the interaction

12   focuses more on subtle, nonverbal cues that tend to be more

13   predicted by negative stereotypes; things like friendliness,

14   care, concern, anxiety.  And what we get is a disconnect where

15   the white participant in this interracial interaction thinks

16   things are going fine, because in their head, they are going to

17   treat everybody the same.

18         But because they are so focused on that they want to

19   treat people the same, they don't see all the ways in which

20   their behavior is different, and that's what their interaction

21   partner is focused on.

22         The fifth thing that we see is the use of post hoc

23   justification.  So, coming up with an explanation why we did

24   what we did but only after the fact.  And so one of the ways

25   that this tends to play out in aversive racism, particularly

Leslie W. Zorwick, Ph.D. - Direct

1    with Asian job candidates, is that we misremember people as

2    being worse than they were after we've made the decision not to

3    hire them or not to put them in a position.

4             And so the idea of people pointing to things that,

5    "Oh, that's why we did it," but it's not how they felt at the

6    time, that disconnect, we tend to see that a lot in the case of

7    aversive racism.

8    Q.   Okay.  Now, you are familiar with the present case of Jun

9    versus Idaho State University; is that correct?

10   A.   I am.

11   Q.   And how did you become familiar with this case?

12   A.   I got an email from you in January of 2016 inquiring about

13   retaining my service based on my previous work in *Spurlock v.*

14   *Fox*.

15   Q.   Now, have you -- have you and are you receiving monetary

16   compensation to serve as a witness for Mr. Yu?

17   A.   Yes, I am.

18   Q.   And would that include all the time you are in the

19   courtroom?

20   A.   Yes.

21   Q.   Has the fact that you are being paid to serve as an expert

22   for Mr. Yu impacted your professional assessment in this case?

23   A.    No, and I'm very confident of that.  So, I actually teach

24   my students in Psychology and Law a couple of papers about how

25   easy it is for experts to be biased by the side that retains

Leslie W. Zorwick, Ph.D. - Direct

1  them.  So, I actually used empirical countermeasures that come

2  from social psychology to make sure that I wasn't doing that.

3          So, two things.  The first is from our earliest

4  correspondences, I told you, "I would be happy to read these

5  case files, but I cannot at all tell you in advance what my

6  opinion will be."  I cannot go into this with the idea that I

7  know what the conclusion is if I am going to do a good,

8  thorough search of evidence.

9          It is why it is problematic when, at the beginning of

10  a situation with someone, we make an assumption about what it

11  might be like.  So, something that sort of raised a red flag

12  for me is that idea that before Mr. Yu was even admitted to the

13  program, people had concerns about his language, because that

14  tells me people were prepared to keep seeing that.  So, I

15  didn't want to do that, so I said, "I'll tell you what my

16  conclusion is, but only after I read everything."

17          The second thing is I made sure to do a thorough

18  search for the not just evidence aversive racism was present

19  but also evidence it wasn't present.  And so one of the things

20  we tend to do when we have an idea of what we expect is we only

21  look for confirmatory evidence.  And I specifically sat down

22  looking for both, very carefully.

23  Q.   Now, have you received any documents in this matter?

24  A.   Yes.  Many, many documents.

25  Q.   Okay.  And now other than the information that has been

1   sort of contested in this particular case --

2   A.    Uh-huh.

3   Q.    -- that we will look at later, can you tell us what the --

4   what some of these documents were?

5   A.    Sure.  So, they are detailed in my expert witness report,

6   but I read the complaint, the case management order, all of the

7   plaintiff's initial disclosures, all of the defense initial

8   disclosures, the defense responses to plaintiff's discovery

9   requests, the plaintiff's responses to defense discovery

10  requests.

11          I read a document prepared by Jocelyn Eikenberg and

12  Dr. Michael Dwyer about the case.  I read a document prepared

13  by Mr. Yu for his Graduate Council appeal.  I looked at

14  Mr. Yu's GRE scores.  And then also, after writing my report, I

15  was able to look at the expert witness reports written by other

16  folks testifying on behalf of Mr. Yu and the trial briefs

17  written by the defense and the plaintiff to get a sense of

18  globally of what's going on in this case.

19  Q.    Now, in what context did you evaluate these materials?

20  A.    So, as I said, I was really careful and thoughtful looking

21  for evidence for the presence of aversive racism but also

22  places where it was absent when it could have shown up.

23          And my approach was to think about those five

24  characteristics or hallmarks of aversive racism and to

25  specifically go through, with those five things, evidence for

Leslie W. Zorwick, Ph.D. - Direct

1  and against to being what I was thinking about.

2              Quite a few different colored highlighters to be

3  looking for these different hallmarks for and against going

4  through those over 2,000 pages of case documents.

5  Q.   Did you pay particular attention to any particular

6  documents?

7  A.   I mean, I think that one of the most influential things,

8  certainly, is the feedback that Mr. Yu gets from his

9  supervisors in various practica and externships.  And then also

10  the end-of-semester evaluations from the Clinical Training

11  Committee, but I looked at a lot of things.

12  Q.   All right.  Did you pay any particular attention to the

13  treatment of other students as a comparison but not looking at

14  the information that was provided for you that was under

15  this -- under what the Judge is going to talk to us about?

16              THE COURT:  So our record is clear, you are talking

17  about records of other students without identifying

18  information --

19              MR. COULTER:  Right.

20              THE COURT:  -- concerning externships or internships.

21              MR. COULTER:  That's correct, Your Honor.

22              THE COURT:  All right.

23              THE WITNESS:  So, the one place that I did look at

24  that was in the initial disclosures was information about what

25  happened when Mr. Yu raised a complaint about Dr. Landers

Leslie W. Zorwick, Ph.D. - Direct

 1  violating some of the expected practices that were in the

 2  affiliation agreement between that placement and Idaho State.

 3          And so that investigation involved reaching out to a

 4  variety of other students, who were not Chinese nationals, and

 5  asking about their experience working with Dr. Landers and that

 6  sort of privileging of the experience of other folks who were

 7  not outside of their cultural context in resolving that

 8  concern.

 9          So, that's a place where I looked at sort of how

10  Mr. Yu's needs were being considered in the context of other

11  students in the program.

12  BY MR. COULTER:

13  Q.    Okay.  Did you expect any ambiguity at all?

14  A.    You mean in what I found?

15  Q.    Yes.

16  A.    Yeah.  I mean, I feel like social behavior is generally

17  really complicated.  There's usually a lot of evidence for and

18  against, and I was genuinely surprised, reading through these

19  materials, at how strongly the presence of aversive racism

20  seemed to be signaled based on multiple examples I saw across

21  all five of these hallmarks of aversive racism.

22          I really -- it's hard for me to imagine a situation

23  that could more clearly demonstrate that phenomenon.  And

24  again, that's not what I was expecting to see, so it was pretty

25  striking.

Leslie W. Zorwick, Ph.D. - Direct

1   Q.   So, for the record then, Dr. Zorwick, do you have an

2   opinion whether Mr. Yu was a victim of aversive racism while he

3   was a student in the doctorate clinical -- the doctorate of

4   clinical psychology program at Idaho State University?

5   A.   I do.  The evidence pretty clearly points to the presence

6   of aversive racism, because there are multiple strong examples

7   of each of these hallmarks of what tends to be happening when

8   aversive racism is present.

9   Q.   And the next question would be how positive are you of

10  this being there?

11  A.   I think I am as positive I can be based on the amount of

12  time I have spent thinking about these issues, reading about

13  aversive racism, and my professional expertise.

14  Q.   All right.  And how certain of your -- how certain are you

15  of your conclusion?

16  A.   I am certain.

17  Q.   And what is that opinion?

18  A.   My opinion is that Mr. Yu's race and international status

19  impacted the way he was treated by the faculty in the Idaho

20  State University Clinical Psychology Program.  I believe this

21  happened through a pattern of intentional repeated choices made

22  by those faculty.

23          I believe that some of these decisions deviate from

24  professional norms.  And I believe this because there are

25  strong specific examples of each of these hallmarks of aversive

Vol. 2 - 274

Leslie W. Zorwick, Ph.D. - Direct

1   racism present in this case.

2   Q.   Okay.  Now, Dr. Zorwick, you have testified that aversive

3   racism has five components or characteristics which you have

4   named.

5   A.   Uh-huh.

6   Q.   These -- these have been named as ambiguity in judgment

7   criteria, race neutral explanation, racial microaggression,

8   channeling your interracial interactions and post hoc

9   explanations.  Did I state that correctly?

10  A.   You did.

11  Q.   Now, can you explain ambiguity in judgment criteria as it

12  relates specifically to this case?

13  A.   Sure.  So, I see four, really -- nope.  I want to say

14  three.  Three really strong examples of ambiguity in this case

15  and how they could have impacted Mr. Yu's experience.

16  Q.   Now, do you have Plaintiff's 28 in front of you?

17  A.   I do not.  I don't have anything in front of me.

18         Thank you.  So, the first example I see of ambiguity

19  is the ambiguity surrounding expected language competency,

20  expected English language skills.

21         So, Mr. Yu met the TOEFL requirement.  That's the

22  standardized test to assess English language competency.  He

23  met that expectation.  At the end of his first year, he's asked

24  to join a program that involves English instruction, and he

25  does that.

1            After that, he's told that he needs to continue to
2    immerse himself.  And so that statement is in Plaintiff's
3    Exhibit 28 in Section IV.
4    Q.    Trying to bring up Exhibit 28.
5    A.    Here we go.  No, the final Section VI.  I think I said IV.
6    So, at the end, he's told by the Clinical Training Committee,
7    and this is the second to last sentence, "We encouraged Jun to
8    immerse himself in English-speaking contexts whenever
9    possible."  They say, "i.e., course work," which he was already
10   doing, "clinic work," which he was already doing, "research,"
11   which he was already doing, "opportunities external to the
12   clinical program."  He was already doing.
13           To say you need to immerse yourself when you are
14   living in a place that speaks English, that's about as
15   immersive as you could get.  He's taking classes in English.
16   He's teaching classes in English.  He's doing research in
17   English.  It's unclear to me what this means.  There is a lot
18   of ambiguity that puts the onus on Mr. Yu to magically improve
19   his English language skill without a clear directive of what
20   that expected level of proficiency would look like.
21   Q.    Could you give --
22   A.    So --
23   Q.    You are not done.  I'm sorry.
24   A.    No, no, no, no.  I am.
25   Q.    We need to bring up Exhibit 30, please.  Plaintiff's

Leslie W. Zorwick, Ph.D. - Direct

1    Exhibit 30.  Wait.  Let's do all the ones.  You got them?

2    Okay.

3    A.   Thank you.  So --

4    Q.   Well, let me ask you the question first.

5    A.   Yeah, go ahead.  Sorry.

6    Q.   Okay.  In Exhibit 30, the semi -- 2011 semi evaluation,

7    how does that fit into this ambiguity in judgment criteria?

8    A.   Sure.  So, at the end of this evaluation, on the second

9    page, the third sentence down -- yeah, the third sentence down,

10   it says, "Language barriers have been a continuous issue in

11   obtaining sufficient supervised professional practice.  His

12   expressive speech in English remains halting at times which is

13   a real problem."

14          So, it's unclear what they want him to do about this.

15   They are acting like bringing up the concern counts as giving

16   him remediation.  But clearly, they have a vision of what

17   success looks like, that they are not articulating, other than

18   that he is not doing what they want.  And that means there is a

19   lot of ambiguity in how this assessment is being made.

20          And remember, the more ambiguity, the more likely we

21   tend to be to see evidence of race-based bias or the use of

22   negative race-based stereotypes.

23   Q.   Defendant's Exhibit 529.

24   A.   Thank you.

25   Q.   I will wait until --

1   A.   Oh, yes.  Okay.  So, the second piece of evidence I see

2   about ambiguity has to do with the ambiguity that exists within

3   some of his evaluations and across his evaluations.

4           So, one place where I see evidence of this is in this

5   Defendant's Exhibit 529 in the final evaluation filled out by

6   Dr. Leslie Speer when Mr. Yu is let go of from the Cleveland

7   Clinic.

8           In the supervisor comments, on the second to last

9   page of this evaluation, she says, "Simultaneously, Jun

10  continues to be eager to learn and accepts feedback well."  And

11  she also says, "He's unaware of his own limitations."

12          So, I struggle with the ambiguity of that because, in

13  theory, part of her job is communicating what his limitations

14  are.  That he could be unaware of them, if he is open to

15  feedback, points to me to a total lack of clarity in what she

16  is trying to communicate to him.

17          And that is being put solely on the shoulders of

18  Mr. Yu as opposed to the person whose role it is to teach him

19  what this issue is.

20          A second place or an additional place where I see

21  this ambiguity -- sorry -- within and across evaluations is the

22  glowing letters of recommendation written by Mark Roberts that

23  don't sync up at all with the decision to dismiss Mr. Yu from

24  the program.

25  Q.   Are you looking at Plaintiff's Exhibit Number 44?

Leslie W. Zorwick, Ph.D. - Direct

1   A.   I am.

2   Q.   Okay.

3   A.   So, in Plaintiff's Exhibit 44, Roberts has written this

4   great letter of recommendation for Mr. Yu to apply to an APPIC

5   internship.  He talks about Mr. Yu being a -- and this is in

6   the first paragraph -- being eager to learn evidence-based

7   assessments.  He refers to Mr. Yu as successfully engaging the

8   generalized curriculum.  And he particularly flags his

9   expertise to speak on Mr. Yu's development.

10          One of the things that I want to particularly flag is

11  on the second page of this evaluation, on the first full

12  paragraph.  He flags that Mr. Yu has been stipended to teach

13  courses and that teaching undergraduate courses has been good

14  for his development but has maybe slowed down some of his

15  supervised contact.

16          As someone who spends their life teaching to

17  students, effective communication is one of the most central

18  features of this job.  Developing close working relationships

19  with students is one of the most central roles of this job.

20  And that they kept hiring Mr. Yu for those kinds of roles

21  communicates something pretty powerful to me.

22          At the very end of this evaluation, in the last

23  paragraph, after talking about Mr. Yu's experience teaching and

24  conducting research, Dr. Roberts says, "I'm very pleased with

25  his development.  Last summer he functioned virtually

Leslie W. Zorwick, Ph.D. - Direct

1    independently performing a clinical trial in his native land."

2              He then says, a couple sentences later, "It is a most

3    impressive accomplishment for a pre-intern in a clinical

4    psychology program, and he consistently displayed those

5    characteristics that endear him to supervisors, i.e.,

6    responsible, personable, timely, collegial."

7              That kind of glowing review about Mr. Yu as a

8    professional is talking about social engagement as well as

9    professional activity.  And the ambiguity between these glowing

10   letters and the decision to dismiss, that suggests there is a

11   lot of ambiguity in how this decision was made.

12             I also see evidence of that in looking at

13   Dr. Roberts's recommendation for Mr. Yu to get dissertation

14   funding.

15             MR. COULTER:  Hold on for a second.

16             Okay.  Your Honor, we would like to move for the

17   admission of Plaintiff's Exhibit Number 44.  Stipulated to but

18   so far it has not been admitted unless I have misunderstood the

19   Court.  If it's stipulated to, you are deeming it as having

20   been admitted?

21             THE COURT:  Well, if it's not admitted yet.  I have

22   to say it's admitted.  So, is 44 stipulated to, Mr. Kelly?

23             MR. KELLY:  Yes, Your Honor.

24             THE COURT:  It is?  All right.  44 is in.

25         (Exhibit 44 admitted.)

Vol. 2 - 280
Leslie W. Zorwick, Ph.D. - Direct

1        MR. COULTER:  Okay.

2        THE COURT:  If it's already been admitted --

3        MR. COULTER:  Then it's admitted.

4        THE COURT:  -- then you don't have to make mention of

5   that.

6   BY MR. COULTER:

7   Q.   Okay.  Do you have Plaintiff's Exhibit Number 45?

8   A.   I do.

9        MR. COULTER:  Okay.  Plaintiff's Exhibit 45 has also

10  been stipulated to, Your Honor.  We would move for its

11  admission.

12       THE COURT:  But again, is this one that you have

13  already stipulated to?

14       MR. COULTER:  Yes.

15       THE COURT:  All right.  So, we all have that list,

16  Mr. Coulter.  And if it's on that list, you don't have to --

17  you can just go right to using the exhibit.  Okay?

18       I know you are trying to be careful about it, but

19  only if it's one that has not yet been admitted, and if you've

20  discussed it with Mr. Kelly, and you now have a stipulation

21  that it's been admitted, then I need to deal with that on the

22  record.  But if I've already said that the ones that had

23  previously been stipulated to are admitted, that -- that's good

24  enough.

25       MR. COULTER:  Okay.  Only if it's a new exhibit --

Leslie W. Zorwick, Ph.D. - Direct

1          THE COURT:  Yes.

2          MR. COULTER:  -- or whatever, then we stipulated to

3    it.  Okay.  Got it, Your Honor.

4          THE COURT:  Okay.

5          MR. COULTER:  If it's been stipulated to already, we

6    just move for admission.

7          THE COURT:  Yes.

8    BY MR. COULTER:

9    Q.   All right.  Sorry to interrupt you, but I wanted to make

10   sure I get all the procedures straight.

11   A.   Okay.

12   Q.   On Exhibit Number 45, can you explain how that is impacted

13   by ambiguity in regards to aversive racism?

14   A.   Sure.  And this is another place where I'm talking about

15   ambiguity across Mr. Yu's different evaluations.  So, at the

16   end here, Dr. Roberts says, "Should Mr. Yu obtain an academic

17   position in China, following the successful completion of his

18   doctoral degree in clinical psychology, his personal connection

19   to Idaho State will be of immense value to Idaho State for many

20   years to come."  This is an indication of an expectation of a

21   future relationship.  It's really inconsistent with how they

22   are going to talk about Mr. Yu later.

23          Also, this says, "Finally, were Mr. Yu successful in

24   accommodating the current treatment measurements and treatment

25   procedures to Chinese families, the potential clinical service

Leslie W. Zorwick, Ph.D. - Direct

1   to high-risk, defiant, and aggressive Chinese children is

2   staggering."

3          The way that they are talking about Mr. Yu, the way

4   that Dr. Roberts is talking about Mr. Yu, he is so glowingly

5   positive; points to the contributions he can make; points to

6   his abilities; points to his success in a variety of domains.

7   And this is consistent -- inconsistent with some of the other

8   feedback that he's getting, which creates a lot of ambiguity

9   surrounding how Mr. Yu thinks he's doing based on the feedback

10  he's getting from his faculty.

11  Q.   All right.  I would like you to take Exhibit Number 37.

12  A.   Uh-huh.

13  Q.   It has been admitted into evidence.  And I want you to --

14  you know, when you are ready to talk about it, just go ahead

15  and talk about it.  I know you are ready, so let's just go.

16  A.   Okay.  So, one of the other things that is a point of

17  concern for me, the third thing, I would say, is a point of

18  concern for me surrounding this idea of ambiguity is the

19  ambiguity in what people supervising Mr. Yu think are

20  acceptable tasks for interns, for externs.

21         And so one of the ways that we see this is, you know,

22  with evaluations like what Dr. Speer says on here that Mr. Yu

23  is just not as far along as expected.  There's a lot of

24  ambiguity there surrounding what is expected?  How is she

25  assessing that?  Based on what activities?

Leslie W. Zorwick, Ph.D. - Direct

1              But also, remember, Dr. Roberts says, "You're doing a

2      great job," in 2011.  In this decision letter, in this first

3      paragraph in argument one, the third sentence of this response

4      is that the reasons behind your dismissal date back to

5      unsatisfactory progress in professional development that was

6      first formally documented during fall 2011.

7              Yes, there were concern that were raised in fall

8      2011.  Also, Dr. Roberts said the potential for Mr. Yu to do

9      good was staggering.  He talks about how collegial and easy to

10     work with Mr. Yu is.

11             And that Mr. Yu is supposed to take away from all of

12     this positive feedback the message that, yes, the faculty have

13     had concerns since 2011.  There is just too much ambiguity in

14     that situation.  It invites the use of race-based stereotypes.

15     Q.   Was there any ambiguity in regards to the tasks that were

16     seen as appropriate for students?

17     A.   I mean, I think so, because it seems like in a lot of the

18     instruction that Mr. Yu was getting, in a lot of things that

19     supervisors are writing, they say, like, "Well, we tried this,

20     but then we had to do this."  Or it seems a little bit unclear

21     what those settings exactly will be going into them.

22             And that can also invite people to be making

23     decisions based on race.  Just the inherent ambiguity and

24     subjectivity there can be problematic, which is why we have to

25     look at outcomes.  We have to look at behaviors.

Vol. 2 - 284

Leslie W. Zorwick, Ph.D. - Direct

1   Q.   Was there any ambiguity in the work with Dr. Cheri Atkins

2   that you observed?

3   A.   So, one of the concerns I think that we might have is if

4   Mr. Yu has multiple placements with the same faculty, and this

5   faculty are potentially inviting him to do different things at

6   different times, then, again, it just suggests that the

7   supervisors have a lot of flexibility in what they do.  They

8   have a lot of flexibility in what they document.  They have a

9   lot of flexibility.

10             And I can see how that is good in some instances, but

11  also it sets the stage for race-based stereotypes to be used,

12  which is why more than what people express as their intentions,

13  we have to look at the impact on folks of decisions that are

14  made.

15  Q.   Well, along those lines, Dr. Zorwick, was there any

16  ambiguity, as far you can see, that was seen that for

17  appropriate placement of students completing the practicums and

18  internships and externships?

19  A.   I don't know how to answer this based on the conversation

20  from before about documents about other students in the

21  program.

22             THE COURT:  Well, if your opinion is -- answer to

23  this question would necessarily call into play the documents

24  we've talked about, then you can't answer it.

25             THE WITNESS:  What I can say is that there are -- I

Leslie W. Zorwick, Ph.D. - Direct

1  feel like there are times when there is, for example, some

2  ambiguity in the way Landers treated his supervisees.  And that

3  the Idaho State faculty erred on the side of the experience of

4  American students relative to Mr. Yu, because I think it has

5  been agreed upon that Mr. Yu is the only Chinese international

6  student at the program during this time.

7           And so there are some places where the faculty are

8  looking to the experience of other students preferentially.

9           MR. KELLY:  Your Honor, I am going to strike -- I

10  mean, you just directed her not to answer, and she did.

11           THE COURT:  Well, I --

12           THE WITNESS:  That was in my original report.  I'm

13  sorry.  I'm sorry.

14           THE COURT:  When an objection is made, you have got

15  to wait for me to just respond to it.

16           THE WITNESS:  Sorry about that.

17           THE COURT:  Mr. Coulter, do you have a response to

18  that?

19           MR. COULTER:  It's in her report, Your Honor.

20           THE COURT:  Well, this -- I understood her to be

21  fencing her response to what was not included in the documents

22  that I have said are off limits for now.

23           So, I am going to overrule the objection.  Next

24  question, please.

25

Leslie W. Zorwick, Ph.D. - Direct

1    BY MR. COULTER:

2    Q.   Now, can you explain race-neutral explanations as it

3    relates to this particular case, which is one of the hallmarks

4    of aversive racism?

5    A.   Sure.  I see two examples of this in this case.  So,

6    remember, race-neutral explanations is acknowledging

7    differences and then really erring on the side of only using

8    race-neutral explanations after decisions are made.

9            So, early in Mr. Yu's time in the program, there is a

10   lot of commentary in his end-of-semester evaluations about

11   English language skill and acknowledging some of his unique

12   needs and experiences as a Chinese international student.

13           In contrast, when the decision is made to dismiss

14   him, the Idaho State faculty talk a lot about how they treat

15   everybody the same.  They have always given Mr. Yu the same

16   opportunities and experiences as other folks.  And it seems

17   unlikely that they were recommending, for example, regular

18   English instruction to other students.

19           So, the fact that they go from acknowledging that

20   race matters to really trying to communicate they never thought

21   about race is kind of that shift that we look for.

22           The second place that I see this is with the APPIC

23   internship process.  So, in suggesting to Mr. Yu that he has

24   three options.  One is to reapply the next year, one is to

25   create a nonstandard internship, and one is to do an internship

Leslie W. Zorwick, Ph.D. - Direct

1  in China, they are clearly structuring those options around

2  Mr. Yu's unique needs.

3  Later on, after the decision is made to dismiss him,

4  the Idaho State faculty talk about that process as, "We do this

5  the same for every student who puts together a nonstandard

6  internship," which again, it seems unlikely they are suggesting

7  any other students in the program do an internship in China.

8  That shift away from acknowledging race as a

9  meaningful part of education and Mr. Yu's experience to race

10  neutrality is one of those hallmarks that tends to be

11  indicative it trying basically to come up with a way to explain

12  race had nothing to do with our decisions and to even create

13  more ambiguity about why we did what we did.

14  Q.   Do you have Exhibit 40 in front of you?  You may not,

15  but --

16  A.   I do not.  I do not.

17  Thank you.  So, all right.  This is the email that

18  Mr. Yu sent to try to identify sites.  So, there are several

19  different things that I see.  I think four different examples I

20  see of the use of microagressions in this case.

21  So, a first thing that really concerns me is the way

22  that the Idaho State faculty framed Mr. Yu's multilingualism as

23  primarily a liability.  So, when they talk about him

24  identifying appropriate internship sites, they say, "You need

25  to find sites where your Chinese language skills are an asset

1   not a liability."

2           It kind of implies they think it is going to a

3   liability or his linguistic skill is going to be a liability in

4   most spaces.  And so that's a potentially problematic thing,

5   but Mr. Yu also explicitly does what is asked of him in trying

6   to identify these sites.

7           So, one type of racial microaggression is the

8   liability, short of framing of his multilingualism.  The second

9   is maybe less awareness of the structural barriers that, again,

10  Asian international students face.  And so the fact that there

11  are going to be less placements for him, the fact that he has

12  to send emails like this, the fact that they have constrained

13  his options and not offered him extra help, which other experts

14  have testified about as well, that they acknowledge he might

15  have a challenging time.  Instead of playing a role in helping

16  him address those problems, they sort of act like his seeking

17  out internships is the same experience that all of the other

18  students in the program are having.  Right?

19          Which can functionally invalidate his experience but

20  also suggests they are not really as aware of these structural

21  challenges that Mr. Yu is going to face.

22          A third example I think that is pretty strong of

23  racial microaggressions is what Jocelyn Eikenberg testified to,

24  that Shannon Lynch approached her at a yoga class and said, "Do

25  you speak English at home?  Jun's English is terrible."

Leslie W. Zorwick, Ph.D. - Direct

1              That's about as strong a signal as you could get, and

2    that it came from someone who supervised Mr. Yu's work, that

3    acted in a supervisory educational capacity and was the chair

4    of his department sends a pretty strong signal that he is not

5    welcome.

6              The final example of racial microaggression comes

7    from Dr. Lynch's final evaluation of Mr. Yu.

8    Q.   Would that be -- Okay.  Doctor, please go ahead and

9    continue with your explanation.

10   A.   So, the evaluation for practicum that Dr. Shannon Lynch

11   filled out, one of her comments refers to Mr. Yu as being

12   disengaged when he's looking at course materials during a

13   practicum discussion.

14             I'm concerned that Dr. Lynch seems to have one model

15   of what successful class participation looks like, and it

16   doesn't acknowledge the fact that sometimes folks process and

17   use information differently.

18             So, at the end of this evaluation, she uses the

19   language that Mr. Yu seemed disengaged.  That -- or unengaged.

20   Sorry.  That he has been reading materials during group

21   practicum discussions on multiple occasions.

22             So, the idea that someone's participation is lesser

23   than if it involves the use of written materials, as opposed to

24   exclusively oral engagement, I am concerned that that is

25   pathologizing a difference.  That an assumption that what we

Leslie W. Zorwick, Ph.D. - Direct

1  might perceive as a white-American-style of class engagement,

2  if that's not present, it's necessarily sort of being described

3  as lesser than.  And that's another signal about who is

4  expected to belong and to succeed in that academic context.

5  Q.   All right.  Doctor, can you explain racial -- racial

6  microaggression as it relates to this particular -- this

7  particular case?

8  A.   Yes.  So, I mean, I think these are the four examples; of

9  not being aware of the structural barriers that Mr. Yu faced;

10  of framing of his multilingualism as a liability; of saying

11  things like his English is terrible, apropos of nothing, in an

12  informal context; and pathologizing the way that he engages in

13  class by assuming that looking at text reflects disengagement.

14  Q.   Okay.  Can you -- I think you listed three ways that

15  microaggressions could be affected in this particular case.  Is

16  there a -- is there a fourth way in regards to microaggression

17  being manifested in this case regarding international student's

18  access?

19  A.   Sorry.  So, I thought I had mentioned four.

20  Q.   Okay.

21  A.   Yeah, I'm sorry.

22  Q.   I'm sorry about that.

23       All right.  Can you explain challenging interracial

24  interaction as it relates to this case?

25  A.   Sure.  I think that there are four examples of this that

Leslie W. Zorwick, Ph.D. - Direct

1    are pretty strong.  The first is what happens when Mr. Yu is

2    dismissed from the internship with Landers.

3          So, in response to that dismissal, Mr. Yu raises a

4    concern with the department that Dr. Landers has not followed

5    the agreed-upon expectations of what happens when a student is

6    at risk of dismissal from that externship.  He doesn't do an

7    evaluation until afterwards and there is no opportunity for

8    remediation.

9          And so Dr. Roberts collects additional information

10   from other students who have worked with Dr. Landers, and none

11   of those other students are Chinese international students.

12   When -- when Idaho State privileges the experience of those

13   other students -- right? when Mr. Yu is arguing, like, a rule

14   violation happened, but the response is, "Well, but other

15   students say he's doing a good job as a supervisor," that

16   really communicates a disconnect about the experience of

17   Mr. Yu, the extent to which they are going to be valued by his

18   faculty at Idaho State and sets the stage for Mr. Yu to feel

19   like he's being treated differently than other students, whose

20   experiences are absolutely being privileged over his.

21   Q.   I want to interrupt you.  I just want to make sure we have

22   it straight for the record.

23   A.   Uh-huh.

24   Q.   Are you saying that Mr. Yu, without advanced notice, that

25   ISU report focused on the experience of white native English

1  speakers in deciding Dr. Landers was an effective supervisor?

2  A.   So, my impression is that we are privileging -- or that

3  the experiences of native English speakers are being privileged

4  in this situation, because I know that Mr. Yu is the only

5  international student in the program from China.

6         There is not information about the race of these

7  other students in this document.  But there is no question that

8  if Mr. Yu is the only international student, these are

9  similarly situated students in the program whose experience is

10 being privileged over Mr. Yu's.

11         MR. COULTER:  Okay.  Your Honor --

12         MS. SUTHERLAND:  It's not admitted.

13         MR. COULTER:  It was stipulated to, Your Honor.  I

14 would ask for it to be admitted at this particular point in

15 time, Exhibit Number 50.

16         THE COURT:  Mr. Kelly, is it stipulated?  Is it in?

17         MR. KELLY:  That's been admitted.

18         THE COURT:  All right.  Okay.  We got some

19 disconnect.  It's already been admitted.

20         MS. SUTHERLAND:  I apologize.

21         MR. COULTER:  Has it been admitted?

22         THE COURT:  50 is in.

23 BY MR. COULTER:

24 Q.   Okay.  Okay.

25 A.   Do you want me to -- I think I had four examples of

 1  challenging interracial interactions.

 2          MR. KELLY:  Your Honor, can we wait for a question,

 3  please?

 4          THE WITNESS:  Sorry.

 5  BY MR. COULTER:

 6  Q.   I'm just getting ready to go to the second one.

 7  A.   I'm sorry.

 8  Q.   Plaintiff's Exhibit 48, do we have that?  Is that new or

 9  what?

10          MS. SUTHERLAND:  It's admitted.

11          MR. COULTER:  It's admitted.  Please place 48 up on

12  the --

13  Q.   All right.  Doctor Lynch, can you talk about that second

14  example now?

15  A.   Sure.  In this evaluation from Dr. Lynch --

16  Q.   Wait a minute.  I think I called you Dr. Lynch.

17  A.   You did.

18  Q.   Oh, my goodness.  Dr. Zorwick.

19  A.   Uh-huh.  So, yeah, this is the final evaluation from

20  Dr. Lynch that I referred to a little while ago that refers to

21  Mr. Yu as unengaged, because he's looking at course materials.

22          The idea that the way that he is engaging in class is

23  perceived to be lesser is exactly the kind of thing that can

24  get communicated through subtle behaviors that communicate

25  something very different to a racial minority in an interracial

Leslie W. Zorwick, Ph.D. - Direct

1  interaction.

2          This -- this kind of comment sets the stage for the

3  challenging kind of interracial interactions that we expect to

4  see when aversive racism is present.

5  Q.   Okay.  Now, do we have 529?  Defendant's Exhibit 529.  And

6  it's been admitted; right?

7          MS. SUTHERLAND:  Uh-huh.

8  BY MR. COULTER:

9  Q.   Now, is there a third example, Doctor?

10 A.   Sure.  This evaluation from Leslie Speer that I spoke

11 about earlier, that the ambiguity and inconsistency in this

12 evaluation is concerning to me.  But I'm also concerned that

13 Dr. Speer reduced her supervision time with Mr. Yu.  That, you

14 know, she acknowledges that while he accepts feedback really

15 well, he doesn't know what his limitations are.

16         I am concerned that something is happening in that

17 interaction that is not getting Dr. Speer to communicate

18 clearly to Mr. Yu what the issues are so he has any chance to

19 be aware of them and work on them.  Because again, this

20 ambiguity, this inconsistency, this lack of clarity is going to

21 set the stage for working relationships that are unnecessarily

22 challenging across lines of racial difference.

23 Q.   Okay.  Exhibit 51.  Thank you.

24         Doctor, you are looking at now Plaintiff's Exhibit

25 Number 51, which is Mr. Yu's practicum evaluation, spring of

1   2011, Dr. Seikel, I think.  Yes.

2   A.    Uh-huh.

3   Q.    Okay.  How does this -- I take it this may be your fourth

4   example.  Could you please explain to the Court how this would

5   be the fourth example in what you are describing?

6   A.    Sure.  So, in some of the comments at the end of this

7   evaluation, one of the things that we see is in his first few

8   years in the Idaho State program, Mr. Yu is regularly described

9   as non-defensive.  Is great to work with.  The first line of

10  this evaluation is that he's diligent, committed, and

11  hardworking.  You know, he -- he's doing a good job.  He's open

12  to getting feedback.

13       By the time the decision is made to dismiss him, the

14  Idaho State faculty are talking about a totally different

15  student.  They are talking about him as not hardworking, not

16  willing to learn, not willing to accept feedback.  And I'm

17  really concerned that the Idaho State faculty don't seem to see

18  any role they might have played in that transition.

19       So, for example, when they privileged the experience

20  of other students over the experience of Mr. Yu in working with

21  Dr. Landers, they are communicating something about how they

22  feel about him.  When they describe the way he engages in class

23  as unengaged, they are communicating something.

24       And so when we have individual practicum folks saying

25  positive things, saying he's diligent, saying he's great,

Leslie W. Zorwick, Ph.D. - Direct

1    saying he's doing good work professionally, with conceptual --
2    conceptualizations that are accurate and sophisticated, that's
3    great.  And it's great that they even acknowledge that part of
4    the problem might be prejudice on the side of clients.
5           What I am really concerned with is at the end, when
6    the decision is made to dismiss him, they start talking about a
7    very different student than they were talking about at the
8    time.  And this points to how ambiguity and racial
9    microaggression can all work together to create working
10   relationships that get more challenging over time, as these
11   signals are being sent that students don't belong, their
12   contributions aren't valued, while the people making those
13   evaluations can claim to themselves that race had nothing to do
14   with it.
15   Q.   Okay.  Now, can you explain post hoc explanations as it
16   relates to this case, because I believe that's the last one.
17   A.   Indeed.
18   Q.   All right.  Let me see what we have here.  Go ahead.
19   A.   So, I would say the strongest evidence I see for the
20   presence of aversive racism is the use of post hoc
21   explanations.  These are striking to me.
22          So, there are seven specific things that I see in
23   terms of the use of post hoc justifications that are very
24   troubling.  And the first is this sentence I have talked about,
25   the third sentence under argument one.

1          This is when Dr. Lynch, as chair of the department,

2   says, "The reasons behind your dismissal date back to

3   unsatisfactory progress in professional development that was

4   first formally documented during fall semester 2011."

5          This is clearly framing the situation that there have

6   been problems since 2011 that have led to this dismissal.  And

7   that is not consistent with the letters of recommendation that

8   Mr. Yu got in 2011.  That is not consistent with the decision

9   to say he was ready to apply for an APPIC internship.

10          It was not consistent with the fact that they let him

11  go virtually unsupervised to conduct therapy with patients in

12  China.  And the fact that after they've made the decision to

13  dismiss him, they construe and frame what happened in 2011

14  differently is an example of post hoc justification.

15  Q.   44.

16          THE COURT:  I think we are going to take our recess

17  at this time.  We'll go till 25 to 3:00.  A little bit less

18  than 20 minutes because of our breaks.

19          All right.  2:35.

20      (Recess 2:15 p.m.  Resumed 2:34 p.m.)

21          THE COURT:  Thank you.  Please be seated.

22          Counsel, when Mr. Coulter has finished with his

23  direct, then I'm going to hear from both of you on this issue

24  of the externship/internship documents.

25          Go ahead, Mr. Coulter.

Leslie W. Zorwick, Ph.D. - Direct

1   BY MR. COULTER:

2   Q.   I believe we were on the second example that you had,

3   Doctor, and you were in midstream.  So, could you go ahead and

4   talk about that?

5   A.   Sure.  So, the second example is after the decision is

6   made to dismiss Mr. Yu, Dr. Roberts also expresses that he had

7   concerns starting earlier, 2012, 2013.  And again, this is

8   really inconsistent with the decision that Mr. Yu is ready to

9   go through the APPIC process, with this letter of

10  recommendation, with the decision to let him practice virtually

11  independently with Chinese families for his dissertation.

12  Q.   Okay.  Was there a third example of a post hoc

13  justification?

14  A.   Yes.  So, when making the decision to dismiss Mr. Yu, they

15  based this on his dismissal from his internship at the

16  Cleveland Clinic.  And at the time, he is, yes, working for

17  Leslie Speer, but he is also working for Cheryl Chase.  So, he

18  has one letter of recommendation that is very -- or one

19  evaluation that is negative and one evaluation that is

20  positive.

21          After they make the decision to dismiss him, they

22  only focus on the negative evaluation he got.  They state that

23  he hadn't actually done any work with clients with Dr. Chase,

24  but Dr. Chase already testified today that he had done direct

25  work with clients.  Not independently, but she had seen him

Vol. 2 - 299
Leslie W. Zorwick, Ph.D. - Direct

1    working with clients.  And in that capacity, she thought he was
2    right where he was supposed to be.
3              So, taking evidence both pro and con and only
4    focusing on one side of it after we've made a decision, that's
5    a post hoc explanation.
6    Q.   And was there a fourth time?
7    A.   Yes.  So, I think --
8    Q.   We can go ahead and put up the exhibit if you would like.
9    A.   Yeah, that would be great.
10   Q.   That would be -- they are all admitted, Your Honor.  All
11   right.
12             Could you go ahead, Doctor, and explain the fourth
13   time?
14   A.   Yeah.  So, the fourth post hoc explanation is the one that
15   I am most troubled by.  So, I think I have 30.  I think I have
16   this in front of me somewhere, but I want to make sure I'm
17   referencing the right page.
18             So, this is on the second page.
19             THE COURT:  Which exhibit are you referencing?
20             THE WITNESS:  Sorry.  The one that is up, 37.
21             MR. COULTER:  37.
22             THE COURT:  Okay.  I thought she said 30.  All right.
23             THE WITNESS:  So, in the response to argument three,
24   this is the one where Mr. Yu has requested to do an internship
25   in China.  And the last sentence of this paragraph is "The

1    graduate faculty is convinced that a fourth chance, an

2    internship in China, is unwarranted and might put Chinese

3    patients at risk of harm."

4            This post hoc explanation is not at all tethered to

5    Mr. Yu's experiences.  They have not mentioned risk of harm to

6    patients up to this point until they have made the decision to

7    dismiss him.  They have never expressed concern about harm to

8    Chinese patients.

9            And the only evidence that exists of Mr. Yu's

10   effectiveness working with Chinese patients is his

11   dissertation, which shows that those families were unbelievably

12   pleased with his work.  It really cannot be overstated how

13   extraordinarily rare it is that of 19 families that began

14   working with him, all 19 of them completed all assessments and

15   all sessions.  It is just staggeringly rare to have a

16   100 percent completion rate.

17           And that those folks give Mr. Yu ratings of 5.4 or

18   5.5 out of 6 suggest that they are incredibly happy with what

19   he is doing as a practitioner for their families.  So, when we

20   have one piece of evidence that actually speaks to the

21   population of the concern, and they ignore it, it seems pretty

22   clear that this is a post hoc explanation for why they have

23   made the decision to dismiss Mr. Yu.

24   BY MR. COULTER:

25   Q.   Okay.  And do you have a fifth example in regards to this

Leslie W. Zorwick, Ph.D. - Direct

1  post hoc decision?

2  A.    I do.  One of the other things that comes up in the

3  decision to dismiss him, in this letter we were just

4  discussing, is that these concerns started when he got

5  dismissed from working with Dr. Landers for his externship.

6  And so I am very concerned that at the time this dismissal from

7  an externship was not flagged --

8          THE COURT:  Let me interrupt again, because the --

9  because now I am confused.  We are putting up evaluations on

10  the screen, and you're talking about a letter we just

11  discussed.

12          THE WITNESS:  Yes.

13          THE COURT:  So, what -- what exhibit are you

14  referencing?

15          MR. COULTER:  We are going to put up 38, Your Honor.

16  Plaintiff's Exhibit Number 38.

17          THE COURT:  All right.  Is that what you are talking

18  about?

19          THE WITNESS:  So, this is the decision to dismiss him

20  that's written by Dr. Landers.

21          THE COURT:  Let's start over.  Okay?

22          MR. COULTER:  Okay.

23          THE COURT:  Thank you.

24  BY MR. COULTER:

25  Q.    Let's go down.  Give me the -- give me -- put up 38.

Leslie W. Zorwick, Ph.D. - Direct

1  Okay.  No, no.  I just want to see 38 without the highlight.

2          All right.  Doctor, is this the letter -- Exhibit 38,

3  is that what you are going to be speaking to?

4  A.   So, this is the letter that Landers sends to dismiss him.

5  What I would like to see again is the evaluation Landers filled

6  out and also the letter to dismiss from the program.

7          So, this evaluation of Landers, after he makes the

8  decision to dismiss Mr. Yu --

9          THE COURT:  You are now talking about Exhibit 48.

10          THE WITNESS:  Uh-huh.  Yes.

11          THE COURT:  Okay.  Thank you.  Go ahead.

12          THE WITNESS:  So, in the comments at the end of this

13  evaluation -- which, remember, the Idaho State faculty is

14  going -- this is from Dr. Lynch.  Yes?  Not Landers?

15  BY MR. COULTER:

16  Q.   John Landers.

17  A.   Okay.  So, that's 46.  Okay.  So, Landers says at the

18  time, even after he has dismissed Mr. Yu, "Given his desire to

19  return to China and specialize in parent/child training, he is

20  probably right where he needs to be."

21          So even though Mr. -- or Dr. Landers has made the

22  decision to dismiss Mr. Yu, he still acknowledges that even in

23  the face of that decision, Mr. Yu is well on track to finish

24  his degree and do the work that he wants to do with Chinese

25  patients.

1          Now, in the letter that upholds Mr. Yu's dismissal

2     from the program, they point to being dismissed from this

3     externship as a reason why he should be dismissed from the

4     program, but they didn't see it that way at the time.

5          Even Dr. Landers, who dismissed him, didn't see that

6     as being worthy of program dismissal at the time.  And so the

7     fact that they look back to that externship as a signal for

8     failure, that it wasn't at the time, is a post hoc explanation.

9     Q.   Did you have another example in regards to post hoc

10    explanation?

11    A.   Sure.  The sixth example is that Idaho State faculty

12    misrepresent Mr. Yu's GRE scores, but only after they've made

13    the decision to dismiss him from the program.  So, in this

14    letter of response, in part of the materials that are shared,

15    Dr. Roberts shares information about --

16              THE COURT:  We are now talking about Exhibit 41?

17              THE WITNESS:  Yes.

18              THE COURT:  All right.  This -- this is important,

19    because in the cold record, the only way that I'm able to tie

20    it to a document is if it's referenced by exhibit number.  So,

21    I need both you and Mr. Coulter to pay attention to that so I'm

22    not constantly having to do that.  All right?

23              THE WITNESS:  Okay.

24              THE COURT:  Thank you.

25              THE WITNESS:  So, in one of the other pages of

1    Exhibit 41, there is a reference made to Mr. Yu's GRE score.

2    BY MR. COULTER:

3    Q.   We will wait to find it.  Do you see it?

4    A.   Yeah, I do.  It was on the previous page.

5    Q.   Page -- ISU document what?  196?

6    A.   I think it's 197.

7    Q.   Okay.  That would be the next one.

8    A.   Yeah.  This first full paragraph.  So, in this letter,

9    Dr. Roberts writes that their concerns about Mr. Yu at

10   admission were his poor verbal GRE score, which is a 410 in the

11   34th percentile.

12           So, what's really common practice for people applying

13   to graduate programs is to take the GRE multiple times.  And

14   it's also common practice for schools to consider the highest

15   score on each section, to combine those in a way that is

16   beneficial to the student, because many students improve upon

17   retesting and studying.

18           What is happening here, what's being represented is

19   not the highest version of Mr. Yu's GRE score.  And that thing

20   where we misremember folks as being worse than they were is a

21   pattern that can be indicative of aversive racism, particularly

22   in the case of Asian job candidates or people that we are

23   considering and making evaluations about.

24           So, that jumped out at me as not being what matched

25   his actual GRE standardized test score.

1  Q.   All right.  We are going to put Exhibit Number 36 next.

2              Okay.  Doctor, do you have a seventh example of where

3  this post hoc generalization affects the aversive racism?

4  A.   I do.  I am really concerned about the fact that after

5  writing a doctoral dissertation, he's offered a master's

6  degree.  Necessarily, master's level research is not the same

7  as doctoral level research.  And when the Idaho State faculty

8  looked at what his plan was for his dissertation, they agreed

9  it was doctoral worthy research.

10             To then, after the fact, decide that what was a

11  doctoral dissertation, that you have described as great

12  research, in letters of recommendation, now only merits a

13  master's degree, is absolutely a post hoc justification,

14  minimizing the quality of what he did before in a way that is

15  consistent with the current decision to dismiss him.

16  Q.   Thank you.  Now, Doctor, from the standpoint of aversive

17  racism, what is your overall opinion of how Mr. Yu was treated

18  by Idaho State University?

19  A.   I believe that the evidence clearly points to the presence

20  of aversive racism.  I believe that because there are multiple

21  concrete examples of all of the hallmarks of aversive racism

22  being present.

23             I believe that this happened through active and

24  intentional choices made by the Idaho State faculty, and I

25  believe that some of these choices deviate from accepted

1   academic and professional behavior.

2            They chose to give him ambiguous feedback.  They

3   chose to weight negative information more heavily than positive

4   information.  They also chose to give him great letters of

5   recommendation, and they chose to have him teach multiple

6   times.  They chose not to warn him that he was on probation or

7   at risk of dismissal.

8            And now what they are doing is choosing to act like

9   he never belonged there after they made the decision to dismiss

10  him.  They are reframing his accomplishments, and they are

11  minimizing his academic and professional successes.  And they

12  are doing that after they made the decision to dismiss him.

13           So, what I think is, with all of this evidence, with

14  all of these examples of the hallmarks of aversive racism being

15  present in this case, I think that that means when the Idaho

16  State faculty communicate that race had nothing to do with

17  these decisions, that aversive racism tells us that's not

18  credible.  Because we should look at the choices people are

19  making in the treatment of students and not how they describe

20  their motives and intentions after the fact.

21  Q.   Do you have an opinion of whether or not this was

22  intentional discrimination?

23  A.   Aversive racism says what we do, the choices that we make

24  are our intensions.  And so there are the things that I do that

25  are based actively in choices that I am making, and then

Vol. 2 - 307
Leslie W. Zorwick, Ph.D. - Direct

1   there's how I describe that to you.  And how I describe what I
2   am doing may not be the same as what I actually did.
3          So, we should give weight to the choices people make
4   about students and how those students are treated independent
5   of how people describe their motives after the fact.
6          So, I believe it was intentional.  I believe it
7   happened through active and repeated choices.
8   Q.   All right.  So, just to be clear, that in this example of
9   aversive racism, regarding Idaho State University, it is your
10  professional opinion that the discrimination was intentional?
11  A.   That's correct.
12         MR. COULTER:  Your witness.
13         THE COURT:  Mr. Kelly, your cross-examination.  Wait.
14  I told you I wanted to hear from you on this other issue of the
15  documents.
16         So, Mr. Coulter I will hear further argument you may
17  have about your questioning on the documents relating to
18  externships or internships of other students.
19         MR. COULTER:  Okay.  Your Honor, first of all, in her
20  report, Ms. Zorwick -- or Dr. Zorwick has stated that similarly
21  situated people were treated differently than Mr. Yu.  She said
22  that on the stand and informed you of that.  They knew about
23  that.
24         When we got the -- the records, we provided them to
25  Dr. Zorwick, because she's the one who is going to be

Leslie W. Zorwick, Ph.D. - Direct

1 testifying about that.  There is no doubt that they -- they --

2 that they could derive that from the report.

3          There was no need to have an additional supplement

4 report when it was already in the first report.  I am going to

5 be talking about this --

6          THE COURT:  The subject of differential treatment was

7 in the first report.

8          MR. COULTER:  Yes, Your Honor.

9          THE COURT:  But not any specific reference to any

10 opinion drawn from these records that we are talking about or

11 obviously a reference that she had reviewed them, because you

12 didn't have them in hand at that time.

13          MR. COULTER:  Yes, Your Honor.

14          THE COURT:  Correct?

15          MR. COULTER:  But it wouldn't change her opinion in

16 regards to that similarly situated people were, in fact,

17 affected by that.  So, all we did was we -- we got the reports

18 that were specifically -- we specifically asked for the reports

19 for a specific reason.  We had -- we had an expert who

20 specifically stated that there was no reason to say anything

21 else or give them anything else.

22          THE COURT:  So, have you elicited all the opinions

23 from her that you want to elicit then on that subject?

24          MR. COULTER:  Your Honor, for every -- I mean, for

25 every single bit of information, the bit of information that we

Leslie W. Zorwick, Ph.D. - Direct

1    are dealing with is aversive racism.  And we are saying that

2    similarly situated people were treated differently.  She's

3    already said that in her report.

4            THE COURT:  Mr. Coulter, it was a fairly

5    straightforward question.  Because what you just said to me

6    implied that she -- she wouldn't say anything different than

7    what -- what she said in her report and what she said on the

8    stand here today.

9            So, what I'm getting to is, because earlier on, when

10   the issue arose, she started to talk about these other

11   documents.  And that's -- that's what led to the objection.

12           MR. COULTER:  Yes, Your Honor.  And what I'm saying

13   is that -- what I'm saying is that, yes, she's going to talk

14   about something based on the records that she received on a

15   motion to compel because of the similarly situated issue.  If

16   she's already been identified as that, and we have extra

17   information, it doesn't seem that it was necessary to

18   supplement any -- any response under the rule, because they

19   already knew it.  And they would not have been surprised by it.

20           And there would be no prejudice to them, because they

21   understood why those records were being -- why those records

22   were being requested and why they were provided.

23           THE COURT:  All right.

24           MR. COULTER:  I just don't think there's any

25   prejudice there at all.

Leslie W. Zorwick, Ph.D. - Direct

1          THE COURT:  Well, that's a different thing.  On one

2   hand, you are telling me you don't think the supplementation

3   was required.  And on the other hand, you are telling me that

4   there wasn't any prejudice if it was required.  Which?  You can

5   argue either side, but --

6          MR. COULTER:  Well, Your Honor, I am saying I'm

7   trying to give a couple of different explanations --

8          THE COURT:  All right.

9          MR. COULTER:  -- because I'm saying, "Look.  She's

10   already done it."  They know exactly why they were given.  They

11   knew exactly who the expert was who was going to testify in

12   regards to aversive racism and where similarly situated people

13   were.

14          THE COURT:  All right.  I'm understanding.

15          Mr. Kelly, let me hear from you.

16          MR. COULTER:  And there is no reason to supplement.

17          THE COURT:  Okay.  Thank you, Mr. Coulter.

18          MR. KELLY:  Well, I am glad you understand, Your

19   Honor.

20          THE COURT:  You need to be at the podium, please.

21          MR. KELLY:  Your Honor, counsel is arguing out of

22   both sides of his mouth, Judge.  I don't understand why, when

23   an expert is reviewing documents that have been turned over,

24   and she is opining about those documents, that we are not

25   entitled to disclosure under Rule 26.

1          I mean, I think it's pretty simple.  He's saying it's

2     in her report but he's not saying where.  I haven't heard

3     anything from the witness indicating that was in her report.

4     She just started talking about it unprompted indicating that

5     she got these records at a later point in time.

6          So, I would think that, clearly, it's additional

7     testimony.  It's clearly additional testimony based on

8     additional records, and it's clearly additional testimony based

9     on additional records that we didn't get any disclosure on.

10         So, it's a violation of Rule 26, and it is

11    prejudicial.  If you allow her to testify some more on -- on

12    this information, then, you know, what -- what could any

13    witness do.

14         THE COURT:  Mr. Kelly, what -- what rule should the

15    fact that these documents weren't produced until after

16    initially your client said "We won't produce them, because they

17    are protected under the Student Privacy Act," and then only

18    were produced -- and they were only were produced after the

19    Court entered an order in the form of a protective order.  And

20    then after they were produced, there were several instances

21    where plaintiff's counsel said "We don't have them.  You

22    haven't given us everything that there should be here."

23         And, I mean, this has all been the subject of then

24    the motion asking for a spoliation order.  So, one of the

25    things I am paying attention to here is the -- if they had

Leslie W. Zorwick, Ph.D. - Direct

1   been -- for instance, if they had been part of an initial

2   disclosure, if they had been produced subject to a proposed

3   protective order when they were first requested, if there

4   hadn't been this disagreement and apparent fact that the

5   university doesn't have certain of them, notwithstanding the

6   fact the handbook says that such records are to be collected

7   and maintained, in the face of all of that, where the equities

8   lie in terms of whether there's good cause for the fact of this

9   witness speaking to them and, in this context, didn't occur by

10  way of supplementation?

11          MR. KELLY:  Well, I would think that the issue of

12  whether they were turned over to the expert immediately is

13  really a nonstarter, Judge.  I mean, how many instances do you

14  see where experts have to supplement their reports because they

15  get information at a later date.  This witness generated her

16  report in March of 2016.  That's three years ago.

17          THE COURT:  When were the documents provided?

18          MR. KELLY:  A year later.

19          THE COURT:  Okay.

20          MR. KELLY:  And, you know, as to the spoliation

21  issue, Judge, apparently she was going to testify as to the

22  documents she got.  There wasn't an issue, "Well, I'm going to

23  testify as to the documents I don't have."  It's the documents

24  she had.

25          So, why didn't, nevertheless, if she was going to

Vol. 2 - 313
Leslie W. Zorwick, Ph.D. - Direct

1   supplement her -- her testimony, she should have supplemented

2   it on -- or Mr. Coulter should have supplemented it on the

3   information and documents she had.  You know, I -- I don't

4   see --

5           THE COURT:  The documents she had, you mean not to

6   include the externship/internship documents?

7           MR. KELLY:  No, no, no.  Those documents.  I mean,

8   the fact is that, you know, counsel's claiming maybe a

9   spoliation claim that we didn't turn over all the documents.

10          THE COURT:  Uh-huh.

11          MR. KELLY:  We still turned over documents that the

12  witness saw.

13          THE COURT:  Right.

14          MR. KELLY:  So, those documents, because they were a

15  basis of an additional opinion by this witness, should have

16  been part of a Rule 26 disclosure.  I mean, I don't know why --

17  you know, we have a continuing obligation.  Everybody has a

18  continuing obligation to supplement their discovery.

19          And I think this is the same issue.  We eventually

20  supplemented those discovery responses based on the Court's

21  order.  They have a continuing obligation to supplement their

22  disclosures based on Rule 26.  So, I think if she's going to

23  opine on the subject matter and on those documents, then we

24  should have had notice.

25          THE COURT:  Okay.  All right.

1    Mr. Coulter, anything else?

2    MR. COULTER:  Yes, Your Honor.  I think the Court

3  raises a good point in regards to -- in regards to this.  My --

4  my point is that we didn't get those documents.  We still don't

5  know --

6    THE COURT:  Well, but when do you say you got them?

7    MR. COULTER:  Oh, Your Honor, I think we got this --

8  I would have to look.  But I want to say it was, like, around

9  20 -- well, I can tell you that we did this.  I can tell you

10  that we definitely had concerns about it because we raised the

11  issue.

12    THE COURT:  Well, I understand that there was this

13  dispute and -- and going back and forth about it.  And I

14  weighed in on it twice.  First, initially in the order on the

15  protective order that they be turned over, because I ruled that

16  the university had to produce them.  And -- and I said that

17  they can produce them in a form that protects the identity of

18  the students, and then most recently in this issue about

19  whether there were records that should -- that apparently

20  should exist that don't exist for whatever reason.

21    But, you had the records that were turned over in

22  response to the motion for a protective order -- or, excuse

23  me -- the motion to compel, notwithstanding you had given --

24  some give and take with defense counsel about where everything

25  was.  But what -- but what the university did turn over, you

Leslie W. Zorwick, Ph.D. - Direct

1    have had for what?  More than a year and half?

2              MR. COULTER:  I'd have to look, Your Honor, but I am

3    sure it's a year.

4              THE COURT:  Yeah.  So, go ahead.

5              MR. COULTER:  But my -- my point is, is that the

6    individual -- my point is, is that the individual was not --

7    they were not harmed by anything, because they knew who our

8    person was.

9              Now, we had the -- we had the records, but we didn't

10   have all the records, and that was one of the reasons why we

11   explained that we didn't get the discovery.  It was one of the

12   reasons why we explained we didn't add any defendants to our

13   federal claim because we never got all the discovery.

14             And that was something that we were waiting on, and

15   we never did get it.  We were still waiting on it.

16             THE COURT:  All right.  Okay.  Well then, I am going

17   to give you my ruling from the bench.

18             The issue is centrally the supplementation

19   requirement under Rule 26 of the Federal Rules of Civil

20   Procedure, which require that a party, who has made a

21   disclosure under Rule 26(a), and subpart (2), for an expert

22   whose report must be disclosed, under 26(a)(2)(B), then the

23   party's duty to supplement extends both to information included

24   in the report and to information given during the expert's

25   deposition.

Leslie W. Zorwick, Ph.D. - Direct

1          Well, I am not sure whether this witness was deposed

2    or not.  Any additions or changes to the information must be

3    disclosed by the time the party's pretrial disclosures under

4    Rule 26(a)(3) are due.

5          Now, it would be the Court's assessment of the

6    application of that rule that in the standard course of things,

7    that if there's going to be supplemental testimony, in other

8    words, something beyond what the expert report already

9    contains, which is to -- to describe the opinions, and the

10   basis for the opinions, and the documents that have been

11   reviewed, then -- then that was required.

12         Now, in this particular instance, it's not as though

13   the documents were provided last week or the day before

14   yesterday.  They have been in your hands for some time.  At the

15   time that you had -- that you went over these with this expert,

16   whether in the course of being busy and preparing for trial or

17   what -- because I tried lots of cases.  I understand how that

18   can go -- but the duty attached.

19         And if it were closer in time, and then -- then my

20   weighing of the equities might change.  But given the amount of

21   time that went by, in the exercise of my discretion, then under

22   the rule I think the matters are not properly the subject of

23   her testimony here.

24         So, as to the objection, as to any inquiry of

25   opinions relating to those records, I am going to grant that

Leslie W. Zorwick, Ph.D. - Direct

1   motion.

2           Go ahead.  If you had something else, Mr. Coulter, go

3   to the podium, please.

4           MR. COULTER:  Yes, Your Honor.  It has to do with the

5   experts, but we haven't rested our case, and certainly we have

6   a witness who can testify to whether or not that person was

7   treated differently -- differently than similarly situated

8   students.

9           We have two choices here.  Two choices, I think, that

10  the Court should consider.  One is that if they are worried

11  about supplement -- supplemental statement by the expert

12  witness, certainly we can draft a supplement.  It might take

13  about, I don't know, maybe a half hour, give it to them, and

14  say "This is what they are going to testify to."  Like -- I

15  think the thing about this case, it's pretty much obvious to

16  them what she was going to testify to.

17          The other is, is that we have not rested our case.

18  We have not stated that the person was not subject to recall,

19  and we can bring somebody on and testify in regards to how that

20  person was treated in regards to -- differently from --

21          THE COURT:  Well, I'm not sure what you are getting

22  to in that regard.  But what I am saying is as to this witness,

23  any testimony about the externship or internship records, that

24  were the subject of the motion to compel and the Court's order

25  on the same, will not be allowed.

Leslie W. Zorwick, Ph.D. - Cross

1          MR. COULTER:  Yes, Your Honor.  I understand that,

2     Your Honor.  I'm not questioning that ruling.  What I am asking

3     the Court, we have not rested our case.

4          THE COURT:  Yeah.  Now, as to what else your proof

5     is, we will just wait and see what comes in and if there's

6     issue about it then.  I can't anticipate --

7          MR. COULTER:  I understand.

8          THE COURT:  -- and make a ruling about that.

9          MR. COULTER:  I just wanted to make sure I was not

10     prohibited.

11          THE COURT:  Yeah.

12          MR. COULTER:  And we had not rested our case.

13          THE COURT:  No, I understand that.

14          MR. COULTER:  All right, Your Honor.

15          THE COURT:  All right.  So, let's hear the

16     cross-examination, please.

17                         CROSS-EXAMINATION

18     BY MR. KELLY:

19     Q.   Doctor, it's my understanding that you just testified that

20     the aversive racism by Idaho State University in this case

21     equates to intentional discrimination; correct?

22     A.   Yeah.  Aversive racism is really how we talk about what

23     intentional racism looks like now.

24     Q.   So, are you the first person ever to opine that aversive

25     racism equates to intentional discrimination?

Leslie W. Zorwick, Ph.D. - Cross

1   A.   I have no idea who has testified to make that argument,

2   but I think the people who study aversive racism argue, that to

3   understand why people do what they do, it makes more sense to

4   look at behaviors and patterns than it makes to look at the way

5   that people explicitly describe their motives.  I think that's

6   in every paper that's published on this.

7   Q.   Well, speaking of papers, in regard to your report --

8   A.   Uh-huh.

9   Q.   -- from March of 2016, did you ever use the words

10  "intentional discrimination"?

11  A.   I think I talked about racism looks different, and

12  people's motives --

13  Q.   That's not my question.  Did you ever, in that report, the

14  32-page report, say that aversive racism equates to intentional

15  discrimination in this case?

16  A.   I suspect you know, because you have it in front of you.

17  I don't remember using that exact phrase.

18  Q.   And I will tell you, you didn't.

19  A.   Uh-huh.

20  Q.   The first time you said that was here today.  So, you are

21  testifying beyond what you testified in your opinion of

22  March 2016.

23  A.   To me, that is included in this literature on aversive

24  racism, because when --

25  Q.   But you didn't put it in there; correct?

Leslie W. Zorwick, Ph.D. - Cross

1    A.    I trust you that it is -- those words are not in there, if

2    you say so.

3    Q.    Let me read your conclusion for you.

4    A.    Uh-huh.

5    Q.    "While aversive racism" -- this is on page 27 of 32 --

6    "aversive racism is typically something my field only studies

7    while considering differences across large groups of people and

8    not individuals" --

9              THE REPORTER:   Could you slow down?

10   BY MR. KELLY:

11   Q.    Sure.   "It's hard to imagine a situation that more

12   strongly demonstrates all the hallmarks that are typically

13   present when aversive racism is occurring, which strongly

14   suggest that the behavior of the ISU Psychology Department was

15   influenced by Mr. Yu's race and international status."

16             Did I use the words "intentional discrimination"

17   there at all?

18   A.    You did not.

19   Q.    What you did do, in your report, is rely a lot on -- and I

20   am sure I am going to screw up their names -- Samuel Gaertner

21   and John Dovidio?

22   A.    Uh-huh.

23   Q.    Did I say those right?

24   A.    You did.

25   Q.    And they are kind of the two individuals who are the

1  premier researchers or authors on aversive racism.  Would that

2  be fair?

3  A.   They coined the term, and so they published the most early

4  on it for sure.

5  Q.   Have you ever read a book that they authored called

6  "Handbook of Employment Discrimination Research"?

7  A.   I haven't.

8  Q.   Okay.  I will let you know that there is a chapter in that

9  book that they wrote entitled "Aversive Racism, Bias Without

10 Intention."

11 A.   Um.

12 Q.   Would that sound accurate as something coming from those

13 two individuals?

14 A.   I don't know, because they have also written stuff where

15 they talk about how the way that people talk about

16 intentionality, that what that connotes is not how we talk now

17 in psychology.  We talk about intent as choices, and as

18 behaviors, and as actions, but we don't generally, in this

19 psychology research, talk about intent as motive in the same

20 way.

21        And so I have read other things written by Jack

22 Dovidio and Sam Gaertner where they do talk about the idea that

23 it is behaviors that communicate motives.

24 Q.   Okay.  Well, let me tell you something else that they

25 wrote that you put in your report.

Leslie W. Zorwick, Ph.D. - Cross

1   A.    Uh-huh.

2   Q.    "Between 1989 and 1999, Dovidio and Gaertner," in

3   parentheses, "2000, found that explicit endorsement of

4   prejudice declined but aversive racism did not.  Part of the

5   difficulty in combating aversive racism is that people who are

6   making decisions based on race and stereotypes may not be fully

7   aware of how stereotypes are influencing them."

8   A.    So, I said something similar, actually, in response to a

9   question that Attorney Coulter asked me.  And that is --

10  Q.    All right.  Well, let me --

11  A.    -- we choose --

12  Q.    Can I --

13  A.    Yes.

14  Q.    Does that sound accurate of something that they did?  They

15  said?

16  A.    Uh-huh.

17  Q.    So, utilizing that terminology, does that equate to

18  intentional discrimination?

19  A.    I think so.  I think that they would say that we can be

20  unaware of how we are influenced by stereotypes, but that that

21  is a choice.  That we could choose to acknowledge what our gut

22  feelings are.  We could choose to think about the ways in which

23  stereotypes influence us.

24           And so I think that a lot of how we use the language

25  of intentionality in psychology research is connoted a little

Leslie W. Zorwick, Ph.D. - Redirect

1   bit differently than the way that you are asking this question.

2   Q.   Okay.  But you said "you think" that that's what they

3   would say.  You don't know that that's what they would say?

4   A.   I don't, but I think that based on a lot of other things

5   they have written.

6   Q.   So, you are saying again "I still think."  You don't know;

7   correct?

8   A.   Yes, based on my professional expertise, where I have read

9   tons of papers they've written, I think that would be their

10  general conclusion.

11  Q.   And again, even though you testified to it today, as you

12  have been sitting through this trial, at no point in time, in

13  your report of March 2016, did you indicate that aversive

14  racism, in this case with ISU, equates to intentional

15  discrimination; correct?

16  A.   Not in that original report, no.

17              MR. KELLY:  Thank you.

18              Thank you, Your Honor.

19              THE COURT:  Mr. Coulter, anything further?

20                        REDIRECT EXAMINATION

21  BY MR. COULTER:

22  Q.   Dr. Zorwick, I just want to make clear.  You believe that

23  the -- that all the -- all the things that you have put in your

24  report add up to show that Mr. Yu was the victim of intentional

25  discrimination via aversive racism; would that be correct?

Leslie W. Zorwick, Ph.D. - Redirect

1   A.   I do.

2   Q.   Okay.  And would it also be of somebody who read that

3   report with some psychological knowledge would probably come to

4   the same conclusion?

5            MR. KELLY:  Objection.  Calls for speculation.

6            MR. COULTER:  She's an expert.  She can speculate.

7            THE COURT:  Just --

8            MR. COULTER:  I'm sorry, Your Honor.

9            THE COURT:  Gentlemen, just give me a moment.  Okay?

10  Sustained.  I agree it calls for speculation as framed.

11  BY MR. COULTER:

12  Q.   Okay.  When you talked about your professional --

13  professional expertise and in how you view intentional

14  discrimination in regards to aversive racism -- all right -- is

15  there anywhere in your report that shows that that's exactly

16  what you are talking about?

17  A.   I feel like a lot of the research that I describe about

18  aversive racism, even that study that I was just asked about

19  that tracks changes in prejudice from 1989 to 1999, points to

20  the fact that while the public explicit expression of prejudice

21  goes down in that 10-year period -- because norms are

22  changing -- what happens, when you put people in an ambiguous

23  situation, where they have race-neutral explanations, and they

24  can point to challenging relationships and make post hoc

25  justifications, what we see, in both 1989 and 1999, is that

Leslie W. Zorwick, Ph.D. - Redirect

1  when those things are present, people make choices that

2  consistently treat racial groups differently.

3          And I feel like a choice that people make about a job

4  candidate is an intentional choice.  They might tell you race

5  had nothing to do with it.  That's how they might label their

6  intention, but the intention is the choice.  And that's what we

7  see when these hallmarks are present.

8  Q.   Now, people like yourself, who deal with aversive racism

9  and intentionality, I believe that after 1999, or whatever,

10  the -- have they come to believe that aversive racism is, in

11  fact, intentional racism?

12  A.   I think that the way we talk about it moves away from

13  really that people can accurately tell us what their intentions

14  were, because we are so influenced by wanting to see ourselves

15  in a positive light.  And so I -- I think that the way that I

16  am describing this is consistent with so much research that I

17  have read.

18          We use language like "unconscious" or "implicit" to

19  describe the structure of attitudes and the way that we measure

20  them, and that comes with a connotation that can sound from the

21  outside of our field.  Like that jargon means we are saying

22  people aren't responsible for what they do.  But that's not

23  what we mean by those terms.

24          We say the only thing that communicates intent is the

25  decision and the impact it has and if that impact is different

Vol. 2 - 326

Leslie W. Zorwick, Ph.D. - Redirect

1  for different groups of folks.

2          MR. COULTER:  No further questions, Your Honor.

3          MR. KELLY:  Nothing further.

4          THE COURT:  All right.  Dr. Zorwick, you may step

5  down.  Thank you.

6          Mr. Coulter, your next witness?

7          MR. COULTER:  Your Honor, we call Dr. Tyler Bowles.

8          THE COURT:  Counsel, how many more witnesses do you

9  anticipate calling?

10          MR. COULTER:  I anticipate calling one more witness.

11  I anticipate recalling Mr. Jun Yu.

12          THE COURT:  Okay.  Well, I am wondering, rather than

13  start with this witness, if given the fact it's almost 3:20,

14  whether we should just start in the morning.

15          We will do some adjustment of -- of today's time,

16  obviously, Mr. Coulter, because of the delays in getting things

17  set up with your call, and so you aren't going to be

18  responsible for all of that.

19          But it looks like you are finishing up your direct

20  maybe a little more quickly than you had anticipated, so would

21  that be all right with you?

22          MR. COULTER:  Yes, Your Honor, because we are

23  bringing back Mr. Yu, so it will be -- it will be a little bit

24  different.

25          THE COURT:  All right.

Leslie W. Zorwick, Ph.D. - Redirect

1          MR. COULTER:  I did have one question, and we can

2   take it off the record, because based on what you said, when we

3   talked about demonstrative evidence, you said, "Well, maybe

4   Dr. Bowles could do something."  I am, like, "Okay.  We can do

5   that."

6          THE COURT:  Let's deal with the issue first about

7   whether we are going to continue at this point.

8          MR. COULTER:  We'll continue at this point, Your

9   Honor.  I have no problem.

10          THE COURT:  Mr. Kelly, we will have the discussion

11   you want to have on the record.  Do you have any problem if we

12   start with this witness tomorrow morning?

13          MR. KELLY:  No, Judge.  And, in fact, since we have

14   moved ahead so quickly, I did have a witness issue.  I don't

15   know if you want to hear about it now.

16          THE COURT:  Well, sir, you may step down or I mean

17   you may take a seat, I should say.  Sorry.  So tomorrow you can

18   get your heart rate up again, so -- it goes with taking the

19   witness stand.

20          All right.  Let's first take up your matter,

21   Mr. Coulter, on this witness, the demonstrative evidence that

22   you wanted to take up.

23          MR. COULTER:  Yes, Your Honor.  I know that Your

24   Honor is sort of aversive to demonstrative evidence.  I'm not

25   saying that's --

Leslie W. Zorwick, Ph.D. - Redirect

1          THE COURT:  Well, no.  When it's appropriate, it's

2     appropriate.  And when it isn't, it isn't.  Go ahead.

3          MR. COULTER:  So, what we wanted to do to cut -- to

4     make things short, because you have had Dr. Bowles in front of

5     you before, I was just going to say -- have him put "this is

6     what the person made.  This is what he says he should be

7     making," whatever, and to keep it the same.  Otherwise, I will

8     just ask him questions.

9          THE COURT:  Well, here is -- and I think what I tried

10    to explain in that ruling is that I don't have a problem with

11    summary demonstrative exhibits, in settings such as an

12    economist's testimony, because of -- well, they are just a

13    commonplace way of putting that in a summary form.  And that's

14    fine.  But if you wanted it to replace his testimony --

15          MR. COULTER:  (Shakes head.)

16          THE COURT:  -- that wouldn't be something I would

17    allow, because it still has to have the testimonial foundation

18    and backup for it.

19          MR. COULTER:  What I wanted to be sure of, because of

20    what's going on in the Court today, is that we may make up

21    that -- that demonstrative thing tonight.  We haven't given it

22    to -- to counsel, because it doesn't exist, but because we

23    didn't know --

24          THE COURT:  Well, I assume it's going to reflect

25    what's already in his report.

Leslie W. Zorwick, Ph.D. - Redirect

1          MR. COULTER:  Yes, Your Honor.

2          THE COURT:  Yeah.  And I -- and that is different

3   than the issue we were dealing with Dr. Zorwick, because what

4   she was going to be testifying to was not in her report.

5          So, if it's in his report and you're -- and I'm

6   thinking, like, you know, one, maybe two at the most

7   demonstrative exhibit boards or something that you are

8   summarizing his testimony.

9          So, and, in fact, if that's the case, then I -- I

10  would have a hard time thinking that there's any reason why,

11  even if Mr. Kelly wanted to object, that I would say you

12  couldn't do that.  All right?

13         MR. COULTER:  All right.  Thank you, Your Honor.

14         THE COURT:  Okay.  Mr. Kelly, then you wanted to take

15  up the witness issue in terms of, I assume, you've got somebody

16  coming on Monday or Friday?

17         MR. KELLY:  Actually, not that far off.  Friday.  I

18  can get him in as early as possible Friday morning.

19         THE COURT:  Okay.

20         MR. KELLY:  So, if --

21         THE COURT:  Do you have witnesses to put on tomorrow?

22         MR. KELLY:  I have three witnesses I can put on

23  tomorrow.

24         THE COURT:  Okay.

25         MR. KELLY:  And then I would be done on Friday.

Leslie W. Zorwick, Ph.D. - Redirect

1          THE COURT:  All right.  Well then -- then let's just

2     do that.  We will go -- take a regular day tomorrow, and then

3     we will see where we are on Friday.

4          Mr. Coulter, I assume, is going to have a rebuttal

5     case and may or may not get done on Friday.  But, so we will

6     see tomorrow.  But, in other words, if we get to 1:00 in the

7     afternoon, and you are done with your witnesses, and you have

8     the witness you had been planning on having come in on Friday

9     morning, then I am fine with that.  We will do that.

10          MR. KELLY:  Thank you.

11          THE COURT:  Okay.  All right.  Anything else,

12     Mr. Coulter?

13          MR. COULTER:  No, Your Honor.

14          THE COURT:  Okay.  All right.  We will see everybody

15     promptly at 9:00 a.m. tomorrow morning.  Thank you.

16        (Recess 3:21 p.m.)

17

18

19

20

21

22

23

24

25

Vol. 2 - 331

Leslie W. Zorwick, Ph.D. - Redirect

INDEX OF EXAMINATIONS

For the Plaintiff:

| Witness Name | Direct | Cross | RD | RX | Voir Dire |
|---|---|---|---|---|---|
| Jun Yu | | 124 | 132 | | |
| Cheryl Ann Chase, Ph.D. | 134 | 145 | 152 | | |
| Gerald P. Koocher, Ph.D. | 156 | 187 | | | |
| Shannon Chavez-Korell | 207 217 | 234 | 238 | 243 | 215 |
| Leslie W. Zorwick, Ph.D. | 246 | 318 | 323 | | |

PLAINTIFF'S EXHIBIT INDEX

| Exhibit No. | Marked | Admitted |
|---|---|---|
| 44 | | 279 |
| 116 and 117 | | 163 |

--oOo--

COURT REPORTER'S CERTIFICATE


    I, KATHERINE EISMANN, Official Court Reporter, certify

that the foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.


Date:  March 11, 2019.

                         /s/ *Katherine Eismann*

                        Katherine Eismann, CRR, RDR