1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF IDAHO

3   JUN YU,                          )
                                     )   Case No. 4:15-cv-430-REB
4            Plaintiff,              )
                                     )
5                                    )   Pocatello, Idaho
        vs.                          )   February 28, 2019
6                                    )   8:59 a.m.
    IDAHO STATE UNIVERSITY,          )
7                                    )   Bench Trial, Day 3
             Defendant.             )
8   _____)

9                      TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE RONALD E. BUSH
10          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

11  APPEARANCES:

12  For the Plaintiff:

13          RONALDO A. COULTER, ESQ.
            HOLLY A. SUTHERLAND, ESQ.
14          Idaho Employment Law Solutions
            776 E. Riverside Drive, Suite 206
15          P.O. Box 1833
            Eagle, Idaho 83616
16          208-672-6112

17  For the Defendant:

18          MICHAEL E. KELLY, ESQ.
            Kelly Law, PLLC
19          137 E. 50th Street
            Garden City, Idaho 83714
20          208-342-4300

21  Also present:  Jun Yu, Mark Roberts, Crystal Anderson

22


23  Court Reporter:  Katherine Eismann, CRR, RDR
                     katherine_eismann@id.uscourts.gov
24

    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

1              (Thursday, February 28, 2019, 8:59 a.m.)

2                            --oOo--

3                   P R O C E E D I N G S

4         THE COURT:  Thank you.  Please be seated.

5         All right.  Counsel, good morning.

6         We begin the third day of the bench trial in the

7    matter of Jun Yu versus Idaho State University.

8              A couple housekeeping matters to begin with.  Because

9    of our schedule getting a little bit out of kilter yesterday,

10   we didn't follow the exact recess schedule that I usually

11   employ.  So, that you are aware of that, the first recess we

12   will try to take at 11:00 a.m., and we will go to 11:20.  The

13   second will be at 1:10 a.m. -- or p.m., excuse me -- to

14   1:30 p.m.

15             Anything that we need to take up before we begin?

16             Mr. Coulter?

17             MR. COULTER:  No, Your Honor.

18             THE COURT:  All right.  Mr. Kelly?

19             MR. KELLY:  Nothing, Your Honor.

20             THE COURT:  All right.  So, where did we leave off?

21   I will go back to my notes.

22             MR. COULTER:  What I am going to do is recall Mr. Jun

23   Yu.

24             THE COURT:  All right.  Mr. Yu, if you will retake

25   the witness stand, please.

1                          JUN YU,

2    having been previously sworn, was examined and testified as

3    follows:

4              THE COURT:  Sir, I will remind you that you are still

5    under oath.

6              THE WITNESS:  Okay.

7              THE COURT:  You may inquire.

8                      DIRECT EXAMINATION

9    BY MR. COULTER:

10   Q.   Mr. Yu, are you the plaintiff in this case?

11   A.   Yes.

12   Q.   And Mr. Yu, are you aware of the motion filed on your

13   behalf to seek student records?

14   A.   Yes.

15   Q.   Now, after litigation, were you -- were you, in fact,

16   provided those records?

17   A.   Yes.

18   Q.   Do you know why those records were requested?

19   A.   To see if I was treated differently from similarly

20   situated students.

21   Q.   Now, to your knowledge, were you the only Chinese --

22   Chinese national student in the program?

23   A.   Yes.

24   Q.   Did you review the student records?  Did you review the

25   student records?

Jun Yu - Direct

1   A.   Yes.

2   Q.   Did you find any instances -- excuse my English -- from

3   reviewing the records that supported that you were treated

4   differently than similarly situated students?

5   A.   Yes.

6          MR. KELLY:  Your Honor, I am going to object.  The

7   review of these records calls for personal knowledge.  Just

8   because he reviews them doesn't mean he has personal knowledge

9   in regard to the contents of them.

10         THE COURT:  Well, that sounds like cross-examination.

11  Overruled.

12         MR. KELLY:  Well --

13  BY MR. COULTER:

14  Q.   Now, I will repeat my last question.  Did you find any

15  instances, from reviewing the records, that supported that you

16  were treated differently than similarly situated students?

17  A.   Yes.

18  Q.   Can you give us an example or could you give the Court an

19  example?

20  A.   For example, Student 55.

21  Q.   Could you please put up Exhibit 19.

22  A.   Thank you.

23  Q.   Now, Mr. Yu, can you tell me what Exhibit 19 is?

24  A.   It's a semi-annual student evaluation fall 2012 for

25  Student 55.

Jun Yu - Direct

1  Q.   And what stands out to you in this document?

2           MR. KELLY:  Objection to form.

3           THE COURT:  Mr. Kelly, do you have an objection?

4           MR. KELLY:  I said objection to form, Your Honor.

5           THE COURT:  I didn't hear the "to form."  Let me look

6  back at the question.

7           MR. COULTER:  I asked him what stands out to you,

8  Your Honor.

9           THE COURT:  All right.  So what specifically --

10          MR. KELLY:  What stands out?  What does that mean?

11          THE COURT:  Is your objection as to ambiguity?

12          MR. KELLY:  Yes, Your Honor.

13          THE COURT:  Okay.  Mr. Coulter, your response?  I am

14 just asking if you have a response.

15          MR. COULTER:  My response is I don't know what's

16 ambiguous about "what stands out."

17          THE COURT:  All right.  Overruled.  Go ahead.

18 BY MR. COULTER:

19 Q.   All right.  Go ahead.  Do you understand the question?

20 A.   Yes.  Failure to -- on page 2, failure to defend the

21 thesis this spring, 2013, would result in a U grade and a

22 probationary status.  Okay.

23 Q.   Okay.  Now --

24 A.   Okay.

25 Q.   I will ask you to go ahead and put up -- are you done?

1   A.   Yes.

2   Q.   Put up Exhibit Number 11.  And before you answer that, I

3   want to make sure we get it up on the screen.

4        All right.  Mr. Yu, can you tell me what this

5   document is?

6   A.   It's a semi-annual student evaluation, spring 2013, for

7   Student 55.

8   Q.   Want stands out to you in this document?

9   A.   On Section V, Student 55 has not made clear progress on

10  his thesis.  He was awarded a U in his research credit for

11  spring semester 2013 consistent with the formal letter provided

12  to Student 55 by Dr. Lawyer on December 10, 2012.

13       Next page, last paragraph, were Student 55 to fail to

14  successfully defend his thesis by the end of fall semester,

15  2013, development policy indicates that the next step would be

16  for the CTC to recommend to the graduate faculty of the

17  psychology department that he be dismissed from the doctoral

18  program in clinical psychology.  Okay.

19  Q.   All right.  Would you please put up Exhibit Number 12.

20  Mr. Yu, can you tell me what Exhibit Number 12 is?

21  A.   It's a semi-annual student evaluation for 2013 for Student

22  55.

23  Q.   And can you tell me what this -- excuse me.  What stands

24  out to you in this document, please?

25  A.   Section VI, so, this student failed to meet the

Jun Yu - Direct

1    requirement that he defend his thesis by fall 2013.  The

2    committee extended this deadline to January 2014, then also

3    provided him another warning, were Student 55 to fail to meet

4    designated tasks in the allotted time frame, the committee will

5    pursue dismissal from the doctoral program.

6            Second to the last paragraph, he was provided another

7    warning a second C in PSYC 637 may be considered grounds for

8    program dismissal in and of itself.  Okay.

9            MR. COULTER:  Please put up Exhibit 108.

10           THE COURT:  I didn't catch that.

11           MR. COULTER:  Exhibit 108, Your Honor.  I'm sorry.  I

12   was speaking to my paralegal and messed up.

13   Q.   Now, Mr. Yu, what is this document?

14   A.   This is the academic transcript for Student 55.

15   Q.   And what stands out to you in this document?

16   A.   On page -- the second page for spring 2013, so this

17   student received two failing grades, one C plus, one U.  Okay.

18   Q.   Now, how were you treated differently than Student 55?

19   A.   I was never warned that I was at risk for dismissal, but I

20   was dismissed.  For this Student 55, he was warned once, then

21   he didn't meet the requirement, then the committee extended it,

22   the time, and provided another warning, two more warnings.  So,

23   the total is three warnings.  Then he was eventually not

24   dismissed.

25           Another area of that's different -- another area for

Jun Yu - Direct

1    differential treatment is this student received two failing

2    grades, which met criteria for dismissal according to the

3    graduate catalog, but he was not dismissed.  Yes.

4    Q.   Are there other similarly situated students who were

5    treated differently than you at Idaho State University?

6    A.   Yes.

7    Q.   In the clinical psychology program?

8    A.   Yes.

9    Q.   Who would that be?

10   A.   Student 37.

11   Q.   All right.  Would you please put up Exhibit 8.  Now,

12   Mr. Yu, what is Exhibit 8?

13   A.   It's an October 3rd, 2014, letter to Student 37.

14   Q.   And what has stood out to you in this document?

15   A.   Second page and end of the first paragraph, if you make no

16   progress during fall semester 2014, I will award you an

17   unsatisfactory grade for PSYC 6650.  The graduate school will

18   react to a U grade with a request for a remediation plan that

19   will include dismissal for failure to adequately respond to the

20   remediation plan.

21         Both -- last paragraph.  Both I, as your thesis

22   adviser and as a Clinical Training Committee, will do whatever

23   we can to help you be successful.  Your success is our success.

24   Please work with me beginning right now to establish a regular

25   weekly meeting time to review your thesis proposal progress.

Jun Yu - Direct

1   Earning a satisfactory grade in PSYC 6650 during the fall

2   semester 2014 is an attainable goal.  Okay.

3   Q.   All right.  Now, Mr. Yu, we have put up Exhibit 9.  Can

4   you tell the Court what this document is?

5   A.   It's an annual student evaluation.

6             THE COURT:  Can you pull that down, please?  I see

7   it.  Pull that down.  Let's get the name off of it.  It should

8   have been redacted by the university before it was disclosed.

9             MR. COULTER:  Your Honor, we did try to redact most

10   of them.

11             THE COURT:  They came to you without redactions?

12             MS. SUTHERLAND:  There were a lot of names --

13             MR. COULTER:  Yes, Your Honor.  They came to us some

14   with --

15             MR. KELLY:  Your Honor, he's misrepresenting.  They

16   didn't come to him -- a couple of them did because they were

17   oversights.

18             MR. COULTER:  No, not just a couple, Your Honor.

19             MR. KELLY:  Oh, Jesus.

20             THE COURT:  Well -- all right, counsel.  The

21   important thing here is all of the identifying information in

22   this, my order was that it was to be redacted.  There are --

23   mistakes can be made, but I'm not going to have a mistake made

24   in a public courtroom.  All right?

25             MR. COULTER:  Yes, Your Honor.

Jun Yu - Direct

1              THE COURT:  And I am upset that it got to this point,

2    and somebody didn't see that.  So, it either gets fixed right

3    now or we don't put it on the screen.

4              MR. COULTER:  We will fix it right now, Your Honor.

5    Just white it out.

6         (Off-the-record discussion.)

7              THE COURT:  We can just use the paper documents.

8              MS. SUTHERLAND:  Okay.

9              THE COURT:  All right?  But I will need to have one.

10             MS. SUTHERLAND:  Would you like me to redact?

11             THE COURT:  Yes, I don't have any business seeing it

12   any more than anybody else.

13             All right.  Exhibit 9.  Let's go.

14   BY MR. COULTER:

15   Q.   All right.  Exhibit 9, can you tell the Court what -- what

16   this document is?

17   A.   It's an annual student evaluation for 2014 to '15 for

18   Student 37.

19   Q.   Okay.  And what stands out to you in regards to this

20   document?

21   A.   On second page, that long paragraph near the end, were his

22   thesis not successfully proposed by the end of fourth semester

23   2015, the committee will consider convening the faculty to vote

24   on program dismissal.  Yes.

25   Q.   Do we need to get Exhibit 105?  Is it redacted?

1          MS. SUTHERLAND:  Yes.

2          MR. COULTER:  It is redacted?

3      (Off-the-record discussion.)

4   BY MR. COULTER:

5   Q.   105 looks good.  Okay.  Mr. Yu, what is this document?

6   A.   It's a January 12th, 2015, letter to Student 37.

7   Q.   Okay.  And what stood out to you in this document?

8   A.   On page one, second paragraph, you earned a C minus in

9   that course, which is PSYC 6632 during spring semester 2013

10  which automatically placed you on development academic

11  probation and required you to retake the course this spring.

12  You should also be aware that the ISU graduate school considers

13  any C or worse as failing for students pursuing a

14  graduate-level program or degree.

15          The ISU graduate catalog goes on to define, quote,

16  "Two or more grades of C plus or below," unquote, as one of

17  three grounds for program dismissal.

18          Second page, last paragraph.  It is our program's

19  responsibility to fully inform you of expectations and the

20  consequences for failure to address concerns but recall what

21  was stated in your October 3rd letter.  Your success is our

22  success.  The Clinical Training Committee and I will do

23  whatever we can to help you succeed.  Please seek our help at

24  any point this spring.  Okay.

25      (Off-the-record discussion.)

Jun Yu - Direct

1    BY MR. COULTER:

2    Q.   Okay.  What is Exhibit 10, or did I miss one and it should

3    be 106?  I just need to know.  Let's go to 106.  Can you put

4    that up?  106.

5              Okay.  Mr. Yu, what is 106?  What is Plaintiff's

6    Exhibit 106?

7    A.   It's a plan of remediation provided to Student 37.  It has

8    many elements.  First, problem identification; second, course

9    of action to remediate the problem; third, measurable objects;

10   fourth, method and specific time to determine if objectives

11   have been met; and the fifth, consequences if objectives are

12   not met; sixth, process of --

13             THE COURT:  Mr. Coulter, is he reading from this

14   exhibit?

15             MR. COULTER:  I think he's reading from the -- from

16   the monitor, Your Honor, which is from the -- he's paraphrasing

17   in some parts, but he's reading from the monitor from the plan.

18             THE COURT:  Well, let's be clear about what's what.

19   I have the monitor in front of me.  I can't -- this exhibit in

20   front of me.  I don't see where it is that he's reading from

21   that.

22             MR. COULTER:  Okay.

23             THE COURT:  So, at least the enlarged portion.  So, I

24   don't know whether he's testifying about it or whether he's

25   reading from the document.  And it's important for me to have

Jun Yu - Direct

1   that distinction in this case.

2              MR. COULTER:  Yes, Your Honor.

3              THE COURT:  All right?

4   BY MR. COULTER:

5   Q.   Okay.  So, can you tell us what 106 is about?

6   A.   It's a plan of remediation that the program designed for

7   Student 37.

8   Q.   Okay.

9   A.   On January -- okay.

10             THE COURT:  Next question.

11  BY MR. COULTER:

12  Q.   All right.  Let's put up Exhibit 10.  If -- let me check

13  it out first.  It's good to go?

14             Okay.  All right.  Mr. Yu, can you tell me what is

15  Exhibit 10?

16  A.   It's an annual student evaluation for Student 37.

17  Q.   Okay.  And what stood out to you in regards to this

18  particular exhibit?

19  A.   The summary part, his C in PSYC 6623 is the second C he

20  has received while in the program, and it could be considered

21  grounds for termination from the program according to ISU

22  graduate school policy.  However, the CTC is confident that

23  Student 37 can do the work required for the program and support

24  his continued efforts.  However, if he were to receive a grade

25  of C plus or worse, in his remaining course work, the CTC could

1    be forced to consider dismissing Student 37 from the program.

2    Q.   So, Mr. Yu -- I'm sorry.  Were you complete?  Done?

3    A.   Yes.

4    Q.   Mr. Yu, how were you treated differently than Student 37?

5    A.   Student 37 was provided multiple warnings that he was at

6    risk for dismissal and was provided a very detailed plan of

7    remediation.  For me, I was never warned that I was or would be

8    at risk for dismissal, but I was dismissed.  And also, I was

9    not provided a plan of remediation.

10   Q.   Mr. Yu, hold on.  Mr. Yu, can you give the Court another

11   example -- an example of another student that you were treated

12   differently than?

13   A.   Yes, there's an exhibit.

14   Q.   Okay.  So, could you please put up Exhibit 0018,

15   semi-annual student evaluation.

16          Okay.  Mr. Yu, can you tell the me -- can you tell

17   the Court what is this exhibit?

18          MR. KELLY:  Judge, I'm sorry.  We have another issue

19   here with the lack of redaction.

20          MR. COULTER:  It's redacted right here.

21          MR. KELLY:  I'm sorry.  That's mine.  That's mine.

22   I'm sorry.

23          THE COURT:  Go ahead.  We are all just trying to make

24   sure we are protecting people's privacy.

25          MR. KELLY:  I'm sorry, Judge.  It is.

Jun Yu - Direct

1          MR. ROBERTS:  It says plaintiff's exhibit, and

2    there's her name.

3          MR. KELLY:  There's a name on there.  Student got

4    partially redacted but not all of it.

5          MR. COULTER:  Right here.  You can't put it up.  You

6    can't put it up yet.  All right?

7          THE COURT:  Okay.  Go ahead.

8    BY MR. COULTER:

9    Q.   All right.  Mr. Yu, what is Plaintiff's Exhibit 0018?

10   What is this document?

11   A.   It's semi-annual student evaluation for 2006 for Student

12   29.

13   Q.   And Mr. Yu, can you tell the Court what stands out to you

14   in this document?

15   A.   Section V, Student 29 -- well, oh, yes, Section V.  So,

16   the C grade in PSYC 623 placed her on academic probation until

17   the class can be retaken and passed at a B or higher level.

18   Q.   Okay.  And Mr. Yu, can you tell us how this treatment was

19   different than how you were treated?

20   A.   So, this student was placed on academic probation.  I was

21   never placed on academic probation but I was dismissed.  Okay.

22   Q.   All right.  Could you please put up Exhibit 17?  Good to

23   go?  Put it up on the screen.

24          All right.  Mr. Yu, can you tell us what this

25   document is?

Jun Yu - Direct

1   A.   It's a semi-annual student evaluation for Student 22.

2   Q.   And what stands out to you about this document?

3   A.   Section V, the Student 22 had to retake the written

4   portion of the qualifying exam in January 2005, although his

5   performance improved, several essays were still considered

6   marginal.  As a result, Student 22 has been placed on academic

7   probation.

8   Q.   Okay.  How was this treatment different than you were

9   treated?

10  A.   So, this student was on academic probation and was not

11  dismissed.  I was never placed on academic probation, but I was

12  dismissed.

13  Q.   All right.  Mr. Yu, can you give the Court another example

14  of another student you were treated differently than?

15  A.   Yes, Student 20.

16  Q.   Good to go?

17          MS. SUTHERLAND:  Uh-huh.

18  BY MR. COULTER:

19  Q.   Throw it up.

20          Okay.  Mr. Yu, can you tell us what stood out to you

21  in regards to this document?

22          THE COURT:  Exhibit 5.

23          MR. COULTER:  It's Exhibit 5, Plaintiff's Exhibit 5,

24  Your Honor.  I'm sorry.

25          THE COURT:  All right.  Go ahead.

Jun Yu - Direct

1          THE WITNESS:  It's a semi-annual student evaluation

2     for Student 20, fall 2012.  Section III, Dr. Roberts was

3     contacted by the season's supervisor, Heather [sic] Sommer, on

4     September 13, 2012.  Student 20 was struggling with test

5     administrative procedures that were assumed to be in his

6     repertoire, given his clinical MA and associate course work.

7     The decision was made to temporarily reduce his service demands

8     to IQ testing with developmentally delayed clients.

9          Subsequently, Dr. Roberts meet with Student 20 five

10    times, during the fall semester, to discuss his progress and to

11    challenge him to address current service tasks with his

12    supervisors.  Dr. Roberts met with Dr. Traughber on December 10

13    to review Student 20's progress and outlook for spring

14    semester.

15          Page 3, last paragraph.  If Student 20's progress

16    remains unsatisfactory, the committee will consider placing

17    Student 20 on academic probation beginning in May 2013.

18    Specific performance goals for the summer and the fall

19    semesters of 2013 would be specified.  Were progress toward

20    degree completion continue to be deemed unsatisfactory

21    throughout summer and fall semesters of 2013, the graduate

22    faculty of the Psychology Department would be asked to vote to

23    consider program dismissal.  Okay.

24    Q.   Okay.  Put up exhibit -- check out Exhibit 6 first.  Good

25    to go?

Jun Yu - Direct

1          MS. SUTHERLAND:  Uh-huh.

2      BY MR. COULTER:

3      Q.   All right.  Exhibit 6 is now before you.  That's

4      Plaintiff's Exhibit, Your Honor.  I will leave out the zeros

5      just say 6.

6               What is Exhibit 6, Mr. Yu?

7      A.   It's an academic transcript for Student 20.

8      Q.   What stands out to you about this document?

9      A.   For -- for fall 2012, you can see the transcript noted

10     academic warning.  Yes.

11     Q.   Okay.  Are you done with that, Mr. Yu?

12     A.   Yes.

13     Q.   Okay.  Could you please put up exhibit -- Plaintiff's

14     Exhibit 101.  How good is it?

15          MS. SUTHERLAND:  101 is good.

16     BY MR. COULTER:

17     Q.   101 is good, Your Honor.

18          Mr. Yu, what is Plaintiff's Exhibit 101?

19     A.   It's an email from externship supervisor sent to

20     Dr. Roberts telling him that the student was terminated.

21     Q.   Okay.  Mr. Yu, is that all you wanted to point out?

22          MR. KELLY:  Your Honor, I'm sorry.  I think we have

23     another issue on this one.

24          THE COURT:  We can't hear you, Mr. Kelly.  What?

25          MR. KELLY:  I think we have another issue on this

Jun Yu - Direct

1  one.

2            THE COURT:  With identification?

3            MR. KELLY:  Yeah, the second paragraph.

4            THE COURT:  Let's get it down.

5            MR. KELLY:  I'm sorry.

6            MR. COULTER:  102, what paragraph?

7            MS. SUTHERLAND:  101 or 102?

8            MR. KELLY:  We are on 101, second paragraph.

9        (Off-the-record discussion.)

10            THE COURT:  Mr. Kelly, why don't you just point out

11  to --

12            MR. COULTER:  I think we know what it is.  I just

13  said we didn't know if it was a student or whatever, so we are

14  just going to cut out the name.

15            THE COURT:  Okay.  That's fine.

16            MS. SUTHERLAND:  I think it was a supervisor.

17            THE COURT:  Lots of moving parts.

18            MS. SUTHERLAND:  Excuse me.  This one, based on the

19  information, it says the student or -- did not call the name

20  that's not redacted on the exhibit.  So, that's why Norma must

21  not be the student.

22            THE COURT:  I don't need to have any explanation.  It

23  happens.  Let's just get it fixed so we can move on.

24            MS. SUTHERLAND:  We will take out the name.

25            MR. COULTER:  Take out the name.  If there's a name

Jun Yu - Direct

1  there, take it out.

2          THE COURT:  Go ahead, Mr. Coulter.  This is 101.

3          MR. COULTER:  Thank you, Your Honor.

4  Q.   Mr. Yu, do you have Exhibit 101 in front of you?

5  A.   Yes.

6  Q.   All right.  Could you please tell the Court what the

7  substance of this document is?

8  A.   It's an email from externship supervisor to -- sent to

9  Dr. Roberts indicating that the student was terminated.

10 Q.   Okay.  102.  102, put it up.

11          Okay.  Mr. Yu, do you have Plaintiff's Exhibit 102?

12 A.   Yes.

13 Q.   Can you tell the Court what this document is?

14 A.   It's a letter sent to Student 16 on November 9th, 2007.

15 Q.   And what has stood out to you in regards to this document?

16 A.   First paragraph, it is important for you to understand

17 that if subsequent dismissal from any program sanctioned

18 activity were to occur, the Clinical Training Committee would

19 forward a recommendation to the psychology department faculty

20 that you be dismissed from the graduate program in clinical

21 psychology.

22 Q.   Is that all Mr. Yu?

23 A.   Yes.

24 Q.   Exhibit 4, is it good to go?

25          Mr. Yu, can you tell the Court what is Exhibit 4?

Jun Yu - Direct

1   A.   It's a semi-annual student evaluation for Student 16, fall

2   2007.

3   Q.   Okay.  What stood out to you in this document?

4   A.   The last paragraph, second page, the committee will

5   determine its recommendation to the psychology department

6   faculty in May 2007 regarding continued retention in the

7   doctoral training program or dismissal from the program.  Yes.

8   Q.   Okay.  Do you want to put up Exhibit 103?  Plaintiff's

9   Exhibit 103, Your Honor.

10             Okay.  Mr. Yu, can you please explain to the Court

11   what is Plaintiff's Exhibit 103?

12   A.   It's an academic transcript for Student 16.

13   Q.   Okay.  And what stands out now this document?

14   A.   Second page, about fall semester 2007.  So, this student

15   was dismissed from externship, but nothing was mentioned here.

16   No U grade.  The class supposed to be PSYC 748 externship, but

17   it didn't appear there.  No U grade for dismissal from

18   externship.

19   Q.   Now, Mr. Yu, could you please tell the Court how your

20   treatment differed -- how was your treatment different by ISU

21   for -- than Student 16?

22   A.   So, Student 16 was warned that this student was at risk

23   for dismissal.  But for me, I was never warned that I was or

24   would be at risk for dismissal, but I was dismissed from the

25   program.  Another thing is this Student 16 was dismissed from

1    externship but was not assigned a U grade.  I was dismissed

2    from an externship and was assigned a U grade.

3    Q.    Okay.  Mr. Yu, are you ready?

4    A.    Yes.

5    Q.    Are there other differences in the way you were treated

6    than other similarly situated students?

7    A.    Yes.  Student --

8    Q.    Hold up.  Good to go?

9          All right.  Mr. Yu, you now have Plaintiff's Exhibit

10   Number 16 before you.  Could you please tell the Court what

11   that is?

12   A.    It's a semi-annual student evaluation for Student 13, fall

13   2005.

14   Q.    And what stands out to you about this document?

15   A.    Last paragraph.  Moreover, if the internship or

16   application process is authorized, internship will have to be

17   informed that Student 13 is currently on academic probation.

18   Q.    And Mr. Yu, how was this treatment different from yours --

19   excuse me.  How was the treatment of this student different

20   from yours from Idaho State University?

21   A.    So, this Student 13 was placed on academic probation and

22   was not dismissed.  I was never placed on academic probation

23   and I was dismissed.

24   Q.    All right.  Mr. Yu, can you give me an example of another

25   student -- excuse me, ma'am.  Can you give me an example of

1    another student that you were treated differently from?

2    A.   Yes, Student 3.

3    Q.   Could you please put up exhibit -- Plaintiff's

4    Exhibit 0002.

5             All right.  Mr. Yu, what is this document?

6    A.   This is a letter sent to Student Number 3 from the dean of

7    graduate school.  In this letter, the dean warned the student

8    that we are sending this letter to inform you that your

9    academic performance needs to improve dramatically in the fall

10   semester to avoid a possible dismissal, or, as a consequence,

11   as stipulated by the graduate school.

12   Q.   Good to go on 14?

13            Okay.  Mr. Yu, can you please tell me what is

14   Exhibit 14, Plaintiff's Exhibit 14?

15   A.   It's a semi-annual student evaluation for Student 3,

16   spring 2012.

17   Q.   And what stands out to you about this document?

18   A.   Oh, last paragraph of first page.  So, the clinical

19   program rules also required the committee to place Student 3 on

20   academic probation until the grade is remediated via the retake

21   process.

22   Q.   And how were you treated differently than Student 13 at

23   your time at Idaho State University?

24   A.   So, this Student 13 was warned by the dean that Student 3

25   was at risk for dismissal and also was placed on academic

Jun Yu - Cross

1   probation.  For me, I was never warned that I was or would be

2   at risk for dismissal and was never put on academic probation

3   but I was dismissed.

4   Q.   Mr. Yu, were you ever placed on probation while you were a

5   student in a doctoral program for clinical psychology at Idaho

6   State University?

7   A.   No.

8   Q.   Mr. Yu, were you ever warned that you were at risk of

9   dismissal from the program while you were a student in the

10  clinical -- in the clinical -- doctorate -- in clinical

11  psychology at Idaho State University?

12  A.   No.

13          MR. COULTER:  No further questions.  Your witness.

14          THE COURT:  Mr. Kelly.

15                     CROSS-EXAMINATION

16  BY MR. KELLY:

17  Q.   Mr. Yu, you were never placed on academic probation at any

18  point in time during your tenure at Idaho State; correct?

19  A.   Correct.

20  Q.   Did you ever receive a grade lower than a B in any course

21  work or any practicum?

22  A.   No.

23  Q.   So, I think you testified today that you made reference to

24  the student handbook; correct?  Are you familiar with the

25  student handbook?

1    A.    I read it.

2    Q.    And are you aware that students are put on academic

3    probation, or they can be placed on academic probation if they

4    receive a grade C or lower.  Does that sound accurate to you?

5    A.    Yes.

6    Q.    So, again, since you never received a C grade or lower in

7    any course work or practicum, logically then, there would be no

8    reason to put you on academic probation; correct?

9    A.    Yes.

10   Q.    And if we looked at all those student evaluations of you

11   that we saw the last couple of days, the evaluation was always

12   that your academic progress was satisfactory; correct?

13   A.    Correct.

14   Q.    And the issues that were at hand with you were your

15   professional development; correct, from Idaho State's

16   perspective?

17   A.    Correct.

18   Q.    So, if we look at Exhibit 19, which you indicated

19   references Student 55, this is for the fall of 2012.  You

20   reference paragraph six.  The first paragraph states "The CTC

21   finds the professional progress of this student to be

22   satisfactory;" correct?

23   A.    Correct.

24   Q.    And then if you go down to the next paragraph, it says,

25   "The committee finds the student's academic progress to be

Jun Yu - Cross

1    unsatisfactory;" correct?

2    A.    Where is it?

3    Q.    See, it's the second paragraph of Section VI.

4    A.    Yes.

5    Q.    Okay.  So, there is a distinction between you and this

6    student; correct?  This student was on academic -- or his or

7    her academic progress was unsatisfactory during this time

8    frame, but at no time frame was your academic progress

9    unsatisfactory; correct?

10   A.    The academic probation also includes the clinical part and

11   the -- you know, the course work part.

12   Q.    Okay.  Well --

13          MR. COULTER:  Excuse me, Your Honor.  I hate to

14   interrupt, but we do have a redaction on this one on the second

15   paragraph.  It says -- you need to take that down.

16          THE COURT:  Take it down, please.  Mr. Kelly, can you

17   take it down?

18          MR. KELLY:  It's down, Your Honor.

19          THE COURT:  I still have it on my screen.

20          MR. KELLY:  That is another exhibit.  I just grabbed

21   that one and have taken it down.

22          MS. SUTHERLAND:  Which exhibit was that?

23   BY MR. KELLY:

24   Q.    So, where can you point out that academic probation

25   includes both academic work and clinical work?

Jun Yu - Cross

1    A.   Let me show you.  For Student 20 --

2    Q.   I am talking in general.  Where does it say, in a clinical

3    handbook or anywhere, that academic probation includes both the

4    academic work and the clinical work?

5    A.   Nothing in the clinical handbook said concerns or problems

6    on the professional part and you were not to be placed on

7    probation.

8    Q.   Okay.  And you are talking about a specific student?

9    A.   No, handbook.

10   Q.   Okay.  But isn't it true there is no reference in the

11   handbook -- there is no policy for U grades obtained in an

12   externship and an internship?

13           THE COURT:  Mr. Kelly, can we stop for a moment?  You

14   said clinical handbook earlier.

15           MR. KELLY:  Clinical student handbook.  I'm sorry.

16           THE COURT:  All right.  And I just wanted -- because

17   there's -- I want to make sure I am not confused about

18   different handbooks.

19           MR. KELLY:  I'm sorry, Your Honor.  It's clinical

20   student handbook.

21           THE COURT:  All right.  Go ahead.

22           THE WITNESS:  Can you show me where in the clinical

23   handbook said that if a student -- like, okay, can be dismissed

24   without warning, or, you know.

25

Jun Yu - Cross

1   BY MR. KELLY:

2   Q.   Well, I don't have the burden here, Mr. Yu, you do.  And

3   you're up here opining about all these other student

4   evaluations and telling us and telling the Court that you are

5   being treated differently than these students.

6           And I'm trying to draw the distinction that most of

7   these students, starting off with Student 29, were on academic

8   probation or the threats of academic probation?

9           MR. COULTER:  Yes, Your Honor.  I think that's

10  argument as opposed to a question.

11          THE COURT:  Well, he's putting context in response to

12  the question the witness posed to him.  I will allow it.  But

13  let's finish it and move to a question.

14  BY MR. KELLY:

15  Q.   So, what I am asking you, is for you to show me where

16  professional -- where there's professional progress that's

17  unsatisfactory, how that then translates into academic

18  probation?

19  A.   Academic probation, we are all doing academic --

20  university doing academic work; right?  Like, academic

21  probation includes both the course work and the clinical work.

22  Q.   And I am asking you to show me, since you are opining that

23  that's in fact the case.  Can you tell me where that's located

24  in the clinical student handbook or anywhere?

25          I will tell you what.  I will represent to you that

Jun Yu - Cross

1   again, that there's no policies, no written policies at Idaho

2   State University for U grades obtained in externships and

3   internships.  That's professional development.  Professional

4   progress; correct?

5   A.   I don't think you accurately represented that policy.

6   Q.   All right.  Tell me what I am saying wrong then.

7   A.   So, you are saying -- you are saying the U grade policy

8   does not apply to professional work; is that correct?

9   Q.   I am telling you that there's no policy.  So, I want you

10  to tell me where the policy is.

11  A.   My understanding is there is a policy.

12  Q.   All right.  And I want you to tell me where it is or what

13  it says.

14  A.   It says if a student is at risk for getting a U grade,

15  then the student will be informed and provided remediation.

16  Then if still not -- not satisfactory, then will be assigned a

17  U grade.

18  Q.   And I want you to tell me where that is.  Again, you're

19  sitting up here opining about all these other student

20  evaluations.  So, if you have these -- this personal knowledge

21  about the distinction between the progress that these students

22  were making and the progress that you were making, I assume you

23  have some foundation for it.  So, is it in the clinical student

24  handbook?

25  A.   Yes.

Jun Yu - Cross

1    Q.   And if it is, I want you to tell me where it is, because I
2    cannot find it.
3    A.   It's in student handbook 2011.
4    Q.   What section?
5    A.   The section about grading.
6    Q.   Okay.  And what does it say?
7    A.   It says just that, what I said.  How to assign a U grade.
8    Q.   Can I tell us what it says?
9    A.   Yes.
10   Q.   Okay.  Under grading, "A student earning a C or less in
11   any graduate course work will automatically be placed on
12   academic probation by the psychology department and required to
13   retake the course at the earliest possible time."
14          Does that sound accurate?
15   A.   Yes.
16   Q.   Okay.  And again, you never received a C or less in any
17   academic course; correct?
18   A.   Correct.
19   Q.   And then it says, "Students registered for thesis or
20   dissertation credits will be graded S, for satisfactory, IP, in
21   progress, or U, unsatisfactory, every semester by their
22   research adviser."
23          Skipping ahead, "Unsatisfactory research performance
24   indicates a failure to contribute or to progress despite
25   repeated informational discussions with the research adviser.

Jun Yu - Cross

1   If a student is at risk of a U grade, the CTC will be informed

2   by the research adviser, prior to the end of the semester, and

3   a formal letter will be issued to describe the nature of the

4   unsatisfactory progress.  Failure to meet the specified

5   remediation plan will result in a U grade and subsequent

6   academic probation.  The probation will be lifted upon

7   semester-long performance yielding an S grade."

8           That's the entire section of the grading portion of

9   the clinical student handbook.

10  A.   Which year was that?

11  Q.   This is from -- this is the latest one from 2014, but I

12  will represent it hasn't changed.

13  A.   In November 2011, it's different.

14  Q.   And do you have a copy of 2011?  I will represent to you,

15  it's not different.

16  A.   It's different.

17  Q.   And again, you have the burden to show me.  I don't have

18  the burden to show you, but I'm giving you the opportunity.

19          Again, I am telling you there is no policy in regard

20  to getting a U grade in an externship or internship at Idaho

21  State University.  It's on a case-by-case basis.

22  A.   There is a policy.  That's on the grading.  So, if there

23  is no policy, then you will -- so, what are we doing?  You are

24  not following policy then.

25  Q.   If there's no policy, what policy are we not following?

Jun Yu - Cross

1   A.   Well, there's -- there's a policy.  Like, there's ethics

2   code.  You know, you need to follow ethics; how to deal with

3   students, how to supervise students, and how to work with

4   students and assign grades.

5   Q.   Okay.  I mean, that's great for you to say, but I'd like

6   to see some proof in that regard.  Again, you are up here

7   espousing an opinion about these other students and indicating

8   you have personal knowledge of why you were treated differently

9   from these students; therefore, you should have some

10  information, documentation, or proof to support that.  And I

11  don't hear any.

12  A.   Well, my support is just reported.  You know, these eight

13  students were, you know, all warned that they were at risk for

14  dismissal and were eventually not dismissed.  And I was never

15  warned that I would be or was at risk for dismissal but was

16  dismissed.  And --

17  Q.   I'm sorry.  Go ahead.

18  A.   And never was -- never placed on probation.

19  Q.   And as you went through these individuals, we determined

20  that, as you discussed them, Student 29 was placed on academic

21  probation.  Student 22 was discussed being placed on academic

22  probation.  Student 20 on academic probation.  Student 16,

23  there was a distinction there, because the professional

24  progress was unsatisfactory.

25  A.   Student 16 was placed on probation.

Jun Yu - Cross

1    Q.   Right.  But that had to do with professional conduct,

2    not -- not academic.  I am agreeing with you on that one.

3    A.   So --

4    Q.   I am telling you the other ones, though, are all academic

5    probation.  That's where the distinction is with you.

6    A.   Well, in fact, that shows -- from Student 16, that shows

7    they don't distinguish academic or professional.

8            MR. COULTER:  That needs to come down.  It's not

9    redacted.

10   BY MR. KELLY:

11   Q.   And if you look at Section VI, all right.  We are looking

12   at Exhibit 4.  Can you find Exhibit 4?  This is in regards to

13   Student 16.

14           THE COURT:  Student 16 you mean?

15           MR. KELLY:  Student 16, Exhibit 4.

16           THE COURT:  All right.

17   BY MR. KELLY:

18   Q.   Do you see that, Mr. Yu?  That's the fall 2007 evaluation?

19   A.   Yes.

20   Q.   And you discussed this earlier?

21   A.   Yes.

22   Q.   So, this again is one where there was some issues with

23   professional progress being unsatisfactory.

24   A.   Yes.

25   Q.   Okay.  So, I'm telling you, that one, I'm agreeing with

Jun Yu - Cross

1    you that there is a -- that's one situation that would be

2    similar to yours in that your professional progress, according

3    to the school, was unsatisfactory.

4             What I am also trying to point out to you and trying

5    to get you to agree with me, that the academic progress of

6    these other students was the issue, not professional progress.

7    Does that sound accurate to you?

8    A.   Well, this student was warned.  I am not talking about --

9    talking about trying to distinguish between, you know, academic

10   probation or professional probation.  The department didn't

11   differentiate it.

12   Q.   They did.  I mean, in every one of these things that your

13   attorney showed you earlier, there was a distinction as to

14   whether the academic progress was satisfactory or the

15   professional progress was satisfactory.

16            In this one, in regard to Student 16, Exhibit 4, is

17   the only one that showed that professional progress was

18   unsatisfactory.  So, all I am trying to do is show that this is

19   the one that's similarly situated you to.  Where the others, it

20   was a distinction that you were fine academically but they were

21   not.  Does that sound accurate to you?

22   A.   You try to differentiate academic probation and

23   professional probation.  Is that right?

24   Q.   That's -- I will answer that question.  That's right.

25   A.   In fact, the department didn't differentiate that in their

Jun Yu - Cross

1    documents.

2    Q.    Sounds like they did, looking at the documents we saw

3    today.

4    A.    What I am telling you is if -- okay.  If a student was put

5    on academic probation and then didn't meet the requirement,

6    would that be -- would that student be dismissed then?

7    Q.    I have answered one question.  You are the one that is

8    supposed to answer the questions.  So, all I want to know from

9    you, again, is the distinction between all these students we

10   discussed today was the fact that, other than Student 16 --

11   A.    Well, there's Student 20 also.

12   Q.    Let me finish.

13   A.    Okay.

14   Q.    Let me finish -- the other ones were all either going to

15   be put on academic probation or the evaluation said their

16   academic progress was unsatisfactory.  And all I want you to do

17   is tell me yes or no, you agree with that, because that's what

18   the documents say.

19   A.    I disagree with you.  You misunderstood my point.  You

20   tried to differentiate between academic probation and

21   professional probation.

22   Q.    I am not trying to do that.  The documents are saying

23   that.

24   A.    The document didn't say that.

25   Q.    All right.  Do you want to go back through each and every

Jun Yu - Cross

1    one of them?  The one we just looked at, Exhibit 4, Exhibit 4

2    discussed how Student 16 was fine academically.  But

3    professionally, the progress was unsatisfactory.  Do you recall

4    seeing that in Section VI of that Exhibit 4?

5    A.    You try to ignore the main point I point out, is if a

6    student was at risk for dismissal, the department would warn

7    the student.

8    Q.    And all I am trying to point out to you, there is a

9    distinction between academic probation and issues and

10   professional issues and probation.

11   A.    I disagree.

12   Q.    Okay.  All right.  We will continue to -- rather than beat

13   a dead horse, we will just disagree on it.

14           But again, just so the record is clear, you never

15   received any C grades in either academic courses or practicums;

16   correct?

17   A.    Correct.

18   Q.    And the two U grades you received were for your externship

19   and your internship; correct?

20   A.    Correct.

21   Q.    And did you ever, in fact, try to appeal those U grades

22   that you received?

23   A.    For internship, actually, the U grades was assigned after

24   I received the letter saying the committee voted to dismiss me.

25   Q.    But you never tried to appeal either one of those U

Jun Yu - Redirect

1  grades; correct?

2  A.   Well, they already -- I was told to appeal to the

3  department about the program dismissal.  They didn't give me

4  any chance to appeal the U grade from internship.

5  Q.   So, the answer would be no; correct?  You did not appeal

6  those grades?

7  A.   That's not accurate.  I was not given the chance.

8  Q.   So, you didn't -- you didn't appeal them though?  Whether

9  you were given the chance or not, though appeals did not take

10  place in regards to those U grades?

11  A.   The internship U grade was assigned --

12           THE COURT:  Let's move on.  New question, please.

13           MR. KELLY:  All right.  I am done, Your Honor.  Thank

14  you.

15           THE COURT:  Do you have further direct examination,

16  Mr. Coulter?

17           MR. COULTER:  Yes, Your Honor.

18           THE COURT:  All right.

19                     REDIRECT EXAMINATION

20  BY MR. COULTER:

21  Q.   Mr. Yu.

22  A.   Yes.

23  Q.   Okay.  During the -- when you got your U grade in

24  regard -- when you got your U grade for the CCCA internship,

25  did you receive the U grade after the Idaho State University

1    had voted to recommend that you be dismissed from the program?

2    A.    Yes, the internship --

3    Q.    So, at the time --

4    A.    -- U grade.

5    Q.    -- you received the U grade, you were not dismissed from

6    Idaho State University; would that be correct?

7    A.    Correct.

8    Q.    Now, Mr. Yu, the nature of litigation, but could you

9    please explain, in your own words, I think what -- I think what

10   you were trying to say but it was kind of hard to figure it

11   out.

12          But do you get a grade in -- do you get a grade when

13   you get a strictly academic?  In other words, you are pencil

14   and paper kind of writing in that program.  So, if I had

15   Psychology 248, and I didn't have to go through an externship

16   or anything, just a standard course, would I get a grade?

17   A.    Would you explain more?

18   Q.    Yes.  If I was taking a graduate course that did not call

19   for me to do any clinical work or professional work, as it has

20   been categorized here, would I get a grade?

21   A.    Yes.

22   Q.    All right.  Now, if I was on externship, would I get a

23   grade?

24   A.    Yes.

25   Q.    All right.  And in any program that you would have, would

Jun Yu - Redirect

1   you -- if you were failing, would you expect to get some type

2   of remediation plan?

3   A.   Yes.

4   Q.   While you were a student at Idaho State University, were

5   you -- did you ever get a remediation plan?

6   A.   No.

7   Q.   All right.  While you were a student at Idaho State

8   University, were you -- would you ever be the subject of

9   getting placed on probation?

10  A.   No.

11  Q.   Why?

12  A.   I was never -- never placed on any kind of probation.

13  Q.   All right.  Now, you referred to, I believe, the APA

14  guidelines; is that correct?  The American Psychology

15  Association guidelines or the ethical considerations; is that

16  correct?

17  A.   Yes.

18  Q.   Okay.  Would you now have a chance to explain what did you

19  mean by that you should have been given something in accordance

20  with the ethical considerations?

21  A.   Yes.  For clinical work, the supervisors will need to

22  follow APA ethics code in assisting --

23  Q.   Did they do so in this case, in your case, as compared to

24  other students?

25  A.   No.

Jun Yu - Redirect

1    Q.    Please explain.

2    A.    Because, well, Dr. Koocher point out they didn't follow

3    ethics code in dealing with me, you know.  Well, let me also

4    explain to you my understanding of that code.  Well, if you

5    work with a student in a professional setting, you -- the code

6    requires the supervisor to provide specific and timely feedback

7    on how the student was doing.

8              And if there's a problem, the supervisor was required

9    to remediate.  Provide the student with an opportunity to

10   improve.  That surely includes, you know, warning, you know.

11   Q.    All right.  Mr. Yu, did you ever -- did you ever receive

12   any internship records from -- for other students to evaluate?

13   A.    No.

14   Q.    So, to your knowledge, you don't know whether or not these

15   other students were in the same position as you were; is that

16   correct?

17   A.    Correct.

18   Q.    And it is possible -- it is possible that if you did

19   receive those documents, you would be more able to explain to

20   Mr. -- you would be more able to capably answer the questions

21   that were provided by -- that were asked by Mr. Kelly; is that

22   correct?

23   A.    Yes.

24              MR. COULTER:  No further questions.

25              MR. KELLY:  Nothing else, Your Honor.

Jun Yu - Redirect

1               THE COURT:  All right.  Sir, you may step down.

2               Mr. Coulter, your next witness.

3               MR. COULTER:  Yes, Your Honor.  I forgot where I was.

4               At this time, we call Dr. Tyler Bowles.

5               THE COURT:  Mr. Bowles, if you will go to the witness

6       box, please.

7               COURTROOM DEPUTY:  Raise your right hand.

8               You do solemnly swear that the testimony you are

9       about to give in the matter now before this Court will be the

10      truth, the whole truth, and nothing but the truth, so help you

11      God?

12              THE WITNESS:  Yes.

13              THE COURT:  Thank you.  Please be seated.

14              COURTROOM DEPUTY:  And for our record, sir, could you

15      state your full name and spell your last.

16              THE WITNESS:  Tyler Joe Bowles, B-O-W-L-E-S.

17              THE COURT:  Back up just a scooch from that

18      microphone, sir.

19              You may inquire.

20              MR. COULTER:  Yes, Your Honor.  I just wanted to have

21      a little sidebar with counsel really quick.

22              THE COURT:  Okay.  That's fine.

23          (Off-the-record discussion held.)

24              MR. COULTER:  Your Honor, we are willing to stipulate

25      that Dr. Bowles is an expert in economics and can opine on

Tyler J. Bowles, Ph.D., CPA - Direct

1   pretrial cause and all the other things that go along with

2   economic analysis.

3           THE COURT:  All right.  I am understanding the

4   stipulation is that Dr. Bowles is qualified as an expert in the

5   discipline of economics; is that correct?

6           MR. COULTER:  That's correct, Your Honor.

7           THE COURT:  All right.  So noted for the record.  Go

8   ahead.

9                   TYLER J. BOWLES, PH.D., CPA,

10  having been duly sworn, was examined and testified as follows:

11                      DIRECT EXAMINATION

12  BY MR. COULTER:

13  Q.   Dr. Bowles, how did you become familiar with this case?

14  A.   Somebody from your office contacted me late 2015, early

15  2016.

16  Q.   All right.  And what was the -- were you eventually

17  retained by counsel?  By my office?

18  A.   Yes, sir.

19  Q.   All right.  And what were you asked to do?

20  A.   To calculate economic damages.

21  Q.   The case of -- in this case?

22  A.   Yes, sir.

23  Q.   Okay.  And did you do so?

24  A.   Yes, I did.

25  Q.   All right.  And did you issue a report?

Tyler J. Bowles, Ph.D., CPA - Direct

1   A.   Yes, I did.

2   Q.   All right.  And Dr. Bowles, can we go ahead and put up

3   Plaintiff's 123.

4            And I believe, Your Honor, we have stipulated for the

5   admission of 123.  Counsel?

6            MR. KELLY:  That's correct, Your Honor.

7            THE COURT:  All right.  Plaintiff's Exhibit 123 is

8   admitted.

9       (Exhibit 123 admitted.)

10  BY MR. COULTER:

11  Q.   So, Dr. Bowles, in looking at the present value of lost

12  earnings for Mr. Yu, can you tell us how you calculated that

13  and what those numbers represent?

14  A.   Yes.  I looked at the -- the earnings, in Chinese

15  currency, of college professors in China.  As an alternative

16  then, as an offset, I looked at what Mr. Yu is now earning in

17  the private sector in the -- as an education -- in an

18  educational consultant firm.

19            I projected that he would work till age 60, and

20  essentially, I looked at the difference.  Again, I originally

21  got these numbers at Chinese RMB currency, converted them to

22  dollars, projected them in dollars, but converted it to present

23  value terms.

24            So, it's essentially the difference between what a

25  person in China can earn in their lifetime as a college

Tyler J. Bowles, Ph.D., CPA - Direct

1   professor versus what Mr. Yu is now earning, adjusted for, you

2   know, raises throughout their life in both the college

3   professor scenario and the private consulting scenario.  And I

4   converted it to dollars, you know, expressed it in dollars for

5   the convenience of the Court.

6   Q.   So, Dr. Bowles, could you please explain the significance

7   of this first page of Exhibit 123 and what the numbers

8   represent?

9   A.   It's just a summary of the lifetime earnings in those two

10  scenarios, and then I just take the differences, the economic

11  loss expressed in present value terms.

12  Q.   And where it says present value of lost earnings, the

13  number says $2,000,185 -- $2,185,793.  Would that be correct?

14  A.   Yes, sir.

15  Q.   And is that your -- is that -- would you stand by that

16  particular representation today?

17  A.   Yes, I do.

18  Q.   Okay.  And do -- there's two tables in there.  Okay.  And

19  can you tell me what -- I guess it's called table two

20  represents?

21  A.   Table two is where I calculate the present value of

22  lifetime earnings as a college professor.  So, I could go

23  through each column if you'd like.

24  Q.   I don't think that would be necessary, but you may get it

25  on cross-examination.  I don't know.  He's entitled to ask you

Tyler J. Bowles, Ph.D., CPA - Cross

1   any questions he likes.  What about table three?

2   A.   Table three is the -- is similar to table two.  I am just

3   looking at the -- at lifetime earnings based on the job that

4   Mr. Yu currently has, adjusted again for raises throughout

5   life, but then converting to present value terms and, you know,

6   using dollars as the currency.

7   Q.   And given the nature of economic analysis, are you

8   confident that the present value of lost earnings that you

9   calculated is correct in this case?

10  A.   Yes.

11          MR. COULTER:  No further questions, Your Honor.

12          THE COURT:  Mr. Kelly.

13                      CROSS-EXAMINATION

14  BY MR. KELLY:

15  Q.   Good morning, Doctor.

16  A.   Good morning.

17  Q.   You did your original work on this case back in March of

18  2016; correct?

19  A.   Yes.

20  Q.   That's when you issued your report?

21  A.   Yes, sir.

22  Q.   Have you done any subsequent work on it since March of

23  2016?

24  A.   Subsequent to my report, I read the deposition, which was

25  taken after my report, I believe, of Mr. Yu.  I also just

Tyler J. Bowles, Ph.D., CPA - Cross

1   rather recently looked at exchange rates.

2   Q.   Okay.

3   A.   Between the dollar and the RMB.

4   Q.   And speaking of exchange rates, they are different now

5   than they were in 2016; correct?

6   A.   Not significantly.

7   Q.   But they are different?

8   A.   Very little.  I would -- no.  It's -- I used the 6.5.

9   It's 6.6.

10  Q.   And it's what now?  6.8, 6.9?

11  A.   The number I looked at wasn't that high.  But that, again,

12  would not be a -- a large difference.

13  Q.   But it would change the numbers; wouldn't it?

14  A.   No.

15  Q.   Not at all?

16  A.   No.

17  Q.   So, mathematically, if you have a different exchange rate,

18  no matter how miniscule, it's not going to change?

19  A.   Since we are both multiplying and divide, you know, we

20  start with Japanese -- excuse me -- with Chinese currency.  We

21  convert that to dollars.  It's -- well, let me take that back.

22  It will have -- it would have a slight change.  It does affect

23  the analysis.  I misspoke.

24  Q.   Okay.

25  A.   But given that range of change you are talking about, it

Tyler J. Bowles, Ph.D., CPA - Cross

1    doesn't affect things significantly.

2    Q.   All right.  So, even though it affects the rate and

3    affects the numbers, you haven't done any updated calculation?

4    A.   I haven't.

5    Q.   So, the numbers that we have up here for Exhibit 123,

6    whether they are minuscule, from your perspective, or not, they

7    would be different; correct?

8    A.   They would be different.  Yes, sir.

9    Q.   Okay.  And how did you calculate the salary for a college

10   professor in China?  Where did you get that information?

11   A.   It -- two sources or three really.  I had an email from

12   Professor Jian Wu from the Zhejiang University that was

13   translated by a colleague of mine, Dr. Nick Guo.  In fact, I

14   enlisted Dr. Nick Guo.  He's an economist at Utah State

15   University or was an economist at Utah State University.  I

16   enlisted his help in the whole project.

17              But from the -- from the email -- and the email was

18   in response to some questions I had posed.  We had this email

19   from Professor Wu, from Zhejiang University, in the Psychology

20   Department, that noted this was the starting salaries for

21   psychologists, clinical psychologists, professors in, again,

22   Zhejiang University.

23   Q.   And in your conversations with any of these individuals,

24   was there some type of guarantee given to you that Mr. Yu was

25   going to get one of these positions?

Tyler J. Bowles, Ph.D., CPA - Cross

1    A.   I also had -- yes.  The guarantee, we can qualify that.  I

2    also had a letter and -- well, two letters from Professor Zheng

3    at Shanghai Normal University, who had a long history in

4    psychology.  And again, it was in response to questions of mine

5    that I had posed.  And Professor Zheng pointed out two things

6    that were important.  And these were also confirmed by

7    Professor Wu at Zhejiang University.

8            That, one, in speaking to Professor Zheng, because

9    Professor Zheng knew the identity of our Mr. Yu.  And that is

10   that clinical psychology programs in China are expanding

11   rapidly.

12           Number two, new faculty or new Ph.D.s with America --

13   from American universities are given preferential treatment.

14   And in Professor Zheng's language, there is an urgent need for

15   clinical professors at China universities, and that Mr. Yu, had

16   he graduated, would have been, and I quote, you know, great

17   demand.

18           I have also traveled extensively in China, as I note

19   in my report, and interacted, you know, over a long period --

20   well, on numerous occasions with Chinese faculty at Chinese

21   universities.  And that's also -- my own personal experience is

22   that Chinese universities put a high preference on American

23   Ph.D.s.

24           So, the answer to the question was, from Mr. Zheng,

25   from my own experience, and talking to Dr. Wu, that Mr. Yu

Tyler J. Bowles, Ph.D., CPA - Cross

1  would have been in high demand, if not at Zhejiang University,

2  a similar university.  A Professor Wu at Zhejiang University

3  noted the same thing.  That American Ph.D.s are given

4  preferential treatment.

5  Q.  But again --

6  A.  An absolute guarantee, no.  But given the information I

7  had, in the but-for scenario, assuming liability, had he not --

8  had he finished a Ph.D. in Psychology at an American

9  university, he would have got a job in China.

10  Q.  Okay.  Do you have a percentage, a -- are you guaranteeing

11  it?  Are you telling me there's a 50/50 chance?

12  A.  Oh, much more than 50/50.  Based on my own information, my

13  personal experience, talking with Dr. Wu, letters from

14  Professor Zheng, the information from Professor Wu, I would

15  say, you know, much more likely than not, I mean, almost

16  certain he would have received an offer from if not Zhejiang

17  University, another similar university.

18  Q.  Did you look at any universities in Beijing at all?

19  A.  I didn't.

20  Q.  Okay.  Are you aware that Mr. Yu lives in Beijing now?

21  A.  I am indeed.

22  Q.  And when did you learn that?

23  A.  Just in the last -- yesterday.

24  Q.  Okay.  But your numbers are based on the representations

25  you got from the people in the -- roughly the Shanghai area;

Tyler J. Bowles, Ph.D., CPA - Cross

1   correct, or the --

2   A.   Hangzhou.

3   Q.   Hangzhou.

4   A.   Hangzhou, yes.

5   Q.   Okay.  All right.  And again, so you haven't looked at any

6   type of job opportunities in Beijing?

7   A.   Well, again, I have traveled extensively in China.  I have

8   interacted with Chinese faculty at a number of universities.  I

9   know how their system works.  It's similar to the US system.  I

10  mean, they are competing with each other.  It's a national

11  market.

12           So, I didn't see it as, you know, particularly

13  important to, you know, compare specific opportunities in

14  Beijing with others in Hangzhou versus Shanghai.

15  Q.   All right.

16  A.   It wasn't necessary.

17  Q.   Okay.  So, then the plan was for him to commute 13 hours

18  to a job in Hangzhou?

19  A.   Well, you're -- I don't agree with the logic.  He was --

20  in the but-for world, we are not living in the but-for world

21  now.  He did not finish his Ph.D.  He's had to do whatever he's

22  had to do to make a living.  But in the but-for world, he is

23  from Hangzhou.  He wanted to work in Hangzhou.  I contacted

24  Zhejiang University.  There were opportunities there.

25           I am confident that had -- you know, had he finished,

Vol. 3 - 382
Tyler J. Bowles, Ph.D., CPA - Cross

1    he could have got a job.  If not Zhejiang, you know, there's

2    many universities.  I have been to Hangzhou.  There's many

3    universities in Hangzhou.

4    Q.   Okay.  Based on your experience of being over there, have

5    you ever looked at the opportunities for individuals,

6    professors with master's degrees?

7    A.   I am familiar with it, yes, sir.

8    Q.   And are there job opportunities for professors with just

9    master's degrees?

10   A.   Not in the -- in the academic environment that we are

11   talking about.  They have -- the Chinese system, to a

12   remarkable degree, somewhat surprising, if you go over there,

13   adopted the US structure of research universities.  And that is

14   the Ph.D. is the coin of the realm for a teaching position at

15   their universities.

16           We have -- we do not have Ph.D.'s teaching economics,

17   or we don't have -- we do not have non-Ph.D.s in the regular

18   research faculty at Utah State University.  And that would be

19   true in Chinese universities.  Again, they have adopted the US

20   system that puts a high preference on Ph.D.s.

21   Q.   So, you have been doing this long enough to know that

22   parties are supposed to mitigate their damages?

23   A.   Yes, sir.

24   Q.   Okay.  Did you happen to look as to the job opportunities

25   for individuals with master's degrees in China at all?

Tyler J. Bowles, Ph.D., CPA - Cross

1    A.   Not specifically, no.

2    Q.   And you are aware, again, that Mr. Yu has a master's

3    degree?

4    A.   Yes, I am.

5    Q.   It seems to me, looking at your report, it's kind of --

6    you know, kind of a lost opportunity report.  Kind of like a

7    wrongful death or a personal injury claim in that you

8    calculated out the damages for Mr. Yu until he's 60 years old;

9    correct?

10   A.   Yes, sir.

11   Q.   Which is the retirement age for someone in China?

12   A.   That's -- that's not an easy yes or no answer.

13   Q.   But that's what it was based on?

14   A.   I went through age 60.  You could go longer.  I mean,

15   certainly, he could stay healthy longer than that, but --

16   Q.   So, you are assuming that Mr. Yu will never get his Ph.D.?

17   A.   That's correct.

18   Q.   Okay.  So, are you aware of the fact that this lawsuit,

19   the remedies sought are two different things?

20   A.   I am indeed.

21   Q.   Okay.  So, if ISU prevails, in other words, if the Court

22   rules that ISU did not discriminate, intentionally discriminate

23   against Mr. Yu, he gets neither his Ph.D. nor damages.  Are you

24   aware of that?

25   A.   Correct.

1  Q.   If Mr. Yu prevails, the remedy will be is he will have his

2  opportunity to go back to Idaho State and get his Ph.D. and

3  potential damages.  So, if he prevails, Mr. Yu, more likely

4  than not, will have his Ph.D.

5  A.   I don't know that.

6  Q.   Well, then you don't know what the damages will be?

7  A.   I have calculated -- you are correct.  I have calculated

8  damages under the no Ph.D. scenario.

9  Q.   Okay.  So, let --

10  A.   I would -- and that's the case we have.  He does not have

11  a Ph.D.  We are sitting here, you know, somewhat speculative.

12  You know, again, we've had five or six years pass, so there's

13  damages regardless of the scenario.  But you are correct in the

14  sense that I have assumed the facts on the ground.  He does not

15  have a Ph.D., and he will not get a Ph.D.

16  Q.   Okay.

17  A.   If the scenario is different than that, then damages are

18  different.  I will agree.

19  Q.   Okay.  Is if he never gets his Ph.D., based on this

20  lawsuit, he doesn't get any damages; correct?

21  A.   Say that again?

22  Q.   If he doesn't prevail in this lawsuit, doesn't obtain his

23  Ph.D. through this process, he also doesn't get any damages;

24  correct?

25  A.   Well, he's been damaged.  Now, whether --

Vol. 3 - 385
Tyler J. Bowles, Ph.D., CPA - Cross

1        MR. COULTER:  Objection, Your Honor.

2        THE WITNESS:  I'm sorry.

3        MR. COULTER:  That calls for a legal conclusion.

4   That's certainly in the realm of Judge -- of the Court, not --

5   not even up to our discussion.

6        THE COURT:  No, he's cross-examining regarding

7   assumptions.  That's an appropriate question.  Overruled.

8        THE WITNESS:  Yes, I would answer the question.  I

9   mean, he's damaged.  He doesn't have a Ph.D.  Now, whether --

10  whether ISU is responsible for those damages is another

11  question.  As is common for a damage expert, I have assumed

12  liability.

13  BY MR. KELLY:

14  Q.   Okay.

15  A.   Without liability, I recognize there are no legal damages.

16  But that doesn't mean he -- he hasn't been damaged, in the

17  sense that being dismissed from the program, damages obviously

18  follow from being dismissed from the program.  Now, again, that

19  may have not been a wrongful act, and that's above my pay

20  grade.

21        But, you know, the cow -- the cow is dead.  A

22  neighbor shoots my cow.  The cow is dead.  Whether or not they

23  are legally responsible to me for some damages is another

24  question.  But he's damaged.

25  Q.   Well, the cow is not dead here though.

1   A.    Yeah, it is.

2   Q.    How is that?

3   A.    He's not -- he doesn't have a Ph.D.  As we sit here today,

4   he doesn't have a Ph.D.

5   Q.    Okay.  And again, the only remedy for him is that the

6   Court will say, "Well, he's not entitled to a Ph.D., hence he's

7   not entitled to damages."  So, your numbers are hypothetical

8   then; correct?

9   A.    No, my numbers are no more hypothetical than any case.

10  Again, as is common for a damage expert, I assume liability.

11  Once I assume liability, I compare the but-for world.  Under

12  the assumed liability, the but-for the world is he has a Ph.D.

13          In reality, I compare the reality world now.   In

14  reality, he doesn't have a Ph.D.  And I calculated damages

15  accordingly as is common as for a damage expert.

16  Q.    But in the real world, what will happen, in a short order,

17  the Court will either say, "No, he's not entitled to his Ph.D.

18  from ISU" or "he is."

19  A.    Yes, that's the liability question.  I agree.  If there is

20  no liability, there is no damage.

21  Q.    Okay.  So, what I want to ask you then, if he is, are we

22  still calculating numbers out for the next 25 years?

23  A.    If -- if -- assuming liability, which means the Court

24  rules that Idaho State committed a wrong, then my damages

25  follow.

Tyler J. Bowles, Ph.D., CPA - Cross

1   Q.   But then he gets his Ph.D.

2   A.   I don't know if he gets his Ph.D.

3   Q.   Well, let's assume that.

4   A.   That's the hypothetical.  Yeah.  Okay.

5   Q.   All right.  Well, let's assume he gets his Ph.D.  Okay.

6   Gets his Ph.D. within a year.  Does that change your numbers?

7   A.   Yes, it does.

8   Q.   And -- and how significantly does it change the numbers?

9   A.   Well, it would change it significantly, because you would

10  only have -- you have four or five years of damages at my

11  estimate, which, you know, you would have, you know,

12  approximately 40,000 a year for, you know, one, two, three,

13  four, five, six, seven years.  So, 40,000 a year approximately

14  at seven years -- what's that?  280.

15          So, you would have 280,000.  I am netting out the

16  offset.  But then there's also a catch-up effect.  I mean, he's

17  now -- at this point in time, he's now -- if he hasn't turned

18  40, he will soon turn 40.  And, you know, that's a different

19  academic market than five or six years ago.

20          And so we have past damages, but we still have future

21  damages even under the scenario of a Ph.D.  But I would agree

22  with you.  They would be less than what I have opined here.

23  Q.   Okay.  So, doing a rough number, assuming he gets his

24  Ph.D. awarded to him in the near future, we have six or seven

25  years of damages.  You are roughing out a number of $280,000?

Tyler J. Bowles, Ph.D., CPA - Cross

1  A.   No, that's just the past damages.  That's the five years.

2  He's now not -- he's behind.  But he's also -- you know, Mr. Yu

3  of -- he's a 40-year-old in a -- in an academic market that's

4  dominated by, you know, a little younger.  And he also is

5  starting later, and so he will never catch up.

6       At 40, there's a question or not whether he would

7  ever even become a full professor, because it takes time to

8  become a full professor.  So , there's -- you know, you never

9  catch up.  It's like getting behind, I suppose, in a ball game.

10  You may not win, because you just can't have -- the clock is

11  going to run out before you catch up.

12  Q.   Okay.  So, based on that scenario, you haven't calculated

13  out any numbers as to what we would look at then in the

14  scenario that Mr. Yu gets awarded his Ph.D.?

15  A.   I can give you the past.  I just gave it to you.

16  Q.   Right.

17  A.   I mean, you're talking 280.  But the future, I haven't

18  calculated that.  I mean, I can give you a -- probably

19  reasonable estimate, but you know.

20  Q.   You haven't done that?

21  A.   I haven't done that.

22           MR. KELLY:  Judge, that's all I have.  Thank you.

23           THE COURT:  Any further direct?

24           MR. COULTER:  No, Your Honor.

25           THE COURT:  All right.  Dr. Bowles, you may step

1  down.  Thank you.

2          MR. COULTER:  At this time, we have concluded our

3  case in chief.

4          THE COURT:  All right.  Plaintiff rests, Mr. Kelly.

5          MR. KELLY:  I'm sorry, Your Honor?

6          THE COURT:  Plaintiff rests his case.

7          MR. KELLY:  I'm sorry.  One more time, Judge.

8          THE COURT:  The plaintiff is resting.

9          MR. KELLY:  Okay.  Thank you.  Judge, I just have a

10  quick motion I want to get on the record.

11          THE COURT:  All right.

12          MR. KELLY:  Judge, and I believe I need to do this to

13  preserve the appeal in this case.  But under Rule 52, since

14  it's a bench trial, I want to preserve the argument -- 52(c).

15  I'm sorry -- the argument in regard to the accrual of the Title

16  VI action.  I know this was addressed in summary judgment, but

17  I believe I need to bring this up again now.

18          That he failed to -- that Mr. Yu failed to assert his

19  Title VI claim within the applicable statute of limitations.

20  Again, it's the university's position that the accrual -- the

21  accrual of his damages occurred when he had reason to know of

22  his injuries, which would have been May 3rd of 2017.

23          Since the complaint was not filed until September of

24  2015, and based on the federally that you follow state law,

25  statute of limitations is two years in Idaho for this

1  particular claim.

2          We take the position that the Title VI claim was

3  asserted untimely, and we are renewing our argument in that

4  regard.  Thank you.

5          THE COURT:  All right.  Mr. Coulter, do you wish to

6  be heard?

7          MR. COULTER:  Your Honor, the only thing -- Your

8  Honor, the only thing I have to say on that is if the case is

9  appealed, I will answer any appeal and any argument at that

10  particular point in time.

11          THE COURT:  Well, it might be better for you to

12  respond in some fashion here, so that that's part of an appeal

13  record.

14          MR. COULTER:  All right.  For the record, Your Honor,

15  we will stand by the arguments that we made when the Court

16  ruled on the motion for summary judgment.  The fact of the

17  matter is, is that in a -- in a discrimination case, you go

18  by -- you start -- our position is that you start the statute

19  of limitations at the time of the last -- last discriminatory

20  act.

21          The last discriminatory act would be October 2nd,

22  2013, as the Court has -- as the Court has ruled.  We believe

23  that the Court has made the correct decision.

24          THE COURT:  All right.  Mr. Kelly, anything further?

25          MR. KELLY:  Nothing, Your Honor.

1            THE COURT:  Well, the argument seems to have shifted

2    a little but from what I recall on the summary judgment

3    briefing and record.  There has been some limited proof put

4    forward in plaintiff's case, as I recall, mostly in the form of

5    a question posed to Mr. Yu by Mr. Kelly, and a response, and

6    then some follow-up on the redirect examination.

7            I was listening carefully to that in the context of

8    the statute of limitations issue.  I am satisfied, however,

9    that the evidence brought forward in the plaintiff's case does

10   not change the landscape in a way that would change my prior

11   ruling that this claim is not barred under the applicable

12   statute of limitations and the applicable law which identifies

13   when that statute begins to run.  So, that will be my ruling on

14   that.

15           All right.  Mr. Kelly, are you prepared to proceed

16   with your case?

17           MR. KELLY:  Yes, Your Honor.

18           THE COURT:  Actually, it's time, I see.  It just

19   happens -- no, we are not there yet, but we are almost there.

20           Who will be your first witness?

21           MR. KELLY:  It would be Mr. Roberts, Dr. Roberts.

22           THE COURT:  Dr. Roberts.  Let's get started.

23           MR. KELLY:  Your Honor, we just had a request to take

24   a quick five-minute bathroom break.

25           THE COURT:  Then we will go ahead and take our recess

1   a bit early.  We are going to come back at 11:10 a.m.  All

2   right?

3           MR. KELLY:  Thank you.

4       (Recess 10:50 a.m.  Resumed 11:09 a.m.)

5           THE COURT:  Thank you.  Please be seated.

6           MR. KELLY:  Your Honor, I will just get a list of

7   those exhibits that needed to be redacted so I don't put up my

8   copies.

9           THE COURT:  All right.  And I have hard copies here

10  from Ms. Sutherland.

11      (Off-the-record discussion.)

12          THE COURT:  Were there others?

13          MS. SUTHERLAND:  I am looking through them now.

14          MR. KELLY:  So, those six.

15          COURTROOM DEPUTY:  And nine.

16          THE COURT:  So, if I have a hard copy of all the ones

17  that had that issue, then --

18          MS. SUTHERLAND:  Yes, and I am actually going to go

19  through the ones that we -- and make sure that you have all of

20  them redacted that we had used today.

21          THE COURT:  If we do that separate and apart.

22          MS. SUTHERLAND:  Yes.

23          THE COURT:  These are the ones that we know had an

24  issue.

25          MR. KELLY:  Right.  I just wanted to make sure I

1    didn't put them up on the screen.

2              THE COURT:  Right.  Understand.  Your first witness,

3    please.

4              MR. KELLY:  Thank you, Your Honor.  Defense calls

5    Dr. Mark Roberts.

6              THE COURT:  Dr. Roberts, we will need you in the

7    witness box, please.

8              COURTROOM DEPUTY:  You do solemnly swear that the

9    testimony you are about to give in the matter now before this

10   Court will be the truth, the whole truth, and nothing but the

11   truth, so help you God?

12             THE WITNESS:  Yes.

13             COURTROOM DEPUTY:  Thank you.  Please be seated.  And

14   for our record, if you could state your full name and spell

15   your last.

16             THE WITNESS:  Mark West Roberts, R-O-B-E-R-T-S.

17             THE COURT:  You may inquire.

18             MR. KELLY:  Thank you, Your Honor.

19                       MARK W. ROBERTS, PH.D.,

20   having been duly sworn, was examined and testified as follows:

21                       DIRECT EXAMINATION

22   BY MR. KELLY:

23   Q.   Dr. Roberts, could you tell the Court how you are

24   currently employed?

25   A.   I am an emeritus professor who is retired.

1  Q.   And where are you retired from?

2  A.   Idaho State University.

3  Q.   And how long did you work at Idaho State University?

4  A.   From 1977 to 2000 -- the summer of 2015.

5  Q.   And what were your roles at Idaho State University?

6  A.   I started as an assistant professor.  I was hired to try

7  to construct a clinical program right from the onset of that

8  period, and we created various structures.  But I was hired

9  to -- because I could teach child development, because I could

10  teach psychometrics, and because I had a Ph.D. in Clinical

11  Psychology, which the program was interested in growing.

12  Q.   Okay.  And after your role as assistant professor, did you

13  get elevated?

14  A.   Yes, I became an associate professor and then a full

15  professor.

16  Q.   When did you become a full professor?

17  A.   Would have been 10 years after the 1977, so 1987.

18  Q.   Okay.  And let me backtrack a little bit.  What is your

19  education?

20  A.   I have a Bachelor's Degree at Stanford University in

21  Psychology.  I have a Master's and Ph.D. in Clinical Psychology

22  in the University of Georgia.

23  Q.   And when did you obtain your Ph.D.?

24  A.   1977.

25  Q.   Okay.  And went right to Idaho State University?

1    A.    Yes.

2    Q.    Okay.  Could you describe for the Court roles you

3    undertook, as a professor at Idaho State University, within the

4    clinical psychology program?  You obviously taught courses?

5    A.    We did not have a clinical program when I joined the

6    university.  We developed what was called a clinical specialty,

7    and I am trying to remember back what that was.  It really

8    wasn't until the opportunity to propose a doctoral degree in

9    clinical psychology that I became much more active.

10           Our graduate dean -- and I can't tell you the exact

11   year -- it was Butch Galm was the Dean at that time --

12   approached my chair, Victor Joe.  Said, "How about pursuing

13   this?"  And, indeed, we pursued it for several years and

14   eventually brought it to fruition.

15   Q.    Okay.

16   A.    And in that capacity, I became the Director of Clinical

17   Training.

18   Q.    And how long did you hold the role of Director of Clinical

19   Training?

20   A.    19 years.

21   Q.    Any other roles that you held within the clinical

22   psychology department during your tenure there?

23   A.    I was a director of the Psychology Clinic at its onset,

24   and then whenever our clinic director left ISU, I would become

25   the temporary clinic director, because I was the first clinic

Mark W. Roberts, Ph.D. - Direct

1  director and the constructor of the first clinic manual.  So, I

2  had an intimate role in the clinic.

3  Q.   Do you have any professional memberships?

4  A.   Yes, certainly.  I am a member of the American Psychology

5  Association, but I am also active in, you know, the Council of

6  University Directors of Clinical Psychology, which is a very

7  important national program that helps clinic directors evolve

8  their programs in accordance with the standards of the American

9  Psychology Association.

10          I am a member of the AABD, Association -- oh, it's

11  been changed -- the Association for Behavioral and Cognitive

12  Therapies.

13  Q.   Okay.  Anything else you can think of?

14  A.   No, those are the primary affiliations.

15  Q.   Okay.  Within the APA, any other roles other than being a

16  member?

17  A.   No.

18  Q.   Okay.  How about related to C of A with the --

19  A.   On the committee -- on the committee of -- for

20  accreditation, I served as a site visitor for many years.  I

21  probably did seven, eight site visits in total of other

22  doctoral programs in clinical psychology.

23  Q.   And you recall what time frame you were doing those site

24  visits?

25  A.   It would have been the 1990s and into the 2000s for sure.

Mark W. Roberts, Ph.D. - Direct

1   I mean, our program was accredited in 1995, first accredited.

2   We had been working at it for the previous several years.  And

3   so it would have been after 1995 that I was invited to become a

4   site visitor.  And I cannot tell you the start date.

5   Q.   Okay.  Fair enough.  Let's jump up to the year 2008.  You

6   obviously know the plaintiff, Jun Yu?

7   A.   Yes.

8   Q.   And did he apply for admission to Idaho State University

9   Clinical Psychology --

10  A.   Yes.

11  Q.   -- Doctoral Program?  In that year, 2008?

12  A.   2008 was his start year.

13  Q.   Okay.  So, his application would have been the previous

14  year then.

15  A.   We would have reviewed applicants for consideration during

16  the 2007-2008 academic year for admission into the fall

17  semester of 2008.

18  Q.   Okay.  And you were personally involved in his admission

19  process?

20  A.   Absolutely, yes.

21  Q.   In what capacity?

22  A.   Well, he was interested -- well, first, as Director of

23  Clinical Training, I had an obligation to organize the

24  admissions process, which involved collecting all the

25  materials, carefully getting them filed, numbered, available

Mark W. Roberts, Ph.D. - Direct

1  to -- for faculty review.  Because the admissions process is --

2  is quite extensive.  Commences someplace in January.

3          And it's my job to keep those files sorted for all

4  applicants, and allowing teams of faculty members to review

5  those files, and then go through the screening process, and

6  then the winnowing down process, and then the decisions as to

7  who -- which set of applicants to invite.  So, it's a lengthy

8  process that culminates in an invitation to interview on

9  campus.

10  Q.   Okay.  During that time frame, how many -- how many

11  students are actually admitted to the program each year?

12  A.   It's either five or six depending upon the year.  We

13  originally only had five full-time clinical faculty, so we

14  could only admit one student per full-time equivalent clinical

15  faculty member.  So, it was five and then when we moved up to a

16  sixth clinical faculty, we could admit six.

17  Q.   Do you recall who else was involved in Mr. Yu's

18  application process?

19  A.   Everybody on the clinical faculty at that time would have

20  reviewed his file.  A subset would have interviewed him.

21  Q.   And again, we are talking about five or six faculty

22  members?

23  A.   I am pretty sure there were six at the time Mr. Yu was in

24  the sequence of -- for admission and then eventually as a

25  full-time student.

Mark W. Roberts, Ph.D. - Direct

1  Q.   Okay.  Do you remember who any of them were, other than
2  you, obviously?
3  A.   Well Dr. Cellucci was there.  I believe Dr. Lynch was
4  there.  Who else?  Dr. Prause, Dr. Lawyer.  I am missing number
5  six, I think.
6  Q.   Is it Maria Wong?  Was she involved?
7  A.   She was not a clinical member.  That's a good question.
8  Maria Wong was a member of the experimental faculty, which
9  meant she was also a full-time member of the Psychology
10  Department, just like I.  However, we were in two different
11  programs.
12         She was very helpful to us in admission, because
13  her -- she was and is a migrant from China, Hong Kong, I
14  believe.  And so she was involved in the process of looking at
15  Mr. Yu, simply because he was also of Chinese background,
16  Chinese citizenship.  So, we involved her.
17  Q.   Okay.  Do you recall your opinion of Mr. Yu's
18  qualifications during the application process?
19  A.   Oh, lots of it.  Lots of them were -- lots of the
20  qualifications were quite good, especially the fact that he
21  already had a master's degree and that master's degree in China
22  included the core psychology topics; social psychology,
23  developmental psychology, research, statistics so on.
24         So, he had a master's degree in China that gave him
25  strength in the field of psychology.  His undergraduate major,

1   if I recall, was in English, which, of course, is excellent for

2   someone who would seek doctoral programs in the states.

3   Q.   Were there any concerns you had about his application?

4   A.   His graduate record exams on the analytic writing were --

5   and he took it three times.  The graduate record exams are

6   formalized tests offered in America for would-be college

7   students and graduate students.  In his analytic writings, he

8   had three measures, and they were all in the 30th percentiles,

9   which was not consistent with people we admit.  But we

10  recognized that English was his second language and didn't

11  think a whole lot about it.

12          We were ecstatic about his quantitative score.  I

13  remember it was quite high.  It was like 80th or 90th

14  percentile, reflective of his master's degree that he earned in

15  China, and we would expect someone who could earn a master's

16  degree to certainly do well in quantitative and probably did

17  well in his own language in China, certainly.

18          But since English was his second language, his

19  graduate record exam verbal score and his writing score would

20  have rendered him inconsistent with a typical successful

21  applicant were it not for the fact that he was -- that English

22  was his second language.

23  Q.   Okay.  Any other concerns that either you or the other

24  committee members of the --

25  A.   The fluency.  We all interviewed him, and his expressive

Mark W. Roberts, Ph.D. - Direct

1  language is halting.  It's been referred to in our documents as

2  choppy, but as you get to know Mr. Yu and interact with him on

3  a regular basis, which I did, the communication becomes quite

4  functional.

5  Q.    Okay.  And originally, Mr. Yu was wait-listed on the

6  program?

7  A.    You know, I believe that, but I have no independent

8  confirmation of that.  I think my colleagues indicated to me

9  that that was the case.  And I'm not surprised, because of the

10 shortcomings here in terms of communication, with English as a

11 second language, and because of the GRE verbal and analytic

12 writing scores.  He probably did not stick out as the top, one

13 of the top six.

14 Q.    And again, that's how many applicants you accepted in that

15 time frame?

16 A.    Right.  But we always -- in the acceptance process, we

17 create an alternate list and rank order them.  And I presume he

18 was in that group and then moved up as our top applicants found

19 an alternative site that was better for them professionally.

20 Q.    But eventually, he matriculated in the fall of 2008;

21 correct?

22 A.    He did.

23 Q.    Just in general terms, do you have a recollection of how

24 the fall semester of 2008 went?

25 A.    In my review for this case, I looked at the eight

Mark W. Roberts, Ph.D. - Direct

1   semiannual evaluations, and I recall that his performance was

2   just fine.  He took the required courses, and he was assigned

3   as a -- a graduate teaching assistantship.  He did not lecture

4   in a course.  We thought that was unwise, but he assisted three

5   or -- I think three of us, including me.  So, his graduate

6   teaching assistantship was relegated to academic work for, I

7   think, three different professors and he did well.

8         Everyone was pleased with his efforts.  I know he

9   scored videotapes for me.  I was pleased about that.  He also

10  was engaged in the ISU's mandatory and appropriate SPEAK

11  Program.  That is a requirement for all international students

12  who have been awarded a graduate teaching assistantship, which

13  he was.  He was fully funded.  That means tuition and a

14  stipend.  But instead of teaching a course, like I say, he

15  worked for three different professors, which we thought was an

16  appropriate accommodation.

17        MR. KELLY:  Okay.  Your Honor, I'm trying to pull up

18  an exhibit here.

19        THE COURT:  Okay.

20  BY MR. KELLY:

21  Q.   Thank you.  Dr. Roberts, we just pulled up what's --

22  A.   Yeah.

23  Q.   -- identified as Plaintiff's Exhibit 25.

24  A.   Uh-huh.

25  Q.   And you were just mentioning the SPEAK Program?

Mark W. Roberts, Ph.D. - Direct

1   A.   Yes.

2   Q.   Could you tell us -- tell the Court what that email

3   represents?

4   A.   Yes.  It sort of defines the contract that the university

5   has with an international student who's assigned to a GTA, and

6   he met weekly with Ms. Leonard to work on his conversational

7   skills or his accent skills.  I did some follow-up on the SPEAK

8   Program.  It's still in existence today, although they do not

9   have records dating back to fall semester 2008.  I actually

10  requested them.

11  Q.   Okay.  For all intents and purposes though, Mr. Yu's

12  experience there went well as far as you know?

13  A.   Yes.  There is no submission of a grade or passing.  It's

14  a requirement to engage in the international program -- or the

15  program for international students in order to help them, for

16  example, construct syllabi for a course.  Because GTA implies

17  you're teaching a course, or how to create exams, or just the

18  expressive language for a presentation.  So, they try to help

19  there.

20          Since Jun was not assigned to teach a course for his

21  graduate teaching assistantship, I'm sure they worked on

22  conversational speech.

23  Q.   Okay.  Is it fair to say, though, it is -- the academic

24  year of 2008 went smoothly for Mr. Yu?

25  A.   Yes.

Mark W. Roberts, Ph.D. - Direct

1   Q.   Let's take a look at Exhibit 507, Defendant's 507.

2   A.   Okay.

3   Q.   That's a -- can you tell us what that is?

4   A.   That summarizes the information that was yielded by his

5   fall 2009 performance.  That would have been fall semester of

6   his second year.  And so you can see the kinds of things he

7   did.  He was assigned to a practicum with me, where he

8   assisted, you can see, and that's exactly what we would do with

9   a new student.

10          Even though this was an area of interest to him, it's

11  my understanding he had never had direct training in it.  And,

12  certainly, I would treat him like every other student who is

13  new to that practicum team.  So, he did co-therapy, and we saw

14  both two-to-six-year-olds and grade schoolers, generally

15  presenting with disruptive behavior.  So, that's hit, disobey,

16  scream, yell, curse, that kind of stuff.  That's what motivates

17  parents to bring them into us.

18          He also -- what did he also?  Oh, that was the plan

19  for the spring.  And you can see the assistantships he had in

20  his duties in his second year here.  You can see he's not

21  teaching a course yet, but he did assistance.  He worked on the

22  SONA system, which is our way in which we recruit

23  undergraduate -- undergraduates to participate in our research

24  and compensate them with credit.

25  Q.   Okay.  If we go down to Section VI.

Mark W. Roberts, Ph.D. - Direct

1    A.    Yes.

2    Q.    The summary, can you just summarize what his fall 2009

3    semester looked like?

4    A.    Yeah.  Every semester, the Clinical Training Committee

5    inductively looks at every document and every piece of evidence

6    we have for the student, which is summarized above here.  And

7    then we make a judgment.  It's judgment based upon this group

8    of six clinical faculty.  And here, certainly, his academic and

9    professional progress were quite satisfactory for a second-year

10   student, and we were pleased about that.

11   Q.    Okay.

12   A.    And we were also -- you can see we were ecstatic about his

13   summer data collection in China.  That was a project for which

14   he had to gain institutional approval and did so in the spring

15   with Dr. Wong's help and my assistance.  And we were real happy

16   about that.

17         There was some issue here.  Oh, I have some

18   recollection of this, because it was a 642.  That's a

19   cognitive -- that's an advanced course in cognitive that he had

20   to take.  And Dr. Cellucci and myself and other people in the

21   committee discussed it and thought it might have been an error

22   of understanding of how to reference things.  So, it was just

23   simply discussed.  It was not -- it's the kind of mistake any

24   student could make.

25   Q.    But you did a -- you remedied that situation?

Mark W. Roberts, Ph.D. - Direct

1   A.   We talked with him about it, yes.  We, as a group,

2   considered it to be remedied.  And Dr. McCullough must have

3   been the instructor for the cognitive course, the 642 course.

4   Q.   Anything else during that fall?

5   A.   Can you scroll down?  I'm not looking at whatever else is

6   there.  Nope.

7   Q.   Okay.  And it's signed by Mr. Yu at the bottom also?

8   A.   Yeah.  It's our obligation to ensure that the student has

9   received the evaluation from the Clinical Training Committee

10   every semester.  And we always give them two copies and say

11   "Make sure to sign one, and if you have any objections, make

12   sure to let us know about that."  And he checked "I will not."

13          And you can see the date there.  And we tend to get

14   these done by the start of the subsequent semester.  And

15   there's January of -- 19 of 2010.  So, just fine.

16   Q.   Okay.  All right.  Let's jump ahead to the spring of 2010.

17   I am showing you Exhibit 505.  Can you take a look at that and

18   tell the Court what that is?

19   A.   Okay.  This would have been a practicum that he took in --

20   could you go back to the top there?

21   Q.   Sure.  Sorry.

22   A.   -- in the spring of 2010 with Cheri Atkins.  It was done

23   here in the psychology clinic.  Dr. Atkins is a local

24   professional licensed psychologist, and we often have students

25   engage in practicum with her at her site.  She's the director

Mark W. Roberts, Ph.D. - Direct

1   of a development disability -- a small development disability

2   agency at the time.  But we also would engage her and

3   compensate her to supplement our own efforts in the clinic.

4            So, she became a -- a supervisor in the clinic.  So,

5   these data are coming from the ISU Psychology Clinic.

6   Q.   Okay.  I am going to reduce the size of it.

7   A.   Okay.

8   Q.   So, you can look at it, but is that too small for you?

9   A.   No, I got it.

10  Q.   And just let me know when you are ready to scroll.

11  A.   Go down.  Let's see what her comments were.

12  Q.   Do you want to go to the comments?

13  A.   Yeah.

14  Q.   Okay.

15  A.   Okay.

16  Q.   And can you tell us what -- what you see as far as this

17  practicum evaluation?

18  A.   Well, the one thing that stuck out was that the B grade,

19  which is an unusual grade.  And I think Dr. Atkins, who was our

20  former graduate student, knew that.  We use Bs in practicum to

21  sort of flag that we notice something that the student should

22  pay attention to.

23            It's not an academic course.  We do for a -- this

24  would be a -- I'm going to make sure I get this right.  8-9,

25  9-10.  This is spring of second year.  We are comparing this

Mark W. Roberts, Ph.D. - Direct

1   young man at this point to other second-year students.  So, we

2   have expectations that are development in nature.

3           And note that almost all of his ratings were meets

4   expectations.  She was concerned about -- and you will have to

5   go up.  Why don't you skip up.  Let me find that B again.

6   There it is.  Ability to form a working alliance with patients

7   she wrote down and below expectations for a second-year

8   doctoral student.  So, she made some judgment about the

9   relationship that did exist between himself and patients.

10          And I am rather certain that she was doing

11  co-therapy.  I haven't gotten any evidence of that, but she

12  made that judgment, and she attributed it to his -- his

13  linguistic discourse.

14  Q.   Okay.  Anything else about that particular document?

15  A.   No.

16  Q.   Okay.  So, the next document I am showing you is the

17  Defendant's 506.  And can you tell the Court what that document

18  is?

19  A.   I think I have got on my screen the same spring of 2006

20  semi-annual evaluation.

21  Q.   Okay.  This is different than what we just looked at

22  though.  That was the practicum, correct, of Dr. Atkins?

23  A.   Oh, okay.  So, this is the summary for that spring

24  semester.  Okay.  Very good.  Okay.  So, what's the question?

25  Q.   Just tell the Court the sum and substance of this

Mark W. Roberts, Ph.D. - Direct

1  document.

2  A.   You can see that he did well in his course work.  532, I

3  think, is physio.  621 is the diagnostic testing course.  And I

4  am blocking out what 649 was.  But, he did As and Bs, and those

5  are academic courses.  So, that's different from practicum.

6  And then the practicum there was from -- this was the second

7  time that -- oh, no.  It reflects the time we just looked at

8  with Atkins, which we just went over.  And that summarizes his

9  assistantships.

10        And again, he's still viewed by the committee as in

11  compliance with both temporal guidelines and his -- if you go

12  to the next page, it should show that his overarching

13  performance was academically and professionally were just fine.

14  They were satisfactory.

15        And again, we were very pleased about his excellent

16  qualities in terms of disseminating the data he collected at

17  the -- during the summer, after his first year, and the fact

18  that he was able to present that at the World Congress of

19  Behavioral and Cognitive Therapy.  In fact, we took him with

20  us, and it was fun.  It was a nice conference.

21  Q.   Okay.  All right.  And then we are going to jump to the

22  summer of 2010.

23  A.   Okay.

24  Q.   This is Defendant's Exhibit 508.

25  A.   Okay.

Mark W. Roberts, Ph.D. - Direct

1    Q.   And can you tell the Court what this document is?

2    A.   Well, it's the evaluation performed by the practicum

3    supervisor.  And you can see that basically he met or exceeded

4    her expectations for someone in the summer of their second

5    year.  So, that's good.  We were pleased about that.  We have

6    no problems.  And again, all she pointed out was that his

7    conversational speech was a concern during supervision, because

8    she was not always -- I will just read it.  "Was not always

9    confident that he fully understood."  But she was still pleased

10   with him, and we were pleased with it.

11   Q.   Okay.  Were you pleased with Mr. Yu during -- for his

12   progress through the system at that point?

13   A.   Absolutely, as reflected in the previous document, which

14   would have been the Clinical Training Committee's summary of

15   his performance during the spring semester of the second year.

16   We gave him satisfactory, satisfactory for both professional

17   and academics, and it was well deserved.

18   Q.   Okay.  So, I want to jump ahead to the fall of 2010.

19   A.   Okay.

20   Q.   And I am showing you what's been marked as Defendant's

21   Exhibit 537.

22   A.   Yeah.

23   Q.   Could you take look at that and tell the Court what that

24   document represents?

25   A.   Scroll down.  I have got to see it all.  Keep going down

Mark W. Roberts, Ph.D. - Direct

1   here.

2          This is feedback regarding his proposed or regarding

3   his integrated paper.  We allowed an integrated paper as a

4   substitute for a strictly written qualifying exam.  The

5   qualifying exam, historically, has been a multi-day, lengthy

6   paper in which students -- or lengthy -- lengthy exam in which

7   students show that they have mastered the basics of the sort of

8   master's degree level courses in psychology.

9          So, all the area courses, Development, Social,

10  Cognitive, and so on.  We allow, like many doctoral programs

11  that exist, an alternative, different ways to satisfy the sort

12  of breadth requirement for knowledge in psychology that the

13  traditional qualifying exam is attempting to assess.

14         And, so, we allow a paper, because a paper is a very

15  scholarly review.  We have stipulations that it has to cover

16  certain areas.  And then once we approve it, then the student

17  works on their own independently.  They have a time limit, and

18  then they come back to the committee and defend it.  And note

19  that -- would you scroll back up?  Because I think this is

20  the -- okay.  Let me take a look.  Give me a second.

21  Q.   Sure.

22  A.   This is the committee's response to his product.

23         THE COURT:  Excuse me, Dr. Roberts.  He may be able

24  to read that, but I can't.  Can you increase it a little bit?

25         MR. KELLY:  Is that better, Judge?

1        THE COURT:  Yes.

2        THE WITNESS:  There you go.  This is the committee's

3  response to the product that he produced in that 30-minute --

4  or 30-day time line that the student is compelled to work on

5  their own, given the approved outline, the approved topic, and

6  so on.  And then what this does, is it shows how the committee

7  evaluated that paper.

8        Okay.  It shows the different strengths and

9  weaknesses.  So, the -- you can see the little points that were

10  looked at, and these were flagged, because we wanted him to

11  think about them in advance of the oral exam, which is the

12  second step of the qualifying exam for someone who elects the

13  integrated paper approach rather than the test approach.

14        So, you can see point number one.  There were some

15  issues about his summary.  And then point number two, strengths

16  and weaknesses of the methodologies in the various papers that

17  he reviewed.  And then here is the little absence.  You know,

18  we were concerned about exploring the corresponding Chinese

19  practices and comparing those to Western practices.

20  Q.  Now --

21  A.  In other words, there was something there that was flagged

22  for him to be prepared for for the orals.

23  Q.  Okay.

24  A.  The upshot is we approved the paper.

25  Q.  Okay.  You gave it an overall evaluation of marginal.  Up

1  above, do you see that?

2  A.   Okay.  But that's enough to allow the student to go to the

3  oral exam, because I'm sure it's a pass, marginal, fail.  And

4  we did have these areas of concern for him to look at.  And,

5  we, like, with any student, we would specify those, and

6  hopefully that would spur him to prepare for the oral exam

7  better.  But it was clearly at least a marginal there.  I don't

8  think was any doubt about that.

9  Q.   So, again, through this point --

10  A.   Fine.

11  Q.   -- in time, through the fall of 2010, everything was okay?

12  A.   Yeah.

13  Q.   From the university's standpoint?

14  A.   Yeah.

15  Q.   Let's jump ahead to the spring of 2011 then, and let me

16  show you the actual document that's marked Plaintiff's

17  Exhibit 29.  Make it bigger here.

18  A.   Excuse me.  That's the summary for the fall semester.

19  Q.   Right.  I just wanted to --

20  A.   Okay.

21  Q.   -- make it bigger, so everybody could see it.

22        Okay.  So, can you -- you advised the Court what the

23  document is.  Could you summarize it for Court?

24  A.   It's going to look at both the professional work, the

25  practicum work, and try to summarize hours earned, and the

1   ratings, and so on.  And then -- and you can see he had zero

2   below expectations rating from his one practicum supervisor,

3   Atkins.

4          And then keep going down.  Okay.  And that's his

5   assistantship.  That's how he justified getting paid, and he

6   did just fine.  And note that he instructed Child Development.

7   And one of the reasons we assigned him to that, is not only is

8   it in his interest area, but it enabled him an opportunity to

9   do what I'm doing right now, which is to speak in public and

10  organize the information.  We really thought that would help

11  him, because you have to field questions from students and

12  operate with English-speaking undergraduates.

13         Okay.  And the work was good.  Was good.  Certainly

14  met our criteria.  And then -- all of these are just ways to

15  flag for students that they are attending their required

16  nonclass, nonclinic professional activities.  Okay, which he

17  did.  Okay.  And then you can see he passed the integrated

18  paper, the oral component that I was alluding to a moment ago.

19  And his academic and professional were judged by the committee

20  to be just fine.  They were satisfactory.

21         And we were excited about him earning some money to

22  go to the -- oh, the Association of Behavior -- I am blocking

23  on -- in Denver, and that was great that he got that paper in

24  there.

25  Q.   Okay.  And anything else?

Mark W. Roberts, Ph.D. - Direct

1   A.    No.   And again, the overarching satisfactory for

2   professional, satisfactory for academic were present there.

3   Q.    Okay.   The last sentence there it says, "Finally, we ask

4   that Jun to consult with Dr. Roberts regarding the most

5   appropriate research forum submission."   What does that mean?

6   A.    Oh, okay.   Every spring, in conjunction with the

7   admissions cycle -- and, in fact, we just went through this in

8   the current program about two weeks ago or a week ago --

9   students are asked to present their current thesis, or

10  dissertation, or professor-driven research that they are --

11  that they participate in.

12         It's a way for -- it's an important mechanism in our

13  training program for two different purposes.   One, it conveys

14  to incoming students who are -- who have been invited to

15  interview, what kind of research we are doing in hopes to

16  attract our top applicants.   But it also has this dual purpose

17  of having students engage in a very important professional

18  activity, which is one of the goals of our accredited program.

19  And that is to present your data in a poster format.

20         That's a common professional activity of

21  psychologists, both academic and clinical.   And so he just had

22  to talk with me about what he was going to do.   And, of course,

23  what he was going to do was to organize his -- the treatment

24  acceptability work that he did in China.   Okay.

25  Q.    Okay.

Mark W. Roberts, Ph.D. - Direct

1  A.   That would be my recollection of what his poster was that

2  year.

3  Q.   Okay.  And we scroll down to the bottom.  Mr. Yu signed

4  off of this evaluation?

5  A.   Yep.  As you can see, he -- oh, I mean, it was a very good

6  evaluation.

7  Q.   And then let's go to -- maybe not.  Okay.  This would be

8  Defendant's Exhibit 510.

9  A.   Okay.

10  Q.   Tell the Court what this document is?

11  A.   Okay.  This would be in the spring of 2011, which would be

12  his third year in the program.  And the supervisor here is

13  Paula Seikel, whose name I misspelled, and the site was not the

14  ISU Psychology Clinic.  Paula Seikel is a professional who

15  supervises students and actually performs clinical duties in

16  the ISU Counseling Center.

17       Okay.  And we -- there is a reason we -- we had him

18  interview for that site, because you have to go down and be

19  approved if you are going to work.  Is we -- we knew

20  historically that the counseling center tends to yield a lot of

21  experience for students, and we really wanted him to have an

22  opportunity to increase his hours of professional,

23  supervised -- of supervised professional activity.

24       That was very important to us, because I knew his

25  hours were behind.  I'm the person who tracks all of those

Mark W. Roberts, Ph.D. - Direct

1   supervised hours with a -- with an eye toward internship

2   applications, because the internship application is coming up

3   here.  And so we wanted him to get more hours.  And also, Paula

4   Seikel, we had worked with her for some time, and she's an

5   excellent supervisor.

6   Q.   Let me ask you just to deviate from this document for a

7   second.  Why, up until this point in time, do you believe

8   Mr. Yu's hours were lagging?

9   A.   Well, I developed an increasing hypothesis.  Now, I'm a

10  fact witness here.

11          THE COURT:  It would help me if we could define what

12  hours we are talking about, so there isn't an abstraction.

13  BY MR. KELLY:

14  Q.   Please define for the Court --

15  A.   We summarize and the students track very assiduously all

16  of their hours of direct therapy, co-therapy, evaluations.  So

17  testing.  Any consultation they might be doing.  All of the

18  supervision they receive, those hours are accumulated, usually

19  during program years one through four, and submitted to the

20  internship sites.

21          The internship sites are national and competitive.

22  And students, of course, want to compete well.  And as the

23  Director of Clinical Training, it's my job to follow student

24  progress in accumulating those hours.  And if someone is

25  decidedly and empirically behind, we notice that.

1          And I know that one of the reasons I wanted him to

2    go, and the Clinical Training Committee accepted this, is that

3    Paula Seikel has been very good at creating interview and

4    follow-up conditions with ISU students on their worst day.

5    That's who goes to the ISU Counseling Center.

6          And students, from our program that have participated

7    there, have often earned 20 -- 20 hours plus of direct contact,

8    which is a good thing.  So, supervised direct contact matters.

9    It helps us in the long run enable a student to match at an

10   internship site.  So, we care about that.

11   Q.    Okay.  So, going back to Exhibit 510, with Paula Seikel's

12   evaluation, could you describe how she evaluated Mr. Yu?

13   A.    Well, like every person who accepts one of our students,

14   be it our own faculty in the ISU Psychology Clinic or somebody

15   in a -- a professional in an area site, such as the ISU

16   Counseling site or several other sites we use both here and in

17   Idaho Falls, they are encumbered to complete this form with the

18   student and go over it with the student.

19          I believe, if you go down to the next page, you will

20   see where they have to sign, and I believe the student signs.

21   Yeah, there is the description.  And then student is -- both --

22   it compels both the student and the supervisor to review their

23   comments.  And you can see here, she did have two items.  And

24   again, we are not frightened by below expectation ratings,

25   especially if there's only one or two.  But it's always a point

Mark W. Roberts, Ph.D. - Direct

1    of conversation between the supervisor and the individual.  And

2    here she did flag -- I believe it was -- certainly the alliance

3    formation issue that Dr. Atkins flagged a couple -- previously.

4           Would you go up and let me -- because my memory is

5    terrible here.  Move up, up, up.  There.  This one, the ability

6    to adjust.  Professional psychologists are not mechanical

7    beings.  We are always reacting both in testing conditions, and

8    in therapy conditions, and in consulting conditions.  In other

9    words, the -- the bulwark of what we do professionally requires

10   to us interact with people that have problems, that we are

11   either evaluating, or attempting to treat, or discussing

12   strategies as in consultation.

13   Q.    Okay.

14   A.    And so that adjustment is real important.  Now, there was

15   only two of these processes that were identified as low, and

16   they are subject for discussion with the student.  Okay.  And

17   it flags it for the Clinical Training Committee, but it doesn't

18   mean we give the student an adverse grade.

19           Okay.  She is the grader, and I cannot recall if she

20   gave him an A or a B.  And both would be acceptable to us.  I

21   know she did not give him a C, because a C would have triggered

22   a probationary status and a retake.  Okay.  So, it had to be at

23   least a B.

24   Q.    Okay.  So, based on the commentary section and the two

25   signatures here, it would at least appear that Professor Seikel

Mark W. Roberts, Ph.D. - Direct

1   sat down with the student and went over it?

2   A.   Yes.  Note that she's talking about things.  Well,

3   non-defensive accepting of supervisory feedback as an issue.

4   And notice she gave some ideas about how to probably help that

5   alliance of being what she calls "himself" and what those of us

6   in the research tradition would call a genuine perspective.

7   Empathy, warmth, and genuineness are the three bulwarks of good

8   listening and good attention to the client.  And so she cast it

9   in this form of, quotes, "being himself."  And then she also

10  mentioned the fluency in the speech here at his third year.

11          That might -- and note that she also said something

12  that caught our attention, and that is that possibly the

13  alliance formation was because the ISU students were not happy

14  about a Chinese -- having a Chinese student as their therapist.

15  And she floated that out there.

16  Q.   Okay.  Let's jump to the summer -- or, excuse me -- the

17  spring of 2011 and the evaluation.  Again, it's --

18  A.   Okay.  So, this is a summary of all the material.

19  Q.   Let me just finish.

20  A.   Oh, I'm sorry.

21  Q.   It's Defendant's Exhibit 511.  So now, if you could tell

22  the Court what it is.

23  A.   This is the summary for that spring.  This would be the

24  end of his third year, so he's had six semesters and two

25  summers with us.

1          MR. KELLY:  Is that big enough for you, Judge?  Is
2    that okay?

3          THE COURT:  Yes.  Thank you.

4          THE WITNESS:  And you can see his academics are just
5    fine.  Good grades.  He's already defended his qualifying exam.
6    Okay.  And there's his -- oh, this was his opportunity to
7    present in -- obviously in English to a group of undergraduates
8    in Child Development, which, of course, is a very important
9    area for him to master.  And we did point out that there was a
10   subgroup that disagreed with quotes, "he communicates clearly
11   or spoke distinctly."  Those are items on the questionnaire
12   that the students complete.  So, we flagged that and noted it.
13   It's been noted on and off.  And again, it's English is his
14   second language.

15   BY MR. KELLY:

16   Q.   Did that throw up any red flags as far as Mr. Yu's
17   development in the program however?

18   A.   I -- I do not think so.  We -- we knew that we were
19   dealing with someone who is speaking English as a second
20   language.  But, he's functional, and doing things, getting
21   things done, and getting -- performing the activities of course
22   work and practicum supervision for sure.

23   Q.   Okay.  Just backtrack to what you were talking about
24   earlier about service hours.

25   A.   Yeah.

Mark W. Roberts, Ph.D. - Direct

1   Q.   Under Section II.  The evaluations track the hours;

2   correct?

3   A.   Yeah.  Are you looking -- if you are looking at the

4   assistantship, that's -- that's --

5   Q.   No, I'm looking at Section II above that.

6   A.   Okay.  Good.  What it's representing here is each

7   semester, we total the amount of professional hours that will

8   eventually sum to produce his application to APPIC internships.

9   That's those -- that's the national organization for

10  internships.  And it shows here that he had two sources of

11  professional hours.  With Paula Seikel, of course, where he was

12  assigned, and then with me.

13         We always had these zero credit activities that

14  students take.  It's not a course, but they are required to do

15  so.  For example, all students here, in their spring of their

16  third year, would be required to perform disability evaluation.

17  That's our mechanism for teaching those cognitive neuropsych

18  tests, and it's been ongoing since their first year.

19             So, there's two sources of hours.  And you can see

20  what we have there are simply the sums for that semester.

21  There is not an accumulated depiction in this -- in this

22  semester-ending summary.

23  Q.   Okay.  So, if we can go to the summary Section VI, where

24  are we with Mr. Yu's development?

25  A.   Okay.

Mark W. Roberts, Ph.D. - Direct

1   Q.   At that point in time.

2   A.   Well, both academic and professional were considered

3   satisfactory at the end of spring semester, as you can see, and

4   that was based upon the data that we had.

5          Now, note this, on the second part of this is that

6   since he's upcoming -- see, the fourth year is the year the

7   student will select and identify and propose an internship set

8   to apply to.  And I provided here the summary data that were

9   available by the end of that third year.

10         And note that I said "These -- this is a way" -- this

11  is something clinical directors do, is we say, "Ah, this is

12  behind the reference point."  And I used his reference points

13  two previous cohorts.  He was the 2008 cohort, so the 2009 and

14  2010 cohorts would have been above him developmentally.

15         And what I looked at was the successful applicants.

16  That would be the best reference point for comparing his

17  current status.  And you can see that he was behind.  And there

18  is a little discrepancy in that comparison, because I am using

19  data as of November 1st of the applicant year for those two

20  cohorts, whereas I am using through the end of his third year

21  for Mr. Yu.  So, that accounts for some of difference.  But you

22  can see that there's a lot of disparity there.

23  Q.   Okay.  But in looking at this summary and, again, the

24  evaluation, you will note that Mr. Yu didn't sign this

25  evaluation until almost three months later.  Do you see that?

Mark W. Roberts, Ph.D. - Direct

1   A.   I do.

2   Q.   Do you recall having discussions about your concerns with

3   Mr. Yu?

4   A.   I have no recall of that, and that -- that little delayed

5   date is a surprise to me.  It's not jogging any memories I

6   have.

7   Q.   Wasn't that the summer he went back to China of 2011?

8   A.   Ah, good idea.  Thank you.  Yes.  The upcoming summer here

9   was his brilliant efforts in China to conduct his dissertation,

10  which we had been working on concurrently here to propose and

11  gain all the approvals and so on.

12        So, that would account for his 8/22/11.  Now, he came

13  back to the states -- let's see that was August -- oh, that

14  would have been fine.  August.  Okay.  So, I understand now and

15  it works great.

16  Q.   So, actually, during that -- during that year that he was

17  in China, you were in contact though; weren't you?

18  A.   Absolutely.

19  Q.   And explain to the Court how you were in contact with him?

20  A.   Well, to perform the research in China, which is what we

21  call an uncontrolled clinical trial.  That is there is no

22  random assignment to a control group.  He's simply trying to

23  replicate an established treatment protocol in a different

24  cultural, with his linguistic and cultural knowledge and

25  skills, at a site where he had support from a university, and

Mark W. Roberts, Ph.D. - Direct

1    which he did.

2            And I am sure my pronunciation -- it's spelled

3    C-H-E-N, so I say Chen.  I don't know.  But Dr. Chen was our

4    local site supervisor.  And then Dr. Wong and I worked

5    carefully to -- because she was a member of the committee, even

6    though she's not a clinician.  And I don't remember the other

7    two off the top of my head.  But we were able to get the

8    approval prior to this summer, so he could depart, implement

9    that study.  And during the course of that, I talked with him

10   weekly on Skype.

11           I still have vivid imagery of sitting there with my

12   sheets of paper and making sure not to leave any protected

13   health information on those sheets of paper.  So everything was

14   family one, family two, family three, family four.  And I kept

15   those as we discussed weekly over the Skype system, which is a

16   godsend.  We could not have really done this over the phone.  I

17   want to see my young man talking to me about his progress and

18   issues.

19           And during that process, I was impressed by his

20   ability to make the right questions.  In other words, "Oh, this

21   parent is blah, blah, blah about the discipline routine, or

22   blah, blah, blah about what do we do in community settings, and

23   I think this.  You got any ideas?"

24           It's just basically good supervision, is what it is,

25   and tracking it.  And I was very pleased by his flexibility

Mark W. Roberts, Ph.D. - Direct

1    there.  In fact, that whole summer experience convinced me that

2    these red flags of below expectations on alliance building,

3    and -- I think it was the ability to adjust.  Those were

4    attenuated, in my own thinking of Mr. Yu, once he was in his

5    own culture, and using his own language, and a very protocoled

6    intervention sequence.  Because that was scripted.  It's almost

7    a script.  You can do this on session one, and this on session

8    two.

9           But the fact that -- and I think it's an important

10   fact -- that the -- oh, I am going to lose my train of thought

11   here.  You will have to go on.

12   Q.   Sure.  Well, once he returned to Idaho State in the fall

13   of 2011 --

14   A.   Oh.

15   Q.   -- subsequent to signing off on that student evaluation

16   about your recommendations, I am putting up what's called --

17   what's identified as Plaintiff's Exhibit 40.

18   A.   Okay.

19   Q.   Could you tell the Court what this document is?

20   A.   Yeah.  I wasn't actually aware of this until I saw it, but

21   I was very pleased to see it.  It showed his effort to identify

22   APPIC sites -- so those are American sites -- APPIC sites that

23   included a Chinese migrant population as folks that would be

24   provided service, because you had it up on the board a moment

25   ago.

Mark W. Roberts, Ph.D. - Direct

1              One of the things that Clinical Training Committee

2   did was to say that if you are to apply to APPIC sites, we want

3   you to apply -- and we actually made it stronger.  We said "He

4   must identify sites" -- and the document you showed is a good

5   effort at that -- "to identify sites in which his Chinese

6   language is a strength rather than liability."

7   Q.   And I have it up again.  That's 511.

8   A.   Okay.

9   Q.   See that?  That's the document you are talking about?

10  A.   I can see it now.

11  Q.   Okay.

12  A.   Okay.  And this was his effort to do it.  And my counting

13  of the 13 sites he applied to and competed for, it would have

14  been in the spring of 2012.  The original 13 that he

15  identified, I counted at least five and possibly six.  Okay.

16  So, he applied to sites beyond what the Clinical Training

17  Committee suggested.  But I think that's perfectly

18  understandable.  There weren't enough Chinese sites.  Sites

19  that had Chinese immigrants as their clinical population.

20  Q.   Okay.

21  A.   So, no problem.

22  Q.   So, in mid-October of 2011, he applied to these APPIC

23  sites; correct?

24  A.   Yeah.  That's my letter.

25  Q.   Okay.  And then Exhibit 44 is what?

Mark W. Roberts, Ph.D. - Direct

1   A.   That's my letter of reference that I would attach to the

2   application for APPIC professional internship sites.  This is

3   my internship application letter.  It's a very strong letter,

4   and I was very pleased because of his performance in China.

5   Like I say, it changed my concerns about alliance formation,

6   and sensitivity, and adjustments.  Because every one of those

7   families completed, and they did well.  They were rated well.

8   And those data with shown to the Court recently.

9          And so I was very pleased.  I was under the

10  presumption that we -- I mean, I did not know nor do we control

11  the sites that a student actually applies to.  So, anyway, it's

12  a very strong letter, and I was pleased to write it.

13  Q.   Okay.  If we can do this, we will get rid of all these

14  other exhibits.

15         So, now, Doctor, what I want to show you is

16  Defendant's Exhibit -- let me get rid of this.  Nope.  That's

17  too small.

18         Defendant's Exhibit 501, can you tell the Court what

19  this is?

20  A.   This is his dismissal letter from the externship we were

21  able to attain for him for the fall semester of his fourth

22  year.  And we were real pleased to get that.  I knew, from

23  talking with Dr. Landers, who is a long-time associate of our

24  program -- he actually earned his Ph.D. from us years ago.  He

25  was in that -- he was actually in our second class.  So, we

Mark W. Roberts, Ph.D. - Direct

1   have -- I have a very long -- a good relationship with

2   Dr. Landers going back over years.

3           And I believed, sincerely, that based upon Jun's

4   testing experience, that he would be a good fit, because this

5   is a program that asks its externs primarily to use

6   neurocognitive testing.  Mr. Yu had more -- had a lot of

7   supervision in testing, had completed several disability

8   evaluations.  And based upon my knowledge, I thought he would

9   be a good fit for that program.  Obviously, I was wrong.  Okay.

10  But I thought he would be a good fit.

11          I was surprised when Dr. Landers phoned me.  I go,

12  "Oh, my goodness."  And then this was the letter that was the

13  follow-up to it.  And you can see that his -- Dr. Landers had

14  to dismiss him based upon his inability to administer the tests

15  without extensive supervision.

16          And you can see his concerns about not only rapport

17  building, but just ability to present the test stimuli.  That's

18  to admin the standardized tests with difficult patients.  So,

19  people who were easily frustrated and possibly depressed or

20  anxious, as many hospitalized elderly patients might be,

21  patients with potential dementia and so on.  That Dr. Landers

22  is pointing out that he had difficulty conceptualizing those

23  cases.  Oh, there he's -- I'm sorry.  I am going to --

24  Q.   Well, let me ask you, Doctor, the APPIC applications by

25  Mr. Yu and your letter of recommendation were done prior --

1    A.    Yes.

2    Q.    -- to receiving this letter from Dr. Landers; correct?

3    A.    Yes.  Obviously, if I were aware that he was in such

4    straits and had been informed, particularly, if he had been

5    dismissed, APPIC requires me to indicate any dismissal from an

6    externship site or a community site.  We are compelled to

7    report that.  We are then compelled to report if we believe the

8    problems identified at the site had been remediated.

9          Okay.  So, this -- I believe my records show that I

10   sent in my APPI letter beyond the previous -- it was in

11   October, and it preceded this.  Okay.  And then here we get

12   this very adverse report and the dismissal from Dr. Landers.

13         And I should point out that that was absolutely his

14   right to do so.  All affiliation -- all affiliated programs

15   reserve the right to send home a student that's being assigned

16   to them.  The affiliation agreement between Idaho State

17   University and the site, okay, specifies that.  That they can

18   discontinue or dismiss a student for cause, and it's their

19   cause.  There's -- there's no review by the university.

20   Q.    So, once you got this letter from Dr. Landers, what did

21   you do?

22   A.    I would have to look at all my notes for all the things I

23   did, but certainly I met with Jun Yu immediately.

24   Q.    Okay.  And do you recall that conversation?

25   A.    Well, we went over what went wrong, and why it went wrong,

Mark W. Roberts, Ph.D. - Direct

1    and what his perspective on all of this was, and then what we

2    were going to do about it.

3    Q.    And what was the plan?  What were you going to do about

4    it?

5    A.    Well, I had to discuss it with Clinical Training

6    Committee.  Yeah, I don't, by fiat, implement a student program

7    without the Clinical Training Committee.  I have several

8    contemporaneous notes that I took that exist today and have

9    that would talk about the meetings I had with Mr. Yu, possibly

10   in Clinical Training Committee meetings, and we eventually

11   evolved a remediation plan for what to do.

12          That -- in that immediate semester, in that immediate

13   semester, he was currently engaged in a second externship site

14   with Dr. -- I am hoping I have got it right -- with Dr. Atkins,

15   who accepted him, but then wouldn't let him perform applied

16   behavior analysis, which was his hope.  And he had one other

17   site.  He had one other activity, and without it, I can't

18   remember.

19   Q.    Could we shut the screen down?  I want to show the Doctor

20   an exhibit that's not been admitted yet.  Could you provide the

21   Doctor with Defendant's 533.

22   A.    Oh, I see.  Oh, okay.  Good.  These are my notes.  This is

23   the kind of thing that I keep.

24   Q.    Wait.  Wait.  Wait.  Wait.  All right.  Doctor, you've

25   been handed Defendant's Exhibit 533.

Mark W. Roberts, Ph.D. - Direct

1  A.   Okay.

2  Q.   Can you explain to the Court what that document is or what

3  those documents are?

4            MR. COULTER:  Your Honor, we are going to object to

5  this particular exhibit being entered.

6            THE COURT:  Mr. Coulter, you are going to have to

7  speak up.

8            MR. COULTER:  Yes.  Your Honor, we are going to

9  object to 533 being entered.  That is the same document of what

10  we have expressed in 106.  It's part that that genre.

11            MR. KELLY:  I haven't moved it yet, Your Honor.

12            THE COURT:  Yeah.  Let him lay the foundation and

13  move its admission, and then I will hear your objection, and

14  then I'll hear any response.

15  BY MR. KELLY:

16  Q.   Okay.  Dr. Roberts, could you explain what that document

17  is?

18  A.   These are notes that would go in the student's file, that

19  I, as clinical director, would maintain to document what I did

20  at each juncture in a particular process.  And in this

21  particular process, I have a student who was dismissed from a

22  site that I anticipated he would do well at.  And it talks

23  about the different things we did.  So --

24  Q.   Okay.  And these are your notes?

25  A.   These are notes that I take and insert into the student's

Vol. 3 - 433

Mark W. Roberts, Ph.D. - Direct

1    program file.  So, they become part of his file.

2    Q.   So, they are kept in the regular course of business?

3    A.   They are kept in the -- because each student has a program

4    file, and I keep those in there.

5              MR. KELLY:  Your Honor, I would move for admission of

6    Defendant's 533.

7              THE COURT:  All right.  Mr. Coulter, what is your

8    objection to 533?

9              MR. COULTER:  My objection is only -- Your Honor, my

10   objection would be only to the text that relates to any

11   complaint that was filed by the Idaho --

12             THE COURT:  So, it's a relevance objection.

13             MR. COULTER:  Yes, Your Honor.

14             THE COURT:  Okay.  And go ahead.

15             MR. COULTER:  It's also a relevance objection.  It's

16   also a legal -- it's also a legal objection because of the --

17   of the reasons we stated within our -- in document 106.

18             THE COURT:  All right.  I gather you are telling me

19   that there's a portion of the exhibit that makes reference to

20   the Human Rights Commission proceedings?

21             MR. COULTER:  Yes, Your Honor.

22             THE COURT:  Okay.  All right.  Counsel, I am puzzled.

23   If this is a contemporaneous record from summer/fall of 2011,

24   is that when the Human Rights Commission proceedings were going

25   on?

Mark W. Roberts, Ph.D. - Direct

1           MR. COULTER:  Around that time, Your Honor.

2           THE COURT:  All right.

3           MR. COULTER:  But this is the exact -- what I'm

4    saying to you is that I couldn't say exactly when it was going

5    on, because that Human Rights Commission has their way of doing

6    things.  But I can tell you that this was before the present

7    complaint.  And if this goes -- if this is in the record and

8    without being redacted, then we would have a problem with that,

9    because it would suggest that we were not on our job.  And if,

10   in fact -- if, in fact, there was a probable cause finding

11   later on, this -- that would be entered.

12          If we allow anything with the Idaho Human Rights

13   Commission for that particular -- for that particular complaint

14   to go into the record, it would be harmful for our client.  Not

15   only that, and it's -- legally it's not -- can't come in, and

16   it would be prejudicial anyway.

17          THE COURT:  But what do you mean legally it can't

18   come in?

19          MR. COULTER:  Because it's prejudicial.

20          THE COURT:  Well, you mean -- so, all right.  First

21   of all, your objection is relevance.

22          MR. COULTER:  Yes, Your Honor.

23          THE COURT:  Right?  And I will hear from Mr. Kelly on

24   that.  But when you say it's prejudicial, all evidence is

25   prejudicial, because it favors one side or the other.  Whether

Vol. 3 - 435

Mark W. Roberts, Ph.D. - Direct

1    it's relevant is the issue --

2            MR. COULTER:  It outweighs the benefit.  It's the 403

3    objection.

4            THE COURT:  Okay.  So, it's so prejudicial that

5    whatever relevance it may have is outweighed.  Is that what you

6    are saying?

7            MR. COULTER:  That's what I am saying, Your Honor.

8            THE COURT:  And I'm here in a complete vacuum as to

9    what it is that it says.

10           Mr. Kelly, let me hear from you, please.

11           MR. KELLY:  Your Honor, to allay any fears here, I

12   think if we could -- I am more than willing to take out any

13   reference to the Idaho Human Rights Commission, although, I'm

14   not quite sure where there's any reference to it.  If

15   Mr. Coulter can point that out, I will be glad to remove that.

16           THE COURT:  Mr. Coulter.

17           MR. COULTER:  Your Honor, we believe that from 594

18   on, it talks about the Idaho Human Rights Commission.

19           THE COURT:  594, what are you referring to?

20           MR. COULTER:  ISU Document 594, Your Honor.

21           THE COURT:  We are dealing with Exhibit 533.

22           MR. COULTER:  Yes, Your Honor.  Page 11 -- page 11 to

23   30.

24           THE COURT:  I'm not tracking.  Mr. Kelly, are you

25   following?

Vol. 3 - 436

Mark W. Roberts, Ph.D. - Direct

1          MR. KELLY:  Well, I think so, Your Honor, but -- he's

2     referring to the Bates stamp numbers at the bottom.  But my

3     copy of 533 omits pages 594 through 600.  So, I think I have

4     already redacted that.

5          MS. SUTHERLAND:  Okay.  We had a copy that he had --

6          MR. KELLY:  So, we have already redacted those pages,

7     Your Honor.

8          THE COURT:  All right.

9          MR. KELLY:  So, if I --

10          THE COURT:  And is the version that you just

11     described the one that you have available in electronic form?

12     Well --

13          MR. KELLY:  Can we shut this down just to -- are you

14     shut down?

15          COURTROOM DEPUTY:  We are.

16          MR. KELLY:  Okay.  Because it's still popping up.

17          THE COURT:  I still have the screen.  Mr. Shumard, if

18     you will check the exhibit.  The witness shouldn't be scouring

19     this right now until we have sorted this out.

20          MR. KELLY:  Dr. Roberts, give the whole document

21     to --

22          THE WITNESS:  I am trying to catch up.  Sorry.

23          MR. KELLY:  Can I just compare notes?

24          THE COURT:  Yes, sure.

25        (Off-the-record discussion.)

Mark W. Roberts, Ph.D. - Direct

1           MR. KELLY:  But I have to check.  Are you shut down?

2           THE COURT:  Yes.  Now it's back up.  There we go.

3    Hold on, Mr. Kelly.

4           MR. KELLY:  It's not here, Judge, so my copy is not

5    redacted, but the hard copy is.  So --

6           THE COURT:  How many pages is the hard copy?  Just

7    approximately.

8           MR. KELLY:  Nine pages, Judge.

9           THE COURT:  Let's just get two copies made of it.

10          All right.  Mr. Shumard, could you run next door and

11   just make two copies of the exhibit?  It will be one for

12   Mr. Coulter and Ms. Sutherland, one for me, the witness will

13   have one.  And is the hard copy you have in your hand redacted?

14          MR. KELLY:  Yes.

15          THE COURT:  Okay.  That should be enough.  And get

16   one for yourself if you want.  Okay.

17          MR. KELLY:  Thank you, Judge.

18          THE COURT:  Uh-huh.  All right.  So, we have had the

19   hard copies made of Exhibit 533.

20          Mr. Kelly, if you will identify for the record the

21   Bates numbers at the bottom of each page, so that we have some

22   definition to it given the confusion.

23          MR. KELLY:  Yes, Your Honor.  The redacted copy of

24   533 starts with Bates Number 583, 586, 588, 591, 533, 601, 610,

25   611, and 612.

Vol. 3 - 438

Mark W. Roberts, Ph.D. - Direct

1           THE COURT:  You said 533?  I think you meant 593.

2           MR. KELLY:  Well, I said Exhibit 533.

3           THE COURT:  Okay.  All right.

4           MR. KELLY:  But it is --

5           THE COURT:  Yeah.  When you were going through the

6   numbers, you went 591 then 533.

7           MR. KELLY:  Okay.  It is 593.

8           THE COURT:  593.  Okay.  All right.  So, you may --

9   and that's -- that's what Dr. Roberts has in front of him; is

10  that right?

11          THE WITNESS:  (Nods head.)

12          MR. KELLY:  Are we okay to continue?

13          THE COURT:  Yeah.  I just want to confirm that's what

14  Dr. Roberts --

15          THE WITNESS:  Yes.

16          THE COURT:  -- has in front of him.  All right.  Yes,

17  you may continue.

18          MR. KELLY:  Thank you.

19  Q.   Okay.  Dr. Roberts, you have Defendant's Exhibit 533 in

20  front of you.  Could you tell the Court what 533 is?

21  A.   Well, these are the contemporaneous notes that all

22  directors of clinical training hurriedly make, upon need, and

23  place into the student's file, so we can document what we did

24  and when we did it.

25  Q.   Okay.  And in regard to Mr. Yu's dismissal from the

Mark W. Roberts, Ph.D. - Direct

1   internship at Eastern Idaho Regional Medical Center, what do
2   your notes reflect that you did once you received notification
3   from Dr. Landers of the dismissal?
4   A.   Okay.  First, if I may, it's an externship, not an
5   internship.
6   Q.   I am sorry.  Thank you.
7   A.   And these notes do commence at the point where I received
8   the phone call from my lifetime colleague, Dr. Landers.  And
9   then it proceeds to the first thing one would do is to meet
10  with the student and review.  And I can see that I met with him
11  twice, looking at all of the material.  And then getting in
12  contact with Dr. Landers over the phone and discussing the
13  issues with him.
14          And then seeing how our student was performing in his
15  other practica, because he was taking a practica from Dr. Lynch
16  at the time.  And again, this is fall semester of his fourth
17  year in the program.
18          Did you want me to comment -- I will just give us a
19  summary of the --
20  Q.   Yes.
21  A.   -- the macro events here.  Talking with Dr. Lynch about
22  his current function.  Meeting with the Clinical Training
23  Committee to go over the issues.  And we met with Clinical
24  Training Committee amazingly quickly, six days after the phone
25  call, so I was pleased by that.  We were able to get the group

Mark W. Roberts, Ph.D. - Direct

1   together.

2            Discussed the plans for Jun, especially what we might

3   consider for spring 2012, which would be his second semester of

4   his fourth year.  I did speak with our Affirmative Action

5   officer, an Equal Opportunity Employer -- Equal Opportunity

6   Director.  She was the director of the office -- Joyce

7   Hammond-Perry.  Talked with her about the process, because I

8   did -- I -- and I'm not -- I cannot recall exactly why that was

9   initiated, but I wanted some university support.

10           And I know I communicated challenges for Jun in that

11  meeting; namely, that I anticipated that he would have

12  interviews for his internship site.  And it turned out he did

13  have four.  And I wanted him to interview well at those sites

14  and to fully embrace a plan for spring 2012 to supplement what

15  he was doing in fall 2011 with the remainder of that semester,

16  which was about a month.

17           Okay.  And when I spoke with Joyce Hammond-Perry, she

18  requested a copy of Jun's eval and summary plans for spring of

19  2012.  And I did create a copy of our plan that Clinical

20  Training Committee looked at.  I did that on November 21st.

21  Okay.  I did speak with Shannon Lynch, in her capacity as chair

22  as well, and as her -- in her capacity as current supervisor.

23           And she did report some concerns about anger in

24  practicum and discussions about -- oh, alternative case

25  conceptualizations that had evoked some of those negative

Mark W. Roberts, Ph.D. - Direct

 1  feelings.

 2          Now we are down to November 29th.  I did encourage

 3  him to complete his evaluation of Dr. Landers, okay, because

 4  each student has the right, and it's my job to enable that

 5  completion of the practicum supervisor evaluation, which I know

 6  is in his file.  So, he did that.

 7          And it was his general opinion that Dr. Landers'

 8  decision was wrong and unfair.  Okay.  And the letter was sent

 9  to Dr. Landers, the plan.

10  Q.   Okay.  And then did you, at some point in time, put

11  together the conclusion of your investigation regarding

12  Mr. Yu's complaint?

13  A.   Yes.

14  Q.   Can I have the screen back up?

15  A.   There is a document --

16  Q.   Okay.

17  A.   -- about that.

18  Q.   Wait a second.

19  A.   Yeah, there we go.

20  Q.   So, Dr. Roberts, showing you Defendant's Exhibit 515.

21  A.   Okay.

22  Q.   Can you tell the Court what this document is?

23  A.   Well, I had a rating scale from Mr. Yu, who was dismissed,

24  that was quite adversary and --

25              THE COURT:  Let me interrupt.  Mr. Kelly, I just had

Mark W. Roberts, Ph.D. - Direct

1    inquired with Miss Case whether the defense exhibits you have

2    been going through were already admitted.  I am told they are

3    not all admitted, so let's clear up any confusion about that.

4              MR. KELLY:  Well, the only one that is not admitted

5    is the notes we just went through.

6              THE COURT:  That's the only one?

7              COURTROOM DEPUTY:  Right.

8              THE COURT:  All right.  Then my confusion.  Then why

9    don't we back up to that before we get ahead of ourselves here,

10   because I'm gathering that the revised form that's in front of

11   the witness is either what had been proposed and stipulated to

12   originally, or what is being proposed and stipulated to today.

13   I am unclear on that.

14             MR. KELLY:  You are talking about 533?

15             THE COURT:  533.  Yes.

16             MR. KELLY:  I didn't move to introduce it; did I?

17             THE COURT:  No.

18             MR. KELLY:  Okay.  So, I am, Judge.  In hindsight,

19   then I will move to introduce revised Exhibit 533 with the

20   redactions and the page numbers I provided you for admission.

21             THE COURT:  With the Bates numbered pages, ISU

22   documents with those Bates numbers.

23             MR. KELLY:  Correct.

24             THE COURT:  Okay.  Any objection?

25             MR. COULTER:  No objection, Your Honor.

Mark W. Roberts, Ph.D. - Direct

1            THE COURT:  All right.

2            MR. KELLY:  All right.

3            THE COURT:  Admitted.

4        (Exhibit 533 admitted.)

5            MR. KELLY:  Thank you.

6            THE COURT:  Go ahead.

7    BY MR. KELLY:

8    Q.   So, Mr. Roberts, what's in front of you now is

9    Exhibit 515.  And again, could you tell the Court what this

10   document is?

11   A.   In the process of attempting to come up with a remediation

12   plan for Mr. Yu and to fully explore the possibility of

13   difficulties that Dr. Landers, as a supervisor, might pose,

14   given Mr. Yu's very negative evaluation, I had to engage in

15   what all clinical directors and directors of clinical training

16   do, which is to look at all the records we have and talk to the

17   person being complained about.

18            Okay.  It says here the Clinical Training Committee

19   is obliged to follow up on any negative evaluation by a

20   student.  Could you scroll down here?

21   Q.   Yeah.  Before I do that --

22   A.   Okay.

23   Q.   -- Dr. Roberts, just for clarification to the Court, this

24   document is dated January 3, 2011.  The correct chronology, it

25   should be what, Dr. Roberts?

Mark W. Roberts, Ph.D. - Direct

1   A.   2012.

2   Q.   Okay.  Thank you.  So, I'm sorry.  Would you like me to

3   scroll down?

4   A.   Scroll down.  Let me see this paragraph.  Okay.  So, one

5   of the strategies -- I took several strategies to do this.  The

6   obvious one is to look at every evaluation completed by every

7   student who was supervised by Dr. Landers.  And he had been

8   supervising for us for, I think, three years, so we had a

9   handful of those.

10         We also had an amazing, fortuitous control student,

11  if you will.  I am a social scientist and do that for a living.

12  I had someone in the same semester, with the same supervisor,

13  meeting at different times, and so I interviewed that student

14  to get their opinions and -- as well as the data from the

15  different evaluations.

16         So, if you keep going down, I had four sources of

17  information; the interview with Dr. Landers regarding -- go

18  back up a little for me.  There you go -- regarding the

19  supervision he provided to Mr. Yu, an interview with the

20  community practicum student who was concurrent, that semester,

21  and then the independent student ratings of Dr. Landers from

22  previous years.

23         And I had -- it doesn't say the number, but I think

24  it does somewhere in here.  And then the APPIC data of

25  professional activities, I believe, completed at his site prior

Mark W. Roberts, Ph.D. - Direct

1  to the dismissal.  So, then I go on to describe all of those

2  things.  There's the phone interview, and there's the interview

3  with the community practicum student, and then there's the

4  student ratings.  And these are -- there's the student ratings

5  right there from the previous -- okay.  Please back up just a

6  titch.  There we go.

7          These are four-point scales completed by students who

8  have performed a practicum under Dr. Landers' supervision.

9  There were two informants but three completed forms across four

10  different semesters, and they were quite good.  In other words,

11  they found him to be extremely helpful.

12          Okay.  There's the overall rating on a five-point

13  scale, which is quite good, and then some of the narratives

14  that the -- the previous practicum students had in regards to

15  their experience at Dr. Landers -- of Dr. Landers at that

16  externship site.

17          Now, we have a qualitatively different item here.

18  These are the professional hours that Dr. Yu accomplished

19  during his two months at the site, and he had a lot of

20  assessment hours.  There was no intervention as per that

21  practicum site.  That's one of the reasons I selected it, and

22  encouraged it, and had Jun Yu interview for it.

23          And program development hours would be reading, or

24  didactics, or whatever Dr. Landers assigned to him, and then

25  seven hours of supervision.  So, for that period of time,

Mark W. Roberts, Ph.D. - Direct

1    that's a two-month period, that's quite good.

2            And then I had a conclusion, I'm sure.  Okay.  My

3    conclusion was that I actually disagreed with Mr. Yu's

4    evaluation of Dr. Landers and recommended that we continue to

5    nominate students at that site.

6    Q.    Okay.  Let me backtrack to a time frame before you did

7    your conclusion here.

8    A.    Okay.

9    Q.    You indicated earlier that there was some issue that

10   Dr. Lynch had with Mr. Yu during the practicum; is that

11   correct?

12   A.    She was -- she was concerned.

13   Q.    I'm showing you on the screen now --

14   A.    Yes.

15   Q.    -- Defendant's Exhibit 512.

16   A.    That will help.

17   Q.    Could you tell the Court what that is?

18   A.    Okay.  That's Dr. Lynch's practicum evaluation form for

19   Mr. Yu that was concurrent to the semester that -- in which he

20   was dismissed by the externship site.

21           Dr. Lynch's team, of course, is dealing with adult

22   psychopathology and trying to introduce students to

23   conceptualization, and evaluations, and interventions

24   appropriate for that at the level of the student's readiness to

25   engage in those professional activities.

Mark W. Roberts, Ph.D. - Direct

1    She would have been looking at him as a pre-intern,

2    so this is a fourth-year student now.  You can see how

3    evaluations by professional staff are development in nature.

4    Obviously, we do not expect a second-year student, who would be

5    in their first year of actual practicum, relative to a

6    third-year, relative to a pre-intern, who is either a fourth or

7    a fifth-year student.  So, she would have been comparing him to

8    pre-interns.  And you can see she had some concerns, these

9    below expectation ratings that are circled there.

10    And there was some issues with accepting input from

11    Dr. Lynch.  And note that we always include, in these forms,

12    the -- the ability to reason with, and discuss, and to resolve

13    conflicts with supervisors and peers.  And she wroted that --

14    rated that as below expectations for a fourth year.

15   Q.   Where is that?

16   A.   It's item -- don't move it, and I will get it here.  Six.

17   It's item six.  I was just trying to go down the list of below

18   expectations ratings.  Same with collegial-peer interaction.

19   Disciplined -- let's see.  Disciplined approach to writing and

20   getting the records done.

21    Create an effective case presentation was below.  He

22   had five in total.  Is there a second page there?  Yeah, there

23   should be a second page.  Keep going down there.  Okay.  So,

24   they are all on the first page.

25   Q.   Okay.

Vol. 3 - 448

Mark W. Roberts, Ph.D. - Direct

1  A.   Okay.  And then that's her written evaluation of concerns.

2  Q.   Okay.  And can you tell the Court what that was?

3  A.   She would do a better job of that than I.  My

4  contemporaneous -- I shouldn't --

5  Q.   Okay.  Well, we will allow her to do that.

6  A.   Yes.

7  Q.   Okay.  And it indicates --

8          THE COURT:  Excuse me.

9  BY MR. KELLY:

10  Q.   -- that this document was signed by Mr. Yu?

11  A.   Yes.  And I did meet with Mr. Yu after this evaluation to

12  discuss it with him, given the below expectations ratings by a

13  senior clinician.

14  Q.   Okay.  I just want to show you this exhibit, Defendant's

15  513.

16  A.   Okay.

17  Q.   Could you tell the Court what this document is?

18  A.   Dr. Lynch was compelled to give him an incomplete because

19  of low patient contact that was no real fault of Mr. Yu's.

20  Sometimes we have low clinic flow.  So, if I recall the

21  language -- and Dr. Lynch can correct me if I'm wrong here,

22  when she's allowed to do so -- that you say, "Okay.  I'm going

23  to give you an incomplete for this course.  Here's what you are

24  going to need to do."

25          And you can go down there.  Okay.  And that's for

1   this fall course as it indicates.  "Jun only got to start

2   direct clinical work in November, given low clinical

3   referrals."  So, in other words he didn't have patient contact

4   during those first two months.  "He needs to complete an

5   individual's treatment and a couple's treatment in the spring

6   with at least two cases where he would be a co-therapist."  She

7   did have to give him a B once the practicum was completed in

8   the spring.

9   Q.   And to your knowledge, did he complete the practicum?

10  A.   Yes.  Yes.  The incomplete was resolved.  Okay.  So, this

11  is the summary for the fall.

12  Q.   This is the Defendant's 514.  And tell the Court again

13  what it is?

14  A.   Okay.  This is in his fourth year, fall semester.  And you

15  can see he had some course work, which he did just fine in.

16  And then you can see that Dr. Landers's practicum, in which he

17  was dismissed, that Dr. Atkins's practicum, in which she

18  limited his activity to observation and discussion.  And then

19  Dr. Lynch's practicum where he -- you can see he didn't get

20  that many contact hours.  He only had seven.  That was the --

21  the clear reason for the incomplete.

22          And then that's discussed, and here's his intern- --

23  he was funded through that externship, which was dismissed in

24  November.  So, I'm sure he was reimbursed for his two-months'

25  worth of work, but he was dismissed from the site.  So, that's

Mark W. Roberts, Ph.D. - Direct

1   an issue, and that's been discussed here with the Court.

2   Q.   Okay.  The last sentence of number three indicates "Given

3   a superior's evaluation --

4   A.   Okay.

5   Q.   -- "and dismissal, he was awarded a U."

6   A.   Yeah.  Given a dismissal, the only grade we can give is a

7   U.  Psychology 7748 is one of two and only two courses that are

8   professional and graded with S/U grading.  There's two academic

9   courses which we were talking about this morning.  The thesis

10  and dissertation that also S/U grading.

11         All our other courses are graded the A through F

12  style.  So, when he -- a student is dismissed, and I've got S

13  versus U, I have to give a U.

14  Q.   And again, just so the record is clear, an S is a

15  satisfactory?

16  A.   S is satisfactory.

17  Q.   And U is unsatisfactory?

18  A.   Yeah.  For a dismissal, there's only one option.

19  Q.   And after awarded, after he being awarded the U, are you

20  aware of any consultation with Mr. Yu about that grade?

21  A.   I can go into my contemporaneous notes.  That's a

22  different document.  I think it's -- it's important to note

23  here that when the Clinical Training Committee reviewed the

24  semester's work, which is summarized in this document, they

25  were compelled to give an unsatisfactory general rating for his

1    professional progress.

2    Q.   Okay.

3    A.   Based upon what he did with the three sites, including the

4    dismissal.

5    Q.   Okay.  All right.  If you go back to Exhibit 533, the

6    third page, that's your handwritten notes.

7    A.   Okay.  I have got them.

8    Q.   Okay.  And there's a reference to 12/1.  Do you see that?

9    A.   Yes, yes.

10   Q.   Could you tell the Court what that was about?  Those notes

11   are about?

12   A.   Well, I have to look at them, but there was a meeting with

13   Jun, which is quite appropriate, and went over the supervisory

14   evaluation that Dr. Landers gave.  Oh, that he performed on

15   Dr. Landers.

16           And at that time, he agreed to release it despite the

17   lack of anonymity.  I think I asked him to do that so that I

18   could share it with Dr. Landers.  Generally, those are kept and

19   summar- -- and compiled, so that when they are given to a site

20   supervisor, anonymity is maintained.  And he -- he verbally

21   agreed to release that to Dr. Landers.

22           I -- I think it's appropriate for me to point out

23   that he later rescinded that.  He said, "No, I don't want

24   Dr. Landers to see that."

25   Q.   Okay.  All right.  But nevertheless, you did have a

1    conversation with him and gave him feedback on the

2    externship --

3    A.   Yes.

4    Q.   -- after he was awarded a U; correct?

5    A.   Yes.  And we talked about the letter regarding what to do

6    in the spring and with the plan of remediation, and he did

7    verbally object to the repetition of ADA evals.  He said that

8    he had done several of those, and I do have evidence of that.

9    So, we discussed that and asked him to put it in writing, which

10   he subsequently did.  And I supported that reason, and we

11   substituted child cognitive tests and child achievement tests,

12   which I fully expected him to have to perform at internship,

13   because I fully expected him to get an internship still.

14   Q.   Okay.

15   A.   So, we made that substitution on 12/1.

16   Q.   Okay.  So, if we look at Exhibit 514 --

17   A.   Okay.

18   Q.   -- which I have up on the screen?

19   A.   Go off the contemporaneous notes.  All right.

20   Q.   The student evaluation for fall 2011, if we look under VI,

21   summary --

22   A.   Yes.

23   Q.   -- starting with where it says, "first."  Was that part of

24   the remediation plan?

25   A.   Yes, he -- well, the first step is to complete his

Mark W. Roberts, Ph.D. - Direct

1   clinical practicum with Dr. Lynch.  Okay.  Because he had

2   only -- I think it was like seven or eight hours of contact and

3   possibly two cases only.

4           Okay.  And there was discussion between myself and

5   Mr. Yu regarding the always present goal that invariably and

6   championed right of all students to disagree with a supervisor

7   and give the reasons and discuss it.  That's that below

8   expectations rating that Dr. Lynch identified for negotiating

9   the faculty.

10          And so I'm -- I'm talking with students, and I wanted

11  that in writing, that it's always okay to disagree and the

12  appropriate way to process that.  It's not in these notes, but

13  I have said it for so many decades, if you would allow me to

14  say it.  Has to do with my orientation about working with

15  supervisors that I give every year to students.

16          THE COURT:  You have to have a question.

17          THE WITNESS:  I am asking my attorney if he wants me

18  to say it.

19          THE COURT:  I understand what you are doing, but I am

20  saying that you can't answer that until you have a question.

21  BY MR. KELLY:

22  Q.   All right.  So, Dr. Roberts, on this Document of 514 --

23  A.   Okay.

24  Q.   -- if we go to the last paragraph, what are you talking

25  about there?

Mark W. Roberts, Ph.D. - Direct

1  A.   It's a -- we are anticipating the spring semester, and

2  that part of his remediation plan is to come back under my

3  team, and do an independent case, and to work with Dr. Haight,

4  who is in the internalizing disorder area of child psychology,

5  which is an excellent supplement to the externalizing work,

6  which is behavior problems that he had already accomplished and

7  done so well in China at.

8       So, it's really a discussion of what -- what to do

9  during spring semester and that -- and I'm sure we integrated

10 into that discussion the letter to him that's the remediation

11 plan to address the concerns raised by the dismissal and

12 Dr. Landers.

13 Q.   Okay.  So, before we get to that evaluation by you and

14 Dr. Haight, during that time frame, in between this particular

15 document and your evaluation in the spring, the APPIC results

16 came out; correct?

17 A.   Yes.  In the spring, the -- the time frame is going to

18 elude me exactly.  But, APPIC first announces interview options

19 in early spring.  And if I were still DCT, I could give you the

20 exact date.  Jun was granted four interviews, based upon my

21 letter and on his performance prior to the dismissal.

22       Okay.  So, everything that I summarized in -- it

23 would have been October something.  There's a document to that

24 effect.  He received four interviews, which is good, okay,

25 because it's a competitive market out there.  About, in those

Mark W. Roberts, Ph.D. - Direct

1    days, maybe 15 percent of applicants could not literally place,
2    because there were too few positions.
3             Okay.  So, he got four interviews and real pleased
4    about that.  Okay.  Unfortunately -- should I go on?
5    Q.   Yes, please.
6    A.   Unfortunately, he did not match.  That's a system whereby
7    the internships rate the applicants that they chose to
8    interview, and the applicants rate the sites at which they
9    interviewed.
10            He had four sites to rate, so he rated this.  I don't
11   have that document, but I know it occurred, because I get
12   copies of those things as the DCT.  Unfortunately, he didn't
13   match.  So, that throws him into what's called phase two of the
14   match, because the algorithm that matches students to sites and
15   sites to students doesn't always work perfectly, and you end up
16   with -- and I can't give you a number -- of unfilled positions.
17            So, those unfilled positions go on the block for
18   individuals who have participated in phase one of the match.
19   And Jun identified, and I think I remember the number, and it's
20   in something -- I think he -- ah, the number is coming to my
21   elderly brain.
22            He identified seven sites he was interested in, and
23   he did yield from those seven sites.  All of materials for
24   phase one are just transferred, I believe, to sites identified
25   by a student for phase two.  And in that process, he was able

1  to identify seven sites he was interested in.  They saw all his

2  materials, and he was granted one interview, which is good.

3  Okay.  But, unfortunately, he still didn't match.

4  Q.   Okay.  And as you alluded to and I think Dr. Koocher

5  alluded to yesterday, during that time frame, there was a

6  shortage of internship opportunities --

7  A.   Yes.

8  Q.   -- with APPIC?

9  A.   I think it's somewhere 15 to 20 percent of students could

10  not match literally.

11  Q.   And that's nationwide?

12  A.   Nationwide, yes.

13  Q.   Okay.  Could you go ahead and look at Defendant's 521?

14  A.   Okay.  This is now spring of his fourth year during his

15  interview process we were just talking about.

16  Q.   Right.  And then tell the Court essentially what the

17  document itself is?

18  A.   Okay.  Well, it's the review of his performance during

19  that semester.  So, as in all of these -- and you've seen

20  several now -- we look at the course work.  And he did he fine.

21  Got a B and an A.  And you look at the two practica he was

22  assigned to.

23        One is the joint work that Courtney Haight and myself

24  administered to him, and you can see he got some good hours and

25  some good support.  Did some learning.  And then he also

1  participated in the interdisciplinary evaluation team, which I

2  was the supervisor of at that time.

3          Now, that's a very low hours productive site.  You --

4  because you do a lot of didactics.  You attend the class.

5  There's a gosh-darn class that you go to, and each of the

6  disciplines presents, and then you have to -- have to either

7  participate in or observe two of the staffings.  And you need

8  to work with your discipline to perform evaluation.  And he was

9  helpful and did his job.  I think he gave an IQ test and an

10  interview.  Okay.

11  Q.    Okay.  And as far as the -- the work you and Dr. Haight,

12  what issues arose during that --

13  A.    Well, we identified four below expectations items during

14  that process, and you would have to show me the form for me to

15  pick those out.  Because of those -- we gave him a B, because

16  that's quite noticeable in a fourth-year student.  We go, "Ah,

17  that's not where we like to see it."

18          If you look -- you are going to need the spring 2012

19  evaluation of us by him [sic].  You can find the below

20  expectations.

21  Q.    I just put up Exhibit 538.

22  A.    I got it.  Scroll down there, and you can see that

23  first --

24  Q.    Tell the Court what that document is.

25  A.    This is the supervisory evaluation of the student

Mark W. Roberts, Ph.D. - Direct

1  participating in an assigned practicum.  Okay.

2  Q.   And what issues developed?

3  A.   Well, you can see the below expectation.  Again, we saw

4  the same issue that Shannon Lynch detected in the previous

5  semester.  That is being able to negotiate with -- with

6  supervisors in a collegial manner to resolve misunderstandings

7  or disputes or disagreements.  Okay.  Keep going down.

8        We did go below for performing alliance.  If I can,

9  let me speak to that a little bit more.

10  Q.   Sure.

11  A.   One of his remediation plans was since the Clinical

12  Training Committee knew that he would be working -- you know,

13  we would be working on this second child team, which he wanted,

14  and what -- what was consistent with his hope for internship

15  plans, that I was supervising him.  And so we took advantage of

16  that to give him an opportunity to show us he could do

17  independent case work for the same kind of clinical

18  presentation that he was so successful at in China; namely, a

19  preschool child, who was disobedient and aggressive, and a

20  parent that wanted to try to help him.

21        And this particular case that came in, he, therefore

22  interviewed, evaluated, observed, had home data collected, did

23  the second session.  It takes two sessions to get through the

24  evaluation process, and that's a process he was intimately

25  familiar with.  He performed those on his own without me even

Mark W. Roberts, Ph.D. - Direct

1    in the room, without me watching.  In fact, I did other work

2    intentionally.

3         Okay.  And then he was scheduled to do the feedback

4    session from the first two visits that entailed interviewing

5    and assessment, plus the training of the parent to collect home

6    data and the home data, and whatever psychometric tests the

7    interview indicated should be given.  So, he was charged to

8    function like an intern-level psychologist, and I wasn't there

9    at all, and I purposely was not.

10        And then I was out of town doing something

11   professional, and came back and was just heartbroken to hear

12   that that patient did not come back.  Okay.  So, I am going,

13   "All right."  So, we did not complete independent case work,

14   and that's a key element in that remediation plan.  Okay.  So,

15   that's fully explicating that below.

16        And in that process of interacting with other --

17   with -- with the patients that he saw with Courtney, the two of

18   us said, "No, this is still below expectations," his responding

19   to the patients during either assessments or interventions.  We

20   thought that was -- that's our opinion.

21        Okay.  Keep going down if you will.  And then this

22   ability to adjust.  And again, these were items that we had

23   seen previously from other supervisors in other settings.  So,

24   we were disappointed to have to give those ratings.  And this

25   is just a description of what occurred, and that's Courtney's

Mark W. Roberts, Ph.D. - Direct

1    nice printing as opposed to my terrible printing.

2    Q.   Okay.  If we go back to your semi-annual evaluation, it

3    appears that you had discussions with Mr. Yu regarding the

4    issues with that practicum; correct?

5    A.   He certainly had a copy of the remediation plan that

6    included the independent work with a parent to try to replicate

7    the use of the protocol he used so successfully in China, in

8    his own culture, to see if he could do that here as a

9    fourth-year doctoral student in our culture.

10   Q.   So, again, at this point in time, you opened up the three

11   options to Mr. Yu for successful internship; correct?

12   A.   We did.  I think it's important to go up a little bit

13   higher and note the summary evaluations that the Clinical

14   Training Committee made.  His academic progress remained

15   perfectly satisfactory, but his professional progress was

16   judged, as a whole, as unsatisfactory by the Clinical Training

17   Committee.

18           So, this is the second macro unsatisfactory rating by

19   that body for the two consecutive semesters of his fourth year

20   of training, and that summarizes the issues that we identified.

21           Do you want me to go on and talk about these options?

22   Q.   Yeah, if you would, please.

23   A.   Okay.  We now have a student that's been unable to match,

24   and we've got some identified difficulties with that student's

25   professional performance.  Not his academics, which were fine.

Mark W. Roberts, Ph.D. - Direct

1    Okay?

2         Now, Mr. Yu has rights as a student, and the first

3    two of those reflect that.  Certainly, a student can reapply.

4    Now, the proviso that makes that option really almost an

5    academic statement for the student here, is that we would have

6    to report the fact that he was dismissed from an externship

7    site and that we did not perceive that these problems had been

8    remediated.  It states that in here somehow.  Oh, that we can't

9    state that those deficits have been overcome.

10        Second, he is always -- anyone who is approved to

11   apply to APPIC internships is always welcome, if they can't get

12   in -- and this is the program safeguard for us because of that

13   imbalance between the number of applicants and the number of

14   sites.  That's why that's created.  It's also created for some

15   other specific needs reasons, such as a family health problem

16   or child problem.  They can't move out of town.

17        So, his second option is to propose an internship

18   himself.  And our rules simply say the student must propose it.

19   We'll check it.  And I referred to, to look at, in the clinical

20   student handbook, how to go about doing that.  Ultimately,

21   that's what he chose to do.

22        Third, we actually championed and valued, given his

23   success in the -- in his own culture, with his own language,

24   and a real specific protocol, and that remarkable success, that

25   he consider proposing a -- I called it an internship experience

Mark W. Roberts, Ph.D. - Direct

1    in China that would be acceptable to the Clinical Training

2    Committee.  And so I described that third option, and he had

3    time to pursue those.  And noting that all three options would

4    require Clinical Training Committee's approval.

5    Q.   Okay.  So, Mr. Yu signed this document on June 18th, 2012.

6    Do you see that?

7    A.   Yes.

8    Q.   And then he supplied some supporting documentation to

9    support his position.  Let's not look at that.  Sorry.  I hope

10   you didn't see that.  Nevertheless, he provided some

11   information supporting his position?

12   A.   He did.  He disagreed with the evaluation and offered

13   information for a Clinical Training Committee to review.

14   Q.   I think we all missed that, Your Honor, in that exhibit,

15   so I think Exhibit 521, that's already been stipulated to, is

16   going to have to be redacted as to that final page.

17           THE COURT:  So, what Bates numbers is it -- will it

18   consist of in the stipulated form?

19           MR. KELLY:  It will be Bates number 577, 578, and

20   579.

21           THE COURT:  Okay.  For the edification of those in

22   the courtroom, Bates number refers to the practice of lawyers,

23   for purposes of controlling documents in a lawsuit, by placing

24   numbers on them.  It refers to a stamp that was invented by a

25   man named Bates.  Now it's all done in other means, but we

Mark W. Roberts, Ph.D. - Direct

1   still refer to it as Bates numbers.  Just in case you're

2   interested.

3          Go ahead, Mr. Kelly.

4          MR. KELLY:  Thank you.

5   Q.   Doctor, just as an aside, there is no document to

6   reference this, but in the summer of 2012, Mr. Yu

7   successfully -- excuse me -- successfully defended his

8   dissertation.  Do you have a recollection of that?

9   A.   Yes, it was in June of 2012, I believe.  We were very

10  pleased.

11  Q.   And then during that summer, Mr. Yu decided to go ahead

12  with the second option and pursue a non-APPIC internship;

13  correct?

14  A.   Yes.  I'm not sure about the actual time line of when that

15  was initiated by Mr. Yu.  I know it consumed the fall semester

16  to look at his proposal and to refine it, so that we can meet

17  our own standards.  And we had standards, because we had done

18  this before five or six times.  So, that was engaged in during

19  the fall.  I am not -- I don't have a date in front of me as to

20  when that was initiated.

21  Q.   Okay.  Well, let me show you this.

22  A.   Probably in the summer or in the fall.  I think it was --

23  I think it was in the fall, yeah.

24  Q.   Okay.  I'm showing you Plaintiff's Exhibit 43.

25  A.   Okay.

Mark W. Roberts, Ph.D. - Direct

1  Q.   Do you see that?

2  A.   Late summer.  Yes.

3  Q.   So, can you tell the Court what that is just for --

4  A.   Well, he was just informing us that he and the

5  professionals at the Cleveland Clinic were willing -- who were

6  willing to try to create this non-APPIC internship had

7  constructed their first revision.  So, it was somewhere prior

8  to August 6th that I received an email about this, indicating

9  that he had identified the possible non-APPIC internship at the

10  Cleveland Clinic, and that he was going to pursue it.  And we

11  said, "Certainly.  You are approved to do that."

12         MR. KELLY:  I have an exhibit, Your Honor, but I just

13  want to make sure it had been stipulated to.

14  Q.   So, let me show you Exhibit 555.

15         THE COURT:  You know, I just realized that we have

16  reached our little past our break time.  So, since you are

17  about to start a new subject, we will take a recess now until

18  1:32.

19         (Recess 1:10 p.m.  Resumed 1:31 p.m.)

20         THE COURT:  Thank you.  Please be seated.

21         All right.  You may continue with your inquiry.

22  BY MR. KELLY:

23  Q.   Dr. Roberts, before we get ahead of ourselves, from a

24  chronological standpoint, I want to refer you back to

25  Exhibit 533, Bates stamp number 612.  Those are your

Mark W. Roberts, Ph.D. - Direct

1    contemporaneous notes.

2              Could you tell the Court what occurred back in May of

3    2012 in regard to a meeting with Mr. Yu and others and the

4    university?

5    A.   We met with Joyce Hammond-Perry, the Affirmative Action

6    Officer, and Shane Ostermeier of student affairs and reviewed

7    our circumstance.  This was in May of 2012.  So, this was after

8    the inability to obtain an APPIC internship and before the

9    semi-annual evaluation was written that specified the three

10   options of reapplying, which is really a vacuous option, but

11   the opportunity to create your own non-APPIC site, or the

12   opportunity to take the culturally accommodated site.

13             So, this meeting predated that Clinical Training

14   Committee decision.  And it was -- I think it's important in

15   the sense that one of the issues that was very wisely raised by

16   Joyce Hammond-Perry, who is a senior administrator and quite

17   accustomed to dealing with faculty and student issues, and the

18   issue that came there was she actually suggested to Mr. Yu,

19   "Why don't you spend some more time here at ISU, work on your

20   clinical skills, and then reapply to the internship."

21             And that's a legitimate option.  And he chose not to

22   do that.  My contemporaneous note says that he actually said he

23   will not -- "I will not enter practicum with Roberts next

24   fall."  That's my recall and my note.

25   Q.   Okay.  So, he was actually given a fourth opportunity?

Mark W. Roberts, Ph.D. - Direct

1   A.   Given another option to stay the course and to acquire

2   skills to reapply.  So --

3   Q.   He nevertheless went ahead with his plan to engage in a

4   non-APPIC internship at Cleveland Clinic; correct?

5   A.   Yes.

6   Q.   What I have presented to you is Defendant's Exhibit 555.

7   Could you tell the Court what that is?

8   A.   You know, the dates have me a bit confused, and

9   Dr. Chase's name, so this may have been after he was dismissed

10  by Dr. Speer, and to try to create an alternative continuation

11  of his internship, but I'm not -- I'm not sure.  I'm not that

12  familiar with this document if it's Jun Yu and Cheryl Chase

13  document after the dismissal.

14  Q.   Well, it also says the Cleveland Clinic.

15  A.   Right, because that's one of her associations, but --

16  Q.   All right.  So, you don't think this is the pre-Cleveland

17  Clinic proposal?

18  A.   Keep going up.

19  Q.   Because it talks about at Cleveland Clinic, it's expected

20  that Mr. Yu will --

21  A.   Can you go up?  I wanted to see the other part.

22  Q.   Tell me where to stop.

23       MR. COULTER:  Your Honor, I'd just like to interject,

24  I don't mind leading a little bit, but I think we are getting a

25  little bit far afield suggesting that he should be looking at.

Mark W. Roberts, Ph.D. - Direct

1           THE WITNESS:  Oh, I got it.

2           THE COURT:  Well, if you have a question you think is

3    leading, object on leading, and I will deal with that.

4           MR. COULTER:  All right, Your Honor.

5    BY MR. KELLY:

6    Q.   All right.

7    A.   Okay.  I've got it.  This does include all three

8    supervisors and pre- -- predates the onset of the eventually

9    approved non-APPIC internship.  And I guess the reason only

10   Dr. Chase is mentioned there is because the Cleveland Clinic

11   represents the other two supervisors, Dr. Speer and

12   Dr. Frazier.  Okay.  That's what threw me off.  Okay.

13   Q.   Okay.  So, eventually, this proposal became a contract;

14   correct, between Cleveland Clinic and ISU?

15          MR. COULTER:  Objection, leading, Your Honor.

16          MR. KELLY:  Foundational.

17          THE COURT:  Yeah, I started to say, no, it's not, but

18   I think the preface to the question potentially is leading, so

19   I will sustain the objection.  Ask it another way maybe.

20   BY MR. KELLY:

21   Q.   Dr. Roberts, I put up Exhibit 35, Plaintiff's Exhibit 35.

22   Do you see that?

23   A.   Yes.

24   Q.   And could you tell the Court what that document is?  Take

25   your time going through it.

Mark W. Roberts, Ph.D. - Direct

1    A.   Can you scroll down.

2    Q.   Sure.  I forgot I was in control.  Tell me -- I'm sorry --

3    where to stop.

4    A.   Okay.  It just indicates the approval process that we

5    underwent during the fall to gain institutional approval of the

6    proposal, and I think that's a letter to the dean.  If you want

7    to scroll up.  It's a letter to the dean from me saying "Here's

8    our affiliation agreement," and I think we're requesting that

9    the university proceed with the affiliation agreement.

10          So, it's a document that talks about that process of

11   gaining institutional approval, which we did.  And then this, I

12   am assuming, is the lengthy -- this is the ISU Clinical

13   Education Agreement.  So, this is the -- what we call an

14   affiliation agreement between Idaho State University and a

15   site.

16          We have such agreements at very shortened limit --

17   levels, between, for example, ourselves and Dr. Landers's

18   externship.  This is a much more extensive one, because of the

19   nature of the 12-month, 2,000-hour contract.  And, so, an

20   affiliation agreement like this is a legal document prepared

21   by -- Barbara Adamcik was the signatory for the final approvals

22   of this affiliation agreement, but it allows us to place a

23   doctoral student, for academic credit, to fulfill a particular

24   program requirement, at a different site, and all of the

25   details necessary to minimize liability to either agency.

1      I am not a lawyer.  I can't tell you how they do

2  these.  I trust them.  They write it and the ultimate signatory

3  is not me.  It's the university.

4  Q.   Let's jump ahead to another related document.  Could we go

5  to -- I need to pull it up.  This is exhibit -- Defendant

6  Exhibit 554.  Could you tell the Court what this document is?

7  A.   Yes.  Part of our protocol to obtain and accept a

8  non-APPIC internship is to ask -- once all parties are agreed

9  with the actual proposal of the content of training and content

10  of evaluation and duration and things like that, we will submit

11  that document to a bona fide expert.

12      We -- Dr. Hedt is a licensed psychologist working at

13  the Boise VA and very accustomed to documents of this type, and

14  she, as an internship director herself, is a perfect candidate

15  for this.  And she reviewed it, and she found, I believe, four

16  issues.

17      You have to lower it down.  The first one listed on

18  my screen is the compensation, because Cleveland Clinic would

19  not pay him for his work, and that's their prerogative.  And we

20  agreed to that in the affiliation agreement.

21      Secondly, Cleveland Clinic would not provide him any

22  on-site due process, which is routine with affiliation

23  agreements between Idaho State University and training sites.

24  The student's due process is available at the university.  If

25  they get an untoward grade, they are always able to appeal that

1   great grade.  If they get dismissed, they can appeal that

2   dismissal with the university.  But she noted both of those

3   absences.

4            And then keep going down.  There's a three and a

5   four, if I recall.  Documentation of the -- of supervision, and

6   that was something we were able to correct.  And training

7   curriculum and internship goals, she had some queries and those

8   were able to be corrected.  So --

9   Q.   Okay.  So, after you communicated with Dr. Speer in

10  November of 2012, the items raised by Dr. Hedt as far as three

11  and four were resolved?

12  A.   Yes.

13  Q.   Okay.  If we look at Exhibit 524.

14  A.   Yep.

15  Q.   Oops, the wrong one.  Sorry.

16           Could you tell the Court what 524 is?

17  A.   Well, the preceding page was the letter to Mr. Yu pointing

18  out that we could not proceed given the deficits --

19  Q.   Let me go back to that for you.

20  A.   You have got it right there, I think.  This is the letter.

21  Q.   Tell the Court what 523 is?

22  A.   Okay.  This is the letter to Mr. Yu saying -- giving --

23  updated on the progress that we had made in gaining approval

24  for his preferred non-APPIC internship site and our responses

25  to -- to that query.

Vol. 3 - 471
Mark W. Roberts, Ph.D. - Direct

1          And as -- if he reviews those three documents, which
2    were enclosed, he could tell that we had two substantive areas
3    that could not be addressed.  So, they can't be addressed.
4    They are a prerogative of the institution that is willing to
5    provide the training opportunity, but they are not willing to
6    provide due process for students.
7          And I remember a correspondence saying that the
8    Cleveland Clinic -- which has umpteen students of all kinds.
9    It's a huge medical complex -- does not provide due process or
10   compensation to students period.  And so the affiliation
11   agreement that we had to craft did not have those in.  Dr. Hedt
12   noticed it.
13         And I -- in this letter, I go, the key language is
14   "Before I provide registration override that will allow you to
15   register for your" -- for his internship -- he had to complete
16   three credits of internship, one each semester.  But I had to
17   have his written acceptance of the limitations of the
18   internship site; namely, no compensation, and no due process,
19   and a signed, written response indicating that you've been
20   fully informed.  And then he also had the responsibility of
21   paying the external reviewer.  That's a burden we put on
22   students.
23   Q.   So, during this fall 2012 time frame, in which you wrote
24   this letter --
25   A.   Yes.

Mark W. Roberts, Ph.D. - Direct

1  Q.    -- you were working with Mr. Yu while he was in Ohio?

2  A.    No, he was in Ohio, and he --

3  Q.    That is what I just asked.  He was in Ohio; correct?

4  A.    Right.  I was not working with him.  I am sending this to

5  him in at his Ohio address.  He left the university area, I

6  believe, sometime in the summer, and I couldn't tell you when

7  after he finished his spring semester.  And he had his three

8  options in hand.

9         And then I hear, via email, sometime in the summer,

10 through my extemporaneous notes somewhere, that he had found a

11 willing partner that he desired to work with, namely, the

12 Cleveland Clinic, and Dr. Speer in particular, because she was

13 an autism expert.  And that would supplement his work with me

14 on externalizing disorders and Dr. Haight's work on

15 internalizing disorder.

16        So, it's a good placement for him.  And we were able

17 to hammer out the agreement, but we had these two remaining

18 snags.  And this is the charge to Mr. Yu there, on

19 November 12th, to give us a signed written consent that he

20 understood and accepted those two limits.

21 Q.    Okay.  So, what I meant -- when I said working with him, I

22 was talking about hammering out this --

23 A.    Yeah, distally, and he was not -- not on-site, and he was

24 in Ohio.

25 Q.    Okay.  So, let's go now to 524 that we discussed earlier.

1   A.    Okay.

2   Q.    Or started to discuss.  Could you tell the Court what

3   Exhibit 524 is?

4   A.    This is the letter -- signed letter that I received

5   indicated that he understood the -- he had been informed of the

6   limits, and he wishes to proceed despite those limitations.

7   So, that was the go-ahead I needed to allow him to register, so

8   I could open up the registration for the course credit for

9   spring semester.

10  Q.    And did you go ahead and do that then?

11  A.    Yes.

12  Q.    And it's your understanding that the internship at

13  Cleveland Clinic started when?

14  A.    You'd have to go to the contract, but I believe

15  January 3rd or 4th.

16  Q.    And at some point in time in January, did you have a

17  telephone discussion with Dr. Speer from Cleveland Clinic?

18  A.    Yes.

19  Q.    Okay.  And could you tell the Court what that discussion

20  entailed?

21  A.    I don't have my notes in front of me, but my recall was

22  that -- and for me to actually talk with her, I needed a FERPA

23  release.  I needed a Federal Education Rights or Privacy Act

24  release from Mr. Yu.  And so she requested a phone

25  conversation, which had, surprisingly to me, never been

Mark W. Roberts, Ph.D. - Direct

1   performed in all of that fall semester construction of this

2   internship.

3           THE COURT:  This is January 2013?

4   BY MR. KELLY:

5   Q.   Dr. Roberts, is this in January 2013?

6   A.   The actual phone conversation I had with Dr. Speer would

7   have been in that area.  But it -- it could not occur until I

8   had the FERPA release.  And so from the date that she phoned me

9   or emailed me saying "I need to talk with you," to the date

10  that I actually talked with her, I had to send a letter to

11  Mr. Yu and request a signed release, so that I could

12  communicate with his internship supervisors.  Something I did

13  not possess, surprisingly.  But Mr. Yu was forthcoming, and

14  that enabled us to talk.

15  Q.   I am showing you what's now been identified as Defendant's

16  Exhibit 526.

17  A.   Okay.

18  Q.   Could you tell the Court what that is?

19  A.   Okay.  This was an email sort of follow-up on the phone

20  conversation that I had.  So, good.  We do have some

21  documentation of what occurred here.  And it just summarized

22  the things that we made clear, that perhaps myself and

23  Dr. Speer weren't on the same page with.

24          Okay.  And I pointed out that what she indicated was

25  that Mr. Yu was at entry levels for several of the APPIC

Mark W. Roberts, Ph.D. - Direct

1    professional skills and possibly some R levels, which is

2    remedial skills.  Okay.  And the letter also talks about what's

3    typical.

4             A typical incoming -- I'm not sure if it's in this

5    letter, but I do know the answer to it.  And that is that a

6    typical intern coming in at the start of their 12-month

7    internship will be rate at the intermediate level.

8             Intermediate level means that they have lots of

9    skills, and they can perform those relatively independently but

10   still require supervision.  And that's why we have an

11   internship, because they are still getting supervision.  Okay.

12            And then I'm trying to -- I know the outcome of what

13   was relevant here, and that was that I did make a suggestion to

14   her that given her concerns -- and I shared some concerns with

15   her, but I have to admit I was not fully forthcoming about all

16   of the reservations that the Clinical Training Committee had

17   exercised, because I did not want to put a damper on this

18   process.  That site found something, during that fall semester

19   when he was a volunteer, that they liked.  They were willing to

20   work with him.  They were certainly willing to work with us to

21   create this document.

22            So, what I indicated to her, that, yes, I agree.

23   He's not as far as long as we would expect for being a student

24   who's completed four years in a doctoral program, and that the

25   one thing she might do, and she acceded to this recommendation,

Mark W. Roberts, Ph.D. - Direct

1   was to use the agreed-upon evaluation system to give him a

2   baseline, give him realistic feedback about where he stood.

3   And that's what this has to be about.

4   Q.   All right.  Well, first of all, you mention --

5   A.   There.  "I recommend" there.  I see it.

6   Q.   You originally, or you stated that Cleveland Clinic saw

7   something that they liked because he was doing volunteer work.

8   A.   They must have, because they --

9   Q.   What do you mean by that?  When was he doing volunteer

10  work?

11  A.   Okay.  Now, the volunteer work was not something I was

12  privy to during its process.  I learned about it subsequently

13  through conversations with Dr. Speer.  And apparently, and

14  quite appropriately, Jun, who was in Cleveland, did some

15  volunteer work, and lots of professional programs use

16  volunteers to do this's and that's.  And having a volunteer

17  with doctoral-level student status is a great opportunity for

18  them, and they took advantage of that.

19         And Jun -- Jun apparently was doing some work, of

20  which I'm not sure what it was, for Dr. Speer, but it was

21  probably the kind of work that a seasoned childcare person like

22  Mr. Yu could perform without supervision.  And I'm sure he

23  wasn't engaged in any professional activities without

24  supervision.  But he was doing sort of volunteer work.  And I

25  know -- I believe he did some work with Dr. Frazier as well

Mark W. Roberts, Ph.D. - Direct

1    scoring protocols or something.

2    Q.   So, this would have been --

3    A.   In the fall.

4    Q.   -- fall of 2012?

5    A.   Yeah.

6    Q.   Was he not a student at ISU at the time?

7    A.   I don't recall if we required him to take a one-credit

8    course, but I don't think so.  I -- I think he was zero credit

9    at that time.  But he was charged to try to, you know, follow

10   up on his three options.  And I have no recall of him, for

11   example, taking a one-credit course at ISU just as a

12   placeholder.

13            And as a volunteer in some agency like the Cleveland

14   Clinic, he doesn't need our approval to do so.

15   Q.   So, in January of 2013, as indicated -- as appears to be

16   indicated in this email exchange with Dr. Speer, she agreed to

17   do some remediation feedback work with him; correct?

18   A.   Yes, I'm sure.

19   Q.   Well, are you sure or that's what happened?

20   A.   I am trying to -- you know, I don't work at the Cleveland

21   Clinic.  I am not Dr. Speer's supervisor.

22   Q.   But based on this document --

23   A.   She --

24   Q.   -- what -- what communications did you have with Dr. Speer

25   about doing further work with Mr. Yu?

Mark W. Roberts, Ph.D. - Direct

1    A.   The agency, the Cleveland Clinic, and the supervisors had

2    all gained approval from Idaho State University to implement

3    the internship with all the safeguards and supervision and

4    alternative activity.  So, they had approvals to do that.

5              Okay.  And the contract commenced, I'm rather

6    certain, either January 3rd or January 4th.  Okay.  I don't

7    have that in front of me.  I can't -- so, he was now -- and he

8    was enrolled, at that point, January 3rd or January 4th, in one

9    credit of internship.

10             Remember, I got that letter from him waiving the two

11   problems with the internship; and, therefore, I allowed him to

12   register, and I believe he did register.  So, he was, under a

13   contract, registered at ISU commencing in January 3rd.

14             But prior to that, he had formed a relationship with

15   the Cleveland Clinic that enabled him to broach the topic of

16   constructing a non-APPIC internship, and they endorsed it and

17   went through all that work in the fall.

18   Q.   Okay.  But based on this email, after you received the

19   concerns from Dr. Speer --

20   A.   Right.

21   Q.   -- you had communications with her?

22   A.   Right.

23   Q.   Right?  And in this email, you made a recommendation;

24   correct?

25   A.   Yes.

1   Q.   Okay.  And what was that recommendation?

2   A.   I had one recommendation.  And since it's different from

3   what's in the contract that was approved by all the parties, I

4   wanted to get that in writing.  It's like these personal notes

5   to myself.  And the recommendation, which she could -- it was

6   up to her, as the clinic -- as the internship director to make

7   that decision.  She said, "Yes, I will accept your

8   recommendation."

9          And my recommendation was to use the established

10  APPIC competency rating form.  This is a nationwide, in use by

11  all accredited internships.  They use this scale.  It's a very

12  detailed, what we call content-valid rating scale.  And you can

13  see, by the information in this letter, the sort of responses

14  that a supervisor can give to a student, at any given point in

15  time, ranging from remedial, to entry level, to intermediate.

16  And I think the next designation is high intermediate and then

17  advanced.

18          So, I said to her, "Okay.  You are concerned about

19  our young man, and we have -- we did see some concerns

20  ourselves."  So I -- I tried to validate her concerns.  And I

21  said, "One thing you can do is implement this rating scale now,

22  as a baseline," to help Mr. Yu understand what she, Dr. Speer,

23  is concerned about.  And -- and she did.

24  Q.   You finish your email with the paragraph, "Thanks for your

25  willingness to provide this opportunity for our student."

Mark W. Roberts, Ph.D. - Direct

1   A.    Absolutely.  She -- I'm trying to maintain my relationship
2   with this licensed psychologist, who is willing to take one of
3   our students to accomplish his Ph.D.
4   Q.    Okay.  Would it be fair to say you were doing this for
5   Mr. Yu's benefit?
6   A.    Absolutely.
7   Q.    Okay.  Let's look at Defendant's 527.  Is this the APPIC
8   form you were referring to?
9   A.    Yes.  This is the one that we agreed to over the phone to
10  establish the baseline.
11  Q.    Okay.  And did you receive a copy of this from Dr. Speer?
12  A.    Yes, this is my copy.
13  Q.    And do you recall offhand what the findings were or the
14  evaluation was with Dr. Speer?
15  A.    Well, it may be down at the very end of the document where
16  they have a summary page.  Take a look.  Because what you are
17  getting here are each of the domains in which they assess and
18  the rating.  Okay.  Go back up there.
19  Q.    Do you want me to go down to the narrative part?
20  A.    Maybe go down to the narrative.  I mean, I actually
21  quantified this myself for different reports.  But here's the
22  qualitative look.  "Jun's eager to learn.  Seeks guidance.
23  Accepts constructive feedback well."  Well, that's an
24  excellent.  Gave me some confidence.
25          Here we go.  And then main areas that -- that he

Vol. 3 - 481

Mark W. Roberts, Ph.D. - Direct

1  should be working on during the internship, "report writing,

2  rapport building with families," okay, because with the

3  autistic kids, it's not a kid.  It's a kid in a family context.

4  "Ability to take feedback," and that's interesting, because

5  that was something we'd always had some issues with, so she

6  labeled that as another area to look at based upon the

7  evaluation.

8       And "identify" -- let's see.  "Demonstrate progress

9  from week to week on his identified goals," because he had very

10  specific learning goals for the internship.  And then

11  interestingly, she pointed out this "awareness of level of

12  abilities."  So, I presume from that, she meant that, like some

13  of our judgments, that there was a sort of an overestimation of

14  abilities, but that's my inference from that.

15       And I think this is just APPIC's stuff that is

16  attached.  And then "the trainee has not successfully completed

17  the above goals," but this was the baseline.  Wasn't this the

18  January one?  Yes.  Okay.  And there's Jun Yu's signature.

19  Q.   Okay.

20  A.   So, he participated in the baseline, he signed it and was

21  aware of those ratings as well as the particulars that were put

22  out there in the narrative form.  This was all well and good.

23  Q.   Okay.  I'm showing you Defendant's 528.  Can you tell the

24  Court what this document is?

25  A.   I have got to make sure on the date.  Where is my date?

1   Okay.  At the end of the semester, she was charged to make a

2   review by the contract.  Okay.  And this was the letter or

3   the -- she sent it to me by way of a secure email.

4           And you can see that she basically says "He's not an

5   appropriate fit.  He's unable to meet the demands.  I will be

6   discussing it with him shortly," but she wanted to make me

7   aware of it.  "I'm sorry that the outcome was not as we hoped."

8   Q.   Okay.  When she indicated in her email to you that she

9   will be sitting down with him in the next week to discuss this

10  with him?

11  A.   Yes.

12  Q.   Did you have any reason to doubt that?

13  A.   No.

14  Q.   And then let me show you 529.  Could you tell the Court

15  what this document is?

16  A.   Oh, this is the reassessment, using the same instrument of

17  the supervising psychologist's ratings of Mr. Yu's performance

18  during that two-and-half-month period, okay, which was

19  technically the end of the semester.

20  Q.   So, if we go to the narrative section, would that be the

21  appropriate --

22  A.   Sure.

23  Q.   Okay.  What were Dr. Speer's comments at that point in

24  time?

25  A.   Okay.  The strength was "he continues to want to learn and

Mark W. Roberts, Ph.D. - Direct

1   accept feedback."  And the concern, of course, was "he has not

2   made progress especially with IN" -- I assume that means

3   independent assessment strategies, "even with significant

4   accommodations and support."  And she pointed out "he was aware

5   of those limitations."

6   Q.   Aware or unaware?

7   A.   That he was unaware.  Oh, yes.  That's -- that's the

8   assertion that that problem, from her point of view, was still

9   extant.  Okay.  And that she -- she actually did believe that

10  this combination of being unaware of limitations, combined with

11  inability to independently perform the assessments, did, in her

12  opinion, put causing harm -- there's a risk for harming

13  patients.  That was her opinion.

14  Q.   And did you have any reason to doubt Dr. Speer?

15  A.   I do not doubt her sincerity or her processes.

16  Q.   Let's look at Exhibit 530.  Can you tell the Court what

17  that is?

18  A.   I think this was the follow-up to the secure email that

19  says the same thing in writing with a signature.  It says that

20  she dismissed him for cause.

21  Q.   Okay.  She also says here that this was all directly and

22  clearly discussed with Mr. Yu?

23  A.   Okay.

24  Q.   Do you see that?

25  A.   I do.

Mark W. Roberts, Ph.D. - Direct

1    Q.   Do you have any reason to doubt Dr. Speer's --

2    A.   I do not doubt it.

3    Q.   Let's jump ahead to Exhibit 531.

4    A.   Okay.

5    Q.   Could you tell the Court, after looking at that, what this

6    is?

7    A.   This is an email from Jun requesting an opportunity to

8    proceed with what he thought was an option that was still in

9    force.  Okay.  And it's -- I indicated in my letter there, "I

10   have not received copies of evaluation," and I needed to get

11   those.

12   Q.   Okay.  By that time, however, you had been at least

13   advised that he had been terminated from the internship;

14   correct?

15   A.   Yes.  I was aware of it because of the email status, but I

16   wanted to see them.

17   Q.   So, you wanted to see the assessments --

18   A.   Uh-huh.

19   Q.   -- before you spoke to Mr. Yu?

20   A.   Yes.  I needed the documents.  And I also did not want to

21   respond to the request for the internship at this subsequent --

22   at this point.  I wanted to see what information was available.

23   Oh, that's one of my lovely contemporaneous notes.

24   Q.   I'm sorry.  Do not look at that.  I'm sorry.

25            MR. KELLY:  That has not been admitted, Your Honor.

1   I'm sorry about that.

2            THE COURT:  I didn't see it.  I was making notes.

3   BY MR. KELLY:

4   Q.   Okay.  In the interim, you had communications with

5   Dr. Chase who you heard --

6   A.   Yes.

7   Q.   -- testify yesterday; correct?

8   A.   Yes.

9   Q.   And let me just pull this up.  This is Plaintiff's

10  Exhibit 47.

11  A.   Okay.

12  Q.   Could you tell the Court what there is?

13  A.   This is informing me of what she is currently doing as of

14  April 8th and has done.  She was doing her excellent work at

15  trying to teach Mr. Yu some of the administrations for dyslexia

16  and about her practice.  And I don't know the full scope of

17  that practice, but I know it focused upon reading disorders in

18  young children.

19           And we learned yesterday something I had -- never was

20  aware of, and that is that -- see in the second paragraph here

21  where she talks about direct service?  That puzzled me, because

22  I knew, from the evaluation that she had submitted, that she

23  did not think he was yet ready to administer tests.

24           But -- so, I was puzzled by the direct -- the quotes

25  "direct clinical service to approximately six cases."  So,

Mark W. Roberts, Ph.D. - Direct

1   during that three-month interval, between the onset of the

2   approved internship and the dismissal from that site, by its

3   director, he did see approximately six -- he did see six cases,

4   I presume.  And we learned yesterday what that included.

5           He gave a structured interview to the parents while

6   the students were being evaluated, and then he participated in

7   the -- I believe the feedback session.  Those are the two

8   things that I recall, and there may be more that I'm not

9   getting.

10           I do know that he -- she did not believe he was able

11   to administer the reading disorder tests at that point.  So,

12   they had been doing a lot of what I would call orientation and

13   discussion, and then the direct service was limited to a

14   structured interview that he gave to the parents and

15   participation in the feedback.  That would -- that's good

16   direct service though.

17   Q.   But based on what you heard yesterday from Dr. Chase, she

18   wasn't allowing him to do any independent testing; correct?

19   A.   That was -- that was what she said yesterday, and that's

20   what she said in her work.  And she had a good rationale.

21   Because of articulation issues, she wanted Jun to do some

22   practice under her supervision with mock patients.  I got that

23   somewhere.  I'm hoping I am not confabulating that.

24           But he was not ready, and the -- I did receive the

25   same APPIC rating form from her that clearly noted that he was

Mark W. Roberts, Ph.D. - Direct

1    not directly testing.  So, her testimony before this Court

2    yesterday corresponds with my knowledge of the documents she

3    sent me; that he did have some direct service.  And I learned

4    yesterday what that was, but it was not testing.

5    Q.    Okay.  There were some discussion that Dr. Chase wanted to

6    continue Mr. Yu's internship; correct?

7    A.    There was.

8    Q.    And what -- how did that resolve itself?

9    A.    I informed her, as a Director of Clinical Training, that

10   Mr. Yu's student status with the Cleveland Clinic was

11   terminated the moment the director of that internship

12   terminated it.  It was her prerogative to do so.  She did so,

13   and so Jun Yu was now terminated as -- from the program.

14          He -- he, under those conditions, was no longer a

15   student.  And there's an email.  And I commented to her, as an

16   old Idaho Bureau of Occupational Licenses person, I'm going,

17   "This guy is not a student.  You should check with your

18   regulatory bodies if you are going the integrate him into the

19   therapy process, even what she was currently doing."

20          What she was currently doing was quite consistent

21   with the internship for a student for a -- for the student's

22   level of skill.  But the moment he stopped officially becoming

23   a -- stopped having that student status, I cautioned her that

24   she should check with her own regulatory bodies.

25          Obviously, I don't know anything about the Ohio Board

Mark W. Roberts, Ph.D. - Direct

1    of Psychologist Examiners, but I do know our own quite well,

2    having served on it.  And that's a problem, to have a volunteer

3    in the professional delivery process.  In Idaho, for example,

4    you must have a master's degree and be approved as a service

5    extender before you can deliver professional services under the

6    license of a licensed practitioner.  And so I assume there is

7    something analogous to that.

8            So, I basically told her -- I had no authority over

9    her, of course.  That was informational only and to recognize

10   that he was no longer in the internship.

11   Q.   Okay.  And did she respond to -- did you --

12   A.   I do not recall if I got anything back from her.  And I

13   would -- she certainly was not compelled to get back to me.

14   Q.   I'm showing you Plaintiff's Exhibit 36, which is your

15   May 3rd letter to Mr. Yu.  Do you see that?

16   A.   Yes.

17   Q.   And could you tell the Court the sum and substance of that

18   letter?

19   A.   I'm rather certain this is the dismissal letter from the

20   graduate faculty of the psychology department and explaining

21   the processes to the student.

22   Q.   Okay.

23   A.   Go ahead.  I was going to say, and the one thing we could

24   do, based upon the fact that he completed an approved empirical

25   project for his dissertation, that even though we could not --

1   he was being dismissed from the doctoral program, he certainly
2   could, upon application and the approval of the graduate
3   school, receive the Master of Science in Psychology to
4   represent his work as a -- in the graduate program, at the ISU
5   clinical doctorate, and the fact that he completed an approved
6   empirical study, which we were all very proud of and supportive
7   of.
8   Q.   I showed you this earlier.  This was an email from Mr. Yu
9   to you?
10  A.   Okay.
11  Q.   About -- oops, wrong one.  It's a -- sorry.  It's
12  Plaintiff's Exhibit 88.
13       Do you see that?  Could you look at that and tell the
14  Court what that document is?
15  A.   This is a request, by Mr. Yu, to reconstrue the internship
16  and turn it into an incomplete with Dr. Chase as one
17  supervisor, because Dr. Chase did indicate an interest in
18  continuing her professional training of him, which we now know
19  exactly where that stood, and he was performing for her under
20  those limitations.  And I am sure she hoped that with proper
21  training, he could acquire these tests -- testing skills and
22  move on.
23       Let me see the bottom.  Okay.  So, again, it's his
24  appeal for an incomplete.  And I know the problems we had with
25  that, and maybe you have got a piece of paper that indicates my

Vol. 3 - 490

Mark W. Roberts, Ph.D. - Direct

1   response to this letter.  I don't know.

2   Q.   Well, I wanted to ask you, prior to your May 3rd letter to

3   him right here and after that email in which he requested an

4   incomplete, did you have any communications with him?

5   A.   No.

6   Q.   Okay.

7   A.   The email.

8   Q.   What's that?

9   A.   Just the email that came to us subsequent.  I believe -- I

10  think the date is that it's subsequent to the dismissal.

11  Q.   Yeah, that would have been subsequent.  But no

12  communications between the April 30th email and your

13  May 3rd letter; is that correct?

14  A.   I -- I am willing to accede to that, yes.  Just too many

15  pieces of paper.

16  Q.   And in regard to his request to grant a second opportunity

17  for internship in China.

18  A.   Okay.

19  Q.   Why -- Dr. Koocher brought this up yesterday saying that

20  the university never explained to Mr. Yu why that Chinese

21  internship wasn't available in perpetuity.  Why was that?

22  A.   I would argue that --

23          MR. COULTER:  The question -- I don't know what -- I

24  actually don't know what he's asking in regards to why is that.

25  Why is what?

Mark W. Roberts, Ph.D. - Direct

1          THE COURT:  Well, I understood the question to be why
2    did the university -- well --
3          MR. KELLY:  I will rephrase it.
4          THE COURT:  Well, yeah.  I think there is some
5    ambiguity there, so ask another question.
6    BY MR. KELLY:
7    Q.   Dr. Roberts, Dr. Koocher yesterday mentioned the fact that
8    the university never explained to Mr. Yu why that Chinese
9    internship option was not available to him in perpetuity, is
10   what he said.
11         Why was it, from Idaho State University's -- what was
12   reasoning, from Idaho State University, why the Chinese
13   internship was not available to him after the Cleveland Clinic
14   internship dissolved?
15   A.   I think, given the dismissal and the content and reason
16   for the dismissal, would preclude us from now allowing a
17   continuation of an internship somewhere else.  We had too much
18   information indicating that Mr. Yu, at this point in his
19   development, was functioning only with intensive supervision,
20   during his autism work with Dr. Speer, that was inconsistent
21   with a fifth-year student at an internship site.
22         That's the reason that he was dismissed, and it
23   corresponded with our own discoveries, through the various
24   practica that have already been presented to the Court here,
25   that he had difficulty with independent display of professional

Mark W. Roberts, Ph.D. - Direct

1  skills consistent with a pre-intern at our site and with an

2  intern at Dr. Speer's site.

3          And only with immediate supervision was he able to

4  interact with -- in a co-therapy situation, in contrast an

5  intern or even a pre-intern, should be at that intermediate

6  level of care.  So, we judged him as -- and I think -- yeah,

7  this might help me if it has the reasons for the dismissal.

8  But it's not in detail.

9          But the inability to perform at that level of an

10  intern or even pre-intern was our main concern.  And we did not

11  think it responsible to allow him to proceed with either an

12  incomplete with Dr. Chase, who had the additional problem of he

13  was no longer a student, okay, or the internship in China,

14  where we said, "Okay.  We originally approved this as a -- as a

15  culturally competent alternative."

16          Okay.  And we were proud to offer that alternative at

17  that point at the end of his fourth year.  At the end of his

18  fourth year, he had those options after being turned down by

19  the APPIC group.  And so we tried to create this cultural

20  accommodation, which he chose not to.  He said he valued the

21  American training more.  And so he quite rightly created the

22  program at Cleveland Clinic, which didn't work out.  They had

23  to dismiss him for cause.

24          So, from my standpoint, and I am only one member of

25  clinical training member -- the Clinical Training Committee,

1   and I'm only one member of the graduate faculty.  From my

2   standpoint, I was responsive to the fact that a second

3   independent site -- so, a site independent from our faculty --

4   who had agreed to work with this student, under the prevised

5   conditions -- that this second site confirmed what we found

6   with the problems labeled and discussed with Dr. Landers, when

7   Dr. Landers dismissed him from the externship, and confirmed

8   those below level ratings that -- that popped up periodically

9   throughout his practicum career, under the protected

10  supervision of the ISU Psychology Clinic or the sites that we

11  put him in -- that he simply was not at a pre-intern level.

12  And the -- the dismissal from the APPIC site confirmed that for

13  me.  Now, the rest of -- the rest -- and hence the internship

14  in China would have an irresponsible recommendation.

15          We would be saying, "Here is this person that we

16  found to be unable to do intern-level work and even

17  pre-intern-level work, and yet we are now" -- we have got that

18  confirmed now, with that second external site.  And this was

19  one he chose as opposed to our assignment of him to

20  Dr. Landers's site.  So, we have that confirmation.

21          And that made me, as one member of committee say,

22  "No, I -- I can't justify the Chinese accommodation at this

23  point, because he's not ready for it."  He certainly would not

24  be placed in a context in which the only intervention he would

25  do would be the two- to six-year old treatment protocol with

Mark W. Roberts, Ph.D. - Direct

1    which he worked so well.

2            When you are on an externship -- an internship

3    anywhere, you are going have to embrace the full array of

4    clinical tasks expected of a near-doctoral-level student.  And

5    we now had confirmation, through this second external site, and

6    this time a site he chose, that he was not able to -- to

7    perform at that level.

8            When we offered that, the Chinese option, it was

9    among the three options.  There was no language in that nor was

10   there any intent, by the clinical faculty, that he could pick

11   and choose among them.  And then if one didn't work out, he

12   could take the next.  We had no intent to even imply that this

13   was still on the table.

14           It was on the table then.  He chose not to do it.

15   Now we have four months' worth of data from the Cleveland

16   Clinic, and they dismissed him.  That data has to go back into

17   our configuration of what recommendation to make to Mr. Yu.

18   And as one member of the Clinical Training Committee, I could

19   not endorse the Chinese option at that point for those reasons.

20   Q.   Okay.  For policies and procedures purposes, you heard

21   today mention about other students being put on academic

22   probation.  Why wasn't that an option for Mr. Yu in this

23   scenario?

24   A.   There is a distinction between an academic course, in

25   which you are graded A -- A, B, C, D.  A, B, C, D or F, okay,

Mark W. Roberts, Ph.D. - Direct

1   and a professional course.  In the professional courses on

2   campus, you are awarded A, B, C, D or F.  And any student who

3   receives a C in any course, including a clinical course, is

4   automatically placed on probation and required to retake the

5   course.

6        Mr. Yu never received a C in any of his practicum

7   courses at ISU, hence that trigger for the automatic probation

8   and retake, which was really designed for academic courses, as

9   opposed to professional courses.  But we nevertheless retain

10  the A, B, C, D, F for our students.  And had he received a C,

11  he would have been put on probation.  And -- and we would have

12  had to retake that course with that supervisor again.  And --

13  but he didn't.

14       The Us that are established -- and the Psychology

15  Department only awards U -- what's call S/U grading.  Our

16  graduate manual indicates we only have S/U grading for two

17  types of courses.  One is the thesis and dissertation.  Okay.

18  And if he got a U in a thesis or a dissertation or even the

19  supervisor was anticipating to giving a U, that supervisor was

20  charged to talk with the Clinical Training Committee about that

21  U for the person's thesis or dissertation, and we would take

22  action.  We would respond in some way.  Which -- which could,

23  indeed, be probation.

24       Generally, what would happen would be that the

25  student would be given a C or lower grade, or given -- given a

Mark W. Roberts, Ph.D. - Direct

1  proviso that if you receive a U, in your thesis or dissertation

2  process, we would look at that as a probationary issue and give

3  you a specific task sufficient as you must defend your thesis

4  before the end of the spring semester.

5          Okay.  There is no policy for the S/U grades we have

6  for externship or internship.  And I believe the reason for

7  that -- because it was certainly discussed over the decades, in

8  Clinical Training Committee, is that we needed flexibility.

9          We didn't want to automatically do A, B or C.  What

10  we wanted to do is look at all the information, and our

11  collective wisdom would then be used to describe what to do,

12  rather than an automatic probation and a warning that if you

13  don't defend your thesis, or you don't defend your

14  dissertation, or you don't submit your prospectus to your

15  adviser by such and such a date, you will be terminated from

16  the program.

17          Okay.  The externship and internship, which are the

18  only two courses that I am aware of that have S/U grading,

19  simply put out that grade, so that we can document completion

20  of the internship or the externship at the university level.

21          So, the student will get academic credit for it, and

22  they have met the criteria for whatever.  Certainly for the

23  dissertation -- or certainly for the internship.  That's a

24  degree requirement.  So, a U means they simply haven't met that

25  requirement.  Okay.

1          And the Clinical Training Committee and, in the case

2     of a dismissal, the entire graduate faculty of the psychology

3     department have to review all those documents, take everything

4     into consideration to make a decision.  And we made that

5     decision, and it was confirmed by the graduate faculty and then

6     appealed all the way through the dean in the graduate school.

7     Q.   But the fact that there's no appeal in regard to S and U

8     grades on externship and internship, that's some type of APA

9     violation?

10    A.   They have reviewed our documents forever, and we just got

11    seven years in full, and no one has ever questioned it.  And I

12    think -- for something like an unsatisfactory externship or

13    unsatisfactory internship, I think my -- my colleagues would

14    agree with me that you want flexibility.

15          You don't want an automatic dismissal from that.  You

16    want to look at that in conjunction with the totality of the

17    student's efforts and try to determine what's the best course

18    of action.

19    Q.   Did Mr. Yu ever attempt to appeal his U externship grade?

20    A.   No.

21    Q.   You know, one of the experts yesterday criticized the

22    university, Dr. Chavez-Korell, due to the fact there was no

23    remediation at the EIRMC externship.  From your perspective,

24    was there, in fact, a --

25    A.   Yes.  I disagree with that very stringently.  We worked

Mark W. Roberts, Ph.D. - Direct

1    very hard to create a remediation plan that would make sense

2    given his context during that fall semester and then the

3    subsequent spring semester.  So, we wanted him to continue

4    with -- during fall semester with his placement at the

5    community practicum side and his -- and his practicum with

6    Dr. Lynch.  So, that was the first decision.  Keep doing those

7    things.

8            And then the second decision was what are we going to

9    do in the spring semester to try to address some of the

10   concerns raised by Dr. Landers.  And so we put him into the

11   child format and -- with some provisos to work with both myself

12   and Dr. Haight, because we were the two child experts on the

13   faculty, and that was Mr. Yu's interest.

14           And we were also, keep in mind, trying to prepare him

15   for internship during that spring, because I -- like I said in

16   sworn testimony a few moments ago, I fully expected him to

17   match.  I really did.  And I wanted him to go into that

18   internship prepared.  And so, hence, we had the remediation

19   plan.  There it is right there.  It's in the letter.

20   Q.   Okay.  So, I just pulled up Exhibit 503.

21   A.   Right.

22   Q.   And so --

23   A.   That's our plan of remediation.

24   Q.   After the externship at EIRMC; correct?

25   A.   Right, for which there is no automatic probation dictated

Mark W. Roberts, Ph.D. - Direct

1    by our university catalog and the approved courses.  That's

2    restricted to thesis and dissertation issues.  Here he has a U,

3    and it's thrown back up to us, as the experts in student

4    training, what to do.

5    Q.   And one other thing I wanted to clear up, Doctor.  There

6    was statement by Mr. Yu yesterday -- and I don't have the

7    exhibit.  It was one of the redacted, revised ones, 538A.  I

8    don't know if he has it.  I don't think he has it up there.

9    A.   What I do have has an Exhibit 53 --

10   Q.   Wait for a question.

11   A.   And the last one is --

12   Q.   Wait for a question.

13   A.   Okay.  I'm sorry.  Oh, okay.

14   Q.   Okay.  Do you have that in front of you?

15   A.   I do.

16   Q.   Could you tell the Court what that is just to --

17   A.   This is a student practicum semester evaluation, and this

18   is the one for the spring of 2012 after the fall in which the

19   dismissal occurred.  And this was part of his remediation plan,

20   was to work with myself and Dr. Haight doing child work.

21   And -- and then this is the evaluation and some of the issues

22   that occurred in it.

23   Q.   Just for the -- I'd like to direct your attention to the

24   last page.

25   A.   Okay.

Mark W. Roberts, Ph.D. - Direct

1   Q.   In the second paragraph.

2   A.   Okay.

3   Q.   And when this was -- document was introduced yesterday,

4   there was a section in there that read that Mr. Yu was assigned

5   a case.  And you told him he did -- you did so because you

6   didn't believe he could handle the case.  Do you see that?

7   A.   I see it.

8   Q.   Is that an accurate statement?

9   A.   Absolutely not.  I categorically deny ever saying that.

10  He may have incorrectly inferred that from the statement that

11  he was required to perform a PCIT case.  And that stands for a

12  two- to six-year-old referral with aggression and disobedience,

13  that protocol that did he so well in China.  And it's part of

14  my research traditions.

15       He -- I may have said something along the lines of

16  "You need to do this.  This is part of your remediation plan.

17  We want to see that you can do this.  You did it in China very

18  well.  Let's see you do it here, and I am not even going to be

19  in the room.  And you do the interview.  You do the two-session

20  evaluation, home observations.  And then you interpret it."

21       And I do know that I went to a conference, quite

22  reasonably, given this goal, and I felt quite comfortable with

23  Mr. Yu seeing this family without anyone in the room.  When I

24  came back, I eagerly said, "Oh, let's how did you.  Let's see

25  what you got."  And the patient didn't come back.

Vol. 3 - 501

Mark W. Roberts, Ph.D. - Direct

1  Q.   You alluded to the site visit by the APA accreditation

2  team recently.

3  A.   Yes, there was a site visit in 2016.

4  Q.   And they actually reviewed the complaints by Mr. Yu;

5  correct?

6  A.   Yes.

7  Q.   And do you recall what their conclusion was?

8  A.   The only thing, off the top of my head, was they -- they

9  are charged to review any complaints by students during the

10  review interval, which include -- which included Mr. Yu's case.

11           THE COURT:  Dr. Roberts, just a moment.

12           MR. COULTER:  There were several complaints.  He said

13  "the complaint."  Which complaint is he talking about as being

14  reviewed by this agency?

15           THE COURT:  Mr. Kelly, Mr. Coulter, with apparently

16  more knowledge than I have about the details, says that the

17  question is ambiguous.

18           MR. KELLY:  I wasn't sure what he was saying, Judge.

19           THE COURT:  Well, let's be fair, and I don't need any

20  of the sarcasm.  It was -- I understood it.  He was saying it

21  was ambiguous.  So, do you want to ask the question again or do

22  you want to respond to the objection?

23           MR. KELLY:  I will ask another question.

24           THE COURT:  All right.

25           MR. KELLY:  And I am not being smart, Judge.  It's

Mark W. Roberts, Ph.D. - Direct

1    just that wasn't an objection.

2              THE COURT:  All right.

3    BY MR. KELLY:

4    Q.    So, Dr. Roberts, you explained earlier that there was a

5    site visit team that came in 2016; correct?

6    A.    Correct.

7    Q.    Okay.  And as part of the site team evaluation for

8    accreditation, they are charged with looking at student

9    complaints against the university; correct?

10   A.    Can I -- to clarify that, it's any student complaint filed

11   during the interval that they are charged to review against a

12   faculty member, against a program, against the university, any

13   and all student complaints that occurred during that period,

14   people like me, who do site visits, are charged to look at.

15   We -- we need to see if the program appropriately discharged

16   their duty to respond to the complaint.

17   Q.    And in this instance, do you have a recollection of the

18   specific complaint against either an individual or the

19   university itself, by Mr. Yu, that was referenced in the site

20   visit report?

21   A.    What was referenced in the site visit report that I am

22   aware of -- and I did look at this specific section of that

23   site visit report, even though I'm an emeritus professor and

24   not involved in that site visit -- it specified that they had

25   reviewed the -- they had reviewed a file drawer full of the

1    complaints, and progress, and responses that had piled up

2    during this process involving Jun Yu.

3            So, there is many different complaints made by Mr. Yu

4    during this that interval.  And the only comment I can recall,

5    from that 2016 site visit report, is their confirmation that

6    they reviewed a file drawer full of documents relative to

7    complaints made by this unidentified student -- because they

8    wouldn't identify in the written report -- and that they found

9    the file and the organization to be professional and ethical,

10   period.

11   Q.   You heard Mr. Yu testify this morning about several other

12   students off of redacted student evaluations; correct?

13   A.   Correct.

14   Q.   And in regard to -- in general terms, in regard to most of

15   these students referred to by Mr. Yu, what was the distinction

16   between Mr. Yu and most of these other students?

17   A.   His problems or deficits in the program were clearly

18   professional.  His academics were excellent and were never in

19   question.  So, it was always a professional issue.

20           And that means only were he in a professional context

21   in which a supervisor gave him a C -- and none did -- would a

22   plan -- would a process under -- be undergone in which the

23   student would be explicitly put on probation and given a goal

24   to eliminate that probationary status.

25           He never got a C.  It was never triggered.  That

Mark W. Roberts, Ph.D. - Direct

1    doesn't mean Clinical Training Committee wasn't aware of the

2    concerns about his development as a psychologist in regards to

3    evaluation, intervention, and so on.  And so that resulted in

4    Clinical Training Committee decisions about how to address

5    these things, and, in particular, the remediation plan with

6    Dr. Landers.

7            But since what Dr. Landers did was administer an

8    externship, for which there is no policy about an automatic

9    probation, we do not place the student on probation.  We simply

10   address the deficits with a plan and then follow-up on how well

11   the student did with that plan.

12           In contrast, most of the students, I think -- I would

13   think all of students that had a probationary status indicated,

14   it was for an academic problem or a conduct problem.  Okay.

15   And with the academic problem, that does trigger an automatic

16   probation warning status.  With the unsatisfactory thesis or

17   dissertation, that's going to trigger Clinical Training

18   Committee to act in some way to address that, including a plan

19   of remediation that often includes a consequence for failure to

20   do so.

21   Q.    Okay.  In several of your communications, which I am

22   having a hard time pulling up right now, you close your letters

23   out by saying "his or her success is our success."

24   A.    That's absolutely true.

25   Q.    And do you believe -- did you believe that about Mr. Yu

Mark W. Roberts, Ph.D. - Direct

1   also?

2   A.   Absolutely.

3   Q.   Okay.  Do you hold any animosity towards Mr. Yu?

4   A.   No.

5   Q.   Did ISU intentionally discriminate against ISU --

6            MR. COULTER:  Objection, Your Honor.  That calls for

7   a legal conclusion.  He hasn't been qualified to testify

8   whether there was intentional discrimination or not.

9            THE COURT:  He's a party.

10            MR. COULTER:  He may be a party, but he still doesn't

11   have the expertise.  If you want to lay the foundation, I have

12   no problem.

13            THE COURT:  Mr. Kelly.

14            MR. KELLY:  All right, Judge.  Is that an objection

15   again?  I mean, I can't tell what this is.

16            THE COURT:  His objection is that it calls for a

17   legal conclusion which this witness isn't qualified to -- to

18   render.  So, I just want to hear your response.

19            MR. KELLY:  Well, my response is it's an opinion of a

20   party witness.  That's what it is.  I don't know if it calls

21   for a legal conclusion.

22            THE COURT:  Yeah, I'm going to allow it in the

23   context here, where he's involved in all of this, subject,

24   obviously, to cross-examination, Mr. Coulter.

25            You can ask the question again.

Mark W. Roberts, Ph.D. - Cross


1        MR. KELLY:  Thank you.

2        MR. COULTER:  Thank you, Your Honor.

3    BY MR. KELLY:

4    Q.   Dr. Roberts, did ISU intentionally discriminate against

5    Mr. Yu in dismissing him from the Ph.D. program?

6    A.   No.

7        MR. KELLY:  All right.  That's all I have.

8        THE COURT:  Mr. Coulter, your cross-examination.

9        MR. COULTER:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11   BY MR. COULTER:

12   Q.   Good afternoon, Dr. Roberts.  How are you?

13   A.   Good.

14   Q.   All right.  Dr. Roberts, let's start from the beginning

15   here.  I think I'm to understand that you started the

16   Psychology Department at Idaho State University?

17   A.   I was one of the primary progenitors of the clinical

18   doctoral degree.

19   Q.   Okay.  So, when you were -- when you say the clinical

20   doctoral degree, did that involve setting up course work,

21   things of that nature?

22   A.   Yes.

23   Q.   Okay.  And when did that start again?

24   A.   The first student matriculated in 1995.  I am sure we

25   started thinking about it and doing preliminary work in 1988,

Mark W. Roberts, Ph.D. - Cross

1  because that was the date that we had an APA senior person

2  recommended to us to come in and consult about the viability of

3  constructing a clinical doctorate.  And that was in 1988.

4          So, it was multiyear process, starting in '88 through

5  '95, when we first admitted our first doctoral students.

6  Q.   And were you involved in that during that whole time?

7  A.   Directly, continuously.

8  Q.   Now, in that -- in that time, did you -- were ethics

9  required to be taught during -- in that -- for the clinical

10  folks?

11  A.   Certainly in the proposal.  And I believe, since we were

12  running what I call a clinical emphasis at the time -- that was

13  something I was charged to try and construct in 1977 when they

14  initially hired me -- we would have had an ethics course.

15  Probably the two-credit course that we now require of all of

16  our second-year doctoral students.  That -- that course has

17  been around for a long time.  I think it preceded me, too.

18  Q.   Now, have you ever heard of the textbooks "Ethics in

19  Psychology and the Mental Health, Standards and Cases"?

20  A.   I believe so.

21  Q.   And do you know who wrote that book?

22  A.   I believe Dr. Koocher.

23  Q.   Okay.  Why would you pick Dr. Koocher's book to --

24  A.   Because it's the best.

25  Q.   Okay.  And why do you say it's the best?

Mark W. Roberts, Ph.D. - Cross

1  A.   That's -- I was -- I have no quantitative way to explain

2  that.  It's just the reputation, and our faculty often used his

3  book.  And he presented at national conferences that we all

4  went to.  We all admire Dr. Koocher.

5  Q.   So, if Dr. Koocher would opine -- if Dr. Koocher would

6  opine in regards to ethical standards and ethical behavior,

7  would you give that any credit?

8  A.   Certainly.

9  Q.   Now, without going in to putting up 594 -- I think it is

10 on the board --

11          THE COURT:  It's not on.

12          MR. COULTER:  Not on the board, Your Honor.

13          THE COURT:  Okay.

14 BY MR. COULTER:

15 Q.   When we talk about patients -- and I am going to talk

16 about Dr. Landers's externship -- what kind of patients do

17 you -- were you -- were you under the understanding that

18 Dr. Landers had at the Eastern Idaho Regional Medical Center?

19 What type were they?

20 A.   They tended to be hospitalized adults, often suffering

21 from dementia or severe enough emotional problems that they

22 required hospitalization.  Okay.  So, it's pretty severe

23 population and primarily adult.

24 Q.   And would you consider this rather clientele?

25 A.   Yes.

Mark W. Roberts, Ph.D. - Cross

1   Q.   Now, I want to go back to something, because I'm going to

2   be jumping all around here in things.  Just kind of how it all

3   works out.

4           But when you -- when Mr. Yu applied to your program,

5   okay, I believe you testified that you were involved; is that

6   correct?

7   A.   Yes.

8   Q.   And Dr. Prause was involved?

9   A.   Yes.

10  Q.   And I think it was Mr. Vik was?

11  A.   Peter Vik, yes.

12  Q.   That's the one you couldn't remember; is that correct?

13  A.   Probably.

14  Q.   Okay.  Now, okay, can you tell us how that whole process

15  works?

16  A.   The admission process is multifaceted and takes a

17  considerable amount of time.  Students have to submit their

18  materials, which includes their graduate record exams, their

19  transcripts, their letters of support, any other documents that

20  they want to give us that attest to their readiness to enter a

21  doctoral program in clinical psychology.

22          We have to assemble all those things at a date

23  certain, and then we start circulating the folders among those

24  people who are on the Clinical Admissions Committee, which is

25  the Clinical Training Committee, and go through a lengthy

Mark W. Roberts, Ph.D. - Cross

1   process of reviewing, and screening, and interviewing and so
2   on.
3   Q.   Okay.  Now, in Mr. Yu's case, was that -- when you say
4   creating folders, can you explain what that really means?
5   A.   Well, there's a folder that includes all of those
6   documents that I referred to a moment ago, and we need it in
7   that format, so that it can be circulated as the student is
8   being interviewed.
9         We -- the secretary holds them all.  And especially
10  when they are not being interviewed, they are all kept in an
11  intern applicant file drawer.  And the secretary moves them
12  around as the student is interviewed.  And every student gets
13  at least three interviews.
14        And we -- it's not a random selection.  For example,
15  Mr. Yu would clearly interview with me, because his interests
16  were in family therapy and in particular disruptive kids.  So,
17  I am sure I interviewed him.
18  Q.   All right.  And was Dr. Prause assigned --
19  A.   I don't recall what her assignments were, but she was on
20  Clinical Training Committee.  So, she had to shoulder her
21  weight in terms of interviewing and being part of the
22  decision-making process.
23  Q.   All right.  Do you doubt that Dr. Prause was a part of the
24  interview process or -- yeah, the interview process with Mr. Yu
25  as she testified to earlier this week?

Vol. 3 - 511

Mark W. Roberts, Ph.D. - Cross

1   A.   I have no doubt that she was involved in that evaluative

2   process.  That's --

3   Q.   Now, Doctor -- Dr. Roberts, did you have any concerns,

4   when you interviewed or looked at the file of Mr. Yu, in

5   regards to his ability to speak English?

6   A.   Not from the documents.  The documents included a TOEFL,

7   which is a Test of English from a Foreign Language speaker, and

8   his score was fine.  Okay.  I did have concern, because the

9   Graduate Record Exam is -- that he took his in English, of

10  course -- and he had 30th percentile writing analytics across

11  three efforts.

12          Students often take that test two or three times, and

13  we usually look at the most recent or we look at the trend,

14  okay, when we have multiple inputs on the same test.  So, and

15  I -- I did look this up.  And that his writing -- and again,

16  understandably, as a second language, I'm sure I'd be

17  30th percentile in German, even though I spoke German -- I took

18  five zillion German classes.

19          So, we understood that.  And we were pleased that one

20  of his three verbals was good.  It was like 70th, 80th

21  percentile, which is pretty typical for a would-be doctoral

22  student, because they have to compete with some very

23  intelligent, highly educated young folks.

24          So, he had one of his three verbals was good.  His

25  most recent was 30th percentile, but the one taken, like, a

1    month or two before was, like, 70th percentile.  So, that gave

2    us, you know, good enough.  And I think I already testified

3    that his math score was great.

4    Q.    Did you, at any time during the application process,

5    question Mr. Yu's ability to, in fact, complete the -- the

6    degree or Ph.D. in Clinical Psychology that's offered by your

7    department?

8    A.    When we were discussing each of the applicants, I am

9    positive that I indicated some concerns about the fluency of

10   his speech.

11   Q.    Okay.  Did you receive any negative reactions for that?

12   A.    I don't recall if my colleagues were negative about that.

13   I am sure it was confirmed by other people, in the sense that

14   Jun Yu's speech understandably is slower.  He takes time to

15   come up with the right English word, and that makes his speech

16   sort of choppy or halting.  Those are the two words that show

17   up in the various documents.

18   Q.    Now, when you talk about speech being choppy or halting --

19   A.    Yes.

20   Q.    -- you were here all during trial?

21   A.    Yes.

22   Q.    Are you talking about the way he testified --

23   A.    Yes.

24   Q.    -- as well?

25   A.    Yes.

Mark W. Roberts, Ph.D. - Cross

1    Q.   Now, what has the -- I think the theme of the -- of Idaho

2    State University, if I hear everything right, you've got no

3    problem -- you had no problems with -- you had no problems with

4    his academic matriculation; would that be correct?

5    A.   His academic progress was consistently judged as

6    satisfactory.  He left us in what we would call "all but

7    internship."  He did everything.  He met all degree

8    requirements except internship.

9    Q.   So, had he completed his internship, he would be -- he

10   would have been a Ph.D. today; is that correct?

11   A.   That's correct.

12   Q.   So, we are talking three credits?

13   A.   We are talking 2,000 hours and 12 -- 11 to 12 months in an

14   accredited internship site by the National Association of

15   Post-Doctoral and Psychology Internship Centers.  That is what

16   the requirement is.

17           It is not a simple one credit.  It is a -- and it

18   says right in the catalog.  This is a 10- to 11-month

19   experience at an APPIC site or its equivalent.  That's why we

20   allow a non-APPIC site in America for someone who doesn't

21   match, given the supply and demand problems.

22   Q.   So, it is three credits?

23   A.   It is a three-credit course, but they are spread out.  So,

24   we insist that the student always be continuously enrolled.

25   Pay ISU for those credits.  It's like a commitment from them to

Mark W. Roberts, Ph.D. - Cross

1   the university while they are on internship.  And quite rightly

2   so.  Even though we are not supervising them, they can at least

3   pay for one credit.  We are monitoring and involved.  In the

4   case of Mr. Yu, quite a lot of involvement.

5   Q.   Now -- now, one of the things that I have noticed, in

6   regards to your testimony, is that the academic part was good,

7   but what you guys call -- excuse me -- what you guys.  What the

8   Idaho State University refers to as professional has to do

9   with -- I would think, and I am not a psychologist -- the

10  interaction with -- with what they call either clients or

11  patients.  Am I correct on that?

12  A.   Yeah.  The professional development components of

13  accredited doctoral programs is quite extensive and involves

14  both course work, which he did well at.  Never getting --

15  always got As and Bs.  But then practicum in a graduated style

16  from where we place the child in a -- or place the youth -- I'm

17  sorry -- place the student in a co-therapy role or an

18  observational role, and then working its way up toward

19  independence, which takes several years to become a good

20  psychotherapist.

21          Okay.  That's why we have basically a four-year

22  program plus a one-year internship, before we would even think

23  about a student applying for independent practice licensure.

24          But our goal is to always get that youth so well

25  prepared that they are well received at their internship,

1    perform admirably and effectively, with whatever assessment and
2    treatment standards, and live up to the standards of that
3    internship, and then go on to apply for licensure.
4    Q.   All right.  So, if I try to narrow that down a little bit,
5    are we talking about clinical opportunity for the graduate
6    student to relate to patients or clients?
7    A.   To learn how to deal with assessment and intervention
8    tasks with patients or clients.  In psychology, we prefer the
9    word client.  But the world uses the word patient, so we tend
10   to say patient, even though they are not sick physically.
11   Q.   I kind of noticed that, so I'm learning.  I'm learning,
12   too.
13   A.   Okay.
14   Q.   That's what I like about the law.  You never know what you
15   are going to run in to.
16          So, when I -- what I noticed, from your -- from the
17   direct examination there, is that it seems as though that the
18   people were saying that Mr. Yu was having a hard time either
19   forming alliances or some other type of patient contact or
20   whatever.  Did I get that right?
21   A.   I think it was the position of the Clinical Training
22   Committee that there were three primary problems with his
23   professional development.  Alliance formation is almost the
24   outcome of the -- of successful work at the other two issues.
25          One is sensitivity to patient signals.  Okay.  When I

1    am testing or when I am intervening, I have to pay attention to

2    the voice, the gestures, the facial expressions, the emotions,

3    such that I can adjust my therapy or my assessment to help that

4    person through the process.  Okay.  And that's that item that

5    kept coming up about sensitivity to patient's signals.

6          The other key element that kept coming up in his

7    practica while he was with us is the ability to adjust given

8    those signals.  So, it's not only sensitivity to the signals

9    but what you do with those signals that makes you a good

10   psychotherapist.

11         How do you process the negative emotion, the denials,

12   the "I can't do that," the frustration of the patient.  You

13   know, psychologists -- clinical psychologists, first and

14   foremost, do no harm.  That's ethical principle number one in

15   every known context.

16         Okay.  If you are repeatedly presenting tasks to

17   someone who is fussing and upset and distressed, that's

18   actually a mistake.  And that was the mistake that got my

19   attention when John Landers described his problems with testing

20   some of these dementia cases that he, as the supervising

21   psychologist, was paid to test and evaluate or have his

22   students do the evaluations under his supervision.

23         That really stuck at me.  And it's consistent with

24   some of the frustration reported by other supervisors, in that

25   they would not allow Mr. Yu to function independently, because

Mark W. Roberts, Ph.D. - Cross

1    they had seen some of these problems with adjustments of

2    assessments, adjustments of treatments, sensitivity to the

3    signals, which would tell you to make that adjustment, both of

4    which interact to help you form the alliance.  So, it's like

5    the alliance is the outcome if you do a good job with those

6    other two things.

7    Q.   All right.  So, were there any empirical data to show that

8    Mr. Yu was not doing what you say he was not doing?

9    A.   The repetitive ratings by different supervisors and

10   different settings that identified similar issues.  Despite

11   moving in that program from the beginning status -- you know,

12   when a first-year student shows some of these, we just smile

13   and go "Okay."  Good supervisors are going to make -- help the

14   student overcome those apparent deficits that they have circled

15   the end of the semester evaluation form.

16        But when we get up to a third-year student or a

17   fourth-year student, in the case of Mr. Yu's dismissal from

18   that externship, we are shocked by having -- I think it was 16.

19   I have looked at it enough times.  I think there were 16 below

20   expectations ratings.  And that's why Dr. Landers said, "He's a

21   bad fit.  Got to take him.  Got to -- got to terminate the

22   externship."

23        And I think that Dr. Spears, who wasn't using our

24   measurements, found the same thing.  She was trying to teach

25   him to administer an autism rating scale, among other things

Mark W. Roberts, Ph.D. - Cross

1    that I'm not aware of.  I know that was one issue.  I know that

2    Mr. Yu even reached out to me, during the early parts of that

3    January -- I got some emails going "Help me with A-2."

4              And I go, "You know, there is nothing I can do here

5    that is going to help.  You've got to work with Dr. Speer."

6    Because teaching someone to administer a test involves

7    practice.  I think Dr. Chase, that we heard from yesterday, was

8    an excellent exemplar of that.  She was saying, "Okay.  To help

9    Mr. Yu learn how to give a dyslexia test, I am going to do the

10   following."  The problem was the internship no longer existed,

11   so --

12   Q.   Okay.  Doctor, so I would assume that when I ask the

13   question did -- "do you have any empirical evidence that Mr. Yu

14   was not performing as you had mentioned," the answer would be

15   "No"?

16   A.   No, the answer is "Yes."  I have lots of that information,

17   through the ratings scale data, by independent professionals

18   that we, as a training program, have approved to implement that

19   training.  So, those ratings scales are empirical information.

20   Rating scales are part of what we do.

21   Q.   Okay, Doctor.  Let me ask it another way.  Did you ever

22   give a test, a standardized test to actually confirm whether or

23   not Mr. Yu had the deficiencies that you are speaking of?

24   A.   No.

25   Q.   Thank you.  While they are looking up an exhibit for me, I

1    can ask you a couple other questions.

2              Now, we talked about Dr. Landers and the externship

3    with Dr. Landers with Mr. Yu; right?

4    A.   Yes.

5    Q.   Okay.

6    A.   Yes.

7    Q.   Now, do you actually know what Mr. Yu's day was with -- in

8    that externship?  Did you actually observe what happened?

9    A.   No, but I did investigate the process of education that

10   Dr. Landers was offering Mr. Yu by way of interviewing

11   Dr. Landers.  A series of very bad ratings by a student, who is

12   dismissed from a site, gets my attention, as it should.

13             And so I looked historically at what other

14   students -- how other students had rated Dr. Landers.  I -- I

15   interviewed a student, who was concurrent but on a different

16   day.  In other words, that's a nice control from an old social

17   scientist standpoint, so there's nothing about Dr. Landers as

18   having a bad semester.  Okay.  I had someone concurrently in

19   there on a different day.

20             And I had two-years' worth of -- I think it was three

21   different students' ratings of Dr. Landers.  And so I

22   investigated the process.  And I learned how he is managing his

23   students, and he has an excellent strategy.  It's not a one-way

24   window, but it's almost equivalent where he's got the student

25   testing in a room adjacent to his office.  And if anything

Mark W. Roberts, Ph.D. - Cross

1    untoward starts to occur, by way of audible distress, he's

2    going to go in and help.  Okay.

3            And what he discovered was the degree of helping he

4    had to provide was inconsistent with the requirements for that

5    site, and that's why he dismissed him.

6    Q.   Okay.  So, my question was, did you know what Mr. Yu's day

7    was like when he was there at --

8    A.   Of course not.

9    Q.   Did you interview Mr. Yu in regards to making your

10   evaluation?

11   A.   Yes.  And I had Mr. Yu complete the rating scale.  I have

12   got some commensurate notes from Mr. Yu.  I could find them and

13   I could show you the dates.  They were immediately after the

14   dismissal.  He and I had several discussions there in the fall

15   of 2011 as we attempted to respond to the dismissal in a

16   productive manner.

17           So, yes.  I talked with him about it.  Got his

18   opinion.  I had him do the rating scale.  Tried to figure out

19   what went on.  Blah, blah, blah.  That's my job.

20   Q.   In that investigation, did you ascertain what his day was

21   like when he went to Eastern Idaho Regional Medical Center in

22   that externship?

23   A.   I did not ask any specific questions about that specific

24   day.

25   Q.   Thank you.  Now, Dr. Roberts, I have up on the screen what

Mark W. Roberts, Ph.D. - Cross

1   has been entered as a Defense Exhibit 523.  We don't have the

2   tag there.  We just have our copy.

3   A.    Okay.

4   Q.    And can you tell me what this is -- this letter is about?

5   A.    Oh, this is the offer to Dr. Hedt to perform a service for

6   to us evaluate their proposal.  November 12th sounds about

7   right.

8   Q.    You said it was a what to Dr. Hedt?

9   A.    I am trying to place this in time correctly.

10  Q.    I think it's a letter to Mr. Yu.

11  A.    Okay.  Now -- I'm confused.  I apologize.  Okay.  This

12  is -- this is the point in the internship proposal process at

13  which I am dealing with the proposal.  The minor changes that

14  Dr. Hedt, our consultant -- because we charge ourselves with

15  obtaining a qualified consultant on any of these things that's

16  independent of the program.  And Jill Hedt, who is the

17  internship supervisor at Boise -- at the Boise VA, is a perfect

18  person to do that.

19        So, this is our response to her work and providing

20  the copies of all of those documents to Mr. Yu so he has them

21  for his records.  And then the requirement that for this to go

22  forth, he will be required to accept the limitations of the

23  proposal identified by Dr. Hedt.  And those, as we have spoken

24  previously, are twofold.

25        The Cleveland Clinic as -- as any scientist willing

1   to take on a student, may or may not pay for them.  And in this

2   case, they were not going to pay him an hourly sum or a --

3   whatever their unit of measurement is for that.  Nor were they

4   going to allow him a due process on-site.  And we could not

5   start this process until Jun Yu did number two on the bottom of

6   this page.  "Give me a signed written response indicating that

7   you have been fully informed of the limits and your willingness

8   to proceed despite those limitations."

9   Q.   All right.  Now, I just -- are you done, Doctor.  I don't

10  want to interrupt you.

11  A.   I am.

12  Q.   All right.  So, prior to this letter written, I believe

13  that you said that there was a meeting between yourself, I

14  think Mr. Yu, and someone with the -- I guess the Diversity

15  Section with Idaho --

16  A.   With the what?

17  Q.   Someone with the Diversity Section at Idaho State

18  University in regards to forming some type of an alternative to

19  an internship?

20  A.   Yes, that was back in May of 2012.

21  Q.   Okay.  And my question is, am I right in saying that there

22  was some type of -- instead of an internship, there was some

23  type of other program that was recommended that would keep

24  Mr. Yu at Idaho State University in some type of formative

25  stage?  Did I get that right?

1    A.    I think you are close.  It's my recollection that we met

2    with the Affirmative Action officer.  Okay.  And we did so in

3    response to Mr. Yu's request that I change his spring practicum

4    grade or his below expectation ratings that he thought were

5    unfair.  And so I immediately turned my administrative units

6    and the Affirmative Action officer -- oh, I am going to block

7    on her name.  She -- and I had it a few moments ago.

8          She and Shane Osterhauser [sic] met with myself and

9    Mr. Yu.  And I -- the process of that meeting was to respond to

10   his request to change his grade; which, of course, I wouldn't.

11   Okay.  And then she raised -- and I think there was some

12   discussion about what he was going to do given the fact that he

13   had been denied an APPIC internship site.  He had just been --

14   he had not matched.  And that was very frustrating for him, and

15   we were in the throes of trying to figure out how to respond to

16   that.

17         And she did explicitly mention -- because I presume

18   Mr. Yu or even I could have talked about the pros and cons of

19   each of those three options, and there are pros and cons for

20   each of those three options; the Chinese accommodation, the

21   reapply, the non-APPIC here in the states.

22         Okay.  She very intelligently and with experience

23   dealing with students and faculty members said, "Why don't you

24   just stay here and work on your professional skills and

25   reapply?"  She said that.  And Mr. Yu said "No."

1   Q.   Okay.  Was that ever proposed to Mr. Yu in -- formally in

2   writing?

3   A.   No.

4   Q.   Okay.

5   A.   He had denied it.

6   Q.   That wasn't the question.  The question was, was it ever

7   proposed to Mr. Yu in writing?

8   A.   The answer is still no.

9   Q.   Thank you.  So, at that time, that was the first time you

10  talked to Mr. Yu in regards to the "You can reapply to the

11  APPIC or construct your own non-APPIC internship or take an

12  internship in China"?

13  A.   I am not sure if those topics were discussed.  My -- my

14  contemporaneous notes do not include the full discussion.  It

15  was -- my -- my notes indicated, though, that he declined to

16  stay.  And my memory -- and work on his skills and then

17  reapply.

18          My memory has burned into it her exact question,

19  which is "Why don't you just stay here and work on your skills

20  and reapply?"  It's not in my commensurate notes.  His response

21  is in my commensurate notes though.  And that affected me in

22  helping Clinical Training Committee say, "Okay.  We've got

23  three things we can do."

24          And we appreciated the suggestion from the

25  Affirmative Action officer, but it was denied by our student.

Mark W. Roberts, Ph.D. - Cross

1    So, there's three things we can do.  And they are listed, and

2    we've already talked about them.

3    Q.    Okay.  So, did you ever talk about the three things that

4    were options for Mr. Yu prior to the -- I guess it's the

5    Clinical Training Committee talking -- listing them?

6    A.    You know, I don't recall what discussions I have.  I've

7    got some commensurate notes, but I know that that was the

8    wisdom of Clinical Training Committee, to give him some options

9    including the accommodated internship in China.

10   Q.    So, the answer to my question is, is you don't really

11   recall talking to him?

12   A.    I don't recall talking with him about it before the

13   Clinical Training Committee.  Clinical Training Committee had

14   all these data from these different sources and had to come up

15   with a recommendation to help our student proceed.

16   Q.    So, would it be correct to say that the first time Mr. Yu

17   had seen something in writing from the -- in writing from

18   anyone would be from the Clinical Training Committee when they

19   listed those three choices?

20   A.    Yes.

21   Q.    Would that be correct?

22   A.    I think I can assert that, yes.  Since you qualify it by

23   saying "in writing."

24   Q.    Yes, sir.  Now, would the next time be -- this is why I

25   have November 12, 2012, letter that you wrote to Mr. Jun Yu.

Mark W. Roberts, Ph.D. - Cross

1    Would the next time be November 12th -- the November 12th,

2    2012, correspondence?

3    A.   You have lost me, because this is a correspondence to

4    Mr. Yu saying "Here is our status with your non-APPIC

5    internship site.  Please do the following so that we can

6    proceed."

7    Q.   Okay.  Now, let's go to the --

8    A.   In other words, we are committed, at this point, to this

9    non-APPIC internship that he wanted to endeavor.  He wanted to

10   have approval for.

11   Q.   Yes, sir.  Now, do you see where it says, "Please remember

12   that the Clinical Training Committee" --

13   A.   Oh, I see what you are doing.  Yes.

14   Q.   I didn't want to confuse you.

15   A.   Go ahead with your question.

16   Q.   Are those the three -- is that, like, the second time that

17   Mr. Yu, to your knowledge, was made aware of the three options

18   that were available to him?

19   A.   Yes, and there -- yes, and there's a very specific reason

20   for that.  He had to give up a salary, and he had to give up

21   due process at the Cleveland Clinic.  And I wanted him to be

22   aware that he did not have to make that choice.  He could have

23   gone back to the other two options, which were both still

24   available, since the Clinical Training Committee did not have

25   any intervening data saying that we could not risk sending him

Mark W. Roberts, Ph.D. - Cross

1    off to China given this -- these repetitious problems.

2           Those were still on the table.  We had nothing

3    between our decision to make these three offers.  Okay.  And

4    the -- we had no data about his performance during that

5    interval, during the fall of 2012.  So, they remained on the

6    table.  And I wanted him to recognize that he did not have to

7    accept these two deprivations, one of which is never found in

8    an APPIC internship.  All APPIC internships pay the students.

9    Okay.  And it's substantial.

10          Okay.  But a due process is usually -- you know, I

11   can't speak for the APPIC people.  They -- I really can't speak

12   for the APPIC people regarding due process, but they pay them.

13   They may rely upon the university to provide due process.

14   Q.   But you -- I believe you testified that during your --

15   during your period and -- before retirement and emeritus

16   status, that you were a site visitor?

17   A.   I was a site visitor before I was emeritus status.

18   Q.   That's what I mean, sir.  If I misspoke, that's what I

19   meant.

20          So, my question would be, when you are a site visitor

21   is that for the APA?

22   A.   APA Committee on Accreditation.  So, it's one major office

23   within the larger APA structure.

24   Q.   Okay.  And under the APA as a site visit -- I don't know

25   what your checklist is or anything -- but is due process one of

Mark W. Roberts, Ph.D. - Cross

1    the things that you look for that's maintained?

2    A.   Certainly at a program.

3    Q.   Thank you.

4    A.   All programs have to have a due process procedure, just

5    like Idaho State University has an overarching due process

6    procedure, and then departments have their own sequence of

7    events we use to react in a -- an appropriate manner given

8    complaints, given problems like a bad grade or whatever.

9    Q.   Now, Dr. Roberts, did you ever tell Mr. Yu that if he

10   failed to complete an internship, that the other options would

11   not be available to him?

12   A.   No.

13   Q.   Dr. Roberts, did you ever tell Mr. Yu that if he failed to

14   complete an internship, by taking this option, that he would be

15   dismissed from the program?

16   A.   No.

17           MR. COULTER:  Your Honor, are we going to 3:30?

18           THE COURT:  Yes.

19           MR. COULTER:  Okay.

20   Q.   Now, Doctor, Mr. Yu eventually started his internship with

21   the Cleveland Clinic?

22   A.   Yes, he did, in the January of 2013.

23   Q.   And do you know what -- I believe you testified he was in

24   some type of volunteer status; is that correct?

25   A.   I reported what I learned indirectly from Leslie Speer and

Mark W. Roberts, Ph.D. - Cross

1   from Jun Yu, in that during the fall of 2012, he engaged in

2   what Dr. Speer called "volunteer work."  So, I am assuming he

3   was helping in her autism program, and I am assuming he must

4   have done some of the activities quite well, because she was

5   interested in him and wanted him to be an intern to help her

6   with the program.

7        And I am almost certain he was doing volunteer work

8   with Dr. Frazier as well, helping him with some research

9   activity.  So, he was doing some things during the fall.  He

10  was not doing those things under the auspices of Idaho State

11  University.  And I have no way to speak for the Cleveland

12  Clinic.  That's their issue with volunteers.

13  Q.   So, basically, what you are saying is that what you know

14  of what was going on there is from secondhand information?

15  A.   Yes.

16  Q.   Okay.  And anything that you might say there would be

17  purely speculation based on that?

18  A.   I got the word "volunteer" from, I believe, Jun, or I got

19  it from Dr. Speer that he has been volunteering.

20  Q.   So, the only time that there was any clinical work to your

21  knowledge or whatever would have to occur -- if they were

22  keeping contact with the contract, would be January -- I will

23  say to you it's January 2nd, 2013.

24  A.   He could not engage in any aspect of the formal training

25  until the onset of that contract, which I believe was

Mark W. Roberts, Ph.D. - Cross

1   January 3rd.  That doesn't mean the -- the volunteering work

2   wasn't helpful or useful, but it was -- and it might have been

3   an entrée into getting the supervisors to value his potential

4   internship with them.  I have no idea.

5   Q.   And, of course, if Dr. Speer were to testify, she could

6   probably tell us what really happened; right?

7   A.   She could.  I can't speak for her.

8   Q.   Now, Dr. Roberts, you said something interesting in

9   regards to the -- I guess it would be the dissertation of

10  Mr. Yu.

11  A.   Yes.

12  Q.   And that -- I am just trying to think what that's called.

13  At the end, you know, when you are doing the -- you have to do

14  your dissertation, but you do a project, and he did his in

15  China?

16  A.   Yes.

17  Q.   So, what's the official word for what he did?

18  A.   He performed his dissertation in compliance with the

19  proposal that was approved by the Clinical Training Committee.

20  Q.   Okay.  And were you part of that Clinical Training

21  Committee?

22  A.   Absolutely.

23  Q.   And can you tell us about this proposal?  What was it?

24  A.   It's what psychologist call an "uncontrolled clinical

25  trial for a specific clinical population, using a very specific

Mark W. Roberts, Ph.D. - Cross

1  protocol."  The protocol was a five-section intervention

2  sandwiched by assessments both before and after.

3       It lacked a control group.  That would have been way

4  beyond what he could do during a summer.  And it was a

5  laudatory project to try to see if an effective program, in the

6  English-speaking world of the states, could be applied to a

7  different culture with any kind of success.  So, we embraced it

8  fully.

9  Q.   Now, Dr. Roberts, what was your understanding of the

10  professional goals, or I should say career goals of Mr. Yu when

11  he applied to Idaho State University?

12  A.   It was very clear that he was hoping to acquire the skills

13  of the Western practices and gain credentials as a psychologist

14  and then go back to China and become a professor and do

15  science.

16  Q.   All right.  So, he never said that he wanted to become

17  proficient in English so that nobody would know he was Chinese?

18  A.   I -- I don't know how to respond to that question.  I find

19  it pejorative.

20  Q.   Well, you can respond to it.  I think your response is you

21  find it pejorative; right?

22  A.   That's correct.

23  Q.   Okay.  Did he ever say that he wanted to stay in the

24  United States and practice in the United States?

25  A.   He certainly kept that option open by opting for the APPIC

                    Mark W. Roberts, Ph.D. - Cross

1    internship site that we could actually monitor and approve.  We

2    have several -- we have half a dozen folks that did non-APPIC

3    internship sites very well with approved programs, became

4    licensed, and were in America.

5            That would have been harder to do with the Chinese

6    sites, since we couldn't attest to its compliance.  I can't

7    read Chinese.  Can't talk with these people.  I don't know.

8    That's the different culture for me.  But his choice of a

9    non-APPIC site suggested he was interested in remaining in the

10   states, so I became ambiguous about his goals at that point.

11   Maybe that was his goal.  I don't know.

12   Q.   But he never told you -- he never told you or anyone on

13   the -- anyone in the administration for the, I guess, the

14   Psychology Department in the Clinical Section that his career

15   goals had changed; is that correct?

16   A.   I am unaware of any communication of that nature, yes.

17   Q.   And he never communicated that to you; did he?

18   A.   No.

19   Q.   Okay.  So, your assumption that his career goals may have

20   changed is just --

21   A.   An assumption.

22   Q.   An assumption.

23   A.   Yes.

24           MR. COULTER:  Your Honor, I think it would probably

25   be a good time to stop.

1          THE COURT:  Well, I am getting the sense that you

2    want the evening to think about whether you have got more to

3    ask.

4          MR. COULTER:  No, sir.  I have a few things to ask,

5    but what I'm going to do is I am going to go over that

6    dissertation, put that chart up, and we are going to go over

7    that in detail.

8          THE COURT:  If that's the case, and you have come

9    to -- either way is fine.  I just -- I have been in your shoes,

10   so I -- I have been watching with interest.

11         If you have a considerable amount yet of

12   cross-examination, and you have come to a good point to stop,

13   then we can finish for the day now, and we will begin again at

14   9:00 a.m. in the morning.

15         MR. COULTER:  That's what we would like, Your Honor.

16         THE COURT:  All right.  We will do that.

17         Dr. Roberts, you may step down.

18         And Mr. Kelly, how many witnesses do you expect to

19   call tomorrow?

20         MR. KELLY:  After Dr. Roberts, I will have three

21   witnesses.

22         THE COURT:  Okay.  Well, and you expect they will

23   fill the rest of the day?  What I'm trying to ascertain is

24   whether there's any likelihood that we would finish tomorrow,

25   but it doesn't sound like there would be with the rebuttal

1   case.

2              MR. COULTER:  There could be -- I think it's likely,

3   Your Honor, because the rebuttal witnesses that we had were

4   designated for a particular purpose.  And when Dr. Gladney --

5   my understanding is Dr. Gladney is not going to be here.  If we

6   were to try to do anything outside of that, I think it would be

7   inappropriate.  So, we are not going to have any --

8              THE COURT:  I guess we will see.

9              MR. KELLY:  Just so you know, I expect two witnesses

10  to be fairly quick.

11             THE COURT:  Okay.

12             MR. KELLY:  And another one to be maybe half the time

13  of Dr. Roberts.

14             THE COURT:  All right.  And the other thing I want

15  you to think about, counsel, is whether you would prefer to

16  give me -- I will give you the opportunity to do some posttrial

17  briefing.

18             I never liked that when I was an attorney in a Court

19  trial, for obvious reasons.  But I will give you the

20  opportunity to include, if you want to make a closing by

21  written form, so that you don't need to come back on Monday,

22  but that's entirely up to you.

23             And if either of you want to make sure that you make

24  oral closings, then absolutely that's what we will do.  Okay.

25  So, think about that, and we will talk about it tomorrow.  All

1    right?

2              Okay.  We will be in recess.  Thank you.

3         (Recess 3:28 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATIONS

2   For the Plaintiff:

3   Witness Name            Direct  Cross   RD    RX     Voir Dire

4      Jun Yu                334     355    368
       Tyler J. Bowles, Ph.D., CPA  376
5

6   For the Defendant:

7   Witness Name            Direct  Cross   RD    RX     Further D

8      Mark W. Roberts, Ph.D.  393    506

9

10                   PLAINTIFF'S EXHIBIT INDEX

11  Exhibit No.                          Marked    Admitted

12  123                                            374
    533                                            443
13                         --oOo--

14                  COURT REPORTER'S CERTIFICATE

15

16      I, KATHERINE EISMANN, Official Court Reporter, certify

17  that the foregoing is a correct transcript from the record of

18  proceedings in the above-entitled matter.

19

20  Date:  March 11, 2019.

21                         _/s/ *Katherine Eismann*

22                         Katherine Eismann, CRR, RDR

23

24

25