1                     IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF IDAHO

3   JUN YU,                          )
                                     )  Case No. 4:15-cv-430-REB
4              Plaintiff,            )
                                     )
5                                    )  Pocatello, Idaho
        vs.                          )  March 1, 2019
6                                    )  8:59 a.m.
    IDAHO STATE UNIVERSITY,          )
7                                    )  Bench Trial, Day 4
              Defendant.             )
8   _____ )

9                        TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE RONALD E. BUSH
10           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

11  APPEARANCES:

12  For the Plaintiff:

13              RONALDO A. COULTER, ESQ.
                HOLLY A. SUTHERLAND, ESQ.
14              Idaho Employment Law Solutions
                776 E. Riverside Drive, Suite 206
15              P.O. Box 1833
                Eagle, Idaho 83616
16              208-672-6112

17  For the Defendant:

18              MICHAEL E. KELLY, ESQ.
                Kelly Law, PLLC
19              137 E. 50th Street
                Garden City, Idaho 83714
20              208-342-4300

21  Also present:  Jun Yu, Mark Roberts, Crystal Anderson

22

23  Court Reporter:  Katherine Eismann, CRR, RDR
                      katherine_eismann@id.uscourts.gov
24

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

1          (Friday, March 1, 2019, 8:59 a.m.)

2                         --oOo--

3                  P R O C E E D I N G S

4          THE COURT:  Thank you.  Please be seated.

5          All right.  We are on the record for day four in this

6     trial.

7          Counsel, anything we need to take up before we get

8     started?

9          All right.  Okay.

10         MR. COULTER:  Yes, Your Honor.  I think it's been

11    decided that we will go with the written closing.

12         THE COURT:  Okay.

13         MR. KELLY:  We agreed on that last night, Judge.

14         THE COURT:  All right.  Then when we -- when we

15    finish, then we will give some shape to that and timing to it

16    so that it isn't just loose ends.  All right?

17         Dr. Roberts, you are still under oath.  You may

18    continue your examination, Mr. Coulter.

19                    MARK W. ROBERTS, PH.D.,

20    having been previously sworn, was examined and testified as

21    follows:

22                      CROSS-EXAMINATION

23    BY MR. COULTER:

24    Q.   All right.  How are you doing this morning, Dr. Roberts?

25    A.   Okay.

Mark W. Roberts, Ph.D. - Cross

1   Q.   We are going to try and get things done and get you off

2   the stand real quick.

3   A.   Okay.

4   Q.   All right.  Can we bring up the exhibit, please.  It's

5   showing up here, but it's not there.  Can you see it on yours?

6   It's not showing up on the screen there, the big screen.

7           COURTROOM DEPUTY:  It might take a minute.

8           THE COURT:  Sometimes it takes a few minutes to warm

9   up.  I have it on my screen.  I think we can go ahead if

10  everybody else can see it.  I appreciate the gallery can't, but

11  we are working on that while you are going.

12          MR. COULTER:  Thank you, Your Honor.

13  Q.   Dr. Roberts, are you aware of the internship that was done

14  in China by Mr. Yu?

15  A.   I am aware of Mr. Yu's --

16  Q.   Not internship but the project.  I'm sorry.

17  A.   Yes.  That was what I was hoping to address, that this was

18  a dissertation approved by the psychology department's

19  committee.  He has a dissertation committee that approved this

20  project.  It was performed after the summer -- it was performed

21  in the summer after his third year of training.  And what --

22  what I am seeing -- yes, so I am aware of it.  I will let you

23  ask the question.

24  Q.   And have you -- have you ever seen this document?

25  A.   Yes.

1   Q.   Now, when it says "satisfaction with therapist's teaching

2   skills," it gives a 19 in that.  What does that mean?

3   A.   The number 19 refers to the number of participants.  Okay.

4   The M refers to the mean score, and the SD stands for the

5   variance across those scores.  And the range is the low to the

6   high score.

7         So, for those 19 people, they were rating him very

8   well and very high for their belief about his teaching skills

9   in that project.

10  Q.   And what do you think that says about his communication

11  skills?

12  A.   In -- in that project, with this control, with this

13  specific therapy, it was perceived by the participants as

14  excellent.

15  Q.   Okay.  Now, let's look at the next one where it says

16  "satisfaction with therapist preparation."  What does that tell

17  you?

18  A.   The same thing.  It's very good preparation as perceived

19  by the participants.

20  Q.   And the next one, "satisfaction with therapist's interest

21  and concern for caregiver and their child's problems."

22  A.   Exactly the same.

23  Q.   Now, let's go into that a little bit.  Would he have --

24  would he have to be able to pick up signals, communicate, those

25  type of thing to get that type of rate -- ranking?

1  A.   Well, I inferred that from the overall project.  That was

2  one of the primary reasons I felt comfortable giving him an

3  unqualified support for his internship application to the APPIC

4  sites, based upon this summer's project and tables like that.

5          It was a great relief to me and great satisfaction to

6  me that he had done so well, with this structured program in

7  China, that I inferred from that that he had profited from his

8  three years of preparation by us, despite some of the below

9  expectations ratings, and manifest those skills with the

10  Chinese population, in -- with a protocol that we had worked

11  with him on, that he was interested in.  So, I was very pleased

12  by this.

13          And inferred that, yes, he was able to form alliances

14  and was sensitive to these families, in China, with that

15  protocol.  And, of course, he had the virtue of his own

16  language and his own culture.

17  Q.   Now, when you -- I think you referred to, in your direct

18  testimony, when Mr. Yu came back from China, I think you and he

19  were working on a project, or at least -- at least there was a

20  patient or whatever, and you had to go someplace else.  And

21  then he was working on that.  Can you explain that again?

22  A.   Okay.  We are talking fall semester of his fourth year,

23  post-project -- post-dissertation project in China.  So, remind

24  me of the question again now?

25  Q.   Okay.  So, I think you testified that you -- that you and

Mark W. Roberts, Ph.D. - Cross

1  he were working on this project together.

2  A.   This project?  Are you referring to the dissertation that

3  was just completed?

4  Q.   No, the practicum.

5  A.   Okay.  He had practicum in that fall.  Okay.  And that was

6  with Dr. Lynch.  And he had a community practica with

7  Dr. Atkins, and he had the externship with Dr. Landers.  Okay.

8  I have got fall of 2011 in my brain now.

9  Q.   How about the spring of 2012?

10  A.   Okay.  We are moving up a semester now.  This would be

11  his -- the second semester of his fourth year.  He -- here he

12  was under the plan of remediation.  So, we adjusted what we

13  would have done and required him to retake a practicum in

14  child, from Dr. Haight, who was the other child specialist.

15  And children were Jun's interest, children and families.

16        So, he got to work with Dr. Haight, but I

17  participated directly in that process as a result of the plan

18  of remediation that was formally evoked because of the

19  dismissal in the fall of 2011 by Dr. Landers.

20        And so during the spring, he was working with

21  Dr. Haight and myself.  He also did -- participated in the

22  interdisciplinary evaluation team, which I direct.  So, he had

23  those two opportunities in the spring to work on his

24  professional skills.  And I don't recall if he had any other

25  assignment that spring.

Mark W. Roberts, Ph.D. - Cross

1          I would think not, but I haven't got the documents in
2    front of me, and I -- my feeble memory is not pulling up
3    anything else.
4    Q.   Well, I think you testified yesterday that -- that when
5    you -- you came back from a -- came back from where you were
6    traveling from that you learned that he -- that's the one I am
7    talking about.
8    A.   Okay.  What would you like me to talk about regarding
9    that?
10   Q.   Yeah, whose patient was that -- or, excuse me -- whose
11   client was that?
12   A.   That would have been my client.
13   Q.   Okay.  And how long were you gone?
14   A.   Oh, I went to a conference of some kind.  All I know is I
15   was -- I cannot tell you where I was, but I was out of town
16   briefly.
17   Q.   Okay.  A couple of days?
18   A.   I don't know.  It could have been most likely like
19   Wednesday-to-Sunday-kind-of-thing probably, but I don't know.
20   Q.   Okay.  So, was Mr. Yu in charge of the -- of this
21   particular client or were you?
22   A.   Mr. Yu independently formed the evaluation, which consists
23   of an interview and some structured questionnaires.  And I do
24   not know, to this day, if he did observations of parent-child
25   interaction during that first session or the second session

1   or -- but I am sure he did -- trained the parent in our

2   standard way of tracking behavior in the home.

3         So, I am -- he was extremely well-versed in this

4   protocol.  It's the protocol that he used in China, but it's

5   also the protocol that he used as a second-year doctoral

6   student when he was on my team and we did many co-therapies.

7   He is intimately familiar with the protocol.

8         And the charge in the plan of remediation was to

9   specifically allow him an opportunity to engage in independent

10  practice, using that protocol that he was so successful with in

11  China and that he had been prepared for by us here in the -- at

12  the university in earlier years.  And I was fully confident

13  that he could do that and encouraged him to do that.

14  Q.   And my understanding, from your testimony, that when you

15  came back you were disappointed that the patient didn't come

16  back; is that correct?

17  A.   Yes, that was crestfalling for me, and I am sure for

18  Mr. Yu.

19  Q.   All right.  Now, isn't it -- I am just going to ask you

20  the question.  Isn't it common that sometimes you will have a

21  patient or client come into the office and they don't come

22  back?

23  A.   Absolutely.  That's -- the base rate of attrition is

24  something like 30 percent in that particular protocol and for

25  that particular population.  I think in the publication that

Mark W. Roberts, Ph.D. - Cross

1   Mr. Yu was first author on, based on this dissertation, that he

2   reported those data from the national level.  So, we expect

3   that.

4   Q.   But you have a great deal of respect for Mr. Yu; right?

5   A.   Absolutely.

6   Q.   Now, Professor Roberts or Dr. Roberts, can you tell me

7   what we are looking at at this particular point in time?

8   A.   It's the link you would get to me probably today.  And you

9   can see that it hasn't been updated, because there actually is

10   a date on the publication there with -- with Jun.

11   Q.   Right.  But it says it's your vita 2019, unless you have

12   another --

13   A.   I did update my vita there.  So, there you go.  That's

14   updated.  Took me a while.

15   Q.   All right.

16         MR. KELLY:  I'm sorry.  Is this an exhibit?

17         MR. COULTER:  No.

18         MR. KELLY:  Okay.

19         MR. COULTER:  It's not an exhibit.  I am just going

20   to ask him questions on it.

21         THE WITNESS:  Okay.

22   BY MR. COULTER:

23   Q.   Okay.  Now, is it not true that in your work, I have

24   noticed that you have Mr. Yu listed on -- on your CV.  And I

25   also notice that you have him listed on your -- one of the

Mark W. Roberts, Ph.D. - Cross

1 | first things you see on your website --

2 | A.   Sure.

3 | Q.   -- is Mr. Yu?

4 | A.   Yeah.

5 | Q.   And that's because you are -- you are proud of the work

6 | that he did; right?

7 | A.   Absolutely.

8 |        MR. COULTER:  All right.  I have no further

9 | questions.

10 |        THE COURT:  Mr. Kelly, any redirect?

11 |        MR. KELLY:  No, I have nothing, Your Honor.

12 |        THE COURT:  All right.  Dr. Roberts, you may step

13 | down.  Thank you, sir.

14 |        All right, counsel.  I am informed that apparently to

15 | get the projector working again, we will have to reboot the

16 | system, which would be another 10-minute exercise.

17 |        Now, my view of these things is that anybody that

18 | comes to this courthouse that wants to see the proceedings of

19 | the Court is entitled to see everything, and so I am inclined

20 | to allow for that.  And we are going to take a recess to get

21 | that accomplished.  So, okay.

22 |    (Recess 9:12 a.m.  Resumed 9:19 a.m.)

23 |        THE COURT:  Thank you.  Please be seated.

24 |        Mr. Kelly, your next witness.

25 |        MR. KELLY:  Thank you, Your Honor.  Do we need this?

Vol. 4 - 547
John Landers, Ph.D. - Direct

1  Does this distract the Court?  I am not using this.

2          THE COURT:  Then we can take it down.  It folds up.

3  Miss Case will come handle that.

4          That, ladies and gentlemen, is known as Elmo.  Why, I

5  don't know, but that's called Elmo.  And Cookie Monster is on

6  the other side, so --

7          MR. KELLY:  Thank, Your Honor.  Defense calls

8  Dr. John Landers to the stand.

9          THE COURT:  All right.  Dr. Landers, if you will come

10  forward to the witness box, please.

11          COURTROOM DEPUTY:  Raise your right hand.

12          You do solemnly swear that the testimony you are

13  about to give in the matter now before this Court will be the

14  truth, the whole truth, and nothing but the truth, so help you

15  God?

16          THE WITNESS:  Yes.

17          COURTROOM DEPUTY:  Thank you.  Please be seated.  For

18  our record, if you could state your full name and spell your

19  last.

20          THE WITNESS:  My name is John Landers, L-A-N-D-E-R-S.

21          THE COURT:  You may inquire.

22          MR. KELLY:  Thank you.

23                  JOHN LANDERS, PH.D.,

24  having been duly sworn, was examined and testified as follows:

25

John Landers, Ph.D. - Direct

1                          DIRECT EXAMINATION

2    BY MR. KELLY:

3    Q.    Dr. Landers, how are you employed?

4    A.    I am a clinical psychologist.  I work primarily for

5    Mountain View Hospital and then also have some private -- a

6    corporation that I run.

7    Q.    Could you let the Court know what your educational

8    background is?

9    A.    I have a Bachelor's Degree in Psychology and then also a

10   Master's and a Ph.D. in Clinical Psychology.

11   Q.    Okay.  And where did you earn your Ph.D.?

12   A.    At Idaho State University.

13   Q.    And when was that?

14   A.    2002.  May of 2002.

15   Q.    Prior to your employment at Mountain View, were you

16   employed at Eastern Idaho Regional Medical Center?

17   A.    Yes.

18   Q.    Okay.  And from -- in what time frame?

19   A.    I would say -- it was six years.  I think it was 2010 to

20   2016.

21   Q.    And in what capacity?

22   A.    As their psychologist.

23   Q.    Okay.  During your time there as a psychologist at EIRMC,

24   did you ever work with Idaho State University in regard to

25   externships for their Clinical Psychology Ph.D. Program?

John Landers, Ph.D. - Direct

1    A.    Yes.

2    Q.    Okay.  And when did that relationship with ISU start?

3    A.    It started previous to me being there.

4    Q.    So, was it ongoing when you arrived in 2010?

5    A.    Correct.

6    Q.    Do you know Jun Yu?

7    A.    Yes, I do.

8    Q.    Okay.  And how do you know him?

9    A.    He was one of the externs.

10   Q.    Okay.  And do you recall what time frame?

11   A.    Only because records show it.  But yes, it was during the

12   fall of 2011.

13   Q.    And were there any other ISU clinical psychology doctoral

14   candidates doing internship EIRMC at the same time?

15   A.    Not that I am aware of, no.

16   Q.    Okay.  Were there any previous -- there were ones previous

17   to Mr. Yu though; correct?

18   A.    Correct.

19   Q.    Do you recall how Mr. Yu's intern -- excuse me --

20   externship at EIRMC developed?

21   A.    Well, I basically have someone come as recommended by the

22   ISU Clinical Training Committee.  I interview them, and I

23   either accept or reject them as someone that would be an intern

24   or extern.

25   Q.    Okay.  So, fair to say that you interviewed Mr. Yu before

Vol. 4 - 550

John Landers, Ph.D. - Direct

1    the externship?

2    A.    Yes.

3    Q.    Do you have any recollection specifically of that

4    interview?

5    A.    I do remember him being in my office and talking to him.

6    Other than just generalities of remembering that, no.

7    Q.    But you felt, at that time, he was acceptable for the

8    externship program?

9    A.    Yes.

10   Q.    Okay.  What was the next step in the externship with

11   Mr. Yu; do you recall?

12   A.    I can recall generally what the next step would have been

13   for any extern, and so I can speak to that.

14   Q.    Okay.  If you would.

15   A.    The next step would be to do any training that they would

16   need to do, because he's working at a hospital.  So, he would

17   have to go through any orientation that's a hospital-based

18   orientation.  And then the next step after that would be he

19   comes once a week, and he participates in whatever it is that

20   I'm doing as an observer, and, at some point, starts

21   transitioning to being a practitioner, with observation by me,

22   and then hopefully ultimately being independent.

23   Q.    Okay.  At some point in time, did Mr. Yu start the

24   internship and observe your work?

25   A.    Yes.

John Landers, Ph.D. - Direct

1    Q.   And how long, if you recall, did that observation period
2    last with Mr. Yu?
3    A.   I honestly don't recall specifically.  It would have to be
4    an assumption.  I would assume it would have been about a
5    month, about four sessions of observation before he was then
6    transitioned to being the practitioner with me observing.
7    Q.   And just so we are clear, what type of clients or patients
8    did you see during that time frame?
9    A.   The patients that I was seeing were in an inpatient
10   psychiatric unit.  So, by virtue of them being there, they had
11   to be one of three things.  They had to be dangerous to
12   themself, dangerous to others, or gravely disabled by reason of
13   mental illness.
14   Q.   Okay.  During that first time frame of observation for
15   Mr. Yu, did you have consultations or feedback with him during
16   that observation time frame?
17   A.   It would have been real time, yes.
18   Q.   Okay.  And by real time, you mean what?
19   A.   Well, as we were going, I would say, "This is what I'm
20   doing" or, you know, "This is why I am doing this" or whatnot.
21   So, real time.  Not set aside we are going to spend three hours
22   talking about it, but at the moment we would talk.
23   Q.   Okay.  And at some point in time, we move past the
24   observational stage, and you will add Mr. Yu to the next step
25   of the internship -- externship; correct?

Vol. 4 - 552

John Landers, Ph.D. - Direct

1   A.   Correct.

2   Q.   And what was that step?

3   A.   That would be him administering standardized testing to

4   patients at the hospital while I am observing.

5   Q.   Okay.  And were you in the room observing with him or how

6   did that take place?

7   A.   At first, I would be in there the whole time.  I do

8   remember that, at some point towards the end of his experience

9   there, that I would leave the room on occasion, but certainly

10  not for the whole time.

11  Q.   Okay.  And again, during the time where he was

12  administering tests, did you provide feedback in real time to

13  him?

14  A.   Yes.

15  Q.   Okay.  And could you give the Court an example of what

16  type of feedback you would give after a testing session?

17  A.   Certainly.  So, let's say he's administering a test and

18  the patient's in duress as he's administering the test.  I

19  might give feedback to say "When you have somebody that's in

20  duress, following the standardized protocol is probably a bad

21  idea.  You need to pay attention to that cue and back off."

22  Q.   And did you see issues with Mr. Yu and his relationship

23  with some of your patients?

24  A.   I did.

25  Q.   Okay.  And could you give the Court some examples of that?

John Landers, Ph.D. - Direct

1    A.   An easy example that I do recall would be of an elderly

2    gentleman who was there at the hospital, and there was a

3    question of mental capacity, dementia.  And he was doing some

4    testing, very simple testing.

5         And the gentleman could not perform that testing,

6    even though it was that simple.  And Mr. Yu continued with the

7    protocol, despite the fact that it was obvious the elderly

8    gentleman was in a lot of duress.

9    Q.   Other than your observations, was there anybody else on

10   the hospital staff that made observations about Mr. Yu during

11   the course of the externship?

12   A.   I did receive feedback from management saying that

13   patients had complained.

14   Q.   Okay.  And do you recall any specifics?

15   A.   Other than that, no.

16   Q.   Did there come a time where you felt Mr. Yu wasn't a fit

17   for your externship?

18   A.   Yes.

19   Q.   And how far into the testing process time frame did that

20   occur?

21   A.   He still would be under observation, if that's what you're

22   asking.

23   Q.   Yes.

24   A.   Yes.

25   Q.   Okay.  Then did there come a time where you contacted

John Landers, Ph.D. - Direct

1  Dr. Roberts at ISU about Mr. Yu's externship?

2  A.   Yes, I made a phone call to Dr. Roberts.

3  Q.   And what did you express to Dr. Roberts?

4  A.   I told him my concern, why I was concerned, and that I

5  didn't think he was a good fit.

6  Q.   Okay.  And did you make a determination that you were

7  going to release him from the externship?

8  A.   I did.

9  Q.   Okay.  I am putting up on the screen, Doctor, what's

10  identified as Defendant's Exhibit 501.  Do you see that at the

11  bottom of the page there?

12  A.   Yes.

13  Q.   And could you identify, for the Court, what this document

14  is?  And I can move it around as you need it.

15  A.   Certainly.  During the phone call with Dr. Roberts, he

16  requested, towards the end of that phone call, that I write

17  what I told him in in -- in written form.  And so this is that

18  letter.

19  Q.   And this letter was dated November 4, 2011; correct?

20  A.   Correct.

21  Q.   And by that time, had you released Mr. Yu from the

22  externship?

23  A.   By released, meaning that that was my intent.  Did he know

24  it at the time that I wrote that letter?  I don't think so.

25  Q.   Okay.  Did you ever have any direct communications with

John Landers, Ph.D. - Direct

1   him that you were releasing him from the externship?

2   A.   No.  After I had the conversation with Dr. Roberts, it was

3   agreed that that would be communicated by ISU.

4   Q.   Okay.  After you wrote this letter, did you also do an

5   evaluation of Mr. Yu's externship for ISU?

6   A.   Yes.  That's standard protocol for the qualifications that

7   ISU needs to keep.  So, every semester an extern's evaluated by

8   their supervisor.

9   Q.   Put up on the screen is Defendant's Exhibit 502.  Do you

10  see that?

11  A.   I don't see a reference to 502, but -- yes, now I do.

12  Yes.

13  Q.   I'm sorry.  So, if we scroll back up to the top, could you

14  tell the Court what this document is?

15  A.   That is the document that you stated, which is the

16  standardized review of his performance for that semester.

17  Q.   Okay.  And you completed this document; correct?

18  A.   I did, yes.

19  Q.   Okay.  And as we scroll down to the bottom of the first

20  page, there's handwritten notations where it says "B equals 16;

21  M equals 15."  Do you see that?

22  A.   Yes.

23  Q.   Is that your writing?

24  A.   No.

25  Q.   Okay.  Do you know what it means however?

John Landers, Ph.D. - Direct

1  A.   Yes.

2  Q.   Okay.  Could you tell the Court?

3  A.   It would be a summary of the four different choices that I

4  had on each item.

5  Q.   Okay.  And B represent?

6  A.   B would be, I assume -- I have to go look.

7  Q.   Let me go up to the top.

8  A.   Below expectations.

9  Q.   And so let me ask you about that first paragraph of the

10  evaluation.  You have circled "pre-intern."  Do you see that?

11  Did you do that or is that --

12  A.   I am pretty sure that would be Dr. Roberts.  He would send

13  everything filled out that he could prior to me filling out my

14  piece.

15  Q.   Okay.  But the circles around the individual letters, that

16  was done by you; correct?

17  A.   Yes.

18  Q.   So, as we scroll down, let me ask you about the ones that

19  you identified as below expectations.  Number five, do you see

20  that?

21  A.   Correct.

22  Q.   Do you recall what that was?  Why you graded him as a B on

23  that category?

24  A.   I could give you a general, you know, summary of why I

25  would rate B on anything --

Vol. 4 - 557

John Landers, Ph.D. - Direct

1  Q.   Okay.

2  A.   -- for him.  Do you want me to do that?

3  Q.   Yes, please.

4  A.   Okay.  So, I can't specifically say why did I say that

5  about that particular issue; but generally speaking, my feeling

6  was and my observation was that Mr. Yu was very qualified in a

7  narrow band of clinical skill but not qualified in a broad

8  band, and certainly not in the area that I was practicing,

9  which is inpatient psychiatric patients doing, you know,

10  clinical testing.

11       And so I don't believe he understood that he was not

12  qualified outside of that narrow band.  Therefore, he wouldn't

13  have asked for additional supervisory assistance.

14  Q.   Okay.  If we look at number nine, you also circled that as

15  below expectation.  Do you have any specific recollection as to

16  why you circled number nine for below expectations?

17  A.   It's been seven years.  I don't remember specifics.

18  Q.   Okay.  If we scroll down to the bottom of this document,

19  there's a narrative.  Do you see that?

20  A.   Yes.

21  Q.   And is that your handwriting?

22  A.   That is, unfortunately.

23  Q.   Okay.

24       THE COURT:  I have seen worse.

25

John Landers, Ph.D. - Direct

1  BY MR. KELLY:

2  Q.   As we look at this narrative, Doctor, could you give the

3  Court a summary of -- of what you were stating in this

4  narrative?

5  A.   Certainly.  So, I mean, the first statement references the

6  first paragraph, which says "You have to consider the

7  development level of the person."  Am I dealing with a

8  first-year student versus a pre-intern, which is the most

9  advanced type of student you could be supervising.

10          So, I'm saying, "Considering that, considering his

11  certain level and the assumption that ISU produces a

12  generalist."  Now, a generalist is someone who is the

13  equivalent of a family doctor.  You know, a family doctor, you

14  go in with a young child, with an elderly person, with a broad

15  range of physical health issues, you expect that individual can

16  address those at least at a competency level.

17          So, ISU's equivalent to that is I am producing a

18  clinician that can practice in an inpatient unit not just with

19  children in an outpatient behavioral setting.

20          So, given his development level, given that

21  assumption, I felt he was significantly lagging based on those

22  assumptions.  I did make statements to say that I think he

23  probably is quite competent in that narrow band, but not in the

24  area where I would be practicing.

25  Q.   Okay.  About halfway through that narrative, you state

1    "However, his deficits have made this practicum one that was

2    not a good fit and placed him, patients, and psychology

3    services at the hospital in a difficult position."

4            Did I read that correctly?

5    A.   Yes, you did.  I admire that.  That's good.

6    Q.   Thank you.  And what did you mean by that?

7    A.   Well, what I mean is he's not a good fit, which I've

8    already explained.  The part about putting patients,

9    psychology, the hospital in a difficult position, I think we

10   have to understand several things.

11           First, there's a stigma against mental health.  We

12   just have to acknowledge that.  If someone has a mental health

13   condition, they are going to delay treatment.  The evidence

14   suggests that because of that stigma.

15           Number two, these patients are now in the most

16   critical position of their lives.  There are considering death

17   as a better option than life.  And so we've got the stigma

18   operating.  We've got their life on the line, essentially.

19           And this is kind of the one shot that we have.  They

20   may not have ever given psychology or mental health a chance

21   before, and if we mess this up, to use the vernacular, they are

22   not going to come back.  And it could be fatal.

23           So, we have to do it right.  And so that's what I'm

24   referencing there, is we can't afford to remediate or

25   experiment and try to teach someone how to do things, that they

John Landers, Ph.D. - Direct

1    should know how to do, with these particular patients.  They

2    deserve the best that we can give them.

3    Q.   Okay.  So, it would be fair to say then, as far as

4    creating your remediation plan within the externship, that

5    would have created not only difficulties but potential

6    dangerous consequences to the patients?

7    A.   Correct.

8    Q.   And at the bottom, it indicates that the evaluation was

9    done in absentia for Mr. Yu.  Again, you didn't have a final

10   sit-down with him in regard to your evaluation of him; correct?

11   A.   No.

12   Q.   And again, this was forwarded on to Idaho State University

13   for their handling; correct?

14   A.   Yes, it was.

15   Q.   Do you recall, Doctor, about two years ago your deposition

16   was taken in this matter?

17   A.   I do.

18   Q.   Okay.  And in your deposition, you brought up a point

19   about cultural competence being a two-way street.  Do you

20   recall that?

21   A.   I do.

22   Q.   And what did you mean by that?

23   A.   Cultural competence is where the clinician has a

24   responsibility to meet the patient where they are.  It's not

25   the other way around.  And so whoever the patient might be, I

John Landers, Ph.D. - Direct

1   have to, as clinician, assess where they are.  Where they are

2   coming from, from a cultural standpoint, from a motivation

3   standpoint, from any -- any type of internal standpoint that

4   they have as far as their beliefs, their values, their views.

5   And, therefore, if I can't do that, I am not effective as a

6   clinician.

7   Q.   And despite the fact that he was acting as an extern,

8   would that cultural competence aspect also apply to Mr. Yu in

9   this instance?

10  A.   Certainly it would.

11  Q.   And would it be fair to say that it would have nothing to

12  do with the fact that he's Chinese; correct?

13  A.   Cultural competence is not about ethnicity.  Some may

14  argue with that, but that is not what we are using the phrase

15  to mean in psychology.  We are meaning "I have got an

16  individual that's sitting in front of me, and I am trying to

17  address their needs.  I can't allow the barrier of where

18  they're at versus where I am at be a problem."

19  Q.   And again, just so we are clear, during his time at the

20  externship with you, you were giving him daily feedback until

21  the time that you released him from the --

22  A.   It would be real-time feedback.  Sure.

23          MR. KELLY:  Thank you.

24          Your Honor, that's all I have.

25          THE COURT:  Mr. Coulter, cross-examination.

John Landers, Ph.D. - Cross

1          I have only got two pages left in the notebook, but I
2    have more notebooks, so that's good.
3          MR. COULTER:  I think I get the hint, Your Honor.
4          THE COURT:  All right.
5                         CROSS-EXAMINATION
6    BY MR. COULTER:
7    Q.   Good morning, Dr. Landers.  How are you?
8    A.   I am doing great.  Thank you.
9    Q.   I still remember the first time we met.
10   A.   It was memorable.  That's good.
11   Q.   It was.  Okay.  Let's talk about this idea of cultural
12   competency.  I think what you said was that cultural
13   competency, in the psychology purview, may have a different
14   meaning than people sort of expect; is that correct?
15   A.   I am certain that it doesn't come across the way people
16   expect.
17   Q.   Right.
18   A.   My wife always tells me to speak English, so --
19   Q.   Yeah.  Yours, too?
20   A.   Yes.
21   Q.   Okay.  All right.  So, if there's -- like a social science
22   could have another different concept of cultural competency?
23   A.   Certainly.
24   Q.   Okay.  Now, you did say that Mr. Yu -- I believe on your
25   direct examination, you said that Mr. Yu was probably competent

Vol. 4 - 563

John Landers, Ph.D. - Cross

1  in a narrow -- in a narrow kind of sphere?

2  A.    Correct.

3  Q.    Could you tell us what that is?

4  A.    What the narrow band would be?

5  Q.    Yeah.

6  A.    Well, he proven himself to ISU earlier that he had been

7  able to perform child behavioral interventions.  So, you have a

8  parent/child interaction that's not working well.  They come to

9  the clinic, you assess what's going on, and you give them

10  feedback, and you train the parent on how to address the

11  behavioral issues.  That's a very important skill.  And I think

12  he had done well at that at ISU Psychology Clinic.

13  Q.    Now, Dr. Landers, did you ever give a -- Mr. Yu a formal

14  letter to him saying that, look.  I think you are not

15  progressing well.

16  A.    No.

17  Q.    Now, let's go to 516.  Defense Exhibit 516.

18        Okay.  Now, go down one.  Take that down.

19        All right.  Dr. Landers, do you remember having a

20  conversation with Dr. Roberts in regard to Mr. Yu's experience

21  in the externship?

22  A.    I did call him, yes.

23  Q.    Okay.  And did you express to Dr. Roberts that Mr. Yu had

24  a problem expressing himself in English?

25  A.    No.

Vol. 4 - 564

John Landers, Ph.D. - Cross

1  Q.   And in your deposition, did you also say that you wouldn't

2  say that, because -- because Mr. Yu did not have a problem in

3  English as far as you are concerned?

4  A.   Right.  If we are talking about pronunciation, if we are

5  talking with articulation, if we are talking about fluency,

6  those were not my concerns.

7  Q.   Okay.  Now bring up this, 502.

8         We are going to bring up Defense Exhibit 502, Your

9  Honor?

10        THE COURT:  Okay.

11  BY MR. COULTER:

12  Q.   Okay.  So, we have Defense Exhibit 502 there.  And I want

13  to bring it to the second page down to the comments.

14        Now, Dr. Landers, I have brought up 502, which we had

15  been talking about with Mr. Kelly, and we went to the document,

16  and we highlighted -- highlighted a section.  Could you read

17  that section, please?

18  A.   Certainly.  "Given his desire to return to China and

19  specialize in parent/child training, he is probably right where

20  he needs to be in this regard."

21  Q.   Now, what do you mean by that?

22  A.   Exactly what it says, which is he had expressed to me, I

23  think at the time of the interview but certainly since then,

24  that what his desire was is to return to China professionally

25  and work with parents who were struggling with their children

Cheri Atkins, Ph.D. - Direct

1    and do what he's learned with Dr. Roberts.

2                MR. COULTER:  Okay.  No further questions.

3                THE COURT:  Any further redirect?

4                MR. KELLY:  I have no questions, further questions,

5    Your Honor.

6                THE COURT:  All right.  Dr. Landers, thank you very

7    much.  You may step down, sir.  Mr. Kelly, your next witness.

8                MR. KELLY:  Your Honor, the defense calls Dr. Cheri

9    Atkins to the stand.

10               COURTROOM DEPUTY:  Raise your right hand.

11               You do solemnly swear that the testimony you are

12   about to give in the matter now before this Court will be the

13   truth, the whole truth, and nothing but the truth, so help you

14   God.

15               THE WITNESS:  I do.

16               COURTROOM DEPUTY:  Thank you.  Please be seated.

17               THE COURT:  You may inquire.

18               MR. KELLY:  Thank you, Your Honor.

19                         CHERI ATKINS, PH.D.,

20   having been duly sworn, was examined and testified as follows:

21                      DIRECT EXAMINATION

22   BY MR. KELLY:

23   Q.   Dr. Atkins --

24               THE COURT:  Just a moment.

25               Miss Case reminds me that we didn't have her state

Cheri Atkins, Ph.D. - Direct

1    her name.  Miss Case, go ahead, please.

2              COURTROOM DEPUTY:  Will you please state your name

3    for our record spelling your last.

4              THE WITNESS:  Cheri Atkins, A-T-K-I-N-S.

5              THE COURT:  Now you may inquire.

6    BY MR. KELLY:

7    Q.   Good morning, Dr. Atkins.

8    A.   Good morning.

9    Q.   Could you please tell the Court what you do for a living?

10   A.   I'm a clinical psychologist, so I have a mental health

11   clinic in town called Allies Family Solutions.

12   Q.   And what type of specific work do you do?

13   A.   I do actually quite a bit, but I am mostly known for the

14   work we do with children and families.  And so I have a mental

15   health clinic and a children's developmental disabilities

16   agency.

17   Q.   And what is your education?

18   A.   I have a Ph.D. in clinical psychology from ISU.

19   Q.   Okay.  And when did you graduate?

20   A.   In 2004.

21   Q.   And at one point in time, were you running practicums for

22   the Idaho State Clinical Psychology Program?

23   A.   Yes.

24   Q.   Okay.  And what time frame were you -- were you doing

25   practicums for ISU?

Vol. 4 - 567
Cheri Atkins, Ph.D. - Direct

1   A.   I took over the clinic in 2008, so I believe it was right
2   away I had students until probably around 2011 or '12.
3   Q.   And --
4   A.   About.
5   Q.   I'm sorry?
6   A.   Yeah, about that time frame.
7   Q.   All right.  Do you know Jun Yu?
8   A.   Well, yeah.  I know who he is, yeah.
9   Q.   You needed to make the record clear.
10  A.   Oh, yes.
11  Q.   And how do you know him?
12  A.   Well, through the -- through our experiences, yeah, with
13  the practicum.
14  Q.   Okay.  So, you had him in one or more of your practicums
15  then?
16  A.   Yes.
17  Q.   Okay.  Do you recall the first practicum you had him in?
18  A.   You know, it was a long time ago.  I think it was the one
19  that I did up at the ISU clinic.
20  Q.   Okay.
21  A.   I believe that was the first one.
22  Q.   Okay.  Madam Clerk, could -- okay.  Thank you.
23            So, what I have put up on the screen for you,
24  Dr. Atkins, is what's called Defendant's Exhibit 505.  Do you
25  see that?

Cheri Atkins, Ph.D. - Direct

1    A.    Uh-huh.

2    Q.    Up on the top right-hand corner?

3    A.    I do.

4    Q.    Could you tell the Court -- first of all -- well, strike

5    that.

6          Could you tell the Court what this document is?

7    A.    It is the -- the end of semester evaluation for the

8    practicum.

9    Q.    Okay.  And can you tell what semester and what year?

10   A.    Yeah, it looks like spring of 2010.

11   Q.    Okay.  And it says "site clinic."  Do you see that?

12   A.    Oh, yeah.  So that -- you know, a lot of times I did the

13   practicums at my site at Allies Family Solutions, but there was

14   an occasion where I was asked to do one up at the university in

15   their site clinic.  And this must have been the one -- that

16   one, so --

17   Q.    And it says "Student Jun Yu."  Do you see that?

18   A.    Yep.

19   Q.    So, this would have been a semester evaluation from the

20   practicum in spring of 2010 that you did with Mr. Yu?

21   A.    Yes.

22   Q.    And as you look at this document, again, we heard this

23   from Dr. Landers, but these letter designations are the scales

24   that you assigned for these specific items to each of the

25   students?

Cheri Atkins, Ph.D. - Direct

1    A.    Uh-huh.

2    Q.    Is that correct?

3    A.    Right.

4    Q.    Okay.  And as we scroll down on this particular practicum,

5    if we go to number 18.

6    A.    Yes.

7    Q.    It looks like you assigned a below expectation?

8    A.    Yeah, it looks like I did.  I --

9    Q.    And do you recall, just looking at item 18, why you

10   designated that as a below expectation?

11   A.    I can -- you know, I don't really -- that was a long time

12   ago, but looking at the content of the item, it looks like I

13   had some concerns about his ability to form working alliances

14   with patients.

15   Q.    Let me just ask you this as an aside.  Underneath 18, in

16   handwriting, it says "course equal B."  Is that your

17   handwriting?

18   A.    No, I think that's Dr. Roberts's actually.

19   Q.    Okay.  Do you recall offhand, though, is that the letter

20   grade assigned for that practicum?

21   A.    I believe so.  I don't recall.

22   Q.    Okay.

23   A.    But I -- I imagine I could have given a B.

24   Q.    Okay.  Let's scroll down to the narrative portion of this.

25   And here, the first section --

Cheri Atkins, Ph.D. - Direct

1   A.   Oh.

2   Q.   -- entry says "grade equals B."  Is that your handwriting?

3   A.   I think that is my handwriting actually.

4   Q.   Okay.

5   A.   But I am not certain, but I could see if I -- if I had to

6   communicate with Jun Yu that I was giving him a B, I probably

7   would have done that so that I could have gone through my

8   narrative with him and explained why.

9   Q.   Okay.  So, if you could look at the narrative for us and

10  give the Court an idea of how Mr. Yu handled that spring 2010

11  practicum?

12  A.   Do you want me to read it or just read it to myself?

13  Q.   Well, give me your interpretation of that narrative that

14  you wrote or give the Court your interpretation of it.

15  A.   I mean, it looks like the gist of it is that -- that I

16  felt strongly that he was a -- you know, a good, hard worker,

17  but that his language -- his language and his ability to

18  communicate was -- was a concern that I had.

19  Q.   Okay.

20  A.   And that's kind of the general theme through, I think, all

21  of the experience I had with him.  That I just thought he was

22  a -- a bang-up guy, but he just -- the communication seemed

23  like it wasn't good enough to do what we were asking him to do

24  on the practicums.

25  Q.   Okay.  And in this particular practicum, what specifically

Cheri Atkins, Ph.D. - Direct

1   were you asking him to do?

2   A.   Let me think for a minute.  If it was up at the clinic, I

3   was probably doing a -- well, I was doing a child focus one.

4   That's what I would have been asked to do, and I recall having

5   a team -- a small team doing that.  We would have been doing

6   probably a mixture of assessment and treatment of kids.

7   Q.   Okay.  And why were conversational skills important in

8   that context?

9   A.   Well, I mean, I think that they are very important.  I

10  mean, how -- how can you provide a service if you are not

11  communicating well with them.  I mean, you have to be able to

12  assess and treat.  I mean, both of those need a high level of

13  communication skills.

14  Q.   And this was mainly communication with children?

15  A.   Oh, yeah.  My practicums all were child-focused.  So --

16  Q.   And in regard to your assessment of Mr. Yu, did you give

17  him feedback in this regard?

18  A.   Yes.

19  Q.   Okay.  And was it on a daily basis, or was it at the end

20  of the practicum where you sat down with him and --

21  A.   Well, I didn't see him on a daily basis, but we had, you

22  know, weekly team meetings.  That would have been a good time

23  to talk about stuff.  Well, for the team.  In terms of his

24  individual feedback, it would have been towards the end.  Yeah.

25  Q.   Okay.  And as you look at this last page of this

Cheri Atkins, Ph.D. - Direct

1   evaluation, as far as you know, Mr. Yu signed off on this

2   evaluation?

3   A.    Yeah.  That's what -- it looks like he did, yes.

4   Q.    All right.  You also had Mr. Yu in a practicum in the

5   summer of 2010; correct?

6   A.    Yes.  I think that was probably -- I don't know if that

7   was at the clinic or if it was at my site.  It might have been

8   at my site.  If you go up to the top, it says where it --

9   Q.    Oops, sorry.  Okay.  What I am showing you up on top, it

10  says Defendant's 508.

11  A.    Oh, okay.  It looks like that one was also at the clinic.

12  Q.    Okay.  Where it says "site four clinic"?

13  A.    Uh-huh.

14  Q.    Yes?

15  A.    Well, it's not a four.  It's a symbol that means

16  psychology.

17  Q.    Oh, okay.

18  A.    I forget what the symbol is called, but it means psych,

19  psychology.  So, psychology clinic.

20  Q.    Okay.  Obviously, I am not a psych major, so thank you for

21  clarifying that.  And again, this was a summer practicum

22  that --

23  A.    Uh-huh.

24  Q.    -- that Mr. Yu did with you; correct?

25  A.    Yes.

Cheri Atkins, Ph.D. - Direct

1   Q.   And would it have been the same subject matter as the
2   spring one?
3   A.   I believe so, yeah.
4   Q.   Okay.  And as we scroll down, during the -- looking at the
5   evaluations, you didn't give him any below expectations during
6   the summer practicum; correct?
7   A.   Correct.
8   Q.   Am I moving too quickly?
9   A.   No, that looks correct to me.
10  Q.   Okay.  And then if we move to the narrative section again,
11  could you just give the Court a summary of what your overall
12  narrative impression of Dr. -- or of Mr. Yu was during that
13  practicum?
14  A.   I still thought he gave 100 percent, and I still felt that
15  his fluent language was a problem.
16  Q.   Okay.  And did you give him feedback in that regard again?
17  A.   Yes.
18  Q.   And overall, you had a good relationship with Mr. Yu?
19  A.   I thought so, yeah.  I was very enthusiastic about having
20  him, actually.
21  Q.   And again, Mr. Yu signed off on this practicum based on
22  what we see here?
23  A.   Yes.
24  Q.   Okay.  Do you recall, Dr. Atkins, that you also had him --
25  Mr. Yu in a practicum in the fall of 2011?

Cheri Atkins, Ph.D. - Direct

1    A.    I do vaguely remember that, because he had at least one
2    practicum that was at Allies Family Solutions.
3    Q.    And what did that practicum entail?
4    A.    I guess the way I looked at that is thinking about the
5    whole practice, giving him opportunities, exposure to kids.
6    Because of the DDA and the mental health clinic, I had a lot of
7    training opportunities for him.  And so usually when I get a
8    student we sit down and --
9              THE COURT:  Doctor, DDA means what?
10             THE WITNESS:  Development Disabilities Agency.
11             THE COURT:  All right.  Thank you.
12             THE WITNESS:  You know, and I -- it would have
13   depended -- like, every student doesn't have the same goals.
14   It kind of depends on, when they get there, what I have to
15   offer and what they want to get out of it.  And we talk about
16   those ahead of time, and so I'm confident that I did have that
17   conversation with Jun Yu.
18             I don't recall whether or not we agreed entirely on
19   what I needed him -- what I wanted him to do, but I think we
20   had a general consensus about it.
21   BY MR. KELLY:
22   Q.    So, nevertheless, even if you didn't agree you still
23   had --
24   A.    Oh, yeah.
25   Q.    -- communications and feedback with him?

Vol. 4 - 575

Cheri Atkins, Ph.D. - Direct

1   A.   Sure.

2   Q.   Do you recall, during that practicum, there was an issue

3   about you allowing him to consult with patients?

4   A.   Yes.

5   Q.   Okay.  And again, why was that?

6   A.   So, I didn't feel comfortable having him see patients on

7   his own.

8   Q.   Okay.

9   A.   I just didn't feel like his -- he was there yet.  And I

10  know he was a more advanced student, but I just didn't -- at

11  least at my clinic, you know, I -- I know there could be a

12  difference between the -- the training clinic, up at ISU, but

13  then my own private practice, I felt like the standard was

14  actually a little bit higher.

15  Q.   So, just in your professional opinion, as a

16  psychologist -- practicing psychologist, you felt he wasn't

17  ready to see your patients?

18  A.   Yes.

19  Q.   And specifically, why did you feel that way?

20  A.   I just didn't feel like he could communicate well enough

21  to provide the service.

22  Q.   And did you convey that to him?

23  A.   Yes, I believe I did.

24  Q.   You didn't fill out a practicum evaluation for that --

25  that semester?

Cheri Atkins, Ph.D. - Direct

1   A.   I don't think so.  I think we started off strong, and then

2   I think it sort of dwindled out.  And I don't even -- I really

3   don't even remember what happened at the end there.  I remember

4   having a lot of contact at the beginning, but I -- I know that

5   there isn't one on file, so I imagine I did not fill one out,

6   because the ISU keeps every -- every document ever created,

7   so --

8   Q.   Okay.  So, fair to say though, however, that for that

9   spring -- excuse me -- fall 2011 practicum, you felt, in your

10  capacity as a licensed professional, that you just didn't feel

11  he was ready to see your patients; correct?

12  A.   Right.  And, you know, I had also had experience with him

13  at the other practicums up at the clinic, ISU Clinic.  And so I

14  just -- I didn't feel comfortable doing it, so I didn't do it.

15  But that doesn't mean I didn't think I had a lot to offer to

16  him.

17       I mean, I -- I had a whole lot that I could offer in

18  terms of expressly the DDA.  I had autistic kids that -- that

19  are working in there, and there's professionals that do applied

20  behavioral analysis.  And given his goal, which I understood it

21  to go to China and practice, I thought how amazing would that

22  be to give him exposure to all of these little autistic kids;

23  because, you know, he hadn't had that exposure yet.  And so

24  that was part of what I was really hoping to do for him was to

25  teach him those interventions and give him exposure.

Cheri Atkins, Ph.D. - Cross

1    Q.   But nevertheless, even though you didn't want him to

2    individually see patients, you still felt there was a benefit

3    to your --

4    A.   Absolutely.  Right.

5    Q.   -- program?

6    A.   And so there's no -- I wouldn't have excused him from the

7    practicum.  I would have just -- we would have just worked

8    together to do the best we could with what we had.  I mean, I

9    had a lot of opportunities at my clinic.

10            MR. KELLY:  Okay.  Thank you.  That's all I have,

11   Your Honor.

12            THE COURT:  All right.  Thank you.

13            Mr. Coulter, do you have cross-examination?

14            MR. COULTER:  Yes, Your Honor.

15                        CROSS-EXAMINATION

16   BY MR. COULTER:

17   Q.   Good morning, Ms. Atkins.

18   A.   Good morning.

19   Q.   How are you?

20   A.   Good.

21   Q.   Okay.  I am going to ask you a couple of questions and not

22   keep you up there too long.

23            What I'm gathering from looking at -- listening to

24   what you had, I think I deposed you, too, it seems to me -- and

25   I was just going to try to wrap it up here -- is that Mr. Yu

Cheri Atkins, Ph.D. - Cross

1  was competent, it's just the idea that -- was it the spoken

2  English that was the issue?

3  A.   That's a difficult question to answer, because I felt

4  like, in some regards, it was hard to assess his competency

5  because the communication was so poor.

6  Q.   And we are talking about was that because of English being

7  a second language, or is that what you were talking about

8  communication?

9  A.   I think that contributed to it.  I don't think that was

10  the whole story, but I don't know.  I had a lot of assumptions

11  when he came to me about his competence being right where it

12  needed to be.  So, I guess I was never really thinking about

13  that too much.  Like, I assumed he came to me, he -- he was a

14  competent young professional, and I was having trouble

15  communicating with him.

16  Q.   Okay.  Now, one of the things that -- well, one of the

17  things I remember you talking about was these nuances, and --

18  nuances in communication and things of that nature.  And I

19  think we had kind of a lively conversation about that.

20  A.   During the deposition?

21  Q.   Yes.

22  A.   Okay.

23  Q.   Yeah, that's the only time I have talked to you.

24  A.   Okay.  Yeah.  Well, I --

25  Q.   All right.  So, anyway, is that part of what you were

Cheri Atkins, Ph.D. - Cross

1    talking about in the communication, making picking up some of

2    the nuances?

3    A.   Sure.  I mean, I think that is part of communication.

4    So --

5    Q.   And do you think you could -- I am just asking you the

6    question.  And do you think you contribute that to -- partly to

7    English being a second language for Mr. Yu?

8    A.   Sure.  I mean, I guess.  I mean, I don't --

9    Q.   What do you think?

10   A.   What do I think?  I think it played a role, but I don't

11   think it was everything.  I mean, I have worked with other

12   professionals that had English as a second language, and, you

13   know, I didn't have that much struggle with it.

14   Q.   Now, you did say something that just kind of piqued my

15   interest.  I think you said ISU keeps every document created.

16   Did you say that?

17   A.   Well, it seems like they do.  I guess what I meant to say

18   is they are very diligent about their paperwork.  And so if I

19   had -- if I didn't have an evaluation on file, it was more

20   likely that I didn't do it versus they misplaced it or didn't

21   have it.  I would trust them more than I would trust me to turn

22   in a piece of paper, to be honest.

23   Q.   And in looking, without bringing them all up and that type

24   of thing, but looking at the evaluations that you had, I

25   thought those -- I thought those evaluations, from a person

Cheri Atkins, Ph.D. - Redirect

1    that doesn't know anything about psych, looked pretty good,

2    because it seemed like you graded him pretty well.

3           Were those -- do you stick by those grades?  I mean,

4    as in Bs, and meets, and not meet, and that kind of thing?

5    A.   Well, I don't know that it really was the best evaluation.

6    I think, you know, any time you have a student where you have

7    to give them an M, you know, that -- that's not as good as an

8    E, and I would expect a lot of students to get Es.  And so Ms

9    to me are more like Bs.  And a B, which is a below expectation,

10   to me, that's a -- that's an even a bigger deal.  So --

11   Q.   But you didn't -- most of yours were meets expectation; is

12   that correct?  Certainly, the first one, you only had one M.

13   A.   Yes.

14   Q.   No, Bs.

15   A.   Within the context much Ms aren't the best marking either,

16   so, on those.

17   Q.   Okay.  But it does mean meets expectations; right?

18   A.   Yes.

19          MR. COULTER:  Okay.  I have no further questions.

20          THE COURT:  Further direct?

21          MR. KELLY:  Yes, Your Honor.  Thank you.

22                    REDIRECT EXAMINATION

23   BY MR. KELLY:

24   Q.   Dr. Atkins, you had mentioned that you had other students

25   that you worked with that English was their second language;

Cheri Atkins, Ph.D. - Redirect

1   correct?

2   A.   Yes.

3   Q.   Okay.  But you didn't have the comprehension issues with

4   these other students as you did with Mr. Yu; is that correct?

5   A.   I would say communication more than comprehension, but --

6   Q.   Okay.

7   A.   -- it's hard for me to even go there with comprehension,

8   when I am sort of stuck at communication.

9   Q.   Okay.  I'm sorry.  And --

10  A.   Yeah.

11  Q.   I meant to say --

12  A.   Yeah.

13  Q.   -- communication.  I'm sorry.

14  A.   Yeah.

15  Q.   Could you give an example of a student?

16  A.   You know, we've had students.  I can't think of one, but

17  it isn't uncommon to work with students all over the country

18  and all over the world.  So, I mean --

19  Q.   I meant a student who --

20  A.   Yeah.

21  Q.   -- English was their second language that you worked with?

22  A.   I'm thinking more of a psychometrician I trained that

23  wasn't through ISU.  It was through a practice with Dr. Ken

24  Lindsey, and she was from India.  And she -- she knew English

25  very well, but she was also -- it was her second language, and

Vol. 4 - 582

Cheri Atkins, Ph.D. - RX

1    she did great.

2            I mean, we -- I worked with her, and she had a thick

3    accent, and we -- it was fine.  It wasn't an accent problem at

4    all or comprehension or communication.

5    Q.    Okay.

6    A.    So she did well.

7            MR. KELLY:  Thank you.  That's all I have.

8            THE COURT:  Mr. Coulter, anything further?

9            MR. COULTER:  One question, Your Honor, or maybe two.

10                       RECROSS-EXAMINATION

11   BY MS. SUTHERLAND:

12   Q.    Are you familiar with the educational system in India?

13   A.    I am not.

14   Q.    All right.  Did you understand -- do you -- would it

15   surprise you to know that that's one of things they do is teach

16   people English?

17   A.    Oh, I am not surprised, but --

18   Q.    And it's pretty much like their first and second language

19   put together?

20   A.    That I was not aware.

21           MR. COULTER:  All right.  Thank you.

22           THE COURT:  Mr. Kelly, anything further?

23           MR. KELLY:  Nothing, Your Honor.

24           THE COURT:  All right.  Dr. Atkins, thank you very

25   much for coming to the courthouse.  You can step down.

 1          MR. KELLY:  Your Honor, I will be calling our last
 2   witness at this point in time.
 3          THE COURT:  All right.
 4          MR. KELLY:  And I would -- thank you -- expect her to
 5   be probably no more than an hour, from my perspective.  Would
 6   you mind if we take a quick break now?
 7          THE COURT:  That would be fine.  We will take 10
 8   minutes.
 9        (Recess 10:08 a.m.  Resumed 10:15 a.m.)
10          THE COURT:  Thank you.  Please be seated.
11          All right.  We have somebody in the box, but I don't
12   know who that is.
13          MR. KELLY:  I'm sorry, Your Honor.  The defense calls
14   Dr. Shannon Lynch to the stand.
15          THE COURT:  You can stay put.  All right.
16          COURTROOM DEPUTY:  You do solemnly swear that the
17   testimony you are about to give in the matter now before this
18   Court will be the truth, the whole truth, and nothing but the
19   truth, so help you God?
20          THE WITNESS:  I do.
21          COURTROOM DEPUTY:  Please be seated.  And just for
22   our record, if you could state your full name spelling your
23   last.
24          THE WITNESS:  Shannon Maria Lynch L-Y-N-C-H.
25          THE COURT:  You may inquire.

1                    SHANNON MARIA LYNCH, PH.D.,

2   having been duly sworn, was examined and testified as follows:

3             MR. KELLY:  Thank you, Honor.

4                       DIRECT EXAMINATION

5   BY MR. KELLY:

6   Q.   Dr. Lynch, could you advise the Court of your current

7   occupation.

8   A.   I am a Professor of Psychology at ISU.

9   Q.   Okay.  And how long have you been at ISU?

10  A.   Since 2004.

11  Q.   Okay.  And what roles have you had as a professor at ISU?

12  A.   I have been an assistant professor, an associate

13  professor, and I am now a full professor.  I served as chair of

14  the department for eight years.  Before that, I was the

15  Diversity and Recruitment Coordinator for two years.  I think

16  that's it.

17  Q.   Okay.  And that was all within the context of the

18  Department of Psychology?

19  A.   Yes.

20  Q.   And what's your education?

21  A.   What's my education?

22  Q.   Yes.

23  A.   I have a Bachelor's in Child Study and Psychology from

24  Tuft's University, and I have a Master's and a Ph.D. in

25  clinical psychology from the University of Michigan.  And I

Shannon Maria Lynch, Ph.D. - Direct

1  have a post-doctoral fellowship.  Do you want me to say that,

2  too?  From Cambridge Health Alliance, Harvard Medical School.

3  I just don't know how detailed to be.  Sorry.

4  Q.   And before your employment at ISU, were you employed

5  anywhere else?

6  A.   I was an assistant professor three years at Western

7  Illinois University in a Master's Program for clinical

8  psychology.

9  Q.   Doctor, where were you born?

10 A.   Bogota, Columbia.

11 Q.   And is English your first language?

12 A.   No.

13 Q.   What language is your first language?

14 A.   Spanish.

15 Q.   But you have been speaking English for several years

16 though; correct?

17 A.   Yes, since I was four.

18 Q.   In your role at ISU, any other roles that you perform or

19 hold such as any work with the APA?

20 A.   Yes.  So, I more recently -- I know Mark Roberts mentioned

21 that he's a site visitor for Accredited clinical psychology

22 Programs for -- and I have started doing that as well.  I was

23 not doing it at the time that Jun was enrolled, but I have that

24 exposure and experience.

25          I'm also on the committee on Women in Psychology for

1    the APA, and I actually chair that committee.  It's a national

2    committee right now.

3    Q.   Okay.  How many site visits have you done?

4    A.   I have done two site visits and most recently they told me

5    that they would like me to chair my next site visit.

6    Q.   Okay.  And I have it marked down, but I didn't see if you

7    mentioned it.  Do you also teach the Cultural Diversity Course

8    for the program?

9    A.   I do.

10   Q.   Okay.  And could you describe for the Court what that

11   entails?

12   A.   The course?

13   Q.   The course itself, yeah.

14   A.   Okay.  Sure.  So, that course is focused on diversity

15   broadly.  And we begin the course by reading about research,

16   specifically about things like implicit bias.  So we read a lot

17   from a book by Scott Plous.  He's the editor, but it has a

18   number of different examples of the ways in which we be biased.

19   And then we read a book called "Overcoming Your Racism" [sic]

20   by Stanley Su, and it's pretty in your face.  You go through a

21   lot of very specific self-awareness exercises.

22          And then we read information, generally primary

23   source articles.  I actually didn't find a textbook that I

24   really liked in terms of being good at addressing different key

25   concepts.  So, we read a number of different primary source

1   articles about different cultural groups.  We read, in some

2   cases, a little more extensively, for example, about indigenous

3   populations.

4            And we read on a section on working with Latter Day

5   Saints.  Because of the region we are in, we see more

6   indigenous, American Indians, specifically Shoshone-Bannock

7   Tribe members in our clinic.  And we also work with the

8   members -- the people who come to our clinic are distressed;

9   right?  So, folks who are very distressed around where their

10  spirituality is intersecting with a concern might come see us.

11  Q.   During your time at Idaho State, have you received any

12  type of awards specifically relating to student mentorship?

13  A.   Yes.  The student body -- the graduate student body, so

14  that's clinical and experimental students, have recognized me

15  three times as the Outstanding Clinical Faculty Member.  One of

16  them, I think, was while Jun was enrolled.  I think was 2010.

17  One was 2014.  One was before that.  I can't remember the date.

18  And then I got a Diffusing Diversity award for my work in the

19  program.

20  Q.   And what do you mean by that?

21  A.   I was nominated by a colleague to be reviewed for my work

22  in terms of the curriculum that I had developed, and then also

23  I went through our curriculum and reviewed all of our courses,

24  because I wanted to make sure that we were infusing diversity

25  and not just assuming that our diversity course would cover

Shannon Maria Lynch, Ph.D. - Direct

1  everything.

2       And so I reviewed all of the professional courses

3  that we taught, and I gave folks feedback about how to include

4  diversity more broadly in the course work.  And so I think that

5  was what caused the nomination.

6  Q.   Obviously, you mentioned his name, so you know Mr. Yu;

7  correct?

8  A.   Yes.

9  Q.   During your time at Idaho State University, have there

10  been other international students enrolled in the Clinical

11  Psychology Ph.D. Program?

12  A.   Yeah.  So, one student was overlapping with him.  She was

13  a student who worked originally with Tony Cellucci and did her

14  dissertation with me.  I also supervised her clinically, both

15  in our practicum in the clinic, and I supervised her in the

16  women's prison doing groups.  And she had immigrated from

17  Romania.  And she had been speaking English for about five

18  years when she started graduate school at ISU.

19  Q.   Okay.  And what's her status?

20  A.   Oh, she's complete.  She's -- the last email I had from

21  her is that she had a baby and some other things.

22  Q.   Any other non-English speaking students?

23  A.   Yeah, we have one currently.  She is from the Czech

24  Republic, and she has English as a second language.  And she

25  has -- I haven't had her in class yet, but I supervised her in

1  practicum this summer, and she did very well with her clients.

2  And she has a pretty strong accent, but she is able to

3  communicate very effectively, and she has done fine in the

4  program.

5  Q.   I am going to switch gears on you a little bit.  Earlier

6  on in this trial, Mr. Yu's wife testified, Jocelyn Eikenberg.

7  Do you know who she is?

8  A.   Yes.

9  Q.   And she testified in regard to a conversation that you and

10  she had, in which the sum and substance of it was is that you

11  told her that Mr. Yu's English was terrible.

12          Do you recall having a conversation with her with

13  that context involved?

14  A.   I remember having a conversation with her.  I know she

15  approached me in a yoga class.

16  Q.   Do you recall what time frame that was?

17  A.   I looked at the documents, and based on the documents, it

18  looks like it was like early 2011.  But I don't have a -- my

19  own personal specific recollection of that date.

20  Q.   Okay.  And what was your recollection of the conversation?

21  A.   That she came up to me in yoga, and I was not happy about

22  that.  That she asked me about the funding situation for Jun,

23  and I was pretty uncomfortable having someone ask me outside of

24  the department and not the student themselves about funding.  I

25  really feel like that's the student's kind of prerogative to

Vol. 4 - 590

Shannon Maria Lynch, Ph.D. - Direct

1  discuss.

2  Q.   Before you go on --

3  A.   Yeah.

4  Q.   -- could you just explain to the Court what funding

5  entails for Ph.D. students?

6  A.   Sure.  So, with we have a couple different funding

7  options.  We have, you know, six students per year.  Typically,

8  students are there for four years.  So, on average, we are

9  trying to fund 24 students.  And we typically had eight

10  graduate teaching assistants at a time in a given year.

11        And Jun's first two years, he had that funding, which

12  was our best funding, because that's a stipend plus tuition.

13  The other main way that we fund students is through

14  externships.  And that funding is good funding, because it's by

15  the hourly wage, or actually it varies a little by site.  But

16  they can make anywhere -- oh, I am going to be guessing.  I am

17  speculating on this, because Mark would know the hourly rates

18  better than me.  I think it's about between 15 and $22 an hour.

19  And then -- but they have to pay tuition when they are on

20  externship.

21        And so what we try to do is get in-state tuition

22  waivers for students, and we are generally successful in doing

23  that.  So, we haven't had a student pay out-of-state tuition

24  except for one time, when someone didn't file paperwork, in the

25  14 years I have been there.

Shannon Maria Lynch, Ph.D. - Direct

1          So, we -- so, I'm sorry.  So, you asked me about

2    funding.  So, those are the funding options.  And Jun had had

3    the best funding we have the first two years.  The third year

4    we had referred him for the externship to Mr. Christensen, to

5    Psych Assessment Specialists, and they had declined, and so we

6    had to come up with funding.

7          And we were able to come up with adjunct funding.

8    And so we asked Mr. Yu to teach a course in the fall and a

9    course in the spring, as primarily as a -- well, for two

10   reasons.  One, it was a mechanism for funding; and, two, we

11   were able to ask him to teach in Idaho Falls in a small class

12   environment, which we thought would be very good for him and

13   help him with his proficiency.  So, it was good for both of

14   those things.  I lost track of where you had asked me.

15   Q.   Oh, that was perfect.  I want, however, to go back to your

16   conversation with Miss Eikenberg.  So, she approached you about

17   his funding --

18   A.   Yeah.

19   Q.   -- for the next semester; correct?

20   A.   So, if I had to speculate, he had the very good funding

21   for two years and then the third year it wasn't as good.  And I

22   could see why that might raise a question.  And so she asked me

23   about the funding, and I believe I said, you know, "Anything he

24   can do to improve his fluency, that's going to make him more

25   competitive."  And I was thinking either at externship or for

Shannon Maria Lynch, Ph.D. - Direct

1    teaching.

2              And so I said, "Practicing English, is -- you know,

3    practice English more, you know, conversational English."  I do

4    not believe I said his English is terrible.

5    Q.   Did the discussion carry on any further than that?

6    A.   I don't recall more discussion than that.  She may have --

7    I can't -- I remember that we were in yoga, and that she was

8    talking to me.  And I actually don't remember if it was before

9    or after the class.  And so I don't -- oftentimes, if it's

10   before the class, I'm antsy, because I don't want to be talking

11   when the teacher is going to start.  So, I don't know.

12   Q.   Okay.  In fact, did you have -- regardless of how the

13   conversation went --

14   A.   Yeah.

15   Q.   -- as a professor and director of the program, whether --

16   did you have concerns about Mr. Yu's English skills?

17   A.   I did have some concerns.  I had concerns on the basis

18   that, you know, in the CT -- I will say I had him in class, and

19   I did not have concerns about his performance in class.  I know

20   I am in psychopathology.  Right?

21             But based on -- I'm on the CTC, the Clinic Training

22   Committee.  And we meet.  We do those annual evaluations each

23   year, and I knew there had been previous evaluations where

24   people had raised communication or fluency as a concern in

25   terms of his effectiveness with clients.

Vol. 4 - 593

Shannon Maria Lynch, Ph.D. - Direct

1           And then I also, because I was the chair at that
2   time, had seen student evaluations of -- the developmental
3   class is the one I remembered, and I think it's the first one.
4   And so I think the second one may have been better.  But the
5   first one, I remember it caught my attention, because the
6   number of the student -- this is a double negative, and I
7   apologize.  It's the way the item is written.
8           It says the instructor communicates clearly.  And he
9   had 20 percent agreement.  Now, there's only 10 students who
10  filled that out, so it's not a hundred students.  It's 10
11  students.  But that's low.
12  Q.   Okay.  I jumped ahead a little bit.  Were you on the
13  admission committee for Mr. Yu?
14  A.   Yes.  I mean, every -- as long as you are employed as a
15  clinical psychology faculty member, you are on the admissions
16  committee.
17  Q.   Okay.  So, I'm asking you to jump back a couple years.  Do
18  you recall having any concerns with his English skills during
19  the admission process?
20  A.   That's a good question.  I don't recall my own concerns.
21  I remember we had a conversation as a faculty about his
22  strengths, about his high -- the higher scores, the TOEFL in
23  particular, and about some of the experiences he brought.  We
24  consistently add -- think that bringing in students who
25  represent diversity of all different kinds bring value.

Shannon Maria Lynch, Ph.D. - Direct

1          And that's part of the -- you know, well, first of

2     all, we just think that.  But second of all, that's part of our

3     accreditation, is we are -- we are looking to recruit and

4     retain students.

5          And then -- so, I remember we had a conversation

6     about that, and I do remember we discussed fluency and his

7     likelihood of success with rural Idaho clients.  We did have a

8     conversation about that.  And one of the faculty, Maria Wong,

9     who is an experimental faculty member, and I -- so, here is

10    what I don't know.  She often was on our committees, because

11    she was recruiting students herself, and the clinical students

12    are good graduate students for her, because she does research

13    on adolescence and substance abuse.  So, she more often mentors

14    clinical students and experimental students.  So, she was often

15    on our admissions process.  Like, she was one of the voting

16    members.  Right?

17         So, the experimental faculty were included,

18    particularly as by request.  So, she could have been part of

19    the whole discussion or we could have just asked her.  That I

20    don't know.  But I do know we talked with her, and she talked

21    about -- she's from Hong Kong herself.  She did graduate work

22    in -- at Hong Kong -- I think at Hong Kong University, but in

23    Hong Kong.

24         And she came here and did post-doctoral work, also

25    actually at the University of Michigan.  We overlap there.  And

Shannon Maria Lynch, Ph.D. - Direct

1  then was at ISU.  And so we talked with her, and she talked a
2  lot about the fact that fluency typically include -- improves
3  dramatically within the first two years.
4  Q.    Okay.
5  A.    And that was something we thought a lot about, and I think
6  helped us decide that we thought it was a good idea to admit
7  Mr. Yu.
8  Q.    Jumping back to the 2011 time frame, recall that Mr. Yu
9  was dismissed from the externship at EIRMC with Dr. Landers;
10  correct?
11  A.    Yeah.  I'm sorry, yes.
12  Q.    And there's been testimony that the program, ISU Clinical
13  Psychology Program, was criticized because it didn't offer a
14  follow-up externship to Mr. Yu after he was dismissed.
15  A.    Yeah.
16  Q.    Could you tell the Court why there wasn't an immediate
17  enrollment in another externship for Mr. Yu after that
18  dismissal?
19  A.    Sure.  There's two reasons.  One is that we have a limited
20  number of externship sites.  And if you'll recall, I said we're
21  funding 24 students.  Right?  And we have eight GTAs.  So, all
22  of the established relationships we had were filled.  Right?
23  So, we would have needed to find a new one in rural Idaho.
24  There are limited sites.
25         So, one issue is simply where we could have possibly

1   put him.  A second issue -- and related to that, the amount of

2   time it takes to do the contract and get all of that done.  I

3   am not the director of clinical training, but I signed things

4   as the chair.  And we started those processes to get students

5   started in August in May to get those contracts approved.  And

6   so one piece of it is -- is that.

7           Another piece of it that's an important piece, is if

8   a student is dismissed from a site, whether it's externship or

9   a practicum, we need to, as a faculty, understand what the

10  concerns were and work with the student before we put them back

11  in a similar situation.

12          So, when he was dismissed from Dr. Landers's

13  externship site, we met at CTC.  We developed that plan that's

14  been discussed several times, where we -- we outlined -- he had

15  to complete his incomplete with me anyway.  Right?  But we

16  outlined working with me with the clients -- the ongoing

17  clients, and then the practicum with Dr. Roberts and

18  Dr. Haight.

19          He was also scheduled to take IET, but we were trying

20  to lay out "These are the things that you're going to do that

21  we're going to do with you, where we are going to attend to

22  those concerns that came up with Dr. Landers."

23  Q.   Okay.

24  A.   And so, I'm sorry.  I am just going to add one sentence.

25  So we wouldn't place him in another external site until we

Shannon Maria Lynch, Ph.D. - Direct

1    thought we had addressed that or at least attempted to address

2    it.  We needed to work on those skills.

3    Q.   Okay.  In the same time frame, Mr. Yu was involved with a

4    practicum with you; correct?

5    A.   He was in my practicum at the same time.

6    Q.   Okay.  What I put up on the screen is what's called

7    Defendant's Exhibit 512.  Do you see that at the bottom?

8    A.   I do.  I forgot my reading glasses, but I can see this,

9    just you can't go any smaller.

10   Q.   All right.  Well, I can make it bigger --

11   A.   This is -- this I can read.

12   Q.   Okay.  So, can you tell the Court again exactly what this

13   document is?

14   A.   So, this is the student practicum extern semester

15   evaluation.  It was actually developed by Robert Hatcher and

16   some colleagues.  It was really meant to be a broad assessment

17   of clinical competencies.

18            I can't remember exactly when we adopted it, but we

19   adopted it in part because we wanted to be comprehensive in our

20   assessment of student competencies, and we were following

21   national guidelines when we did that.

22            So, this is a very widely used competency's measure.

23   And what it's meant to do is be developmental.  So, if you look

24   at the instructions, it says "Developmental program in the

25   year."  Like, you need to be rating whether they are meeting

Shannon Maria Lynch, Ph.D. - Direct

1  expectations, not -- below expectations or exceeding

2  expectations based on their year.

3          And so at this time, Mr. Yu was in his third year.

4  Right?  2011, so 8-9, 9-10, 10-11.  Fourth year.  I'm sorry.

5  Thank you.  Mark was telling me fourth year.

6  Q.   What's your -- what's your testimony?

7  A.   I'm sorry.

8  Q.   We need your testimony.

9  A.   I'm sorry.  I was counting the dates, and I got to four,

10  and then I looked up, and I saw him holding up four fingers.

11  So, I got to four on my --

12          THE COURT:  Let's be clear.  That's not appropriate.

13          THE WITNESS:  I'm sorry.  I didn't know that.  I was

14  counting dates.

15          THE COURT:  Let's move -- move on.

16          THE WITNESS:  Yep.

17  BY MR. KELLY:

18  Q.   So, specifically, this evaluation was for what course?

19  A.   From the fall practicum with me in 2011.

20  Q.   And what did the practicum entail?

21  A.   I supervised students seeing adults, and my specialty is

22  with couples and trauma.  We do see cases much more broadly,

23  but we often get cases that have really more specifically an

24  interpersonal violence component or couples' cases.

25  Q.   Okay.  And what was Mr. Yu's role in this practicum?

Shannon Maria Lynch, Ph.D. - Direct

1  A.   He was a student on the practicum.  He was one of four

2  students.

3  Q.   Okay.  And what was his involvement specifically?

4  A.   So, when the students are on the practicum, when cases

5  come in, they get assigned.  At the beginning of the practicum,

6  usually there's a little bit of a backlog, and so we go

7  through -- I read out loud what the cases are, and the students

8  take turns picking.

9         And then -- so, ideally, they each -- you know, we

10  spread them out across them at the beginning of the semester,

11  and then depending on their caseloads, students get assigned

12  cases as they come in.  The clients can express a preference.

13  So, for example, because I take a lot of trauma cases,

14  sometimes we get a preference for female clinician.  And it was

15  an unusual practicum for me in the sense that I had one female

16  student and three male students.

17  Q.   Okay.  And as you look at this evaluation -- I can scroll

18  down for you, or tell me how you want to look at this, but --

19  A.   You can hold it right there.

20  Q.   Okay.  So, my first question as to this form is I notice

21  that at least on this first page, there's a fair number of

22  below expectations circled.  Do you see that?

23  A.   I do.

24  Q.   Okay.  And do you have a recollection in regard to each of

25  these as we take -- if we can take them one by one, each of

Shannon Maria Lynch, Ph.D. - Direct

1   these issues and why you indicated that Mr. Yu's performance

2   was below expectations?

3   A.   Yes.  So, the first thing I'll say, if -- if I can, is

4   that early in the practicum, Jun was assigned two clients, and

5   they didn't come in.  And, so, he didn't have clients the first

6   month and a half.  The first client intake that I -- when I

7   went back and looked, was October 16th was an intake he did

8   with me.

9        So, there was a period of time -- all the students

10  were assigned clients at the very beginning, and neither of the

11  two he was assigned came in.  Sometimes that happens, because

12  they've been wait listed, and they sought services other places

13  before we even contact them.  But he didn't have those two.

14       So, these are based on the clients that he did have.

15  Right?  So, I want to be clear about that.  And that was a

16  co-therapy case with me, where I was directly in the room with

17  him and doing the case with him, and a co-therapy case with

18  another student, who -- for a couple.

19       I almost always assign co-therapy for couples.  All

20  the students that semester on practicum were doing co-therapy

21  for couples, and one of the other students was also doing a

22  co-therapy with me.  Just to be clear that those models of

23  training were common across all the students.

24       And then when I was -- during the course of the

25  semester, I was struggling a little bit with Mr. Yu's

Shannon Maria Lynch, Ph.D. - Direct

1   participation in the practicum.  On a couple of occasions, he

2   was reading during the practicum, which is quite unusual.  And

3   I felt like he was very disengaged.  And then when I talked to

4   him about it -- sorry.  This is difficult.

5   Q.   Take your time.

6   A.   When I talked to him about it -- he -- he -- he

7   indicate -- he had very strong opinions about -- which, to be

8   frank, is fine.  I work with students all the time who are very

9   passionate and committed about the perspectives they have.

10   Right?  How strongly they adhere to a particular theoretical

11   perspective.  That's fine.

12          But when I talked to him about the practicum and the

13   ways in which he was disengaged, he -- he would just kind of --

14   he would suggest that he was right and I was wrong.  Which

15   again, as a faculty member, working with students for 15 years,

16   I work with lots of students who think they have the best idea

17   about what treatment to use or they are just very infatuated

18   with a particular new -- like, right now, it's acceptance and

19   commitment therapy.  Like, they all want to do it.  That's

20   fine.

21          But when I tried to talk with Mr. Yu about the --

22   taking alternative perspectives.  Right?  About being broader

23   or about just ways in which he was engaging with me and with

24   his peers, he would -- he wouldn't -- he wouldn't respond.  He

25   wouldn't say, "Okay, but."  He would just say "No."  And that

1    was very difficult.  And so I did indicate that in my ratings.

2    It -- it's the most disrespected I have ever felt as a

3    practicum supervisor.

4    Q.    Okay.  So, as we look at number four --

5    A.    Yeah.

6    Q.    -- that was the first below expectation?

7    A.    So, it was about authority and input, me offering him

8    suggestions, and him asserting very strongly that he was right.

9    That -- and part of what he was doing made sense in the sense

10   he was very focused on diagnostic criteria.  And I think that

11   was what he wanted to organize himself around.  And again,

12   that's okay, but you can't just do that.  So, I was trying to

13   get him to -- to be broader.  And he was -- it -- I did not

14   find I was able to be successful in that.

15            And then collegial peer interactions, right?  That is

16   actually very similar.  Those things overlap for me.

17   Q.    You are talking about number eight?

18   A.    Yes.  Uh-huh.  Yeah.  And then -- and by the way, it

19   wasn't across the board.  Right?  Like, I gave him a meets

20   expectations on how he interacted with our staff.  So, it was

21   very -- I felt like it was pretty specific to me being in a

22   position of authority and trying to suggest things to him that

23   were outside of the repertoire that he wanted to use.  Right?

24   Q.    Okay.

25   A.    And then the organize and discipline approach to writing

Shannon Maria Lynch, Ph.D. - Direct

1    and maintaining notes, that's important, because I have worked

2    with a number of students.

3    Q.    That's number 12.

4    A.    Number 12.  A, for a number of different reasons where

5    their writing isn't necessarily -- like, there's grammatical

6    errors and things.  That's not what I mean.  I mean that

7    especially for a fourth-year student, his ability to sit

8    through the session -- you know, we were doing the sessions

9    together -- and then to write a note that captured the key

10   elements of the session was not at a fourth-year level.

11   Q.    Okay.  Anything else on this evaluation?

12   A.    In terms of effective case presentation, that was his

13   ability to talk about the cases that he did have in practicum.

14   And that one, I was basing it on when we were talking in the --

15   in the group supervision about the case.  And again, it was

16   that he was so narrow.  So, I did not think it was effective,

17   because he was ignoring key components of the client's

18   presentation.

19   Q.    Okay.  And just to be clear, that's number 13.

20   A.    I'm sorry.  Yes.

21   Q.    Okay.  So, let's go down to the next page.  Is there

22   anything --

23   A.    I will comment that I didn't think it was fair.  You will

24   see I wrote "No opportunity to evaluate next term," because --

25   because we had only, at that point, had -- we had by -- by the

1   end of the semester, because the client -- his first client was

2   in October, we had three intake sessions and then three therapy

3   sessions, with the one he was doing co-therapy with me and two

4   to three of the couples therapy.  And I didn't think it was

5   fair to evaluate him on more of the therapy interactions,

6   because it hadn't been -- there weren't enough sessions to do

7   that yet.

8           And then these were things he absolutely met

9   expectations on, the strengths he brought at that time.

10  Q.   And what are you refer to?

11  A.   I am sorry.  I'm looking and pointing.  The -- sort of his

12  ability to propose and defend diagnostic conclusions was right

13  on.  Right?  He could absolutely look at a list of criteria and

14  talk about why the -- the client met that criteria.  He was --

15  he could look at the diagnostics, the kind of listing, and

16  he --

17  Q.   That's number 30; correct?

18  A.   Yeah.  And so I'm just looking on 27, 28, there were

19  skills he did have.  Right?  And those are the ones where he

20  gets the Ms.

21  Q.   Okay.  If we look at 35 through 39, he wasn't graded

22  there.  Why not?

23  A.   That's the same reason I gave before, because I didn't

24  think it was fair to rate him on those until he had seen more

25  clients.  The crisis one, the woman we were seeing had

Vol. 4 - 605
Shannon Maria Lynch, Ph.D. - Direct

1    presented in crisis, but she was -- it was ongoing, and I
2    wanted to be able to see how he did over time.  And I actually
3    had concerns about that, at the time, and I wanted to give him
4    more time to see if it got better in terms of crisis response.
5    Q.   And what concerns did you have?
6    A.   In terms of sensitivity to client cues and the ability to
7    change direction in session.  We would have a plan for the
8    session, which was an appropriate plan and one where he had
9    found good material to work on.  I think that one was, like,
10   interpersonal skills.  And then the client came in, and she
11   indicated that she had had very little to eat and very little
12   to drink.
13           And that's a time where you need to redirect your
14   focus and talk with the client about basic health.  And Mr. Yu
15   wanted to do the planned interpersonal skills.
16   Q.   Okay.  So, let's go down to the next page and the
17   narrative here.
18   A.   Uh-huh.
19   Q.   Could you summarize that for the Court?  Take a look at it
20   and then summarize it for the Court.
21   A.   Yeah.  So, I acknowledged that he didn't get the cases
22   right away.  And so I talked about giving him an I for that
23   reason, that I didn't think it was fair to give a grade at that
24   time.  There's also an incomplete contract that references
25   that.

Shannon Maria Lynch, Ph.D. - Direct

1          And then I talked about the assignment to the cases.

2    And then I said what I thought were his strengths; seeking out

3    the assessment and treatment materials; looking at diagnostic

4    materials.  And then I commented on the things I had concerns

5    on.

6          So, his engagement in practicum, both with me and

7    with his peers.  The -- the lack of engagement at times that

8    concerned me, and then his resistance to being broader.  The

9    fact that he really wanted to tie everything to diagnostic

10   criteria, and he wasn't responding to other aspects of the

11   client presentation, and particularly the difficulty with

12   alternative perspectives.

13         Like, it's fine to have something you really adhere

14   to or believe in, but you still have to be able to be flexible

15   enough to think about other things.  Right?

16   Q.   Okay.

17   A.   And then I talked about the fact that his notes were

18   timely.  Like, there was -- I never had to say, "You're not

19   doing this."  But that there were -- they weren't organized and

20   containing the material that you would expect by a fourth year.

21   His notes looked much more like a first- or second-year

22   student.

23   Q.   And you gave him this feedback; correct?

24   A.   I did.

25   Q.   And so it looks like he signed the document?

Shannon Maria Lynch, Ph.D. - Direct

1    A.   He did, and he responded, and indicated that he disagreed

2    with the majority of my feedback.

3    Q.   Okay.  Subsequent to this evaluation, the university and

4    Mr. Yu entered into a course completion contract; correct?

5    A.   Yes.  That's when I fill out when it's -- the instructor

6    fills it out for the course.

7    Q.   Okay.  And I'm just showing you what's Defendant's

8    Exhibit 513.  Do you see this to the right-hand bottom?

9    A.   Yes.

10   Q.   And could you tell the Court specifically what this

11   contract is or this document?  I'm sorry.

12   A.   Sure.  It's an incomplete contract.  We do one whenever we

13   give a student an incomplete, and we state what the student

14   does need to do to complete the contract.  If you just move it

15   up a little?

16        And then we also state, if they don't carry out

17   additional work, what the grade would be.  So, at that time, I

18   commented, based on what I had seen, that Jun's grade -- or

19   Mr. Yu's grade -- sorry -- would be a B.  And then -- but we

20   did see the clients into the January and February, and so

21   because he did more work, I gave him an A minus instead of a B.

22   Q.   Okay.  So, he essentially followed through --

23   A.   Yeah.

24   Q.   -- with course completion?

25   A.   It was part of the remediation plan, so that we could work

1    specifically on his responsiveness to clients.

2    Q.    Doctor, let me get to this document.  I am showing you

3    what's been marked as Defendant's Exhibit 536.  Do you see that

4    at the bottom of the --

5    A.    Uh-huh.  Yes, I do.

6    Q.    And could you tell the Court what this document is?

7    A.    This is the letter that I sent in my role as chair after

8    Mr. Yu appealed the dismissal from the program by the

9    department.  So, I think it's the second contact about it.  So,

10   when a student is dismissed, they have the right of appeal.

11   And it goes first to the department -- back to the department

12   to the chair, and then it goes to the Dean's office for review.

13   And then it goes -- sorry -- to the college, and then it would

14   go to the Graduate Council.

15   Q.    Okay.  And again, this was the second step --

16   A.    This is the second status.  This was -- it came to me as

17   chair, and I was -- he asked me to review, and he wrote out his

18   rationale for why he didn't think it was a fair or appropriate

19   decision.  And so what you see is his statements about why he

20   didn't think he should be dismissed.  And so what I did is I

21   took each statement he made, and I explained why I didn't think

22   that it was sufficient to reverse the decision.

23   Q.    Okay.  So, if we look at argument one, could you summarize

24   that for the Court?

25   A.    So, he says that he was in good standing until this

1  Cleveland Clinic dismissal.  And I wrote that it was true he

2  was in good standing, meaning that he was not on academic

3  probation, but we agreed with his opinion -- or disagreed --

4  I'm sorry -- with his opinion that the Clinic Cleveland [sic]

5  termination was the nexus, like the only data point.

6         I think that's really important.  We were collecting

7  or forming our understanding of Mr. Yu's competency across

8  time, particularly his last two years.  Right?  That's where

9  you would expect to have the -- the demonstrations of

10  competency.  And so we were basing our decisions on the -- at

11  first dismissal.  That was important to us.  And then what we

12  observed in the fall, my practicum, and then in the spring on

13  Dr. Roberts's and Courtney Haight's -- Dr. Haight's practicum.

14         And then -- and then the dismissal from the Cleveland

15  Clinic.  So, we had multiple examples where -- of concern, of

16  high concern of not having the competency -- let me be clear --

17  that you would expect.

18         So, he got unsatisfactory progress, specifically in

19  professional development, three times.  Those were indicators

20  of our concern.  So, that's the -- the response was that he

21  wasn't -- he had multiple indicators of concern, and we were

22  basing our decision on multiple data points rather than one

23  thing was the reason for the dismissal.

24         Internship views should be -- viewed -- or

25  internships should be viewed as -- at worst as incomplete, lack

1    of due process.  And I want to read what I wrote, if you don't

2    mind, before I try to summarize it.

3    Q.   Yes.  Take your time.

4    A.   So, the argument that the internship should be viewed as

5    incomplete and the lack of due process, there are a couple of

6    points there.  What I was really trying to get at is that he

7    had been at the internship for a number of months.  That he

8    had -- to our understanding, based on communications with

9    Dr. Speer and in particular a written evaluation that both of

10   them signed in January, they had an agreed-upon plan about what

11   his competency level was and what they were working on.  Right?

12           So, they both signed that paper in January saying

13   this is where we see Mr. Yu's competency.  And so we knew that

14   he had been involved in that and informed about the concerns,

15   and then we were told that she was meeting with him regularly

16   in supervision.

17           So, the idea that it -- that he didn't get what he

18   should have gotten at internship did not seem accurate.  So,

19   we -- so, the piece of this, in terms of due process, was that

20   he got what he was supposed to there.  The fact that he didn't

21   have due process, as a forum, like, to appeal at Cleveland

22   Clinic, we were informed of before he started.  He was informed

23   of before we started.  And that was the condition of going

24   there that he chose.  He wanted to go there.

25           And so we couldn't control the due process there.

Shannon Maria Lynch, Ph.D. - Direct

1  His due process was at ISU to appeal the grade or, in the case

2  of the dismissal, to go through an extensive review process

3  there.  He had due process.

4  Q.    Okay.

5  A.    So, that's actually what I was just talking about, the

6  next section.  Dr. Cheryl Chase did have a positive opinion of

7  his performance, but she also indicated very limited

8  opportunity to supervise him in direct client care.  And that's

9  what we needed at the level of internship.  She stated that she

10  did not allow him to do the assessments.  In fact, I was --

11  we -- we didn't even have the information that he was doing the

12  structured interviews.  We had the information that she did not

13  allow him to do assessments.

14        That was very concerning to us for an intern.

15  Interns should be doing independent assessments.

16  Q.    Okay.  Are you finished with that section?

17  A.    Yeah.  The opportunity to do the internship in China, we,

18  at the time that we offered that, had information about the

19  dismissal and had worked on the remediation plan.  Mr. Yu had

20  applied for the APPIC internship.  We had given him the

21  go-ahead to do that.

22        We actually -- I want to be clear.  We gave him that

23  before.  We gave him the go-ahead to do the internship before

24  we knew about the dismissal from the externship and before he

25  had the subsequent troubles in the spring.  I did know he was

Shannon Maria Lynch, Ph.D. - Direct

1   having some struggles in my practicum, but that wasn't

2   sufficient to stop us.  Right?  We wanted multiple data points.

3           So, the idea at the time was he could do one of those

4   three things; reapply to the APPIC internship; do the typical

5   thing for a student who doesn't match, which is the non-APPIC

6   internship.  And to be frank, that's a lot of work.  The

7   student has to put together a proposal.  It takes time to do

8   that.  It's a lot of work, but it allows them to move forward

9   in a more timely manner.

10  Q.   I just wanted to ask you about the last sentence of that

11  paragraph.

12  A.   Yeah.

13  Q.   It says, "The graduate faculty is convinced that a fourth

14  chance, i.e., an internship in China is unwarranted and might

15  put Chinese patients at risk of harm."  What did you mean by

16  that?

17  A.   So, when we -- when we gave him the go-ahead to the

18  internship, we didn't have the other information.  Right?  By

19  the time we got the second dismissal, A -- or one thing is that

20  Dr. Speer referenced that concern, but we also had that concern

21  by the time we had multiple data point about his inability to

22  be responsive to clients, when they, you know, basically did

23  something out of a pretty narrow presentation.

24          And at that point, we -- we are gatekeepers.  A

25  Ph.D. -- a Clinical Ph.D. means that you are competent in -- as

1    a clinical psychologist.  It's hard to dismiss a student.  We

2    don't do it very often.  But when we give a Clinical Ph.D., it

3    means we have confidence in the student's ability to serve as a

4    clinical psychologist across the different populations.  It's

5    not specific to one population.

6              It's can you do this work competently.  And we were

7    concerned, based on the number of data points, that he could

8    put clients at harm.

9    Q.   And then the last paragraph you advised Mr. Yu of his

10   right to appeal --

11   A.   Yes.

12   Q.   -- to the next level; correct?

13   A.   Absolutely.

14   Q.   Okay.  Dr. Lynch, we heard from a couple of experts on the

15   plaintiff's side, but particularly Dr. Zorwick who pointed to

16   this letter, in fact, as an --

17   A.   Yeah.

18   Q.   -- indication that while you had concerns raised about

19   Mr. Yu before the dismissal, they didn't merit dismissal.  But

20   you use them for reasons to dismiss him after the fact; and,

21   hence, she was calling them a post hoc justification.

22   A.   Yeah, I disagree strongly.

23   Q.   And why is that?

24   A.   Because we take a development perspective.  It says that

25   in the instructions for our evaluations for professional

Shannon Maria Lynch, Ph.D. - Direct

1    skills.  We are very clear that we expect different levels of

2    performance and competency in a first-year student versus a

3    third- or fourth-year student.

4         So, we also don't judge students on the basis of one

5    supervisor.  Right?  Because any one supervisor, if they have a

6    struggle with a student, we want to be sure that it's not just

7    the student and the supervisor.  We do want to make sure about

8    that.

9         This is a case where we had a student who was

10   dismissed from an externship site with a supervisor who had a

11   record of good, solid supervision with a number of students

12   prior to him.  Then he was on my practicum.  And I gave him the

13   evaluations that I did around difficulty accepting feedback in

14   particular, but then also responsiveness to the client.  Right?

15        And the way I framed that in the practicum was

16   problems in lives -- or in the evaluation.  And then we had his

17   difficulties with Dr. Haight and Dr. Roberts, again with

18   responsiveness to clients and taking feedback.

19        And then we had Dr. Speer's report.  So, we didn't

20   decide, in the fall, at the first dismissal, that he was not

21   able to do these things.  We worked with him for another year,

22   and then we still -- I mean, in part, we were really following

23   our processes.  Right?  We were concerned in the spring, when

24   he finished the practicum with Dr. Roberts and Dr. Haight.  But

25   he had the meeting with Dr. Roberts and the Equal Opportunity

Shannon Maria Lynch, Ph.D. - Direct

1    Officer, and he said he did not want to stay with us.

2            And then he -- and then he put together the

3    internship, and it was a site he wanted to go to where it

4    sounded like he had some interaction with them that had been

5    very positive.  We wanted him to be successful.

6            So, he went on that local internship -- or I'm not --

7    it wasn't local, the non-APPIC internship.  When you put --

8    when he was then dismissed from that site that he chose, with

9    someone where it sounded like he had developed a positive

10   relationship, that data, across now a year and a half, is what

11   we based our decision on.  Right?  It was development, not post

12   hoc.

13           MR. KELLY:  Okay.  Your Honor, I think that's all the

14   questions I have.  Thank you.

15           THE COURT:  All right.  Thank you, Mr. Kelly.

16           Just bear with me just a moment.

17           Mr. Coulter, we can take a 20-minute recess now and

18   then come back and finish with this witness, or if this is the

19   last -- if defense intends to rest after this, and you don't

20   intend to put on a rebuttal case, and we can finish right now

21   without the recess.

22           So, do either of you have a particular preference for

23   that?

24           MR. COULTER:  Well, Your Honor, I would prefer to

25   have a recess to allow the client to compose.

Vol. 4 - 616

Shannon Maria Lynch, Ph.D. - Cross

1        THE COURT:  That's fine.  We will take a 20-minute

2   recess.  We will be back at 10:25 [sic].

3        (Recess 11:04 a.m.  Resumed 11:25 a.m.)

4        THE COURT:  Thank you.  Please be seated.

5        Mr. Coulter, you may proceed.

6        Doctor, of course, you are still under oath.

7        THE WITNESS:  Okay.

8                    CROSS-EXAMINATION

9   BY MR. COULTER:

10  Q.   Good morning, Dr. Lynch.  How are you today?

11  A.   Good morning.

12  Q.   Now, Doctor, you recognize I do represent Mr. Yu; right?

13  A.   Yes.

14  Q.   Okay.  Now, other than Mr. Kelly, when you prepared for

15  this, for your testimony today, who else did you speak to?

16  A.   About my testimony?

17  Q.   Yes, ma'am.

18  A.   Mr. Kelly, and then in the room, Mr. Kelly was speaking to

19  me and two other people were there, but he was speaking to me.

20  They weren't -- they were just sitting there.

21  Q.   You didn't -- you didn't converse with Dr. Roberts?

22  A.   About my testimony?

23  Q.   Yes, ma'am.

24  A.   No.

25  Q.   Okay.  Now, I understand, Dr. Lynch, you have been

Shannon Maria Lynch, Ph.D. - Cross

1   speaking English since you were four years old?

2   A.   Yes.

3   Q.   Okay.  And so you don't have any accent whatsoever.  It

4   looks like you speak fluent English; right?

5   A.   Yes.

6   Q.   Okay.  Now, have you ever been to China?

7   A.   Nope.

8   Q.   Okay.  Have you been to the Far East?

9   A.   Nope.

10  Q.   So, what's the furthest west have you been?

11  A.   The furthest west?

12  Q.   Yes, ma'am.  From here, from Pocatello.

13  A.   Oh, you are going to push my geography.  I have been to

14  Kauai, Hawaii.  I have certainly been in Europe -- or not

15  certainly.  I have spent three months in a Semester Abroad

16  Program and took classes in the Autonomous University of Spain.

17  Q.   You do realize that's east of Pocatello?

18  A.   No.  I am serious about you are challenging my geography.

19  I am thinking about where I have been in terms -- so, west of

20  Pocatello.  Hawaii is west of Pocatello.

21  Q.   Yes.

22  A.   Yes.  But not Europe?

23  Q.   No.

24  A.   Okay.  I need to look at map to see that.

25  Q.   Okay.  So, you are not familiar with -- well, how familiar

Vol. 4 - 618

Shannon Maria Lynch, Ph.D. - Cross

1  are you with Chinese culture?

2  A.   Not specifically familiar with Chinese culture.

3  Q.   Now, is my understanding that Mr. Yu -- that -- oh, I know

4  what I wanted to ask you.  I am just kind of going around a

5  little bit.

6          Now, my understanding is that there's, I guess,

7  Professor Maria Wong that works at the Idaho State University?

8  A.   Yes.

9  Q.   And she was part of that selection committee, or

10  recruitment committee, or what?

11  A.   Yeah, no.  I think -- I tried to be very careful there,

12  because I don't remember if she was officially on the committee

13  or if we just consulted with her.  But I know we did talk with

14  her during the admissions process, and I def- -- I can

15  comfortably say that.  I think she was on the admissions

16  committee.  She often is.

17  Q.   I think you had said she was from Hong Kong?

18  A.   Uh-huh.

19  Q.   Okay.  Did she grow up there?

20  A.   Yes.

21  Q.   And she speaks really good English?

22  A.   Yes.

23  Q.   Okay.  Now, do you understand that Hong Kong was a British

24  Colony?

25  A.   Yes.

1  Q.   And do you understand that -- that English is pretty much

2  a primary language, just like in India, for people that live in

3  Hong Kong?

4  A.   Okay.

5  Q.   Now, what kind of linguistic expertise do you know that

6  Maria Wong has?

7  A.   I don't know that she has linguistic expertise.

8  Q.   And you don't know if she's ever taught any languages?

9  A.   I don't know that she's taught languages.

10 Q.   But you just took her at her word that in a couple of

11 weeks or a couple years, that the English would improve?

12 A.   She was an individual who had a similar experience, and we

13 were there, and we think it's important to consult.  That's

14 actually part of what we are charged to do, when we're -- when

15 we're looking for information is consult, and so we did consult

16 with her.

17 Q.   Do you think it might be important that you might consult

18 with somebody who is a linguistic expert that has that

19 expertise to say that a person would acclimate to, in fact,

20 another language within a certain amount of time?

21 A.   I think that would have been an additional benefit.

22 Q.   Okay.  Now, let's go back to this conversation that you

23 had with Miss Eikenberg.  Now, you don't seem to recall what

24 you said exactly; right?

25 A.   I don't have an exact recollection, no.  It was a long

Vol. 4 - 620

Shannon Maria Lynch, Ph.D. - Cross

1   time ago.

2   Q.   Okay.  So, do you realize that Miss Eikenberg's

3   recollection was pretty specific?

4   A.   No.  I -- I mean --

5   Q.   She actually -- she actually testified exactly what --

6   exactly what -- what you understand she said [sic].  Okay.  And

7   she doesn't -- she has a very good recollection of that.  Did

8   you know that?

9   A.   No, I did not hear her testimony.

10  Q.   Okay.  Well, I am going to represent to you that that's

11  what happened.  Now, were you in here for Dr. Landers's

12  testimony?

13  A.   No.

14  Q.   Okay.  Well, I will represent to you that he did testify

15  that even though -- even though that Mr. Yu was, I guess,

16  dismissed from externship, he basically said that based on

17  Mr. Yu's goal to return to China, that he's probably right

18  where he needs to be.  Would that surprise you?

19  A.   I believe he said that in the documents.  That, at that

20  time, in the fall 2011 documents, he made a reference to --

21  well, I don't know if he said he was right where he needed to

22  be, so I didn't hear the testimony.

23          My memory of Mr. Landers's or Dr. Landers's documents

24  was that he stated that the concerns that he saw, that he

25  thought that Mr. Yu would be okay to do work with individuals

Shannon Maria Lynch, Ph.D. - Cross

1  in China.

2  Q.   Okay.  Now, what I am learning, from this experience, is

3  that it seems to me that there doesn't seem -- there doesn't

4  seem to be anybody in the administration at Idaho State

5  University that has told Mr. Yu at any time that he's going to

6  be subject to dismissal if something happened.  Would that be a

7  correct statement?

8  A.   Can you rephrase the question?  I am -- I am trying to

9  understand.  You're asking about specific to administration?

10 Q.   Well, you know what?  I think I asked a bad question if

11 you don't understand.  So, I am going to repeat it.

12 A.   Okay.  Thank you.

13 Q.   I am going to rephrase it.  So, let's take that first

14 year.  Well, first of all, I need to ask you, how familiar are

15 you with Mr. Yu's total progress through Idaho State

16 University?

17 A.   I am familiar with his evaluations and the CTC meetings

18 around that.

19 Q.   Now, let's take the CTC meetings around that and

20 evaluations.  Was there ever any evaluation that informed

21 Mr. Yu that he was in danger of being dismissed from the

22 clinical psychology program at Idaho State University to your

23 knowledge?

24 A.   He was informed three times that he had unsatisfactory

25 professional progress.  And so that is a concern and a warning

Shannon Maria Lynch, Ph.D. - Cross

1   and a flag.  He was not warned specifically for dismissal.

2   Q.   Okay.  So, I guess the question -- the answer to my

3   question would be no?

4   A.   Oh, I didn't know it was a yes/no question.  If it's a

5   yes/no, then no.

6   Q.   Okay.  Now, Mr. Yu was -- was given three options.  One

7   would be -- three -- when he came to -- when he -- let me put

8   it into context.

9        When it came to going to an internship, okay, Mr. Yu

10   was given three options.  Was that my correct understanding?

11   Is that what your understanding was, that he got three options

12   to either; one, complete a non-APPIC internship; two, to

13   complete an APPIC internship; or, three, construct an

14   internship in China.  Were those the three options?

15   A.   Pretty much.  It was to reapply.  But, yeah.

16   Q.   Reapply.

17   A.   Uh-huh.

18   Q.   Because I guess reapplication was when did he not match;

19   right?

20   A.   Right.  That's the time line.  The three options only

21   became three options when he didn't match.  And so that's why I

22   offered that, is because ideally, if he matched, those options

23   would never have been on the table.

24   Q.   Okay.  And during that year, I guess when he did not

25   match, was that -- was that -- was that unusual or pretty well

Shannon Maria Lynch, Ph.D. - Cross

1  the way it went because of the vacancies and lack of vacancies?

2  A.   That's good question.  It wasn't super typical for

3  students in our program.  We typically have a high match rate.

4  But certainly nationally, it isn't uncommon not to match.

5  Q.   Okay.  And if I told you that Dr. Roberts testified that,

6  at that particular time, when -- when Mr. Yu did not match,

7  that was sort of an interesting time with the psychological

8  education aspect where people just didn't match.  Would that

9  surprise you?

10  A.   No.  And I did get to hear Dr. Roberts's testimony.

11  Q.   Would you agree that I summed it up correctly, as far as

12  the match was concerned?

13  A.   Yeah.  Sorry.  The question was broad.  Can I restate what

14  I understood?

15  Q.   Yes, ma'am.  You certainly can.

16  A.   Okay.  So, I understood you to be saying that nationally

17  the match rate was such that it's not uncommon, and I would say

18  I think, at that time, the match rate was 15 to 20 percent not

19  matching.

20  Q.   Okay.

21  A.   If that's -- okay.

22  Q.   All right.  Thank you very much.  Now, there's -- there's

23  an interesting question I need to ask you, and I don't mean to

24  upset you.  All right?  But you were -- you are an

25  instructor --

Shannon Maria Lynch, Ph.D. - Cross

1    A.    Yeah.

2    Q.    -- I guess at this practicum where Mr. Yu was there;

3    right?

4    A.    Uh-huh.

5    Q.    Okay.  Now, apparently, you asked Mr. Yu a few things, and

6    Mr. Yu said "No" to some questions that you asked him or

7    something that you said to him, and it was either misunderstood

8    or whatever.  Am I correct, or do I need to restate that?

9    A.    Oh, you need to restate that.

10   Q.    Okay.  Did Mr. Yu ever tell you -- when you suggested

11   something to him, did he ever tell you "No"?

12   A.    Yes.

13   Q.    Okay.  And have any other students ever told you "No"?

14   A.    Not like that.

15   Q.    Well, how do you say "No" not like that.  What is -- I

16   only know no as --

17   A.    So, it's really okay to disagree.  But when you disagree,

18   you can say, "Well, this is" -- you can say, "This is what I

19   think."  Or you at least acknowledge, "Okay.  I am hearing" --

20   you know, "You said what you said.  This is what I think."

21   It's quite unusual for a student to say "You're wrong."

22   Q.    In the psychology field?

23   A.    To a professor, when they are in training, when you are on

24   a practicum team, for a -- for a student to discount the

25   authority of a professor suggesting that they include an

Shannon Maria Lynch, Ph.D. - Cross

1   additional perspective.

2           So, the example that I was giving was the diagnosis.

3   I think it's fine to work from a diagnosis.  In fact, you

4   should include diagnostic criteria.  But when I said "I think

5   you have to also include these other components," and I -- I

6   have to be clear and say I can't remember the exact words.  But

7   Mr. Yu's response was effectively, "You're wrong," and very

8   focused on the diagnostic criteria.

9   Q.   And as a professional psychologist, that upset you?

10  A.   I was frustrated by the fact that he wasn't taking

11  additional perspectives.  That he wasn't being broad.  It

12  doesn't upset me when a student takes a different perspective.

13  I can give you the example.

14          I was psychodynamically trained, and I take

15  predominantly an interpersonal perspective.  But we have a

16  number of behavioral faculty in our department, and I

17  frequently work with students who have very strong behavioral

18  perspectives.  And I don't think that's a problem as long as

19  they can take an additional perspective.

20  Q.   But if they don't, that causes you to be upset?

21  A.   I think it causes me to be concerned about whether they

22  are able to do more than one perspective.  And in this case, it

23  was a crisis case where the individual's diagnosis was

24  important but not the only key factor.

25  Q.   And that's never happened to you before?

1  A.    I -- in 14 years supervising practicum, I haven't had

2  another student indicate to me that my feedback was -- I have

3  had students indicate to me that my -- that -- what's the --

4  that they disagreed, but not that they wouldn't consider it or,

5  like, not a dismissal of the feedback.  Does that make sense?

6  Q.    Ma'am, it's your answer.  I don't know --

7  A.    Okay.

8  Q.    -- if it makes sense or not.

9  A.    All right.  Okay.

10  Q.    I will let the Court decide that.

11        I believe that after Mr. Yu's class where he upset

12  you with the answer, you gave -- I think you suggested that he

13  would get a B, if he was being graded at that time; right?

14        MR. KELLY:  Your Honor, I'm going to object.

15  Misstates the testimony.

16        MR. COULTER:  Well, that's why I am asking her.  I

17  can clear it up.

18        THE COURT:  Just a moment, Mr. Coulter.

19        Well, you can follow-up, if you need to, Mr. Kelly.

20  I don't find it to be, on my recollection of the prior

21  testimony, inappropriate.  Overruled.

22  BY MR. COULTER:

23  Q.    Can you answer the question, ma'am?

24  A.    So, I said that Mr. Yu would get a B on the basis of his

25  performance over the course of the practicum, and I was

Vol. 4 - 627

Shannon Maria Lynch, Ph.D. - Cross

1    referencing the difficulties he had with perspective taking

2    with a client and in the ways in which he had performed with

3    the client in terms of not being flexible.  I wasn't

4    representing a disagreement with me.

5    Q.   All right.  But you wrote an evaluation after -- you wrote

6    an evaluation where that B was put on there, if -- am I

7    correct?

8    A.   Oh, are you talking about a B as an item or B as a grade?

9    Q.   No, a B as what you -- I don't know if I'm talking about

10   an item or a grade.  What I'm talking about is the B that was

11   placed on the -- on the document.  What is it?  513?  What was

12   that?  This is grade B right here.

13          Do you remember the -- do you remember the course

14   completion contract?

15   A.   Yes.

16   Q.   All right.  That's what I am talking about.

17   A.   Okay.

18   Q.   Okay.  Now, on the course completion contract, that was --

19   Mr. Yu had an evaluation; am I correct?

20   A.   Uh-huh.

21   Q.   And then Mr. Yu had a course completion contract which is

22   right here.

23   A.   Yes.

24   Q.   Okay.  And I think it says --

25          THE COURT:  Let's identify this for the record,

Vol. 4 - 628

Shannon Maria Lynch, Ph.D. - Cross

1   please, Mr. Coulter.

2           MR. COULTER:  It's Defendant's 513, Your Honor.

3           THE COURT:  Very well.

4   BY MR. COULTER:

5   Q.   And it says, "If Jun does not" -- I think it says, "If Jun

6   does not carry out additional work, his current efforts reflect

7   performance and skills equivalent to a B."  Is that correct?

8   A.   Yes.

9   Q.   Is a B a passing grade?

10  A.   Yes.

11  Q.   Okay.  Now, on Defense Exhibit 513, prior to getting this,

12  there was an evaluation, am I correct?  Prior to having this

13  contract, was there an evaluation done on Mr. Yu by you?

14  A.   My only hesitation is the date.  I think they were pretty

15  close together, so I'm not sure if it was prior.

16  Q.   Okay.

17  A.   But they were simultaneously, right?  Because I indicate,

18  in the evaluation, that I am giving him an I.  So, I might

19  have -- that's my only hesitation was the prior.

20  Q.   All right.  Now, in the grade that Mr. Yu earned after --

21  after the contract and completing the course, what was the

22  grade?

23  A.   I gave him an A minus.

24  Q.   And what does an A minus represent?

25  A.   It means that when -- in the following semester, when I

1   was working with him, I thought he made effort at it, in terms

2   of we had three more sessions with the client that he was doing

3   co-therapy with me and then an additional couple of sessions

4   where he was doing co-therapy with the other student.  And I

5   thought that he made progress on some skills, and I was trying

6   to be encouraging.

7           MR. COULTER:  Okay.  Is this Defense Exhibit 520?

8           MS. SUTHERLAND:  It is.

9   BY MR. COULTER:

10  Q.   Now, Doctor, do you recognize this document?

11  A.   Yes.

12  Q.   Okay.

13  A.   This is the evaluation I completed in December of fall

14  2011.

15  Q.   Okay.  And is this -- is this the evaluation that

16  Mr. Kelly went over with you?

17  A.   Yes.

18          THE COURT:  An exhibit number will help me when I am

19  working through all this.

20          MR. COULTER:  Exhibit -- Plaintiff's -- it's Defense

21  Exhibit 512, Your Honor.

22          THE COURT:  All right.

23  BY MR. COULTER:

24  Q.   Now, I am particularly interested in 18.  And I believe it

25  says "The ability to form a working alliance with patients."

1   Is that correct?

2   A.   Yes.

3   Q.   And you -- you said that it was below average; right?

4   A.   No, I actually circled NA.

5   Q.   NA.  Okay.  I'm sorry, but there's a -- there's a writing

6   in there.

7   A.   Yeah.  There's a mark, but I circled, and all of my other

8   indications are circles.  And so I circled NA, and I wrote to

9   the side that I wanted to see him in more sessions to be fair

10  in evaluating him on that.

11  Q.   Okay.  I'm going to bring up Plaintiff's Exhibit 119.

12  Now, have you ever seen this chart before?

13  A.   I can't remember if I had seen it.  You and I discussed it

14  in the deposition, and so I must have seen it actually, because

15  I recall having a conversation with you about the anchors and

16  the information about the anchors.

17  Q.   Okay.  Now, do you understand where this chart came from?

18  A.   Mr. Yu's dissertation.

19  Q.   All right.  Now, and do you know where that -- do you know

20  where he got the information for his dissertation?  Do you know

21  where he collected the data?

22  A.   Yes.

23  Q.   All right.  And where did he do that?

24  A.   In China.

25  Q.   Okay.  Now, what does the number 19 throughout stand for?

1   A.   The number of subjects.

2   Q.   All right.  And how would you say that Mr. Yu was able to

3   get along with patients or clients in China, based on 19

4   people, and 19 people coming back, and these evaluations?

5   A.   I -- I said this in the deposition, and I am going to say

6   again that the anchors aren't here, so -- the definitions.  But

7   I am going to go with the idea that I think my memory is that

8   six was very satisfying and zero was not at all satisfied.  Is

9   that correct?  Can I ask that question?

10  Q.   You can ask the question.  I can tell you that that range

11  between four and six, I think the high end is six and the low

12  end is -- I don't know what it is, but -- but it's four and six

13  is what his range was in regards to being either satisfactory

14  or unsatisfactory.  Six as being very good, best, down to five.

15  A.   It would -- it's really helpful, if you ask me to comment

16  on the satisfaction of something, to see the definitions for

17  them.  But I will say that if six is the highest, four to six

18  looks like a good satisfaction range.

19  Q.   Okay.  What about -- so, if you look at it from this

20  perspective, satisfaction with therapist's teaching skills,

21  what would that tell you?

22  A.   That those clients for that five-session specific protocol

23  were satisfied with his teaching skills.

24  Q.   And what about the second one, satisfaction with

25  therapist's preparation?

1    A.   That they were satisfied with his preparation.

2    Q.   And the third one, satisfaction with the therapist's

3    interest and concern for caregiver and child's problems?

4    A.   That they were satisfied.

5    Q.   And what about the helpfulness of the therapist?  What

6    does that tell you?

7    A.   Again, that they were satisfied.

8    Q.   And what does it tell about the personal feelings that

9    these clients had towards the therapist?

10   A.   Again, that they were satisfied.

11   Q.   And they were all in China?

12   A.   Yes.

13   Q.   Is that correct?  Now, do you have any -- other than --

14   other than your gut feeling, okay, do you have any empirical

15   information to show that Mr. Yu would do harm to any clients in

16   China?

17   A.   I don't have empirical information to --

18   Q.   Thank you.

19   A.   Okay.

20   Q.   Now, Dr. Chase -- or, I mean, excuse me.  Dr. Lynch, you

21   probably know that I am the person who wrote all the -- wrote

22   all the appeals and that type of thing for Mr. Yu?

23   A.   For school?

24   Q.   No, for -- for when he was being considered for dismissal

25   from the program?

Shannon Maria Lynch, Ph.D. - Cross

1    A.   I don't -- I don't know that I know that.

2    Q.   Okay.  If you don't, I was.  Okay?  And one of the things

3    that struck me about this -- this case was that the only thing

4    that --

5            THE COURT:  Mr. Coulter, this is not a place for you

6    to testify.

7            MR. COULTER:  I understand, Your Honor.

8            THE COURT:  Then what are you doing?

9            MR. COULTER:  Well, what I am going to ask her to

10   compare Dr. Chase and Dr. Speer.  Those things are right in --

11   those things are right in front of us.

12            There was a -- there was a comment that one of the

13   things that struck them was that Dr. Chase would not let Mr. Yu

14   do independent testing.  And I wanted to go into that.

15            THE COURT:  Well, you can go into those things as

16   they are fact specific to particular details of how these

17   matters were handled for Mr. Yu subject to any objection from

18   defense counsel.  But what is not proper for you to do is to

19   try to lay some preface about your -- your involvement or lack

20   thereof with it.  All right?

21            MR. COULTER:  Yes, Your Honor.

22            THE COURT:  Okay.

23   BY MR. COULTER:

24   Q.   All right.  So, let's take -- let's take the decision, one

25   of the decisions that was made was that -- that, I guess,

Shannon Maria Lynch, Ph.D. - Cross

1    the -- I guess the university looked at was Mr. Yu's

2    performance during this internship prior to his being

3    dismissed; is that correct?

4    A.    Did we consider his performance at internship prior to

5    dismissing him?

6    Q.    Yes.

7    A.    Yes.

8    Q.    Okay.  Now, the two things that you had, or at least from

9    the supervisors, I think -- let me preface it this way.

10            How many supervisors were in Mr. -- or how many

11   people were involved in the internship that Mr. Yu had with the

12   Cleveland Clinic to your knowledge?

13   A.    To my knowledge, originally three.

14   Q.    Now, do you know who -- who those three people with?

15   A.    Dr. Speer, Dr. Frazier, and Dr. Chase.

16   Q.    Now, did Dr. Frazier give you any input in -- did

17   Dr. Frazier give you -- when I say you, the university -- any

18   input in regards to how Mr. Yu had been performing in this

19   internship?

20   A.    Yes.  Very early on, he indicated that he did not believe

21   Mr. Yu was prepared for internship, so he stopped supervising

22   him.

23   Q.    Do you know the date of the very early on?

24   A.    No.

25   Q.    Was it in December of 2012?

Vol. 4 - 635

Shannon Maria Lynch, Ph.D. - Cross

1   A.   I don't think it was December.

2   Q.   Okay.  Well, just give me kind of a --

3   A.   My understanding is he started in January, so I would

4   guess it was after that.

5   Q.   Okay.  Was that through a telephone call or something?

6   A.   No, I was informed, I think, as a member of CTC, that he

7   stopped.  So, I was told by Dr. Roberts that it had been

8   communicated that Dr. Frazier did not feel that Jun was ready.

9   Mr. Yu was ready.

10  Q.   Okay.  So, you had a -- there was a phone call between

11  Dr. Roberts -- Dr. Roberts and Dr. Frazier?

12  A.   I don't know if it was between Dr. Roberts and

13  Dr. Frazier.  I only know that we received that information.

14  Q.   Did the CTC look into that?

15  A.   I -- not to my knowledge.

16  Q.   Okay.  Now, did the CTC consider the input of Dr. Speer?

17  A.   Yes.

18  Q.   Okay.  And did the CTC consider the input of Dr. Chase?

19  A.   Yes, we considered the input.  We did not feel that it was

20  as strong, because she indicated very limited client contact.

21  Q.   Now, well, would it surprise you that in her testimony

22  that she did not indicate that?

23  A.   Yes.

24  Q.   Okay.  And as a matter of fact, that her testimony was

25  that when she was going through her internship, because of the

1    testing, she wasn't allowed to do it either.  Because of the --

2    I guess the difficulty and the preciseness of these particular

3    tests.  Did you know that?

4    A.    Nope.

5    Q.    Okay.  Did you also -- do you also know that she testified

6    that Mr. Yu was involved in the clinical hours?

7    A.    I was told that she testified that he did clinical

8    structured interviews and then sat in on the feedback.

9    Q.    All right.  And did you also -- did they tell you also --

10   I guess they talked to you about the case and the testimony.

11   But did they also tell you that she actually testified that

12   Mr. Yu took input, got the people ready for the testing, worked

13   with -- worked with Dr. Chase?  Did they tell you that?

14   A.    No, I don't think I got that level of detail.

15   Q.    Did they also tell you that Dr. Chase -- Dr. Chase felt

16   that, okay, I'm in this beginning process with him.  I'm going

17   to give him even more responsibility in the coming -- in the

18   coming times during this particular internship.  Did they tell

19   you that?

20   A.    No.

21   Q.    Okay.  And was it that one of the chief concerns of the

22   CTC was that Mr. Yu did not have the clinical experience that

23   he should have when he had -- when he was involved in his

24   internship?

25   A.    Yes.  And a lot of that did rely on the information from

1  Dr. Speer, that he was not making progress, that he wasn't able
2  to learn to give the primary assessment, the ADOS that they use
3  at that site.  That he wasn't responding or able to make
4  progress in the supervision.  And that was very key information
5  for us.
6  Q.   Okay.  So, the lack of that information, that key
7  information, is pretty substantial; would you not say that?
8  A.   Well, Dr. Chase sent us an evaluation, and she stated in
9  that evaluation that she didn't feel that she could allow him
10 to test yet.  So, she shared that, and that was taken into
11 account.  And she did share that she thought that their
12 conversations about the reports were productive.
13       So, what we could see that he was getting what we
14 call the didactic training, the exposure, but we did take quite
15 seriously that he was three months in and was not yet doing the
16 testing.
17 Q.   But you didn't know why?
18 A.   She stated that she didn't think he was prepared at that
19 time.
20 Q.   And, but you are not aware of her testimony; right?
21 A.   Well, that -- no.
22 Q.   Okay.  So, I would tell you that her testimony in court
23 was certainly different than what you describe.
24       MR. KELLY:  Objection, Your Honor.  Counsel is
25 testifying.

 1          THE COURT:  Mr. Coulter.

 2          MR. COULTER:  I am only reciting, as defense counsel

 3   has done, what was said in court and relaying it to the

 4   witness.

 5          MR. KELLY:  Without a question.

 6          THE COURT:  All right.  The difficulty in all of

 7   that, Mr. Coulter, is that you need to make certain that you

 8   preface it as your own recollection of the testimony; because,

 9   otherwise, you are testifying as to what may or may not have

10   been said.

11          MR. COULTER:  Okay, Your Honor.

12          THE COURT:  Am I making sense --

13          MR. COULTER:  Yes, Your Honor.

14          THE COURT:  -- in the distinction?

15          MR. COULTER:  Yes, Your Honor.

16          THE COURT:  All right.  Go ahead.

17   BY MR. COULTER:

18   Q.    Based on my recollection of the testimony that was

19   provided by Dr. Chase, she indicated that Mr. Yu was doing

20   fine, and that she had -- she had basically decided that she

21   was going to give him even more responsibility when the

22   internship continued.  Would that surprise you?

23   A.    Yes.

24   Q.    Okay.  Now, one of the things that -- by the way, do you

25   know who Dr. Koocher is?  Dr. Gerald P. Koocher?

Shannon Maria Lynch, Ph.D. - Cross

1   A.   Yes.

2   Q.   How do you know who he is?

3   A.   Most recently from his role in the APA torture scandal,

4   but before that he was very strongly considered one of the

5   better ethicists in the country for psychology.

6   Q.   Okay.  And you characterized something as a torture

7   scandal.  Is that sort of like an official --

8   A.   It's the Hoffman Report that was generated, and there were

9   concerns about a number of peoples' roles.  So, that's my most

10  recent exposure to his name.  I was being quite honest in my

11  response to you.  Prior to that, my knowledge of him was a very

12  strong professor of ethics.

13  Q.   And to your knowledge, did you use Dr. Koocher's text in

14  Idaho State University on ethics?

15  A.   I don't teach that class, so I don't know the text that's

16  used.

17  Q.   That's fair enough.  So, but you are required to know

18  something about ethics in the clinical psychology?

19  A.   Oh, yes.  Absolutely.

20  Q.   And you know that he has published books in that area?

21  A.   Absolutely.

22  Q.   Now, one of the things I got to know is did anyone -- did

23  anyone, let's say, during the first, or second, or fourth

24  semester -- at some time, did anyone specifically say to

25  Mr. Yu -- and maybe I have asked this question before, but I

Vol. 4 - 640

Shannon Maria Lynch, Ph.D. - Cross

1    just want to make sure I do it again or whatever.

2              Did anyone tell him, at any particular semester, that

3    he would be in danger of dismissal if something happened?

4    A.   If something -- I am not --

5              MR. KELLY:  Objection, Your Honor.  That question is

6    vague.

7              MR. COULTER:  Okay.  I will restate it.

8    Q.   Okay.  So --

9              THE COURT:  Hold on.  So, the objection is vagueness.

10   You are going to restate.

11             MR. COULTER:  I will restate, Your Honor.

12             THE COURT:  All right.

13             MR. COULTER:  I will admit it's kind of vague.

14             THE WITNESS:  Yeah.

15   BY MR. COULTER:

16   Q.   So, let's go through semester.  First of all, I got to ask

17   you a question, because it wouldn't be fair.  Are you familiar

18   with Mr. Yu's academic record?

19   A.   Yes.

20   Q.   How familiar are you?

21   A.   From reviewing the CTC evaluations.

22   Q.   Okay.  Now, in reviewing his record, is there anywhere

23   where someone -- anywhere where any faculty, or practicum, or

24   whatever supervisor Mr. Yu had, ever told him that if he didn't

25   do something, i.e., a class or whatever, that he be would be

Vol. 4 - 641

Shannon Maria Lynch, Ph.D. - Cross

1  dismissed from the clinical psychology Program at Idaho State

2  University?

3  A.   There is not a specific statement to dismissal.

4  Q.   And again, just to be clear, on the options that were

5  provided to Mr. Yu --

6  A.   Uh-huh.

7  Q.   -- apply for non-APPIC, apply for APPIC again, construct a

8  non-APPIC, or go to do an internship in China, okay, no one

9  told him if he did -- if he was incomplete, that he would be

10  dismissed from the program?

11  A.   No, I don't -- we didn't expect him to be.

12  Q.   So, the answer is no?

13  A.   No.  Yeah.

14  Q.   Now, I thought I found it interesting, and I -- in regards

15  to this post hoc question that was asked by Mr. Kelly.  I think

16  people will agree or disagree.  All right?

17         But you don't know all the facts that went into any

18  type of post hoc assessment by, I guess, Professor Zorwick; do

19  you?  Well, let me ask it this way, because you actually seem

20  puzzled.

21         Are you familiar with any of the work that

22  Dr. Zorwick has done in this case?

23  A.   I guess I thought she was arguing that we made a post hoc

24  analysis.  So, when you said we made a post hoc analysis, I was

25  confused.  I am really trying to answer your question.

1    Q.   I get it.  So, now you know I am talking about

2    Dr. Zorwick, and I am talking about that post hoc evaluation

3    that she had.

4    A.   I am so sorry.  She made an evaluation of our

5    decision-making process.

6    Q.   Right.

7    A.   Yes.  I know that she made an evaluation of our

8    decision-making process.

9    Q.   Okay.  And it's your testimony that she just didn't get it

10   right?

11   A.   I think she did not know some things, and I think she also

12   picked things out that support a post hoc analysis.  So, she

13   made that argument.  But I feel strongly that the other way to

14   see that, an alternative perspective, is that we took a very

15   developmental approach.  And that we took information in as we

16   went.  That when -- when we had the first dismissal, we made

17   the plan.  And then we worked with him, finishing out my

18   practicum, and then the additional practicum, and that we were

19   still trying to get him to internship until he was dismissed

20   from a second external site.  That is not post hoc.  That's a

21   developmental perspective.

22   Q.   And so if three experts disagree with how Idaho State

23   University treated Mr. Yu, they would just have it all wrong?

24   A.   They have very different perspectives.

25             MR. COULTER:  Thank you very much.  I have no further

Shannon Maria Lynch, Ph.D. - Cross

1    questions.

2            THE COURT:  Mr. Kelly.

3            MR. KELLY:  Your Honor, I have no redirect of this

4    witness.  And at this point in time, defense rests.

5            THE COURT:  All right.  You may step down.

6            THE WITNESS:  Thank you.

7            THE COURT:  Thank you.

8            Mr. Coulter, will plaintiff present a rebuttal case?

9            MR. COULTER:  No, Your Honor.

10           THE COURT:  All right.  Then the case is fully

11   submitted.

12           Counsel informed the Court, at the beginning of the

13   trial day, that they would request permission to make written

14   closing arguments.  I will permit that.  I will allow you to

15   propose your own set of findings of fact and conclusions of

16   law.  Of course, I have an independent responsibility to

17   prepare those on my own, so I won't require that of you, but if

18   you would like to do so for me to consider in the course of

19   preparing a decision, then you can do so.

20           One of the difficulties in any time there's a Court

21   trial is that the longer the case goes without the Court being

22   able to get to it and write the decision is that it congeals,

23   and it becomes -- it's a larger task, because you have to get

24   back to it when it's not as fresh in your mind as it once was.

25           So, my preference would be not to -- not to give you

1  an inordinate amount of time to complete these pieces of

2  remaining work, but I also want to give you sufficient time to

3  be able to do it in light of what your other responsibilities

4  are.

5         In that regard, Mr. Coulter what -- how much time

6  would you request -- well, here is the other thing.  I will

7  allow up to 20 pages for the written closing arguments, and I

8  will allow up to 20 pages for the combined propose findings and

9  conclusions.

10        So, with that in mind, Mr. Coulter, how much time

11  would you request to complete that task?

12        MR. COULTER:  Your Honor, first, I just want to make

13  sure I understand what you are doing here.  We have findings of

14  fact, 20 pages, and conclusions of law 20 pages?

15        THE COURT:  No.

16        MR. COULTER:  Okay.  Or 20 pages altogether?

17        THE COURT:  Yes.

18        MR. COULTER:  Thank you.  I think sufficient time --

19  excuse me, Your Honor, for sitting down.  I think sufficient

20  time would be -- since my client's in China, I think sufficient

21  would probably be 21 days.  21 days from today's date.

22        THE COURT:  Okay.  Mr. Kelly, how about you?  That

23  would make it the 22nd of March.  Is that --

24        MR. COULTER:  Yeah, whatever 21 days is.  Yeah, 22nd.

25        THE COURT:  Is that a -- a weekend?

1              MR. COULTER:  It's a Friday, Your Honor.

2              THE COURT:  Friday?  All right.

3              MR. KELLY:  That will work for me, Your Honor.  I

4    think that's sufficient time.

5              THE COURT:  All right.  Let me propose to you then,

6    because if they come in on Friday -- well, the Court -- the

7    Court's had lots of those "Thank God it's Friday.  Only two

8    more working days until Monday."

9              Weekends, I guess what I'm saying is that if it's a

10   Friday deadline, chances are I won't get to it until -- start

11   looking at it until the following week.  So, I would be glad to

12   give you until that Monday in case you would like the weekend

13   to be able to --

14             MR. KELLY:  Yeah, if we could have -- that would be

15   perfect, Judge, if we could have until Monday, March 25th.

16             THE COURT:  Is it 25th?

17             COURTROOM DEPUTY:  Yes.

18             THE COURT:  All right.  March 25th then, those will

19   need to be filed by that deadline, and then we will start doing

20   the work that we have on it.

21             All right.  Miss Case, anything else that I am

22   forgetting then in those details?

23             COURTROOM DEPUTY:  No.

24             THE COURT:  Mr. Shumard?

25             THE LAW CLERK:  Just to clarify, is that deadline

1    going to be for the closing arguments as well?

2              THE COURT:  Okay.  Yes.  Closing argument as a

3    separate filing, and then the proposed findings of fact and

4    conclusions of law as a separate filing.

5              All right.  Mr. Coulter, anything else that you want

6    to take up at this time then?

7              MR. COULTER:  No, Your Honor.

8              THE COURT:  And Mr. Kelly?

9              MR. KELLY:  Nothing, Your Honor.

10             THE COURT:  All right.  The Court will be in recess.

11        (Recess 12:07 p.m.)

1              INDEX OF EXAMINATIONS

2    For the Defendant:

3    Witness Name            Direct   Cross   RD    RX    Further D

4       Mark W. Roberts, Ph.D.          538
        John Landers, Ph.D.      547    562
5       Cheri Atkins, Ph.D.      565    577   580   582
        Shannon Maria Lynch, Ph.D.584   616

6

7

8

9                       --oOo--

10               COURT REPORTER'S CERTIFICATE

11

12      I, KATHERINE EISMANN, Official Court Reporter, certify

13   that the foregoing is a correct transcript from the record of

14   proceedings in the above-entitled matter.

15

16   Date:  March 11, 2019.

17                      /s/ *Katherine Eismann*

18                    Katherine Eismann, CRR, RDR

19

20

21

22

23

24

25