Ronaldo A. Coulter (ISB No. 3850)
Holly Sutherland (ISB No. 9521)
IDAHO EMPLOYMENT LAW SOLUTIONS
776 E. Riverside Drive, Suite 206
P.O. Box 1833
Eagle, Idaho 83616
Telephone: (208) 672 6112
Facsimile: (208) 672 6114
ron@idahoels.com
holly@bankruptcylawid.com

*Attorneys for Plaintiff*

# THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JUN YU, | ) |
|                **Plaintiff,** | ) **Case No: 4:15-cv-00430-REB** |
| v. | ) |
| IDAHO STATE UNIVERSITY, | ) **PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
|                **Defendant.** | ) |

Comes now Plaintiff, Jun Yu (hereinafter referred to as "Plaintiff or Mr. Yu") and submits his Proposed Findings of Fact and Conclusions of Law.

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

1. The filing of the complaint has been found to be timely as a matter of law; *see* Docket 63.

2. That Mr. Yu is a citizen of China who grew up in a Chinese cultural and language context.

3. In 2008, Mr. Yu was accepted into ISU's Graduate program seeking to obtain a Doctorate (Ph.D.) in Clinical Psychology. Mr. Yu is/was an international student and is Chinese; his identity includes Chinese language/culture, and speaking English as a foreign language.

4. Mr. Yu attended ISU from August of 2008 through May of 2013. His final GPA was 3.69.

5. Mr. Yu successfully defended his dissertation titled "A Clinical Trial of Behavioral Family Therapy in China."

6. Mr. Yu's career goal was to return to China to work at a university or research center.

7. The ISU Clinical Psychology Ph.D. program Mr. Yu attended was accredited by the American Psychological Association (APA).

8. Per IDAPA Rule 24.12.01.004, the Idaho State Board of Psychologists Examiners has incorporated into its administrative rules the APA Ethical Principles of Psychologists and Code of Conduct.

9. Per Idaho Code § 54-2309(5), any psychologist who has been unethical as detailed by the current, and future amended, ethical standards of the American Psychological Association is subject to discipline up to and including the revocation of the psychologist's license.

10. ISU's Clinical Psychology Ph.D. program is obliged to follow APA standards including the APA Ethical Principles of Psychologists and Code of Conduct (Ethics Code) and relevant APA policies.

11. That ISU policy, APA accreditation standards, and the APA Ethics Code embrace "cultural and individual diversity" and prohibit discrimination and harassment based on the diversity dimensions.

12. When Mr. Yu entered the program, he was the only non-white student for whom English was not their first language.

13. All of Mr. Yu's clinical supervisors in his externships and internship that Mr. Yu worked with during his time as an ISU student were white European Americans who did not speak Chinese.

14. Mr. Yu's score of 94 on the English proficiency test TOEFL far exceeded ISU's admission requirement of a score of 80 for international students.

15. Mr. Yu, a person who spoke English as a foreign language, was keenly aware that he needed to immerse himself in English so that he would be successful in the doctorate program.

16. Mr. Yu did immerse himself in learning English.

17. Mr. Yu, because of his efforts to become fluent in English, was able to provide professional services in a manner consistent with an international student seeking a Ph.D.

18. Mr. Yu completed all of his course work in English; taught courses at ISU in English and received satisfactory evaluations from his students; and successfully presented and defended his dissertation in English.

19. Prior to embarking on an internship, Mr. Yu had successfully completed all other degree requirements and successfully defended his dissertation.

20. Prior to embarking on his internship, Mr. Yu was still in good standing and not on any form of academic probation; Mr. Yu was never apprised that should he fail to complete

the internship that he would be dismissed from ISU's doctoral program in clinical psychology; and Mr. Yu had satisfactory grades in all of his required courses.

21. During Mr. Yu's first three years in the program, the Clinical Training Committee (CTC) evaluations written and signed by Dr. Roberts stated that "[t]he committee finds Jun's academic and professional progress to be satisfactory."

22. Mr. Yu received As and Bs in all of his classes, including his practica, and published a paper in an international peer-reviewed journal.

23. Consistent with APA Ethics Code requirements, ISU Psychology Department's Clinical Student Handbooks for 2011-2012 and 2012-2013 states:

> "If a student is at risk of earning a U-grade, the Clinical Training Committee (CTC) will be informed by the advisor prior to the end of the semester, and a formal letter will be issued that describes the nature of the unsatisfactory progress, the steps needed to remedy the deficiency, and a deadline for re-evaluation. Failure to meet the specified remediation plan will result in a U-grade and subsequent academic probation. Probation will be lifted upon semester-long performance yielding an S-grade."

24. Mr. Yu was dismissed from an externship and internship -- both classes where students could earn a U[Unsatisfactory]-grade or an S-grade -- without remediation[1].

25. During Mr. Yu's fourth year in the program, Dr. John Landers was Mr. Yu's supervisor for Fall 2011 PSYC 7748 Clinical Externship class at Eastern Idaho Regional Medical Center (EIRMC).

26. That Dr. Landers and Mr. Yu were in a cross-cultural supervision relationship.

---

[1] ISU presented a plan of remediation to Student 37 (Plaintiff Exhibit 106) that included the six elements described by ISU's Clinical Student Handbook 2015: (1) problem identification, (2) a course of action to remediate the problem, (3) measurable objectives, (4) method and specific time to determine if objectives have been met, and (5) consequences if objectives were not met, and (6) process of appeal. While at trial the Defendant and its witnesses often spoke of a remediation plan, it provided no document as evidence to show that they provided Mr. Yu with any remediation plan that was in conformance with the remediation plan given by ISU to Student 37.

27. On November 4, 2011, after just over two months into the Externship, Dr. Landers abruptly dismissed Mr. Yu from PSYC 7748 Clinical Externship, alleging Mr. Yu was "unable to grasp the communication nuances." *See* Defense Exhibit 501.

28. That Mr. Yu was assigned a U-grade after abrupt dismissal from the Externship.

29. That Student 16 was dismissed from an externship but was not assigned a U-grade. See Plaintiff Exhibits 4, 101, 102 and 103.

30. Dr. Landers did not provide Mr. Yu any prior specific feedback regarding his alleged areas of concern and omitted remediation, denying Mr. Yu due process under his supervision.

31. In his one page letter sent to Dr. Roberts dismissing Mr. Yu from the PSYC 7748 externship, Dr. Landers shared that "concerns do not revolve around effort" but that:

> "I have consistently observed that Jun Yu is unable to grasp the communication nuances that are required to build rapport with difficult patients, administer standardized tests with difficult patients… Given his desire to return to China and specialize in parent/child training, he is probably right where he needs to be in this regard."

32. Dr. Roberts pointed out comments from past practica regarding Mr. Yu's command of English.

33. Despite Mr. Yu's academic success in his four plus years in the doctoral program, Mr. Yu continued to receive negative comments regarding his supposed language skills inadequacy.

34. That Dr. Cheri Atkins served as an Adjunct Faculty member in the Department of Psychology at ISU.

35. That Dr. Atkins allowed Mr. Yu to enroll in her Fall 2011 PSYC 7724 Community Practicum class at ISU held at her own private practice site, but only allowed Mr. Yu to observe during his practicum at her private practice.

36. That notwithstanding Dr. Atkins's concerns about Mr. Yu's English language proficiency, Mr. Yu obtained a "B" in his Spring 2010 PSYC 7725 Psychology Clinic practicum and an "A" in his Summer 2010 PSYC 7725 Psychology Clinic practicum; in these two PSYC 7725 practicum classes, Dr. Atkins allowed Mr. Yu to provide direct clinical services to clients.

37. That Dr. Shannon Lynch was the Chair of the ISU Department of Psychology from 2010 to 2017.

38. That Dr. Lynch wrote in her 12/15/2011 practicum evaluation of Mr. Yu "I am assigning an "I" [Incomplete] at this time" and "his current efforts reflect performance + skills equivalent to a "B"."

39. After Mr. Yu finished the Incomplete in Spring 2012, Dr. Lynch gave him an "A-" grade for her practicum but did not do a final evaluation of Mr. Yu's work.

40. That Dr. Shannon Lynch signed the May 17, 2013 document that denied Mr. Yu's appeal of the recommendation that Mr. Yu be dismissed from the program.

41. That Dr. Lynch complained to Mr. Yu's wife that Mr. Yu's English was "terrible."

42. At the time Mr. Yu was dismissed from the Graduate program, Mr. Yu was a student in good standing with only one internship to complete prior to receiving his Doctorate in Clinical Psychology.

43. Completing an internship involved two steps. The first step was simply obtaining an internship, which is a stressful and challenging process. The second step was for Mr. Yu to successfully complete the internship.

44. On July 13, 2012, Dr. Mark Roberts acknowledged that Mr. Yu had completed all the academic requirements necessary to receive his doctorate in Clinical Psychology save one clinical internship.

45. Dr. Mark Roberts provided Mr. Yu with three (3) options to complete his internship.

46. The three (3) options offered by Dr. Mark Roberts to Mr. Jun Yu to complete his internship were (1) re-apply to the national internship, (2) propose a local internship, subject to Clinical Training Committee approval, and (3) propose a modified/accommodated internship in China.

47. On November 12, 2012, Dr. Mark Roberts in correspondence to Mr. Yu reminded Mr. Yu that he had three (3) avenues available to him to obtain an internship: (1) Non-APPIC Internship such as the one he was pursuing with the Cleveland Clinic, (2) Re-apply to an APPIC member site, and (3) Propose an accommodated internship in China.

48. At no time from when the options were offered to Mr. Yu was there any representation made by the Defendant that the options to re-apply to APPIC member sites or propose an accommodated internship in China were no longer available to Mr. Yu.

49. That at the time, and for both personal and professional reasons, Mr. Yu chose not to construct an internship in China, where he did the work that was the basis for his dissertation.

50. Dr. Roberts gave Mr. Yu the Association of Psychology Postdoctoral and Internship Centers (APPIC) standards, which he directed Mr. Yu to follow in constructing his internship.

51. Mr. Yu initially found Dr. Cheryl Chase, a psychologist in private practice, who was interested in working with him on the internship.

52. APPIC standards required at least two supervisors for an internship, compelling Mr. Yu to look for other supervisors.

53. In searching for the additionally needed supervisor, Mr. Yu found Dr. Leslie Speer and Dr. Thomas Frazier at Cleveland Clinic Center for Autism (CCCA), who agreed to work with him.

54. Mr. Yu constructed an internship with Dr. Chase and the Cleveland Clinic Center for Autism (CCCA) in Cleveland, Ohio, as it seemed to be the best option to complete the internship within the time and the manner that suited Mr. Yu's goals.

55. Mr. Yu worked with Dr. Roberts and the Clinical Training Committee (CTC) to develop an internship proposal.

56. On or about October 31, 2012, a Clinical Education Agreement entered into by the Cleveland Clinic and ISU governing Mr. Yu's internship with CCCA was established.

57. On January 2, 2013, Plaintiff started his internship with CCCA.

58. The internship was designed to last for at least one year.

59. That Dr. Leslie Speer of the CCCA was one of three of Mr. Yu's supervisors during Mr. Yu's internship.

60. That Dr. Cheryl Chase, a Psychologist with a private practice in Independence, Ohio, was also a supervisor in Mr. Yu's internship.

61. That Dr. Mark Roberts served as the Director of Clinical Training at ISU Department of Psychology while Mr. Yu was a student at ISU.

62. That Dr. Thomas Frazier of the CCCA was one of three of Mr. Yu's supervisors during Mr. Yu's internship.

63. Dr. Thomas Frazier, however, ceased his role as a supervisor of Mr. Yu in the first week of Mr. Yu's internship. This was against the internship proposal.

64. That on January 11, 2013, in a phone conversation Dr. Leslie Speer expressed concerns to Dr. Roberts alleging Mr. Yu manifested a "...slow learning curve."

65. That Dr. Leslie Speer also reported that Dr. Thomas Frazier, who was named in the approved internship as a second supervisor at the CCCA, indicated Jun "...was not ready for patient care."

66. Dr. Mark Roberts recommended that Dr. Leslie Speer use the agreed upon "Psychology Trainee Competency Assessment Form" as soon as possible (i.e. January).

67. Dr. Mark Roberts recommended that Dr. Leslie Speer use the agreed upon "Psychology Trainee Competency Assessment Form" to "establish a baseline and to gauge progress at the agreed upon evaluation points for the internship."

68. That the agreed upon evaluation points were April, July and December.

69. That Dr. Mark Roberts never addressed any of the concerns raised by Dr. Leslie Speer with Mr. Yu.

70. The first time Mr. Yu learned of the concerns Dr. Speer expressed to Dr. Roberts in the January 11, 2013 phone conversation was when he received his May 3, 2013 letter.

71. That ISU had failed to timely monitor any of Mr. Yu's off-site placements.

72. That Student 20's off-site placement was timely monitored by ISU. See Plaintiff Exhibit 5.

73. That it was clear based on the comments of Dr. Leslie Speer, that establishing rapport with clients as well as other areas that require communicating in English was a concern of Dr. Leslie Speer in her assessment of Mr. Yu.

74. That there exists no evidence that any action was taken by Dr. Leslie Speer to recognize the language or cultural challenges encountered by Mr. Yu and devise a strategy to effectively address the issue during his brief internship with CCCA.

75. On April 3, 2013, Dr. Leslie Speer abruptly dismissed Plaintiff from CCCA alleging "Jun has not made progress" and the "level of remedial work required is beyond the scope of this placement."

76. Prior to his dismissal, Dr. Speer omitted remediation with Plaintiff, and had never warned Mr. Yu that he was or would be at risk for dismissal.

77. In an e-mail dated March 21, 2013 that Dr. Speer sent to Dr. Roberts at ISU, Dr. Speer wrote: "I will be terminating his [Mr. Yu's] placement here". Dr. Speer determined that she "will be terminating" Mr. Yu's placement 11 days before the date on her final evaluation of Mr. Yu, which was April 1, 2013; Dr. Roberts failed to take appropriate action per APA Ethics to avoid harming Mr. Yu.

78. On April 29, 2013, Dr. Cheryl Chase evaluated Mr. Yu's performance and found it to be satisfactory.

79. That Dr. Cheryl Chase provided a positive evaluation of Mr. Yu's internship performance that was discounted by ISU during the appeals process.

80. That on May 3, 2013, Dr. Roberts informed Mr. Yu in writing that the Clinical Training Committee recommended he be dismissed from the doctoral program in Clinical Psychology based on Mr. Yu's alleged unsatisfactory progress towards degree completion.

81. That, after exhausting all administrative appeals, on October 2, 2013, in a letter from the graduate school, Mr. Yu was informed that his dismissal from ISU was effective immediately.

82. The May 3, 2013 letter recommending dismissal omitted any reference to Dr. Cheryl Chase's positive evaluation of Plaintiff's performance.

83. The May 3, 2013 letter relied on the evaluations of Dr. Landers, Dr. Lynch, Dr. Roberts, and Dr. Speer to justify recommending Mr. Yu's dismissal.

84. That prior to the May 3, 2013 letter recommending dismissal, Mr. Yu had never been placed on probation and had never been informed that he was at risk of being dismissed from the doctoral program.

85. That, in a letter to Student 37 signed by Dr. Roberts, it stated, "It is our program's responsibility to fully inform you of expectations and the consequences for failure to address concerns". See Plaintiff Exhibit 105.

86. That, in not warning Mr. Yu he was at risk for dismissal prior to being dismissed from the program, ISU failed to meet its stated responsibility to fully inform students of expectations and the consequences for failure to address concerns.

87. That Student 16 and Student 20 had never been on probation yet were warned they were or would be at risk for dismissal from the program. See Plaintiff Exhibits 5 and 102.

88. That Students 55, 37, 20, 16, and 3 were all warned that they were or would be at risk of dismissal and were not dismissed from the program. See Plaintiff Exhibits 2, 4, 5, 8, 9, 10, 11, 12, 102, 105, 106 and 107.

89. That Students 55, 37 and 3 were all placed on probation, but were never dismissed from the ISU program. See Plaintiff Exhibits 8, 9, 10, 11, 12, 14, 19, 105, 106, and 107.

90. That ISU presented a Plan of Remediation to Student 37 that included the six elements described by ISU's Clinical Student Handbook 2015. See Plaintiff Exhibit 106.

91. That Mr. Yu was dismissed from the ISU program without receiving remediation in conformance with the Plan of Remediation given to Student 37. See Plaintiff Exhibit 106.

92. That Dr. Lynch admitted, "It is true that you [Mr. Yu] were in good standing. You were not on academic probation at the point of dismissal from the Cleveland Clinic."

93. The May 3, 2013 letter recommending dismissal contained alleged deficiencies of which Mr. Yu had received no prior or adequate notice.

94. The May 3, 2013 letter also contained multiple omissions, misrepresentations, and unsubstantiated claims.

95. In continuing with his internship at Cleveland Clinic, Mr. Yu relied on the representation by the Defendant that he had the options to re-apply to APPIC member sites or propose an internship in China.

96. After his dismissal from the Cleveland Clinic, Mr. Yu, in reliance on the options provided to him in completing the only internship needed to obtain his doctorate in Clinical Psychology, informed Dr. Mark Roberts of Plaintiff's desire to construct an internship at the Shanghai Mental Health Center.

97. Mr. Yu was denied the opportunity to construct an internship at the Shanghai Mental Health Center.

98. That ISU denied Mr. Yu the opportunity to complete his degree requirements in China where his cultural competence and communication skills are beyond question and appreciated.

99. In denying Mr. Yu's request to construct an internship in China, Dr. Lynch stated that the two options available to Mr. Yu were never "explicitly or implicitly intended as a set of options to be taken in sequence, given a problem in one venue or the other."

100. Dr. Lynch wrote, "The Graduate Faculty is convinced that a fourth "chance" (i.e., an Internship in China) is unwarranted and might put Chinese patients at risk of harm."

101. Dr. Lynch's opinion is contradicted by the fact that Mr. Yu's dissertation, a clinical trial of Behavioral Family Therapy in China, is evidence that he was a benefit to Chinese patients.

102. That in the May 3, 2013 letter, it was stated, "We recommend that Idaho State University award you the Master of Science degree in Psychology, to be conferred in August, 2013."

103. The recommendation was made despite the fact that Mr. Yu had successfully defended his dissertation and only needed to complete an internship to be awarded his Ph.D.

104. Upon information and belief, it is the practice in doctoral programs in Psychology, to award students in a Clinical Psychology Doctoral Program a Ph.D. in General Psychology based upon their completion of required course work at the time of their dismissal from a Clinical Psychology Doctoral Program.

105. At the time of his dismissal, Mr. Yu had successfully completed the course requirements to be awarded a Ph.D. in General Psychology.

106. Notwithstanding his academic eligibility, ISU did not award Mr. Yu a Ph.D. in General Psychology.

107. That due to this May 3, 2013 letter from the doctoral program in Clinical Psychology, Mr. Yu had to cancel a job interview with a university in China for an assistant professor position in their Psychology Department.

108. That Dr. Roberts, Dr. Lynch, Dr. Landers and Dr. Atkins, as a result of their cultural incompetence, failed to recognize or acknowledge the inherent challenges Mr. Yu faced in a foreign social-cultural context while speaking a foreign language.

109. That there is no evidence that Dr. Roberts, Dr. Lynch, Dr. Landers or Dr. Atkins were culturally competent and specifically competent to supervise a Chinese international student whose cultural-linguistic background was different from their own.

110. That, consistent with aversive racism, ISU had not articulated minimal levels of achievement required to maintain satisfactory professional progress in the program nor in practicum settings (including the externship and internship) as per APA standards, yet ISU determined Mr. Yu had allegedly failed to meet standards in an externship, an internship and the program itself.

111. That Students 55 and 37 had each received two failing grades, meeting dismissal criteria per the ISU Graduate Catalog, yet were not dismissed by ISU. See Plaintiff Exhibits 8, 9, 10, 11, 12, 19, 105, 106, 107 and 108.

112. Dr. Tyler Bowles, Ph.D., who is a Professor, Department of Economics and Finance at Utah State University, serves as the Head of the Department of Economics and Finance, Utah State University and has been a private consultant since 1994, testified on behalf of Mr.Yu.

113. Dr. Tyler Bowles calculated the economic loss to Mr. Yu as two million, one hundred eighty-five thousand, seven hundred ninety-three dollars and no cents ($2,185,793.00) as follows:

| Present Value of Lost Earnings Mr. Jun Yu | |
|---|---|
| | **Amount** |

| **Present Value of Life-Time Earnings in Dollars** | |
|---|---|
| As a College Professor in China, Public Sector | $2,472,480.00 |
| As an Educational Consultant, Private Sector | $286,687.00 |
| **Present Value of Lost Earnings** | $2,185,703.00 |

## PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1343, and 1367. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and grant all further relief deemed necessary and proper as Plaintiff brings this private right of action for intentional discrimination pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et.seq.*[2]

2. Pursuant to 28 U.S.C. §§ 1391(b)(1) and 1331(b)(2) jurisdiction is proper in the United States District Court for the District of Idaho.

3. During his time as a student at ISU, Mr. Yu was entitled to matriculate in an environment free of discrimination because of his race or national origin per Title VI of the 1964 Rights Act, 42 U.S.C. §§ 2000d et. seq.

4. To prove that he suffered discrimination under Title VI, Mr. Yu had to prove by a preponderance of the evidence that he was the victim of unlawful discrimination because of his race or national origin. The proof required can be either by direct evidence or circumstantial evidence.

**Direct Evidence of National Origin Discrimination in Violation of Title VI.**

---

[2] *See Alexander v. Sandoval*, 532 U.S. 275, 280-81, 121 S. Ct. 1511, 1516, 149 L. Ed. 2d 517 (2001).

5.      Direct evidence is evidence 'which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Mayes v. Winco Holdings, Inc.*, No. 4:12-CV-00307-EJL, 2014 WL 1652661, at *7 (D. Idaho Apr. 23, 2014), *rev'd and remanded,* 846 F.3d 1274 (9th Cir. 2017) citing *Coghlan v. American Seafoods Co.,* 413 F.3d 1090, 1095 (9th Cir.2005) (citation omitted). Direct evidence of linguistic discrimination can be established by a showing that an individual has the physical, cultural or linguistic characteristics of a national origin group and that a plaintiff's accent and/or speech pattern played a motivating part in an adverse decision; *see* 29 CFR § 1606.1 and see generally *In re Rodriguez*, 487 F.3d 1001, 1008–09 (6th Cir. 2007).

6.      The record contains a preponderance of evidence to establish that Mr. Yu was the victim of intentional discrimination. Based on the evidence presented at trial of how Mr. Yu's speaking of the English language and the plain language of Defendant's Exhibit 536, there is no doubt that Mr. Yu's accent and or speech pattern was a motivating factor in Mr. Yu's dismissal from Idaho State University. Therefore, Mr. Yu has established by direct evidence that he was the victim of national origin discrimination.

**Circumstantial Evidence of National Origin Discrimination in Violation of Title VI.**

7.      In order for Mr. Yu to prove that he was a victim of intentional discrimination in violation of Title VI by circumstantial evidence, Mr. Yu had to first establish a prima facie case of discrimination. To establish a *prima facie* case of racial and national origin discrimination by the Defendant, Mr. Yu had the burden of showing the following: (1) that during the relevant time period, ISU was a recipient of federal funds, (2) that he is a member of a protected class, (3) that he suffered an adverse action at the hands of ISU in pursuit of his education; (4) that he was qualified to continue in pursuit of his education; and (5) that he was treated differently from

similarly-situated students who were not members of his protected class. [3] *See Washington v. Jackson State Univ.*, 532 F. Supp. 2d 804, 810 (S.D. Miss. 2006); *see generally, Joseph v. Boise State Univ.*, 998 F. Supp. 2d 928, 944 (D. Idaho 2014), *aff'd*, 667 F. App'x 241 (9th Cir. 2016).

8. The Court has ruled that it will take judicial notice of the fact that ISU was a recipient of federal funds during the relevant time period. Mr. Yu, by his presence and his testimony has established that he is a member of a protected class; is a citizen of the People's Republic of China and grew up in a Chinese cultural and language context. Through Dkt. 149, the Court has taken judicial notice that ISU "was a 'program or activity receiving Federal financial assistance" during the period from July 1, 2007 through June 30, 2014." It is an undisputed fact that Mr. Yu was dismissed from ISU's doctoral program, therefore he has established that he has suffered an adverse action at the hands of ISU in pursuit of his education.

9. At the time of his dismissal from the Defendant's Doctorate in Clinical Psychology program ("Program"), Mr. Yu: (1) was a student in good standing; (2) had completed his doctoral dissertation and only needed to complete the one remaining internship; (3) was not on any probation or disciplinary status; and (4) had not received any warning that,

---

[3] Title VI provides a private right of action for intentional discrimination. Disparate treatment, a form of intentional discrimination, occurs in education when an academic institution discriminates against an individual because the individual possesses one of the protected characteristics and treats others who do not possess the protected characteristic differently. *See generally* U.S. Equal Employment Opportunity Commission, Enforcement Guidance on National Origin Discrimination, No. 915.005 (Nov. 18, 2016), https://www.eeoc.gov/laws/guidance/national-origin-guidance.cfm#_Toc451518801.

should he not successfully complete the internship at the Cleveland Clinic, he would be terminated from the Program. [4]

10. Through lengthy trial testimony, Mr. Yu established that he was treated differently than similarly situated students who were not members of his protected class. The prima facie case was augmented by the testimony of Mr. Yu's experts. While the Defendant maintained that none of its actions constituted unlawful and intentional discrimination, Mr. Yu through his experts' testimony established that the actions of the Defendant fell far below and substantially deviated from accepted academic norms which make the actions of the Defendant arbitrary and capricious and sufficiently strengthens Mr. Yu's case.

11. Arbitrary and capricious is defined as being without reason and unsupported by substantial evidence or erroneous as a matter of law. *See Ford v. Unum Life Ins. Co. of Am.*, 465 F. Supp. 2d 324, 331 (D. Del. 2006); *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 387 (3d Cir. 2000), *as amended* (July 19, 2000).

12. As the evidence brought forth by the Defendant is not credible and Mr. Yu has presented both direct evidence of discrimination and circumstantial evidence of the same, the Court must find that the Defendant intentionally discriminated against Mr. Yu in violation of Title VI; *see Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 134, 120 S. Ct. 2097,

---

[4] ISU presented a plan of remediation to Student 37 (Plaintiff Exhibit 106) that included six elements described by ISU's Clinical Student Handbook 2015: (1) problem identification, (2) a course of action to remediate the problem, (3) measurable objectives, (4) method and specific time to determine if objectives have been met, and (5) consequences if objectives were not met, and (6) process of appeal. While at trial the Defendant and its witnesses often spoke of a remediation plan, it provided no document as evidence to show that they provided Mr. Yu with any remediation plan that was in conformance with the remediation plan given by ISU to Student 37. Of critical significance, no exhibit proffered by the Defendant warned Mr. Yu of any adverse consequences he would face should he be unsuccessful in his internship with the CCCA.

2101, 147 L. Ed. 2d 105 (2000) *see Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746-747 (9th Cir. 2003); *see Saetrum v. Vogt*, 673 F. App'x 688, 690 (9th Cir. 2016).

13. The opinion evidence of Mr. Yu's expert economist, Dr. Tyler J. Bowles will be accepted; therefore, Mr. Yu is entitled to recover from the Defendant the sum of two million, one hundred eighty-five thousand, seven hundred ninety-three dollars and no cents ($2,185,793.00).

14. The Defendant must readmit Mr. Yu into the Defendant's Graduate Clinical Psychology Program; or, in the alternative, award Mr. Yu a Ph.D. in either General Psychology or Clinical Psychology.

15. The Defendant must allow Mr. Yu to complete his remaining internship in the Peoples Republic of China where the opportunity presents itself that will allow Mr. Yu to successfully receive his Doctorate in Clinical Psychology.

Mr. Yu, as the prevailing party, may recover reasonable attorney fees and costs pursuant to 42 U.S.C.A. § 12205.[5] Accordingly, Plaintiff is directed to file a motion seeking reasonable attorney fees and costs for the suit that the Court will decide in a separate order. The motion must be filed within fourteen (14) days after entry of judgment per Dist. Idaho Loc. Civ. R. 54.1 and 54.2.

DATED: this 25th day of March 2019

> PLAINTIFF
> By Plaintiff's Attorney
> Idaho Employment Law Solutions
> /s/
> R. A. (RON) COULTER

---

[5] *See City of Riverside v. Rivera,* 477 U.S. 561, 575-576, 106 S.Ct. 2686, 2694 - 2695 (U.S.,1986), *Hensley v. Eckerhart* 461 U.S. 424, 440, 103 S.Ct. 1933, 1943 (U.S.S.C., 1983) and *Schwarz v. Secretary of Health & Human Services* 73 F.3d 895, 901 (C.A.9 (Or.),1995)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of March, 2019, I caused to be served a copy of the foregoing document on CM/ECF Registered Participants as reflected on the Notice of Electronic Filings, as follows:

MICHAEL E. KELLY, ISB # 4351
SHANNON M. GRAHAM, ISB #10092
KELLY LAW, PLLC
137 East 50th Street
Garden City, ID   83714
Telephone: (208) 342-4300
Facsimile: (208) 342-4344
mek@kellylawidaho.com
smg@kellylawidaho.com

                                          IDAHO EMPLOYMENT LAW SOLUTIONS

                                          ___/s/_____
                                          R. A. (RON) COULTER