## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| JUN YU, | Case No.: 4:15-cv-00430-REB |
| Plaintiff, | **TRIAL DECISION, WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| IDAHO STATE UNIVERSITY, | |
| Defendant. | |

## <u>INTRODUCTION</u>

This decision brings this case to a conclusion following a trial upon allegations made by Plaintiff Jun Yu ("Yu") against Defendant Idaho State University ("ISU").  Yu, a student in the ISU Clinical Psychology doctoral degree program, alleged that ISU intentionally and unlawfully discriminated against him due to his race or national origin during his enrollment in and subsequent dismissal from that program.[1]  His claim was brought under Title VI, 42 U.S.C. § 2000d, a federal law which prohibits intentional discrimination on the basis of race or national origin by programs receiving Federal financial assistance.  ISU is an institution which receives Federal financial assistance.

A bench trial (that is, a trial to the judge and not a jury) was held in the Pocatello federal courthouse from February 26, 2019 through March 1, 2019.  These individuals testified: Dr. Nicole Prause, Jocelyn Eikenburg, Plaintiff Jun Yu, Dr. Cheryl Chase, Dr. Gerald Koocher, Dr. Shannon Chavez-Korell, Dr. Leslie Wade Zorwick, Dr. Tyler Bowles, Dr. Mark Roberts, Dr. John Landers, Dr. Sheri Atkins, and Dr. Shannon Lynch.  Multiple exhibits were admitted from

---

[1] Other claims raised by Yu were dismissed by the Court before trial.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 1**

both sides of the case. Following the completion of the evidence, the parties submitted written closing arguments.

Yu, as the Plaintiff, has the burden of persuasion upon his claim, by a preponderance of the evidence. This written decision will describe the Court's assessment of the testimony and other evidence as well as the details of the Court's decision upon the relevant facts of the case and the Court's conclusions as to the applicable law, consistent with Federal Rule of Civil Procedure 52(a).[2] In doing so, the Court bears in mind certain core principles. One of these is that "live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012). The need for a court "to hear live testimony so as to further the accuracy and integrity of the fact-finding process" is not a mere platitude. *Id.* Cross-examination is also critical to fact-finding, as "no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience." *Greene v. McElroy*, 360 U.S. 474, 497 (1959) (citation omitted).

After hearing and evaluating the trial testimony, after considering and measuring the credibility of the witnesses, and after reviewing and pondering the trial exhibits, the Court is not persuaded that ISU discriminated against Yu because of his race or national origin. Even if ISU discriminated against Yu based on a protected characteristic, which the Court does not find, the evidence does not meet a burden of persuasion by a preponderance of the evidence that any such

---

[2] To the extent the Court has concluded that any evidence in the record does not support either the claims or defenses made by the respective parties, it will not be referenced in these Findings of Fact. The failure to mention an event or piece of evidence is not an oversight but rather an indication the Court does not consider that evidence especially relevant to either support a claim or defense, or to contradict it.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 2**

discrimination was intentional.   Title VI prohibits intentional discrimination.  For the reasons

described in this decision, Yu has failed to prove by a preponderance of the evidence that he was

the victim of intentional discrimination.  He cannot, therefore, prevail on his Title VI claim.

Judgment will be entered in ISU's favor.

## FINDINGS OF FACT

### A.  Jurisdiction and Venue.

1.      This Court has jurisdiction over the subject matter of this civil action pursuant to

28 U.S.C. § 1331, because the action arises under the Constitution or laws of the United States.

2.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a)(2), because a

substantial part of the events alleged to have given rise to the claim occurred in this District.

### B.  Jun Yu's Background.

3.      Plaintiff Jun Yu is a citizen of China who grew up in Chinese culture and

speaking the Chinese language.  In 2005, he earned a master's degree in developmental and

educational psychology from Shanghai Normal University in China.  He then moved, along with

his wife Jocelyn Eikenburg, to the United States to pursue a doctoral degree in psychology.  Trial

Tr. vol. 1, 36:21–37:14.[3]

4.      Yu enrolled and took classes at Cleveland State University in Ohio while he

prepared to take the entrance exams necessary to be considered for admission into a doctoral

psychology program.

5.      In the fall of 2007, Yu applied to various universities, including Idaho State

University.  Trial Tr. vol. 1, 38:17–19.

6.      Yu's application to ISU included scores from the Test of English as a Foreign

---

[3] There are four trial transcript volumes.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 3**

Language ("TOEFL") and the Graduate Record Examination ("GRE").  TOEFL gauges the

English proficiency of non-native English speakers.  Yu's TOEFL score was satisfactory enough

for admission to ISU.  Trial Tr. vol. 1, 37:19–22 (Yu), 147:10–12 (Zorwick), Trial Tr. vol. 4,

174:8–10 (Roberts).  His GRE scores were high in some areas but low in others.  He had a "very

high quantitative GRE" score (Trial Tr. vol. 1, 23:34–24:1, Prause), but a "poor GRE Verbal

score (410; 34th percentile)" and "poor GRE Analytic Writing score (3.5; 18th percentile)."  Ex.

41, Bates-numbered page "ISU Documents 0197."  Although Yu took the GRE multiple times,

not all his GRE scores are in the record.[4]

  7.  When Yu applied to ISU's Clinical Psychology doctoral program, the faculty

panel reviewing his application included Dr. Prause, Dr. Lynch, Dr. Roberts, and others.  Dr.

Wong was also involved in discussing Yu's application.

  8.  The admissions panel identified both strengths and weaknesses in Yu's

application.  Dr. Prause anticipated Yu helping her teach a statistics course, which his high

quantitative GRE score suggested he could do.  Dr. Lynch felt that Yu's addition to the program

would improve diversity in multiple ways.  Trial Tr. vol. 4, 55:5–20.  Dr. Roberts believed that

Yu's psychology degree from Shanghai Normal University indicated that he would arrive on

campus already conversant in some core psychology topics.  Trial Tr. vol. 3, 66:14–24.

  9.  The panel also had concerns about Yu's candidacy.  Dr. Roberts credibly testified

that Yu's relatively low GRE verbal and writing scores were inconsistent with those of native

English speakers who were offered admission.  Trial Tr. vol. 3, 67:14–18.  Some allowance was

given for Yu's low scores because he was not a native English speaker.  Moreover, the written

---

[4] It is possible that the other GRE scores do appear somewhere in the multiple hundreds
of pages in the record, but Yu did not call the Court's attention to such scores.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 4**

evidence shows that ISU "discounted these poor scores on the GRE in order to enhance the Program's diversity." Ex. 41, Bates-numbered page "ISU Documents 0197."

10.    The panel discussed Yu's fluency in English.  Dr. Roberts described Yu's expressive language as "halting" and "choppy."  (Even though the trial was held many years after the admissions committee first considered Yu's application, the Court's observation and hearing of Yu's testimony at trial corroborates Dr. Robert's observations made contemporaneously to the decision to admit him to the doctoral program.)  Dr. Lynch credibly testified that ISU faculty member Dr. Maria Wong, who had studied in Hong Kong and who was involved in reviewing Yu's application, told the panel that English fluency of foreign students typically improves dramatically within the first two years.  Trial Tr. vol. 4, 56:11–13.

11.    Ultimately, Yu was accepted into the ISU Clinical Psychology program and he began his classwork in the fall of 2008.

**C.  Yu's Studies at Idaho State University.**

12.    Preliminary work to establish ISU's Clinical Psychology doctoral degree began in 1988, with the first student enrolling in 1995.  Trial Tr. vol. 3, 169:6–7.  The program is accredited by the American Psychological Association and was first accredited in 1995.  Trial Tr. vol. 3, 63:25.

13.    ISU's Clinical Psychology doctoral degree requires completion of a five-year program.  The first four years involve academic and some supervised clinical work. The fifth year involves a professional internship consisting of a minimum of 2,000 clinical hours over eleven months, where the student is expected to work independently with clients.[5]  Students are

_____

[5] In this setting, the student is still supervised by a licensed, practicing psychologist.  But the expectation is that the student will have achieved a level of subject matter and clinical

evaluated each academic semester by a Clinical Training Committee ("CTC") and at the end of

each clinical placement by the supervising faculty member and/or the clinical psychologist.

14.    Yu performed well in the academic coursework at ISU.  In Fall 2008, he passed

required courses, worked as a graduate teaching assistant, and assisted three faculty members

with their work.  He participated weekly in the university's "SPEAK" program, to improve his

communication in English.  Ex. 25.  Yu's Fall 2008 Semi-Annual Student Evaluation by the

CTC (Ex. 24) indicated his academic and professional progress were satisfactory and that he was

on track.

15.    Yu remained on track in Spring 2009.  His CTC evaluation that semester (Ex. 26)

reflected that he had "done a great job" helping Dr. Wong with her research and that both his

academic and professional progress were satisfactory.  The CTC was "pleased to recognize his

strong GTA [Graduate Teaching Assistant] performance."

16.    In the summer of 2009, Yu did self-directed research in China that later became

the basis for his dissertation.  With CTC approval, he conducted a clinical trial of behavioral

family therapy in China.  He used a specific clinical therapy for the treatment of disruptive

behaviors in two- to seven-year-old children that had been developed, well-studied, and accepted

in the United States but was not used in China.  Yu adapted the therapy for use in China.  He

accumulated 251 direct clinical hours.  Although only required to recruit ten families, he

recruited 19 families for the study.  All families completed the study, which is unusual as

typically such studies have some attrition.

17.    The study itself was a success. Yu's reporting of the study was that the children's

---

competence such that it is appropriate for him or her to see clients without the supervising
psychologist being present at the same time.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 6**

behavior problems reduced after the treatment and the parents and caregivers were very satisfied

with Yu's services.  Trial Tr. vol. 1, 79:25–80:21.  He introduced an exhibit taken from his

written dissertation displaying the results of a "Parent's Consumer Satisfaction Questionnaire"

evaluating participants' satisfaction with Yu as a therapist (Ex. 119).  All 19 families completed

the questionnaire, and the "mean" satisfaction among them across each of the categories listed

was high.[6]  This study formed the basis of Yu's dissertation, which he successfully defended in

the summer of 2012.

    18.    Yu's Fall 2009 CTC evaluation (Ex. 27) showed that Dr. "Roberts was pleased

with his progress" and Dr. Cellucci noted he "did a good job" with an ADA evaluation.  Yu's

academic and professional progress were still deemed satisfactory, and the CTC even

"congratulate[d]" Yu on his work in China that summer.

    19.    The Fall 2009 CTC evaluation also contained mention of an "issue of apparent

plagiarism" in his written work, but that issue was satisfactorily resolved, with Dr. Cellucci

noting that "cultural differences in citation practices may have contributed to the mistake."  Ex.

27.  Dr. Roberts testified that the issue "might have been an error of understanding of how to

reference things" and that it was the kind of mistake any student could make.  Aside from the

notation in the Fall 2009 CTC evaluation, the issue was not raised again.  For the Court's

decision here, it carries no weight either in favor or against Yu.

    20.    In the Spring 2010 semester, however, Yu's CTC evaluation was less positive

(Ex. 28).  Dr. Prause "was very pleased with his assistance in basic statistics class" and the CTC

made specific mention that the research data set Yu collected in China had been accepted for an

---

[6] There are additional details about these satisfaction ratings, but they are not central to
the issues in this case.  There is no dispute that the clinical study in China was a success and the
participants were pleased with Yu's efforts.

international conference.  But the evaluation also recounted Dr. Atkins's observation and concern that Yu had difficulty forming alliances with English-speaking clients, possibly due to his limited English fluency.  The CTC "encourage[d] Jun to immerse himself in English-speaking contexts whenever possible" and assigned him to placements which would allow him opportunities to use English in clinical contexts.  Nonetheless, the CTC continued to deem Yu's academic and professional progress to be satisfactory.

21.     At trial, Yu testified that he took the CTC's direction to immerse himself in English speaking contexts.  He said he did all clinical work in English, he interacted with professors, peers and others in English, he listened to radio programs and songs in English, and he watched movies and television programs in English.  Trial Tr. vol. 1, 49:14–19.

22.     The Spring 2010 evaluation was based in part on a practicum evaluation completed by Dr. Atkins, following her work with and observations of Yu in a clinical setting at the ISU Psychology Clinic.  (Ex. 53.)  Dr. Atkins graded Yu "below expectations" in his ability to form and maintain working alliances with patients.  She said he was "bright and talented" and possessed "a very strong work ethic and commitment to psychology."  However, she deemed it necessary to "give him feedback regarding the impact of his language skills to his clinical work." In that regard, Dr. Atkins said that, "[w]hile I have witnessed dramatic improvements over the past year or so with conversational English, his conversational skills are still subpar for doctoral level training experience in both assessment and treatment…. I am positive he will make a good clinician; however, if he is to continue to train or practice in English, I recommend further remediation of language problems."

23.     In the summer of 2010, Yu continued to work with Dr. Atkins at the ISU Psychology Clinic.  She completed a separate evaluation regarding his performance from that

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 8**

summer, in which she wrote:

> Jun is a professional student that gives 100% effort at all times.  Fluent English is still a concern, especially when testing younger children.  Also, language was at times a concern during supervision as I was not always confident that he fully understood my instructions.  He is obviously a very bright and talented young man who will do extremely well in his native language.

(Ex. 55.)  Thus, documented concerns about Yu's command of the English language persisted.

24.     Yu's Fall 2010 CTC evaluation (Ex. 29), which included reference to Dr. Atkins's evaluation over the summer term, noted that Yu successfully taught an academic course in Child Development with only minimal assistance, and it mentioned a travel award he received to attend a behavioral analysis conference.  Yu published a research paper in the fall term, and he worked with Dr. Cellucci in a practicum at the ISU Psychology Clinic.  Dr. Cellucci's hand-written evaluation of Yu's work (Ex. 56) is illegible.  Although Dr. Cellucci did not testify at trial, the Fall 2010 CTC evaluation said that Dr Cellucci "was pleased with [Yu's] effort and his progress" but that he had also concluded Yu "needs more practice counseling patients."  Yu's academic and professional progress were described as satisfactory.

25.     Yu successfully proposed his dissertation in February 2011.  During that Spring 2011 semester, Yu was supervised by Dr. Seikel in the ISU Counseling Center.  Ex. 30.  Dr. Seikel graded Yu "below expectations" as to Yu's ability to form alliances and as to his ability to adjust treatment.  She was positive about Yu's diligence, attendance, research skills, non-defensiveness, and the accuracy and sophistication of his conceptualizations, but she also expressed concern about his ability to form alliances and about the drop-out rate of his student clients.  The drop-out rate, she said, might partially be from "prejudice on the clients' side."

26.     In the Spring 2011 semester, Yu also instructed an undergraduate Tests & Measurements course.  In evaluations completed by the students, a "significant subgroup" of the

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 9**

12 students who completed the evaluation (of 20 total students in the class) did *not* agree that he "communicated clearly" and "spoke distinctly."

27.      Notwithstanding the undergraduate student evaluations and the concerns of Dr. Seikel about Yu's clinical work, the CTC in the Spring 2011 evaluation rated Yu's academic and professional progress as satisfactory.  The evaluation contained this statement:

> Language barriers have been a continuous issue in obtaining sufficient supervised professional practice for Jun.  Jun's expressive speech in English remains "halting" at times, which is a real problem in alliance formation with American clients.  The committee has confidence in Jun's development as a scientist, a writer, and in clinical case conceptualization, especially for disorders of childhood.  If Jun is to apply this November to APPIC[7] sites, he must identify sites in which his Chinese language is a strength, rather than a liability.  The Clinical Training Committee can only support Jun's application to such sites.  We believe sites exist that serve Chinese immigrant populations and would be pleased to have a psychology intern well versed in child disorders and parent-child assessments/treatments who is fluent in Chinese.

The CTC also made note that Yu had completed fewer clinical hours than other students at the same point in the program.

28.      With the Spring 2011 CTC evaluation, as with each of the prior CTC evaluations, Yu declined to submit materials responding to this evaluation and he signed off on it.

**D.  Yu's Professional Development Falters.**

29.      The Fall 2011 semester marked the beginning of Yu's fourth year in the program.  During this semester, Yu participated in two clinical practica and a clinical externship.

30.      Dr. Lynch supervised Yu's Fall 2011 practicum at the ISU Psychology Clinic.  In her evaluation (Ex. 48), she graded his performance "below expectations" in five categories: (1) Recognizing and accepting supervisor's input and authority; (2) Negotiates and manages

---

[7] APPIC is the Association of Psychology Postdoctoral and Internship Centers.  It facilitates "matching" clinical psychologist doctoral students with internship placement sites.

conflict; (3) Collegial interactions; (4) Organized, disciplined approach for records; and (5) Case

presentation.  Dr. Lynch did not grade some of the other categories (including alliance

formation) because she had not observed enough of Yu's patient interactions to evaluate his

performance in those areas.  Significantly, her collective grade for Yu was "incomplete" because

clients assigned to him at the beginning of the semester elected not to pursue treatment and he

was therefore only "directly engaged with clients in the last month of the semester."

31.     To deal with that deficiency, Dr. Lynch drew up an ISU "Course Completion

Contract" indicating that Yu could complete the practicum and earn a grade by finishing

treatment in two cases he had begun with her.  Ex. 49.  The agreement required him to complete

the additional work in order to earn a grade and that if he did not do so, "his current efforts

reflect performance + skills equivalent to a 'B'."  The next semester, Yu did perform additional

work and Dr. Lynch ultimately gave him an 'A-' grade for the semester practicum, as listed on

his academic transcript.  Ex. 33.

32.     Dr. Lynch also reported that Yu was skilled in systematic approaches to gathering

data to inform clinical decision-making and he had knowledge of standardization/psychometric

issues related to assessment strategies.  He also had the ability to propose and defend diagnostic

conclusions.

33.     However, Dr. Lynch's written remarks on the Fall 2011 evaluation contained

additional criticisms of Yu's academic and clinical performance.  She wrote that he:

> appeared unengaged (e.g., reading materials) during group practicum discussions
> on multiple occasions.  He seldom offered thoughts or insights without prompting.
> While Jun's commitment to seeking out empirically supported treatments is
> commendable, he appears to be tied to diagnostic criteria in his treatment planning
> and struggled to incorporate life problems in his consideration of clients and their
> treatment needs.  When presented with alternative perspectives on this, he seemed
> resistant to supervisory input and at times defensive in his responses.  This
> improved over time but was notable.  Related to his limited clinical experiences on

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 11**

this team, Jun has only had limited opportunity to produce written materials.  He was timely in producing notes but initial drafts were very concrete with a literal reporting of experiences described by the client.  They were not well organized and did not resemble typical notes produced by third year students.  His most recent effort demonstrated better organization and conceptualization of the session.  My overall sense is that Jun and my ability to work together is improving.  I fully expect further improvement in the coming months and look forward to seeing his growth as a therapist in training.

Ex. 48.

34.     Dr. Lynch testified at trial about the basis for these remarks.  She described struggling with Yu's participation, pointing out to him that it was quite unusual for a student to be reading during practicum sessions.  She felt he was very disengaged and that when she spoke with him about the subject, he was dismissive of her perspective and refused to consider her feedback.  Dr. Lynch said she regularly works with students who are passionate and committed about their own strong opinions and perspective, and that she has no problem working with students who have strong opinions.  Her testimony was sometimes emotional but was very credible, quite firm and compelling, especially as to her interactions with Yu.  Among other things, she recounted that in 15 years in working with students she had never felt such disrespect from a student as she did from Yu when talking to him about considering other perspectives and when talking with him about the manner in which he was engaging in the practicum.  (For his part, Yu testified that he remained engaged even though he was reading materials which he described as relevant to the discussion at hand, and he said that in his culture it is not unusual for someone to read while still engaged.)

35.     In the second of his Fall 2011 semester practica, Yu was supervised by Dr. Atkins.  The trial record contains no written evaluation of Yu's performance in this practicum, but Dr. Atkins testified credibly at trial about Yu's work.  Of particular significance, she did not feel comfortable having Yu see clients on his own because, despite being a fourth-year doctoral

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 12**

student, his skills were not where they needed to be. In particular, he could not communicate well enough to provide services to her clients. Tr 4, 37:11–38:3. Nonetheless, Yu's academic transcript indicates that Dr. Atkins gave him an 'A' grade for the practicum.

36.     Yu's Fall 2011 semester also included a clinical externship. Yu was supervised by Dr. Landers, a clinical psychologist who was the head of a clinical psychology clinic at the Eastern Idaho Regional Medical Center ("EIRMC") in Idaho Falls. His clients at EIRMC were inpatient psychiatric patients who were either dangerous to themselves, dangerous to others, or gravely disabled by reason of mental illness. Trial Tr. vol. 4, 14:10–14.

37.     After the initial orientation and training at EIRMC, Yu observed Dr. Landers administer psychiatric tests. Yu eventually began administering some tests himself while Dr. Landers directly observed him. The goal of the clinical externship was for Yu to become capable of independently administering such tests, but he did not obtain such competence and Dr. Landers did not have the confidence in him to allow Yu to administer the tests independently. Among other examples, Dr. Landers testified at trial about what he described as very simple testing used to evaluate a client for dementia. Yu attempted to administer the testing, but the client was unable to perform the testing. Yu, however, continued to attempt to conduct the testing to the point of the client's duress. Dr. Landers cited this as one example of a shortcoming in Yu's issues relating to clients.

38.     Yu did not complete the EIRMC externship. Dr. Landers dismissed Yu from the position, writing in a November 4, 2011 letter to Dr. Roberts (Ex. 38) that, even though Yu was "quite reliable and diligent," he was never able "to grasp the communication nuances that are required to build rapport with difficult patients, administer standardized tests with difficult patients, conceptualize clients from a broad perspective and coherent psychological theory, and

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 13**

provide feedback to patients and other hospital providers regarding the outcome of psychological assessment." Yu was not, Dr. Landers said, "at the level expected of an advanced doctoral student." Concerningly, Dr. Landers also said that some of the work done by Yu had led to "reported difficulties with patients and has impacted the perceived quality of care that we provide to our patients at EIRMC." Dr. Landers did say that Yu had "mastered the behavioral science components essential to his career goal of returning to China to provide parent/child skills training" and that Yu was "amiable and exhibits a willingness to learn as well as desire to do well." However, Dr. Landers concluded, even before the externship was scheduled to end, that "Mr. Yu is not a good fit for this program."

39.     Dr. Landers, who had been supervising ISU externship students for several years by then, also formally evaluated Yu's externship performance on the same standard form used for practicum evaluations. Ex. 46. He said Yu's work was "below expectations" in 16 categories and "meeting expectations" in 15 categories. Some "below expectations" ratings matched categories where Yu previously had received "below expectations" ratings in other clinical settings, while others were new. But, Yu also received "meets expectations" ratings from Dr. Landers in some categories where other supervisors had rated him "below expectations." Overall, this was Dr. Landers' assessment of Yu:

> Considering Jun's developmental level in the program and the general assumption that ISU's program is designed to produce generalists, I would state that he is significantly lagging in all of the "B" rated areas of functioning primarily as it relates to cultural awareness and competency. Given his desire to return to China and specialize in parent/child training, he is probably right where he needs to be in this regard. However, his deficits have made this practicum one that was not a good fit and placed him, patients, and psychology services at the hospital in a difficult position. As I observe[d] Jun provide standardized assessments it became quite clear that significant remediation would be necessary that did not fit with the expectations for skill of those arriving at this site. I would recommend continued focus in his area of interest rather than @ generalizations in his 4th year.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 14**

Supervisor evaluations at ISU are generally reviewed with the student.  In this instance, Dr. Landers and Dr. Roberts agreed that Dr. Roberts would discuss the externship dismissal with Yu.

40.     After Yu's dismissal from the EIRMC fellowship, Dr. Roberts (on behalf of the CTC) sent Yu a letter dated November 21, 2011 (Ex. 34) regarding the dismissal.  That letter, which attached Dr. Landers's evaluation, contained a recommended course of action for the Spring 2012 semester which the CTC believed would best prepare Yu for a year-long clinical internship as the culmination of his studies.  The plan was designed to "address performance concerns raised by Dr. Landers and provide … more intensive professional practice opportunities to facilitate success during [the] internship year."  Yu received an "unsatisfactory" grade for his clinical externship in the Fall 2011 semester, based on his dismissal from the EIRMC externship.

41.     The ISU Department of Psychology publishes a Clinical Student Handbook.[8]  Ex. 94.  It contains this language regarding remediation plans:

> The CTC reserves the right to construct a formal Plan of Remediation to address potential challenges that may make a student currently unready for internship training. In such instances, a formal Plan of Remediation will be constructed by the Clinical Training Committee. These steps would be triggered by one of three events: 1) a student dismissal from an external training site; 2) an Unsatisfactory (U) grade in any professional course (PSYC 7724, Community Practicum; PSYC 7725, Clinic Practicum; PSYC 7726 Supervision Practicum; PSYC 7727, Psycho educational Evaluation; or PSYC 7748, Clinical Externship ); or 3) any other concern regarding professional development that leads the Clinical Training Committee to believe that a formal remediation plan is warranted. A written Plan of Remediation will include the following six elements:
>     1. Problem identification
>     2. Course of action to remediate the problem
>     3. Measurable objectives
>     4. Method and specific time to determine if objectives have been met
>     5. Consequences if objectives are not met
>     6. Process of appeal

---

[8] The Clinical Student Handbook in the record is dated August 2015 and applies to the 2015–2016 academic year, several years after Yu was dismissed from ISU.  However, no one credibly disputes that the handbook in effect at the time Yu left the program was any different in relevant substance than the handbook referenced above, which is in the record.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 15**

The Clinical Training Committee will review the student's progress at the time specified in the Plan.

Ex. 94 at 5–6.

42.     Yu was dismissed from the EIRMC externship and he received a 'U' grade in PSYC 7748. The remediation plan provisions of the Handbook[9] were thus triggered, such that Yu properly could be placed on a remediation plan.

43.     The November 21, 2011 letter from Dr. Roberts to Yu (Ex. 34) was not titled as a remediation plan, nor did it follow exactly the numbered items of the remediation plan language of the Clinical Student Handbook. In other words, the letter did not directly state or identify each problem as a separately numbered paragraph, nor did it create a separately numbered paragraph setting out measurable objectives or when and how progress would be evaluated. There was no separate numbered paragraph discussing consequences if objectives were not met, and it did not discuss a process of appeal.

44.     Whether inartful or imprecise when considered against the language of the Clinical Student Handbook, the language and purpose of November 11, 2011 letter nonetheless reasonably only can be read as a remediation plan to address shortcomings in Yu's professional competence. (The November 11, 2011 letter is referred to hereafter as the "Remediation Letter.") The Remediation Letter "recommended" a specific "course of action" which had the obvious purpose in the context of the letter of addressing "potential challenges that may make a student currently unready for internship training," which was the purpose of a remediation plan.

---

[9] The policy says that CTC "reserves the right" to implement a Plan of Remediation. Whether the policy also imposes a duty on the CTC is relevant to this litigation but is not outcome-determinative. The Court's decision is the same regardless of whether a remediation plan was mandatory or something else. Therefore, the Court need not make a finding as to whether a remediation plan was required.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 16**

In the Remediation Letter, Dr. Roberts specifically stated that the CTC believed the recommended course of action would "best prepare [Yu] for success in [his] APPIC clinical internship."

45.    Unsurprisingly, given the difficulties in Yu's assigned practica and his dismissal from the EIRMC externship, the CTC concluded in their Fall 2011 evaluation (Ex. 31) that Yu's professional progress was unsatisfactory even though his academic progress remained satisfactory.  The evaluation included reference to a discussion Yu had with Dr. Roberts about "the professional manner in which negative feedback from a supervisor should be addressed." The evaluation described changes that Yu had requested to the remediation plan contained in the Remediation Letter, but it said only some, not all, of the requested changes would be adopted. The evaluation ended with a statement that the CTC was "very pleased that [Yu] was granted four interviews at APPIC internship sites."

46.    In the Spring 2012 semester, Yu made progress on items listed in the Remediation Letter (as revised in the CTC's Fall 2011 evaluation).  Dr. Roberts and Dr. Haight jointly supervised Yu in a practicum that semester.  Their evaluations graded Yu with four "below expectations" ratings for his work that semester.  Ex. 538(a).  One supervisor described an "episode of difficulty accepting + processing supervisors' feedback occurred + was quite noticeable."  The other supervisor wrote, "Jun shows a passion and diligence for clinical work but struggled to evidence his abilities to take on a primary therapist role.  Jun also struggled at communicating difficulties or misunderstandings he was having with the case, at the supervisory level."  The full CTC evaluation for the semester recorded that "[b]oth supervisors observed difficulties in clinical process skills that yielded the Below Expectation ratings.  Specifically, Jun appears to struggle with alliance formation, sensitivity to client signals during sessions, and the

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 17**

ability to adjust assessment/treatment given ongoing circumstances."  Ex. 32.

47.    Yu "disagreed" with those conclusions and "considered the concerns unjustified," a fact that was also recorded in the evaluation.  Yu submitted a response that was attached to the evaluation, in which he said the supervisors did not adequately support their "below expectation" ratings, that they did not give timely feedback and opportunities to improve, and that they did not trust him.  As to the latter, he said the lack of trust from his supervisors was "against the ethics of supervision."  Yu said he was "in a hostile environment where any small mistake could be held against me."  *Id.*

48.    Dr. Roberts separately supervised Yu that semester in an Interdisciplinary Evaluation Team setting, at the end of which he rated Yu as "meeting expectations" in 22 categories and did not rate him "below expectations" in any category.

49.    When the Spring 2012 semester was over, the CTC found Yu's academic progress to be satisfactory but again (the second straight semester) found his professional progress to be unsatisfactory.  Yu's "[d]ifficulties in communicating with patients and supervisors remain noticeable.  Further, Jun's difficulties in assuming the perspective of patients and supervisors is inconsistent with fourth year doctoral student status."  Ex. 32.

50.    Concerningly, Yu had not been able to secure a clinical internship through the national "matching" process used by APPIC, a fact noted in the evaluation.  Successful completion of an approved internship was essential to demonstrating clinical skills and competence and was required to obtain the doctoral degree in clinical psychology.  In response to that significant hurdle facing Yu, the CTC set out three alternative paths for Yu to attempt completion of the internship requirement.  First, he could re-apply for an APPIC internship the following year.  (The CTC evaluation made clear, however, that the fact of Yu's EIRMC

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 18**

externship dismissal would have to be reported on his application and the CTC could not then report that "the problems that surfaced during the failed externship have been overcome.")  The second option was for Yu to propose a self-constructed internship, consistent with the policies and procedures outlined in the Clinical Student Handbook.  Lastly, he could propose "an internship experience in China consistent with his career goals."  The CTC strongly recommended this third option, believing it would play to Yu's strengths while minimizing the impact of his weaknesses.  The choice, however, was left to Yu.

### E. Yu's Internship at the Cleveland Clinic.

51.     Yu chose the second of the options.  Dr. Dwyer, for whom Yu had worked while he studied at Cleveland State University, put him in touch with Dr. Cheryl Chase, a clinical child psychologist in private practice in Cleveland, Ohio.  Trial Tr. vol. 1, 88:18–89:1.  Yu identified two additional psychologists as potential supervisors.  Exhibit 121 is a "Proposal for Non-APPIC Internship Placement" describing an internship Yu proposed at the Cleveland Clinic Center for Autism (the "Cleveland Clinic" or "CCCA") in Cleveland, Ohio.  Under that proposal, Yu would spend 3.5 days each week at the autism clinic where he would be supervised by Dr. Leslie Speer and Dr. Thomas Frazier, and the other 1.5 days each week supervised by Dr. Chase at her clinic.  Dr. Speer was to direct the internship, which was to run from January 2, 2013 through December 20, 2013.  The proposal was agreed upon by Yu, Dr. Speer, and Dr. Roberts.

52.     Because the proposed internship was a non-APPIC internship, the ISU Department of Psychology worked with CCCA to negotiate an "Affiliation Agreement" (Ex. 120) to set out the terms of the relationship between ISU and CCCA.  The Affiliation Agreement did not mention Yu by name and it specified that the agreement "does not and is not intended to confer any rights or remedies upon any party" other than ISU or CCCA.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 19**

53.     Prior to approving the CCCA internship, ISU hired psychologist Dr. Hedt to evaluate the proposal as a third-party consultant.  In a letter sent from Dr. Roberts to Yu dated November 12, 2012 (Ex. 523), Dr. Roberts conveyed two substantive concerns raised by Dr. Hedt.  One concern dealt with compensation, in that although all APPIC internships include compensation for the work performed by the student interns, Yu would not be compensated for his non-APPIC CCCA internship.  Trial Tr. vol. 3, 188:10–14.  The second concern dealt with due process rights, in that Yu would have no due process rights in regard to CCCA's handling of the internship and his participation in the internship.  His due process rights would therefore be limited to those available to him as a student at ISU.  Dr. Roberts said in his letter that he wanted to make sure that Yu was aware of these concerns and to be certain that Yu knew he did not have to proceed with the internship if he were concerned about such issues.  Dr. Roberts's letter also reiterated to Yu that he could instead choose one of the other options (to reapply for an APPIC internship or propose an internship in China).

54.     In response, Yu sent Dr. Roberts a letter dated November 19, 2012 (Ex. 524) stating that "I have been fully informed of the limits of the internship proposal with the Cleveland Clinic.  I wish to proceed despite those limitations."

55.     Yu began his internship as planned in early January 2013.  After only a few days, Dr. Speer called Dr. Roberts to discuss Yu's progress and abilities.  Trial Tr. vol. 3, 137:1–25.  Dr. Speer did not testify at trial; however, Dr. Roberts testified that Dr. Speer told him that Yu was not performing at expected competency levels for a clinical psychology intern.  Dr. Roberts said that he agreed with Dr. Speer that Yu was not as far along as would be expected for a student who has completed four years in a doctoral program, and Dr. Roberts followed-up the telephone conversation with an email sent to Dr. Speer the same day, Ex. 526.  In the email, Dr.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 20**

Roberts suggested that Dr. Speer formally evaluate Yu's competency early in the internship using the standardized evaluation system described in the internship proposal. Such an evaluation, Dr. Roberts said, would give Yu a baseline to compare against future evaluations so that progress could be measured.

56.     On January 15, 2013, Dr. Speer prepared a "Psychology Trainee Competency Assessment" for Yu (Ex. 527), using the standard form identified in the internship proposal. This form, which differed from the evaluation forms used for ISU practica and externships, allowed ratings for 23 different objectives. The rating scale had options for "NA" (Not applicable or not assessed), "A" (Advanced skills comparable to a licensed practitioner), "HI" (High Intermediate/Occasional supervision needed), "I" (Intermediate/Should remain a focus of supervision), "E" (Entry level/Continued intensive supervision is needed), and "R" (Needs remedial work). Yu's internship proposal described the ratings in this manner:

> beginning interns usually can earn an 'I' rating for 'Intermediate' levels of competency across most items; during the final semester of the internship, it is anticipated that Mr. Yu will earn some 'HI' ratings for 'High Intermediate' competency levels. Any ratings of 'E' (Entry Level competency, typical of pre-internship practicum students) or 'R' (needs Remedial work) should set the occasion for a negotiated plan to address that competency.

Ex. 121 at 10.

57.     Dr. Speer's January 15th, 2013 evaluation, Ex. 527, rated Yu as "Advanced" in the categories of using positive coping strategies and efficiency/time management. But alarmingly, she rated him as "Entry level" or "Remedial" in seven categories, including professional interpersonal behavior, establishing patient rapport, diagnostic skill, psychological test selection and administration, psychological test interpretation, seeking current scientific knowledge, and consultation assessment. His other ratings were either "Intermediate" or "NA." She noted that Yu was "eager to learn" and "seeks guidance & accepts constructive feedback

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 21**

well."  However, under "areas of additional development or remediation," she also listed "report

writing, rapport building with families/child, ability to take feedback from supervision &

demonstrate progress from week to week on identified goals… [and] awareness of level of

abilities."  On the conclusion section of the assessment, she marked that "[t]he trainee HAS NOT

successfully completed the above goal," which was that "[a]ll competency areas will be rated at a

level of competence of I or higher."  The same paragraph also states that "[w]e have made a joint

written remedial plan as attached, with specific dates indicated for completion."  The last page of

the exhibit includes two hand-written objectives Dr. Speer assigned Yu, along with a notation

that his competency would be reevaluated in two months.  Preprinted text in the conclusions

section of the assessment form states:

> In the rare situation when it is recognized that a trainee needs remedial work, a
> competency assessment form should be filled out immediately, prior to any
> deadline date for evaluation, and shared with the trainee and the director of training.
> In order to allow the trainee to gain competency and meet passing criteria for the
> rotation, these areas must be addressed proactively and a remedial plan needs to be
> devised and implemented promptly.

Dr. Speer and Yu each signed the evaluation on January 15, 2013.  Above her signature, Dr.

Speer indicated that "[w]e have reviewed this evaluation together."

58.     Early in the internship, Yu's other CCCA supervisor, Dr. Frazier, concluded that

Yu was unprepared for the internship and ceased working with him.  Trial Tr. vol. 4, 94:9–95:5.

The record lacks further detail in this regard.

59.     Approximately two months later, on March 21, 2013, Dr. Speer informed Dr.

Roberts that the internship was being terminated because of Yu's lack of progress and inability

to do what he needed to be able to do.  She emailed Dr. Roberts (Ex. 100), and said:

> Hi Dr. Roberts, I am writing to inform you that I am about to complete my
> second performance review for Jun Yu and that he has not made progress.
> Therefore, I will be terminating his placement here.  This is not an appropriate

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 22**

placement for him.  He is unable to meet performance demands and does not demonstrate adequate progress/learning.  I will be sitting down with him in the next week to discuss this with him, but wanted to make you aware of the situation.  I am sorry there was not a different resolution to this situation.  Please feel free to contact me with any questions.

60.     Dr. Speer completed a second Psychology Trainee Competence Assessment Form, dated April 1, 2013 (Ex. 529).  That evaluation again rated him as "Advanced" in efficiency and time management, but it rated him "Entry level" or "Remedial" in diagnostic skill and seeking current scientific knowledge.[10]  Dr. Speer's written remarks note that Yu "continues to be eager to learn & accepts feedback well" but "has not made progress."  She also raised what by that time were familiar concerns about his shortcomings in clinical practice, saying that Yu "is not learning int. & assessment St. even w/sig. accommodations & support.  Jun is unaware of own limitations.  Combination of above factors put Jun at risk for causing harm to patients."  Dr. Speer signed the evaluation, but the exhibit of record does not bear Yu's signature.

61.     On April 4, 2013, Dr. Speer sent a follow-up letter to Dr. Roberts (Ex. 528), raising again what she described as Yu's "significant risk to do harm to families/patients he may work with in the future."  The letter states:

> I am writing to notify you that I conducted Jun Yu's second performance review yesterday.  As was discussed with him during our meeting yesterday, he has not made adequate progress and is unable to meet the demands of his placement here at the Center for Autism, thus I am left with no choice but to terminate the contract we have with him and Idaho State University.  Moreover, Jun demonstrates limited insight into his own limitations as a clinician.  This combined with his

---

[10] Exhibit 529 in the record bears sequential Bates numbers ISU Documents 521 through 527, but other numbers that appear in the bottom center of each page, which appear to be page numbers on the original document, count by two from 18 through 30.  Moreover, this evaluation has fewer categories than Dr. Speer's January 2013 evaluation despite appearing to use the same form.  In short, apparently there are missing pages from this exhibit, but it nonetheless evidences Dr. Speer's assessment that Yu's performance did not improve.  Further of significance, on Bates-numbered page "ISU Document 0029" of Exhibit 36, there is evidence that Dr. Speer rated Yu at the lowest possible levels – "Entry level" or "Remedial" – in 12 categories of his April 2013 evaluation.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 23**

eagerness to perform activities he is not ready to perform, I believe, put him at significant risk to do harm to the families/patients he may work with in the future. This was all directly and clearly discussed with Mr. Yu.  I am sorry we could not come to a different resolution.  Please feel free to contact me with any questions.

62.     On April 7, 2013, apparently thinking that the other options the CTC had previously presented to him to satisfy his internship requirement were still available to him, Yu emailed Dr. Roberts to inquire about doing an internship in China (Ex. 531).  Nothing in the record persuasively indicates that Yu had a right to pursue first one of the three options, and then if not successful in that option to choose a second (or, based upon his theory, possibly even a third) option if he was unsuccessful in his first (and, potentially, second) selected option.  The choice was his to make, and if one choice was more realistic than the other choices it was up to Yu to decide upon which avenue would be best for him, knowing that he had to successfully complete the internship in order to complete the requirements of the doctoral program.  Although ISU did not specifically say to Yu that he could choose only one option, the Court is persuaded that the clear purpose of the letter and the options set out in the letter was to give Yu the single choice of three avenues.  Further, the letter makes apparent that ISU was giving careful thought to various options and specifically highlighted the option for an internship in China as the best option because it would play to Yu's strengths while minimizing the impact of his weaknesses. It was described as the best option – not the best fallback option.

63.     Dr. Roberts responded on April 8, 2013 (Ex. 531) to say that the CTC would need to review the evaluations from CCCA "and then consider what courses of action are available."

64.     On that same date, Dr. Chase, the internship director for the non-CCCA portion of Yu's internship, sent Dr. Roberts an email about her experience working with Yu (Ex. 47).  She said Yu was "easy to work with, knowledgeable, and well-prepared from week to week."  She commended his high ethical standards and the value of his assistance and said that his "case

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 24**

summaries are informative and thorough, diagnostic impressions are accurate, recommendations

are relevant and appropriate, and report drafts are well written and thought out."  She also said

that he was "eager, willing, and capable."  Even so, however, she was not willing to have him

"engage in testing students directly," due to her "concerns about Jun delivering test items since

English is a second language for him," which could complicate assessments for language-based

learning disabilities.

65.     At trial, Dr. Chase further described why she had not yet allowed Yu to perform

testing independently.[11]  She explained that when evaluating for dyslexia, a language-based

disorder, it is critical that the test administrator very precisely both speak and hear sounds

expressed in English.  Clinicians for whom English is a second language might not pronounce

sounds the same way, she said, and might not hear back and understand whether the client was

saying the sounds properly.  According to Dr. Chase, even a strong accent or drawl from a native

English speaker could impact the testing, and many clinicians are moving toward using a

standardized audio recording to administer the test to avoid such issues.  Dr. Chase said she

would have the same concern with any clinician for whom English was a second language.  She

described that Yu was already adept at interpreting test results and turning them into meaningful

treatment decisions, which is the more important skill.  Both her contemporaneous email and her

credible trial testimony indicate that she anticipated giving Yu more responsibilities as the

internship progressed.

66.     However, after Dr. Speer dismissed Yu from the CCCA internship, Yu was no

longer a supervised intern at that point for medical licensure purposes, and therefore likely could

---

[11] In its Memorandum Decision and Order (Dkt. 151), the Court granted Yu's motion in limine (Dkt. 74) seeking to allow Dr. Chase to testify by videoconference.

not properly perform further work of a similar nature for Dr. Chase.  Trial Tr. vol. 3 150:1–

151:7.

**F. Yu's Dismissal from Idaho State University.**

67.      After dismissal from the CCCA internship on April 3, 2013, Yu began working to

find a professor or internship site willing to work with him in China.  Trial Tr. vol. 1, 97:19–22.

In an email to Dr. Roberts dated April 14, 2013 (Ex. 122), he indicated that a professor at

Shanghai Mental Health Center expressed interest in taking him on as an intern.

68.      Several weeks later, on April 30, 2013, Yu emailed Dr. Roberts (Ex. 88) to

request that he be graded "incomplete" (rather than "unsatisfactory") for his CCCA internship,

because he contended he was not given a joint written remedial plan or alternatively because he

said Dr. Chase wanted to continue working with him and had rated him positively.

69.      ISU did not grant Yu's request.  In a letter to Yu dated May 3, 2013 and signed by

Dr. Roberts (Ex. 36), Yu was informed that the Graduate Faculty of the ISU Psychology

Department had voted to dismiss him from the doctoral program in clinical psychology based on

his unsatisfactory progress toward degree completion.  The same body voted to award Yu the

degree of Master of Science in Psychology.[12]  The letter included Dr. Roberts's summation, as

the Director of Clinical Training and on behalf of the Clinical Training Committee, of Yu's

history as an ISU student, including his academic and professional records.  The summation

concluded:

> The committee concluded that Mr. Yu is not making satisfactory progress
> in the development of professional skills consistent with the requirements of the
> doctoral degree in clinical psychology.  Despite four years (August 2008 to May
> 2012) in the standard curriculum on campus and three months in an approved
> clinical internship, he remains unable to provide professional services in a manner
> consistent with expectations for a fourth year student or an intern.  Neither faculty

_____

[12] Yu did not accept that offer.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 26**

supervisors at Idaho State University (Roberts, Haight, and Lynch during his fourth year), nor faculty supervisors at the approved internship at the Cleveland Clinic (Speer & Frazier) granted Mr. Yu the expected degree of independent professional function, given his poor performance. All licensed supervisors are required to authorize only those professional responsibilities that a trainee can perform competently.

It is the opinion of the Clinical Training Committee, based on Mr. Yu's objective record and the qualitative reports of multiple supervisors in multiple sites, that his poor performance is not simply a matter of poor linguistic communication with English-speaking patients and supervisors. It appears that Mr. Yu lacks sufficient perspective-taking skills and conceptual abilities to become a clinical psychologist. Specifically, he seems unaware of the impact of his behavior on patients and supervisors alike, failing to appreciate the perspectives of those critical audiences. Second, he appears unable to conceptualize a patient's current bio-psycho-social functions through the normal professional processes of integrating information obtained from interviewing, psychometric testing, direct observation, intervention trials, and individual and cultural differences. Third, he appears unable to adjust a professional course of action in response to patient needs, e.g., unable to notice and respond to patient distress in the moment. Finally, he seems to lack insight into his own shortcomings, resulting in ineffectual problem-solving and unsuccessful conflict negotiation.

This summation was presented to and discussed by the Graduate Faculty in the course of considering whether to dismiss Yu.

70.     Yu appealed the dismissal. On May 17, 2013, Dr. Lynch, as Chair of the Department of Psychology, sent Yu a letter (Ex. 37) notifying him that the Graduate Faculty had voted unanimously to uphold his dismissal. The letter addressed several of Yu's arguments challenging his dismissal. First, Yu had argued that he was in good standing until the CCCA dismissal. Dr. Lynch acknowledged that Yu had not been on academic probation when he was dismissed from CCCA, but she noted that his progress in professional development had been rated unsatisfactory for several semesters. Second, Yu had argued that he should have received an "incomplete" grade for the internship due to the lack of due process provided by CCCA. Dr. Lynch responded that there was no reason to believe Dr. Speer failed to make reasonable efforts to assist him and no reason to doubt her efforts to work closely with him to adequately and fairly

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 27**

address any concerns.  Dr. Lynch's response also reminded Yu of his waiver of due process

rights at CCCA.  Third, Yu had argued that Dr. Chase held positive opinions of his performance.

Dr. Lynch responded that Dr. Chase's evaluation was not given significant weight because Yu's

work with her was limited to didactics and discussion, not face-to-face service provision with

clients.  Finally, Yu had argued that he should be given an opportunity to do an internship in

China.  Dr. Lynch acknowledged that Yu previously had been presented just such an option, but

she explained that the prior options were not intended to be taken in sequence if there were a

problem with the option Yu first selected.  After summarizing various specific concerns recorded

by several supervisors over the course of Yu's time as an ISU student, she explained that

"[b]ased on the available data, we believe you may actually put patients at risk, not as a matter of

inadequate linguistic abilities, but as a matter of poor perspective taking and difficulties with

conceptualization.  The Graduate Faculty is convinced that a fourth 'chance' (i.e., an internship

in China) is unwarranted and might put Chinese patients at risk of harm."

71.     Yu again appealed the dismissal.  On July 30, 2013, Dr. Turley-Ames, Dean of

ISU's College of Arts and Letters, sent Yu a letter again upholding his dismissal (Ex. 553).

72.     Thereafter, Yu appealed to the Graduate Council.  On October 2, 2013, Dr. Van

der Schyf, Dean of ISU's Graduate School, sent Yu an email (Ex. 539) notifying him that the

Graduate Council had sustained his dismissal and that Yu was not entitled to further appeals.

73.     On September 16, 2015, Yu filed this lawsuit.

**G.  Testimony of Yu's Trial Witnesses.**[13]

---

[13] The fact witnesses called by ISU testified primarily on topics covered by Yu's witnesses.  Therefore, this section sequentially discusses all of Yu's witnesses but does not sequentially discuss ISU's witnesses.  The relevant testimony of ISU's witnesses is interwoven throughout these Findings of Fact.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 28**

74.     Yu testified at trial, at two separate times.  Yu's counsel also called as fact witnesses Dr. Nicole Prause, Jocelyn Eikenburg and Dr. Cheryl Chase.  He also called expert witnesses Dr. Gerald Koocher, Dr. Shannon Chavez-Korell, Dr. Leslie Wade Zorwick, and Dr. Tyler Bowles.  ISU called Dr. Mark Roberts, Dr. John Landers, Dr. Sheri Atkins, and Dr. Shannon Lynch as fact witnesses.  ISU did not call any expert witnesses.

75.     In the order of proof at trial, Yu first called Dr. Nicole Prause.  Dr. Prause was an assistant professor at ISU from 2007 through 2010 and was on the admissions panel reviewing Yu's application.  She said that during a meeting of the panel Dr. Roberts expressed difficulty understanding Yu's speech, but Dr. Prause said she and at least one other panel member understood Yu just fine.

76.     Dr. Prause said Yu was successful in interacting with students in English while he independently taught the laboratory section of her statistics course.  She said that students found him to be warm and easy to approach as well as sweet and helpful.  She classified student evaluations of Yu's academic instruction as generally good.  She recalled no student complaints about Yu's ability to communicate effectively in English.

77.     Dr. Prause also testified, based on her experience as a professor with extensive background in psychology, about available assessments to evaluate a therapist's ability to form alliances or communicate effectively with a client.  She said there are 11 tests commonly used to assess therapeutic alliance with a client, at least some of which have been available for decades.  She also said there are hundreds of studies that assess a clinician's ability to judge another clinician's interactions with clients.  She remarked that as clinicians gain more years of practice, their judgments about their own efficacy tend to increase while actual patient outcomes tend to decrease, indicating that highly experienced clinicians become poorer judges of patient outcomes

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 29**

without good quantitative assessment.

78.     On cross-examination, Dr. Prause agreed that her interactions with Yu were primarily when he was her teaching assistant and that she did not supervise or observe him in a clinical setting.  She denied harboring ill will or animosity toward ISU, but she did admit to threatening to sue the school several years ago.

79.     The Court found Dr. Prause to be generally credible, although her evasiveness on the topic of a threatened lawsuit against ISU left the Court with a sense that she does, in fact, harbor animosity toward ISU.  Nonetheless, her testimony that Yu was successful as her teaching assistant and that neither she nor her students had communication issues with Yu is not inconsistent with other evidence in the record.  The overall record shows that although many people (including students) struggled to understand Yu and communicate with him, others did not.  Dr. Prause's testimony is part of that same mix.  However, her testimony has limited relevance upon the most critical issues because she did not observe Yu in a clinical setting. Moreover, her testimony about additional assessments that evaluate clinician efficacy or ability is given little weight because the testimony was neither specific nor anchored to the facts of this case.  The Court has noted and considered her assertion that Dr. Roberts raised concerns about Yu's speech during a recruitment committee meeting but the Court also finds that Dr. Prause's testimony in that regard did not evidence that Dr. Robert's concerns were discriminatory in intent, related to Yu's race or national origin.

80.     Yu next called his wife, Jocelyn Eikenburg.  Ms. Eikenburg described, among other things, a conversation she had in May 2010 with Dr. Lynch, one of Yu's professors.  Ms. Eikenburg said that she knew Dr. Lynch from ISU events she attended with Yu and she said that she and Dr. Lynch happened to attend the same yoga class at ISU one day.  Ms. Eikenburg said

she greeted Dr. Lynch and they engaged in small talk, after which Dr. Lynch walked away. According to Ms. Eikenburg, Dr. Lynch then returned and asked Ms. Eikenburg whether she spoke English at home with Yu.  Ms. Eikenburg answered yes, after which Dr. Lynch said words to the effect of, "Well, you should know, Jun's English is terrible"  and that unless Yu's English were to improve, "we will not be able to find a clinical position for him in this town."  Ms. Eikenburg testified that she thought these remarks were outrageous.  She described her experiences living in a foreign country and teaching English as a second language, which she said gave her a good understanding of the different English-speaking levels of non-native speakers.  She said that Yu's English is very good and it just did not merit to be labeled as terrible.  She acknowledged that Yu is not a native speaker and so he naturally cannot speak like native speakers, but she concluded by saying that the fact he is not a native speaker does not mean that his English is a problem.  The implication of her testimony was that she believed Dr. Lynch was being unfairly critical of her husband's English language skills.  Ms. Eikenburg's testimony was given in earnest; there was no trace of doubt or insincerity.  However, it also is true that Ms. Eikenburg had neither the first-hand knowledge nor the professional expertise to be able to comment upon whether Yu's English language skills were problematic in the nuanced world of a clinical psychologist.  Hence, her testimony is only of limited value on that subject and, as described to follow, to the extent that her testimony was intended to evidence some sort of discriminatory animus based upon her husband's race or national origin, the Court is not persuaded.

81.     Dr. Lynch's testimony about the same conversation was broadly consistent with Ms. Eikenburg's, but she described additional details that help place the conversation in its appropriate context.  Dr. Lynch said that Ms. Eikenburg initiated the conversation by bringing up

the subject of Yu's tuition assistance from ISU, as his school-provided funding had recently decreased, a relevant detail not mentioned by Ms. Eikenburg.  Dr. Lynch said that she was simply expressing to Ms. Eikenburg that anything Yu could do to improve his English fluency would make him more competitive for paid externships or teaching opportunities.  She denied saying his English was "terrible."  Here, Dr. Lynch's comments about Yu's fluency – as advice in response to a question Ms. Eikenburg herself raised – were not made out of the blue, with no prior context.  Ultimately, because the tone and precise language of Dr. Lynch's statements is disputed and because nothing in Ms. Eikenburg's testimony suggests that there was any antipathy in them based on Yu's race or national origin, the overall persuasive relevance of this exchange, and Ms. Eikenburg's testimony on it, is minimal at best.

82.     Next, Yu took the stand.  He first talked about his background prior to enrolling at ISU as well as his career since leaving ISU.  Then he spoke at great length about his progress as an ISU student.  He detailed the courses he took, the professors who instructed him, and his clinical experiences.  He discussed several of his various practica and CTC evaluations, during which a recurring theme in his testimony emerged: Yu consistently agreed with every single piece of positive feedback any professor or supervisor recorded, and he consistently disagreed with or minimized every single piece of constructive criticism or negative feedback.  (By way of example, see Trial Tr. vol. 1, 61:2–13, 62:10–19 (Landers); Trial Tr. vol. 1, 67:1–9 (Lynch); Trial Tr. vol. 1, 78:24–79:1 (Roberts/Haight); Trial Tr. vol. 1, 97:5–10 (Speer); Trial Tr. vol. 1, 111:12–112:6 (Seikel).)  In each instance, he gave great credence to the judgment of the faculty member or clinical psychologist when they were offering praise of his work, but he discredited and even criticized their judgment if their feedback and grading was anything other than laudatory.  Of course, Yu has his subjective perception of the accuracy or fairness of his

professors' and supervisors' comments.  But Yu had a significant blind spot in his reaction to the negative or constructive feedback and grading he received.  Rather than acknowledging that the same doctoral faculty members and clinicians who recognized strengths in his academic work and efforts could also legitimately point out his academic and clinical shortcomings, Yu simply dismissed any criticism and less than sterling evaluations as unjustified and unfair.[14]

83.     For example, Yu agreed with Dr. Landers's remark that given his desire to specialize in parent-child training in China, Yu was probably right where he needed to be.  But he dismissed Dr. Landers's conclusion that he was unable to grasp communication nuances and disagreed with the other "Below Expectations" ratings Dr. Landers assigned him.

84.     Yu's testimony about Dr. Speer's April 1, 2013 evaluation (when she terminated his Cleveland Clinic internship) provides another example.  Yu testified that he agreed with her comments that he was eager to learn and accepted feedback well, but he disagreed with her comment that he was at risk for causing harm to patients.[15]  Yu was unwilling to allow for the

---

[14] There is some arguable inconsistency in the record on the point of Yu's reaction to feedback.  Dr. Speer said in her evaluations that he accepted feedback well, but she terminated him because, among other things, he was not able to do what was expected of him in an internship setting and because she believed patients were at risk of harm if he worked with them.  Yu said he agreed that he accepted feedback well, *but* that he disagreed with her that he was at risk for causing harm to patients.  Similarly, he agreed with Dr. Lander's positive comments, but disagreed with Dr. Lander's observation that Yu was unable to grasp "communication nuances" and he disagreed with all of the "Below Expectations" ratings Dr. Landers had given.  The bottom line in all of that is exactly what this decision describes – Yu might say he accepted feedback well, but to dismiss that feedback when it points out shortcomings and to disagree with evaluations that his work was "Below Expectations" is not the same as *accepting* feedback.  To the contrary, it is *rejecting* feedback.

[15] The trial transcript contains the following exchange between Yu and his counsel:
Q.     And did Dr. Speer provide an evaluation that you agree with?
A.     I agree with her comments that I continue to be eager to learn and accept feedback well.  I, however, I respectfully disagree with her comment that I was at risk for causing harm to patients.
Trial Tr. vol. 1, 97:5–10.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 33**

possibility that the concerns raised about his work could have a basis in fact.  He simply refused to accept such criticism.

85.    Moreover, when counsel asked him if there was ever any type of formal assessment regarding the concerns that Dr. Speer stated in her evaluation, he said, "no."  But Dr. Speer's April 2013 evaluation (Ex. 529) was preceded by a January 2013 evaluation (Ex. 527) that did, in fact, document several of her concerns.  Here, the Court finds Dr. Speer's evaluation much more credible – she is, after all, a licensed clinical psychologist with substantial experience and with a history of working with clinical doctoral interns.  Yu, in contrast, was a doctoral student with very little clinical experience and with concerns raised about his clinical skills by the supervisors in those settings – which included criticisms regarding the ability to form the necessary clinical relationship with a client and regarding a lack of self-awareness about his shortcomings.

86.    Additionally, Yu's adamant disagreement (as expressed in his trial testimony) with negative feedback he had received is itself corroboration of some of the negative feedback, such as Dr. Speer's statement that Yu was not aware of his own limitations and Dr. Lynch's comment that Yu rejected her authority as his professor and supervisor (based on Dr. Lynch's testimony that she had never been treated with such disrespect by a student in her teaching career).  It is completely sensible that a clinical psychologist or an academic professor working with the training of a doctoral student would be very concerned that a student with Yu's binary

---

Similarly, when his counsel asked at trial whether Yu disagreed with the joint evaluation prepared by Drs. Roberts and Haight after his Spring 2012 practicum with them, he testified: "I agree with the comments that I was passionate and diligent for clinical work.  The part I disagree with are the, the below expectation ratings and the negative comments."  Trial Tr. vol. 1, 78:24–79:25.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 34**

view of the world would render him unable to discern the nuances that clinical psychologists must be expected to discern or to treat them in the manner necessary to protect patients' well-being.

87.     The Court heard and observed Yu in his testimony for multiple hours during the trial.  The Court observed Yu in the courtroom while other witnesses were testifying. Accordingly, the Court developed a good sense for his credibility as a witness.  He was generally credible when discussing simple matters of background facts or historical events, although in a number of instances the questions (from both ISU counsel as well as Yu's own counsel) had to be repeated multiple times before Yu understood the question posed to him in English so that he was able to answer.  Yu's speech was reasonably clear and understandable, but with occasional quirks.  He frequently paused for significant periods at the beginning or even in the middle of answering a question.  Sometimes his answers were non-responsive to the question posed and it was difficult to tell whether Yu misunderstood the question or was intentionally being evasive. Either way, his credibility was diminished somewhat by such responses.

88.     Often a party to a lawsuit is understandably passionate about the case and very personally engaged with the trial and its outcome.  Yu was no different.  He felt very strongly that ISU mistreated him and that he should prevail on his claim.  At times, however, Yu's credibility suffered because of his exasperation, such as when ISU's counsel asked him about whether ISU had a policy that required Yu to be placed on academic probation.  And, at other times in cross-examination, Yu's testimony that he was treated differently than other students (because they were placed on academic probation while he was not) did not hold up.  Instead of either agreeing that he had not been treated differently in this regard or offering some persuasive evidence that he was, he simply refused to accept the possibility that his interpretation of the ISU

grading policy was incorrect.  This mirrored in some respects his flat refusal to credit virtually any negative feedback that any supervisor had for him, while universally crediting all positive feedback.

89.     Yu also testified at times as if he were reading from a script.  When asked why he thought he was dismissed from the CCCA internship, he responded not with his understanding of Dr. Speer's reasons – after all, she had made the decision – for dismissing him, he instead answered that he was treated unfairly.  Trial Tr. vol. 1, 103:18–20, 104:13–17.  His initial answer about Dr. Landers's dismissal of him from the EIRMC externship was the same: "My understanding is he treated me unfairly."  Trial Tr. vol. 1, 106:25–107:4.  Perhaps Yu genuinely believed he was treated unfairly, but here again the Court perceived a lack of self-awareness about the genuineness of the concerns expressed by both Dr. Landers and Dr. Speer.  Such a lack of self-awareness reflected in his trial testimony is highly relevant because it also mirrored the feedback from other of his clinical supervisors.  Yu seemed to be unaware of, or unconcerned with, the need to do more than to say he'd been treated unfairly in order to rebut the concerns raised by his clinical supervisors.

90.     To be clear, this case does not turn entirely on Yu's credibility as a witness.  Yu's burden was to prove that ISU intentionally discriminated against him on the basis of his race or national origin, and his testimony as to whether he felt he was discriminated against is but one piece of evidence on that point.  But noticeably absent from Yu's testimony, and from virtually all the evidence in this case, was anything more than a generalized assertion that Yu's race or national origin influenced how he was treated by ISU.

91.     The Court concludes that Yu either lacked the capacity to acknowledge genuine shortcomings in his work in the doctoral psychology program, for whatever reason, or he decided

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 36**

it would be beneficial for trial purposes to emphasize positive feedback and discount negative feedback, regardless of the purpose and fairness of the feedback.  Yu said nothing at trial to suggest he held himself accountable in any way for his well-documented poor clinical performance and numerous negative reviews.  Yet, he received critical evaluations over multiple years from multiple independent supervisors in several different settings.  Those evaluations included consistent references from multiple faculty members and supervisors about the same or similar weaknesses or limitations in Yu's performance – weaknesses and limitations that he steadfastly refused to acknowledge might have any merit.

92.     Among the common threads in the negative evaluations Yu received was a lack of clinical competence.  These observations were not exclusive to ISU professors, as three different non-ISU psychologists dismissed him from clinical settings.  But his English fluency was not a common thread, as some psychologists who gave him negative evaluations took pains to describe.  Dr. Landers, by way of example, testified that "[i]f we are talking about pronunciation, if we are talking with articulation, if we are talking about fluency, those were not my concerns."  Trial Tr. 4, 26:21–23.  Rather, Dr. Landers dismissed Yu from the EIRMC externship because Yu

> was very qualified in a narrow band of clinical skill, but not qualified in a broad band.  And certainly not in the area that I was practicing, which is inpatient psychiatric patients doing . . . clinical testing.  And so I don't believe he understood that he was not qualified outside of that narrow band.  Therefore, he wouldn't have asked for additional supervisory assistance.

Trial Tr. 4, 20:4–10.

93.     Yu's testimony, at times, was simply not credible.  On cross-examination, Yu initially denied speaking to Dr. Speer or Dr. Roberts about either of Dr. Speer's assessments.  He also denied ever learning specifically why he was dismissed from the CCCA internship.  When

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 37**

asked why he thought he was dismissed from the internship, he answered that he was treated

unfairly.  He testified that was the only reason he believes he was dismissed.  Trial Tr. vol. 1,

103:5–22.  He was critical of Dr. Speer, as he had been critical of other supervisors, for not

explaining to him the objectives and rating scales on the standard evaluation forms used to assess

his performance.[16]  But ultimately he did admit that he had talked with Dr. Speer about her

assessment and he understood that she believed he potentially could harm some patients.

94.     Similarly, when ISU's counsel asked Yu why Dr. Landers had dismissed him

from the EIRMC externship, Yu's answer was that Dr. Landers had treated him unfairly and

judged him prematurely.  But when pressed, he admitted that Dr. Landers said that Yu was

unable to grasp communication nuances.  Trial Tr. vol. 1, 106:22–107:7.  Nonetheless, he also

characterized it as unfair that Dr. Landers did not give him a remediation plan or an opportunity

to improve after he was notified of his limitations.[17]

95.     Yu next called Dr. Cheryl Chase, one of his internship supervisors.  Dr. Chase,

self-employed as a clinical psychologist in private practice in Cleveland, Ohio, also has worked

as an adjunct instructor and has published in the field of clinical psychology.  Her role in Yu's

---

[16] Although not directly at issue here, the Court finds that Yu's claimed ignorance about
the meaning of such objectives and ratings is not credible.  These instruments would have been
well known to him and his years of academic classroom success as a doctoral student in clinical
psychology would have given him the resources necessary to interpret the meaning and
significance of these assessments even if they had not been previously known to him.

[17] For his part, Dr. Landers testified that his patients typically are "in the most critical
position of their lives.  They are considering death as a better option than life. . . . We have got
their life on the line, essentially.  And this is kind of the one shot that we have. . . . if we mess
this up, . . . they are not going to come back.  And it could be fatal."  Trial Tr. vol. 4, 22:8–15.  In
such a setting, Dr. Landers further testified, he could not "afford to remediate or experiment and
try to teach someone how to do things that they should know how to do with these particular
patients."  Trial Tr. Vol. 4, 22:17–19.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 38**

internship was to supervise his work in her practice and to send feedback both to ISU and to Dr. Speer (the overall internship supervisor).[18]

96.   Dr. Chase had two conversations with Dr. Speer.  In the first, Dr. Speer expressed concerns about Yu's socialization and interactions with client families.  Dr. Chase told Dr. Speer that she did not share the same concerns.  In the second conversation, Dr. Speer told Dr. Chase that she was terminating Yu's internship.

97.   Dr. Chase testified that Yu's progress in the internship placement was at the point of her supervising his administering of tests, to ensure they were done properly.  He was not allowed to do direct testing in clinical cases.  Dr. Chase said four to eight weeks of experience is usually needed before interns are allowed to conduct testing of patients because every test (in her specialty) is specifically standardized and there are nuances for each test involving the use of follow-up questions and how the test is timed.  Until he gained that experience, Dr. Chase initially had Yu focus on case studies.  She was impressed with his ability to interpret and summarize data to make recommendations and diagnostic impressions.

98.   Dr. Chase sent an email to Dr. Roberts on April 8, 2013 (Ex. 47) to update him on Yu's performance and progress at that point, about three months into his internship.  She was concerned about Yu "delivering test items" because English is a second language for him, saying that her plan was to have him initially administer tests requiring little verbal instruction before moving on to tests that are CD based.  Dr. Chase's concern about Yu's English competence was related to dyslexia evaluations.  According to Dr. Chase, because dyslexia is a language-based disorder, a primary test to evaluate dyslexia involves reading off "nonsense" words formed from

---

[18] Dr. Chase did not know Dr. Speer other than through the very limited interactions between them related to Yu's internship.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 39**

English sounds.  The test requires precise pronunciation and English listening skills to administer correctly.  Dr. Chase said she would "absolutely" have the same concern about *any* intern who spoke English as a second language.  She said it took her, even as a native English speaker, a year to a year and a half before she could listen and hear the nonsense words properly.

99.     Dr. Chase testified that as of April 2013 Yu had made solid progress in administering tests.  But she also said that the "real work" is in interpreting the test data and making meaningful recommendations that families can use, and she was impressed with Yu's abilities in this regard.  She said that Yu was progressing just as she would have expected based on his level of training.

100.     Dr. Chase was asked to explain what she meant in her April 8, 2013 email when she said that she and Yu had "discussed about a dozen cases, and provided direct clinical service to approximately six cases."  She said that at the beginning of the internship, they had reviewed some of Dr. Chase's historical cases together.  Then, Yu sat in on two cases with Dr. Chase and drafted the initial report on those cases.  By "direct" service, Dr. Chase meant that Yu was interacting with patients who were paying for services.  He would bring patients back from the waiting room, do the background interview, observe the testing, and then do a joint feedback session together.  Although she had not yet begun to have Yu administer any tests independently, she testified (on redirect examination) that she had planned to have Yu engage in more sophisticated tasks based on his progress.

101.     On cross-examination, Dr. Chase agreed that in a pretrial deposition she had testified that Yu had not tested students directly and instead his work had just been observational.  Dr. Chase clarified that Yu's efforts with respect to the testing element had been observational.  She said she felt Yu was at an appropriate level given where he was at in his training in part

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 40**

because he had demonstrated a knowledge of ethics and a knowledge of scoring and interpreting tests and data to make a diagnosis and treatment recommendations.

102.     Yu described Dr. Chase's feedback about his progress during his internship with her as "uniformly positive."  Plf.'s Closing Arg. 18 (Dkt. 177).  He contends her evaluation of his performance was discounted by ISU during the appeals process.  Plf.'s Proposed Findings of Fact and Conclusions of Law ¶ 79 (Dkt. 176).

103.     As discussed *supra* (¶ 70), ISU understood from Dr. Chase's April 8, 2013 email that Yu had not performed any professional work with patients.  *See* Ex. 37.  This was a reasonable interpretation of her email, even if Dr. Chase enlarged upon her experience with Yu in her trial testimony.

104.     Moreover, Dr. Chase's email (Ex. 47) was not "uniformly positive," as Yu would describe it.  In the email, which was sent contemporaneously to her work with Yu, she said she had "concerns about Jun delivering test items since English is a second language for him."  Ex. 47 at 1.  Dr. Chase's email documented yet another clinician's concern (another person who, notably, was not part of the ISU Psychology Department) about Yu's language fluency and its impact upon clinical work.  Further, Yu had not started any independent work for Dr. Chase after three months on site (and after four years of doctoral studies), which suggested that he had not yet demonstrated the ability to practice independently.  Significantly, even though Dr. Chase provided additional explanation at trial for Yu's not working independently in her clinic, that additional explanation had not been provided to ISU during Yu's dismissal proceedings.

105.     Dr. Koocher, the first of four expert witnesses Yu called to testify, is a clinical psychologist who has been on the faculty of several colleges and universities, including Harvard Medical School.  He has taught, written, and lectured extensively on the issue of ethics in

psychology.  He said that his textbook on ethics in the field of psychology was used by ISU's

clinical psychology program.  In 2006, he was the president of the American Psychological

Association.  He also has been a site visitor for an accreditation body.  The Court found Dr.

Koocher qualified to testify as an expert witness in this matter.

106.     Broadly, Dr. Koocher opined that Yu was a victim of ISU's failure to adhere to

ethical guidelines and principles applicable to psychologists and to accredited programs in

professional psychology.  He identified several examples of what he said were such ethical

failures and he also alleged due process violations.  He faulted ISU for dismissing Yu without

giving him an opportunity to present his side at a hearing before the dismissal.  Trial Tr. vol. 2,

52:20–24.  He faulted ISU for allowing Yu to teach undergraduate courses despite perceiving

him to have poor communication skills.  Trial Tr. vol. 2, 53:22–25.  He faulted Dr. Roberts, as

the Director of Clinical Training, for not insisting that CCCA agree to preserve all of Yu's due

process rights.  Trial Tr. vol. 2, 55:7–16.  He faulted ISU for not taking an active role in helping

Yu arrange an internship.  Trial Tr. vol. 2, 56:8–17.  He faulted ISU particularly for not putting

Yu on probation[19] or notifying him he was at risk of dismissal, although he then admitted during

cross-examination that there was no reason Yu should have been on academic probation.  Trial

Tr. vol. 2, 59:7–20; Trial Tr. vol. 2, 57:14–16.  He faulted ISU for offering Yu a master's degree

after his dismissal, even though Yu had successfully defended a dissertation.  Trial Tr. vol. 2,

61:1–2.

107.     Dr. Koocher testified that a school's response when a student is dismissed from an

internship depends on the circumstances of the dismissal.  For malfeasance such as sexual

---

[19] Dr. Koocher did not distinguish between "academic probation" and any other possible
kinds of probation.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 42**

intimacies with a client or a substance abuse problem, he said that it would not be unusual for a program to dismiss the student as personally unsuited for the profession or as risky to the profession in some way.  But in other circumstances, he said that usually the school tries to find an alternate way for the student to acquire experience, with remediation opportunities if necessary.  Although Dr. Koocher did not elaborate on these points, the Court finds that ISU could reasonably be characterized as having dismissed Yu based on a belief that he was personally unsuited for the profession or that he posed a risk to clients if he were to practice clinical psychology.  Further, although Dr. Koocher did not make the effort to make the connection, ISU had, in fact, tried to find alternate ways for Yu to meet the internship requirement when it came up with the three alternative approaches Yu could choose from after he failed in the first instance to be matched for an internship through APPIC.

108.    Despite opining that regional accreditors would find ISU's policy of not having a procedure allowing appeals of externship or internship grades "deeply flawed," Dr. Koocher said that he would not be surprised if an accreditation site visit team were to find that Yu's complaint was thoroughly addressed, properly documented, and professionally managed.  Trial Tr. vol. 3, 72:1–9; Trial Tr. vol. 3, 77:4–10.  His testimony did not resolve this apparent disconnect.

109.    ISU's counsel sought to impeach Dr. Koocher's credibility by cross-examining him about a document called the "Hoffman Report," which related to the position of the American Psychology Association, while Dr. Koocher was its president, regarding whether it was ethical for psychologists to function as military interrogators.  Dr. Koocher testified that the report stated he had supported a role for military psychologists in the treatment and interrogation of detainees.  He said that he was not given the opportunity to write a formal rebuttal to the report and that at least one student called for his resignation as a dean at DePaul University when

the report was made public.  The Court assumes that the cross-examination on this topic was intended to suggest that Dr. Koocher's positions on the ethics of clinical psychology have shifting sands, but the Court concludes that whatever criticism was directed at Dr. Koocher as to the Hoffman Report, its relevance to this case is hard to find.

110.    The Court found Dr. Koocher otherwise to be generally credible, but much of his testimony was of only limited relevance and often drawn upon figurative chalkboards disconnected to this case.  His testimony was permitted because of the possibility it might have relevance to the central issue in this case – whether ISU intentionally discriminated against Yu on the basis of race or national origin – but after hearing such testimony, there was very little such relevance.  Dr. Koocher had a laundry list of criticisms of Idaho State University's Department of Psychology.  He opined that ISU had perpetrated ethical lapses and due process violations in Yu's case, but nothing he said persuasively suggested that such alleged lapses or violations were motivated by Yu's race or national origin, or that they were intentional.  They were drawn from a paper record, with no first-hand knowledge of the workings of the psychology department, the members of its faculty, or the day-to-day life of the department and its doctoral students.  That does not make Dr. Koocher, or any of the other of Yu's experts, disqualified from coming up with opinions about the Department of Psychology and its people.  But, the remove of distance and the lack of real familiarity do impair the credibility of such opinions, particularly when there appears to have been no effort to learn more than the paper record.  Regardless, the Court finds no evidence of a Title VI violation based on Dr. Koocher's testimony and so his overall testimony is of little help to Yu's case.

111.    Yu next called Dr. Shannon Chavez-Korell as an expert witness to testify regarding cultural competence in the field of psychology.  Dr. Chavez is a licensed psychologist

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 44**

and tenured professor whose work focuses on cultural competence, multi-culturalism, and professional ethics.

112.     Dr. Chavez testified that multi-cultural competency in the field of psychology is defined by the domains of awareness, knowledge, and skills.  These involve cultural awareness of self, cultural knowledge of self and others, and skills used as the interventions performed with clients.  She testified that there has been a movement in the field of psychology to recognize that psychology and psychologists have historically done great harm to clients and individuals by not recognizing the role that culture plays in the day-to-day lives of individuals.  As an outgrowth of this movement, she testified, the concept of clinical competence has evolved to include multi-cultural competence.  She also noted that the American Psychological Association ("APA") requires accredited programs to provide training in multi-cultural psychology within their curricula.  The Court found her qualified to opine on multi-cultural competence in this matter.

113.     Based on her review of Yu's practicum evaluations across semesters and other documents and applying APA standards related to ethics and multi-cultural guidelines, Dr. Chavez opined that Yu was a victim of cultural incompetence.  She further opined that ISU failed to adequately and properly address the diversity and cultural challenges faced by Yu.  She testified that when the multi-cultural competence framework of awareness, knowledge, and skills is missing, there is a risk of harm and that Yu was harmed by ISU's failure to employ such a framework.

114.     By way of example, Dr. Chavez mentioned a "missed opportunity" in Yu's first practicum, when she said that Dr. Atkins remarked that Yu's language skills were affecting his clinical work and the CTC recommended Yu immerse himself in English-speaking contexts.  Dr. Chavez noted that Yu was already immersed in English-speaking contexts, as an international

student studying in the United States.  She also suggested that additional English practice would

not address the primary problem Dr. Atkins noted, which was related to forming working

alliances.[20]  From a cultural competence perspective, Dr. Chavez opined, Yu could have

benefited from a remediation or recommendation that was more specific to what his needs were

and the cultural challenges that hindered him.  But she did not explain what such a remediation

or recommendation might have looked like, or even how to approach the problem of identifying

a more culturally competent response.

      115.    Dr. Chavez's testimony may have been grounded in theoretical touchstones and

perhaps also on empirical evidence of the existence of the need for cultural competence in the

field of clinical psychology and the teaching of clinical psychology.  But, as to the doctoral

program at ISU and as to Yu's performance in that program, her testimony was unpersuasive on

issues relevant to Yu's Title VI claim against ISU.

      116.    Dr. Chavez's opinions, in many instances, were both conclusory and vague.  It

was clear that she was critical of some of ISU's actions, but it was not clear what specific actions

she thought ISU should have undertaken instead (the "missed opportunity" being one such

example).  This left the impression that she measured ISU's cultural competence, or

incompetence, not by the actions the ISU faculty took but rather by the results they produced.

For instance, the trial record makes clear that ISU *did* attempt to address what Dr. Chavez

describes as a "cultural" issue – Yu's language difficulties – by raising the issue, expressly and

repeatedly, and taking steps and providing suggestions to assist Yu in improving his English

---

[20] The Court found this testimony confusing.  It seems completely sensible that an improvement in Yu's English-speaking abilities would improve his ability to form working alliances.  As a matter of common sense, people relate to and communicate with each other more easily when they share fluency in a common language, including the nuances of the language.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 46**

language skills.  Dr. Chavez suggested that because some methods of doing so might be obvious
– to immerse oneself in the language environment more fully, for example – then the suggestion
of such a method must reflect cultural incompetence.  But, in the Court's view, the most
commonly used and understood methods of mastering a second language – particularly as to
such things as nuance, idioms, and dialect – all emphasize immersion in the settings where the
second language is the primary language.[21]  Employing those means of learning, or suggesting
such means of learning, cannot reasonably be characterized as "cultural incompetence."  Further,
even though Dr. Chavez did not say that ISU's mention of the language issues was itself
improper, she did opine that ISU was culturally incompetent because it had not done more.  But,
as in life generally, it is easier to identify problems than it is to identify a better practice.  Dr.
Chavez's testimony discounting ISU's actions while speaking in only general terms about
potential alternative courses of action rang hollow – especially when she failed to acknowledge
the "opportunities" that ISU did not "miss" to raise the exact same issues.

117.    Dr. Chavez also used a wide brush to paint ISU as culturally incompetent for what
she said was a "decision to overlook the cultural issues related to Mr. Yu… and to not take
responsibility for the role in actually mediating his training needs, and to not have a process for
him to appeal directly to the faculty."  Trial Tr. vol. 2, 106:9–14.  But she spoke as if such a
"decision to overlook" was a conscious, intentional, affirmative choice that ISU had made,
without explaining her reasoning for perceiving it that way.  And, as with other criticisms she
directed at ISU, she did not acknowledge the actions ISU did undertake to address cultural issues

---

[21] Additionally, there are many degrees of language immersion, even for a graduate
student already in an English language environment.  The international student who stays home
and only ventures out to go to class, or who mingles only with other international students who
speak the same native language, is not immersing herself in the second language.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 47**

and training needs.  Nor did she suggest what should have been done differently that would have made the University more culturally competent.  Moreover, she made no mention of Yu's well-documented shortcomings in the critical clinical competency area of the doctoral program requirements.  Perhaps that omission came from the fact that Dr. Chavez works primarily in academia, but her failure to speak directly to that issue left no guidepost for the Court to weigh the relative significance of alleged cultural incompetence on ISU's part against the significant difficulties Yu had in mastering essential clinical skills.

118.    Consistent with Federal Rule of Evidence 614(b), the Court inquired of Dr. Chavez about how her opinions on ISU's alleged cultural incompetence relate to the central issue in this case, whether there was intentional discrimination.  Trial Tr. vol. 3, 116:1–19.  Dr. Chavez testified that she perceived intention based on the fact that Yu was struggling and the ISU faculty, in her opinion, intentionally decided not to intervene.  She pointed to no evidence to support her opinion.  In follow-up questioning from ISU's counsel, she narrowed her testimony to say that ISU specifically intentionally discriminated against Yu because he was Chinese (Trial Tr. vol. 3, 118:9–13), but the only basis she offered such a statement was her factually inchoate opinion that the ISU faculty had not acted to support him.  She did not point to any evidence that ISU acted or failed to act toward Yu based on his race or national origin.

119.    Dr. Chavez's testimony was helpful to the extent that it defined cultural competence and articulated its role in the field of psychology.  But her testimony was less helpful when applied to the specific facts of this case because she did not convincingly articulate how purported cultural incompetency in the Department of Psychology transmuted into

intentional discrimination against Yu.[22]  Moreover, even if the Court were persuaded to accept Dr. Chavez's testimony as evidence that discrimination *could* occur due to a lack of cultural competence, that alone does not show that discrimination *did in fact* occur.  Finally, the Court finds that Dr. Chavez's ultimate opinion that ISU intentionally discriminated against Yu based on his national origin is not supported by her testimony or by the record as a whole.

120.    Yu next called Dr. Leslie Zorwick to testify as an expert witness regarding aversive racism and prejudice.  Dr. Zorwick is a social psychologist and tenured professor at Hendrix College in Conway, Arkansas, where she has been since 2007.  She has published in the field of social psychology on the topics of gender stereotypes, race-based prejudice, and diversity.  Her stated expertise is in social psychology, with a focus on stereotyping, prejudice, discrimination, and identity.  The Court found her qualified to opine on aversive racism.

121.    Dr. Zorwick testified that "aversive racism" is a theory that tries to explain how racism presents itself in modern contexts.  She described it as the most dominant theory regarding "modern manifestations" of prejudice.  She explained that the key premise of aversive racism is that prejudice today looks different than it has looked historically.  She said that under the theory, racism tends to manifest now as a sort of duality in which a person can simultaneously hold a generalized belief in egalitarianism while also understanding and being

---

[22] Of course, such testimony could be subject to objection as speculative.  But the testimony as given did almost nothing to fill in the gap between what ISU did and what it, perhaps, could or should have done.  This gap means that the testimony regarding ISU's alleged cultural incompetence was largely untethered from the other evidence in the case, especially any evidence about whether ISU engaged in actionable intentional discrimination.  Further (and paradoxically so given Dr. Chavez's emphasis upon cultural competence), her testimony seemed to reflect the absence of even a basic inquiry into the structure and operations of the ISU academic community, the Department of Psychology, and their culture.  Rather, she seemed to presume that this academic department, in this university, in this place, was culturally incompetent.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 49**

influenced by negative racial stereotypes.  She testified that "aversive racism theory gives us a way to say we need to look at not what people say about their intentions but what they do.  And if what they do treats different groups of people differently, that gives us a much better window into what was influencing the judgment and decisions of people when race is a factor."  Trial Tr. vol. 2, 128:23–129:3.  She explained that we need to look for patterns of behavior and choices that treat groups differently rather than explicit motives, because social norms surrounding how people express their motives have changed significantly.  Trial Tr. vol. 2, 135:2–6.  She also explained that considering the motives ascribed to actions is not enough – one must also look at the actions themselves and the consequences of those actions to fully understand what was influencing the actor.  Trial Tr. vol. 2, 137:1–4.

122.    Dr. Zorwick testified that there are five characteristic hallmarks of aversive racism.  Trial Tr. vol. 2, 137:22–140:22.  First is the presence of ambiguity surrounding decision-making.  Second is race-neutral explanations after the fact.  Third is the expression of micro-aggressions, small events that communicate who is and is not valued in different contexts.  Fourth is challenging interracial interactions and relationships, which Dr. Zorwick described as differences in perspective during an interracial interaction when a white participant focuses on wanting to treat people the same while a non-white participant focuses on subtle nonverbal cues.  Fifth is the use of post-hoc justification.[23]

123.    Dr. Zorwick testified that she reviewed documents provided to her in this case to identify evidence that aversive racism was present and evidence that it was not present.  Trial Tr.

---

[23] Dr. Zorwick did not explain how the second and fifth characteristics differ, even though (1) "explanations after the fact" and "post-hoc justification" are synonymous; and (2) both concepts relate to explaining or justifying a decision after the decision has already been made.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 50**

vol. 3, 142:9–14; Trial Tr. vol. 3, 143:12–14.  She said that the documents she considered

strongly signaled the presence of aversive racism across all five of the hallmarks she mentioned.

Ultimately, she opined that Yu's race and international status impacted the way he was treated by

the ISU faculty and that this happened through a pattern of intentional repeated choices made by

ISU faculty.  Trial Tr. vol. 3, 146:8–12.  To support her ultimate opinion, Dr. Zorwick offered

factual examples from Yu's case that she said related to each of the five hallmarks of aversive

racism.

124.    Dr. Zorwick found ambiguities where ISU remarked on Yu's communication

skills but did not articulate what standard of fluency they expected of him and when Dr. Roberts

wrote Yu glowing letters of recommendation (Ex. 44) that she said were inconsistent with the

later decision to dismiss him from the program.  But discussion of Yu's difficulties expressing

himself in English were raised as far back as his ISU application interview and were noted by

multiple supervisors thereafter.[24]  Further, there were distinctions drawn about the differences

between his written fluency and his verbal fluency.  Frankly, Dr. Zorwick's contention that ISU

was aversely racist because of what she characterizes as "ambiguity" in discussing Yu's English

fluency is simply nonsensical.  His language difficulties clearly impacted his ability to form

clinical relationships with clients and to communicate with supervisors in clinical settings, in an

English language setting.  Dr. Zorwick's labeling of racist ambiguity on this topic had no

suggestion of what she contends ISU should have done differently to address the problem of

Yu's English proficiency.  The Court is not persuaded that ISU's acknowledgment of, and advice

regarding, a significant perceived problem is somehow evidence of unlawful intentional

---

[24] Indeed, the first example was in the admission committee's discussion of Yu's TOEFL
scores.

discrimination merely because the written feedback did not create some undefined meaning of "fluency," an otherwise commonly understood word.  ISU urged him to keep practicing his English and to do so in various settings where English was being used, which was eminently reasonable under the circumstances.

125.    As to Dr. Zorwick's criticism of Dr. Robert's recommendation letter as a hallmark piece of ambiguity indicating aversive racism, the Court finds no credibility whatsoever.  Dr. Zorwick either missed or overlooked the fact that *after* Dr. Roberts wrote Yu's letter of recommendation in support of his APPIC application in October 2011 and *before* ISU dismissed Yu from the doctoral program in May 2013, Yu had multiple clinical psychologists tell the University that Yu was not competent to work in their clinics – one of whom said expressly that Yu was a potential danger to any clinical patients with whom he might work – all of which also led to Yu's dismissal from two separate clinical placements.  There is nothing remarkable about the head of an academic department writing a letter of recommendation for a student, when the very nature of such a task includes describing the student in the best possible light.[25]  In Yu's case, the Graduate Faculty's vote to dismiss him, followed by the subsequent actions upholding that decision in the higher levels of the University academic ranks, occurred more than a year and a half later, and after two, separate, dismissals for lack of competency from clinical

_____

[25] There are multiple examples in the record where professors and clinical psychologists who worked with Yu described academic successes in his work and where they remarked upon good personality traits and the strong work ethic that he brought to his teaching and research. They also gave encouragement to him in many of those instances where what can only reasonably be described as constructive criticism was offered.  It would be an unusual circumstance where an academic department working with doctoral graduate students did not meet its responsibilities to its students in such a manner.  The students have made an investment in themselves and the university.  The university, in turn, has made an investment in the students. The students and the faculty expect their doctoral students to succeed; otherwise, they would not have admitted them to the program.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 52**

placements.  Dr. Zorwick's testimony that these two events are an example of ambiguity that constitutes aversive racism is not credible.  Rather, it is incredulous to such a degree that it impairs the entirety of her testimony.[26]

126.    Dr. Zorwick then identified two examples of what she characterized as race-neutral explanations, which she described as aversive racism in the form of acknowledging differences and then erring on the side of only using race-neutral explanations after decisions were made.  Yu's early evaluations in the program, she said, referenced some of his needs and experiences as a Chinese international student but she went on to say that ISU's decision to dismiss him from the program discusses how every student is treated the same.[27]  But, as in other portions of her testimony, she did not say what ISU should have done differently so as to avoid engaging in aversive racism.  Federal law prohibits intentional discrimination based on protected characteristics and that is the gravamen of this lawsuit.  But it is not discriminatory for ISU to speak to Yu's cultural circumstances and language skills in prior evaluations, particularly in a field such as clinical psychology.  And, as described previously, the nature of Yu's difficulties became most problematic for his success in the program after he had attempted, and failed, multiple clinical placements.

127.    Third, Dr. Zorwick testified as to four examples of micro-aggressions.  First, she explained that ISU framed Yu's multilingualism as a liability.  But this characterization is not

---

[26] Dr. Zorwick also opined upon what she said was racist ambiguity related to Dr. Speer's decision to dismiss Yu from the internship.  Her testimony there was equally non-persuasive; regardless, Dr. Speer is not an agent or employee of ISU.  Thus, Dr. Zorwick's criticism of Dr. Speer is not relevant to Yu's claim against ISU.

[27] Ironically, Dr. Zorwick finds evidence of aversive racism in the fact that ISU apparently did not recommend regular English instruction to other students or encourage other students to consider an internship in China, but Dr. Chavez would have testified (one would presume) that if ISU had not done so for Yu, that would be evidence of cultural incompetency.

supported by the evidence.  Limitations in Yu's *English* proficiency were well-documented, but

nothing in the record indicates ISU perceived Yu as not being proficient in his *native* language.

His "multilingualism" never came up expressly; the focus at every turn was on limitations he had

in some areas of his English language communication skills.  Moreover, in the CTC evaluation

laying out Yu's three options for satisfying his internship requirement, the CTC said that "an

internship experience in China would preclude the communication difficulties that appear to be

restricting his professional development in the USA.  Performing psychotherapy in a foreign

language and in a different culture is understandably difficult, given the subtle nature of

communication."  Ex. 32.  Additionally, Yu himself expressed that he was looking for sites in

need of interns who speak Chinese and understand Chinese culture (Ex. 40).

128.    The Court is persuaded by repeated emphasis and comment from the professors

and clinicians who have testified in this case, along with multiple pieces of the documentary

evidence, that doing the work of a clinical psychologist in the best possible manner is enhanced

by fluency in understanding, speaking, and writing the language of the patient, to include

understanding the nuances of the language and the nuances of a patient in response to statements

or conversation from the clinician.  It is self-evident, then, that it is important for a clinical

psychologist whose clients speak English to have a strong fluency in English even if it is not his

native language.

129.    As a second example, Dr. Zorwick suggested that ISU perpetrated racial micro-

aggressions by being less aware of structural barriers that Asian international students face and

by offering Yu less help or support than it offered other students.  Trial Tr. vol. 2, 160:12–161:1.

The Court is familiar with theories of prejudice which are discussed interchangeably with the

theory of aversive racism described by Dr. Zorwick's, but which carry different names, such as

unconscious bias or implicit bias.  They have a common thread of a lack of awareness on the part

of the person who carries such an unconscious bias, and a belief that a concerted effort by an

individual to understand the possible presence of such unconscious bias can help lessen its

pernicious effects.  That theory underlies the testimony of Dr. Zorwick and, to some extent, the

testimony of Dr. Chavez.  But Dr. Zorwick apparently would suggest that even the most

egalitarian individuals, of whatever race, can be unaware of their unconscious bias (as the name

describes) but still be intentionally racist.  That simply makes no sense.  This example is

illustrative of that disconnect, as Dr. Zorwick opines that ISU faculty members were aversively

racist toward Yu by being "less aware" of structural barriers that might face Yu as an

international Chinese student.  Even more telling, Dr. Zorwick offered no explanation of what

those structural barriers might be, how they might relate to a Chinese international student's

progress in the doctoral program, or how, exactly, a lack of knowledge about such things

(whatever they might be) becomes an intentional, micro-aggressive, act of discrimination against

Yu.  Such a connection, if any can be drawn, would depend in the first instance upon the actual

fact of "structural barriers" faced by Asian students at ISU, which were not described.  Second,

there would need to be evidence that other students were provided more help or support than was

provided to Yu.  Again, the record is nearly absent of any such evidence.

      130.    Yu was a foreign national student in the United States, studying at an American

public university.  There are challenges that come with that, just as there are challenges for any

doctoral student, but perhaps with greater difficulties for the international student who is living

in a different culture and working in a second language.  But Yu knowingly and willingly elected

to take on those challenges – one such reason, as was described at trial, was that if he obtained a

doctoral degree from an American university his future job prospects and his future income, in

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 55**

China, would be greatly enhanced.  He also would have the opportunity to gain a greater fluency in the English language and a better understanding of the life and customs of the American people.  Hence, Dr. Zorwick's testimony both assumes too much and is inapposite to the concept of *intentional* discrimination.  An assumed lack of awareness of structural barriers, even if the Court were persuaded of such a lack of awareness, without more, does not rise to the level of intentionality.

131.    Third, Dr. Zorwick testified that Dr. Lynch gave a strong signal that Yu was "not welcome" by telling Yu's wife that his English was terrible.  Trial Tr. vol. 2, 161:2–9.  This example is not credible because Dr. Zorwick again made assumptions without a full context. She assigns the worst possible motive to the conversation, a conversation which Dr. Lynch described quite differently than did Ms. Eikenburg.  Nothing in Dr. Zorwick's testimony credits the possibility, if not (as the Court concludes) the probability, of a non-discriminatory motive for the statements made by Dr. Lynch to Ms. Eikenburg.  Even if one accepted Dr. Zorwick's characterization of the conversation as constituting evidence of aversive racism, there is again lacking any evidence of intention.  But, even more fundamentally, nothing at all in any of Dr. Zorwick's testimony ties any of ISU's actions or inactions, whether intentional or otherwise, to Yu's race or national origin.  The Court is well-aware that the plaintiff in a Title VI action has a steep mountain to climb to show unlawful animus when discriminatory acts might be cloaked in pretext.  But there must also be some anchor to a protected characteristic to prevail on the claim, and there simply is no such anchor in any of the evidence in this case.  Dr. Zorwick did not acknowledge the possibility that Dr. Lynch was trying to help Yu by identifying an area for improvement.  More broadly, she also did not acknowledge the alternative explanation that Yu was dismissed not because of his race or national origin, but because he had repeatedly failed to

demonstrate clinical competence.

132.   Fourth, Dr. Zorwick testified that Dr. Lynch committed a micro-aggression by referring to Yu as not being engaged because he read course materials during a practicum discussion.  Trial Tr. vol. 2, 161:10–7.  She said Dr. Lynch apparently had one model of what successful class participation looked like and that her model did not acknowledge that some students process information differently.  Dr. Zorwick was concerned that Dr. Lynch pathologized an assumption that engagement that does not fit the model of "white American" class engagement is perceived as being less valid or important.

133.   In listening carefully to Dr. Zorwick's testimony and reading the trial transcript to go over it again, the Court is left with the sense that, in this instance also, Dr. Zorwick makes assumptions about micro-aggression without a credible basis to do so.  She assumes that because of their culture, Chinese students participate in clinical psychology practicum academic classes differently than non-Chinese students.  But there is no evidence of that in the pretrial record, nor even any evidence drawn upon Dr. Zorwick's own experience as a teaching academic.  Even if there were such evidence, Dr. Zorwick goes on to assume that Chinese students read course materials during class instead of listening to and participating in classroom discussion.  There is no evidence of that.  Indeed, if a professor such as Dr. Lynch were to have suggested that Yu was participating in the small practicum course in his disengaged and disrespectful manner (in Dr. Lynch's view) because he was Chinese, then the circularity of Dr. Zorwick's opinion is even more apparent.  In other words, does she contend that Dr. Lynch was aversely racist against Yu by calling him out about his classroom behavior, in a class where discussion and respect for the professor is critical to the learning process (remembering also that Dr. Lynch testified that she had never worked with a student who showed such disrespectful behavior toward a professor)?

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 57**

Or is it her opinion that Dr. Lynch was aversely racist against Yu because she didn't say to him "you're Chinese, and therefore you process information differently than persons of other nationalities, and therefore I don't expect you to participate in the practicum discussions or pay attention to the professor during class?"

134.    The Court will give Dr. Zorwick the benefit of the doubt about the good faith of her criticism of Dr. Lynch even if the Court does not accept her opinion on this subject.  In other words, perhaps her view might have been different had she had the benefit of hearing Dr. Lynch's trial testimony about this subject.

135.    Next Dr. Zorwick testified about examples of "challenging racial interactions." First, she said that ISU privileged the experience of white native English speakers over Yu's experience when evaluating Yu's complaint against Dr. Landers after Yu was dismissed from the EIRMC internship.  Trial Tr. vol. 2, 163:1–164:5.  Once again, she did not testify as to what she believed ISU should have done differently, nor did she say how ISU should have responded that would not have been an example of a "challenging racial interaction."  Would she have had ISU end its relationship with Dr. Landers as a site supervisor based solely on Yu's experience, because any criticism by Dr. Landers of an extern of a nationality different than the United States would be a "challenging racial interaction?"  Would she have had ISU discount the experiences of other students who did not have problems with Dr. Landers's supervision on the basis that they were not Chinese, even if Dr. Landers had offered constructive criticism of their work in his clinic?

136.    In context, ISU's handling of Yu's complaint against Dr. Landers was entirely reasonable.  When Yu complained, ISU investigated.  Among other things, other students were polled about their own experiences working in Dr. Lander's clinic.  Based in part on the positive

feedback of other students, ISU chose to continue working with him as a site supervisor.  If there was a flaw somewhere in that process, Dr. Zorwick failed to point it out.  The Court finds no evidence this can serve as an example of aversive racism.

137.    Second, Dr. Zorwick testified that Dr. Lynch's evaluation of Yu in which she described him as unengaged during practicum meetings set the stage for challenging interracial interactions.  Trial Tr. vol. 2, 165:20–166:4.  Dr. Lynch's subsequent testimony included a description of interactions that were, it could be described, challenging.  But they were challenging because of Yu's behavior in the classroom and toward his professor, not because of culture and race.  In other words, one can look at the interactions between the two and not know whether the professor and the student are of the same, or different, races and cultures, and still be left with the conclusion that the student acted in a way that was not conducive to learning and not respectful of the professor.  The interaction between the two can be characterized as a challenging *racial* encounter only if one accepts the assumption of Dr. Zorwick, which is unsubstantiated in the record, that the culture of Chinese students condones being disengaged, condones reading other materials during lecture and classroom discussion, and condones being disrespectful to the professor who disapproves of such behavior.  The simple act of describing the proposition illustrates the absurdity of it.  Even if culture played a role in shaping the interactions, nothing in Dr. Zorwick's testimony tied such challenges to the fact that Dr. Lynch and Yu were of different races.  In Dr. Lynch's telling, which the Court found to be credible, Yu flatly rejected her guidance and authority.[28]

---

[28] Dr. Zorwick also testified about purportedly challenging interracial interactions between Yu and Dr. Speer at the CCCA internship.  Because Dr. Speer was not an agent or employee of ISU, this example is not relevant.  Thus, the criticism directed toward Dr. Speer does not support Dr. Zorwick's opinion that ISU engaged in aversive racism.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 59**

138.    Moreover, Dr. Zorwick's opinions about Dr. Lynch's actions are even less credible when one considers Dr. Lynch's own background.  Dr. Lynch was born in Colombia and spoke Spanish as her first language, not learning English until she was four years old.  Trial Tr. vol. 4, 47:5–13.  Dr. Lynch teaches ISU's cultural diversity course and testified at some length about some of the nuances of the course.  Trial Tr. vol. 4, 48:1–49:4.  She previously received an award for infusing diversity throughout ISU's curriculum, ensuring that diversity was included across all courses rather than relegated to being covered in just a single course.  Trial Tr. vol. 4, 49:5–23.  Yet, Dr. Zorwick's testimony did not acknowledge Dr. Lynch's experience as a person, like Yu, for whom English is a second language.  Nor did it acknowledge Dr. Lynch's own expertise in teaching the subject of cultural diversity.

139.    Next, Dr. Zorwick described examples of post-hoc explanations in this case, which she described as the strongest evidence of aversive racism.  Trial Tr. vol. 2, 168:14–177:9.  First, she framed ISU's description of "unsatisfactory progress in professional development that was first formally documented during fall semester 2011" from ISU's May 17, 2013 letter upholding Yu's dismissal (Ex. 37) as inconsistent with letters of recommendation ISU faculty wrote in 2011.  But as already discussed, Yu's dismissal from the EIRMC externship occurred after Dr. Roberts had already written his letter of recommendation and before the most problematic of Yu's internship efforts.  (Additionally, Dr. Zorwick makes no mention of the fact that ISU told Yu that the fact of his dismissal from the EIRMC internship would have to be mentioned in any subsequent internship applications.)  Moreover, the purposes of the different letters are just that – different.  Positive characteristics will be included in a letter of recommendation; issues and concerns about the lack of success in the doctoral program will be included in a letter of dismissal.  Context is key.  The Court does not agree that ISU reframed the

events of 2011 as a post-hoc justification of Yu's dismissal.  To suggest that such a reframing

was done as a post-hoc justification to dismiss Yu on the basis of race or national origin is even

more of a stretch, and simply is not credible.

140.    Second, Dr. Zorwick said it was inconsistent for Dr. Roberts to say during Yu's

dismissal proceedings that earlier on he had concerns about Yu's progress and performance, even

though he had previously signed off on Yu on independently conducting clinical research in

China and, also, applying for APPIC internships.  Here again, the Court finds no inconsistency.

The clinical research in China was approved before the concerns about Yu's clinical competency

had completely unfolded.  And when Dr. Roberts signed off on Yu's APPIC internship

application, there were concerns over Yu's clinical abilities and related issues, but they had not

yet escalated to the point of Yu being terminated from the EIRMC externship or the Cleveland

Clinic internship.  Yu's progress, including difficulties and successes, was along a continuum as

would be the case for any student in a multi-year doctoral study program.

141.    There is an inconsistency to be found, however, in Yu's expert testimony

evidence, as Dr. Zorwick criticizes Dr. Roberts for approving Yu's request to pursue

independent clinical research in China (which then became the basis for his dissertation) and

then describing Yu's shortcomings in the details of the decision to dismiss Yu from the doctoral

program.  Had Dr. Roberts not approved Yu's request to pursue the independent clinical research

in China (or not approve Yu's request to use such research for his dissertation), then – based

upon the rationale of her trial testimony – Dr. Chavez surely would have identified such

decisions as evidence of cultural incompetence.

142.    Third, Dr. Zorwick criticizes ISU for her belief that ISU focused on Dr. Speer's

negative evaluation describing the termination of Yu's CCCA internship and did not focus on

Dr. Chase's evaluation.  She suggests that the evaluations should have been treated the same, but she did not explain how they were treated differently or why they should have been treated the same.  The record is clear that Dr. Speer and Dr. Chase did not work in the same clinic and did not have the same interaction with Yu.  Indeed, the only way that such information from two different clinical professionals could be compared directly against each other would be if they were both directly involved with the student at the same time and with the same patients.  That was not the case.

143.    Moreover, Dr. Speer reported that Dr. Frazier (Yu's third internship supervisor) also had reported that Yu was not ready to care for patients and Dr. Frazier had ceased working with him.  Therefore, it would have been surprising if ISU's Department of Psychology had *not* focused on Dr. Speer's evaluation, particularly when it contained very similar themes to problems Yu had previously had in a clinical setting.  Finally, as described *supra*, Dr. Chase's evaluation was not as uniformly positive as Dr. Zorwick (or Yu) suggests, given that Dr. Chase had not yet permitted Yu to work independently with clients.  Particularly in a doctoral program with the responsibility to graduate fully qualified and competent practitioners, it is not credible to characterize actions taken by ISU after receiving such information from the clinicians working directly with Yu in his second attempt at completing an internship (after he was not selected in the APPIC matching process) as some sort of contrived "post-hoc justification" in ISU's dismissal of Yu from the program.  The CTC considered and relied on Dr. Speer's feedback in making its original decision to dismiss Yu.  Ex. 36.  It was not post-hoc aversive racism.

144.    Fourth, Dr. Zorwick perceived a post-hoc justification in ISU's statement when the decision was made to dismiss Yu from the program, that an internship in China was unwarranted because Yu might put Chinese patients at harm.  Dr. Zorwick said that ISU had not

mentioned risk of harm to patients previously, implying that the issue was raised at this point as a post-hoc justification to uphold his dismissal.  The Court agrees that ISU had previously discussed with and even recommended to Yu that he pursue an internship in China, as one of the options to him listed in the Remediation Letter.

145.    However, again Dr. Zorwick's testimony loses all credibility because she fails to acknowledge the important events that took place between those two points in time.  Regardless of whether ISU had expressly mentioned a risk of harm to patients previously, both Dr. Landers and Dr. Speer specifically and directly raised the subject.  Dr. Landers wrote in his evaluation that Yu's "deficits have made the practicum one that was not a good fit and placed him, patients, and psychology services at the hospital in a difficult position."  Ex. 46.  When asked to explain this statement on the witness stand, Dr. Landers testified that his patients were often in crisis and that some of them were considering death as a better option than life.  He regarded the care he offered as the "one shot" to improve some patients' lives and he said that mistakes in providing care could be fatal.  Trial Tr. vol. 4, 22:1–20.  He said that even if he had placed Yu on a remediation plan during the externship, there could have been dangerous consequences to patients.  Trial Tr. vol. 4, 22:21–25.

146.    Dr. Speer was even more direct – her April 2013 evaluation said starkly that Yu presented a "risk for causing harm to patients."  Ex. 529.  Thus, ISU had credible reports from two different outside supervisors that Yu's work in a clinical setting created a risk of causing patient harm.  Those serious and worrisome details were in the cement of Yu's progress in the doctoral program.  The fact that ISU did not concrete such matters until Yu's dismissal proceeding does not equate to some form of post-hoc justification.

147.    Moreover, the CTC rated Yu's professional progress in multiple instances as

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 63**

unsatisfactory.  In a clinical psychology doctoral program, unsatisfactory professional progress and supervisor's evaluations stating that a student lacks sufficient clinical competence and presents a risk of patient harm inescapably raise red flags about the prospect of patient harm if that student were to be awarded a doctoral degree and begin a clinical practice.  In the face of that information, it goes too far for Dr. Zorwick to suggest that, by including Chinese patients in that larger concern, ISU was engaging in an act of post-hoc, aversive racism, justification.  Notwithstanding the clinical research Yu had conducted on his own in China, by the time he was dismissed from the doctoral program there was ample evidence (and most importantly, from those who had worked directly with him in a clinical setting) to doubt Yu's clinical competence in a variety of patient settings.

148.    Fifth, Dr. Zorwick focuses on Dr. Landers's 2011 assessment that "[g]iven his desire to return to China and specialize in parent/child training, he is probably right where he needs to be in this regard."  Ex. 46.  She found this to be inconsistent with ISU's subsequent concern that Yu could put Chinese patients at risk.  But this example fails for the same reason as the prior one – by the time Yu was dismissed from ISU, some eighteen months after his dismissal from the EIRMC externship, ISU had significant additional and even worrisome evidence about the limitations in Yu's competence.  Moreover, Dr. Zorwick reads too much into Dr. Landers's remarks, given that he qualified them with the word "probably" and was speaking to Yu's status as a fourth-year student in an externship and not a fifth-year student – who should be capable of almost independent work – heading into an internship.  Not only had Yu not completed an internship at that time, he had been unable to successfully complete an externship.

149.    Sixth, Dr. Zorwick faults ISU for what she characterizes as a misrepresentation of Yu's GRE scores in dismissing him from the program.  In response to a complaint Yu filed with

the American Psychology Association about his dismissal from the ISU doctoral program, ISU said it was concerned at the time of considering his admission about his "poor GRE Verbal score (410; 34th percentile) and his poor GRE Analytic Writing score (3.5; 18th percentile)."  Ex. 41, Bates-numbered page "ISU Document 0197."  Dr. Zorwick said schools commonly consider the highest score on each section to maximize a student's score, but ISU did not do so here.  She framed this as a pattern of misremembering a person as being worse than he was, which indicates aversive racism.  Because Yu's complete GRE scores are not in the record, the Court cannot evaluate the accuracy or substance of Dr. Zorwick's claim that ISU misrepresented Yu's GRE scores.  But there is no reason to doubt that Yu did in fact earn the GRE scores reported in Exhibit 41.  The Court further finds that it would not be surprising or improper for an admissions panel to discuss concerns related to students who had earned such low-percentile scores – even if they did better on a different attempt at the test.  Finally, here again, Dr. Zorwick would measure the University against an impossible to satisfy metric.  In other words, she would also be critical of the University if they had chosen *not* to admit Yu to the program based in whole or in part upon the poor scores on the verbal and analytic writing portions of the GRE.

150.    Seventh, Dr. Zorwick testified that ISU's decision to offer to award Yu with a master's degree instead of a doctorate, after he had successfully defended a doctoral dissertation, is a post-hoc justification that minimizes the quality of the work he had completed.  Once again, Dr. Zorwick's search to find evidence of aversive racism leaves no room for an innocuous, and here more sensible, explanation.  To begin, Yu did not complete the requirements for a Ph.D.  Of particular importance, in a program leading to a degree in *clinical* psychology, he did not complete the year long, 2000 hour, internship which is the final demonstration of his qualifications to gain such a degree, and practice such a profession.  Put simply, Yu didn't earn a

doctoral degree.

151.    However, it was reasonable for ISU to evaluate whether awarding a different or lesser degree would be appropriate even if not obligatory.  Doing so does not diminish the work the student had successfully completed; rather, it is, as ISU communicated to Yu, academic recognition of the work he did successfully complete.  At any rate, neither party pointed to any evidence in the record regarding whether the award was pursuant to a policy or was otherwise consistent or inconsistent with how other students are treated.  Hence, the fault lines of much of Dr. Zorwick's testimony are also found here – that is, to be consistent with her logic she would need to criticize ISU of aversive racism if ISU had *not* offered Yu a master's degree.  Moreover, even if ISU's offer of a master's degree did show a post-hoc justification, there is no evidence whatsoever that it was based on Yu's race or national origin.  But the Court does not agree with any notion that ISU's offer of a master's degree somehow implied that Yu, or his dissertation, or his other successes in the program were somehow unworthy or devalued or, further, that any such decision was evidence of intentional discrimination.

152.    Fundamentally, the Court does not find that ISU engaged in any post-hoc justifications with respect to Yu or the decision to dismiss him.  Dr. Lynch credibly testified that "[w]e were collecting or forming our understanding of Yu's competency across time, particularly his last two years."  Trial Tr. vol. 4, 69:20–24.  The decision to dismiss Yu was made after he had repeatedly failed to demonstrate satisfactory professional progress and clinical competency, with concerns of a serious nature having been raised about his working directly with patients. The dismissal proceeding called for a review of the available data about his performance, in a setting where the ISU faculty could, and did, evaluate such data holistically.  Nothing about such a process constitutes post-hoc justification, and nothing in Dr. Zorwick's testimony persuades the

Court that this process included intentional discrimination evidenced by post-hoc justifications.

153.     Even if the theory of aversive racism can be supported by the presence of what Dr. Zorwick describes as the five "hallmarks" of aversive racism, her testimony about supposed specific examples of such "hallmarks" simply are not persuasive against the testimony of those who were involved in the events and within the context of a doctoral program in clinical psychology.  Many of her examples fall apart under the barest scrutiny.  Even those that survive scrutiny lend only marginal support to her assertion that Yu is a victim of aversive racism.  Most significantly, nothing in Dr. Zorwick's testimony persuades the Court that ISU discriminated against Yu on the basis of his race or national origin or that if ISU did discriminate against him that such discrimination was intentional.

154.     For his last witness, Yu called Dr. Tyler Bowles, an economics expert, to testify as to Yu's alleged damages, primarily in the form of earnings he alleges he will lose over his working lifetime because he was not able to complete a doctoral degree.  Because the Court concludes that Yu has not proven ISU's liability under his Title VI claim, factual findings regarding Yu's alleged damages are unnecessary.  Therefore, Dr. Bowles's testimony will not be further discussed.

**H.  Evidence Regarding Other ISU Students.**

155.     Yu took the witness stand a second time during trial to testify regarding ISU's treatment of allegedly similarly situated students.  He testified that he was the only Chinese national student in ISU's clinical psychology doctoral program while he was enrolled.  Trial Tr. vol. 3, 3:14–16.  He discussed several students, identified anonymously by number.

156.     With respect to Student 55 (Trial Tr. vol. 3, 4:13–7:19), Yu highlighted that in a

Fall 2012 semi-annual evaluation (Ex. 19)[29] the CTC noted the student had not made progress on the thesis and warned that "[f]ailure to defend the thesis this spring would result in a U grade and probationary status."  In a subsequent evaluation in Spring 2013 (Ex. 11), Student 55 was awarded a 'U' (for "unsatisfactory") grade in the research credit for that semester.  The evaluation notes that "[i]n accordance with Clinical Student Handbook procedures (Handbook, pp. 12–13), the U-grade carries with it an automatic academic probation."  The evaluation further states that if Student 55 did not successfully defend the thesis by the end of the Fall 2013 semester, departmental policy would have the CTC recommend dismissal from the program.

157.    In the Fall 2013 semester, Student 55 not only failed to successfully defend the thesis, but also earned a 'C' (that is, failing) grade in an academic course.  (Ex. 12.)  Per Student 55's Fall 2013 CTC evaluation, the thesis advisor asked the committee to reconsider its prior decision to raise the question of dismissal.  Based on the advisor's advocacy, the CTC was persuaded to allow the student another attempt to defend the thesis in January 2014.  The evaluation also warned, and Yu's testimony highlighted, that a second 'C' grade in the same course could result in dismissal from the program.

158.    Student 55's academic transcript appears in the record as Exhibit 108.  The student ultimately was awarded a Ph.D. degree, despite the fact of two failing grades in the Spring 2013 semester.

159.    Yu testified that he was treated differently than Student 55 in that Yu was never

---

[29] Per the Court's Protective Order (Dkt. 46), ISU disclosed certain student records with identifying information other than race and national origin removed.  Hence, each anonymous student is assigned a number.  The Court presumes that Yu testified accurately as to which exhibits relate to which students, as the Court cannot independently confirm such relationships based on the record.  In making such a presumption, the Court notes that ISU did not object to Yu's representations about how these exhibits relate to each other.

warned he was at risk for dismissal prior to being dismissed, while Student 55 received a total of

three warnings and was not dismissed.  Yu also pointed out that Student 55 received two failing

grades, which meets the criteria for dismissal according to the graduate catalog.  Trial Tr. vol. 3,

7:10–19.

160.     Student 55's academic records demonstrate that, despite issues with academic

progress, including with the thesis, the student's professional progress was on track.  In Fall 2012

and Spring 2013, the CTC found professional progress to be satisfactory but academic progress

to be unsatisfactory.  (Exs. 19, 11.)  Summaries of the supervisor evaluations for seven clinical

placements included just one "below expectations" rating.

161.     Therefore, the Court finds that Student 55 was not similarly situated to Yu,

because among other reasons, Yu's time at ISU was marked primarily by his lack of professional

progress rather than a lack of academic progress.  Yu successfully and timely defended his

dissertation and he never earned a failing grade in any academic courses.

162.     Next, Yu testified regarding Student 37.  Trial Tr. vol. 2, 7:20–13:21.  On October

3, 2014, Dr. Roberts sent this student a letter (Ex. 8) warning that the student would receive an

"unsatisfactory" grade if the student made no progress during the Fall 2014 semester in an

assigned literature search related to the student's thesis proposal.  The letter noted that such a 'U'

grade would result in a "request for a remediation plan that will include dismissal for failure to

adequately respond to the remediation plan" and it included a quotation of the policy from the

Clinical Student Handbook.  Near the end of the letter, Dr. Roberts wrote, "[y]our success is our

success!"

163.     Student 37's annual CTC evaluation for the 2014–2015 academic year included a

remark that "[w]ere [the student's] thesis not successfully proposed by the end of fall semester,

2015, the committee will consider convening the faculty to vote on program dismissal for lack of satisfactory progress toward degree completion." (Ex. 9.) Yu testified that Student 37 earned a 'C-' in one course during Spring 2013, based on a January 12, 2015 letter Dr. Roberts sent the student (Ex. 105). When mentioning this, the letter pointed out that "the ISU Graduate School considers any C or worse as … failing for students pursuing a graduate level program or degree" and it warned that two or more grades of 'C+' or below could result in program dismissal. Yu also referred to a portion of the letter stating that "[i]t is our program's responsibility to fully inform you of expectations and the consequences for failure to address concerns, but recall what was stated in your October 3rd letter: 'Your success is our success!' The Clinical Training Committee and I will do whatever we can to help you succeed. Please seek out help at any point this spring."[30]

164.    Student 37 was placed on a formal Plan of Remediation on January 25, 2016 (Ex. 106). Both the Plan of Remediation and Student 37's next CTC annual evaluation, dated June 28, 2016 (Ex. 10), show a 'C' in another course. Yu testified that because this was the second 'C' the student had earned in the program, it could be considered grounds for termination from the program under ISU policy. However, instead of initiating dismissal proceedings, the CTC said that it "is confident that [Student 37] can do the work required for the program and support [the student's] continued efforts." The evaluation then said that a grade of 'C+' or worse in remaining coursework would force the CTC to consider dismissal from the program.

165.    Yu testified that Student 37 was provided multiple warnings of risk of dismissal and was provided a very detailed plan of remediation, while Yu was never warned of a dismissal

---

[30] Although Yu did not testify about other aspects of Exhibit 105, the Court notes that the student's professional progress was called into question based on several "below expectations" ratings by site supervisors. At the time, Student 37 was a second-year student.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 70**

risk and never provided a plan of remediation.  Trial Tr. vol. 3, 13:16–21.

166.    The Court finds that Yu and Student 37 were not similarly situated.  Student 37's warnings of a dismissal risk and remediation plan were premised on that student's poor academic performance.  Yu's academic (as distinct from professional or clinical) performance was satisfactory throughout his time as an ISU student.

167.    Next, Yu testified about Student 29 (Trial Tr. vol. 3, 13:22–15:8).  Exhibit 18, a Fall 2006 CTC semi-annual evaluation of the student's progress, shows that the student earned a 'C' grade in a course and was placed on academic probation.  Yu testified that he was treated differently in that Yu was never placed on academic probation prior to his dismissal.

168.    A similar situation exists with respect to Student 22.  Trial Tr. vol. 3, 15:9–23. When the student had to retake the written portion of the Qualifying Exam in January 2005 and several of the essays were considered marginal, the student was placed on academic probation. Ex. 17.  Yu testified that he was treated differently than Student 22, again, because Yu was never placed on academic probation.

169.    Neither Student 29 nor Student 22 were similarly situated to Yu because in both cases the students were placed on academic probation because of academic, but not clinical competency, problems.

170.    Yu testified that Student 20's (Trial Tr. vol. 3, 15:24–17:22) CTC semi-annual evaluation for Fall 2012 indicated that the student was struggling to administer certain tests that were assumed to be in the student's repertoire.  Ex. 5.  The evaluation noted that Student 20's progress was unsatisfactory in both the academic and professional categories and the student had earned 22 "below expectations" ratings in a practicum and in an assistantship that semester.  Yu quoted a portion of the evaluation saying that if Student 20's "progress remains unsatisfactory

the committee will consider placing [the student] on academic probation, beginning in May

2013.  Specific performance goals for the summer and fall semesters of 2013 would be specified.

Were progress toward degree completion continue to be deemed unsatisfactory throughout

summer and fall semesters of 2013, the Graduate Faculty of the Psychology Department would

be asked to vote to consider program dismissal."  Yu observed that Student 20's academic

transcript reflects an "academic warning" for the Fall 2012 semester.

171.    Yu did not say how he was treated differently than Student 20, but a review of

Yu's academic transcript (Ex. 33) does not show any academic warning.  But it is clear from

context that Student 20 was warned about *academic* probation because the *academic* progress

was unsatisfactory.  Yu's academic progress was uniformly satisfactory.  Yu was not similarly

situated to Student 20.

172.    Yu next testified about Student 16 (Trial Tr. vol. 3, 17:23–21:10), who was

dismissed from an externship by a site supervisor in October 2007.  Ex. 101.  Per the record,

Student 16 failed to show up for a scheduled shift at the externship, leaving clients as well as

another student or supervisor in the lurch.  As a follow up, Dr. Roberts sent a letter to the student

dated November 9, 2007 (Ex. 102) warning that "if a subsequent dismissal from any

programmed sanctioned activity were to occur, the Clinical Training Committee would forward a

recommendation to the Psychology Department faculty that you be dismissed from the graduate

program in clinical psychology."  Student 16's CTC semi-annual evaluation for Fall 2007

similarly indicated that the CTC would "determine its recommendation to the Psychology

Department Faculty in May 2007, regarding continued retention in the doctoral training program

or dismissal from the program."  Ex. 4.  Yu noted that Student 16's academic transcript (Ex. 103)

did not reflect dismissal from an externship.  He testified that for the Fall 2007 semester there

should have been a course called PSYC 748 externship for which [the student] should have

received a 'U' grade, but there is no such entry on the transcript.  Based on these facts, Yu

testified that he was treated differently than Student 16 in that he was never warned he was at

risk of dismissal and he was assigned a 'U' grade upon his dismissal from an externship, while

Student 16 was warned of a risk of dismissal and was not assigned a 'U' grade after dismissal

from an externship.

173.    The exhibits relating to Student 16 show that the externship dismissal was based

on absenteeism and "repeated poor communication regarding absences."  Ex. 102.  The content

of the exhibits appears intentionally vague, but the student was informed that the CTC "is aware

of significant stressors in your personal life that have surely contributed to your … absences"

and the CTC invited [the student] to consider taking a leave of absence from the program until

certain personal issues were resolved.  Moreover, the practicum supervisor, Dr. Dickey, noted

"some difficulty in meeting professional responsibilities due to some personal problems."  Ex. 4.

174.    The Court is not persuaded, on balance and as the finder of fact, that Student 16 is

similarly situated to Yu.  Student 16's issues stemmed from personal issues, rather than relating

to academic performance.  Hence, the student is perhaps more closely aligned with Yu than the

other students Yu mentioned, but nothing in the exhibits about Student 16 indicates that

supervisors were concerned with professional competence as a clinical psychologist in training

except related to attendance and giving advance notice about absences.  Although the exhibits

describe this as a "communication skill," the concern relates to Student 16's professionalism

rather than questions as to the capacity to perform the basic functions of a clinical psychologist,

as in Yu's case.  Moreover, the exhibits show that some outside factor in Student 16's personal

life significantly impacted the student around the time of the student's externship dismissal.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 73**

Yu's externship dismissal, in contrast, was the result of shortcomings in his clinical competence that related directly to the work he was expected to perform and to the health and safety of his supervisor's clients.  Nothing in Student 16's exhibits suggests an inability to carry out the work expected of the student when the student was working.  Yu, on the other had (as expressed by Dr. Landers and others) was dismissed because it was perceived that he was not capable of doing the required work.

175.    Even if Student 16 and Yu were similarly situated, they were not treated differently.  Based on Yu's testimony, the Court would expect to find a 'U' grade on Student 16's transcript for the Fall 2007 semester, but the exhibit does not show a 'U' grade for the semester.  Yu bears the burden of persuasion, and his testimony is the only evidence on this point.  Yu had Student 16's records for at least a year before trial, so he had ample time to investigate further into this apparent discrepancy; still, he introduced no other evidence related to the transcript.  The Court will not assume why the transcript does not show a 'U' grade.

176.    Student 13 was the next subject of Yu's testimony.  Trial Tr. vol. 3, 21:13–22:5.  Yu testified that the CTC's Fall 2005 semi-annual evaluation of Student 13's progress (Ex. 16) showed that Student 13 was on academic probation but was not dismissed, while Yu was never put on academic probation and was dismissed.

177.    Finally, Yu testified regarding Student 3.  Trial Tr. vol. 3, 22:6–23:17.  Reading from a letter from ISU to Student 3 dated July 13, 2012 (Ex. 2), Yu testified that ISU warned the student that "academic performance needs to improve dramatically in the fall semester to avoid a possible dismissal or other consequences as stipulated by the Graduate School."  Reviewing Student 3's CTC semi-annual evaluation for Spring 2012 (Ex. 14), Yu testified that Student 3 was required to be placed on academic probation until a failing grade was remediated by retaking

the test.  Yu testified, again, that he was treated differently in that this student was warned of being at risk for dismissal and was placed on academic probation, while Yu was dismissed without warning and without being on academic probation.

178.     On cross-examination, Yu said that he never received a grade lower than a B in any course work or practicum.  When asked to distinguish poor academic progress from poor professional progress, Yu testified that he believed professional progress was, or should be, a component of academic progress and therefore poor professional progress could or should result in academic probation.  But when pressed to identify an ISU policy or other evidence showing that *academic* probation can be a consequence of unsatisfactory *professional* progress, Yu could not do so.  Trial Tr. vol. 3, 24:11–36:15.  He stated repeatedly that there was a policy, but his belief was based on his interpretation of a printed ISU policy on grading that appears in the ISU Department of Psychology Clinical Student Handbook (Ex. 94).  The version of the Clinical Student Handbook in the record as Exhibit 94 is from the 2015–2016 academic year.[31]  Yu testified as to a policy from the 2011 Clinical Student Handbook, but he did not put that document in evidence.  Accordingly, the only relevant documentary evidence available for the Court to review regarding a policy allegedly contained within the 2011 Clinical Student Handbook is the 2015–2016 Clinical Student Handbook.  Within the 2015–2016 Clinical Student Handbook, the following text appears under a section entitled "Grading":

> Students are expected to earn As or Bs in all graduate courses.  A grade of C or less is considered inadequate in any graduate course that fulfills requirements for either the MS or PhD degrees.  A student earning a C or less in any graduate course will be automatically placed on academic probation by the Psychology Department and required to retake the course at the earliest possible time.  Failure to earn an A or B upon retaking the course may be considered grounds for program

---

[31]   An excerpt of a similar but not identical Clinical Student Handbook appears as Exhibit 112, but the Court cannot discern its date.  Regardless, the excerpt does not contain a policy on grading or academic probation.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 75**

dismissal.  Multiple C grades in graduate courses, despite subsequent remediation, may also be construed by the departmental faculty as evidence of unsatisfactory progress toward degree completion.

Students registered for thesis (PSYC 6650) or dissertation (PSYC 8850) credits will be graded S ("Satisfactory"), IP ("In Progress") or U ("Unsatisfactory") every semester by their research advisor.  Prior to the actual defense of the research, it is important that students actively earn an S-grade each semester by making persistent, positive, and timely contributions to their own research or to team research.  An IP-grade is given for noticeable, but minor problems in research contribution and/or progress.  All IP-grades will be changed to S-grades upon the successful defense of the thesis or dissertation.   Unsatisfactory research performance indicates a failure to contribute and/or progress, despite repeated informal discussions with the research advisor or a prior IP grade.  If a student is at risk of earning a U-grade, the Clinical Training Committee will be informed by the research advisor prior to the end of the semester, and a formal letter will be issued that describes the nature of the unsatisfactory progress, the steps needed to remedy the deficiency, and a deadline for re-evaluation.  Failure to meet the specified remediation plan will result in a U-grade and subsequent academic probation. Probation will be lifted upon semester-long performance yielding an S-grade.

Clinical Student Handbook 16 (Ex. 94).  When ISU Counsel read from what he represented to be the 2014 Clinical Student Handbook while cross-examining Yu, the portions he read aloud were materially identical to the excerpt printed above.[32]

179.     Yu contends that he should not have been dismissed without having first received a written warning or being put on academic probation.  He interprets the grading policy as requiring him to have been placed on academic probation at some point, presumably after either his dismissal from the EIRMC externship by Dr. Landers or his dismissal from the CCCA internship by Dr. Speer.  But he failed to show either that academic probation was required under the policy listed above or that there was some other policy under which academic probation was required.

180.     The Court has considered both circumstances.  If there was some other policy

---

[32] ISU Counsel also represented that the 2011 version was not different, but counsel's assertion is argument, not evidence.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 76**

under which academic probation was required, Yu's position is unpersuasive because he has not introduced persuasive evidence that such a policy existed and mandated academic probation in his case. On the other hand, if Yu was subject to the grading policy quoted above, his position is unpersuasive because he has not shown that his externship or internship were contemplated by such policy.

181.    The first paragraph of the grading policy refers to "graduate courses" but does not expressly define the term. The lack of a definition creates a potential ambiguity, in that a student could believe that externships and internships are "graduate courses" because graduate students enroll with ISU to earn credit for such placements. However, this interpretation is foreclosed by the fact that the very first sentence of the policy states that "[s]tudents are expected to earn As or Bs in all graduate courses." Thus, context clarifies that graduate courses must mean only those courses for which A and B grades are available. This excludes courses that use a different grading scale – such as the S ("Satisfactory"), IP ("In Progress"), or U ("Unsatisfactory") grading scale referenced in the policy's second paragraph.

182.    The second paragraph of the grading policy, which uses the S/IP/U grading scale, by its terms applies only to thesis or dissertation credits. Although clinical placements in externships or internships use the same S/IP/U grading scale,[33] the language in this paragraph focuses directly and exclusively on research and defense of a thesis or dissertation. Both

_____

[33] Yu's academic transcript reflects that he earned a U (rather than a C or other failing grade on the "graduate courses" grading scale) for both his clinical externship in Fall 2011 and his clinical internship in Spring 2013. Ex. 33. Other students' academic transcripts that appear in the record also show use of the S/IP/U scale for externships and internships during 2006–2007 and 2010–2014. Exs. 6, 103, 107. Moreover, the 2015–2016 Clinical Student Handbook states, in a section entitled "Internship," that "[s]tudents will receive an IP (In Progress) grade for each semester until the internship is completed. Upon receipt of a copy of the internship certification of satisfactory completion … internship grade(s) will be changed from IP to S (Satisfactory)." Ex. 94 at 33.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 77**

paragraphs of the policy specify that poor performance in either type of course – "a C or less in any graduate course" or "[u]nsatisfactory research performance" followed by "[f]ailure to meet the specified remediation plan" in a thesis or dissertation course – will result in academic probation.  Neither paragraph contemplates clinical placements in externships or internships, or the consequences of receiving a failing grade in such a placement.

183.    Thus, aside from Yu's unpersuasive testimony, there is simply no evidence in the record that dismissal from an externship or internship necessitates – or even permits – putting a student on academic probation.  To the contrary, Dr. Roberts testified persuasively that ISU distinguishes between academic and professional courses and development, which is borne out both by the Clinical Student Handbook and by the numerous CTC student evaluations – for Yu as well as other students – separately assessing students' academic progress and professional progress.

184.    Yu was never placed on a formal Plan of Remediation (*see supra*, ¶¶ 43–44) or warned that he was at risk of dismissal due to unsatisfactory professional progress.

185.    Dr. Lynch credibly testified that ISU has been successful in working with at least two other international students.  Trial Tr. vol. 4, 50:2–22.  A Romanian national who had been speaking English for approximately five years prior to enrolling at ISU successfully completed the program, and a Czechoslovakian national who speaks English as a second language is a current student.  The Czechoslovakian national has a strong accent but nonetheless communicates very effectively, did very well with clients in a practicum, and so far has done well in the program.

186.    Yu's testimony regarding the other students he mentioned does not establish that he was treated differently than similarly situated students.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 78**

187.     However, Yu testified that he never received any internship records for other students that would allow him to evaluate whether he was treated differently than other similarly situated students.  Trial Tr. vol. 3, 39:10–39:21.  Prior to trial, this Court ruled that ISU failed to produce relevant evidence regarding student records and it granted Yu's motion in limine seeking an adverse inference against ISU.  (Dkt. 154.)

188.     Because of this adverse inference, the Court finds that Yu was treated differently than similarly situated students.  However, when considered together with the other evidence presented at trial, the Court finds that there is insufficient evidence that, when considered along with the adverse inference that Yu had been treated differently than similarly situated students, would lead to a factual conclusion that ISU intentionally discriminated against Yu on the basis of race or national origin.

## CONCLUSIONS OF LAW[34]

1.     The Court has proper jurisdiction over the parties and the subject matter of this action.

2.     The Court has previously issued rulings that dismissed all but one of Yu's claims for relief against ISU.  The only remaining claim alleges a violation of Title VI, 42 U.S.C. § 2000d.

3.     Title VI of the Civil Rights Act of 1964 states that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

---

[34] To the extent any of the Conclusions of Law stated in this section might also be considered Findings of Fact and are not already stated in that section, they are incorporated by this reference into the Findings of Fact as well.

4.      To prove Title VI discrimination, Yu must show by a preponderance of the evidence that: (1) he was "subjected to discrimination" due to "race, color, or national origin," (2) by a "program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

5.      Such discrimination must be intentional to be actionable under Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 280–281 (2001).

6.      At all relevant times, ISU was a "program or activity receiving Federal financial assistance" for purposes of satisfying the elements of Title VI.[35]  Thus, the second element of Yu's Title VI claim is satisfied.

7.      To satisfy the first element of his Title VI claim, Yu must prove he was discriminated against in the educational context.  This requires proving "membership in a protected class, meeting the school's legitimate educational expectations, an adverse educational action and worse treatment than that of similarly situated students not in the protected class." *Joseph v. Boise State Univ.*, 998 F.Supp. 2d 928, 944 (D. Idaho 2014) (quoting *Brewer v. Bd. of Trustees*, 479 F.3d 908, 920 (7th Cir. 2007)).

8.      As a Chinese national, Yu is a member of a protected class.  His race and his national origin are each a protected characteristic.

9.      Yu has not proven that he met ISU's legitimate educational expectations.  The record contains a preponderance of evidence, both in contemporaneous documents and in trial testimony, that Yu's professional progress was unsatisfactory and that he lacked clinical competence in key areas.  The evidence presented in this case failed to persuade that Yu was dismissed for any reason other than his inability to gain, or to demonstrate, the degree of clinical

---

[35] In its Memorandum Decision and Order (Dkt. 149), the Court previously took judicial notice of such a conclusion.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 80**

competence expected of a fifth-year clinical psychology doctoral student.

10.     Yu's dismissal by ISU was an adverse educational action.

11.     Pursuant to an adverse inference, Yu has established that he was treated worse than similarly situated students not in his protected classes.

12.     Yu has not proven that any of the evidence upon which he relies, in the form of alleged actions or inactions of ISU directed toward or otherwise affecting his enrollment and progress in the doctoral clinical psychology program, were actions or inactions intended to discriminate against Yu on the basis of race or national origin.

13.     Accordingly, Yu has failed to prove all of the elements of his claim for unlawful discrimination under Title VI.

14.     Because Yu has failed to prove his claim, no conclusions regarding his alleged damages, or mitigation thereof, are necessary.

15.     The Defendant, Idaho State University, is entitled to judgment in its favor, with Plaintiff Jun Yu to take nothing on his claim.

## **FINAL DISCUSSION**

The scope of the trial in this matter was limited to Yu's Title VI claim alleging unlawful intentional discrimination. Although Yu had asserted due process violations and other claims, those claims were dismissed on summary judgment and only the Title VI claim remained at trial. Yu's trial presentation did include evidence regarding ISU's alleged due process violations and ethical violations, but only because such evidence might be relevant to actions or inactions of ISU as pertained to the intentional discrimination claim under Title VI.

Yu's claim fails because there is a shortfall of persuasive evidence, either direct or circumstantial, that his dismissal was motivated in any way to intentionally discriminate against

him because of his race or national origin.  Yu contends in his closing argument that he was the victim of "linguistic discrimination" because numerous faculty and supervisors remarked on his ability to speak English.  But the simple reality is that Yu enrolled himself in a course of study that required him to relate to patients or clients who were most often native English speakers, and in a field of study in which the ability to communicate clearly and to understand clearly are especially important skills.  Yu speaks English relatively well, but he also does so in a "halting" and "choppy" manner which can make him difficult to understand.  It was entirely appropriate for ISU faculty to discuss Yu's fluency in English (or limitations to the same), both among themselves and with Yu directly, because it became an issue in his course of study.  Indeed, and consistent with a theme running throughout this case, ISU might just as easily have courted trouble had it *not* raised issues with Yu about his English fluency.

Title VI does not directly protect against linguistic discrimination, although it is well established that language, including accent and speech patterns, can serve as a proxy for national origin.  But the Court is not persuaded that ISU treated Yu's English-speaking ability as a proxy to discriminate against him based on his race or national origin.  Rather, the evidence shows the opposite is true:  Yu's application to ISU was welcomed because it presented an opportunity to grow the program's diversity.  Each reference to his spoken English related in some manner, either expressly or implicitly, to his difficulties demonstrating clinical competence, including a difficulty in establishing rapport and forming therapeutic relationships with English-speaking clients.

Yu was always ready to credit the good judgment of his professors and clinical supervisors when they praised him or gave him high marks.  That is perfectly understandable.  Less understandable was his unyielding insistence that those same persons were wrong or unfair,

or both, when he received lower marks or constructive criticism, or when, as happened, he was dismissed from a clinical externship or internship.  Such compartmentalization of his academic and clinical grading and feedback was further evidence of the lack of self-awareness that several of his professors commented upon.  This lack of self-awareness, accompanied by his refusal to consider whether he had shortcomings in his clinical interaction, no doubt contributed to his inability to complete the necessary requirements of the doctoral degree he sought.  He did not respond to direct, constructive criticism with a commitment to examine how he might do better or an examination of what he needed to change to be successful.  Instead, the evidentiary record, found in Yu's testimony and in the testimony of the professors and clinical psychologists who worked with Yu, revealed someone who didn't want to hear that there were any shortcomings in his work.  Put bluntly, the Court's objective assessment of the evidence on such matters led to a conclusion that Yu's response was more often a stubborn denial of any shortcomings, apparently from a lack of self-awareness and self-reflection.  Hence, the Court was not surprised to hear from Dr. Lynch that in all her years of teaching, she had never felt such disrespect from a student as she did from Yu.

Yu's theory of the case is that he was deprived of his doctoral degree on the eve of graduation, having satisfied every requirement except one – his clinical internship.  But the clinical internship is no small feat – it is a capstone experience to the program, requiring 2,000 clinical hours over 11 months.  Yu completed only about three months of his internship before he was dismissed.  Although he had met all other requirements, including successfully defending his dissertation, he was not as close to graduating as he asked the Court to believe.

Dr. Lynch testified quite credibly and compellingly about the important role of the ISU Clinical Training Committee to act as the "gatekeeper" for students seeking a doctoral degree

who would then go into the larger community to work with patients as clinical psychologists. The granting of a doctoral degree, she said, is an affirmation to the community that the graduate possesses the skills and knowledge to do the work of a clinical psychologist. She said that dismissing a student from a graduate program is not the university's goal and is not an easy situation for anyone involved. But she said, with sincere credibility, that dismissal from the program is required when the university, as represented by its faculty, lacks confidence that the student is competent to practice clinical psychology. She also testified that faculty members in a doctoral program are not alchemists. They cannot conjure a competent clinical psychologist out of a student who has shortcomings in relevant areas of expertise even after repeated efforts to provide the student with the tools and opportunities to achieve and demonstrate competency. The ISU faculty were concerned that Yu could put patients at harm. That concern was first raised and then, regrettably, validated by the shortcomings of his work in multiple clinical settings.

The inquiry all but ends there. ISU concluded that Yu was not qualified to continue his education in the clinical psychology program. ISU argues that its decision should be given deference by the Court. The parties dispute whether ISU's academic decisions are entitled to deference. ISU relies upon decisions holding that faculty and officials of public universities are best positioned to evaluate whether a student is fit to continue his or her education at the institution. Def.'s Closing Arg. 2 (Dkt. 179) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226–228, 230 (1985); *Bishop v. Wood*, 426 U.S. 341, 349 (1976); *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89–90 (1978)). Yu, quoting *Ewing*, argues that such deference does not apply because ISU substantially departed from accepted academic norms:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 84**

> judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Ewing*, 474 U.S. at 225 (footnote omitted).

This language suggests that such deference is required every time a "genuinely academic decision" is under review.  The court rulings relied upon by ISU all involve due process challenges to academic dismissals; none involve claims of unlawful discrimination under Title VI.  Although the reasoning of the cases draws upon similar policy reasons as could be argued to be present in this case, there is no binding authority requiring the Court to give such deference here.  And, it is not plain that academic deference should apply in this case.  Ultimately, however, the Court concludes that ISU should prevail in the case, with or without deference being given to its academic dismissal decisions.  The Court does make note, however, of a passage from Justice Powell's concurring decision in *Ewing*: "University faculties," wrote Powell, "must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation."  *Ewing*, 474 U.S. at 225 n.11 (quoting *Horowitz*, 435 U.S. at 96 n.6 (Powell, J., concurring)).  Justice Powell also opined that the student in *Horowitz* "was warned of her clinical deficiencies and given every opportunity to demonstrate improvement or question the evaluations."  *Horowitz*, 435 U.S. at 93 (Powell, J., concurring).

Those are the facts of this case.  One element Yu was required to prove to prevail on his Title VI claim was that he was eligible to continue in his education.  The Court is persuaded that the ISU faculty and officials involved in the decision to dismiss Yu were properly exercising their professional judgment as to Yu's eligibility to continue his studies at ISU.  The Court is not persuaded that, in making such a decision, they substantially departed from accepted academic

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 85**

norms.[36]

The Court reaches its decision without giving deference to ISU's academic decisions, notwithstanding the similarities of this case to the *Ewing* decision.  The Court is well satisfied that ISU's actions were justified, were the product of proper and careful decisions, and were not the product of intentional discrimination on the basis of race or national origin.  ISU put forth persuasive evidence that Yu lacked clinical competency even after years of training and numerous opportunities to improve.  Yu, who bore the burden of persuasion, did not put forth persuasive evidence to prove all the elements of his claim under Title VI, 42 U.S.C. § 2000d, which prohibits intentional discrimination on the basis of race or national origin.

For these reasons, Yu cannot prevail on his claim.  He has pursued this claim for many years, along with his counsel, and with the support of his wife and friends.  It will be a bitter pill to receive this result and he has the right, of course, to pursue an appeal.  It is evident that he feels he was not treated fairly by ISU, but his was the same fair chance as that given to every other student in the doctoral program.  Many students, but not all, are able to convert that fair chance into the responsibility and privilege of working as a clinical psychologist with a doctoral degree.  Mr. Yu was not able to do so, but fairness is not a guarantee that he would do so.  And, for the reasons described in this decision, there is nothing that ISU did that rose to the level of intentional discrimination on the basis of Yu's race or national origin that prevented him from

---

[36] There was considerable criticism thrown the way of the ISU Department of Psychology and the University in this case.  Dr. Koocher, in particular, had a myriad of criticisms, even though their relevance to the intentional discrimination claim was attenuated at best, and it seemed to this Court that as with Drs. Chavez and Zorwick, Dr. Koocher also spent too little time seeking to learn more about the University, the department, its professors, and its students, so as to then make a more considered judgment about where and if such criticism might be deserved.  Even so, there were pieces of criticism which, although not meeting the measure of proof required of Yu to prove his case, still should be considered by the University as its own measure of constructive criticism resulting from this case.

**TRIAL DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW – 86**

pursuing that fair chance.

## <u>ORDER</u>

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendant Idaho State University is entitled to judgment in its favor.  The Court will issue a judgment in due course, after which the Clerk of the Court is directed to close the case.



DATED:  May 31, 2020

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge